1              IN THE UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF TENNESSEE, COOKEVILLE DIVISION

3   ------------------------------------------------------------

4   ILIGHT TECHNOLOGIES,            )

5              Plaintiff,           )

6                                   )

7   v.                             )  CASE NO. 2:06-0025

8                                   )

9   FALLON LUMINOUS PRODUCTS,       )

10             Defendant.           )

11  ------------------------------------------------------------

12                  TRANSCRIPT OF PROCEEDINGS

13                        VOLUME V

14  ------------------------------------------------------------

15  DATE:              April 24, 2009

16  TIME:              9:00 A.M.

17  BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

18                     And a Jury

19  ------------------------------------------------------------

20

21

22

23  COURT REPORTER:    PEGGY G. TURNER
                       OFFICIAL COURT REPORTER
24                     801 BROADWAY, ROOM A-837
                       NASHVILLE, TENNESSEE 37203
25                     PHONE:  (615)726-4893
                       Peggy_Turner@tnmd.uscourts.gov

```
 1                    A P P E A R A N C E S:

 2    For the Plaintiff:   Timothy J. Vezeau
                           Stephen Price
 3                         Melissa Hunter
                           Bill Ferrell
 4                         John Scruton

 5    For the Defendant:   Mark Kittredge
                           Jonathan Rose
 6                         Samuel Lipshie
                           Brandy McMillion
 7                         Douglas Sawyer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    W I T N E S S E S:

 2   WALTER BRATIC
     Continued Statement by Mr. Bratic          Page 478
 3   Cross Examination by Mr. Lipshie           Page 496
     Redirect Examination by Mr. Price          Page 558
 4
     ERIC ERIKSSON
 5   Video Deposition of Eric Eriksson          Page 567

 6   TIMOTHY FALLON
     Video Deposition of Timothy Fallon         Page 576
 7
     TIM DEMMOND
 8   Video Deposition of Tim Demmond            Page 595

 9   DOUG BAGIN
     Video Deposition of Doug Bagin             Page 603
10
     RICHARD HUO
11   Video Deposition of Richard Huo            Page 622

12   CHARLES RICHARD NELSON
     Direct Examination by Mr. Kittredge        Page 634
13   Cross Examination by Ms. Hunter            Page 658
     Redirect Examination by Mr. Kittredge      Page 668
14
     LEAH WHITE
15   Direct Examination by Mr. Sawyer           Page 670

16   SEAN CALLAHAN
     Video Deposition of Sean Callahan          Page 693
17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

08:57:28  THE COURT:  Any preliminary matters before we get started, either side?

08:57:33  MR. VEZEAU:  No, we're fine.

08:57:37  THE COURT:  I don't mean to be preachy, but I think it would be helpful if you all picked up the pace.  Direct examination is a planned examination.  You have full discovery to prepare for cross examination.  If you would make your points on cross examination and move on, I think it would be appreciated.  Because I'm having to reschedule a number of matters on my calendar to accommodate and avoid any disruption of this trial.  And I would very seriously hate to adjourn this trial and then regather at a later date, but the slower this goes, the more likely that might happen.

08:58:22  MR. PRICE:  Your Honor, as a reminder, that Tuesday issue with the juror who had the conflict, if we could figure that one out at some point today so that the witnesses, if that happens on Tuesday, could be so notified.

08:58:35  THE COURT:  Who are the other witnesses for today?

08:58:37  MR. PRICE:  Today we're going to have Mr. Bratic on direct and then cross, we should have some video clips, --

08:58:46  THE COURT:  Video clips of what?

08:58:47  MR. PRICE:  Deposition testimony.

08:58:48  THE COURT:  Whose depositions?

08:58:49  MS. HUNTER:  Your Honor, it's the deposition testimony

1   of Eric Eriksson, Tim Demmond, Tim Fallon, Richard Huo and

                    2   Doug Bagin.

08:59:02            3        THE COURT:  Are there any -- do we still have

                    4   outstanding objections on those designations?

08:59:05            5        MR. KITTREDGE:  Actually, there is one issue that I

                    6   think you ruled on, and I'm just a little unclear, and that

                    7   was with respect to Richard Huo.  His testimony was all about

                    8   manufacturing in China that hasn't been designated.  And I

                    9   wasn't sure, Your Honor, whether it was testimony about South

                   10   Carolina or maybe about manufacturing in China.

08:59:28           11        THE COURT:  Well, on cross examination of the

                   12   plaintiff's first witness, you raised the issue about him --

                   13   them manufacturing parts of their products out in foreign

                   14   countries.  So if you have raised that issue, I think that

                   15   that puts it in a different context.

08:59:49           16        MR. KITTREDGE:  I understand what you are saying.  I

                   17   didn't think I had raised it, but it just came out in an

                   18   answer, but --

08:59:55           19        THE COURT:  Well, you were exploring other places

                   20   where they manufacture other than Cookeville.  And one of

                   21   those, it raised the issue.  So it will be overruled.  The

                   22   China reference will be permitted.

09:00:07           23        MR. PRICE:  Your Honor, we believe we will be done

                   24   with our case in chief this morning, depending upon how long

                   25   cross lasts.

09:00:14 1          THE COURT:  Okay.

09:00:16 2          MR. KITTREDGE:  We'll be prepared to call Chuck

3    Nelson, Leah White and John Hardaway today, Your Honor, this

4    afternoon.  We are trying to get our expert witness in also,

5    but he is stuck on an airplane.

09:00:29 6          MR. VEZEAU:  Your Honor, we're going to have a real

7    problem, discussing with the Court, with Mr. Hardaway.  Mr.

8    Hardaway is one of Fallon's attorneys.  And they want to put

9    one of their attorneys on the stand to testify as a purported

10   fact witness on issues that aren't in dispute.  The reason

09:00:42 11   I --

09:00:45 12         THE COURT:  Well, we'll take that up later.  Let's

13   bring the jury in.

09:00:50 14         MR. VEZEAU:  Yes, Your Honor.  That's fine.

09:01:19 15         THE COURT:  Let's bring the jury in, Mr. Marshal.  I

16   think there was one other juror that had an issue about the

17   29th or 30th, Juror Number 1.  If we're lucky we'll make the

18   30th, I think.  But we'll see.

09:01:56 19         (Jury in.)

09:01:57 20         THE COURT:  Good morning, ladies and gentlemen of the

21   jury.  You can be seated.  Before we start with the --

22   continue with the examination of this witness, Mr. Whitehead,

23   you had made a reference to a meeting on Tuesday?

09:02:10 24         THE JUROR:  Yes, sir.

09:02:13 25         THE COURT:  What's the time of that meeting?

09:02:13  1          THE JUROR:  It's really all day.

09:02:16  2          THE COURT:  It's an all day meeting?

09:02:17  3          THE JUROR:  Yes, sir.

09:02:19  4          THE COURT:  Was there any part of the meeting for

          5  which you are indispensible?

09:02:28  6          THE JUROR:  I could -- I really need to be there at

          7  about 11:00.

09:02:32  8          THE COURT:  Okay.  So if we adjourned at 11:00 and

          9  reconvened at 1:00 or 1:30, would that accommodate you?

09:02:42 10          THE JUROR:  It's all of the afternoon.

09:02:45 11          THE COURT:  Well, we'll see.  We'll discuss the matter

         12  further, okay?

09:02:47 13          THE JUROR:  Thank you.

09:02:50 14          THE COURT:  All right.  You may continue.

09:02:50 15  CONTINUED DIRECT EXAMINATION

09:02:55 16  BY MR. PRICE:

09:02:58 17          Q.    Mr. Bratic, you may now continue with your

         18  narrative.

09:03:07 19          A.    Okay.  Good morning.  Yesterday I focused my

         20  damages analysis -- my analysis in testimony regarding damages

         21  suffered by iLight, assuming the patent was a valid

         22  infringement.  Now I'm turning my attention to the opinions of

         23  Mr. Degen, who is Fallon's damages expert.  It is Mr. Degen's

         24  opinion that the appropriate measure of damages in this case

         25  is a reasonable royalty.  Mr. Degen concluded that the royalty

1   would mostly likely be equal to the cost of retooling to

2   implement Fallon's current design, which would be $30,000 to

3   $40,000, but no more than $590,274 based a royalty of two

4   percent of net sales.

09:03:52  5        Mr. Degen and I agree that a reasonable royalty is the

6   correct measure of damages in this case.  However, I disagree

7   with the amount of royalty damages that Mr. Degen concluded

8   were appropriate in this matter.

09:04:07  9        First, I would like to outline summary of my

10  disagreements with Mr. Degen and then provide some additional

11  detail on those agreements.  I disagree with Mr. Degen's

12  opinion that the royalty would be capped at $30,000 to $40,000

13  or Fallon's cost of redesigning the accused products.

09:04:36  14       Would you please put up TX 32 R-1.

09:04:51  15       According to Dr. Roberts, Fallon's products, though

16  redesigned in 2008, still infringed the patents-in-suit.

09:05:01  17       Would you please put up Trial Exhibit 32 R-2.

09:05:10  18       ILight filed this lawsuit against Fallon in March

19  2006, and it took Fallon two years to retool to make its

20  current design, which is still infringing, according to Dr.

21  Roberts.  In addition, there is no evidence that Fallon could

22  have designed around the patents-in-suit at the time of first

23  infringement, which is January 2005.

09:05:40  24       Would you please put up Exhibit TX 32 R-3.

09:05:49  25       Remember that all Fallon's infringing sales were to

479

Sam's Club and to Anheuser-Busch.  Fallon would not be able to general its actual accused sales with either Sam's Club or Anheuser-Busch if it had taken Fallon more than two years to develop an alleged noninfringing design.

09:06:09          Please go to TX 32 R-4.

09:06:14          Now, Mr. Degen has arrived at another measure of royalties if the design around argument is not successful.  To get his royalty rate, Mr. Degen simply multiplied Fallon's suspect profitability of 7.7 percent times 25 percent, which equals about two percent.  Multiplying his two percent royalty rate times $29.5 million equals about $500,000.

09:06:43          Also, Mr. Degen's royalty here is understated because he has only included accused sales through September 2008. Which I brought them out to April 2009.

09:07:02          Please go to TX 32 R-5.

09:07:16          Mr. Degen's royalty rate was based upon an accrued rule of thumb known as the 25 percent rule of thumb.  It has been widely criticized for being crude and arbitrary. Generally, there is no economic basis for the figure 25 percent.  There is no consideration of specific circumstances that determine the value of the patent at issue.

09:07:42          The author of the rule of thumb, Robert Goldscheider, has said that the licenses which were the basis of his 25 percent rule of thumb included ongoing transfer technology in trademarks.  None of that is part of the hypothetical

480

negotiations in this case. And there is no consideration of
incremental value of using the patented technology.

09:08:05   Mr. Degen has not relied upon anything else but the 25
percent rule of thumb as his starting point for his royalty
rate analysis. As such, Mr. Degen's royalty rate lacks any
economic basis and is speculative.

09:08:20   Mr. Degen also overstates the claim that iLight would
not have made the accused sales. ILight was competing with
Fallon and other companies for AB's -- AB, Anheuser-Busch --
LED sign business, and it is speculative to conclude that
iLight would not have made the sales in Fallon's place if
Fallon did not make the accused sales.

09:08:36   Mr. Degen has no basis to state that Anheuser-Busch
was not interested in iLight's signs. AB, Anheuser-Busch, was
purchasing iLight's products from iLight before Fallon became
involved in the bidding process for that work. Mr. Degen had
no basis for statement that iLight had a poor relationship
with Anheuser-Busch other than his interview of Tim Fallon.
And for a short period of time around 2004, Sam's Club stopped
purchasing oval neon Open signs from Fallon while it was
testing LED Open signs made by IDG.

09:09:18   It is speculative to state that Sam's Club would not
work with IDG and iLight to come up with a satisfactory LED
sign product if Fallon was unable to sell the accused products
in January 2005.

481

09:09:33 1        I would like now to discuss in more detail my

2    disagreements with Mr. Degen, and I have organized my opinions

3    into the five Georgia-Pacific buckets, which are the same

4    buckets I discussed earlier in my direct examination

5    yesterday.

09:09:50 6        Could you bring up 30 R-6.  Okay.

09:09:56 7        The first bucket I want to discuss is the licensing

8    bucket on the far left.

09:10:26 9        Could you bring up 32 R-7.

09:10:28 10       With regard to the iLight/IBG agreement, IBG did not

11   receive a royalty-free license with respect to its main factor

12   of LED signs Mr. Degen claimed.  IBG and iLight formed a

13   strategic partnership through which iLight obtained the

14   opportunity to sell into the sales channels and gain access to

15   particular customer bases it had not entered into before and

16   make profits by providing the waveguiding surfaces to IBG.

17       ILight approached Sam's Club with a better designed

18   LED Open sign, and if Fallon had not infringed the

19   patents-in-suit, iLight would have had a better chance to get

20   Sam's Club business.  Nevertheless, Mr. Degen and I agree that

21   this particular agreement was not instructive to the royalty

22   rate in a bare patent license for the two patents-in-suit.

23       With respect to the iLight/Image Works agreement, it

24   is correct that this iLight/Image Works relationship was a

25   joint venture.  It was not a one way license and not

482

applicable to the situation of a hypothetical negotiation.

09:11:24  Mr. Degen argues that if one apply the terms of the Image Works agreement at the time of the hypothetical negotiation when Fallon expected net profits of 7.7 percent, a 50/50 split of those profits would have resulted in a royalty rate of 3.5 to 4 percent. It is not appropriate to apply the terms of the iLight Image Works agreement to the hypothetical negotiation. ILight and Image Works had a cooperative relationship with iLight, whereas iLight and Fallon had a competitive relationship as discussed below.

09:12:01  However, as I discussed during my earlier testimony, Fallon enjoyed a profit premium in the range of 15 percent on its sales of accused products from January 2005 to September 2008, compared to its nonaccused neon sign sales. If one were to apply the terms of the Image Works agreement, as Mr. Degen suggests, a 50/50 split of the profits would have resulted in a royalty rate of approximately 7.5 percent.

09:12:34  Would you please pull up TX 32 R-8.

09:12:40  With respect to this CK iLight patent license agreement, Mr. Degen and I agree that the patented technology covered by the CK license allows for colored changing. The patents-in-suit generally relate to lighting devices for the simulation of neon lighting using optical waveguides and high intensity low voltage light sources and are ideally adapted for signage and advertising uses.

483

Mr. Degen also states that the CK license covers

2    almost 12 times the number of patents at issue in this case,

3    and it would appear that the patents in the CK license are not

4    comparable to those in suit.  The patented technology in this

5    matter is more fundamental and the scope is broader than that

6    which is covered in the CK license.

09:13:30  7          The number of patents covered in the license do not

8    necessarily have a correlation with the royalty rate.  It

9    depends on specific situations such as the importance of

10   coverage in patent technology, the relationship between the

11   parties, and other terms involved in the agreement.

09:13:45  12         ILight approached CK to enter into this license

13   regarding color changing technology, and at the time the CK

14   license was entered, iLight had not produced or sold any color

15   changing LED products yet.  Thus, iLight's existing products

16   were not considered competitive products.

09:14:08  17         ILight recently introduced its Hypnotica full color

18   changing products.  It is my understanding that iLight is

19   paying a royalty of five percent to CK for this line of

20   products.

09:14:22  21         As discussed under Georgia-Pacific factor five, the

22   competitive relationship between iLight and Fallon would make

23   the nine percent instead of the 4.5 percent royalty rate in

24   this CK license more comparable.  The rates are consistent

25   with Mr. Paul Kallmes' -- the prior Director of Licensing in

CK -- experience and understanding of CK's licensing

practices.

09:14:44  3          Now I'm going to turn to 25 percent or above in more

4     detail.  Under the factors listed in the licensing

5     characteristics bucket, Mr. Degen states that there is a

6     commonly used across-the-industry rule of thumb that says a

7     royalty rate will typically fall between one-quarter and

8     one-third of the infringer's expected net operating profit,

9     and that this 25 percent rule is widely accepted as a starting

10     point for calculating a reasonable royalty.

09:15:11  11          As discussed earlier, the 25 percent rule of thumb is

12     widely criticized for being crude and arbitrary.  Generally,

13     there is no economic basis for the figure 25 percent.  This

14     rule gives no consideration of specific circumstances that

15     determine the value of the patent at issue.

09:15:25  16          In addition, there is no consideration of the

17     incremental value of using the patented technology.

09:15:34  18          Mr. Degen argues that, based on Fallon's expected net

19     profit for 2005 of 7.7 percent, up from 5.7 percent in 2004,

20     that the rule of thumb suggests a royalty rate of between 1.9

21     and 2.6 percent.  He states that this is only a starting

22     point, and his final rate includes analysis of all the

23     Georgia-Pacific factors.

09:15:55  24          Mr. Degen has not relied upon anything but the 25

25     percent rule as a starting point for royalty rate analysis.

1  As such, Mr. Degen's royalty rate lacks any economic basis and
2  is speculative.

09:16:08  3      I'm now going to talk about the technology.  If we can
4  go to TX 32 R-9.

09:16:42  5      I would like now to discuss Mr. Degen's evaluation of
6  the factors under the technology bucket.  In evaluating the
7  technology bucket of factors, Mr. Degen claims that, because
8  Fall's redesign does not include reflective sidewalls, it is
9  not accused of infringement.  However, according to Dr.
10  Roberts, Fallon's products redesign in 2008 still infringed
11  the patents-in-suit.

09:17:03  12      In addition, Mr. Degen claims that the cost of
13  retooling, the $30,000 to $40,000, would represent an amount
14  that Fallon may have been willing to pay for a license to the
15  patents-in-suit.  However, iLight filed the lawsuit against
16  Fallon in March 2006, and it took Fallon two years to retool
17  or make its current design, which is still infringing.
18  Therefore, there is no basis for Mr. Degen to assume that
19  Fallon could have designed around the patent-in-suit at the
20  time of the hypothetical negotiation.

09:17:32  21      Mr. Degen cites to alleged noninfringing alternatives
22  in the market, including Everbright's LED products, Enhance
23  America's LED products, and the Lextron products.  However,
24  Everbright's product is flat piece of plastic.  It does not
25  look like neon.  Enhance America has very little market in the

LED signs that look like neon.  And Lextron's products can't
be used in tight bends and is not as bright as neon.

09:17:59      In evaluating the technology factors, Mr. Degen claims
that I erroneously attributed all of the advantages of
neon-looking LED to the products of patents-in-suit.  He
states that the technology at issue is simply one of many ways
of making neon-looking LED signs, and his royalty rate opinion
reflects a more accurate assessment of the patents' utility
and advantages in the context of a range of acceptable
alternatives.  However, Mr. Degen has not provided any
evidence of any noninfringing alternative with similar
characteristics.

09:18:32      I am now going to turn to a third bucket, commercial
success.  Can you turn to TX 32 R-10, please.

09:18:43      I would like now to discuss the factors in the
commercial success bucket.

09:20:26      Please put up TX 32 R-11.

09:20:30      Mr. Degen states that for 2002 through 2004, iLight
had negative profits each year, and moreover, iLight continues
to show negative profits and it has only one year earned
profits, which was five percent of sales.  However, without
Fallon's infringement, iLight had a good chance to continue to
increase the sign sales and make profits.

09:20:53      Mr. Degen claims that Sam's determined iLight IBG sign
to be not of acceptable quality based on low sales in its test

stores, and that iLight management did not believe its products were viable with Sam's as of March 17, 2006. However, according to Mr. Cleaver, the LED Open signs that iLight designed and approached Sam's Club with was a much better design compared with IBG's original design.

However, Sam's Club declined to even consider the redesigned sign since Fallon had already come up with the accused products.

Mr. Degen states that the LED penetration of the neon sign market was low at the time of the hypothetical negotiation, and it continues to have a relatively small share of the overall neon sign market.

Mr. Degen states that iLight's and Fallon's combined 2007 sales represent less than two percent of the neon sign market they were targeting. Neither Fallon nor iLight are significant market players in the signage market. What matters is how important the patented technology is to the parties at the hypothetical negotiation.

In that regard, Mr. Fallon testified in his deposition that AB was desperate to replace their major brand purchases with LEDs as opposed to neon just because of the sort of stigma some of their wholesalers have with neon. There has been a push at Anheuser-Busch to replace neons with other technologies -- LEDs, back-lit signs, stuff like that, that has been going on since early 1990s.

09:22:24 1        And that's from the deposition testimony of Timothy

2   Fallon.

09:22:29 3        From Mr. Fallon's perspective, sales of accused

4   products increased to be more than 50 percent of its total

5   company sales, and 100 percent of its accused product sales

6   were to Sam's Club and Anheuser-Busch.  Without the patented

7   technology, Fallon would have likely lost business to both

8   Sam's Club and Anheuser-Busch.

09:22:52 9        With regard to the amount of profit that should be

10  credited to the iLight patents, Mr. Degen states that Fallon

11  took on the business risk of developing and manufacturing its

12  own LED products.

09:23:02 13       But Mr. Degen overstates this risk.  The following

14  facts indicate that Fallon would have run more risk of losing

15  a significant portion of its existing business to competitors

16  without developing and manufacturing its own LED product.

17       Sam's Club stopped purchasing Fallon's neon signs in

18  2004 in order to test LED products.  Fallon's document dated

19  March 12, 2005 indicate that, quote:  We really believe LED is

20  critical to future growth, quote.

09:23:41 21       Fallon's document dated September 2005 indicated that,

22  quote:  Sam's is asking Fallon to launch the LEDs immediately,

23  and we have issues with that, quote.

09:23:49 24       And Anheuser-Busch was, quote:  Desperate to replace

25  their major brand purchases with LEDs as opposed to neon,

quote.

Mr. Degen states that Fallon's accused products were also sturdier, and were perceived to be higher quality than iLight products at the time. Mr. Degen failed to provide any basis or evidence to support in the statement other than an interview Mr. Fallon.

Mark Cleaver did not at all agree with this statement. For a short period of time around 2004, Sam's Club stopped purchasing oval neon Open signs from Fallon while it was test marketing LED Open signs made by IBG. In the absence of infringement, it is very likely that Sam's Club would have worked with IBG/iLight to come up with a satisfactory LED sign product if Fallon was not able to offer the accused products in January 2005 because Sam's Club expressed an interest in this kind of sign made by IBG and iLight.

ILight would probably continue the cooperation with IBG if they were able to make the sales to Sam's Clubs. Mr. Degen argues that my analysis of gross profits is inappropriate, as is his comparison of ex-post operating profits for the LED products to the operating loss for the non-LED products.

Mr. Degen states that gross profits do not determine the viability of a company, and a rational business would look at net operating profit, not gross, in determining whether payment of a royalty was viable.

490

However, Fallon's average gross profit premium of

2   selling accused products versus neon products, which is 15.3

3   percent, is almost the same as its average operating profit

4   premium, which is 14.3 percent.  This indicates that Fallon is

5   able to generate more profits from selling accused products

6   covered by the patented technology.

Mr. Degen argues that I did not do analysis of the

8   details of the underlying sales to determine what other

9   factors may have caused the observed differential profits in

10   that factors such as customer volume can be an important

11   determinance of demand.  However, Fallon has not produced any

12   evidence regarding customers or other factors that could have

13   caused the profitability difference in the LED business versus

14   non-LED business of Fallon.

Mr. Degen, as an expert for Fallon, was able to

16   investigate this issue by interviewing Fallon management, but

17   he chose not to do that.  Mr. Degen argues that a more

18   meaningful analysis would be to compare Fallon's expected

19   operating profits for 2005 of 7.7 percent to its actual

20   operating profits in 2004, which is 5.7 percent, which yields

21   a difference of two percent.

However, Fallon's neon business could have begun to

23   deteriorate in 2004 because its existing customers decided to

24   convert to LED products.  Therefore, it does not make sense to

25   use 2004's operating profit margin as a benchmark.

491

09:26:57 1    I'm now going to turn to the competition bucket, the

2    fourth bucket.  And could you please put up TX 32 R-12.

09:27:11 3    I would like now to discuss some of the factors in the

4    competition bucket.

09:27:21 5    Would you please pull up TX 32 R-13.

09:27:24 6    Mr. Degen claims that he has seen no evidence of an

7    expressed licensing policy by iLight, and cites iLight's

8    willingness to license in the IDG and Image Works agreements.

9    However, around the time of the hypothetical negotiation,

10   iLight's LED sign sales increased significantly.

09:27:45 11   According to Mr. Cleaver, iLight's LED sign business

12   increased in 2005, and iLight geared up, expecting to win more

13   business in that channel.  As discussed in my report, iLight

14   entered into agreements with IBG and Image Works for

15   cooperation and expansion of its business, and the situation

16   is not comparable to the hypothetical negotiation.

09:28:08 17   Mr. Degen argues that I overstated the level of

18   competition between Fallon and iLight with respect to the

19   allegedly infringing sales to Sam's Club and Anheuser-Busch.

20   With respect to Fallon's sales of the accused products to

21   Sam's Club, Mr. Degen states that primary factors -- primary

22   competitors for Open signs included Everbright, Pro Light, and

23   Enhance America.

09:28:31 24   However, Mr. Degen failed to provide any basis for his

25   statement regarding Fallon's primary competitors for Open

signs other than his interview of Tim Fallon.  According to

Mr. Cleaver, Everbright and Pro Light products do not have all

of the desired features, such as brightness, uniformity, and

neon-like appearance.

09:28:50    For example, Pro Light signs show dotted LED lights

clearly, while Enhance America's website does not list any LED

signs in its products being offered.

09:29:04    Another argument Mr. Degen asserts is that Fallon had

not been able to offer an acceptable, non-infringing product,

Sam's Club would have chosen another supplier, not iLight.

However, to avoid losing its business with Sam's Club, Fallon

developed the accused products, which are the LED Open sign

products, and offered it to Sam's Club.  Fallon may have lost

its business with Sam's Club without offering the accused

products.

09:29:31    For a short period around 2004, Sam's Club stopped

purchasing oval neon Open signs with Fallon while it test

marketed LED Open signs made by IBG.  It is speculative to

state that Sam's Club would not work with IBG/iLight to come

up with a satisfactory LED sign product if Fallon would not be

able to sell the accused products in January 2005.

09:29:53    With regard to Anheuser-Busch, Mr. Degen failed to

recognize that Anheuser-Busch was, quote, desperate to replace

their major brand purchases with LEDs as opposed to neons,

quote.  And Fallon would not have won Anheuser-Busch's

493

business in 2006 without offering the accused products.

Other than his interview with Mr. Fallon, Mr. Degen failed to provide any basis for his statement that Anheuser-Busch did not choose iLight because of its alleged bad relationship with Mr. Loberfeld of iLight.

There is no basis for Mr. Degen to claim that Anheuser-Busch would not likely have chosen iLight, but would have increased purchases from other companies that it had selected as suppliers. For example, there is an Anheuser-Busch document which indicates that both iLight and Fallon were involved in bidding on AB's or Anheuser-Busch's LED sign business.

Also, as I discussed previously, other noninfringing signs in the market do not have all of the desired features, such as brightness, uniformity, and neon-like appearance.

I am now going to talk about fifth bucket dealing with experts and the hypothetical negotiation.

Would you pull up TX 32 R-14.

I'm now going to discuss some of the factors in competition bucket, and ask that you please put up TX 32 R-15.

Mr. Degen argues that a seven percent royalty would have left Fallon expecting to lose two percent of revenues on its sales of the accused products. However, Fallon may have initially implemented an aggressive pricing strategy in order to guard the business of Anheuser-Busch. And if Fallon

increased its price by a small percentage, such as three
percent, the extra profits would increase the operating
profits by the same percentage.

In addition, I understand the reasonable royalty then
should not be limited to operating profits made by the
defendant.  Mr. Degen's opinion that Fallon could design
around iLight's patent for $30,000 to $40,000 is unfounded
because, according to Dr. Roberts, Fallon's redesigned
products in 2008 still infringed the patents-in-suit.

Also, there is no evidence that Fallon could have
designed around iLight's patents at this time of first
infringement in January of 2005.  Mr. Degen has not relied on
anything else but the 25 percent rule as a starting point for
his royalty analysis, which is an arbitrary, speculative rule
that has no economic basis.

The seven percent royalty rate is reasonable because
the 15 percent profit premium Fallon earned on its accused
products; the CK/iLight license agreement; Mr. Kallmes'
experience in the industry and at Color Kinetics; iLight and
Fallon are competitors; and there was commercial success of
the products.

Fallon should pay iLight $2.5 million in reasonable
royalty damages, which is based on a reasonable royalty of
seven percent.

THE COURT:  You may cross examine.

09:33:07 1            MR. LIPSHIE:  Yes.

09:33:07 2    CROSS EXAMINATION

09:33:09 3    BY MR. LIPSHIE:

09:33:28 4            Q.      Good morning, Mr. Bratic.

09:33:29 5            A.      Good morning.

09:33:32 6            Q.      I'm Sam Lipshie, one of the lawyers for Fallon.

7    And we have not met; correct?

09:33:41 8            A.      No, we met in the restroom yesterday.

09:33:42 9            Q.      That's correct.  We saw each other.

09:33:43 10           A.      We'll leave it at that.

09:33:46 11           Q.      Now, sir, you haven't been retained or

12   qualified to testify or give any opinions about patents or

13   whether my client, Fallon, may have infringed any patents of

14   iLight; correct?

09:33:58 15           A.      Oh, that's absolutely correct.

09:34:01 16           Q.      And you are not qualified to do so, are you,

17   sir?

09:34:01 18           A.      That's correct.

09:34:04 19           Q.      So, in your testimony about the damages you

20   claim that iLight is entitled to recover from Fallon, you are

21   assuming that there has been patent infringement?

09:34:10 22           A.      Correct.

09:34:13 23           Q.      And you are also assuming, are you not, sir,

24   that what you were told by Mr. Fallon and other

25   representatives of -- Mr. Cleaver and other representatives of

```
 1  iLight was true; correct?
09:34:28   2        A.    Correct.  As well as Dr. Roberts.
09:34:32   3        Q.    That's the iLight damages expert -- I mean, the
 4  iLight technical expert?
09:34:36   5        A.    Correct.  He was here yesterday.
09:34:41   6        Q.    Now, you will recall yesterday you strayed from
 7  the written narrative a few times.  And you testified that the
 8  patents lasted for 17 years.  Do you recall that?
09:34:59   9        A.    I believe I said 17 years from -- my narrative
10  said 17 years from date of issue.
09:35:09  11        Q.    Your narrative, sir, says 16 years from the
12  date of the entry.  It's on Page 15.
09:35:19  13        A.    Did you say Page 15?
09:35:21  14        MR. PRICE:  He may not have his direct right here.
15  Would you like me to get that for you?
09:35:34  16        THE WITNESS:  Actually, I do.  Yes, it says here
17  approximately 16 years after the date of the hypothetical
18  negotiation.
09:35:38  19  BY MR. LIPSHIE:
09:35:40  20        Q.    So that was just a mistake; correct?
09:35:41  21        A.    Correct.
09:35:44  22        Q.    The Identity Group agreement.  Do you recall
23  that?
09:35:45  24        A.    Yes.
09:35:46  25        Q.    With iLight?
```

09:35:46 1          A.    Yes.

09:35:50 2          Q.    And you testified on direct that you reviewed

3     agreements between iLight and the Identity Group Inc. and

4     between iLight and Image Works Display Marketing Group that

5     were not instructive to the royalty rate that would have been

6     agreed to between iLight and Fallon; correct?

09:36:07 7          A.    Correct.

09:36:15 8          Q.    Now, Identity Group was the strategic partner

9     of iLight, who licensed IDG to sell iLight products to Sam's

10    Club; correct?

09:36:30 11         A.    Well, they were partners for the purpose of

12    developing products that were sold or going to be sold to

13    Sam's Club and other people.

09:36:40 14         Q.    And that is the agreement that was in force

15    when iLight -- when the iLight signs were sold to Sam's Club;

16    is that correct?

09:36:49 17         A.    Well, there were two agreements, I believe,

18    between the parties.  So I'm not sure which one.

09:36:55 19         Q.    Well, let's put them up.

09:36:57 20         A.    Do you have a copy?

09:37:03 21         Q.    It's TX 45.  Do you have a hard copy?

09:37:05 22         A.    Yes.

09:37:20 23         Q.    This is Plaintiff's premarked Exhibit 45.

09:37:21 24         A.    Thank you.

09:37:30 25         Q.    Okay.  The sales that iLight licensed IDG to

make in its supplemental license, which I think is called the

            Interim Supply and License Agreement, which is on the

09:37:39   3    screen --

09:37:43   4            A.      Let me look.  Yes.

09:37:47   5            Q.      -- were for sales to Sam's Club, isn't that

           6    correct?

09:38:35   7            A.      Let me double check.  I don't have the

           8    information here regarding the first agreement.  So if this is

           9    the most current agreement in place at that time, then yes,

          10    this would have been the operative agreement.

09:38:47  11            Q.      So iLight was willing to license another firm

          12    to make sales to Sam's Club; isn't that correct, sir?

09:38:56  13            A.      Under their terms of their overall

          14    relationship, yes.

09:38:59  15            Q.      All right, sir.  Now, under the supplemental

          16    license, Identity Group got to sell to Sam's Club royalty

          17    free; correct?

09:39:12  18            A.      I'm sorry, repeat that?

09:39:12  19            Q.      Okay.  Yes or no.

09:39:15  20            A.      I'm just saying to repeat.

09:39:17  21            Q.      The Identity Group license with iLight was

          22    royalty free for the sales that were made to Sam's Club?

09:39:25  23            A.      Under their overall agreement, yes.

09:39:27  24            Q.      Pay no royalties?

09:39:28  25            A.      I'm sorry?

09:39:31  1          Q.      Pay no royalties?

09:39:33  2          A.      Right, based on the overall agreement between

          3   the parties, not just limited to that one.

09:39:37  4          Q.      And Identity Group still sells signs to Sam's

          5   Club without any partnership to iLight, doesn't it?

09:39:42  6          A.      That I don't know.

09:39:43  7          Q.      You don't know that?

09:39:44  8          A.      I know they were selling, but whether they do

          9   it today, I don't know.

09:39:49 10          Q.      Do you know that they continued to sell to

         11   Sam's Club after their so-called strategic partnership with

         12   iLight was terminated?  Do you know that, sir?

09:39:58 13          A.      At that time they were selling some products to

         14   Sam's Club.  How much I don't know.  Whether they continue to

         15   do that today, I have no information to indicate that that's

         16   the case.

09:40:08 17          Q.      And no information to indicate it's not?

09:40:09 18          A.      Correct.

09:40:13 19          Q.      So Identity Group doesn't have to have iLight

         20   to sell LED sign products to Sam's Club, does it?

09:40:20 21          A.      Not under the agreement they have reached.

09:40:20 22          Q.      Pardon?

09:40:22 23          A.      Not based on their relationship, no.

09:40:24 24          Q.      They are free to do it?

09:40:27 25          A.      Well, apparently, under whatever terms they

                                                                    500

```
 1  agreed to.

 2         Q.    All right.  Then you talked about a CK or Color
 3  Kinetics agreement that iLight has?

 4         A.    Yes.

 5         Q.    You testified about that at length in your --
 6  particularly your direct testimony.  Under that license that
 7  iLight had from CK?

 8         A.    Right.

 9         Q.    And so the jury understands, that was from CK
10  as opposed to CK?

11         A.    Correct.

12         Q.    What was iLight able to do that it otherwise
13  could not have done?

14         A.    Well, it was able to introduce products that it
15  didn't have a license to sell before.

16         Q.    Let's put up TX 43, which is Plaintiff's 43.
17  Now, you testified earlier that the CK license is instructive
18  to you on the hypothetical negotiation between iLight and
19  Fallon, which forms the basis for your testimony regarding a
20  reasonable royalty; correct?

21         A.    No, that's not correct.  It's part of the
22  basis.  It doesn't form the basis.

23         Q.    I just said it was instructive.

24         A.    I thought you said it was the basis.

25         Q.    No, sir.
```

09:42:11  1          A.     Then I misunderstood your question.

09:42:11  2          Q.     To be specific --

09:42:13  3          MR. PRICE:  Your Honor, objection, argumentative.

09:42:15  4          THE COURT:  Well, asked and answered.  Let's go on.

09:42:16  5   BY MR. LIPSHIE:

09:42:19  6          Q.     Did you consider that?

09:42:20  7          A.     Did I consider it?  Absolutely.

09:42:22  8          Q.     You found it instructive?

09:42:23  9          A.     Yes.

09:42:26  10         Q.     And isn't it true that, under the CK license

         11   agreement with iLight, there was never a nine percent royalty

         12   paid on any licensed products?

09:42:37  13         A.     No, no royalty was paid.  There was an

         14   agreement to pay when competitive products were introduced.

09:42:46  15         Q.     Were any competitive products ever introduced?

09:42:47  16         A.     Not yet.

09:42:49  17         Q.     Never have been, have they?

09:42:52  18         A.     No, but the agreement is not terminated yet.

09:42:57  19         Q.     Just listen to my question.  Let's go to the

         20   license agreement where it identifies what competitive

         21   products were there.  Page nine, I believe.  See Page nine,

         22   you've got the agreement, it has a place to identify

         23   competitive licensed products which would bear a nine percent

         24   royalty rate.  Do you see that, sir?

09:43:21  25         A.     Excuse me.  Page nine of the agreement says --

09:43:25  1           Q.    It's not Page nine, it looks like 13.  It's a
         2    schedule.
09:43:29  3           A.    Oh, you are talking about the schedule?
09:43:29  4           Q.    Yes, sir.
09:43:33  5           A.    Yes.  There is nothing on Page nine.
09:43:35  6           Q.    Look at Page 13.
09:43:39  7           A.    13 is Schedule B to the agreement.
09:43:42  8           Q.    Uh-huh.  Look under competitors licensed
         9    products that would bear a nine percent royalty rate, wouldn't
        10    it?
09:43:47 11           A.    Right.
09:43:47 12           Q.    That's blank, isn't it?
09:43:47 13           A.    That's right.
09:43:49 14           Q.    To your knowledge, there has never been
        15    anything filled in in the blank?
09:43:52 16           A.    Not yet.
09:43:54 17           Q.    To your knowledge, there has never been a
        18    royalty rate in excess of four to five percent under that
        19    royalty license agreement that you found instructive; right?
09:44:08 20           A.    That's correct.
09:44:13 21           Q.    So under its lengthy relationship with CK,
        22    iLight never had any reason to care what the nine percent
        23    royalty rate was for competitive license products; correct?
        24    Because there weren't any?
09:44:26 25           A.    No, that's not true at all.  It's a

```
 1    misstatement.

 2    Q.    You can explain it if you want.

 3    A.    Sure.  This agreement is a ten year agreement

 4    which was executed in May 2006.  This still has to run through

 5    2016.  We're only roughly three years into this agreement.

 6    This agreement provided for a scenario, whenever competitive

 7    products are introduced, that the parties both agree and

 8    determine are competitive products, that iLight will then

 9    agree to pay a nine percent royalty.

10    There is no reason -- because I do licensing work for

11    clients and execute these kind of agreements -- that companies

12    would sit down and negotiate an agreement and write in terms

13    that they didn't think were possibly occurring sometime during

14    the existence of the license.

15    So the mere fact that iLight has not introduced a

16    competitive product yet does not mean that the nine percent

17    provision for competitive products during the life of this

18    agreement, which has another 17 years to go, is irrelevant.

19    Q.    But they haven't yet, and there is no assurance

20    they ever will, correct?

21    A.    They haven't yet.

22    Q.    And there is no assurance they ever will;

23    correct?

24    MR. PRICE:  Your Honor, asked and answered.

25    THE COURT:  That's argumentative.  Let's go on.
```

09:45:46   1    BY MR. LIPSHIE:

09:45:47   2         Q.    How much has iLight actually paid in royalties

           3    to CK under that license agreement?

09:45:49   4         A.    I don't know.

09:45:52   5         Q.    Would it surprise you if it was less than

           6    $20,000 in 2008?

09:45:56   7         A.    No, it wouldn't surprise me.

09:45:57   8         Q.    It would or would not?

09:46:00   9         A.    Would not.

09:46:03  10         Q.    ILight's total revenues were $7.1 million for

          11    January through September of 2008; is that correct?

09:46:06  12         A.    I'm sorry, you're trailing.  Your voice is

          13    dropping off.

09:46:11  14         Q.    I'm sorry, sir.  Your report reflects that

          15    iLight's total revenues were $7.1 million from January through

          16    September 2008?

09:46:21  17         A.    Well, I don't --

09:46:21  18         Q.    Is that correct?

09:46:24  19         A.    I don't have my report in front of me, but

          20    that's my general recollection.

09:46:34  21         Q.    Okay.  Let's put up Exhibit 542.  That's

          22    Defendant's.  Could you tell me, sir, looking at Defendant's

          23    Exhibit 542, what the total amount of royalty and licensing

          24    fees were?

09:48:12  25         A.    Let me look.

09:48:15  1          Q.    Look on Page two -- let's see if we can speed

        2    this up -- and look for an $18,280 figure.

09:48:33  3          A.    Page two?  There it is.  I found it.  There was

        4    another $18,000 figure.  Yeah, it's account number 57,650,

        5    royalty and license fees.

09:48:45  6          Q.    Right.  To the best of your knowledge, that's

        7    the CK royalty; correct?

09:48:52  8          A.    Well, I don't know if it's CK.

09:48:55  9          Q.    You are not aware of any other royalty or

       10    licensing income for intellectual property licenses that

       11    iLight would have received during that year?

09:49:01 12          A.    I'm not aware of any.

09:49:07 13          Q.    And what percentage of the revenues of $7.1

       14    million would $18,280 be?

09:49:14 15          A.    Well, it would be a very, very small

       16    percentage.

09:49:17 17          Q.    Roughly a quarter of one percent?

09:49:20 18          A.    It would be less than one percent.

09:49:23 19          Q.    Less than half of a percent?

09:49:25 20          A.    Well, on total sales.  I don't know if all

       21    those sales would cover.

09:49:30 22          Q.    Your testimony, what you have told the jury, is

       23    that iLight hasn't paid any nine percent royalties for

       24    competitive products under the license, but it wants to

       25    recover -- you believe it has reasonable rights of seven

```
 1    percent or almost $2.5 million from Fallon; correct?

 2    A.    I'm sorry.  Could you repeat the last part of

 3    your question?

 4    Q.    Your testimony as to what's a reasonable

 5    royalty yesterday and today was about seven percent, it's

 6    seven percent of Fallon sales, which is about $2.5 million;

 7    correct?

 8    A.    Yes.

 9    Q.    And that is not withstanding that iLight has

10    not paid CK under its license agreement in excess of four to

11    five percent; correct?

12    A.    Well, yes, but my opinion based on all of the

13    factors I considered, not just the CK licensing.

14    Q.    You talked a lot about Mr. Kallmes?

15    A.    Yes.  Mr. Kallmes.  That's how I pronounced it.

16    Q.    Kallmes.  And he was the prior director of CK;

17    is that correct?

18    A.    Correct.  He was at CK when they instituted the

19    iLight license.

20    Q.    Okay.  What date was that?

21    A.    Right before I filed my report, so it would

22    have been in December of 2008 or the early part of 2009.

23    Q.    Did you go there?  Where did you meet?

24    A.    We talked on the phone.

25    Q.    And did you talk to him or did one of your
```

assistants?

09:50:59  A.    No, I talked to him.

09:51:02  Q.    And was Mr. Kallmes a director of licensing
when the iLight licensing arrangement was negotiated and put
in place?

09:51:12  A.    That's my recollection.

09:51:19  Q.    Let me ask you a few more questions about the
use of the invention, okay?

09:51:23  A.    Sure.

09:51:26  Q.    And that's part of the bucket of the
Georgia-Pacific factors that you testified about and showed a
number of charts; correct?

09:51:33  A.    Yes.

09:51:35  Q.    Now, you testified about the benefits
associated with the patented technology, including the rugged
and breakage resistance of the product; correct?

09:51:50  A.    Yes.

09:51:52  Q.    Now, you can have a rugged or breakage
resistant LED light without the patented technology; correct?

09:52:04  A.    I don't know, I'm not a technical person,

09:52:09  Q.    Well, you also testified that non-neon gas was
a benefit of the patented technology.  Do you recall that?

09:52:16  A.    Yes.

09:52:22  Q.    But iLight doesn't hold or claim a patent on
non-neon lighting, do they, sir?

09:52:29  1    A.    You mean in the three asserted patents?

09:52:29  2    Q.    Yes.

09:52:31  3    A.    Not that I know of.

09:52:35  4    Q.    They don't own a monopoly to manufacture and

       5  sell simulated neon lighting, do they?

09:52:42  6    A.    I don't know.  That's a technical question.

09:52:50  7    Q.    And you testified also that the product for

       8  which iLight claims a patent is easy to install; correct?

09:52:56  9    A.    Yes.

09:53:00 10    Q.    But it doesn't require patented technology to

      11  develop the easy to install LED product, does it, sir?

09:53:08 12    A.    Well, that I don't know.  All I know is these

      13  are what I understand the benefits of practicing with that

      14  are.

09:53:15 15    Q.    Because with respect to those matters, you just

      16  know what you are told; correct?

09:53:19 17    A.    Well, what -- my understanding is based on my

      18  interviews.

09:53:23 19    Q.    And what you were told during your interviews;

      20  correct?

09:53:24 21    A.    That's correct.

09:53:29 22    Q.    And as to all of those, at the time of this

      23  hypothetical negotiation between iLight and Fallon to

      24  determine a reasonable royalty in January 2005, both parties

      25  would have known the answers to those questions, wouldn't

```
 1    they?

09:53:48  2         A.    I assume so.

09:54:01  3         Q.    Slide 24, please.  Do you recall that chart

 4    sir?

09:54:08  5         A.    I do.

09:54:28  6         Q.    You testified about a profit premium for

 7    Fallon's LED versus its neon products, did you not, sir?

09:54:37  8         A.    Versus its nonaccused neon products; right.

 9    That's correct.

09:54:41 10         Q.    And you testified that these profit premiums

11    would have been an important consideration in determining a

12    reasonable royalty at the time of the hypothetical

13    negotiation?

09:54:51 14         A.    That's correct.

09:54:58 15         Q.    Now, in January of 2005, neither parties, to

16    your knowledge, had any reason to believe that Fallon expected

17    to lose money on its future neon signs, did you?

09:55:07 18         A.    I'm sorry, you are saying --

09:55:11 19         Q.    At the time of the hypothetical negotiation, to

20    the best of your knowledge, neither party had any reason to

21    anticipate that Fallon would lose money in the future on the

22    sale of its neon sign product; is that correct?

09:55:27 23         A.    On the neon products?

09:55:27 24         Q.    Yes, sir.

09:55:32 25         A.    No, that's not true.  They had losses in 2004.
```

1   The only products they sold in 2004 at Fallon were neon

         2   products.  So they knew they were losing money.

09:55:43 3            Q.    You said they sold to Fallon.  Who were you

         4   talking about?

09:55:48 5            A.    No, I'm saying Fallon as a company, in 2004,

         6   the year before they introduced their accused products, they

         7   lost money.  In fact, they lost money every year since they

         8   introduced the accused products.  And if it wasn't for the

         9   profits of the accused products, the company's losses would be

        10   even higher than they were.

09:56:10 11           Q.    Well, I understand that is your testimony about

        12   the profits.

09:56:13 13           A.    Well, that's a fact.

09:56:17 14           Q.    Fallon experienced a very large overall 2007

        15   loss on its neon products; right?  In 2007?

09:56:27 16           A.    Well, let me look.  Let's see.  In 2007?  I

        17   don't have the breakdown of 2007 on its neon.  Let me see.  I

        18   had the combined.

09:56:36 19           Q.    It was your Exhibit 6 to your report.

09:56:40 20           A.    I just don't have my report in front of me.

09:56:43 21           Q.    Do you recall if it reflected a 15 percent

        22   negative operating margin on the end products in 2007?

09:56:52 23           A.    That wouldn't surprise me.  Well, let's assume

        24   that's the case.  Two years prior at the hypothetical

        25   negotiation, Fallon would not, to your knowledge, have had any

reason to believe that two years later Fallon would have that

high an operating loss on its neon products; correct?

09:57:13    A.    No, I wouldn't agree with that.  They knew

their neon business was in a decline.  That's why they were

rushing to get into LED sign business, because people at

Anheuser-Busch and Sam's were insisting on migrating to LED

signs, not neon signs.  So they knew that business was on the

decline.

09:57:32    Q.    Well, let me ask it this way.  To the best of

your knowledge, did Fallon continue to invest money in product

development, sales, marketing, other promotional and

development expenses, for its neon signage after 2005;

correct?

09:57:49    A.    Well as to R & D spending, I don't have any

evidence of R & D spending by Fallon on neon products.

09:57:56    Q.    But you would not expect a company that would

continue for years to invest in producing, manufacturing and

selling a product which, although it might not have done well

the prior year, you wouldn't expect them to do that if they

expected it to continue for years in the future to run a much

larger operating loss; correct?

09:58:18    A.    I'm not sure what your question is.

09:58:26    Q.    I will withdraw it.  You testified that both

Plexineon and Fallon's accused products have been commercially

successful and profitable.  Do you recall that?

512

| | | |
|---|---|---|
| 09:58:41 | 1 | A. Yes. |
| 09:58:44 | 2 | Q. And I think you testified that iLight has |
| | 3 | several markets -- architectural trim, signs, POP, and slot |
| | 4 | machines? |
| 09:58:54 | 5 | A. It's not that it has several markets. Those |
| | 6 | are markets that target to sell its products. |
| 09:59:00 | 7 | Q. Targeted markets? |
| 09:59:00 | 8 | A. Yes. |
| 09:59:05 | 9 | Q. How much of iLight's gross revenues in 2007 |
| | 10 | resulted from the sales of the LED signs that are at issue in |
| | 11 | this case? |
| 09:59:16 | 12 | A. I don't have that information. |
| 09:59:19 | 13 | Q. Do you have any recollection from your |
| | 14 | analysis? |
| 09:59:20 | 15 | A. Not offhand, no. |
| 09:59:23 | 16 | Q. About what percentage of iLight's gross |
| | 17 | revenues resulted from the sales of LED sign products in 2008 |
| | 18 | such as are at issue in this? |
| 09:59:35 | 19 | A. I don't have that in front of me. |
| 09:59:38 | 20 | Q. Well, let me ask you, do you know about what |
| | 21 | percentage of Fallon's total revenues resulted from the sale |
| | 22 | of the architectural trim product? |
| 09:59:50 | 23 | A. No, I don't have a breakdown of those markets. |
| 09:59:53 | 24 | Q. The same question regarding P-O-P. |
| 09:59:56 | 25 | A. The answer would be the same. I don't have a |

1    breakdown.

09:59:58  2         Q.    Slot machines?

10:00:01  3         A.    Slot machines?  No, I don't have a breakdown.

4         Q.    Do you know, sir, that Fallon is not in the

5    architectural trim, signage or lighting business?

10:00:10  6         A.    No, I don't know.  They have a lot of

7    divisions, several divisions.  I'm not sure of all of the

8    divisions.

10:00:16  9         Q.    But as far as you know, Fallon competes with

10   iLight in the illuminated architectural trim business?

10:00:23  11        A.    I don't know.

10:00:26  12        Q.    You just don't know?

10:00:29  13        A.    Well, as to that, I don't.

10:01:24  14        Q.    Let's put up on the screen Exhibit 955.  This,

15   sir, is an iLight produced document, is it not?  A financial

16   document?

10:01:32  17        A.    It's a document.  It's from my report that I

18   prepared based on their information.

10:01:34  19        Q.    Okay.  You prepared this?

10:01:34  20        A.    Yes.

10:01:41  21        Q.    So you are very familiar with it.  The way I

22   read it, it appears that iLight lost over $800,000 on its

23   products using the patented technology for each of the prior

24   three years before the hypothetical royalty negotiation in

25   January of 2005; is that correct?

10:02:02  1          A.      I'm sorry, would you repeat the question.

10:02:03  2          Q.      As part of your exhibit --

10:02:03  3          A.      Yes.

10:02:09  4          Q.      -- hasn't iLight lost over $800,000 on its

5    products that use the patented technology for each of the

6    prior three years before the hypothetical negotiation in

7    January of 2005?

10:02:23  8          A.      Well, at the net profit line at the very

9    bottom, yes.  At the gross margin line, no, they were very

10   profitable.

10:02:32 11          Q.      That's right.  I asked you about net profits.

10:02:35 12          A.      Yes.  At net profit, I agree, when you took

13   into consideration all of the company's sales, all of the

14   expenses it had lost in the three years leading up to the

15   hypothetical issue.

10:02:45 16          Q.      And you would agree with me that net profits is

17   a very important measurement and concept in for-profit

18   business?

10:02:53 19          A.      It's one of several important factors,

20   analytical tools, that you look at.

10:03:00 21          Q.      And in the last seven years, according to your

22   own prepared exhibit, iLight has shown a net loss in six of

23   those years; is that not correct?

10:03:07 24          A.      Yes, it has.

10:03:12 25          Q.      So iLight has had a net operating profit only

```
 1   one year out of those seven.  Isn't that correct?
 2        A.    Let me look.  No, that's not true, because it
 3   has had a net operating profit all those years.  It's just
 4   that it has only had a net profit for one of the six.
 5        Q.    So it had a net loss for six out of the seven
 6   years; correct?
 7        A.    Right.  But operating profits, and operating
 8   profits, all of those years, positive operating profits.
 9        Q.    I'm talking about negative net losses, no
10   profits for six out of the last seven years; correct?
11        A.    At the net profit line, yes.  Let's be clear.
12        Q.    Okay.  I'm with you.  They lost money six out
13   of seven years?
14        A.    Correct.  At the net profit line.
15        Q.    You also testified about iLight's sales having
16   increased 930 percent; correct?  Do you recall that?
17        A.    Yes.  On its LED products.
18        Q.    Right.  The products at issue here?
19        A.    Right.
20        Q.    Well, didn't they start from just virtually
21   zero?
22        A.    ILight was a start-up company.  It started in
23   2000.  So as a start-up company, it's not surprising it would
24   have losses in earlier years, because they're investing in the
25   company.
```

10:04:31  1          Q.      It's also not surprising it would have a large

        2  increase in sales associated with LED products?

10:04:38  3          A.      Right, because of demand for LED products.

10:04:41  4          Q.      They hadn't sold any before, so anything they

        5  sold would is going to raise that level very high?

10:04:46  6          A.      Right, because there is a demand for LED

        7  products.

10:04:49  8          Q.      During that period of time, iLight sold

        9  products other than LED products; correct.

10:04:52 10          A.      My understanding is they did.

10:04:55 11          Q.      But you don't know what percentage that breaks

        12  up into?

10:04:56 13          A.      Not offhand, no.

10:05:00 14          Q.      Now, during that period of the 930 percent

        15  increase in iLight sales attributable to LED signs?

10:05:04 16          A.      Yes.

10:05:08 17          Q.      Are you with me?  Didn't it include the sale of

        18  approximately 30,000 Camel signs to R.J. Reynolds for a total

        19  price of approximately $2.4 million?

10:05:22 20          A.      Yes, I believe that would have been included in

        21  that transaction.

10:05:28 22          Q.      And in fact, those signs weren't sold by iLight

        23  to R.J. Reynolds, were they?  They were sold by its partner,

        24  IDG?

10:05:40 25          A.      Well, I don't know who made the sale.  What I

know is, I focused on iLight's revenues that it generated or
reported based on the sale of LED signs to R.J. Reynolds.
They got sales data from that, because under their profit
sharing agreement with IDG, they got to record revenues and
profits on those LED sales.

10:06:04    Q.    That's my point.  That's what they booked as
income as a result of those Camel signs?

10:06:07    A.    Sure.

10:06:14    Q.    Through their partnership with IDG?

10:06:14    A.    Revenues and income.

10:06:15    Q.    Right.  It was only one year, wasn't it?

10:06:16    A.    Yes.  That transaction.

10:06:17    Q.    It was a nonrecurring sale, wasn't it?  That
one was.

10:06:18    A.    Yes.

10:06:22    Q.    All those $2.4 million comprised of sales of
Camel cigarette LED signs to R.J.R. Reynolds -- that was a one
off deal, wasn't it?

10:06:33    A.    I don't know if it was a one off deal; it was
one large transactions.

10:06:38    Q.    They sold it, they hoped to sell more, and they
didn't; correct?

10:06:40    A.    I assume they hoped to sell more.

10:06:43    Q.    Do you know, sir, that Fallon never competed to
try and sell Camel LED signs to R.J.R. Reynolds?

A.    I don't know that to be true.

Q.    You don't have any reason to believe they were

3    trying to compete with iLight with respect to those sales that

4    were associated with $2.4 million of revenue, do you?

A.    That was in -- that transaction was in 2003, I

6    believe.  And Fallon didn't even have a product, neon -- a

7    non-neon product in 2003, so how could they compete for an LED

8    product?

THE COURT:  You get to answer questions.  You don't

10    get to ask them.

THE WITNESS:  Sure.

BY MR. LIPSHIE:

Q.    So you think that was in 2003?

A.    2003 or 2004, but I don't believe Fallon had a

15    product then.

Q.    Well, in any event, in your testimony, you are

17    not attempting to connect or to blame Fallon for iLight's

18    continued inability to sell additional Camel signs to R.J.R.,

19    are you?

A.    Well, I don't know what R.J.R. or R.J.

21    Reynolds' strategy has been, what its business plan has been,

22    regarding acquiring LED signs beyond that one transaction.  I

23    haven't seen any documentation in this case, so I can't

24    speculate as to what R.J. Reynolds would or wouldn't do, or

25    who they are buying products from, whether they are buying

from anybody.

10:08:25 Q.    Forget about you.  ILight and Fallon, when they sat down in their hypothetical negotiation in January of 2005, they would have known, wouldn't they?

10:08:32 A.    Would have known what?

10:08:36 Q.    The specifics with respect to customer relationships to sell signs to R.J.R., Camel, LED signs that resulted in $2.4 million prior to that hypothetical negotiation; correct?  They wouldn't have -- that would have been a factor in their negotiation?

10:08:54 A.    What would have been a factor?  I don't understand your question.

10:08:57 Q.    Well, you are saying hypothetical negotiation. You are looking at all these factors, revenues, increases in sales at iLight, decreases at Fallon, increases at Fallon. And then you're going back to the hypothetical negotiation of January of 2005, and you're evaluating all those factors, and you are determining what a reasonable royalty rate is; correct?

10:09:22 THE COURT:  Let me see.  Is the question whether the sales to R.J. Reynolds -- would the plaintiff's sales, a joint venture or otherwise, have been a factor in determining what a reasonable royalty was in 2005?

10:09:40 THE WITNESS:  If that's the question, Your Honor, the answer is, no, it's not relevant.

BY MR. LIPSHIE:

10:09:42 1

10:09:43 2       Q.    It's not relevant?

10:09:43 3       A.    No.

10:09:46 4       Q.    Even though you factored in sales for iLight to

5  R.J. Reynolds on the Camel signs in coming up with your

6  conclusion that there is $2.5 million in reasonable royalties

7  owed at a rate of seven percent?

10:10:03 8       A.    No, that's not my analysis.  My analysis didn't

9  include any Fallon sales to R.J. Reynolds.  That was strictly

10  Anheuser-Busch and Sam's Club.

10:10:11 11       Q.    But you also evaluated the iLight revenues, and

12  they weren't just limited to Sam's Club and Anheuser-Busch;

13  isn't that correct, sir?

10:10:22 14       MR. PRICE:  Objection, Your Honor.  We're getting

15  argumentative.

10:10:26 16       MR. LIPSHIE:  He asked the question.

10:10:30 17       THE COURT:  I think he answered your question about

18  what he considered in forming his opinion about what a

19  reasonable royalty rate was, so I believe we've exhausted

20  that.

10:10:42 21       MR. LIPSHIE:  All right.  Let's move on.

10:10:42 22  BY MR. LIPSHIE:

10:10:50 23       Q.    Okay.  You testified, sir, that Fallon might

24  have lost Sam's Club business without the LED Open sign;

25  correct?

```
10:10:54   1          A.      Right.

10:10:56   2          Q.      Now, that's speculation on your part; correct?

10:11:00   3          A.      Well, no, I wouldn't say it's speculation,

           4   because Sam's went to Fallon, and Fallon started making an LED

           5   sign, because they knew that Sam's wanted to move away from

           6   neon to LED signs.

10:11:12   7          Q.      Well, iLight didn't have any sales relationship

           8   with Sam's Club at the time, did it?

10:11:19   9          A.      No, but my point is, we're talking about --

10:11:21  10          Q.      Just answer my question.

10:11:24  11          A.      Well, repeat your question, please.

10:11:27  12          Q.      ILight didn't have any direct sales

          13   relationship with Sam's Club at the time, did it, sir?

10:11:32  14          A.      I don't know if they had a direct sales

          15   relationship with them or not.

10:11:37  16          Q.      You do know that Sam's Club was a long

          17   established sign customer of Fallon, don't you?

10:11:44  18          A.      Yes, it was a neon sign customer.

10:11:50  19          Q.      Were you aware that Fallon had, at Sam's Club's

          20   request, developed and produced additional products that Sam's

          21   Club bought during that period of time?

10:11:59  22          A.      I don't know what you mean by additional

          23   products.

10:12:02  24          Q.      Different times types of products that were

          25   requested by Sam's Club?
```

10:12:04 1          A.     Oh, different products?  That wouldn't surprise

2      me, because Sam's club was requesting an LED sign product too.

10:12:11 3          Q.     Were you aware that, in connection with

4      examining LED products, that Sam's Club expressed interest in

5      having the Fallon oval neon design?  Did you know that, sir?

10:12:27 6          A.     Yes.  That's my understanding, is that Sam's

7      Club expressed an interest in an oval neon sign -- non-neon

8      design -- non-neon sign.

10:12:37 9          Q.     But that was Fallon's oval design; right?

10:12:42 10         A.     That was a design that Fallon presented to

11     Sam's Club.

10:12:43 12         Q.     And it had been selling to them for their neon

13     signs; correct?

10:12:47 14         A.     Yes, but they also stopped buying that product

15     while they were testing IDG/iLight oval non-neon LED.

10:12:55 16         Q.     Yes, sir.  So can you tell the jury that

17     Fallon's marketing and sales relationship with Sam's Club

18     wasn't important in Fallon retaining the Sam's Club sign

19     business of LEDs?

10:13:11 20         A.     Well, I'm not saying it wasn't important.

21     There's a number factors that drive sales in customer

22     relationships.  Pricing, technology, customer relationships.

23     There's a variety of factors.  The simple issue is, if you

24     assume the patents are valid you infringe.  And if you assume

25     you don't a design around that, you won't make those sales.

523

1    You have to remove that product from the market.

10:13:38     2         Q.    That's really not my question, sir.

10:13:40     3         THE COURT:  Well, he was trying to answer the last

             4    question, so --

10:13:41     5    BY MR. LIPSHIE:

10:13:44     6         Q.    Are you aware that the board of directors and

             7    management of iLight --

10:13:48     8         MR. PRICE:  Objection.  Your Honor, may we approach?

10:13:49     9         THE COURT:  Ladies and gentlemen, we're going to

            10    excuse you for just a few minutes.  Please don't discuss the

            11    evidence amongst yourselves until you receive all of the

            12    evidence, the argument of counsel, and the charge of the

            13    Court.

10:14:10    14         (Jury out.)

10:14:11    15         THE WITNESS:  May I step down?

10:14:25    16         THE COURT:  Yes.  Yes, sir.  Your objection.

10:14:27    17         MR. PRICE:  Yes, Your Honor.  We have a pending motion

            18    in limine that addresses this exact issue.  This question

            19    relates to a board meeting that occurred right at the time

            20    this lawsuit was filed.  At that meeting, or after the

            21    meeting, there was a circulated draft of board minutes that

            22    included discussions with patent counsel regarding the lawsuit

            23    and potential settlement possibilities.

10:14:50    24         This particular document was inadvertently produced

            25    during the production of massive amounts of documents.  When

this document was brought out for first time by Fallon's

counsel in Mark Cleaver's deposition, I immediately requested

that that document be returned, said that it was privileged,

explained the situation, invoked our rights as well as the

protective order, and asked for it back.

10:15:20  Subject to that objection, he did ask questions

conditionally regarding it.  But at all times we asserted it

and requested it back.  And now they are requesting to use it.

10:15:31  THE COURT:  I don't remember a motion in limine on

that issue.

10:15:34  MR. PRICE:  Yes, it's -- which motion in limine

number?

10:15:38  MS. HUNTER:  Your Honor, I believe it's Number 5.

10:15:41  MR. PRICE:  It is one of the five, and if you want to

know the exact number, Your Honor, we'll get that for you.

10:15:47  THE COURT:  If you will get me the docket entry

number, that will be helpful.

10:15:52  MR. LIPSHIE:  Your Honor, do you want me to put it up

on the screen for you so you can see what it is we're talking

about?

10:16:03  THE COURT:  If somebody has got the motion, just let

me see it.

10:16:37  MR. PRICE:  It's docket entry number 154, Your Honor.

10:16:41  THE COURT:  Well, I ran a motions report.  When we had

those arguments on motions in limine, I thought all had been

addressed.

MR. PRICE:  No, Your Honor.  We addressed their

motions.  We did not address ours on day one.

THE COURT:  Well, I was going through all of them that

were on my motions report.

MR. PRICE:  Roughly, Your Honor, there were four or

five on each side.  We did cover all of theirs, but we did not

cover any of ours.  Maybe one of ours.

THE COURT:  What do you say to their contention that

there was an inadvertent disclosure and, therefore, there is

no waiver?

MR. KITTREDGE:  Your Honor, this did come up in the

deposition of Mark Cleaver, and Mr. Price said that he would

request to have it back.  We were waiting to get that request

in writing, and we never did.  We went ahead and used it in

the expert report that we served last fall and never heard a

thing about it since then.  We don't believe they have had --

THE COURT:  Well, if there is no dispute they

requested it back, which reflects that they were asserting the

privilege.  There is no doubt about that, is there?

MR. KITTREDGE:  I thought there was.  I was waiting --

THE COURT:  What was your ambiguity about requesting

it back?

MR. LIPSHIE:  They were supposed to request it in

writing.  They never did.  The real question is whether it's

attorney-client.

10:18:28     MR. KITTREDGE:  I believe it's whether or not it's privileged and they have met their burden in demonstrating it.

10:18:30     MR. PRICE:  Your Honor, I could not have requested it back more clearly on the record.  I will be glad to run this transcript up if we really want to talk about that.  These are portions quoted.

10:18:46     MR. LIPSHIE:  Your Honor, we do not dispute that Mr. Price said that the portion of the document he was claiming the privilege of.  The only point there is, they never got back and told us which portion it was.

10:18:57     MR. PRICE:  No, that is absolutely not true.  We had an explicit discussion on the record exactly which portions of that document were privileged and which were not.  That is absolutely inaccurate.

10:19:07     MR. LIPSHIE:  Okay.  Well, I apologize if that's inaccurate.

10:19:11     MR. KITTREDGE:  What Mr. Price said is correct, Your Honor.  We discussed a portion on the record.  And our position in that, as we wrote in our brief, is we don't believe that they carried their burden of proving that it's actually privileged.

10:19:25     THE COURT:  It's at a board meeting, it's a statement of their counsel in connection with litigating pending.

10:19:32     MR. KITTREDGE:  It's not a statement of counsel.

527

```
 1   There is no evidence of that.

10:19:37  2         THE COURT:  Let me see the document.

10:19:39  3         MR. PRICE:  He wants to see the actual board minutes.

 4   Is that correct, Your Honor?

10:19:45  5         THE COURT:  Yes, sir.

10:19:50  6         MR. PRICE:  Do you all have the slide?

10:19:57  7         THE COURT:  Give me the document, if you don't mind.

10:19:57  8         MR. PRICE:  I apologize, Your Honor.  I was planning

 9   on doing this --

10:20:00 10         THE COURT:  Well, it's attached to your motion.

10:20:02 11         MR. KITTREDGE:  It's attached to the motion and might

12   be attached to our response as well.

10:20:21 13         MR. PRICE:  Your Honor, here's the document.

10:20:23 14         THE COURT:  It reflects that they discussed the merits

15   of the patent infringement cases, and Nagle, patent counsel,

16   participated in much of the discussion.

10:20:40 17         MR. PRICE:  That is correct, Your Honor.  In short,

18   they are discussing the lawsuit they are just about to file

19   and what the potential settlement possibilities are in that

20   lawsuit with their counsel.

10:20:57 21         THE COURT:  I would consider this probably qualifying

22   as attorney-client as well as work product.

10:21:02 23         MR. KITTREDGE:  Very well.

10:21:12 24         THE COURT:  Objection sustained.  Now, I'm getting a

25   little concerned here.  There is a reference -- one of these
```

questions appears to be directed as to which company was

commercially successful.  And it seems to me that the issue is

whether that was an infringement, and if so, what the

reasonable royalty was.

10:21:44  You asked a lot of questions about other products and

profitability on other products.  And I'm not sure that's

really relevant.

10:21:51  MR. LIPSHIE:  Your Honor, in his testimony and report,

what he has done in applying the factors on the reasonable

royalty is he has attributed substantial importance to the

revenues of both companies and done a comparative analysis to

determine, in his opinion, that you ought to add on for this

factor and that factor.

10:22:11  THE COURT:  Well, my recollection of what his

testimony was, was that -- is that Fallon was losing money on

the neon gas signs.  And that prompted a need to get into the

non-neon gas product lines to be commercially successful.

That was my reference -- understanding of his testimony on

that.

10:22:39  MR. LIPSHIE:  Well, he has testified to a great deal

on that.  He has relied upon a lot of hearsay statements that

his people told him that go to other issues in the case, on

competition, who was competing with who, on which customers.

He has given his opinion as to the likelihood --

10:22:59  THE COURT:  Yes, but I guess for lack of a better

term, it's the relevant product market that should be at

issue.  And the relevant product market in this case is not

architectural lighting but the signage part of the business.

That's the relevant market in this case.

MR. LIPSHIE:  Well, let me give you an example, Your

Honor.  Just that he was testifying about -- he was saying,

and he makes -- on several occasions he attributes a lot of

importance to how successful iLight's commercial LED lighting

was.  And he -- evidences that, both in his testimony and in

his reports, both direct and rebuttal.

THE COURT:  He testified about the signage and the

impact of signage on the --

MR. LIPSHIE:  Their revenues went up 930 percent.

Well, that

THE COURT:  But he attributed that in his testimony to

the sale of the Joe Camel product.  He didn't -- that was the

testimony, as I recall it.

MR. LIPSHIE:  I did; he didn't.  On cross I brought

that point out.

THE COURT:  No, I think he -- that was what I

understood on direct.

Well, bring the jury in, Mr. Marshal.

MR. LIPSHIE:  Your Honor, I will try and move on.

(Jury in.)

COURT:  All right, counsel.

1    BY MR. LIPSHIE:

2         Q.    Mr. Bratic, you also testified that in 2006

3    Fallon competed with iLight and other companies to sell custom

4    made signs to Anheuser-Busch.  That's in your report; correct?

5         A.    Yes.

6         Q.    Do you know if any of the other companies still

7    make sales to Anheuser-Busch?

8         A.    No, I don't know.

9         Q.    Do you know if iLight makes any sales to

10   Anheuser-Busch?

11        A.    I don't believe they do, not anymore, not

12   currently.

13        Q.    You went on to testify that Fallon may have

14   initially implemented an aggressive pricing strategy in order

15   to garner the business of Anheuser-Busch.  Was it pricing or

16   the accused technology in your opinion that allowed Fallon to

17   acquire the Anheuser-Busch signage business?

18        A.    Well, it was both.  Anheuser-Busch wanted the

19   LED signage.  And it appears to me, based on -- if you look at

20   the economics of it, if you had a choice between who you are

21   going to get the same technology from, and one company sells

22   the sign for $100 and another one sells it for $180, you are

23   going to make a business decision to take and adopt that same

24   technology from the lower cost provider, which happened to be

25   Fallon.

Q.     Okay.  And you say Fallon was the lower cost

provider?

A.     Well, they provided it at a lower cost.  In

other words, they sold their signs to Anheuser-Busch, the LED

accused signs, in 2005, when that order was issued, awarded by

Anheuser-Busch.  They were selling for an average of roughly

$100 a sign, whereas Fallon had been selling them -- the ones

that they sold, the LED signs to Anheuser-Busch, for $180 a

sign.  That's a pretty big gap.

Q.     Couldn't that depend on the product mix that

has been sold to the customer?

A.     I'm just saying, I have information -- I don't

have information about their product mix sold by Fallon.  What

I do have is pricing information that has been produced in

this litigation as far as what Fallon sold those LED accused

products to Anheuser-Busch and what iLight had been selling

them for at the time they lost the account.

Q.     So you are comparing it to iLight -- are you

saying Fallon undercut its own price and started selling for

less and less a price?  Are you doing a comparative analysis?

A.     I'm doing both.  I also had the information

that shows that after Fallon got the Anheuser-Busch account,

once they locked that account in, they started raising their

prices, to the point now they are almost $170 a sign.

Q.     Let's look at Exhibit #934.  And that's Exhibit

8 to your report.  I don't know if you have your exhibits.

10:28:23   2        A.      I do not have my exhibits.

10:28:24   3        Q.      Let's give this to you.

10:28:28   4        A.      Thank you.  Thank you very much.

10:28:40   5        Q.      Could you look at Page three.  Doesn't that

6 indicate that seven of Fallon's products that were sold to

7 Anheuser-Busch went down in price the next year?

10:28:55   8        A.      I'm sorry?  On Page three?

10:28:56   9        Q.      Yes, sir.

10:28:57   10       A.      Okay.

10:29:00   11       Q.      Does that not indicate on Page three that seven

12 of the Fallon accused products sold to Anheuser-Busch went

13 down in price the next year?

10:29:12   14       A.      I don't know what you mean, seven products.

15 The total sum of all these products on Page three is a series

16 of more than seven products.

10:29:22   17       Q.      That's my question.  Seven of them went down,

18 didn't they, and only two went up the next year?

10:29:28   19       A.      Well, I have to look.  You have to look at them

20 individually.  Some of them, they didn't sell some in some of

21 the earlier years and introduced some in later years, so --

10:29:37   22       Q.      Do you have any quibble with that, that seven

23 of them went down the next year, and two of them -- only two

24 went up?

10:29:44   25       A.      I'm sorry, which -- is that what you highlight

```
         1   as being the seven ones up there?
10:29:47 2        Q.    Yes, sir.
10:30:26 3        A.    All right.  Well, let's take a look at that.  I
         4   see six up there that show between 2007 and 2008 that the
         5   price went down.
10:30:37 6        Q.    Okay.  You say six, and I say seven.
10:30:39 7        A.    I'm looking at the yellow highlights.
10:30:41 8        Q.    You see two?
10:30:45 9        A.    I'm sorry, between what years?
10:30:49 10       Q.    I think that's 2006 and 2007; right?
10:31:02 11       A.    No, you are comparing 2007.  Oh.  Well, --
         12  between 2006 and 2007, on that page alone, there's just two
         13  products.
10:31:25 14       Q.    Two what?
10:31:28 15       A.    Two products on that page.
10:31:34 16       Q.    Good.  And the average price per product when
         17  you look at that, sir?
10:31:36 18       A.    Yes.
10:31:39 19       Q.    Didn't it go up because the product mix
         20  changed?  Isn't that correct?
10:31:44 21       A.    Well, you would have to look at it.  These
         22  aren't weighted numbers.  In other words, these numbers are
         23  not weighted by the volume and the price.  So I can't answer
         24  that question.
10:31:55 25       Q.    Let me put it this way.  If one of the products
```

was a small sign that sold for $50, and then they changed the

mix, so the next year they are selling a 7' sign, naturally

that's going to cost a lot more than the very small one;

correct?

10:32:16  A.    I would expect so.  It's a different product.

10:32:20  Q.    You do know, sir, that Fallon's gross margin on

its LED sales decreased in 2007 compared to 2006; correct?

10:32:31  A.    Well, now, I have to look.  I don't know if I

have that information.  I'm sorry, would you repeat the

question.

10:32:45  Q.    Did not Fallon's gross margin on the LED sales

decrease in 2007 compared to 2006?

10:33:00  A.    Now, are you -- excuse me.  It's gross margin?

10:33:01  Q.    Gross profit margin.

10:33:06  A.    No, that's not true.  In fact, Fallon broke out

their retail and custom business for LED products.  And while

in 2006 the gross profit margin was 33 percent on retail, in

2007 the gross margin dropped to 28 percent.  But the custom

business, the gross margin in 2006 was 20 percent and went up

to 26 percent in 2007.

10:33:31  Q.    All right, sir.  You testified earlier about an

e-mail dated December 3, 2005 from a guy named Tim Demmond; is

that right?

10:33:43  A.    There were some e-mails I testified about.

10:33:44  Q.    Pardon?

10:33:49  1          A.     There were several e-mails I testified about.

10:33:51  2          THE COURT:  Well, listen carefully to the question.

       3   He's focusing on one.

10:33:55  4          THE WITNESS:  One, December?  I believe there was one,

       5   yes.

10:33:56  6   BY MR. LIPSHIE:

10:33:56  7          Q.     And you quoted that particular one?

10:33:56  8          A.     Yes.

10:34:00  9          Q.     Now, the hypothetical negotiation took place on

      10   January 20th -- or January of 2005; correct?

10:34:07 11          A.     Right.  On or about January of 2005.

10:34:09 12          Q.     But that e-mail was about a year later?

10:34:12 13          A.     I'm sorry, what was the date of the e-mail?

10:34:15 14          Q.     12/3/05.  12/3/05.

10:34:15 15          A.     Oh, yes.

10:34:17 16          Q.     So that wouldn't have had any effect on the

      17   hypothetical negotiation, would it?

10:34:25 18          A.     No, that's not true.

10:34:29 19          Q.     All right.  You recall your reasonableness

      20   check and how that related to the Georgia-Pacific factors that

      21   you testified about?

10:34:38 22          A.     Generally.

10:34:42 23          Q.     Okay.  Let's put up 32 TT, which was up there

      24   previously during the witness's testimony.  That's your

      25   reasonableness check; right?  That's how you entitled that?

10:34:57   1          A.    Yes.

10:34:59   2          Q.    You've got seven percent reasonable royalty

         3     that's up there.  Now, what percent of seven -- what percent

         4     is seven of 7.7?

10:35:20   5          A.    Of 7.7?  I don't understand the question.  What

         6     is seven percent of 7.7?

10:35:27   7          Q.    No.  You've got a seven percent reasonable

         8     royalty rate?

10:35:30   9          A.    Yes.

10:35:38  10          Q.    And Fallon's profits were 7.7; right?

10:35:41  11          A.    Their -- Fallon's -- which profit are you

        12     talking about?

10:35:45  13          Q.    Which one do you think was 7.7?

10:35:47  14          A.    Million, you mean?

10:35:47  15          Q.    Percent.

10:35:51  16          A.    Oh, that's their company-wide projected

        17     operating margin.  In other words, that was a projected

        18     operating margin, company-wide for 2005 that was prepared in

        19     2004.

10:36:05  20          Q.    All right.  Well, that has already happened;

        21     right?

10:36:08  22          A.    Well, no.  It never happened.  It was a

        23     projection.  And it was for company-wide.  There were no

        24     specific projections ever prepared by Fallon for the accused

        25     products.

| 10:36:19 | 1 | Q.    I'm not talking about projections, sir.  I'm |

10:36:19  1        Q.    I'm not talking about projections, sir.  I'm

       2  talking about actual results.

10:36:24  3        A.    Well, I'm sorry.

10:36:29  4        THE COURT:  You all, you did ask about projections at

       5  the beginning.

10:36:29  6  BY MR. LIPSHIE:

10:36:33  7        Q.    You are talking about 7.7 percent reasonable

       8  royalty rate.  That's seven percent of what?

10:36:38  9        A.    It's seven percent of sales, of accused

      10  products, of $35 million in products, accused infringing

      11  products.

10:36:52 12        Q.    Do you know what Fallon's made on its sales of

      13  infringing product?

10:36:57 14        A.    Well, --

10:36:59 15        Q.    7.7 percent, wasn't it?

10:37:04 16        A.    No, I don't believe that's correct.  And that's

      17  the profit after they allocated a bunch of arbitrary expenses

      18  to the product.  But Fallon made a lot of money on the gross

      19  profit margin and not the operating profit level.

10:37:21 20        Q.    They allocated expenses that businesses often

      21  allocate?

10:37:24 22        A.    No, that's not true, not in this case, because

      23  Fallon actually had roughly $3 million in what they call SG&A

      24  sales, general and administrative expenses, going back before

      25  they introduced the LED signs.  And they have had about the

same volume of SG & A or sales, general and expenses during

the time period that they reintroduced the LED signs.  So that

was a new business line that didn't cause them to spend any

more money in terms of buying the CEO an extra car, or buying

him a bigger office or buying him extra phones or those kind

of expenses.  And if you look at what Fallon has actually

done, and I have a chart that shows, all they did was

arbitrarily take the total company sales in general

administrative expenses as a percentage of total sales and

just arbitrarily applied that to the accused products without

any analysis to support that.

Q.    All right.  Thank you for that answer.  You

disagree that there was a 7.7 figure, as Dr. Degen testified

yesterday?

A.    No, that's not true.  What Dr. Degen testified

to in his report was a 7.7 projected profitability of

products.  All I'm saying is those projections in 2004 were

company-wide.  They were not for the accused products.

There's no documents in this case that Fallon has ever

produced showing projections of its accused products sales

and --

Q.    I'm with you now.

A.    I just wanted to be sure it's clear.

Q.    Okay.  You disagree with Mr. Degen on a lot of

things.  If you take his projections as correct -- and we know

you disagree with them, you don't need to explain again why --

do you see that little blue thing, that blue sliver?

10:39:20  A.    Yes, I do.

10:39:23  Q.    That would be the .7 percent of remaining
profit to Fallon out of that whole pie; correct?

10:39:28  A.    No.

10:39:33  Q.    No?  If you've got --

10:39:38  A.    That's 7.7 percent if you take the reasonable
royalty out.

10:39:42  MR. PRICE:  Objection, Your Honor.  There is a lack of
foundation.

10:39:43  BY MR. LIPSHIE:

10:39:45  Q.    That's your chart, isn't it, without the
sliver?

10:39:48  A.    That's not my chart.  It's your chart.

10:39:51  Q.    Is that not your chart that has been adapted to
show roughly what proportion .7 percent has to your reasonable
royalty of seven percent, which we just saw on your prior
chart?

10:40:04  A.    That's my chart that you took and modified.

10:40:06  Q.    That's right.  That's all I'm saying.

10:40:07  A.    Okay.  If you asked me that question, yes.

10:40:08  Q.    Well, that was the question, sir.

10:40:11  THE COURT:  Well, it wasn't too clear to me.

10:40:12  BY MR. LIPSHIE:

10:40:14 1          Q.     So that's all that would be left for Fallon to

2    cover such things as business risk, design, marketing,

3    customer relationships, changes in the economy, things of that

4    nature; correct?

10:40:26 5          A.     No, that's not true at all.

10:40:33 6          Q.     Okay.  Don't you think if Fallon had to pay

7    seven percent of total sales from the accused product, LED

8    signs, to iLight, they would have to raise their price?

10:40:48 9          A.     No, they wouldn't have to raise their price.

10:40:52 10         Q.     So they could just -- they could just pay a

11   large amount of what they were otherwise managing to take in

12   as profit, leaving them with some smaller amount of profit,

13   and would not have to raise their prices?  Is that right?

10:41:05 14         A.     They would not have to raise price at all,

15   because they would still keep half of their profits.  They

16   would pay seven percent royalties and still keep seven percent

17   of the sales price as profit.  So essentially, you're

18   splitting their profits on the product 50/50.

10:41:20 19         Q.     All right.  So you are saying that if you are

20   Sam's Club or Anheuser-Busch, and you are a vendor, let's say

21   the vendor is not making enough profit.  They have got more

22   costs, which includes seven percent of the total sales price

23   that it gets, you don't think that sometimes like the price

24   goes up seven percent of sales, say a large increase in the

25   price of gas or something of that nature, that the seller

would not have to raise the price of its product?  That's
supply and demand, isn't it, sir?

10:41:54    A.    We are talking about what actually happened.
We know there has been $35 million in sales of these products.
We know that Fallon has enjoyed a 15 percent profit premium
over its losing neon business.  We know that without this
product line, this accused product line, Fallon would be in a
world of hurt.  They would have been more than happy to split
their 15 percent profit premium, and they wouldn't have had to
raise their prices because we are dealing with their prices
that they actually sold their products at.  There's no
guessing here.

10:42:23    Q.    I understood.  So your testimony is the law of
supply and demand is not an appropriate factor?

10:42:30    THE COURT:  No, sir, that's not what he said.  That's
not what he said.

10:42:31 BY MR. LIPSHIE:

10:42:35    Q.    Rule of thumb.  You testified you don't like
Mr. Bagin's rule of thumb; correct?

10:42:41    A.    I disagree with him on the rule of thumb.

10:42:45    Q.    You disagree with him vociferously.  The
Georgia-Pacific factors -- that's not all he did, is it?  He
didn't just apply rule of thumb and ignore the Georgia-Pacific
factors that you testified about, did he?

10:43:00    A.    No, but his starting point for his entire

analysis was the Georgia-Pacific rule of thumb as to what he
thought were projected or expected sales of the accused
products, which is not true. And he came up with 1.9 percent
to 2.6 percent, and then he went through the Georgia-Pacific
analysis and ended up with 2 percent.

10:43:20   Q.   Right. He just used it as a starting point.
That's the point I'm trying to make, to get across to the
jury. Then he applied the Georgia-Pacific factors. You
disagreed with his analysis. But he didn't just apply a rule
of thumb and that was it, he went through the analysis.

10:43:37   MR. PRICE: Your Honor, counsel is testifying.

10:43:37   MR. LIPSHIE: Is that correct?

10:43:40   THE COURT: Well, he can ask him about the other
expert's report. Go ahead, Mr. Lipshie.

10:43:49   THE WITNESS: He did use a 25 percent rule of thumb.
And as I already discussed in my rebuttal testimony, he did go
through a Georgia-Pacific analysis because I walked the jury
through my criticisms and disagreements with him on his
analysis of the Georgia-Pacific analysis.

10:44:00   BY MR. LIPSHIE:

10:44:07   Q.   You don't know why Mr. Degen went through the
George Pacific factors? You just testified yesterday.

10:44:13   MR. PRICE: Your Honor, asked and answered.

10:44:13   THE COURT: Sustained.

10:44:13   BY MR. LIPSHIE:

1          Q.      The 25 percent rule of thumb has been used as a

2     starting point in expert damages analysis for decades, hasn't

3     it, in court cases?

4          A.      Sure.   It has also been widely criticized in

5     court cases, too.

6          THE COURT:  Well, we're not going to argue about court

7     cases.  We can argue about what people in the field do.

8     BY MR. LIPSHIE:

9          Q.      But it has been widely used, even though you

10     disagree with it?

11         A.      It has been widely used and widely criticized.

12         Q.      And the fact that you chose not to do it and

13     Mr. Bagin chose to use the 25 percent rule of thumb as a

14     starting point before he then engaged in his Georgia-Pacific

15     analysis doesn't deem his testimony unreliable per se, does

16     it?

17         A.      I'm not going to sit in judgment of what is

18     reliable -- his testimony is reliable.  That's for the jury to

19     figure out, not for me to determine.  I can just tell you what

20     he did and where I disagree with him.  It's ultimately for the

21     jury here to make their decisions about what is reasonable and

22     what makes sense.

23         Q.      All right, sir.  In your background

24     qualifications, it was revealed that you have testified many

25     times as a damages expert on patent infringement in federal

court proceedings such as this one; correct?

10:45:37  A.  Correct.

10:45:41  Q.  And that's part of your curriculum vitae, your resume and your qualifications; right?

10:45:46  A.  Yes, sir.

10:45:49  Q.  Have you ever been disqualified as an expert witness as to your testimony on damages from patent infringement?

10:45:57  A.  No.  I have had a report excluded, but have not been disqualified.

10:46:09  Q.  All right, sir.  Did you know or would it surprise you if I told you that the Northern District of California --

10:46:24  THE COURT:  Hold on, Mr. -- hold on.  Wait a minute.  Would counsel approach the bench?

10:46:26  (Whereupon, a bench conference was held, out of the hearing of the jury, to wit:)

10:46:28  THE COURT:  We're not going to have witnesses testifying about other court cases.

10:46:35  MR. LIPSHIE:  I just asked him a question has he ever been disqualified as a witness, and he has been.  They listed it in his CV.

10:46:45  THE COURT:  Let me see the language of the case.

10:46:47  MR. PRICE:  He's qualified as a technical expert. There's no damages.

10:46:52 1      THE COURT:  That's why -- that's the reason.  Let me

2  see the case.

10:46:54 3      (Conclusion of bench conference.)

10:46:55 4      THE COURT:  Ladies and gentlemen of the jury, we're

5  going to excuse you for a few minutes.  Please don't discuss

6  the case amongst yourselves or with anyone else until you

7  receive all of the evidence, the argument of counsel, and the

8  charge of the Court.

10:47:31 9      (Jury out.)

10:47:34 10     THE COURT:  If somebody has got an opinion, hand it

11  up.

10:47:41 12     From the Court's perspective what we have here is a

13  characterization of what some judge ruled, and I think that

14  that's a matter that the Court needs to address before

10:47:49 15  counsel --

10:47:50 16     MR. LIPSHIE:  I agree, Your Honor.  And I didn't stick

17  it up there.  I expected to bring it to Your Honor's

18  attention.

10:47:59 19     MR. PRICE:  It has now been put out in front of the

20  jury, though.

10:48:00 21     THE COURT:  Well, wait a minute.

10:48:01 22     MR. LIPSHIE:  Go ahead and read it.

10:48:01 23     MR. PRICE:  Excuse me?

10:48:04 24     THE COURT:  Let me read it.

10:48:05 25     MR. PRICE:  Oh absolutely, absolutely.  I apologize.

That's not what I'm inferring.

10:50:20    THE COURT:  The difficulty I have with this is that
we're going to get into a factual determination.  For example:

O2 Micro fails to show any effort it took to get all
of the information necessary for its expert to provide a
reasonable royalty calculation that does not rely upon
unreasonable inferences or speculation.

10:52:29    Part of this is a legal issue, too.  The reference to
the flaws in his report refers to the defendant's argument.
It really doesn't articulate the basis upon which the Court
grants summary judgment.  He granted it, but --

10:52:50    MR. LIPSHIE:  They strike his testimony as to damages,
and they give the reason why.

10:52:57    THE COURT:  He doesn't strike it.  What you have here
are critiques of the testimony.  He didn't strike it.  He just
said it wasn't sufficient -- the appropriate construction
would be, the Court grants summary judgment in favor of the
defendants, O2 Micro has presented no evidence of damages.

10:53:16    MR. LIPSHIE:  And he is the damages expert and they
struck his testimony, Your Honor.

10:53:22    THE COURT:  Well, they didn't strike it.

10:53:22    MR. LIPSHIE:  They excluded it.

10:53:23    THE COURT:  They didn't exclude it.  They found it
inadequate.

10:53:27    MR. LIPSHIE:  Unreliable under Daubert grounds.

547

10:53:29 1          THE COURT:  Well, that's what the defendants argue,

2   but the Court doesn't adopt that language.

10:53:33 3          MR. LIPSHIE:  Well, they kicked it out because --

10:53:36 4          THE COURT:  Well, you keep saying they kicked it out.

5   He didn't kick it out.  He obviously considered it.  If he

6   considered it, he didn't kick it out.

10:53:41 7          MR. LIPSHIE:  All right, Your Honor.  I will defer to

8   Your Honor's reading of this.

10:53:46 9          THE COURT:  Well, that's why I think we needed a

10  discussion, because you are characterizing the matter.

10:53:51 11         MR. LIPSHIE:  Can I see it?

10:53:53 12         THE COURT:  Well, I thought you would have seen it.

10:53:55 13         MR. LIPSHIE:  I have seen it.

10:53:55 14         THE COURT:  Well, I thought you had read it before.

10:53:55 15         MR. LIPSHIE:  I have read it, Your Honor.

10:53:56 16         MR. PRICE:  Your Honor, my concern is, now this has

17  come out before the jury without context.  And my

18  understanding is, part of the reason --

10:54:01 19         THE COURT:  I'm going to see if, after the Court's

20  references to this, whether he's still going to ask this

21  question.  And if he is, then I will ask accordingly.

10:54:13 22         MR. PRICE:  Unfortunately, I believe he already got

23  out the first one.

10:54:17 24         THE COURT:  I think he got out -- he said, have you

25  been disqualified.  And he said --

10:54:19  1          MR. LIPSHIE:  He said no.

10:54:23  2          THE COURT:  He said, no, I was not disqualified.  He

          3     said the report was rejected.  Or the report --

10:54:26  4          MR. LIPSHIE:  Was excluded.

10:54:27  5          THE COURT:  Was excluded.  I don't think it was

          6     excluded.  If it was excluded, the Court never would have

          7     considered it.  He obviously considered it and didn't find it

          8     adequate.

10:54:39  9          Part of the inadequacy was that they didn't give him

          10     enough information.  His client didn't give him enough

          11     information.  That, I think, is a reasonable construction of

          12     that language.

10:54:47  13          MR. PRICE:  I believe in this particular case it also

          14     had to do with the technical expert issues that underlie it.

10:54:53  15          THE COURT:  Well, I didn't see all that.

10:54:55  16          MR. PRICE:  That's why you are only getting the

          17     highlighted versions.  It actually, if you read the whole

          18     thing in context, they have major issues with the technical

          19     person.  You have to assume in damages --

10:55:06  20          THE COURT:  Well, the Court separately discussed the

          21     issue of damages.

10:55:08  22          MR. PRICE:  You are correct, Your Honor, that that

          23     didn't play into context of the summary judgment ruling.

10:55:14  24          THE COURT:  Well, I mean, he had a separate ruling on

          25     the issue of damages.  And I think the Court can consider that

separately in a motion.  For the issues before the Court.  To say it was excluded I don't think is appropriate, because the Court obviously considered it.  It was -- I think the most reasonable construction is the Court did not feel that it was adequate to show -- to prove the element of damages in that case.

MR. LIPSHIE:  ILight says -- here would be what I would point to, Your Honor.  And this could be a close call.  I have never been in this particular argument before.  It says, third, it goes, as defendants point out, which is what Your Honor was talking about, Mr. Bratic's report does not account for the law of supply and demand.  Mr. Bratic hypothesizes a royalty that would triple the average selling price for MPS's accused products, but he makes no allowance for the impact that increased prices would have had on demand.

Then they go ahead, they cite a case, they say, O2 Micro, who had hired Mr. Bratic, attempts to distinguish this case, noticing the plaintiffs there sought lost profits, not a reasonable royalty.  This difference is inconsequential.  Then they cite to the parties' arguments.  They say, defendants have not offered evidence from an economist or other expert, put they do point to flaws in Mr. Bratic's report that, when combined, are serious enough to render it unreliable and inadmissible.  As a result, O2 Micro has not met its burden of proving damages.  The Court grants summary judgment in favor

of defendants on -- that O2 Micro has presented no evidence of damages.

That's what I would rely upon. And that's all. It goes from right there to the last highlighted. I think they do --

THE COURT: Well, here's the difficulty that I have, my understanding of this. What the plaintiffs seek are a reasonable royalty of actual past sales. And an injunction against any future production or sales by the defendant of their product.

If you have an injunction, then there's no more sales by the defendant. So that the issue of whether there is an increase in price is really for the plaintiff.

MR. LIPSHIE: Well, that's not the only thing they mention.

THE COURT: No, but --

MR. PRICE: Obviously it is a reasonable royalty situation and not lost profits, either.

MR. LIPSHIE: Well, this is a reasonable royalty case.

THE COURT: It is on reasonable royalty. But it's on past sales, on sales that have actually occurred, is what they are seeking. It's a form of disgorgement, is what it is.

MR. LIPSHIE: I think it is there, too, Your Honor.

THE COURT: But in terms of future prices, if you are asking for an injunction that the defendant not make the

```
  1   product anymore, then it seems to me whether it increases what

  2   the price -- what a price -- a price increase of the defendant

  3   is irrelevant, because they don't make the product anymore.

10:58:34  4        MR. LIPSHIE:  But that's what they are looking at.  He

  5   has given a reasonable royalty on past sales.  They are

  6   saying, what you did is you didn't take into account that your

  7   reasonable royalty would have increased the price and caused a

  8   reduction in demand.

10:58:48  9        THE COURT:  But that speaks to future sales.  If there

 10   are future sales, it may raise the price.  But if you are

 11   asking for an injunction that you don't sell it anymore, then

 12   the future price of the defendant is irrelevant.

10:59:00 13        MR. LIPSHIE:  Even if you go back to 2005 and look at

 14   the hypothetical negotiations?

10:59:03 15        THE COURT:  No, but we're not -- that's the point.

 16   You are looking at what the actual sales price was.  The sale

 17   has been consummated.

10:59:11 18        MR. LIPSHIE:  Well, he's doing both, and then he's

 19   grasping back on to the reasonable royalty rate.  His theory

 20   that if you paid all this additional money for past sales, it

 21   wouldn't have caused iLight to have to raise the price to make

 22   the same amount of sales.  That's -- that's my point, Your

 23   Honor.  I think that's what their point is.  But I will leave

 24   it to Your Honor.

10:59:37 25        MR. PRICE:  Your Honor, the underlying sales data was
```

supplied by Fallon.  Both sides relied on the exact same data.

                The only projection was the forecasting because we didn't have

                supplementation.

10:59:49        MR. LIPSHIE:  We're not arguing about forecast.

11:00:21        THE COURT:  Well, it seems to me that -- well, --

11:00:25        MR. LIPSHIE:  Your Honor, may I make a suggestion?  He

                has listed it in his expert report, and it was part of his

                qualifications, and he has said --

11:00:34        THE COURT:  Well, I will allow you to ask him whether

                any of his reports have been rejected by a court as inadequate

                to show a reasonable royalty.

11:00:51        MR. LIPSHIE:  That was going to be my suggestion.

11:00:54        THE COURT:  Yeah, but the way you characterized it

                before is a bit of mischaracterization.

11:00:58        THE COURT:  Let me try it and see what Your Honor

                says.

11:01:00        MR. PRICE:  I take it, Your Honor, then I can put it

                in context?

11:01:05        THE COURT:  Well, what do you mean put it in context?

11:01:07        MR. PRICE:  If he's going to open this door, I'm going

                to be able to ask Mr. Bratic his understanding of why that

                occurred.

11:01:14        MR. LIPSHIE:  Your Honor, that's why I was going to

                make that suggestion.  If he then goes back into it --

11:01:20        MR. PRICE:  The bottom line is, they are highlighting

very narrow issues and losing the big picture.  If they are

going to project this situation onto here where Mr. Bratic has

testified in hundreds of cases, and they pick out one --

11:01:34  THE COURT:  You know, here's the difficulty I have.

For example, the Court in this case points out to the

arguments, but it doesn't reflect which rationale it's

following.  It doesn't make an express ruling that he's

disqualified under Daubert as unreliable.

11:01:52  MR. PRICE:  Correct.

11:01:54  THE COURT:  It only says he grants summary judgment.

If you grant summary judgment, it seems to me you had to

consider the evidence in some context.

11:02:02  MR. PRICE:  That's correct.

11:02:08  THE COURT:  I think to me it's a little bit ambiguous.

But I think it's fair to say that the Court found it

inadequate, or the Court rejected it as inadequate to

determine a reasonable royalty under the facts of that case.

Otherwise, we're going to get into a debate about the merits

of that case, and I don't want to take this too far, because

everybody is going to be trying to characterize the Court's

ruling.  So what are you going to ask?

11:02:40  MR. PRICE:  Well, at a minimum, Your Honor, we're

going to have to put it in context that this is one of

hundreds of matters in which he has testified.

11:02:55  THE COURT:  Well, I mean, that point I think is -- I

don't see any problem with that.

11:02:58     MR. PRICE:  I understand.  I mean, the problem is, Your Honor, we're kind of getting into a Rule 403 situation where they are, in my opinion, taking this out of context.

11:03:07     THE COURT:  No, but I mean, I think they are entitled to point out if there was an occasion when a court didn't accept his calculation of what a reasonable royalty was.  I think they are entitled to point that out.

11:03:21     MR. PRICE:  And, Your Honor, in turn, am I entitled to ask this witness his understanding of why that occurred in that case?

11:03:27     THE COURT:  No, because actually he would be speaking for the court.  You can point out things that the court cited. For example, it said the defendant -- Micro failed to show any effort to get all of the information necessary for its expert. I'm trying to confine this, because I think it could get a little bit out of control.

11:04:08     MR. PRICE:  That's my concern, Your Honor.

11:04:10     THE COURT:  I think he could ask that it was rejected, and I think he could point out the language about whether the client in that case got all of the necessary information for its expert to provide a reasonable royalty calculation.  I think that is the extent to which you can go.

11:04:30     MR. LIPSHIE:  Maybe we can avoid this.  How did the record end up before the jury went out?  He answered --

555

| | | |
|---|---|---|
| 11:04:38 | 1 | THE COURT:  Well, I will ask the court reporter to |
| | 2 | read it back. |
| 11:04:40 | 3 | MR. LIPSHIE:  Because we might could stop right there |
| | 4 | if that's acceptable. |
| 11:04:46 | 5 | THE COURT:  No, sir.  There was a very big inference |
| | 6 | raised by you. |
| 11:04:49 | 7 | MR. PRICE:  I was going to say, a cautionary |
| | 8 | instruction. |
| 11:04:52 | 9 | MR. LIPSHIE:  Didn't the witness just say, my |
| | 10 | testimony was excluded or something? |
| 11:05:29 | 11 | THE COURT:  Hold on.  Stop. |
| 11:05:31 | 12 | MR. PRICE:  I'm inclined to let the record stand if |
| | 13 | we're to go beyond this point. |
| 11:05:36 | 14 | MR. KITTREDGE:  That's fine. |
| 11:05:39 | 15 | THE COURT:  We'll just leave it be. |
| 11:05:41 | 16 | MR. LIPSHIE:  We'll be here all day. |
| 11:05:42 | 17 | MR. PRICE:  That's my concern. |
| 11:05:44 | 18 | THE COURT:  Everybody gets to interpreting what the |
| | 19 | court said, and we've got enough to deal with rather than |
| | 20 | interpret another decision. |
| 11:14:00 | 21 | MR. LIPSHIE:  We did end up with an answer. |
| 11:14:00 | 22 | COURT REPORTER (Reading): |
| 11:14:00 | 23 | Q.    Have you ever been disqualified as an expert |
| | 24 | witness as to your testimony on damages from patent |
| | 25 | infringement? |

556

11:14:00    1    　　　　　　A.　　　No.　I have had a report excluded, but have not

            2    been disqualified.

11:14:00    3    　　　　　　Q.　　　All right, sir.　Did you know or would it

            4    surprise you if I told you that the Northern District of

            5    California --

11:14:00    6    　　　　　　THE COURT:　We're in recess.

11:14:00    7    　　　　　　(Recess.)

11:14:05    8    　　　　　　THE COURT:　Let me -- you all can have a seat.　Let me

            9    be clear on two court evidentiary rulings.　Or one was a

           10    remark as opposed to a ruling.

11:14:20   11    　　　　　　On the issue of appearance, if the issue is whether

           12    the products -- earlier there was testimony about a customers'

           13    reaction to a product to show obviousness.　To the appearance

           14    of a product to show obviousness.　Well, obviousness, as I

           15    stated, quoting from the Supreme Court decision, for the

           16    purpose of obviousness, it has to be someone, a person who is

           17    learned in the art.

11:14:49   18    　　　　　　Where the issue is the appearance of whether this

           19    plaintiff's product gives the full appearance -- gives the

           20    appearance of neon lighting, that is one aspect of the claim

           21    for which that testimony would be admissible.

11:15:09   22    　　　　　　On the issue of the reasonable royalty, I think that

           23    the reference to law and demand may be relevant only insofar

           24    as it would have affected the determination of price at the

           25    time of sale, which I think is a separate issue from what the

557

issue of damages are, which is -- which slightly different,

however, than the issue of damages.

11:15:43 3    Anybody else?

11:15:59 4    You can bring the jury in.

11:16:02 5    How much longer do you expect to go?

11:16:05 6    MR. LIPSHIE:  About 22 seconds.

11:16:12 7    THE COURT:  I will hold you to it.

11:16:15 8    (Jury in.)

11:16:19 9    THE COURT:  You can be seated.

11:16:23 10    Mr. Lipshie.

11:16:25 11    MR. LIPSHIE:  Your Honor, I think I have heard enough

12    from this witness.

11:16:30 13    THE COURT:  Well, I just asked for a question.  You've

14    got one or you don't.

11:16:33 15    MR. LIPSHIE:  What I would like to do is just admit

16    into evidence what has been marked as Plaintiff's 43,

17    Plaintiff's 45, Defendant's 542, Defendant's 955, and

18    Defendant's 954, all of which were passed up to this witness.

11:16:53 19    THE COURT:  Without objection, they will be admitted.

20    Any redirect of this witness?

11:16:56 21    MR. PRICE:  Yes, Your Honor.

11:16:57 22    MR. LIPSHIE:  Thank you, sir.

11:16:57 23    REDIRECT EXAMINATION

11:16:57 24    BY MR. PRICE:

11:17:01 25    Q.    Mr. Bratic, Mr. Lipshie asked you some

questions about the IDG agreement with iLight?

11:17:06     A.      Yes.

11:17:09     Q.      Specifically about whether it was a, quote, royalty free agreement?

11:17:10     A.      Yes, sir.

11:17:13     Q.      And you said that you were looking at it based on the overall agreement. What did you mean by that?

11:17:19     A.      Well, I mean, it's no different than when Intel, for example, makes a chip that they sell to Dell, puts it into a Dell computer. Well, Intel gives Dell Computers a license for its technology and its intellectual property rights because Deal is buying its product.

11:17:39     In the IDG agreement, they had an overall business relationship because they were sharing and using iLight's technology. To make the product, the LED neon product, they had to have a license or the right to use iLight's technology. So it was a collaboration, a joint development agreement, that is radically different than a bare patent license between two competitors, iLight and Fallon. There is no collaboration at all, say iLight gives for licensing Fallon, iLight gives that it's going to lose sales down the road.

11:18:15     Q.      Mr. Lipshie was also asking you about the Color Kinetics/iLight agreement. And in that context he was asking you how much royalties have been paid by iLight.

11:18:29     A.      Yes.

Q.    Do you know what iLight products were affected

        2    by the Color Kinetics license?

A.    My recollection was certain Plexineon signs.

Q.    Do you recall anything about the Hypnotica

        5    product?

A.    Well, I just recall that that's a new product

        7    that was recently released.

Q.    Do you know whether that product was affected

        9    by the Color Kinetics agreement?

A.    I'm not sure which product it is, but one of

       11    those products we are paying a four to five percent royalty

       12    on.   It's a noncompetitive product within that license

       13    agreement, so they pay the four percent royalty initially for

       14    18 months, then it switches to five percent royalty.

Q.    And there were two different rate structures

       16    within the agreement?

A.    Well, there was that, but the noncompetitor

       18    products was four to give percent.  And then there was for the

       19    competitor products, which iLight had the right to bring out

       20    during the length of the license which expires in 2016, they

       21    would end up paying nine percent royalty on those products.

Q.    Mr. Lipshie was also asking you about some

       23    exhibits, specifically some deposition testimony exhibits in

       24    December of 2005, and asking you whether you could consider

       25    something in December relevant to the January 2005

1  hypothetical negotiation, and you indicated you could.  Why is
2  that?
11:20:00  3      A.    Well, because even the Supreme Court of the
4  United States and a number of federal courts --
11:20:03  5      MR. LIPSHIE:  Your Honor?
11:20:05  6      THE COURT:  Sustained.  Disregard the last statement.
7  Do you want to restate your question?
11:20:08  8  BY MR. PRICE:
11:20:10  9      Q.    If you could answer without reference to court
10  cases.
11:20:13  11     A.    Sure.  Well, there is a well-known concept in
12  patent damages called Book of Wisdom.  And the Book of Wisdom
13  is a concept that you can take information that wouldn't
14  exactly be knowable, for example, in January 2005 but occurred
15  after January 2005, and have considered it at the hypothetical
16  negotiation.
11:20:36  17     Q.    Mr. Lipshie was also asking you, with respect
18  to the hypothetical negotiation, what profits you may have
19  considered in 2004, 2005, and 2006 in your examination of the
20  profits during that time frame, and specifically iLight sales
21  of the LED products at issue.  What impact did you see in that
22  time frame with respect to those type of sales by iLight?
11:21:04  23     A.    Well, iLight's product sales obviously started
24  declining after Fallon came on the market with its LED signs.
11:21:23  25     Q.    At some point, Mr. Lipshie and you were talking

about the R.J.R. sales.  Now, the R.J.R. sales -- that related

to Image Works?

11:21:32    A.    That's my recollection.

11:21:34    Q.    Not Identity Group?

11:21:35    A.    That's correct.

11:21:38    Q.    Okay.  I just wanted to clear up.  I think
there was a mistaken reference to IDG there.

11:21:44          And Mr. Lipshie also indicated that Fallon had not
competed with respect to R.J. Reynolds and asked you about
what you were aware of in that regard.

11:21:53    A.    Right.

11:21:54    Q.    And I believe you indicated that you weren't
aware of that?

11:21:59    A.    I think what I said was, I wasn't privy, you
know, I didn't have access to R.J. Reynolds' own documents to
know who was competing for the R.J. Reynolds account.  That
kind of information has never been available in this lawsuit.

11:22:15    Q.    Let me see if I can help you with that.

11:22:25          Will you pull up TX 51, please.

11:22:27          Do you recognize this document?

11:22:30    A.    I'm having a hard time seeing it from over
here.

11:22:49    Q.    Well, it was -- well, let me make this easier.
Let's just cut to the chase.

11:22:54          Will you pull up the last page of this document,

please, nine.  And specifically, will you pull up -- can you

         focus on 79.

11:23:36         In this Fallon sales forecast, comment number 79, will

         you please read that?

11:23:41         A.      Sure.  It says, R.J.R., which is R.J.

         Reynolds, is looking at Fallon's LED unit.  We will be

         producing a prototype and competing against iLight.  Too soon

         to add to forecast.

11:23:57  BY MR. PRICE:

11:24:19         Q.      Thank you.  Let's pull up a link.  This is a

         follow-up document.  This is an entire document.

11:24:31         MR. LIPSHIE:  Your Honor, this is redirect.  He hasn't

         testified as to any familiarity with any of these documents or

         that he has seen them.

11:24:40         THE COURT:  It wasn't raised on cross.

11:24:42         MR. PRICE:  Your Honor, I believe we should approach.

11:24:42         (Whereupon, a bench conference was held, out of the

         hearing of the jury, to wit:)

11:24:49         THE COURT:  It wasn't raised on cross.  What did you

         ask him on cross?

11:24:54         MR. PRICE:  Mr. Lipshie was asking about whether

         Fallon had competed with iLight with respect to R.J.R.

         Reynolds.  And he declared that they had not.  In fact, this

         Lincolnshire document that Fallon didn't produce but that

         their venture capital company did, showing, in fact --

I'm sorry.  The Lincolnshire document shows that

Fallon did not.  And this document is showing that Fallon also

in 2008 was still going after the business.  If you will turn

to the last page, you will see the drawing of the Camel sign

that they were submitting to R.J.R. at that time.

THE COURT:  What do you say?

MR. LIPSHIE:  He can't introduce that through this

witness, Your Honor.  He's testifying he doesn't know.

MR. PRICE:  They opened that door, Your Honor.

MR. LIPSHIE:  That's not an open door.  That's an

expert witness who has already testified.  He already

testified he didn't know about it.  It's not our witness.

MR. PRICE:  He asked -- he declared they didn't

compete and asked him whether he knew.

MR. LIPSHIE:  I asked whether they were entering that,

and he said he did not know.

MR. KITTREDGE:  It's not on anything he reviewed, Your

Honor.

MR. PRICE:  You are absolutely correct.  But they

opened the door.

THE COURT:  They have opened the door.  The question

is whether this witness knows about it.

MR. PRICE:  I understand.

MR. LIPSHIE:  He can use another witness.

THE COURT:  You can introduce this through another

witness.

2          MR. PRICE:  Fine, Your Honor.  Thank you.

11:26:38 3          (Conclusion of bench conference.)

11:26:38 4     CONTINUED EXAMINATION

11:26:38 5     BY MR. PRICE:

11:26:42 6          Q.     Mr. Lipshie was asking about the 25 percent

7     rule of thumb.

11:26:44 8          A.     Right.

11:26:45 9          Q.     And you mentioned that this was widely

10     criticized in the industry.

11:26:48 11          A.     Correct.

11:26:49 12          Q.     Would you please explain that.

11:26:53 13          A.     Well, in the real world, where people negotiate

14     licenses all the time, I have never experienced a situation,

15     and I have negotiated licenses for clients for over 300, 400

16     times in my career in 30 years.  And if I ever came to a

17     client and said, well, let's talk about a royalty with the

18     other side, and let's start out with a rule of thumb, 25

19     percent of this, or 25 percent of that, they would say, well,

20     why am I hiring you?  You are not adding anything of substance

21     to the analysis, you are just taking 25 percent of a number; I

22     could do that.

11:27:26 23          So the point is, it's arbitrary, and I say it's

24     arbitrary because, if it were the case that everybody used the

25     25 percent rule of thumb in every single industry, you would

have uniformity or consistency of royalty rates, and that's
not the case.  In all kinds of industry you pick, royalty
rates are -- can be all over the board.  And why?  Because
there are many unique facts and circumstances to each
individual unique negotiation.  That's why taking an arbitrary
25 percent of a number is just totally arbitrary, in my view
just speculative.  It adds no value.

11:27:58    MR. PRICE:  Thank you, Your Honor.  And thank you, Mr.
Bratic.  That's the end of my questions.

11:28:01    THE COURT:  Any recross?

11:28:02    MR. LIPSHIE:  None, Your Honor.  Thank you.

11:28:07    THE COURT:  You may step down, sir.

11:28:07    THE WITNESS:  Thank you, Your Honor.

11:28:09    THE COURT:  Does the plaintiff have a short witness?

11:28:13    MR. PRICE:  Your Honor, at this juncture we have video
clips.

11:28:14    THE COURT:  How long is the first one?

11:28:17    MS. HUNTER:  Your Honor, a total of five witnesses who
will testify by video deposition.  It will take approximately
an hour and a half.

11:28:32    THE COURT:  Do you have two that will cover 30?

11:28:35    MS. HUNTER:  Two?  Yes, Your Honor.

11:28:38    MR. PRICE:  We believe we can run two for about 30
minutes.

11:28:40    THE COURT:  All right.  You may call your next

1   witness.

11:28:43   2          MS. HUNTER:  Your Honor, if I may, a brief

3   introduction.

11:28:48   4          THE COURT:  All right.

11:28:49   5          MS. HUNTER:  Ladies and gentlemen, at this point we

6   intend to call an individual by video deposition.  Actually,

7   we will present five individuals who had their depositions

8   taken.  And the parties have agreed to show particular clips

9   to you, so please excuse the rough cuts and transitions.

11:29:08   10         At this point we'll call Mr. Eric Eriksson, one of the

11  inventors of the patents-in-suit.

11:29:49   12         And your Honor, if we may dim the lights.

11:29:49   13         (Video playing:)

11:29:50   14         Q.    (By Mr. Kittredge) Can you state your full name

15  for the record?

11:29:54   16         A.    Eric Rudolph Eriksson.

11:29:56   17         Q.    And what is your home address?

11:30:00   18         A.    3816 Russett Lane, in Glenview, Illinois,

19  60026.

11:30:04   20         Q.    Are you still employed by iLight Corporation?

11:30:06   21         A.    No.

11:30:12   22         Q.    Actually, could you describe for me your

23  education and background following high school?

11:30:21   24         A.    I went to IIT, Illinois Institute of

25  Technology, in the architecture program.  It's a five year

567

program for a bachelor of science in architecture.  I have not
gone on to master's work or higher education beyond that.

11:30:37    Q.    When did you get your B.S. in architecture?

11:30:37    A.    '78.

11:30:43    Q.    And when did you join iLight?

11:30:49    A.    I joined iLight at the very first in, oh, 2000.
There was a period of time when I was not employed, but I
worked half-time with the team and then eventually became
employed.

11:31:06    Q.    When you say you were attached to the team, do
you mean the team of iLight?

11:31:08    A.    ILight.

11:31:10    Q.    Was that in 2000?

11:31:10    A.    Yes.

11:31:13    Q.    So you first started out working half-time at
iLight?

11:31:14    A.    Yes.

11:31:17    Q.    Basically a contract employee?

11:31:18    A.    I suppose.

11:31:22    Q.    Okay.  Were you -- at what point did you become
a full-time employee?

11:31:29    A.    I do not recollect exactly, but I believe it
would be November of 2000, late 2000.

11:31:37    Q.    So it was a relatively short time that you were
working on a part-time basis?

11:31:43  1          A.      I worked part-time over half a year, less than

2     one year.

11:31:46  3          Q.      And is it -- do I understand correctly that you

4     worked full-time at iLight from about November of 2000 until

5     you left in June of 2007?

11:31:53  6          A.      Yes.

11:31:54  7          Q.      So if I understand correctly, from the time you

8     got your B.S. in architecture until the time you started

9     working in iLight, your career was as an architect?

11:32:03 10          A.      Yes.

11:32:07 11          Q.      Was that all in the Chicago area?

11:32:07 12          A.      Yes.

11:32:10 13          Q.      Were you the vice-president of product

14    development until you left there in June of 2007?

11:32:19 15          A.      I was vice-president of product development.  I

16    did have some different titles in my time at iLight.  So it

17    was not necessarily continuous.

11:32:31 18          Q.      Okay.  You were vice-president of product

19    development.  You left in June of 2007?

11:32:34 20          A.      Yes.

11:32:38 21          Q.      But somewhere in between obviously 2001 and

22    June 2007 you had --

11:32:42 23          A.      Yes, yes.

11:32:43 24          Q.      Is it fair to say that George Hulse was a

25    member of the team who was the real expert in waveguides?

11:32:53  1          A       George's specialty was in optics, more so than
         2  me.  I am a generalist as an architect.

11:33:04  3          Q.      Do you recall any visiting Fallon?

11:33:11  4          A.      It seems to me I visited Fallon years later up
         5  further north of Chicago, closer to Milwaukee, I believe.  I
         6  did on at least one occasion, yes.  I recall another visit
         7  with them going to --

11:33:33  8          Q.      Go ahead.

11:33:39  9          A.      -- to be --  I visited Fallon at their trade
        10  show in Vegas once and spoke with one of their senior
        11  engineers.  At the time -- this was later, but at the time I
        12  had a functioning piece of our prototype product in my pocket.
        13  It was neon -- light neon with LEDs.  I remember pointing to a
        14  Fallon sign, put my finger on the neon sign and asking, can
        15  this ever been made out of LEDs.  And he looked at me and
        16  said, no, it can't be done.  That was the only other time I
        17  can remember interacting regularly with -- that is, knowingly
        18  interacting with Fallon.

11:34:27 19          Q.      Do you remember when that was?

11:34:30 20          A.      It was pretty early on in that it was one of
        21  our earliest working prototypes.  So early in iLight's
        22  history.

11:34:38 23          Q.      2000, 2001?

11:34:40 24          A.      I don't know the year, but it would be just
        25  very early.  Shortly after accomplishing what we did here as

described in our patent, my lab books. 2001, perhaps.

11:34:54    Q.    Do you remember the name of the person you spoke with?

11:34:58    A.    No, that would be a stretch. He was there with Fallon for 15-plus years, he said. He was a senior engineer type, was well versed in neon and neon transformers, and was familiar with LEDs.

11:35:22    Q.    Did you identify yourself as somebody from iLight?

11:35:28    A.    I don't believe I introduced myself. I simply approached him in his trade booth at what was probable a sign -- ISA's annual sign show, probably.

11:35:41    Q.    That would have been my next question. Do you remember the name of the trade show?

11:35:48    A.    Most likely the ISA trade -- annual trade show.

11:35:51    Q.    And did you show him the prototype you had in your pocket?

11:35:56    A.    No, I did not, because he -- no, I did not show it to him.

11:36:03    Q.    Did you show that prototype to anyone at the trade show?

11:36:08    A.    I know I showed it, but I don't know who I showed it to.

11:36:21    Q.    Was it shown to a company or two that had a booth at the show?

| | | |
|---|---|---|
| 11:36:28 | 1 | A. The striking memory I had was when he said, no, |
| | 2 | it can't be done. But after that, I don't remember any |
| | 3 | particular -- any one other instance except that I -- I |
| | 4 | remember showing it, because I was sort of proud of it, |
| | 5 | because it was a big deal. So know I showed somebody. |
| 11:36:49 | 6 | Q. To somebody at this trade show? |
| 11:36:51 | 7 | A. Professionals in the trade. |
| 11:36:52 | 8 | Q. More than one? |
| 11:36:55 | 9 | A. Yes, no doubt. |
| 11:36:59 | 10 | Q. Was this after the time that iLight had filed |
| | 11 | this patent application? Do you remember? |
| 11:37:04 | 12 | A. It would be -- it would have been after the |
| | 13 | time of application. |
| 11:37:12 | 14 | Q. It wasn't Las Vegas, was it? |
| 11:37:16 | 15 | A. Yes, almost certainly. |
| 11:37:17 | 16 | Q. Las Vegas is -- I'm not making fun. |
| 11:37:23 | 17 | A. To the best of my memory, it was Las Vegas. |
| 11:37:26 | 18 | Q. The question I had was really simple about it's |
| | 19 | a sign that says Camel store on it. Do you do see that, sir? |
| 11:37:32 | 20 | A. Yes, I do. |
| 11:37:34 | 21 | Q. Is this a product that was made by iLight? |
| 11:37:35 | 22 | A. Yes, it was. |
| 11:37:38 | 23 | Q. Is it your understanding that this sign, the |
| | 24 | Camel store sign, was made in accordance with the '238 Patent, |
| | 25 | Exhibit 2 that we have been discussing? |

11:37:50  1          A.    I would say yes.

11:37:54  2          Q.    The -- looking at the blue outline of the

          3    Camel?

11:37:59  4          A.    Yes.

11:38:03  5          Q.    Is that what you would describe as an optical

          6    waveguide?

11:38:10  7          A.    That is the classic piece of our patented

          8    Product, the both diffusing and optical waveguiding elements.

11:38:20  9          Q.    I will ask a quick question about the Camel,

          10   the blue outline of the Camel that we are talking about.  Is

          11   that what you consider a rod-like member?

11:38:32  12         A.    It is one -- yes.

11:38:35  13         Q.    And not sure I've described this, two circles

          14   that are green and interlocked.  Do you recognize this sign,

          15   Mr. Eriksson?

11:38:39  16         A.    Yes, I do.

11:38:41  17         Q.    What is it?

11:38:47  18         A.    This is for Kool cigarettes.

11:38:50  19         Q.    And is the sign we were talking about, the

          20   green one for Kool cigarettes, is it your understanding that

          21   that was made accordance with the '238 Patent?

11:39:00  22         A.    Yes.

11:39:06  23         Q.    Do you recognize the red striped device that

          24   I'm holding?

11:39:07  25         A.    Yes.

11:39:08  1          Q.     What is this?

11:39:13  2          A.     That would be our classic standard plastic neon

        3    product.

11:39:18  4          Q.     Is this a product sample used for a sales

        5    package?

11:39:22  6          A.     It would be a typical salesman's sample.

11:39:24  7          Q.     And what causes this to be red?

11:39:27  8          A.     There are red entities in it.  If we turn it

        9    off, we would see if there is any red pigmentation in the

       10    plastic.  It comes --

11:39:40 11          Q.     So it might have pigmentation and might not?

11:39:43 12          A.     It could.

11:39:46 13          Q.     I see.  The outer housing here -- can you tell

       14    me what the outer housing of this device is made of?

11:39:55 15          A.     It's an opaque plastic acrylic.  This

       16    particular one is red in color.

11:39:59 17          Q.     How does it apply?

11:40:06 18          A.     It is extruded with the light diffusing

       19    waveguiding metal elements all at one time.

11:40:14 20          Q.     And are the LEDs then added later?

11:40:16 21          A.     LEDs are added after the fact.

11:40:20 22          Q.     I see.  And is it your understanding that this

       23    red device is manufactured in accordance with what you

       24    understand of the '238 Patent?

11:40:31 25          A.     Yes.

574

11:40:33  1          Q.      You would agree, wouldn't you, that the idea of

2  having a reflective wall or walls around a lighting element

3  was not an invention created by iLight?

11:40:48  4          A.      Simply reflecting light is not an invention

5  created by iLight.

11:40:55  6          Q.      Do you know where iLight purchased the LEDs

7  that it used in its products while you were employed there?

11:40:59  8          A.      What was the question again?

11:41:02  9          Q.      Where did iLight purchase the LEDs that it

10  used?

11:41:07  11          A.      Are you asking am I aware of it, or do I know

12  where they got them?

11:41:11  13          Q.      Do you know where they got them?

11:41:11  14          A.      Yes.

11:41:11  15          Q.      Where?

11:41:17  16          A.      They are made by Cotco.

11:41:21  17          Q.      Do you spell that C-o-t-c-o?  And do you know

18  where Cotco manufactures them?

11:41:30  19          A.      I actually presume it's China.  I suppose they

20  have alternate locations that I'm unaware of.

11:41:36  21          Q.      Do you know if are there any manufacturers of

22  LEDs in the United States?

11:41:44  23          A.      I believe there are, but I must admit in all my

24  dealings they always seem to be made in Korea -- in Asia,

25  basically.

11:41:53  1        Q.    So to the best of your knowledge, all of the

        2  LEDs ever used by iLight were manufactured in Asia?

11:42:01  3        A.    Oh, I would supposed so, yes.  Yes.

11:42:11  4        MS. HUNTER:  Your Honor, next the plaintiff would like

        5  to call Timothy G. Fallon by video deposition.  And Mr. Fallon

        6  is national accounts manager at Fallon.

11:42:24  7        Q.    (By Mr. Price) Good morning, Mr. Fallon.

11:42:25  8        A.    Hi.

11:42:28  9        Q.    Would you state your full name.

11:42:29  10       A.    Timothy G. Fallon.

11:42:31  11       Q.    What's your middle name?

11:42:32  12       A.    Gale.

11:42:34  13       Q.    Are you a junior or senior?

11:42:34  14       A.    No.

11:42:37  15       Q.    What's your position with the defendant Fallon

        16  on this?

11:42:41  17       A.    I'm employed as a national accounts manager.

11:42:46  18       Q.    How long have you been in that capacity?

11:42:50  19       A.    I don't recall specifically.  2002, somewhere

        20  in there, maybe.

11:42:57  21       Q.    Before you were national accounts manager for

        22  Fallon, did you have any other position with Fallon?

11:43:00  23       A.    Yes.

11:43:01  24       Q.    And what was that?

11:43:05  25       A.    I was what they called engineering clerk.

| | | |
|---|---|---|
| 11:43:08 | 1 | Q. How long were you an engineering clerk? |
| 11:43:11 | 2 | A. A year and a half, approximately. |
| 11:43:14 | 3 | Q. Before you were an engineering clerk, did you |
| | 4 | have another position with Fallon? |
| 11:43:16 | 5 | A. No. |
| 11:43:19 | 6 | Q. So your first time to be employed by Fallon was |
| | 7 | as an engineering clerk? |
| 11:43:23 | 8 | A. Yes. |
| 11:43:27 | 9 | Q. So it was approximately the 2000, 2002 time |
| | 10 | frame? |
| 11:43:33 | 11 | A. 2000. |
| 11:43:36 | 12 | Q. Somewhere in 2002 you became national accounts |
| | 13 | manager? |
| 11:43:37 | 14 | A. Correct. |
| 11:43:40 | 15 | Q. I take it you didn't have a position with |
| | 16 | Fallon other than clerk and national accounts manager? |
| 11:43:49 | 17 | A. No. |
| 11:43:51 | 18 | Q. Where were you employed prior to Fallon? |
| 11:43:53 | 19 | A. United States Air Force. |
| 11:43:54 | 20 | Q. How long were you there? |
| 11:43:55 | 21 | A. Four years. |
| 11:43:57 | 22 | Q. What was the approximate time frame? |
| 11:44:00 | 23 | A. '96 to 2000. |
| 11:44:03 | 24 | Q. Did you have any relatives that have ever been |
| | 25 | employed by Fallon? |

| | | | |
|---|---|---|---|
| 11:44:05 | 1 | A. | Yes. |
| 11:44:06 | 2 | Q. | Who is that? |
| 11:44:07 | 3 | A. | My father. |
| 11:44:09 | 4 | Q. | Who is he? |
| 11:44:11 | 5 | A. | Tim Fallon. |
| 11:44:13 | 6 | Q. | And what's his middle name? |
| 11:44:15 | 7 | A. | Ross. |
| 11:44:21 | 8 | Q. | Is your father still associated with Fallon? |
| 11:44:21 | 9 | A. | No. |
| 11:44:25 | 10 | Q. | When did he stop being associated with Fallon? |
| 11:44:26 | 11 | A. | I don't recall specifically. |
| 11:44:29 | 12 | Q. | Do you know approximately? |
| 11:44:36 | 13 | A. | 2003 to 2004, something like that. |
| 11:44:40 | 14 | Q. | Obviously, the defendant is called Fallon |

          15   Luminous.  Is that because of your father's name?

| 11:44:44 | 16 | A. | Yes. |
|---|---|---|---|
| 11:44:48 | 17 | Q. | Was your father founder of the company? |
| 11:44:48 | 18 | A. | Yes. |
| 11:44:51 | 19 | Q. | When was the company founded, if you know? |
| 11:44:52 | 20 | A. | I don't know. |
| 11:44:56 | 21 | Q. | Do you know what your father's role was with |

          22   the company until 2002?

| 11:45:06 | 23 | A. | Varied.  I'm not sure specifically. |
|---|---|---|---|
| 11:45:10 | 24 | Q. | Do you know who he was primarily responsible |

          25   to?

11:45:16    1          A.     Yes, but it changed.

11:45:18    2          Q.     How so?

11:45:21    3          A.     He sold the company in 2000, so he was no

4   longer the owner. But he was still the president as far as I

5   know. That's my understanding. I don't have specific

6   knowledge.

11:45:34    7          Q.     That's okay. I'm not trying to -- I'm really

8   just looking for some generalities here. To whom did your

9   father sell the company in 2000?

11:45:49   10          A.     Lincolnshire Management.

11:45:54   11          Q.     Why did your father leave Fallon in 2002?

11:45:55   12          A.     I don't know.

11:46:00   13          Q.     You never had that discussion with him?

11:46:02   14          A.     No.

11:46:06   15          Q.     So did you grow up in Spartanburg, South

16   Carolina?

11:46:08   17          A.     Not really.

11:46:10   18          Q.     Where did you grow up?

11:46:13   19          A.     Kind of everywhere.

11:46:19   20          Q.     Predominantly?

11:46:25   21          A.     The state of South Carolina.

11:46:34   22          Q.     When you returned from the Air Force and joined

23   Fallon in approximately 2000, were you living in South

24   Carolina at the time?

11:46:43   25          A.     Yes.

11:46:47  1        Q.      Why did you change positions from engineering

       2   clerk to national accounts manager?

11:46:52  3        A.      I was offered the job.

11:46:56  4        Q.      How did that come about?

11:47:01  5        A.      They asked me, would you like to call on

       6   Anheuser-Busch?  Sure.  Okay, here's the position.  Thank you.

       7   It's that simple.

11:47:14  8        Q.      So who asked you if you wanted this position,

       9   if you remember?

11:47:20 10        A.      At the time I believe it was the president of

      11   the company, Keasler Tanner.

11:47:25 12        Q.      Keasler?

11:47:28 13        A.      Uh-huh.

11:47:37 14        Q.      So your father had departed Fallon by this

      15   time?

11:47:39 16        A.      No.

11:47:42 17        Q.      You may have misunderstood me.  I thought you

      18   said he was the president of Fallon until his departure.

11:47:46 19        A.      Uh-huh.

11:47:48 20        Q.      Is that correct, or -- ?

11:47:51 21        A.      Again, I'm not familiar with the structure at

      22   that time.  He was still there operating as the head, but

      23   Keasler was also over the operations, titles, either way.

11:48:07 24        Q.      I'm with you.  So your father was still

      25   effectively the head of Fallon at the time you were offered

the national accounts manager position?

11:48:16 A.    Keasler was the head of operations.

11:48:18 Q.    And your father was the overall head of the
company?

11:48:24 A.    That's my understanding, yeah.

11:48:28 Q.    Had you inquired about this position before it
was offered to you?

11:48:31 A.    No, it didn't exist.

11:48:33 Q.    Oh, it didn't exist at all?

11:48:35 A.    No.

11:48:38 Q.    Had you -- I guess at this point in time had
you been involved in any sales related positions with Fallon?

11:48:43 A.    No.

11:48:46 Q.    Does Fallon have any other U.S. production
facilities outside of Spartanburg?

11:48:49 A.    Yes.

11:48:52 Q.    Where is the other facility?

11:48:55 A.    In Andigo, Wisconsin.

11:48:58 Q.    Currently what products of Fallon are made in
Andigo?

11:49:01 A.    Neon signs.

11:49:03 Q.    Has Fallon, to your knowledge, ever sold any
product to Anheuser-Busch before you became national accounts
manager?

11:49:08 A.    Yes.

| | | |
|---|---|---|
| 11:49:10 | 1 | Q. What were those products? |
| 11:49:12 | 2 | A. Primarily neons. |
| 11:49:15 | 3 | Q. Do you know what type of neon products? |
| 11:49:17 | 4 | A. Neon signs. |
| 11:49:22 | 5 | Q. Do you know the approximate time frame? |
| 11:49:22 | 6 | A. No. |
| 11:49:25 | 7 | Q. When you became the national account manager, |
| | 8 | then Fallon was not making any products at all for |
| | 9 | Anheuser-Busch? |
| 11:49:33 | 10 | A. That's correct. |
| 11:49:39 | 11 | Q. Do you know why Fallon was not selling any |
| | 12 | products to Anheuser-Busch at that time? |
| 11:49:43 | 13 | A. Not specifically. |
| 11:49:49 | 14 | Q. How about generally? |
| 11:49:53 | 15 | A. My understanding is that Fallon had chosen not |
| | 16 | to sell anything to Anheuser-Busch. |
| 11:49:59 | 17 | Q. Why? |
| 11:50:00 | 18 | A. I don't know. |
| 11:50:05 | 19 | Q. You don't have any understanding as to why? |
| 11:50:05 | 20 | A. No. |
| 11:50:09 | 21 | Q. I take it when you became the national account |
| | 22 | manager, you were specifically assigned to Anheuser-Busch. I |
| | 23 | believe it was your only customer at that time; correct? |
| 11:50:18 | 24 | A. Correct. |
| 11:50:22 | 25 | Q. I guess in 2002 they finally decided they did |

582

1    want to sell products to Anheuser-Busch?

11:50:26   2         A.    Correct.

11:50:29   3         Q.    Previously they decided they did not?

11:50:30   4         A.    That's my understanding.

11:50:35   5         Q.    So why in 2002 was Fallon identified in selling

6    products to Anheuser-Busch again?

11:50:39   7         A.    I don't know.

11:50:42   8         Q.    You weren't told anything about why we are

9    going to start calling on Anheuser-Busch again?

11:50:51   10        A.    No, I was -- I was told things, but --

11:50:53   11        Q.    What were you told?

11:50:56   12        A.    I was told that Anheuser-Busch was looking for

13   a second domestic neon supplier and asked us to come back in

14   and talk about being a vendor again.

11:51:10   15        Q.    Who was their other neon supplier at that time?

11:51:14   16        A.    They had three.  They were looking for another

17   domestic one.  The other domestic supplier was Everbright.

11:51:26   18        Q.    So when you initially were calling on

19   Anheuser-Busch, that was to sell neon products?

11:51:35   20        A.    No.

11:51:37   21        Q.    What were you trying to sell to Anheuser-Busch

22   on behalf of Fallon when you became the national accounts

23   manager?

11:51:46   24        A.    All of Fallon's products, the entire range of

25   offerings.

11:51:50  1          Q.      Did that include LED products?

11:51:52  2          A.      Yes.

11:51:59  3          Q.      Did you have any LED-only products at that time

4    at Fallon?

11:52:02  5          A.      I don't recall specifically.

11:52:05  6          Q.      If I recall correctly, you indicated earlier

7    that was the 2004-2005 time frame when Fallon first started

8    selling LED-only products to Anheuser-Busch?

11:52:19  9          A.      Correct.

11:52:24  10         Q.      How did that come about where you all were

11   selling only LED products?

11:52:37  12         A.      We don't sell only LED products.

11:52:40  13         Q.      I'm only asking about the LED products.  I

14   realize that you continue to sell neon products.  I'm asking

15   you, how did it come about in the 2002-2004 time frame that

16   Fallon started selling to Anheuser-Busch only LEDs?

11:52:57  17         A.      My recollection is that Anheuser-Busch had

18   asked for several suppliers, different designs, that they were

19   buying in neons, to be made in LED, is my recollection, again.

11:53:26  20         Q.      So I take it that you responded to that request

21   on behalf of Fallon?

11:53:35  22         A.      Yes.

11:53:40  23         Q.      And at some point in time, in the 2004-2005

24   time frame, Anheuser-Busch chose to buy these LED signs from

25   Fallon?

584

A.    Yes.

Q.    Whom were you dealing with primarily at

3    Anheuser-Busch in this regard?

A.    No one specific person primarily.

Q.    Well, who did you primarily call upon at

6    Anheuser-Busch?

A.    There was an array of people.

Q.    How about for the LED signs?

A.    An array of people.

Q.    There were a handful of people you primarily

11    dealt with?

A.    I would call it a handful, yeah, five or six.

Q.    Who were they?

A.    Various people from merchandizing and

15    procurement.

Q.    Do you recall any of their names?

A.    I do.

Q.    Will you tell me who they are?

A.    The procurement manager was Matt Walland.  His

20    boss was Greg Cook.  And his boss was Kirby Billmeyer.  And

21    then for merchandising -- I'm sorry, there was also Bob

22    Manilotti, from procurement.  Chris Rowell in merchandizing,

23    Mike Ivaster.  Mike Ivaster.

Q.    Mr. Fallon, can you identify this document,

25    Exhibit 1?

| | | |
|---|---|---|
| 11:55:06 | 1 | A.     Yes. |
| 11:55:08 | 2 | Q.     What is that, please? |
| 11:55:14 | 3 | A.     It's an e-mail from me to Sharon Van Roo, a |
| | 4 | copy to Tim Alford, Chuck Nelson, Joe Clay and Tim R. Fallon. |
| 11:55:23 | 5 | Q.     This is a memo you sent to Ms. Van Roo December |
| | 6 | 2, 2003? |
| 11:55:26 | 7 | A.     Yes, looks like. |
| 11:55:30 | 8 | Q.     You mentioned that Ms. Van Roo was a buyer for |
| | 9 | Sam's Club? |
| 11:55:31 | 10 | A.     Yes. |
| 11:55:36 | 11 | Q.     Who is Jim Alford? |
| 11:55:40 | 12 | A.     Jim Alford at the time was running the neon |
| | 13 | factory in Spartanburg. |
| 11:55:44 | 14 | Q.     In the next sentence of that same paragraph, |
| | 15 | you say this new product, referring to Fallon's product, I |
| | 16 | take it, will look similar to iLight's Newon.  Do you see |
| | 17 | that? |
| 11:55:57 | 18 | A.     I'm with you. |
| 11:56:03 | 19 | Q.     What do you mean there? |
| 11:56:08 | 20 | A.     Well, I can't tell you what I mean.  I think I |
| | 21 | can recall my objective of this sentence is to, you know, use |
| | 22 | something that she knows to describe something she had never |
| | 23 | seen before.  So when I say it would look similar to iLight, |
| | 24 | she has seen that, I assume she is looking at it, I don't |
| | 25 | recall if this time she is testing it or not, but obviously |

she is familiar with it.  And my objective is to refer to that

                to let her know, you know, what ours is going to look like.

                        Again, I think to this point, I think we can -- we

                have gone through a couple of revolutions, and maybe I've

                shown her pictures.  I can't remember all the details

                involved.  But my basic objective was to refer to something

                that she knew, to describe what I was going to show her, and

                then also talk about the differences.

11:57:14    Q.      So Ms. Van Roo at this point in time had seen

                and was familiar with iLight's LED Open sign?

11:57:21    A.      I believe so, yes.  I'm not sure.  I don't know

                this specifically.

11:57:24    Q.      That was your understanding?

11:57:24    A.      Correct.

11:57:27    Q.      And you are telling her that you are going to

                have Fallon's LED Open prototype sign for her in approximately

                three weeks; correct?

11:57:34    A.      Correct.

11:57:37    Q.      And that you anticipate that this new product,

                the Fallon Open sign LED prototype, is going to look similar

                to iLight's LED Open sign; is that correct?

11:57:53    A.      Again, I'm writing that as a point of reference

                for her.  You know, again, our objective was on --

11:57:58    Q.      I understand.  You explained that.  I'm asking

                you.

11:58:02 1          A.     Are you asking me to read what I wrote?

2      Because I can do that.  You know, I can read it.

11:58:08 3          Q.     So I'm asking you specifically, when you say

4      this new product, you are referring to the Fallon LED Open

5      sign prototype?

11:58:15 6          A.     Correct.

11:58:17 7          Q.     Once again, and I apologize I'm having to

8      repeat this, when you say this new product, you are referring

9      to the Fallon LED prototype; correct?

11:58:26 10         A.     To one that we were going to show her, yes.

11:58:29 11         Q.     And you are saying that prototype will look

12     similar to iLight's Newon, and you are referring to the iLight

13     LED Open sign; correct?

11:58:41 14         A.     That's what I wrote here, yes.  That's what I

15     -- I believe that's what we are referring to, yes.

11:58:47 16         Q.     And that's what you meant when you wrote it,

17     too?

11:58:50 18         A.     Again, I don't recall specifically even writing

19     this e-mail, like I said, but I have no reason to believe I

20     didn't write this.

11:58:57 21         Q.     At the top of the next page of that e-mail, you

22     reference, when I make my next trip.  How often did you visit

23     with Ms. Van Roo at Sam's Club?

11:59:13 24         A.     Again, I don't recall specifically, but on

25     average probably once a month maybe.

1          Q.      And I assume that would be in Bentonville,

2    Arkansas?

3          A.      Sometimes, not always.

4          Q.      Trade shows, things like that?

5          A.      Trade shows, club openings, factory visits.

6          Q.      And you specifically note iLight and Newon as

7    being, I guess, other players in the LED sign industry?

8          A.      Well, my understanding at this point is that

9    they are one and the same, yeah.

10          Q.      Your understanding is that iLight and Newon

11    were working together, for lack of a better description, to

12    make LED signs at this time?

13          A.      No, that was not my understanding.

14          Q.      What was your understanding?

15          A.      My understanding is they are the same people.

16          Q.      Fairly early on in this deposition I believe is

17    when we were discussing Exhibit 1.  I asked you whether you

18    personally have been involved in obtaining an iLight sign, and

19    if so, when.  My vague recollection is that you weren't sure

20    as to either.  Fallon's -- your counsel supplied a

21    supplemental response to a particular interrogatory request

22    that we made back in December of 2006.  And they state, and

23    I'll just quote it to you, it says:

24          ILight's Open sign was obtained in December 2003 by

25    Tim G. Fallon, national accounts manager, (636)332-9725 for

1  product comparison.

12:01:15  2        Does that ring a bell to you?

12:01:19  3        A.      Not specifically, no.  Like I said, I -- that

4  may be accurate.  I don't know.

12:01:24  5        Q.      As you sit here, you don't know whether, A,

6  whether you actually acquired one, and, B, what it was?

12:01:30  7        A.      Right.  What was the date again?

12:01:31  8        Q.      December of 2003.

12:01:33  9        A.      No, I don't recall anything.  Like I said, I

10  may have been involved in it; I may have inquired myself.  My

11  recollection is it came from a dealer.  I don't recall

12  specifically.  That may be accurate.

12:01:46  13       Q.      (By Mr. Kittrell) Do you remember those

14  questions that Mr. Price was asking you about, the show in

15  October 2002?

12:01:52  16       A.      I do.

12:01:56  17       Q.      Apparently you saw a sign there that had LED

18  lights with some kind of plastic covering that maybe looked

19  like -- a little bit like a neon sign; is that correct?

12:02:09  20       A.      It is.

12:02:11  21       Q.      Do you know -- at the time did you know whose

22  sign that was?

12:02:14  23       A.      No, not specifically.

12:02:17  24       Q.      Now, you also testified that at some point you

25  developed an understanding that it was an iLight sign, at some

*point after the show.  Is that accurate?*

12:02:23   *A.      Yes.*

12:02:25   *Q.      Do you know where you got that understanding?*

12:02:28   *A.      No, I don't.*

12:02:30   *Q.      Do you know, as you sit here today, whether or*
           *not the sign you saw in October of 2002 was actually an iLight*
           *sign?*

12:02:44   *A.      No.  Again, it was in the U.S. Stamp design*
           *booth.  And the only -- I saw a new one, I think, if I*
           *remember correctly.*

12:02:52           (Conclusion of video.)

12:02:52           THE COURT:  Is that it?

12:02:54           MS. HUNTER:  Yes, Your Honor.

12:02:54           THE COURT:  All right.  Ladies and gentlemen of the
           jury, we're going to take our noon recess.  As I stated to you
           earlier, if any of you would like lunch delivered here to the
           courthouse, if you will write down what you would like, and
           we'll see what that it gets delivered to you.  Please don't
           discuss the case amongst yourselves or anyone else until you
           receive all of the evidence, the argument of counsel and the
           charge of the Court.

12:03:17           If you have a lunch order, if you will give it to the
           Marshal, and we'll make the arrangements.  We're in recess.

12:03:51           (Jury out.)

12:03:53           THE COURT:  How many more witnesses?

12:04:03  1          MS. HUNTER:  We have three more video depositions to

2      present.

12:04:05  3          THE COURT:  How long do you think those will --

12:04:09  4          MR. VEZEAU:  Which will take about 45 minutes, 45 to

5      50 minutes, maybe an hour at tops.

12:04:13  6          MR. PRICE:  Your Honor, we also have -- for

7      bookkeeping purposes, we have a lot of exhibits, as you know,

8      to get into the record before we close our case in chief.  I

9      don't know if you want to do that now.

12:04:25  10          THE COURT:  Why don't you do that now.  What exhibits

11     do you want to admit into the record.  Which exhibits?  Just

12     read the exhibit numbers.

12:05:06  13          MR. PRICE:  I'm going to first start with Mr.

14     Bratic's.

12:05:09  15          THE COURT:  It doesn't matter whose testimony.  Just

16     admit the exhibits.

12:05:15  17          MR. PRICE:  We've got to divide it up.  TX 32 A.

12:05:18  18          THE COURT:  Any objection?  Is there any objection to

19     any of these?

12:05:24  20          MR. KITTREDGE:  I haven't seen the list.  There is a

21     good chance there isn't any.  We could review this over lunch.

12:05:32  22          THE COURT:  Why don't you all look at it over lunch,

23     you come back in, and we'll take it up first thing.

12:06:11  24          (Recess.)

12:59:59  25          THE COURT:  Are there any preliminary matters before

we get started?  Did we resolve the exhibits issue?

13:00:08        MR. PRICE:  I think we're ready to go.

13:00:09        THE COURT:  Okay.  Will you announce for the record

       which exhibits you want to move into evidence?

13:00:16        MR. PRICE:  Yes, Your Honor.  Ms. Gregory, do you want

       me just to simply --

13:00:20        THE COURT:  If you will just give the exhibit number,

       counsel.

13:00:22        MR. PRICE:  That's what I was asking.  Thank you.

13:00:25        THE COURT:  That's all right.

13:00:40        MR. PRICE:  TX 32, 32 A, TX 32 A-1, TX 32 B, TX 32 D

       as in dog, TX 32 E, TX 32 F, TX 32 G, TX 32 H, 326 I, 32 J,

13:01:14    TX 32 K, TX 32 L, TX 32 N, TX 32 O, TX 32P, TX 32Q, TX 32 R,

       TX 32 S, TX 32 T, TX 32 U, TX 32 V, TX 32 W, TX 32 X, TX 32 Y,

       TX 32 Z, TX 32 AA, TX 32 BB, TX 32 CC, TX 32 DD, TX 32 EE, TX

       32 FF, TX 32 GG, TX 32 HH, TX 32 II, TX 32 JJ, TX 32 KK, TX

       32 LL, TX 32 MM, TX 32 NN, TX 32 OO, TX 32 PP, TX 32 QQ,

13:02:59    TX 32 RR, TX 32 SS, TX 32 TT, TX 32 UU, TX 32 VV, TX 32 R-1,

       TX 32 R-3, TX 32 R-4, TX 32 R-5, TX 32 R-6, TX 32 R-7, TX 32

       R-8, TX 32 R-9, TX 32 R-10, TX 32 R-11, TX 32 R-12, TX 32

       R-13, TX 32 R-14, TX 32 R-15.

13:03:52        TX 59, TX 88A, TX 65, and TX 51.

13:03:55        That's the first portion of the documents we would

       move into evidence.  And we now so move.

13:04:05        THE COURT:  They will be admitted.

13:04:08 1        MR. KITTREDGE:  No objection.

13:04:09 2        MR. PRICE:  Ms. Gregory, would you like these

3    documents?

13:04:11 4        MS. GREGORY:  Yes.

13:04:15 5        MR. SCRUTON:  All right.  The second set is from Dr.

6    Roberts' testimony.  These will all be preceded by the letters

7    TX.  So I will just read the numbers.  9 A, 11, 11-A, 12, 13,

8    14, 29, 29 A, 29 C, 29 E, 29 F, 29 G, 29 H, 29 I, 29 J, 29 K,

9    29 L, 29 M, 29 N, 29 O, 29 P, 29 Q, 29 R, 29 S, 29 T, 29 U, 29

10   V, 29 W, 29 Y, 29 Z, 29 AA, 29 BB, 29 CC, 29 DD, 29 EE, 29 FF,

11   29 GG, 29 HH, 29 II, 29 JJ, 29 KK, 29 LL, 29 MM, 29 NN, 29 OO,

12   29 PP, 29 QQ, 29 RR, 29 SS, 29 TT, 29 UU, 29 VV, 29 WW, 29 XX,

13   29 YY, 29 ZZ, 29 AAA, 29 BBB, 29 CCC, 29 DDD, 29 EEE, 29 GGG,

14   29 FFF, 29 III, 29 JJJ, 29 KKK, 29 LLL, 29 MMM, 29 NNN,

15   29 OOO, 29 PPP, 29 QQQ, 29 RRR, 31, 31 A, 31 B, 31 C, 31 D,

13:08:02 16   31 E, 31 F, 31 G, 31 H, 31 I, 31 J, 31 K, 31 L, 31 M, 31 N, 31

17   O, 31 P, 31 Q, 31 R, 31 S, 31 T, 83 A and 83 B.

13:08:24 18        We move those into evidence.

13:08:27 19        THE COURT:  Without objection, they will be admitted.

20   Any other matters?

13:08:32 21        MS. HUNTER:  And finally, we had one more short list,

22   Your Honor.  TX 19, TX 20, TX 21, TX 22, TX 23, TX 24, TX 26,

23   TX 27, TX 41, TX 47, TX 57, TX 58, TX 60, TX 61, TX 62, TX 63,

24   TX 587, and TX 588.

13:09:11 25        And Your Honor, we would move these into evidence.

594

```
13:09:13   1          THE COURT:  Without objection, they will be admitted.

           2   Any other matters?

13:09:16   3          You can bring the jury in.

13:09:19   4          MR. PRICE:  Your Honor, we now ask to provide those

           5   documents to the courtroom deputy.

13:09:25   6          THE COURT:  All right.  Before we have closing

           7   arguments, there will be an exhibit conference at which

           8   counsel go over the exhibits that the clerk's records reflect

           9   have been admitted for both of each party, and if are there

          10   any deficiencies, we'll take them up at the conclusion of that

          11   conference.  You can pass up your exhibits.

13:09:59  12          Are there any other matters, either side?

13:10:24  13          You may bring the jury in, Mr. Marshal.

13:10:45  14          (Jury in.)

13:10:48  15          THE COURT:  You all can be seated.  Defense may call

          16   its next witness.  I'm sorry, the plaintiff may call its next

          17   witness.

13:10:55  18          MS. HUNTER:  Yes, Your Honor.  ILight calls Tim

          19   Demmond by video deposition.  And at the time of this

          20   deposition, Mr. Demmond was the vice-president of sales and

          21   marketing for Fallon.  And if we can dim the lights, please.

13:11:12  22          (Video playing:)

13:11:47  23      Q.    Are you vice-president of sales and marketing?

13:11:47  24      A.    I am.

13:11:50  25      Q.    How long have you been vice-president of sales
```

and marketing?

13:11:54      A.     Since 2 -- April of 2004.

13:11:56      Q.     To make it easy, give you a little trial run here in a deposition, if you can tell me, if you will, your educational background subsequent to high school, I would appreciate it.

13:12:08      A.     Sure, Western Michigan University, marketing degree.

13:12:12      Q.     When did you get that?

13:12:18      A.     1987 I graduated.

13:12:21      Q.     Is that a B.A. or B.S.?

13:12:22      A.     B.S.

13:12:28      Q.     When did Fallon commence the sales of LED products?

13:12:37      A.     To the best of my recollection, 2005, I believe.

13:12:49      Q.     And to whom were the first sales of LED products?

13:12:49      A.     To Sam's Club.

13:12:55      Q.     And is that a no consignment?

13:12:56      A.     It is.

13:12:58      Q.     Now, we have couple of signs, you have probably noticed, on the table here. One is a big sign, which we will identify a bit later, but it says Open. Do you recognize that sign?

13:13:03  1          A.    I do.

13:13:03  2          Q.    And do you recognize that as a Fallon sign?

13:13:03  3          A.    I do.

13:13:17  4          Q.    Is that the type of sign that was provided or

          5    sold by Fallon to Sam's Club?

13:13:20  6          A.    It is.

13:13:24  7          Q.    Now, were you involved in the decision to get

          8    into LED signage products?

13:13:28  9          A.    No.

13:13:30  10         Q.    Who was?

13:13:33  11         A.    I'm not exactly sure who was instrumental or

          12   involved.  I know that Tim Fallon had a part, Chuck Nelson.

13:13:44  13         Q.    Anyone else?

13:13:50  14         A.    Probably Joe Clay.

13:13:53  15         Q.    Anyone else?

13:13:56  16         A.    Not to my knowledge, no.

13:13:59  17         Q.    Were you consulted in connection with a

          18   decision to begin to manufacture and sell LED products?

13:14:07  19         A.    No.

13:14:11  20         Q.    It was announced as a fiat to you, or how did

          21   you find that out?  Too many questions here.  Let me see if I

          22   can be more specific.  How did you learn that the company had

          23   made a decision to get into the LED products for sale?

13:14:26  24         A.    When I first learned was when I took the

          25   position of sales, vice-president of sales and marketing.

That's how I first learned of the product, that they were
working on this developing product.

13:14:37  Q.    Okay.  That was 2004?

13:14:37  A.    That was 2004.

13:14:39  Q.    And what do you recall learning about it at
that time?

13:14:43  A.    That they were just working on an LED product.

13:14:44  Q.    Who told you?

13:14:47  A.    Chuck Nelson.

13:14:48  Q.    Do you recall what he told you?

13:14:54  A.    No, I don't recall.  Just mentioned he had a
product.

13:14:58  Q.    Do you recall that anyone explained to you why
the company was moving into these products?

13:15:04  A.    Chuck Nelson was explaining that we were moving
towards the LED product because it was driven by the customer.
The customer was very interested in going green, the
environmental issues, so, therefore, we were trying to satisfy
their needs and replace the neon with a product that was more
environmentally friendly.

13:15:31  Q.    The customer in this case you are referring to
-- was that Sam's Club?

13:15:38  A.    Yes.

13:15:48  Q.    Now, please explain to me why the LED sign
compared to the neon sign is more environmentally friendly?

13:16:05   1          A.      Okay.  Low voltage, less energy consumption,

           2   UPS shippable, adds to less gas consumption, fuel consumption.

13:16:23   3          Q.      Anything else?

13:16:36   4          A.      No mercury.

13:16:43   5          Q.      You say UPS shippable.  How were the neon

           6   products shipped?

13:16:47   7          A.      Pallets.

13:16:52   8          Q.      But apparently they had to be shipped by -- how

           9   were they shipped, though?  They weren't shipped by UPS?

13:17:00  10          A.      No, freightage.

13:17:06  11          Q.      Do you believe that is a feature, an advantage,

          12   if you will, of the LED signage products over the neon

          13   products?  That is, less breakage?

13:17:12  14          A.      Yes.

13:17:15  15          Q.      And could you explain that to the jury, why

          16   there is less breakage?

13:17:24  17          A.      Sure.  A neon product is a glass product, it is

          18   very fragile.  And an LED is -- the LED product that we

          19   produce is plastic.

13:17:30  20          Q.      And when the neon tube would break, do you

          21   understand then there is the potential of releasing mercury

          22   into the environment?

13:17:42  23          A.      If it was a mercury filled tube, yes.

13:17:49  24          Q.      With respect to sales to Budweiser of signage

          25   products, do you still sell -- I'm sorry, let's call it

```
 1    Anheuser-Busch.  Do you still sell neon signage products to

 2    Anheuser-Busch?

13:18:01   3          A.    We do.

13:18:05   4          Q.    And you sell -- I assume you sell LED products

 5    to Anheuser-Busch?

13:18:09   6          A.    We do.

13:18:21   7          Q.    Do you know -- do you still sell neon signage

 8    to Sam's Clubs, Open signs?

13:18:29   9          A.    We do.

13:18:33  10          Q.    Do I understand you do sell Open signs to Sam's

11    Clubs that use LEDs as opposed to neon?

13:18:38  12          A.    Yes.

13:18:43  13          Q.    Does the company produce a product referred to

14    as Super Bright?

13:18:46  15          A.    We do.

13:18:47  16          Q.    Okay.  What was that?

13:18:51  17          A.    It's actually a product we're producing now.

13:18:52  18          Q.    For?

13:18:52  19          A.    For Sam's.

13:18:54  20          Q.    Is that an Open sign?

13:18:55  21          A.    It is.

13:18:57  22          Q.    Anything else other than Open?

13:18:58  23          A.    No.

13:19:01  24          Q.    Okay.  Is that called the Xenon light?

13:19:01  25          A.    No.
```

```
13:19:04   1            Q.      It's just called the Super Bright?

13:19:05   2            A.      Yes.

13:19:07   3            Q.      When did you start producing that for Sam's

           4    Club?

13:19:11   5            A.      We are currently going through the transition

           6    now.

13:19:14   7            Q.      Transition from what to what?

13:19:22   8            A.      From the current oval LED, which is the 1877,

           9    large oval.

13:19:25  10            Q.      When you say the transition, is the Super

          11    Bright to replace the large Xenon Open sign?

13:19:37  12            A.      It is.

13:19:39  13            Q.      Can you explain for us the differences between

          14    the Super Bright version compared to the large Xenon Open

          15    sign?

13:19:53  16            A.      Super Bright is the Open, the word Open is

          17    double stroke.

13:19:56  18            Q.      What is that?

13:20:00  19            A.      It means it's sort of block letter.  The sign

          20    is five inches longer.  And by virtue of adding the LEDs, the

          21    double stroke is brighter.

13:20:24  22            Q.      Any other differences that come to mind?

13:20:30  23            A.      No.

13:20:34  24            Q.      How did the Super Bright come about?  Was that

          25    driven by the customer, or was that pitched maybe by Fallon to
```

the customer?

13:20:49    A.    Excuse me.  It was driven by the customer to
            update the image.

13:20:56    Q.    I place before you Plaintiff's Deposition
            Exhibit 516 bearing production number AL 16629.  So the e-mail
            at the bottom of this exhibit is yours, is that correct, from
            December 3, 2005?

13:21:12    A.    Yes; correct.

13:21:14    Q.    To Chuck Nelson?

13:21:16    A.    Correct.

13:21:22    Q.    Then later on it says, Chuck, AB --

13:21:25          -- AB is Anheuser-Busch; correct?

13:21:25    A.    Correct.

13:21:27    Q.    -- said that they are going to order several
            thousand units of this product, and they absolutely need to
            have Version 2 in their hands next week.  We either deliver,
            or they buy from iLight.  Our fate is in our hands.

13:21:46          How did you learn that if you did not deliver that
            Anheuser-Busch would buy from iLight?

13:21:51    A.    Information from the sales guy.

13:21:54    Q.    Sales guy being?

13:21:56    A.    Tim Fallon.

13:21:58    Q.    For the record, will you please identify
            Exhibit 524.

13:22:03    A.    This is an Open sign produced by Fallon.

13:22:05  1        Q.      And that is for Sam's Club?

13:22:06  2        A.      Yes.

13:22:08  3        Q.      Sold by Fallon to Sam's Club?

13:22:08  4        A.      Yes.

13:22:12  5        Q.      And again, that is also depicted in the

          6    photograph previously marked as Plaintiff's Deposition Exhibit

          7    522?

13:22:19  8        A.      Yes, it appears to be.

13:22:24  9        Q.      Now, in the initial vertical leg to the end,

          10   how many rows or strips, if you will, of LEDs are there?

13:22:29  11       A.      I see one row.

13:22:31  12       Q.      Okay.  Do you see a reflection of that LED

          13   strip?

13:22:37  14       A.      Yeah, I see a reflection of a row, yes.

13:22:42  15       Q.      Okay.  And do you know whether or not the

          16   reflective surfaces that you are seeing are important to the

          17   operation of it?

13:22:55  18       A.      I have no idea.

13:23:02  19       Q.      Who at Fallon would be most conversant with

          20   that aspect of the design of this sign, if anyone?

13:23:19  21       A.      Chuck Nelson.

13:23:28  22       MS. HUNTER:  ILight will now call Mr. Doug Bagin by

          23   video deposition.  Mr. Bagin is the CEO of Fallon Visual

          24   Products Corporation, as well as the Chief Executive Officer

          25   of Fallon Luminous Products Corporation.

| | | |
|---|---|---|
| 13:23:52 | 1 | (Video playing:) |
| 13:23:55 | 2 | Q. (By Mr. Vezeau) This deposition is, as was |
| | 3 | indicated, being taken pursuant to a notice of you, Mr. Bagin, |
| | 4 | as an individual. |
| 13:23:58 | 5 | MR. VEZEAU: I understand, Mark, the witness is here |
| | 6 | to testify as the designated witness of Fallon with respect to |
| | 7 | opinions? |
| 13:24:07 | 8 | MR. KITTREDGE: The opinion of counsel topic, yes. |
| 13:24:09 | 9 | Q. (By Mr. Vezeau) when did you then become |
| | 10 | involved with -- well, let me ask it this way. Do I |
| | 11 | understand correctly that you have a position of |
| | 12 | responsibility with Fallon? |
| 13:24:21 | 13 | A. Yes. |
| 13:24:27 | 14 | Q. Do you have that with Fallon Visual Products |
| | 15 | Corp? |
| 13:24:28 | 16 | A. Yes. |
| 13:24:30 | 17 | Q. What position do you have? |
| 13:24:35 | 18 | A. Chief Executive Officer. |
| 13:24:44 | 19 | Q. When did you become that? |
| 13:24:46 | 20 | A. I believe it was December -- November, December |
| | 21 | of 2005. |
| 13:24:50 | 22 | Q. And are you also CEO of Fallon Luminous |
| | 23 | Products Corp? |
| 13:24:52 | 24 | A. Yes. |
| 13:25:01 | 25 | Q. When did you first become aware of a company -- |

of iLight Technologies?

13:25:12     A.    I became aware of iLight Technologies when the company received a letter from iLight.

13:25:25     Q.    That is from iLight's counsel?

13:25:25     A.    Yes.

13:25:28     Q.    Is that one of the -- did you review documents yesterday?

13:25:31     A.    Some documents, yes.

13:25:34     Q.    Did any of those documents refresh your recollection as to events that occurred in the past?

13:25:44     A.    No.

13:25:51     Q.    I will hand that exhibit to you.  And ask you if that is a letter you referred to as occasionally as being the first instance in which you became aware of iLight.

13:26:18     A.    Yes, I believe this is when I first became aware of -- aware of the company.

13:26:27     Q.    Do I understand from Mark correctly that you misspoke earlier, that you now believe you became CEO in late 2004 --

13:26:34     A.    That's correct.

13:26:37     Q.    As opposed to 2005?

13:26:38     A.    That's correct.

13:26:50     Q.    Thank you.  So when this letter from Joe Buries of Stites & Harbison came to the company, Fallon Luminous Products Corporation, you were then CEO of the company; is

1   that correct?

13:27:05   2        A.      That's correct.

13:27:08   3        Q.      What, if anything, did you do when this letter

4   was brought to your attention?

13:27:17   5        A.      I instructed the people to send it to our

6   counsel.

13:27:24   7        Q.      And who did you instruct?

13:27:24   8        A.      (Respite.)

13:27:33   9        Q.      Let me ask it this way.  Do you remember who

10   you instructed?

13:27:37  11        A.      I would say basically it would be -- it came to

12   my attention.  We had several officers in the room looking at

13   it.  We made a decision to immediately send it to our counsel.

14   I don't know if it was one person or another, but --

13:27:58  15        Q.      Do you remember that meeting?

13:28:00  16        A.      Yes.

13:28:03  17        Q.      You said you had several officers in the room

18   discussing it.  Who was in the room?

13:28:17  19        A.      Leah White, Joe Clay.

13:28:20  20        Q.      Who else?

13:28:27  21        A.      Joe Clay.

13:28:29  22        Q.      Anybody else?

13:28:31  23        A.      That may be it.  I'm not sure who else was

24   there.

13:28:35  25        Q.      At the time, Leah White was CFO?

13:28:35  1          A.      Yes.

13:28:40  2          Q.      And Joe Clay was what?

13:28:41  3          A.      President.

13:28:46  4          Q.      Do you remember the discussion with Leah White

          5     and Joe Clay pertaining to this letter?

13:28:53  6          A.      I remember asking him to send it to our patent

          7     counsel.

13:28:55  8          Q.      Do you remember anything else about the

          9     discussion?

13:28:57 10          A.      No.

13:29:01 11          Q.      Did you ask who in the heck this iLight

         12     Technologies is?

13:29:04 13          A.      Not that I remember.

13:29:06 14          Q.      Okay.  But I thought previously you had

         15     indicated this was the first time you became aware of the

         16     company; is that correct?

13:29:13 17          A.      To the best of my recollection.

13:29:15 18          Q.      All right.  Now, at the time this letter came

         19     in and you instructed someone, whether it was Mr. Clay or Ms.

         20     white, to send this to your counsel, this, being the letter,

         21     Defendant's Deposition Exhibit 550, were you then

         22     manufacturing LED signage products?

13:29:59 23          A.      Yes.

13:30:02 24          Q.      At the time you were issued instructions to

         25     send this letter to counsel for Fallon, had -- did you issue

instructions to put the sales of the Fallon LED Open signs on
hold?

13:30:15  A.   No.

13:30:22  Q.   Do you know if it was sent to your counsel?

13:30:28  A.   I didn't deliver it, but there was a response
to it, so it was sent to my counsel.

13:30:32  Q.   What response are you referring to?

13:30:38  A.   A letter that basically -- I believe it was to
counsel from iLight, which indicated that we did not infringe,
or -- based on their opinion, we did not infringe.

13:31:05  Q.   Do you know when that letter went to iLight's
counsel?

13:31:13  A.   The exact date, no.

13:31:22  Q.   Did you have -- before that -- let me withdraw
that.  The letter you are referring to that went to iLight's
counsel, I assume that was from Fallon's counsel to iLight's
counsel --

13:31:31  A.   Yes.

13:31:31  Q.   -- is that correct?

13:31:37  Okay.  Prior to -- did you receive a copy of that
letter?

13:31:39  A.   Yes.

13:31:47  Q.   Prior to receiving a copy of that letter, had
you discussed the infringement or noninfringement situation
with anyone other than this initial meeting when you said,

```
                1    send it to counsel?
13:32:04        2           A.      Yes.
13:32:08        3           Q.      And tell me about that.  What discussions
                4    occurred?
13:32:16        5           A.      I don't recall the exact discussion, but it was
                6    simply the fact that the letter indicated that we did not
                7    infringe.  That was all that was important to me.
13:32:29        8           Q.      Do you recall the basis for that conclusion?
13:32:30        9           A.      Excuse me?
13:32:33       10           Q.      Do you recall the basis for that conclusion?
13:32:38       11           A.      I believe it had to do with the waveguide.
               12    There were a couple of issues -- a couple of facts that were
               13    put in the opinion, but I can't tell you.  I'm not a patent
               14    attorney.  So I've read the -- read the letter.  The most
               15    important thing to me as CEO was that we did not infringe.
13:33:07       16           Q.      Now, you indicated that the letter referred to
               17    as the basis for the noninfringement, I thought you mentioned
               18    the term waveguide.  Am I correct?
13:33:18       19           A.      Yes.
13:33:22       20           Q.      What do you mean by waveguide?
13:33:27       21           A.      My understanding of a waveguide is something
               22    that could be a lampshade, it could be anything that diffuses,
               23    or light passes through it.
13:33:45       24           Q.      Did the Fallon LED Open sign we've been talking
               25    about have a waveguide?
```

609

13:33:52  1        A.      I didn't call it a waveguide.  It was not
        2    necessarily -- restate the question, please.  It had a lens.
13:34:04  3        Q.      Is that a waveguide?
13:34:07  4        A.      To me it was a lens.
13:34:10  5        Q.      You used the term waveguide.  I'm trying to
        6    understand what you mean.
13:34:12  7        A.      That was in the patent.
13:34:17  8        Q.      You say your product used a lens?
13:34:19  9        A.      That is what I call it.
13:34:22 10        Q.      Okay.  That's what you call it.  Do you know if
       11    that lens is a waveguide?
13:34:28 12        A.      I'm not sure where you are going with this.  I
       13    call it a lens, you call it a waveguide, or -- I'm not sure
       14    what you are getting at.
13:34:38 15        Q.      I need to know whether or not there is any
       16    difference between what you call a lens and the waveguide.
13:34:44 17        A.      Do I know?
13:34:44 18        Q.      Yes.
13:34:46 19        A.      If there is a difference?
13:34:47 20        Q.      Yes.
13:34:49 21        A.      I don't know.
13:34:56 22        Q.      Okay.  Prior to your receiving a copy of your
       23    counsel's letter to iLight's counsel, did you have discussions
       24    with your counsel?
13:35:07 25        A.      Personally, no.

| | | | |
|---|---|---|---|
| 13:35:11 | 1 | Q. | Do you know if anyone at the company did? |
| 13:35:12 | 2 | A. | I believe so. |
| 13:35:14 | 3 | Q. | Who? |
| 13:35:20 | 4 | A. | Probably Leah white, Chuck Nelson. |
| 13:35:20 | 5 | Q. | Do you know -- |
| 13:35:22 | 6 | A. | Could have been several individuals. |

13:35:27    7      Q.      Do you know -- you say could have been. Do you

           8    know for a fact that that occurred?

13:35:36    9      A.      I wasn't at the meeting.

13:35:39   10      Q.      You weren't at the meeting. Do you understand

         11    -- let me ask you this. Do you know -- assuming any such

         12    discussion occurred, do you know what was discussed?

13:35:55   13      A.      I believe that counsel for Fallon discussed the

         14    -- their belief that it was a noninfringement of the patent

         15    we're talking about. And why, they told why, our counsel

         16    believed there was no infringement. And they went through the

         17    issues, whatever they were.

13:36:17   18      Q.      Do you recall the issues?

13:36:19   19      A.      I wasn't at the meeting.

13:36:21   20      Q.      Were those issues important to you?

13:36:31   21      A.      It was not that important to me.

13:36:35   22      Q.      Other than the issue you referred to of a lens

         23    versus a waveguide, do you recall any other basis for the

         24    opinion by Fallon's counsel that there was no infringement?

13:36:57   25      A.      I relied on the letter. That was what was

important to me.  If you would repeat the question again.

13:37:14    Court reporter:  Other than the issue you referred to
of a lens versus a waveguide, do you recall any other basis
for the opinion by fallon's counsel that there was no
infringement?

13:37:21    THE WITNESS:  Not Fallon's counsel, no.

13:37:21 BY MR. VEZEAU:

13:37:24    Q.    To continue with my identification, I will
place before you what has been identified as Defendant's
Deposition Exhibit 551, a letter to Fallon's counsel from
iLight's counsel dated December 23, 2005.  I ask you to take a
look at that and let me know if you have seen that document
before.

13:37:56    Have you seen that letter before?

13:37:56    A.    Yes.

13:37:59    Q.    When?

13:38:03    A.    Probably shortly after it was delivered.

13:38:13    Q.    How did you get a copy of this letter?

13:38:23    A.    Typically, if it was sent to counsel, we would
get a copy of it.  What I'm referring to, the second
paragraph, I think -- I believe I've seen other patent numbers
and development by iLight.

13:38:42    Q.    What, if anything, did you do or did the
company do when you became aware of this letter, this letter
being Defendant's Deposition Exhibit 551?

13:39:04 1          A.       We compared -- I know we compared the product

2    that iLight produced under their patent.  We looked at it,

3    found it basically the same design -- the same patent, the

4    same sign as described in the patent, compared it to our own.

5    This was during -- between the first letter that you showed me

6    and the second letter.  I did personally look at both signs

7    and found that they were -- there was basically -- they were

8    totally different.

13:39:50 9          Q.       What -- how -- what is the basis for your

10   benefit that they were totally different?

13:39:56 11         A.       The construction of the sign.

13:39:57 12         Q.       Pardon?

13:39:59 13         A.       The construction of the sign.

13:40:03 14         Q.       This is iLight's physical sign versus the

15   Fallon physical LED Open sign?

13:40:11 16         A.       Yes.

13:40:22 17         Q.       When did Fallon -- since you did the comparison

18   -- let me withdraw that question.  Since you did the

19   comparison, do I assume correctly that Fallon had an iLight

20   Open sign?

13:40:28 21         A.       Yes.

13:40:30 22         Q.       Where did you get that?

13:40:36 23         A.       I'm not sure exactly who picked up the sign or

24   purchased the sign, but the first time I saw the sign was in

25   Knoxville, Tennessee.

13:40:49 1          Q.     Do you remember when that was?

13:40:56 2          A.     It was in 2005, after the opinion letter that

3     we received from our counsel.  That's when I looked at it.

13:41:06 4          Q.     The letter you are referring to is the one that

5     your counsel sent to iLight's counsel?

13:41:13 6          A.     Yes.

13:41:16 7          Q.     Who in Fallon did the actual comparison of the

8     physical products, that is, iLight's Open sign versus Fallon's

9     Open signs, the LED versions?

13:41:32 10         A.     Most likely it was Chuck Nelson.

13:41:36 11         Q.     Did he give you anything, a written report on

12    that comparison?

13:41:41 13         A.     Not that I'm aware of.

13:41:44 14         Q.     Did you discuss that comparison with him?

13:41:48 15         A.     I don't believe so.

13:41:50 16         Q.     How did you become aware that this comparison

17    was done in Fallon?

13:42:03 18         A.     I saw -- I believe I saw a memorandum of some

19    sort.

13:42:07 20         Q.     From whom?

13:42:12 21         A.     From our counsel.  I understand it was

22    discussed with Chuck.

13:42:23 23         Q.     In 2005, were you aware of the construction of

24    the Fallon LED Open sign?

13:42:27 25         A.     Yes.

13:42:29  1          Q.      Had you seen it?

13:42:30  2          A.      Yes.

13:42:34  3          Q.      Had you seen it disassembled and assembled,

4      that is, in both conditions?

13:42:37  5          A.      Yes.

13:42:49  6          Q.      Had you compared the inner surfaces of the sign

7      in the channel that held the LED lights to the outer surface

8      of the sign?

13:43:06  9          A.      You are talking -- you are speaking about the

10     molding case?

13:43:09  11         Q.      Yes.

13:43:11  12         A.      Did I look at the outer and inner?

13:43:12  13         Q.      Yes.

13:43:13  14         A.      Yes.

13:43:15  15         Q.      And what did you observe, if anything?  In

16     other words, can you describe that for the jury?

13:43:22  17         A.      Yes, I could describe it.

13:43:24  18         Q.      Please do so.

13:43:33  19         A.      It's a plastic injection molded case with a

20     textured outside finish and a -- I believe it actually had an

21     area to put the lens in, dropped into it.  The inside of the

22     molded -- the injection molded case was basically a -- what

23     you would expect to see inside of a molded product.  The

24     design is on the outside, basically the inside is typically

25     regular plastic.

13:44:46  1          Q.     What do you mean by regular plastic?

13:44:48  2          A.     Plastic like that type of plastic on a bottle

   3    or a computer, just generic type of plastic.

13:45:01  4          Q.     Now, you referred to the outside finish as

   5    being textured.  What do you mean by that?

13:45:16  6          A.     I believe it had some texture to it basically.

13:45:27  7          Q.     Can you describe that for the jury?

13:45:35  8          A.     It was rough in nature.  It basically had very

   9    small lines or a texture to it.  I'm not -- I can't really

   10   describe it to you other than it had a texture to it.

13:45:54  11         Q.     Do you know the reason for that?

13:46:01  12         A.     No.  It was similar to what we had for other

   13   signs.  It was black in color.

13:46:16  14         Q.     Now, you also referred to the inner surface of

   15   the molded product that is that in which the LEDs were placed.

   16   Was that also textured?  In other words, rough in surface?

13:46:31  17         A.     No.

13:46:34  18         Q.     Why not?

13:46:41  19         A.     The consumer didn't see it.  The outside of the

   20   mold costs money to produce a mold of that type, to produce

   21   the product.  The actual surface, that would be -- that the

   22   consumer would be looking at would be on the outside, not the

   23   inside of the product.

13:47:13  24         Q.     Do you know if anyone at Fallon ever measured

   25   the reflectivity of the outer surface that you referred to,

the textured outer surface, compared to the inner surface of

the molded product?

13:47:31    A.    NO.

13:47:34    Q.    Do you know if your attorneys ever did that?

Do you know if your opinion counsel ever did that?

13:47:43    A.    I really didn't know.

13:47:51    Q.    Did you, or to your knowledge, anyone at Fallon

ever explain to your opinion counsel the difference between

the textured outer surface that you referred to of the product

compared to the inner surface?

13:48:14    A.    NO.    Not that I know of.

13:48:17    Q.    I will hand you Plaintiff's Deposition Exhibit

522 and ask you to take a look at it and tell me if you can

recall seeing that document before yesterday.

13:49:00    A.    Yes, I've seen this.

13:49:04    Q.    When?

13:49:06    A.    The spring of '05.

13:49:08    Q.    Pardon me?

13:49:11    A.    In the spring of '05.

13:49:13    Q.    Do you recall those discussions being reported

to you that the other employees had with your counsel at that

time?

13:49:21    A.    I knew there was a meeting, yes, that they

discussed why the sign in question, in their opinion, was not

an infringement.

|  |  |
|---|---|
| 13:49:32 | 1 |

        Q.     Do you recall the details of those discussions as reported to you?

13:49:37  3        A.     No.

13:49:42  4        Q.     Did you read this document in 2005, this document being Defendant's Deposition Exhibit 552?

13:49:55  6        A.     I'm sure I did.

13:50:01  7        Q.     Did I say Defendant's?  I apologize.  Back through my notes I wrote it as D.  It should be Plaintiff's Deposition Exhibit 552, the document we've been discussing.

13:50:15  10       In 2005, how much time did you spend reviewing this exhibit, Plaintiff's Deposition Exhibit 552?

13:50:29  12       A.     As long as it took to read.  My interest in this, after seeing the letter from our attorney that said we did not infringe, and subsequently seeing the signs out of my own curiosity, probably after receiving this, and saw that there was -- there was no -- no likelihood that these signs had any relation to each other, they were totally different, that was the end of my deep involvement in this, if you want to call it deep involvement.  When my lawyer said it doesn't infringe, when I see the signs and they don't look like each other, I go on to something else.

13:51:18  22       Q.     Now, I want to direct your attention to the last page of that memorandum with Production Number FAL 122525.  And to the paragraph starting, as set forth.  This sentence -- the second sentence in that paragraph says, the

housing is of singular construction.  Do you know what housing

is being referred to there?

13:52:03     A.     I believe I understand what it means, yes.

13:52:06     Q.     And do you understand what is being referred to

as the channel in the Fallon LED Open sign in which the LEDs

sit?

13:52:25     A.     I know the LEDs sit in a channel.  Is that what

you are talking about?

13:52:32     Q.     Yes.  Do you understand that's the housing

being referred to in this sentence?

13:52:40     A.     I really can't answer the question the way --

like I told you before, I saw the opinion that we didn't

infringe, I saw the signs.  I am not a technical person.

That's enough for me as CEO to go on with other business.  So

I'm not going to get into technical things here, whether it

refers to this or that, because that's not my job.

13:53:11     Q.     But it was your job to make a decision as to

whether to continue manufacturing and selling the Fallon LED

Open sign; is that correct?

13:53:19     A.     That is correct.

13:53:21     Q.     The buck stopped on your desk?

13:53:24     A.     Theoretically, yes.

13:53:26     Q.     And you made a decision to continue; is that

correct?

13:53:29     A.     Based on my attorneys and based on seeing the

signs, that is correct.

13:53:36  Q.    Earlier in your testimony, you referred to the
correspondence you became aware of in the spring of 2005 from
your counsel to iLight's counsel.  I'm asking you, is this the
correspondence you were referring to?

13:53:57  A.    No.  The correspondence that I referred to was
the original letter claiming infringement.  That was the --
that was which -- we received a letter from our counsel which
said we do not infringe, and that was basically the end of the
story for me as far as where I was being involved.

13:54:21  Q.    And is the letter you are referring to from
your counsel the memorandum that was marked as Plaintiff's
Deposition Exhibit 552?  Or is it something else?

13:54:32  A.    I saw that, too.

13:54:33  Q.    Pardon me?

13:54:35  A.    Yeah, I saw this also.

13:54:37  Q.    Is that what you are referring to?

13:54:48  A.    I'm referring to the April 1st letter?  550?

13:54:51  Q.    Yes.

13:55:07  A.    I did see 552.  555, I probable saw it, but it
was not a -- it probably went from my in-box to my out-box,
because I wasn't following the legal goings-on between the
attorneys.  Once I had an indication from our attorney that we
did not infringe, and once I saw the two signs, I became very
disinterested in this.  It was apparent to me that this is not

1       something I should waste my time on.

13:55:49   2          Q.    The e-mail which I -- I had asked you some

3       questions generally about this earlier in your dep, and you

4       didn't recall it, but I'm referring to the Thursday, March 31,

5       2005 e-mail.

13:56:08   6          On the second page of Exhibit 561, there is a

7       reference to -- his reference in his e-mail to you:  We can

8       only submit a patent application for the LED Open sign with

9       broken borders, but I don't believe it will receive approval,

10      and if iLight gets a whiff of our filing and files an

11      objection, we are dead in the water.

13:56:33   12         Do you know -- the LED Open sign referred to in that

13      sentence, do you believe that's in reference to the Fallon LED

14      sign it was then providing to Sam's Club?

13:56:46   15         A.    Would you repeat the question, please?

13:56:48   16         Q.    (Mr. Vezeau) Would you read that back.

13:56:48   17         (Record read.)

13:57:04   18         A.    Yes, I believe so.

13:57:13   19         Q.    Okay.  So apparently before you received -- and

20      I realize it's close in time, but before you received

21      Plaintiff's Exhibit 551 or became aware of it -- I'm sorry,

22      the first exhibit we looked at today, Plaintiff's Exhibit 550,

23      I believe you previously testified that that was the first

24      time you heard of iLight?

13:57:47   25         A.    (Respite.)

13:57:51  1          Q.    It's not a trick question.  Obviously the dates

       2     are close.  But my question is, is it fair to say that you

       3     were made aware of iLight at least prior to your becoming

       4     aware of Exhibit 550?

13:58:11  5          A.    I guess by 12 hours it appears.

13:58:15  6          Q.    Well, do you know when you actually received a

       7     copy of Exhibit 550?

13:58:20  8          A.    Exactly when I received a copy?

13:58:22  9          Q.    Yeah, what day?

13:58:30 10          A.    I don't know.  Soon after it was received.

13:58:31 11          Q.    Pardon me?

13:58:39 12          A.    Soon after it was received.

13:58:44 13          Q.    Now, Mr. Huo refers to:

13:58:49 14          ILight does have a patent filing for their LED

      15     product.  Please see the attached pdf.

13:59:03 16          Do you recall what the pdf was?

13:59:11 17          A.    I would assume it's the patent.

13:59:15 18          MS. HUNTER:  And finally, the plaintiff iLight calls

      19     Richard Huo by video deposition.  Mr. Huo is the Chief

      20     Operating Officer of Fallon Visual Products Corporation, and

      21     he is also the President of Fallon Shanghai.

13:59:39 22          (Video playing:)

13:59:41 23          Q.    (By Mr. Vezeau) What are your current

      24     responsibilities with Fallon Luminous Products?

13:59:46 25          A.    I'm currently the Chief Operating Officer of

Fallon Visual Products Corporation, as well as a Managing
Director of Lincolnshire Management.

14:00:01    Q.    Currently are all of Fallon Luminous's LED sign
products that are sold to Sam's Club and Anheuser-Busch -- are
they made at this facility in China?

14:00:12    A.    No.

14:00:13    Q.    Where are they made?

14:00:18    A.    We still -- we outsource some of the products.

14:00:21    Q.    What percentage are made at the facility in
China?

14:00:26    A.    I don't have an exact number.

14:00:29    Q.    Okay.  But at least some are?

14:00:29    A.    Yes.

14:00:32    Q.    All right.  Where are the other facilities?
Geographically where are the other facilities that you
outsource these products to?

14:00:44    A.    They are in Shanghai.

14:00:49    Q.    Does the facility that you set up in Shanghai
still manufacture neon products?

14:00:53    A.    Yes.

14:00:57    Q.    Do you know what percentage of its production
is neon versus LED?

14:01:01    A.    No, I don't.

14:01:04    Q.    Do you have any continuing responsibilities
with respect to that facility in Shanghai?

14:01:14  1          A.     I'm still the President of Fallon Shanghai.

14:01:16  2          Q.     What is the relationship between Fallon

         3   Shanghai and Fallon Luminous Products?

14:01:24  4          A.     Fallon Shanghai is a supplier to Fallon

         5   Luminous Products Corporation.

14:01:36  6          Q.     Does Fallon Luminous Products Corporation

         7   itself make any LED signage products?

14:01:45  8          A.     No.

14:01:52  9          Q.     Does it make any neon products itself?

14:01:52 10          A.     Yes.

14:01:57 11          Q.     Where does it make the neon products?

14:01:59 12          A.     In Andigo, Wisconsin.

14:02:04 13          Q.     All of the LED products it sells are made in

        14   Shanghai?

14:02:09 15          A.     Yes.

14:02:12 16          Q.     Does Fallon Shanghai also make a product that

        17   is referred to as a Super Bright product?

14:02:22 18          A.     Yes.  It is a new Open sign.

14:02:25 19          Q.     Can you describe that for us?

14:02:31 20          A.     It's an Open sign with an enclosure, LEDs and a

        21   diffuser.

14:02:36 22          Q.     For whom is that product made?

14:02:38 23          A.     For Sam's Club.

14:02:43 24          Q.     And how does that product differ, if it does at

        25   all, from the prior LED Open sign product sold by Fallon to

```
 1    Sam's Club?
 2         A.    I believe it's brighter.
 3         Q.    And how does it achieve that brighter
 4    characteristic?
 5         A.    I believe there's more LEDs in that particular
 6    product.
 7         Q.    Anything else?
 8         A.    No.
 9         Q.    Do you know whether the Super Bright sign on
10    one or more of the letters includes a second, if you will,
11    channel containing a strip of LED lights?
12         A.    There are two colors, I believe, in the O.  Is
13    that your question?
14         Q.    It may be.  Maybe you're explaining it better.
15    Is that a difference from the prior product?
16         A.    Yes.  I believe -- again, I don't have the, you
17    know, the picture of the product in front of me, so, you know,
18    it's difficult for me to --
19         Q.    You don't remember the product that well?
20         A.    I try not to remember the product.
21         Q.    Do you know whether the second color you
22    referred to, those lights that form the second color or
23    provide the second color, are in the same channel, if you
24    will, or enclosure as the lights for the first color?  Are
25    they in a separate enclosure?
```

14:04:39  1          A.      There are different PCB boards for different

2     colors.  We do not maintain multiple colors on the same

3     printed circuit boards.

14:04:50  4          Q.      Do those printed circuit boards for the

5     respective colors sit in the same channel or a different

6     channel?

14:04:57  7          A.      We treat it as an enclosure, so --

14:05:03  8          Q.      So do they just sit side by side?

14:05:07  9          A.      They sit within that enclosure.

14:05:12 10          Q.      Now, what I'm wondering, with the second

14:05:13 11     color --

14:05:13 12          A.      Right.

14:05:18 13          Q.      -- Does that -- is that then fit into the same

14     enclosure?  Or is there a separate --

14:05:26 15          A.      The enclosure is compartmentalized.

14:05:30 16          Q.      So it sits in a separate compartment?

14:05:33 17          A.      Yes.

14:05:38 18          Q.      Other than the second compartment or a second

19     color of LCDs?

14:05:48 20          A.      LEDs.  You said LCDs.

14:05:56 21          Q.      I did, it's LEDs.  Is the construction of that

22     Super Bright product different than the prior Open sign

23     product for Sam's Club?

14:06:08 24          A.      The methodology is the same.

14:06:21 25          Q.      Now, in 2005 you became aware that iLight had

pursued patent protection for the LED sign; is that correct?

14:06:35   A.   I don't recall.  I don't recall.

14:06:38   Q.   You will see some documents in front of you.
There are stickers at the bottom.

14:06:41   A.   Okay.

14:06:43   Q.   Can you open to Plaintiff's Deposition Exhibit
561.

14:06:48   A.   Yes.

14:06:49   Q.   Do you have that?

14:06:49   A.   Yes.

14:06:53   Q.   There is an e-mail string there.  And I want
you to focus on your e-mail that bridges the first and second
pages of the exhibit.

14:07:02   A.   Okay.

14:07:07   Q.   Tell me when you finish reading it.

14:07:09   A.   Okay.  Yes.

14:07:14   Q.   All right.  Now, you referred in that e-mail
message, iLight does have a patent filing for their LED
product.  Do you see that?

14:07:20   A.   Yes.

14:07:25   Q.   You say, please see the attached pdf.

14:07:25   A.   Yes.

14:07:32   Q.   So at least by March 31, 2005, 5:15 p.m. --

14:07:33   A.   Uh-huh.

14:07:36   Q.   -- you were aware of a patent filing by iLight

1 *for its LED product; is that correct?*

2    *A. I don't recall, but based on that e-mail, I*

3 *would say yes.  Yep.*

4    *Q. And do you know what was attached to this as a*

5 *pdf?*

6    *A. No, I don't recall that.*

7    *Q. Now, you also indicate in the -- going back up,*

8 *that e-mail message, that we can always submit a patent*

9 *application for the LED oval sign with broken borders, but I*

10 *don't believe that we will receive approval.  Why didn't you*

11 *believe it would receive approval?*

12    *A. Because there was prior -- I believe that there*

13 *was prior art in this type of product.*

14    *Q. And you said if iLight gets a whiff of our*

15 *filing and files an objection, we are dead in the water.  Why*

16 *did you believe that?*

17    *A. That's just my opinion of what the patent*

18 *process was.*

19    *Q. What did you mean by that?*

20    *A. I don't recall.*

21    *Q. You don't know what you meant?*

22    *A. Based on that -- again, this was written four*

23 *years ago, so based on that, my interpretation right now would*

24 *be that it could possibly block -- dead in the water.  Again,*

25 *my interpretation was that there was prior art on the patent,*

```
 1    and that's why it wouldn't get the approval.  I don't recall
 2    why I said that we would be dead in the water.
14:09:25  3         Q.    You are President of Fallon Shanghai; correct?
14:09:25  4         A.    Yes.
14:09:30  5         Q.    Fallon Luminous imports products from your
 6    company; right?
14:09:32  7         A.    Yes.
14:09:35  8         Q.    So in that sense your company is part of
 9    importation and shipping products?
14:09:42 10         A.    Fallon Shanghai exports products to Fallon
11    Luminous Corporation.
14:09:45 12         Q.    Those products are then shipped to Fallon
13    Luminous in the United States; correct?
14:09:52 14         A.    We export to Fallon Products -- yes, yes, to
15    Corporation in South Carolina.
14:09:58 16         Q.    Right.  Who arranges the shipping?
14:10:04 17         A.    The shipping is arranged by -- by Fallon
18    Products Corporation.
14:10:10 19         Q.    And I only have this fax copy, so I will let
20    you look at it.  But what I want to direct your attention to
21    is one of your e-mails from May 10, 2005 to Tim Demmond.
14:10:24 22         A.    Demmond.
14:10:29 23         Q.    The subject is:  Get my hands on an iLight
24    product.  Tim --
14:10:38 25         Because it also went to Tim Fallon.
```

14:10:38  1          A.      Okay.

14:10:40  2          Q.      I would like to get my hand on an iLight Open

          3  sign.  I tried in northern California, and I had no luck.  Can

          4  you guys try?  We need three or four.  Regards, Richard.

14:10:56  5          I will show that to you.  Dated May 10, 2005.

14:10:56  6          A.      Okay.

14:10:59  7          Q.      What was the need for three or four iLight

          8  signs?

14:11:06  9          A.      I don't recall.

14:11:11  10          Q.      Do you recall getting iLight LED Open signs in

          11  2005?  Or 2006?

14:11:32  12          A.      I don't recall getting an iLight sign.

14:11:36  13          Q.      So you have no recollection what the need was

          14  there, referred to in your e-mail?

14:11:41  15          A.      No, I don't recall.

14:11:50  16          THE COURT:  Does that conclude the plaintiff's proof?

14:11:54  17          MR. VEZEAU:  Yes, Your Honor.  That concludes the

          18  plaintiff's case, the live witnesses, and the deposition

          19  testimony.  We have entered our exhibits.

14:12:03  20          THE COURT:  Are there any other exhibits?

14:12:04  21          MR. VEZEAU:  Pardon me?

14:12:10  22          THE COURT:  Are there any other exhibits?

14:12:12  23          MR. VEZEAU:  I believe not, Your Honor.  I believe

          24  we've taken care of that subject further -- with counsel you

          25  referred to and, therefore, we rest.

14:12:20 1          THE COURT:  For the defense?

14:12:23 2          MR. KITTREDGE:  Your Honor, we have a Rule 50 motion.

14:12:25 3          THE COURT:  Ladies and gentlemen of the jury, I'm

4     going to excuse you for a few minutes.  Please don't discuss

5     the case amongst yourselves until you receive all of the

6     evidence, the argument of counsel, and the charge of the

7     Court.

14:12:46 8          (Jury out.)

14:13:05 9          THE COURT:  All right, counsel.  Yes, sir.

14:13:07 10          MR. KITTREDGE:  We went ahead and filed a motion, Your

11    Honor.  I didn't know how much, if you would want to hear it

12    or not.  We believe as a matter of law that iLight has not

13    proved its case of infringement, that the evidence of

14    infringement presented by Dr. Bratic just doesn't meet the

15    legal requirements.

14:13:25 16          In particular, he was not able to provide any kind of

17    rational explanation of when a rod becomes solid versus what I

18    think he called hollow, no rationale explanation of his human

19    observer test, it was inadequate as a matter of law that he

20    was applying.  There was no evidence of any scientific

21    analysis or measurements of Fallon's plastic lens cover to see

22    if it has any actual waveguide properties.  Similarly, no

23    measurement or analysis to see if it does preferentially

24    scatter light.  All he did was look at it and apparently apply

25    his human observer test.

14:14:02 1       Similarly, with respect to preferentially scatters

2  light, no rational explanation of what does and what does not.

3  Apparently anything does.  And the differences between

4  interior light reflecting surfaces and exterior light

5  absorbing surfaces was, again, inconsistent and just

6  inadequate to the meet the burden of proof.

14:14:30 7       THE COURT:  For iLight?

14:14:32 8       MR. VEZEAU:  Thank you, Your Honor.  We were just

9  handed this motion, of course, and haven't had time to look at

10  it.

14:14:38 11      THE COURT:  It wasn't filed.  It's not on the docket

12  yet.  So if you will pass up a copy.

14:14:45 13      MR. KITTREDGE:  I think we have it electronically

14  filed just in case.  We're not sure how you filed after that.

15  I've got a couple of copies for the Court.

14:14:56 16      MR. VEZEAU:  If the Court would like, we, of course,

17  will file an opposition.  But just very briefly, I think the

18  Court sat through quite a bit of testimony from -- it wasn't

19  really on this issue, Dr. Bratic -- I think counsel misspoke,

20  but Dr. Roberts.

14:15:11 21      MR. KITTREDGE:  I'm sorry, Dr. Roberts.

14:15:13 22      MR. VEZEAU:  That's fine.  And Dr. Roberts went into

23  excruciating detail over each of the claims, provided jury, we

24  think, with more than enough evidence that a reasonable juror

25  could finding infringement in this case of the asserted claims

632

1    by the accused products.

14:15:30  2    We think frankly, the evidence, we think, was very

3    strong, but certainly it meets the standard sufficient to

4    mandate that judgment as a matter of law is not appropriate at

5    this time.

14:15:42  6    THE COURT:  Anything further?

14:15:44  7    MR. KITTREDGE:  I have nothing further to add, Your

8    Honor.

14:15:49  9    THE COURT:  Okay.  Considering the testimony of Dr.

10    Roberts as well as all the other proof presented by the

11    plaintiff, viewed in a light most favorable to the plaintiff

12    as required under a Rule 50 motion, the Court concludes that

13    the plaintiff has presented sufficient evidence to show

14    infringement as well as damage.  And the motion for judgment

15    as a matter of law is denied.

14:16:28  16    MR. VEZEAU:  Thank you, Your Honor.

14:16:30  17    THE COURT:  Are you ready with your first witness?

14:16:30  18    MR. KITTREDGE:  Yes, Your Honor.

14:16:36  19    THE COURT:  You can bring the jury in, Mr. Marshal.

20    (Jury in.)

14:17:16  21    THE COURT:  Are there any matters for the defendant?

14:17:18  22    MR. KITTREDGE:  Your Honor, the defense calls Mr.

23    Chuck Nelson.

14:17:22  24    THE COURT:  Mr. Nelson, if you will come around,

25    please sir.

14:17:35  1          (Witness sworn.)

14:17:41  2          COURT REPORTER:  Please state your full name for the

          3  record.

14:17:45  4          THE WITNESS:  Charles Richard Nelson.

14:17:45  5  DIRECT EXAMINATION

14:17:45  6  BY MR. KITTREDGE:

14:17:50  7          Q.      Are you employed by Fallon?

14:17:52  8          A.      Yes, I am.

14:17:52  9          Q.      What is your position?

14:17:53  10         A.      National Accounts Manager.

14:17:55  11         Q.      Where do you live?

14:17:57  12         A.      Spartanburg, South Carolina.

14:18:00  13         Q.      How long have you lived in Spartanburg?

14:18:02  14         A.      Twenty-- well, practically my whole life.

14:18:06  15         Q.      And are you married?  Do you have children?

14:18:09  16         A.      I'm married, three children, 18, 15 and a two

          17  year old.

14:18:16  18         Q.      Could you for the jury describe your kind of

          19  post-high school educational background?

14:18:22  20         A.      Technical college, two different technical

          21  colleges, and a bunch of other classes, part-time classes and

          22  so forth.  That's pretty much it.

14:18:32  23         Q.      What type of course work did you study?

14:18:35  24         A.      Practical engineering, mechanical engineering.

14:18:40  25         Q.      And if you could also for us describe your job

1    history up to Fallon.

14:18:49  2         A.    Up to Fallon, I previously worked a couple of

3    other small part-time jobs.  I worked for two years at another

4    neon company where I learned how to bend glass, basically all

5    the production aspects of neon.

14:19:04  6         Q.    The neon company that you worked at before

7    Fallon -- was that a sign company?

14:19:09  8         A.    Yes, it was.  The name of the company was Neon

9    Commitment Group.

14:19:13  10        Q.    And what kind of signs did it make?

14:19:18  11        A.    Neon signs, backlit signs, all types of POP

12    signs.

14:19:20  13        Q.    All types of POP?

14:19:24  14        A.    Point of purchase displays.

14:19:29  15        Q.    And can you describe what a backlit sign is?

14:19:34  16        A.    It's a sign, a plastic sign, that is lit with

17    some type of light source, be it neon, florescent, compact

18    florescent, whatever.

14:19:45  19        Q.    Why is it called back lit?

14:19:49  20        A.    That's essentially what it is.  It's lit from

21    the back.

14:19:51  22        Q.    What is lit from the back?

14:19:54  23        A.    The plastic face.

14:19:58  24        Q.    And what kind of light is used to light it?

14:20:01  25        A.    Anything.  Any type of light.  Any type of

light that's available or economical.

14:20:05   Q.   Fluorescent bulbs?

14:20:10   A.   Fluorescents, compacts, neons, LEDs, whatever
was available.

14:20:15   Q.   And when did you join Fallon Luminous Products?

14:20:19   A.   I joined Fallon Luminous Products in 1988, late
'88.

14:20:23   Q.   What was your first job at Fallon?

14:20:27   A.   I was their only engineer at the time.

14:20:29   Q.   So what were your responsibilities when you
started at Fallon?

14:20:37   A.   Design drawings, creatives, I did a lot of
different things from prototypes to mold making.  We didn't
have a lot of people back then, so --

14:20:48   Q.   And is this all for sign products, or did
Fallon make other things?

14:20:51   A.   This was all for sign products.

14:20:53   Q.   Are they all lighted signs?

14:20:54   A.   All lit.

14:20:58   Q.   If you can walk us through how your career
progressed, what different job positions you have had while
you have been at Fallon.

14:21:07   A.   From the engineering aspect of it, I went
through -- well, starting as an early engineer, as the company
grew, we started hiring more engineers, and we got to a point

where we had three or four engineers. And then I was promoted

to engineering manager. And I stayed at that position for a

while, then I was promoted to vice-president of engineering.

And I was at that position for many years, then moved to

vice-president of research and development, and then to the

position I'm at right now.

14:21:49      Q.      Throughout your career at Fallon, have you been

involved in designing and developing signs?

14:21:52      A.      Yes.

14:21:54      Q.      Can you describe some of the types of signs you

have worked on?

14:22:05      A.      Everything from lit signs, to CD holders, to

posters, to any kind of -- different retail items for Sam's

Club, Spencer's Gifts, you name it. If it had lights on it or

it was a type of display, we would make it at a customer's

request.

14:22:27      Q.      And what's a combination sign?

14:22:29      A.      A combination sign?

14:22:32      Q.      Yeah, maybe I misunderstood something.

14:22:38      A.      We would make compact disk holders, a CD holder

for Sam's that had a lit tube in it.

14:22:47      Q.      I see. I think this would be a good time to

look at one of the exhibits that has been entered.

14:22:52      Your Honor, can I get one of the exhibits up and show

it to the witness?

14:22:57 1          THE COURT:  Yes.  As I stated before, all counsel and

2    witnesses have leave to either leave the witness stand or

3    leave the podium as necessary to present proof.  It's a

4    standing directive I gave at the beginning.

14:23:13 5          MR. KITTREDGE:  I apologize for forgetting.

14:23:24 6          Can we show the witness Plaintiff's Exhibit TX 83 A.

14:23:27 7    BY MR. KITTREDGE:

14:23:31 8     Q.     Do you recognize Exhibit 83 A?

14:23:31 9     A.     Yes.

14:23:33 10    Q.     What is it?

14:23:37 11    A.     It's an embedded oval Open neon.

14:23:39 12    Q.     And I'm going to ask you to explain to the jury

13    what that means, embedded.  But would it be easier for you to

14    come down?

14:23:45 15    A.     Yeah, probably.

14:24:09 16    Q.     Let me get an easel for you.

14:24:13 17    A.     The phrase embedded is -- well, what this is,

18    it's a vacuum-formed plastic enclosure that houses the Open

19    sign.  The neon being fragile glass, it was the manner in

20    which to encapsulate the glass to allow us to ship it into

21    Sam's, to get it to the customer without breaking, as well as

22    just hanging in the window, where if you bump the glass with a

23    window washer, you can't really disturb it in any way.  It

24    ships better, it hangs better, the end user can operate it

25    better.

638

14:24:49 1       What it is, it is the face and cage of a vacuum-formed

2       part.  But the face is formed and shaped in the Open with a

3       channel, which pre-exists that patent on this as well.  And it

4       just completely encapsulates.  The plastic has a hair cell on

5       it, and that hair cell plastic just eliminates all the

6       fingerprints on it.  And that's something since we started

7       making the Opens and started make it black as a standard

8       procedure.

14:25:24 9       Q.      Okay.  You can sit down, I think.  Now, Exhibit

10      83 A, the neon Open sign, were you involved in developing this

11      product?

14:25:32 12      A.      Yes.

14:25:34 13      Q.      What was your involvement?

14:25:36 14      A.      Complete.  I handled everything from, I think

15      I've got the first vacuum-formed tool made from when I pulled

16      the first part.

14:25:43 17      Q.      Can you explain what vacuum forming means.

14:25:47 18      A.      Vacuum forming or therma-forming is a type of

19      forming where you take a flat sheet of plastic and you

20      basically clamp it into a frame, you push it into an oven, and

21      when it comes out, it's molten hot.  And then you drape that

22      over into a mold or your imprint, and you use vacuum to pull

23      out the air between the two parts, thus creating the shape.

24      And when it cools, you've got a hardened shape.

14:26:13 25      Q.      And I think you described it as being -- was it

```
 1    hair cell?
14:26:14   2            A.    It's a texture -- it's a common texture in the
 3    plastics industry.  We buy the plastic pretextured for that
 4    part.
14:26:23   5            Q.    Did Fallon develop this hair cell?
14:26:27   6            A.    No, that came straight from the plastics
 7    industry.
14:26:31   8            Q.    Who did Fallon sell this sign to?
14:26:31   9            A.    Sam's Club.
14:26:34  10            Q.    Was it a successful product for Fallon?
14:26:42  11            A.    Yeah, we sold that one for many years.
14:27:05  12            Q.    Can we have the exhibit -- Plaintiff's Exhibit
 13    TX 9 A.  Mr. Nelson, do you recognize Exhibit 9 A?
14:27:18  14            A.    Yes, I do.
14:27:21  15            Q.    What is Exhibit 9 A?
14:27:25  16            A.    It is our Opti product.  It's an LED lit
 17    product.
14:27:29  18            Q.    Did you have any involvement in developing this
 19    product?
14:27:33  20            A.    Yes, I did.
14:28:35  21            Q.    Why did Fallon begin development on -- of the
 22    sign that has been marked as Exhibit 9 A?
14:28:41  23            A.    It was at the request of our customer.
14:28:43  24            Q.    What customer was that?
14:28:43  25            A.    Sam's Club.
```

14:28:47  1          Q.      When did this happen?

14:28:47  2          A.      2004.

14:28:55  3          Q.      Did Sam's Club stop buying the neon oval Opens

         4  while you were working on the development of the LED sign?

14:29:02  5          A.      Never.

14:29:09  6          Q.      Did Sam's Club keep buying the oval neon signs

         7  all through 2004?

14:29:13  8          A.      Yes.  They still carry them on their website.

14:29:14  9          Q.      To this day?

14:29:18 10          A.      Yes.

14:29:24 11          Q.      And the oval Opens that Sam's Club carries on

        12  its website -- where are they made?

14:29:27 13          A.      Excuse me?

14:29:33 14          Q.      The oval neon opens that Sam's Club carries on

        15  its website -- where are they made?

14:29:38 16          A.      It's old inventory.  They were made in

        17  Spartanburg originally.

14:29:43 18          Q.      So what was Fallon's reaction when Sam's Club

        19  came to it and asked it to make an LED version of the neon

        20  Open?

14:29:49 21          A.      Could you repeat that?

14:29:52 22          Q.      What was Fallon's reaction, the company's

        23  reaction, when Sam's Club came to it and asked if it could

        24  make an LED version of its neon Open sign?

14:30:07 25          A.      We immediately jumped on it, as always.

14:30:13  1          Q.     And whose responsibility was that?

14:30:19  2          A.     Mine.

14:30:19  3          Q.     So, can you describe for the jury how you came

          4    up with the LED Open sign?  What did you do?

14:30:20  5          A.     Well, other than the obvious, the shape being

          6    the exact same shape, I took the blueprints that I used

          7    basically to create the vacuum formed version and transferred

          8    it over to create the LED version.  I created the center lines

          9    for our LED vendors to start laying out the boards and the

         10    internal components.  And then started looking at vacuum

         11    formed components, printed components, and we made several

         12    different molds and different pieces of plastic to act as

         13    diffusers, so that when the LED components came in, we could

         14    start knocking out samples.

14:30:58 15          Q.     How long did this process take?

14:30:59 16          A.     Several months.

14:31:08 17          Q.     How did you decide -- maybe I could hand you an

         18    item we've marked as Defendant's Exhibit for Identification

         19    655 A.  Do you recognize Item 655 A?

14:31:26 20          A.     Yes, it's a letter N.

14:31:29 21          Q.     And is it from one of Fallon's signs?

14:31:30 22          A.     Yes, that's correct.

14:31:32 23          Q.     And is this similar to some of the mock-ups you

         24    were working with originally?

14:31:38 25          A.     They weren't this -- this pretty, but yes.

14:31:43 1        Q.    How did you decide how far apart to put the

2  LEDs?  I'm talking about initially when you were developing

3  this.

14:31:50 4        A.    It was just more common sense than anything.

5  If it was a half an inch, we played around with different

6  spacings and just kind of ended up with around a half an inch.

7  And it just seemed to fit with the length of the letter.  When

8  you start spacing the LEDs out from one end of the channel to

9  the other, it just kind of ends up that way.

14:32:14 10       And if -- the spacing isn't always exactly a half

11  inch.  Sometimes it's a little more, sometimes it's a little

12  less, sometimes it's a lot more, depending upon the length of

13  the letter.

14:32:23 14        Q.    Why does it have to be different, depending on

15  the length of the letter?

14:32:28 16        A.    Well, you don't want two LEDs too close

17  together or too far apart, or you end up with a dark spot or a

18  hot spot.  And you always want one at the end, or when you get

19  to the end of the letter, you will end up with a dead spot.

14:32:39 20        Q.    So you have to make sure the spacing is even?

14:32:41 21        A.    Somewhat even.

14:32:44 22        Q.    Can I hand you and the deputy hand you an item

23  we've marked as Defendant's Exhibit 655 B.  Do you recognize

24  Item 655 B?

14:33:02 25        A.    Yes, it's a plastic letter from the Open sign.

14:33:05    1          Q.      Is that similar to the plastic that you were

2    using in earlier mock-ups?

14:33:08    3          A.      The same type of plastic, yes.

14:33:09    4          Q.      And what is that?

14:33:13    5          A.      It's acrolite, cyroacrolite, is what it is.

6    It's a common trade plastic sold in the industry.

14:33:19    7          Q.      How did you decide to use that type of plastic?

14:33:25    8          A.      I just pulled it out of a chip selection I had

9    in my desk, basically.  It was the one that looked the best.

14:33:35   10          Q.      So you have channels, you have LED, you have

11    the lens.  How did you decide the distance that you should

12    have between the plastic letter and the LED?

14:33:49   13          A.      Well, based on past history, -- it's the same

14    distance as we have for our backlit plates on neon signs,

15    actually.  The two inches wasn't anything magical.  It was

16    just -- that was what we typically used for a backlit sign was

17    two inches, so we just -- it just kind of worked out to be two

18    inches.  We're actually a little thinner than that now, but we

19    started with two inches, because that's where the neon was.

14:34:23   20          MR. KITTREDGE:  Your Honor, can we approach real

21    briefly?  I want to ask a question without stepping over a

22    line.

14:34:32   23          THE COURT:  Pardon?

14:34:32   24          MR. KITTREDGE:  I'd like to ask a question, but I

25    don't want to cross a line and need to check.

14:34:33 1    THE COURT:  Ladies and gentlemen, we're going to

2    excuse you for a few minutes.  Please don't discuss the case

3    amongst yourselves or with anyone else until you receive all

4    of the evidence, the argument of counsel, and the charge of

5    the Court.

14:35:10 6          (Jury out.)

14:35:12 7    THE COURT:  All right.

14:35:14 8    MR. KITTREDGE:  I was -- I apologize.  I may have made

9    this more complicated than I needed to.  I was going to move

10   those two items into evidence that he has been looking at.

11   They were part of a sign that was on our exhibits we

12   exchanged, but they themselves hadn't been pulled out and

13   tagged a number.  I didn't want to do that in front of the

14   jury.  Mr. Vezeau might object.  I didn't know if he would.

14:35:40 15   MR. VEZEAU:  Your Honor, if I might make a suggestion.

16   Perhaps counsel want to wait until the end like we did with

17   most of our other witnesses so we don't interrupt.  We're not

18   going to object to these particular exhibits.

14:35:51 19   MR. KITTREDGE:  I just want to make sure I don't get

20   lost.  And I'm not going to have very many exhibits.  And I

21   don't think it's going to be that long.

14:35:59 22   THE COURT:  Well, if there is no objection to the

23   exhibits.

14:36:09 24   Bring the jury in, Mr. Marshal.

14:36:28 25   (Jury in.)

14:36:32  1          THE COURT:  You can be seated.

14:36:34  2          Counsel.

14:36:35  3          MR. KITTREDGE:  Your Honor, I would like to offer

          4    Exhibits 655 A and 655 B into evidence.

14:36:42  5          THE COURT:  Without objection, it will be admitted.

14:36:43  6    BY MR. KITTREDGE:

14:36:46  7          Q.      Mr. Nelson, when you were developing the LED

          8    version of the Open sign, were you trying to simulate a neon

          9    sign?

14:36:53 10          A.      Oh, yes.  That was the point.

14:36:56 11          Q.      Why did you want to simulate a neon sign?

14:37:01 12          A.      Well, that's what we made was neons.  We were a

         13    neon company, and we were trying to get close to a neon sign.

14:37:06 14          Q.      What did you think of the results that you

         15    ended up with?

14:37:10 16          A.      I thought they were pretty good, and I still

         17    do.

14:37:12 18          Q.      Well, did you think that the glow on your

         19    letters were nice and uniform?

14:37:18 20          A.      I thought so, yes.

14:37:20 21          Q.      Did you like the brightness?

14:37:21 22          A.      Yes, I do.

14:37:23 23          Q.      Did you use any kind of -- you testified about

         24    how you figured out the distances and everything, but did you

         25    use any kind of mathematical modeling program to help you

```
 1    figure out whether you had things arranged properly?

 2         A.    We don't have that kind of software available

 3    to us.

 4         Q.    Did you do any kind of luminescence analysis on

 5    your LEDs to plot how they spread out lights to make sure you

 6    were getting -- spreading the right way?

 7         A.    No, sir.

 8         Q.    Well, how did you get that nice uniform look?

 9         A.    I'm going to say experience, you can say look,

10    whatever.  We just did it.

11         Q.    Now, the oval -- let me make sure I'm reading

12    the exhibit numbers.  Exhibit 9 A, the LED version, -- is that

13    made by vacuum molding?

14         A.    No, sir.  That is injection molding.

15         Q.    What's the difference between injection molding

16    and vacuum molding?

17         A.    Injection molding is a different process where

18    you take a liquid plastic and you pipe it hot into a two part

19    steel mold, male/female, and the liquid goes in and creates

20    the part.  And then when it's pulled apart, after the parts

21    harden, you end up with actually that, or -- typically

22    computer parts, cell phones, there's multiple things in this

23    room that are injection molded.  It's a common process.

24         Q.    And is this surface on the outside of Exhibit

25    9 A, the LED version, is that -- would you still call it a
```

hair cell?

14:39:04  A.     It's a texture of hair cell.  The hair cell is really an industry name for it, but it's a texture, yes.

14:39:15  Q.     Was the purpose on Exhibit A for that texture the same as it is for the old neon sign?

14:39:20  A.     Again, it's basically to make the product more durable on the assembly line, wear and tear in the field, doesn't show dust as well, doesn't show fingerprints.  So when you're handling it down the assembly line, when the customer picks it up, they don't see fingerprints, you don't have to dust it as often as if it's a nice glossy piece.  If you just leave it gloss, or make it a shiny part, it's going to show fingerprints and dust, and it's not going to look as attractive in the window.

14:40:07  Q.     Can we hand the witness Exhibit 11.  Now, Exhibit 11 -- do you recognize what Exhibit 11 is?

14:40:12  A.     Yes.

14:40:13  Q.     What is it?

14:40:16  A.     One of our original LED Opens we provided to Sam's.

14:40:19  Q.     And Exhibit 11 has the plastic piece removed from the letter E?

14:40:22  A.     Yes.

14:40:25  Q.     And if you look inside that letter E, the channels are shiny.  Is that fair?

648

14:40:28  1          A.     Yes.

14:40:38  2          Q.     Can you maybe hold it up for the jury so they

       3     can see what we're talking about.  And my question is, why is

       4     that surface shiny?

14:40:45  5          A.     Well, imagine a steel tool going into that

       6     little slot, and then having to have pull back out of that

       7     slot.  If I've got this same texture on it, it's kind of like

       8     sandpaper locking it in.  You're not going to be able to get

       9     it off as easy.  You're going to break the parts getting them

      10     off the mold.

14:41:01 11          That part has to be a little bit more polished than,

      12     say, I don't know if you can see it or not, but the inside is

      13     not -- these flat parts are not as shiny because it's a flat

      14     surface.  It's just got tool marks all over it because it's

      15     just flat to flat.  It comes right off.

14:41:20 16          So it's part of the process.  You have to polish some

      17     parts more than other parts to physically be able to get it

      18     off the tool.

14:41:23 19          Q.     When you say polish some parts, are you talking

      20     about the sign?

14:41:28 21          A.     Parts of the tool.  There is a front and a

      22     back, or a male and a female part of the tool.  And the inside

      23     here would probably be the -- the female portion of the tool,

      24     and it would have to be polished more than the other side.  So

      25     the two come apart.  So you end up with a more glossier

looking component.

14:41:45 Q. Does that have something to do with the size of the opening that's there?

14:41:50 A. Well, the size of the opening makes it -- you are going to want to polish it a little more, the smaller the opening.

14:41:57 Q. What happens to the tool if you don't polish it?

14:41:59 A. Well, you're going to start cracking the tool and you'll break the parts as you're getting them off. You will end up with a lot of damaged parts, you will slow the production down, you will increase your part cost, you will have a lot more tool repair as well.

14:42:13 Q. Now, I think you said a little while ago -- and I think we can take that away from you so it's out of your way. I think you testified a little while ago that the LED Open sign is injection molded. What's the advantages of injection molding?

14:42:54 A. The advantage of injection molding is you get a little bit cleaner, crisper part. The seams are less, you can get less tool marks than you can in vacuum forming. We would run an injection molding part when we're running a really high volume. We ran the other parts as well, but we had our own vacuum forming facility, so we tried to keep everything we could in house.

650

14:43:20  1    But typically, it was when you had a really high
          2    volume or you needed a really crisp looking part.
14:43:28  3         Q.    Let's shift topics a little bit and talk about
          4    the competitive nature of the sign business.  How do you
          5    decide what drives the sign development in your business?
14:43:40  6         A.    For the most part customers and the industry.
          7    You look and see what is out in the field, and you try and
          8    make a determination of where the industry is going, and based
          9    on that and the customer's needs.
14:43:54 10         Q.    Do you -- as part of your own business,
         11    Fallon's business practices, does it look at competitors'
         12    products?
14:44:01 13         A.    Yes.  I am sure they look at ours.
14:44:02 14         Q.    Why is that?
14:44:05 15         A.    Well, they look at ours.
14:45:07 16         Q.    Okay.  Mr. Nelson, I'm going to have the deputy
         17    hand you Exhibit 1081-A.  Do you recognize Exhibit 1081-A?
14:45:23 18         A.    Yes, I do.
14:45:24 19         Q.    What is it?
14:45:26 20         A.    It's one of -- our newest model of LED Open
         21    signs for Sam's.
14:45:31 22         Q.    Does have a name?
14:45:33 23         A.    They call it Super Bright Open.
14:45:36 24         Q.    What was the purpose of making this new design?
14:45:40 25         A.    Sam's typically, if not once a year, every --

651

1  sometimes twice a year, but at least once a year requests a

2  new model.  They want to see a new model of product or a new

3  model of sign very often.  They want new, fresh Open designs.

4  Not just the -- it doesn't have to be that it's -- excuse me,

5  that it's a different channel or anything else, they just want

6  it to have a new look as far as the shape of the Open, the

7  layout of it.  They want something fresh.

14:46:56  8       Q.    Okay.  Can I have that back for a minute.  If

9  you could come down here, maybe I could ask you some questions

10  and the jury can see what we're talking about.  We're looking

11  at the inside of Exhibit 1081-A.  I would like you to explain,

12  if you look at the outside of the blue, the blue swoop here,

13  there is no sidewall; is that right?

14:47:19  14       A.    That's correct.

14:47:23  15       Q.    And why did you make that without a sidewall?

14:47:27  16       A.    Less plastic.  And it was a redesign to make

17  the product lighter, and it didn't change the look.

14:47:34  18       Q.    Would it be possible to do this similar process

19  without the sidewalls on letters as well?

14:47:40  20       A.    Not for this particular model it wouldn't be,

21  because you would have light leaks from the red over to the

22  blue board, and you would end up with a pinkish colored board

23  instead of a blue board.

14:48:00  24       Q.    But you could put a wall between them?

14:48:03  25       A.    You could put a character.

14:48:05  1          Q.    And then you could do it without the sidewalls?

14:48:07  2          A.    That's correct.

14:48:14  3          Q.    And don't you have -- let me get the exhibit.

4      If you could sit back down.

14:48:45  5          If we can show Exhibit 728 A.  Do you recognize

6      Exhibit 728 A?

14:48:50  7          A.    Yes, sir.  It's a Bud Light Bowtie.

14:48:52  8          Q.    Take off the back.  I would like to draw your

9      attention to -- and one of those pieces of PCB boards will

10      lift up, I believe.  And hold that up to the jury so they can

11      see it.  Not the PCB board, the sign.

14:49:16 12          And the question for you, Mr. Nelson, is, the letters

13      that are exposed there -- do those have sidewalls?

14:49:21 14          A.    No, they don't.

14:49:25 15          Q.    And that's the type of process and feature we

16      were talking about that could be done on other signs as well?

14:49:30 17          A.    That's correct.

14:49:52 18          Q.    We can take that back.

14:49:53 19          MR. KITTREDGE:  Your Honor, I would like to offer

14:49:56 20      1081 A into evidence.

14:50:36 21          THE COURT:  Without objection, it will be admitted.

14:50:40 22      For clarity of the record, if you refer to the exhibit number.

14:50:42 23          MR. KITTREDGE:  I'm sorry, I didn't mean to hand that

24      to the witness.  I was just handing it to the Court since it

25      was going to be offered into evidence, and I didn't think I

```
     1    was going to need it again.  I apologize.

14:51:02  2    BY MR. KITTREDGE:

14:51:20  3         Q.    Could we hand the witness Exhibit 40.  Mr.

     4    Nelson handed you a document, Exhibit 40.  Do you recognize

     5    Exhibit 40?

14:51:27  6         A.    Yes, I do.

14:51:28  7         Q.    What is it?

14:51:35  8         A.    It's a letter from our attorneys to the iLight

     9    attorneys stating that we don't infringe on their patent.

14:51:42 10         Q.    Do you recall when you first saw this letter?

14:51:45 11         A.    End of April, first of May, probably.

14:51:46 12         Q.    Of which year?

14:51:47 13         A.    2005.

14:51:51 14         Q.    And what was the context of you seeing it?

14:51:56 15         A.    I agreed with it.  I had seen -- I had seen the

    16    product, and there was no comparison.  It was a solid rod

    17    plastic piece, and there -- just didn't look the same at all.

14:52:08 18         Q.    And the question I meant to ask -- and I

    19    apologize if it wasn't clear -- is, how did you get this?  Who

    20    -- when did you see the letter?  What was the context of you

    21    seeing the letter?

14:52:18 22         A.    Seeing the letter?

14:52:19 23         Q.    Yes.

14:52:23 24         A.    I'm not sure who sent me the letter.  It came

    25    through the office.
```

14:52:28  1     Q.    I see.  You described you had seen the product.
          2  Are you referring to ILight's product?

14:52:42  3     A.    Well, it was Newon.

14:52:45  4     Q.    We're going to hand you an exhibit that has
          5  been marked 734 A.  You feel do you recognize the item marked
          6  734 A?

14:53:01  7     A.    Yes, I do.

14:53:03  8     Q.    And what is it?

14:53:04  9     A.    It's a Newon Open sign.

14:53:08  10    Q.    When you said you saw the product, is this the
          11  sign you are referring to?

14:53:13  12    A.    This wasn't the exact sign, but I'm familiar
          13  with this sign.  I believe it was -- it might have been in
          14  Costco's or something.

14:53:21  15    Q.    You describe seeing a sign.  Let me back up.
          16  Did I understand that you did develop your own personal
          17  opinion about whether or not you infringed?

14:53:30  18    A.    Yes.  I looked through the product and compared
          19  it to our product, and I don't see as there was a comparison.

14:53:42  20    Q.    Did you study the patent?

14:53:45  21    A.    I wouldn't say study.  I looked through the
          22  patent.  I'm not a patent attorney, but I looked through it to
          23  the best of my abilities.  And based on what I read, I'm not
          24  sure exactly when, or if it was at this time, but based on
          25  what I read on it, I still don't -- I still to this day don't

think we infringed.

14:54:07  Q.    Could I have the sign back?

14:54:15  Your Honor, I would like to offer 734 A into evidence.

14:54:33  THE COURT:  Without objection, it will be admitted.

14:54:33  BY MR. KITTREDGE:

14:54:37  Q.    Is your employment relationship with Fallon changing?

14:54:40  A.    Yes, it is.

14:54:43  Q.    And how is it changing?

14:54:51  A.    I will be shortly leaving Fallon, pursuing some personal career choices and doing some consultant work and starting my own thing.

14:55:08  Q.    If you are leaving Fallon, why are you sitting at counsel table with us?

14:55:13  A.    Because I developed the product.  It's mine.

14:55:15  Q.    Do you have a personal commitment to the product?

14:55:18  A.    As everything I did at work.

14:55:22  Q.    Do you know what an ISA trade show is?

14:55:23  A.    I'm very familiar with it.

14:55:26  Q.    What is an ISA trade show?

14:55:27  A.    It's the International Sign Association.

14:55:30  Q.    Why are you familiar with the International Sign Association?

14:55:36  A.    Because up until December 31 of this year I sat

656

on the ISA board of directors.

14:55:40  Q.    You are currently on the board of directors?

14:55:43  A.    It ended as of this year, 2009.

14:55:46  Q.    And how long had you been on the board of
directors?

14:55:52  A.    Since 2004.  Affiliated with them since 2000.

14:55:56  Q.    Does the ISA have a trade show in Las Vegas?

14:55:59  A.    It alternates between Las Vegas and Orlando
every other year.  One year it's in Orlando; one year it's in
Vegas.

14:56:08  Q.    So on you are on the board of directors.  Did
Fallon have a booth at that show?

14:56:11  A.    Never.

14:56:12  Q.    Never?

14:56:16  A.    Never.  We never exhibited at the ISA trade
show, ever.

14:56:18  Q.    Why not?

14:56:20  A.    They didn't feel they needed to exhibit at the
ISA trade show because it was for our vendors, not our
customers.

14:56:28  Q.    Who is they?

14:56:29  A.    Fallon.

14:56:32  Q.    Did you want Fallon to attend and have a booth
at the trade show?

14:56:39  A.    I tried repeatedly for years.

14:56:40   1          MR. KITTREDGE:  I have no further questions.

14:56:52   2          THE COURT:  You may cross examine.

14:56:52   3   CROSS EXAMINATION

14:56:54   4   BY MS. HUNTER:

14:56:57   5          Q.    Good afternoon, Mr. Nelson.  My name is Melissa

       6   Hunter, and I have a few questions for you.  I understand that

       7   you began working at Fallon in 1988; is that correct?

14:57:07   8          A.    I think it was late '88, that's correct.

14:57:09   9          Q.    Late '88.  So a little over twenty years of

      10   experience with Fallon?

14:57:12  11          A.    Yes, ma'am.

14:57:14  12          Q.    And between the time that you started working

      13   at Fallon and the end of 2003, did you or did anyone at Fallon

      14   ever design, or manufacture, or sell any LED products that

      15   simulate the appearance of neon?

14:57:35  16          A.    LED products that simulate the appearance of

      17   neon?

14:57:37  18          Q.    Yes, sir.

14:57:39  19          A.    No, ma'am.

14:57:41  20          Q.    So no time until after 2003?

14:57:41  21          A.    That is correct.

14:57:44  22          Q.    When was your first sale of an LED sign that

      23   simulates neon?

14:57:50  24          A.    I think it was 2004, but don't hold me to that.

      25   I don't know when the actual sale was.  I wasn't on the sale

```
 1    side then, I was on the development side.

 2         Q.    Is it safe to say it was sometime a little
 3    after 2003?

 4         A.    That's correct.

 5         Q.    Well, so at some point when you began
 6    developing this idea, this LED product that simulates the
 7    appearance of neon, in fact, that was your goal from what I
 8    understand, you had already actually seen iLight's solution to
 9    this very problem you were trying to solve, hadn't you?

10         A.    I don't recall seeing iLight's solution to this
11    problem, no.

12         Q.    You don't recall seeing an ILight sign before
13    sometime in 2004 when you began developing the sign?

14         A.    We started developing in early 2004 so I don't
15    -- no, ma'am, I don't.

16         Q.    You don't recall.  Can I see Trial Exhibit 19,
17    please.

18         THE COURT:  Plaintiff's 19?  Are we talking about
19    Plaintiff's Exhibit 19?

20         MS. HUNTER:  Yes, Your Honor.  It's in evidence.

21    BY MS. HUNTER:

22         Q.    Mr. Nelson, are you able to see this, or would
23    you like the hard copy?

24         A.    It can see it from here.

25         Q.    Mr. Nelson, this is an e-mail from Tim Fallon
```

1    to Sharon Van Roo; is that correct?

14:59:17            2         A.    Tim Fallon, yes, that's correct.

14:59:19            3         Q.    Can you tell me who Sharon Van Roo is?

14:59:22            4         A.    She was the head buyer at Sam's, I believe, at

                    5    the time.

14:59:25            6         Q.    And I see you are copied on this e-mail?

14:59:25            7         A.    That's correct.

14:59:27            8         Q.    So I'm looking right now, and looking in

                    9    particular, in the first paragraph, it looks like what's going

                   10    on is, at this point in 2003, you were selling this neon Open

                   11    sign to Sam's Club, were you not?

14:59:40           12         A.    Yes, we were.

14:59:43           13         Q.    And it appears that from this e-mail, am I

                   14    reading this correctly, that Sam's Club was deciding to

                   15    replace the neon sign with another sign; is that right?

14:59:57           16         A.    I can't speculate what -- this is what Tim

                   17    Fallon wrote.  I don't know what Sharon's expectations were.

                   18    It also says, in developing our other technology.  So it

                   19    appears we were developing it prior to 2004 as well.

15:00:11           20         Q.    I understand.  I understand.  My question was,

                   21    in particular, that Tim Fallon was contacting the buyer for

                   22    Sam's Club, and what he was contacting her about was a sign

                   23    that she appears to be replacing the neon sign with; is that

                   24    right?

15:00:28           25         A.    (Respite.)

1      Q.      And I will direct your attention actually to

2    the third sentence in this e-mail.  And if you will read that

3    out loud for me?

4      A.      Previously aware?  Okay.  Highlight it.  Thank

5    you.  I was told that the item you are planning on replacing

6    the oval Open neon with is the same one you and I looked at

7    the SHOPA show.  I don't know what that is.  I wasn't at the

8    SHOPA show.

9      Q.      I understand.  But it looks like in this

10   e-mail, would it be fair to say that one of your biggest

11   customers right here is looking at replacing your neon sign

12   with another sign, a sign seen at a SHOPA show?

13     A.      Well, being Sam's Club, I'm sure they have a

14   thousand people walk through the door every day trying to take

15   business that we've had for 20 years.

16     Q.      I'm sure they do.  And in the very next

17   sentence of this e-mail -- and I realize you weren't the

18   author of this e-mail, but you were copied on it.  At the time

19   were you Vice-President of Engineering?

20     A.      Yes, ma'am; I was.

21     Q.      It looks like, you are right, you say, in

22   developing our alternate technology in the past months, we

23   have looked at a couple of iLight's products?

24     A.      That's correct.

25     Q.      So it's fair to say that, as of the time that

661

you started developing your alternate technology sometime in
        late 2003, you had already seen iLight's solution?

15:01:50     A.     Well, Tim Fallon had at the SHOPA show.  I
        hadn't.

15:01:53     Q.     You hadn't seen the iLight sign?

15:01:54     A.     No, ma'am.

15:01:57     Q.     But my understanding was, from your testimony,
        that you were the person who worked on developing this
        alternate technology?

15:02:03     A.     Well, I am.

15:02:05     Q.     But you didn't look at the iLight sign?

15:02:07     A.     Well, I didn't have it available to me.  It was
        at a SHOPA show.

15:02:13     Q.     But this is talking a sign that was examined in
        the past three months.

15:02:19     A.     Well, I personally didn't see it.  Tim Fallon
        had access to a lot.  He wrote the e-mail.  I can't say as
        what he did or didn't look at.  I worked off making it as
        close to the neon as possible because it was a neon
        replacement.

15:02:37     Q.     And let's go down to the very bottom paragraph
        in this particular page.

15:02:42     A.     One of the things, Tim was in St. Louis and I
        was in South Carolina, too.  So if that helps you understand
        why some of the things he saw and I didn't see, we were in two

1    different states.

15:02:53 2         Q.    So I'm sure that there's two -- there are some

3    things that go on that the one party doesn't see that the

4    other does.  But my question is, it's clear that you are

5    developing this alternate technology.  And then we go down to

6    this first couple of sentences and the bottom paragraph, what

7    this says is, we have decided on the alternate technology that

8    we are going to offer.  And based on your testimony that you

9    started in 2004, is this the preliminary stages?

15:03:36 10        A.    It sounds very similar, yes.

15:03:40 11        Q.    And then the second sentence you -- Tim Fallon

12   -- pardon me, Tim Fallon writes, this new product will look

13   similar to iLight's Newon.

15:03:53 14        So sometime as early as December of 2003, or three

15   months prior to that, Tim Fallon and possibly others at Fallon

16   had seen iLight's solution to the problem that is neon signs;

17   is that correct?

15:04:08 18        MR. KITTREDGE:  Objection, Your Honor.

15:04:10 19        THE COURT:  Overruled.

15:04:12 20        THE WITNESS:  Well, at that time there was only few of

21   us left at the Spartanburg facility.  So if I didn't see it,

22   then I can't speak for who else did, but I don't know what Tim

23   physically viewed, took apart, or what he did in St. Louis.

15:04:25 24        Q.    But someone at Fallon was aware?  Someone who

25   was working on developing the alternative technology?

15:04:31   1              A.      It appears Tim has seen it, yes.

15:04:33   2              Q.      Was Tim involved in developing the alternate

           3      technology?

15:04:36   4              A.      Yes, he was.

15:04:39   5              Q.      He was?  And he didn't pass the information

           6      along to you?

15:04:42   7              A.      Tim didn't pass a lot of information along to

           8      me.

15:04:45   9              Q.      I understand.  You don't have any reason

          10      necessarily to believe that he would be dishonest to one of

          11      your biggest customers?

15:04:51  12              A.      No, I don't.

15:04:57  13              Q.      Okay.  I heard you testify a little bit about

          14      this Exhibit 83 A, the embedded neon sign that was sold to

          15      Sam's Club, and that Sam's Club is also selling it on line?

15:05:09  16              A.      Yes, ma'am.

15:05:12  17              Q.      You said something about inventory.  Are you

          18      still shipping and producing the neon sign for Sam's Club at

          19      this time?

15:05:20  20              A.      We're not producing new product, no.

15:05:22  21              Q.      So they are kind of -- they are selling the

          22      rest of the inventory?

15:05:25  23              A.      That's correct.

15:05:27  24              Q.      Do I understand correctly that they have

          25      switched away from this product altogether?

15:05:32 1          A.     Well, they are still using up the old

     2     inventory, but they have switched to the new product, yes.

15:05:38 3          Q.     They are placing new orders for neon?

15:05:41 4          A.     Correct.  It wouldn't be that neon even if we

     5     were still making neons, because they change every year.

15:05:47 6          Q.     Okay.  Okay.  And you testified that the neon

     7     sign was made in several different places.  Where is your LED

     8     sign manufactured?

15:05:55 9          A.     The LED sign is manufactured at our Shanghai

    10     facility in China.

15:06:05 11          Q.     Now, I'd like to go a little bit back to the

    12     development process.  We saw this e-mail.  If we could bring

    13     back Trial Exhibit 19 just in general.  It's authored December

    14     2, 2003, yet your first sale of an LED product that simulates

    15     neon wasn't until January of 2005; is that right?

15:06:30 16          A.     That's correct.  Well, I don't know when the

    17     first sale it was.  If that's what they are reporting.  Like I

    18     said, I couldn't tell you when the first sale was.

15:06:39 19          Q.     So it was more than a year after you began

    20     developing your alternate technology, according to Tim Fallon?

15:06:47 21          A.     That was when the first production shipped

    22     maybe.

15:06:50 23          Q.     The first production shipped -- I'm sorry?

15:06:54 24          A.     The first production product arrived at Sam's

    25     in 2000, I would speculate.  But it had to have been made --

15:06:59   1          THE COURT:  2000?

15:07:05   2          THE WITNESS:  2005.  The dates that you were saying,

           3   2005.

15:07:06   4          MS. HUNTER:  Right, right.

15:07:07   5          THE WITNESS:  That would have been when the production

           6   would have arrived at Sam's.  It would have had to have been

           7   on a boat or assembled from somewhere else 14 to 15 weeks or

           8   20 weeks out, and then there's a 20 week -- or a 12 week

           9   tooling time as well.

15:07:23  10   BY MS. HUNTER:

15:07:31  11          Q.    Okay.  Okay.  You also testified about how it

          12   was important to have a uniform appearance.  And it's clearly

          13   a property of a neon sign for it to look nice and uniform.

          14   And you are really not sure exactly how you came about the

          15   design.  You just started plugging in LEDs until it gave you a

          16   neon sign?

15:07:55  17          A.    Well, no, I believe I said it was based on

          18   experience, and experience in the neon industry, with the

          19   lighting industry 20 years.  I used the same technology I

          20   used, for the same experience I used to lay out a neon backlit

          21   sign, and the space and the gaps between neon tubes backlit

          22   plate at two inches, and assumed the same principles would

          23   apply with the LEDs and just went by that.

15:08:17  24          Q.    And would your basis of experience also include

          25   the competitor analysis of other signs?

15:08:23  1           A.     No, not at that level, no.

15:08:28  2           Q.     Not at that level.  And I just have one final

          3    matter to raise.  Well, actually, I would like to get back

          4    Trial Exhibit 728 A.

15:09:00  5           Mr. Nelson, this is the Budweiser sign that you looked

          6    at just a moment ago.  And I would just -- you testified that

          7    about sidewalls.  Are there sidewalls in the red part of the

          8    Bowtie, this red Bowtie that goes around?

15:09:20  9           A.     Do you want me to come down?  Could I come down

          10   there and see what you are talking about?

15:09:32  11          Q.     Yes.  I'm asking specifically about this red

          12   portion that forms the outer -- the Bowtie outline.  Are there

          13   sidewalls in this particular product?

15:10:01  14          A.     There are sidewalls, yes.

15:10:07  15          Q.     And finally Mr. Nelson, you talked a little bit

          16   about Exhibit 40, which is a letter that was sent on behalf of

          17   iLight.  And you mentioned that you -- you did receive the

          18   letter, and that you did conduct an analysis on your own.  You

          19   talked about comparing the product to the product.  And you

          20   really didn't focus a whole lot on the comparison of the

          21   patent, iLight's patent, to Fallon's product; is that correct?

15:10:38  22          A.     Well, I reviewed the patent.  I didn't compare

          23   -- what it is, I reviewed the patent, looked at it, and the

          24   patent matched the product, and I compared the product to the

          25   patent -- or the product to the product.

15:10:50   1          Q.      Just to make sure I understand, so you compared
           2   iLight's product to Fallon's product rather than going
           3   directly, comparing the patent?
15:10:59   4          A.      No, that's not what I said.  I compared the
           5   patent to iLight's product, and their product matched their
           6   patent.
15:11:04   7          Q.      And then from iLight's product to Fallon's
           8   product?
15:11:08   9          A.      That's correct.
15:11:10  10          MS. HUNTER:  I think I understand.  Thank you, Mr.
          11   Nelson.
15:11:12  12          THE COURT:  Any redirect?
15:11:13  13          MR. KITTREDGE:  Just a couple of questions, Your
          14   Honor.
15:11:14  15   REDIRECT EXAMINATION
15:11:14  16   BY MR. KITTREDGE:
15:11:19  17          Q.      When you had a successful LED version of the
          18   oval Open sign, did Sam's Club immediately switch out the neon
          19   signs?
15:11:27  20          A.      No.  It was an overlap.
15:11:29  21          Q.      Was there a test period?
15:11:31  22          A.      Somewhat of a test period, yes.
15:11:35  23          Q.      Did it go into all of Sam's Club stores during
          24   that test period?
15:11:38  25          A.      Not immediately, no.  They never do.

15:11:40  1          Q.     And so during that time period, did you

        2  continue selling the neon?

15:11:43  3          A.     That's correct.

15:11:45  4          Q.     Are you still selling -- is Fallon still

        5  selling any neon signs today?

15:11:49  6          A.     Right now I would say the production is about

        7  even.

15:11:51  8          Q.     About even between --

15:11:53  9          A.     LEDs to neons.

15:11:54 10          Q.     Can you give me an example of somebody

       11  purchasing neon signs today?

15:12:06 12          A.     Well, Anheuser-Busch, for instance, in the last

       13  sales meeting, their last six months sales, they bought a

       14  little over 6,000 LED units and over 9,000 neons.

15:12:15 15          MR. KITTREDGE:  That's all I have.

15:12:17 16          THE COURT:  Any recross of this witness?

15:12:19 17          MS. HUNTER:  No, Your Honor.

15:12:21 18          THE COURT:  You may step down, sir.

15:12:24 19          You may call your next witness.

15:12:27 20          MR. KITTREDGE:  Defendant's next witness will be Leah

       21  White.

15:13:07 22          (Witness sworn.)

15:13:10 23          COURT REPORTER:  Please state your full name for the

       24  record and spell it.

15:13:18 25          THE WITNESS:  Leah Ann White. Leah, L-e-a-h, Ann,

669

A-n-n, White, W-h-i-t-e.

15:13:18 DIRECT EXAMINATION

15:13:18 BY MR. SAWYER:

15:13:30 Q.    Good afternoon, Ms. White.

15:13:30 A.    Hi.

15:13:33 Q.    Can you just tell the jury where you live, where are you from?

15:13:40 A.    I live in Glen Alpine, North Carolina, a town a little bit smaller than Cookeville.

15:13:45 Q.    Ms. White, can you tell us who you work for?

15:13:48 A.    Fallon Luminous Products Corporation.

15:13:52 Q.    Okay.  And can you tell us your current title?

15:13:53 A.    CFO.

15:13:56 Q.    And what is CFO?

15:14:00 A.    I'm sorry, Chief Financial Officer.

15:14:07 Q.    And can you give us a little bit of your educational background after you graduated high school?

15:14:12 A.    I went to the University of North Carolina at Chapel Hill, and I graduated December of 1980.  And I received my bachelor of science degree in business administration, specializing in accounting.

15:14:25 Q.    And can you tell the jury if you have any other certifications, those kinds of things?

15:14:31 A.    I'm a certified public accountant.  I received that designation in 1987.  And I've just recently received my

Certification in Financial Forensics, my CFF.

15:14:50    Q.    You just indicated that you are a CFO of Fallon.  When did that employment start?

15:14:55    A.    When I started with the company in March of 2000.

15:14:58    Q.    Okay.  Now, can you give us a little bit of background of your employment history just from after you graduated college to 2000?

15:15:09    A.    Let's see.  I started with the American Life Insurance Company, then went to work for the Holding Company in Atlanta Georgia.  I went to work then for Scientific Atlanta in Atlanta, Georgia, wanted to move home.  So I went to work for A & E Products Group which is located -- or was located in Forest City, North Carolina.  And then from there we moved to Phoenix, had a big move to Phoenix.  And then Tyco International purchased the company.  When they purchased, I operated for my pay-out moved back to Charlotte, went to work for Collins & Aikman.  And then from there worked for Briggs Plumbing in Duncan, South Carolina, and then finally to Fallon.

15:15:59    Q.    When you started with Fallon, which you said was March of 2000?

15:16:01    A.    Correct.

15:16:03    Q.    What was your title when you started?

15:16:06    A.    Chief Financial Officer.

671

15:16:07  1        Q.      Same title as today?

15:16:12  2        A.      Yes, sir.

15:16:19  3        Q.      Okay.  Have you held any other titles at Fallon

          4    besides CFO?

15:16:23  5        A.      Yes, I was also Chief Operating Officer.

15:16:29  6        Q.      And what dates were you -- we know you were CFO

          7    from 2000 until the present.  What dates were you COO?

15:16:35  8        A.      I believe that was around August of 2005

          9    through February of 2008.

15:16:47 10        Q.      And I just want to talk a little bit about the

         11    difference now.  What were some of your responsibilities,

         12    roles, as COO, which is Chief Operating Officer; is that

         13    right?

15:16:57 14        A.      Correct.

15:17:00 15        Q.      So, roles as COO.

15:17:04 16        A.      As COO, I became responsible for engineering,

         17    for manufacturing, distribution, quoting, contract review and

         18    analysis, purchasing.

15:17:21 19        Q.      Okay.  So you were sort of the -- one of the

         20    chief officers at Fallon at that time?

15:17:26 21        A.      Correct.

15:17:30 22        Q.      How about your -- you mentioned agreements.

         23    Does Fallon have any patent license agreements?

15:17:38 24        A.      No, we do not.

15:17:43 25        Q.      Now, I want to talk about CFO.  What are some

of your responsibilities as CFO, Chief Financial Officer?

15:17:50    A.    As Chief Financial Officer, I am responsible
for all of the accounts payables, accounts receivables,
payroll, human resources, financial statement consolidations,
budgets, forecasts, internal controls.

15:18:07    Q.    Okay.  That was a lot of stuff.  How about --
when you say financial consolidation, what do you mean?

15:18:15    A.    Every month we prepare our financial
statements, which includes a P & L balance sheet, cash flow
statement.

15:18:24    Q.    P & L, profit and loss?

15:18:25    A.    Profit and loss statement, yes.

15:18:29    Q.    And you said budgets and forecasts?

15:18:30    A.    Budgets and forecasts.

15:18:32    Q.    How often are those prepared?

15:18:35    A.    Budgets are prepared annually.  Forecasts we
used to prepare quarterly, then we got into a monthly routine
with that.  So pretty much monthly now.

15:18:49    Q.    And can you -- on the profit and loss
statement, the P & L statements that you mentioned, are there
sort of categories of numbers or dollars that you typically
see in a P & L?

15:19:03    A.    Yes.

15:19:05    Q.    What are some of those numbers?

15:19:08    A.    Let's see.  We have gross sales, which is your

top line sales, we have gross margin, operating income, net
income.

15:19:19  Q.    And what's net income?

15:19:25  A.    That's your bottom line profit.  Net profit.

15:19:29  Q.    Is that different than gross profits?

15:19:37  A.    Oh, yes.

15:19:42  Q.    Now, let's talk about gross profits versus net
profits.  What is the difference?

15:19:49  A.    Okay.  I've been doing accounting for a while,
so I don't want to be technical.  Let me --

15:19:54  Q.    Just give a --

15:19:57  A.    Just like your paycheck.  My paycheck is my
take home pay.  I have gross pay and I have take home pay.
From that, I have medical expenses, utilities, house payment,
food, gas, everything else I have to pay for to live, to
exist, and then I have my net cash residual or my net income.

15:20:21  THE COURT:  Before business, the cost of the business
includes the salaries of the people that work for you?

15:20:30  THE WITNESS:  Correct.  That's absolutely right.

15:20:34  BY MR. SAWYER:

15:20:41  Q.    When you say net income, if you were making ten
percent of your -- your net income was ten percent?

15:20:48  A.    Uh-huh.

15:20:50  Q.    If someone asked, a third party wanted ninety
percent of that, is that a relationship that you would want to

engage in?

15:20:57     A.     Absolutely not.

15:20:58     Q.     And why not?

15:21:02     A.     I can't afford to give away 90 percent of my
income, my net income.

15:21:10     Q.     Okay.  So if there is an analysis between net
income versus gross income, is there a difference there of a
percentage of what you are willing to give a third party?

15:21:21     A.     Yes.

15:21:49     Q.     Could I have Plaintiff's Exhibit 7.
Plaintiff's Exhibit 7.  We'll just use those.  Great.  Thank
you.

15:22:29     Ms. White, do you have Plaintiff's Exhibit 7 in front
of you?

15:22:31     A.     I do.

15:22:34     Q.     And in April 2005, what position did you have
at Fallon?

15:22:40     A.     Chief Financial Officer.

15:22:43     Q.     And have you seen this letter before?

15:22:45     A.     Yes, I have.

15:22:47     Q.     When did you see it?

15:22:52     A.     It was around the same time period, first of
April, around the first of April.

15:22:56     Q.     Did this letter come to you?

15:22:59     A.     No, it did not.

| | | |
|---|---|---|
| 15:23:03 | 1 | Q. But do you remember receiving it at Fallon? |
| 15:23:04 | 2 | A. I do. |
| 15:23:06 | 3 | Q. What, if anything, did you do with that letter? |
| 15:23:09 | 4 | A. I called our patent attorneys. They are |
| | 5 | located in Greeneville, South Carolina. And they recommended |
| | 6 | that I send this to them immediately, and I did. |
| 15:23:21 | 7 | Q. Could I have -- that's fine. You can set that |
| | 8 | down. Plaintiff's Exhibit 40, please. It has been admitted |
| | 9 | already. I'm going to hand her a copy. |
| 15:23:37 | 10 | A. Do I have to switch glasses? |
| 15:23:40 | 11 | Q. Switch to see all those little letters. Do you |
| | 12 | recognize this letter? |
| 15:23:45 | 13 | A. Yes, I do. |
| 15:23:47 | 14 | Q. And do you remember seeing that letter? |
| 15:23:48 | 15 | A. Yes, I do. |
| 15:23:51 | 16 | Q. About when was the first time you saw that |
| | 17 | letter? |
| 15:23:54 | 18 | A. About that date, April 14th. |
| 15:23:56 | 19 | Q. And what is this letter? |
| 15:24:00 | 20 | A. This is our attorney's response to iLight's |
| | 21 | attorney that we weren't infringing. |
| 15:24:12 | 22 | Q. Okay. Can I have Plaintiff's Exhibit 8, |
| | 23 | please. It has been admitted as well. I will hand you up a |
| | 24 | copy. Do you recognize that letter? |
| 15:24:34 | 25 | A. I do. |

15:24:41  1          Q.      And in December 23, 2005 what was your title at
       2    Fallon Luminous?

15:24:47  3          A.      At that time I was both CFO and COO.

15:24:52  4          Q.      When was the first time you saw this letter?

15:24:55  5          A.      I'm thinking it was near the end of 2005, the
       6    beginning of 2006.

15:24:59  7          Q.      And how did you -- I see the letter is not
       8    addressed to you, so how did you end up getting that letter?

15:25:06  9          A.      My attorney sent it to me.

15:25:12  10         Q.      What, if anything, -- I'm sorry, strike that,
       11   Your Honor.  Can I please have Plaintiff's Exhibit 41.  Again,
       12   it has been admitted.  Do you recognize that letter?

15:25:38  13         A.      I do.

15:25:40  14         Q.      And what is that letter?

15:25:44  15         A.      That is a response that our attorney sent to
       16   the iLight attorneys that they were reviewing the patent
       17   applications.

15:25:51  18         Q.      And about that time, did you have any
       19   conversations with the lawyers regarding either this January 9
       20   letter or the December 23 letter?

15:26:00  21         A.      I did.

15:26:01  22         Q.      And what were the substance of those
       23   conversations?

15:26:06  24         A.      Since this was the second receipt from iLight
       25   that we were potentially infringing, I requested that they do

more work and actually prepare an opinion at that point.

15:26:22   Q.   And do you know if an opinion was prepared per your instructions?

15:26:26   A.   It was.  Or they were.

15:26:30   Q.   Can I have Defendant's Exhibit 503, please.

15:26:33   MR. PRICE:  Your Honor, may we approach?  I believe we need to have a conversation.

15:26:36   THE COURT:  Ladies and gentlemen, we're going to excuse you for a few minutes.  Please don't discuss the evidence amongst yourselves until you receive you all of the evidence, the argument of counsel, and the charge of the Court.

15:27:05   (Jury out.)

15:27:09   THE COURT:  All right, counsel.  Does the witness need to be excused?

15:27:12   MR. VEZEAU:  That would be probably a good idea.

15:27:15   THE COURT:  Ma'am, you if you will step out, we'll call you.  The Marshal will come and get you when we are ready for you.

15:27:26   THE WITNESS:  Okay.

15:27:34   THE COURT:  You all can have a seat.

15:27:36   MR. PRICE:  Thank you, Your Honor.  As you know, we filed a motion in limine to exclude the second opinion.  And you also heard Doug Bagin, who was the corporate rep specifically designated to testify about those patent

678

opinions.  And they basically prevented anybody before that
time from testifying about them.  They designated Mr. Bagin to
testify about it, and you heard what he said.  He remembered
little, to anything, of it.

15:28:05    MR. KITTREDGE:  That's correct, Your Honor.  Doug
Bagin was a 30(b)(6) witness.  We understood he had
investigated and he understood more of these opinions, more
than he was able to testify to.  You mentioned yesterday if
there was a witness who could authenticate these opinions, you
might hear the testimony.  And that's why she is here.  She
wasn't identified during discovery --

15:28:30    THE COURT:  No, the discussion yesterday was that he
couldn't identify them, but there was no discussion at that
time whether he was a Rule 306 30(b)(6) witness.  And if you
designate him as a Rule 30(b)(6) witness to speak on behalf of
the corporation, then you are bound by it.

15:28:51    MR. KITTREDGE:  We're done with that issue with this
witness.

15:28:53    THE COURT:  All right.

15:28:57    MR. PRICE:  But that applies to Exhibits 503 and 504?

15:29:01    THE COURT:  I think it was 552 and 553.

15:29:03    MS. HUNTER:  Yes, that was the deposition numbers.
For trial, they are Trial Exhibits 503 and 504.

15:29:08    THE COURT:  Okay.  They will be marked for
identification only.

MR. PRICE:  Thank you, Your Honor.

THE COURT:  Will there be any further questioning of

3    this witness?

MR. SAWYER:  Could I just check my notes?

THE COURT:  Yes.

MR. KITTREDGE:  Before you bring the jury back, I

7    understand --

THE COURT:  Pardon?

MR. KITTREDGE:  Before you bring the jury back, there

10    is one issue with the next witness we might address so the

11    jury won't have to go right back out.

THE COURT:  Well, do you think you are done?

MR. SAWYER:  I am done, Your Honor.  I apologize.

THE COURT:  That's all right.  All right.  What's the

15    next witness?

MR. KITTREDGE:  The next witness is John Hardaway.

17    He's the lawyer who wrote the letters that we have been

18    talking about.  And we wanted to present him to explain the

19    letters.

MR. PRICE:  Your Honor, he has never been identified

21    as an expert.  We have had this same letter identified already

22    by multiple witnesses.  To put patent counsel up here to

23    testify for that effect alone is obviously incredibly

24    cumulative, and we certainly don't want to get in a situation

25    where Mr. Hardaway is going to offer a quote, unquote, expert

```
 1    opinion when he has never been so designated.
15:30:25  2           MR. KITTREDGE:  He has not been designated as an
 3    expert witness.  We're not offering him as an expert.  He is a
 4    fact witness.
15:30:29  5           THE COURT:  Well, from the Court's perspective, the
 6    letters will speak for themselves.  To the extent that he
 7    would be testifying, it appears to be elaborating beyond that
 8    he is going to be setting forth reasons other than those
 9    stated in defense, stated to the client, that is the basis for
10    the defense in this case.
15:30:57 11           So -- and beyond that, appears to me that he is
12    basically giving opinion testimony on the merits of the
13    lawsuit.  And actually it's Berry v. City of Detroit where the
14    Sixth Circuit said that you don't allow expert witness to
15    testify on matters that have a distinct legal meaning.  And
16    infringement has a distinct legal meaning.  And whether
17    something infringes is a distinct legal meaning.  So I don't
18    think the testimony would be admissible on several grounds.
15:31:40 19           MR. KITTREDGE:  The biggest distinction I would make,
20    Your Honor, is that this is a willfulness case, and that makes
21    it relevant.  And he's not testifying about -- it's a subtle
22    distinction, but it's very real one about the case in suit,
23    it's about the analysis that was done at the time.  And we've
24    had witnesses testify about what all kind of documents mean.
15:32:02 25           THE COURT:  Well, is there going to be any opinion
```

testimony on the other side challenging, other than the legal
contentions that both sides are going to make about it?  It's
in the record.  You will have the ability to make the argument
as to what the facts set forth in that -- and the reasoning in
that letter is.  I mean, you will be fully be able to present
that in your closing.

15:32:25  7      MR. KITTREDGE:  Then I've said everything I have to
say.

15:32:28  9      THE COURT:  Well, on that basis I will sustain the
objection if that's all he's going to testify to.

15:32:33  11      MR. SAWYER:  Your Honor, I may have one additional
question for Ms. White.  Can I just confer with counsel to
make sure?

15:33:03  14      THE COURT:  Sure.

15:33:05  15      MR. SAWYER:  Your Honor, just one more question.  This
is a document that was produced during discovery.  It was not
identified as a trial exhibit, but we would like to present it
for rebuttal.  I will explain quickly the circumstances.

15:33:15  19      THE COURT:  Okay.

15:33:16  20      MR. SAWYER:  Mr. Cleaver gave testimony that, after
the January 9th letter, basically, that it was radio silence
from Fallon until they sued us.  And now iLight has told Your
Honor that we should exclude the opinions because they don't
have someone can rely on it, and the implication to the jury
is going to be that we didn't give an opinion, we didn't do

1    anything.

15:33:42        2          This document that I present to Your Honor is a letter

                3    from Fallon's patent counsel, who is here today -- I can

                4    present this letter with Ms. White, because she is familiar

                5    with it -- in which they reply back in the interim to iLight

                6    and tell them, without a doubt, we've reviewed it, we've done

                7    it, and you don't infringe.

15:34:05        8          This isn't the opinion.  Now, if Mr. Hardaway was

                9    going to testify, which Your Honor is excluding him, he's

                10   going to say that, in January they engaged us to get an

                11   opinion, and we worked on it, and yes, they did file it before

                12   we completed and gave it to them, gave it to Fallon, but it's

                13   because these things take a long time.  And we offer this as

                14   rebuttal to Mr. Cleaver's testimony that there was basically

                15   radio silence.

15:34:33        16         THE COURT:  Well, --

15:34:36        17         MR. SAWYER:  It's just additional correspondence.

15:34:38        18         THE COURT:  Well, but, see, they are really two

                19   different letters.

15:34:42        20         MR. SAWYER:  Actually, it's the same letter.  They are

                21   just -- one has notes on it from the attorney.  I thought I

                22   would bring them both.

15:34:53        23         THE COURT:  No, one talks about filing a declaratory

                24   judgment action.

15:34:59        25         MR. KITTREDGE:  We can use just the first one, Your

Honor.  We just brought them both for full disclosure of what
we're talking about here.

15:35:08        MR. SAWYER:  Your Honor, it's a letter to Ms. White
from the attorney, just sort of identifying that it went to
Ms. White.

15:35:12        THE COURT:  Yes, but the question -- I mean, we get
back to the issue earlier:  Was this presented during the
deposition of the Rule 30(b)(6) witness.

15:35:25        MR. KITTREDGE:  No, Your Honor.  It was not.

15:35:27        MR. SAWYER:  I'm sorry, I didn't hear Your Honor.

15:35:33        THE COURT:  Was this presented to the -- well, there
are two.  One is to adversary counsel.  So I'm not sure how
the letters to Beres, to Joel Beres, of the plaintiff's
counsel, without it being shown to the company, would be
relevant to show the company's good faith.

15:36:06        MR. SAWYER:  Your Honor, I guess what I would present,
just -- and I really would just like to present the letter
from Mr. Hardaway to Mr. Beres.  And Ms. White can identify
that letter by saying she has received a copy it.  I don't
need that second letter.  And it literally is just like the
other letters, to suggest, you know, that we did have good
faith.

15:36:29        THE COURT:  Let me ask you this.  Other than for the
Beres letter, for the Beres letter, what is the difference
between the Beres letter and what you all have been arguing

```
 1   here since we have been here?

15:36:38  2          MR. SAWYER:  I think the difference is, Your Honor,

 3   our January 9th letter says we're going to further

 4   investigate.  This letter conclusively states we've done the

 5   further investigation, and we have concluded.  And this goes

 6   to the totality of the circumstances of willfulness.

15:36:53  7          MR. PRICE:  Your Honor, I would note that neither of

 8   these documents were on any of the exhibit designations for

 9   this trial.  And we have exchanged multiple ones.

15:37:02 10          MR. SAWYER:  That's true, Your Honor.

15:37:04 11          THE COURT:  Well, the thing that I'm concerned about

12   is, at the time of the Rule 30(b)(6) deposition

13   representative, if this was going to be something that the

14   company said we relied upon for our good faith defense, that

15   that would have been presented at that time.

15:37:20 16          MR. KITTREDGE:  It had been produced at that time,

17   Your Honor.

15:37:24 18          THE COURT:  Yes, but I'm talking about the Rule

19   30(b)(6) representative would have identified it as something

20   that, well, our lawyers told us this, and by golly, that's

21   what we were looking at.  And I didn't hear any reference to

22   that at all.

15:37:40 23          MR. KITTREDGE:  They didn't put it in front of you.

15:37:41 24          MR. PRICE:  That is inaccurate.  He was presented as a

25   30(b)(6) witness for the patent case.  They were tried as two
```

1  patent opinions.  A very short one right before the lawsuit

2  was filed and a longer one afterwards.  And with back-up

3  documents because of that.  That's what was presented at the

4  30(b)(6).

15:37:56  5     THE COURT:  Well, you dispute that this -- they are

6  disputing that this letter was not produced for the Rule

7  30(b)(6) deposition.

15:38:03  8     MR. KITTREDGE:  We produced John --

15:38:03  9     THE COURT:  And I would think --

15:38:03  10     MR. KITTREDGE:  I apologize.  I didn't mean to speak

11  over you.

15:38:03  12     THE COURT:  No, that's all right.  Go ahead.

15:38:07  13     MR. KITTREDGE:  We produced John Hardaway's entire

14  file before the 30(b)(6) deposition and just for that

15  deposition.  And they had it all.

15:38:16  16     THE COURT:  Well, did you have an opportunity?  Did

17  you have an opportunity on cross to reflect that --

15:38:30  18     MR. PRICE:  That's what we received for the 30(b)(6),

19  Your Honor.

15:38:37  20     MR. SAWYER:  There is no dispute that this was

21  produced during discovery; right?  We're not disputing that.

15:38:46  22     MR. PRICE:  Let him do what he was going to do.

15:38:49  23     THE COURT:  Are you saying these documents are the

24  only ones produced?

15:38:53  25     MR. PRICE:  Yes, sir, Your Honor.

686

15:38:55  1          MR. KITTREDGE:  I don't understand what is being said

       2   here.  What is counsel saying?

15:38:58  3          MR. PRICE:  We have provided him --

15:39:02  4          THE COURT:  The question was, you said we made his

       5   file available at the Rule 30(b)(6) deposition.  What they

       6   have just handed me is what they represent to the Court that

       7   you gave them -- well, this letter is in there.

15:39:21  8          MR. PRICE:  Then it was in there.

15:39:26  9          THE COURT:  Well, was there an opportunity for the

      10   defense to -- if, when they asked him about the letters that

      11   counsel relied upon, that you could point out the February 6?

15:39:37 12          MR. KITTREDGE:  I had the opportunity to cross him.  I

      13   didn't have any questions for him at that time.  I didn't call

      14   the witness.

15:39:47 15          THE COURT:  And it's not on the exhibit list?

15:39:50 16          MR. KITTREDGE:  We did not put it on our exhibit list,

      17   and we didn't think it was going to matter until Mr. Cleaver

      18   testified that there was this period of radio silence.  It was

      19   not on our list.  We said that before we showed -- right at

      20   the beginning of this conversation.

15:40:30 21          THE COURT:  We'll mark the Beres letter of February 6,

      22   2006 for identification only.  And I will decide on its

      23   admissibility later.

15:40:41 24          MR. SAWYER:  Would Your Honor like me to, outside the

      25   jury's presence, to identify the letter?  If not, we can just

move on.  I don't have any further questions.

15:40:49  MR. KITTREDGE:  Does the witness need --

15:40:50  THE COURT:  Well, wait a minute.  I'm confused.  The
Beres letter wasn't written to the witness.

15:40:55  MR. SAWYER:  I realize that, Your Honor.  She will
testify to the fact that it was her communications with the
lawyer that wrote this, and that she was copied on it.  She
got a copy and then reviewed it, saw the letter.

15:41:09  MR. KITTREDGE:  She can authenticate it.

15:41:11  THE COURT:  Well, is there any issue on
authentication?

15:41:14  MR. VEZEAU:  Your Honor, this was the first time -- I
took that deposition.  The corporate representative, Mr.
Bagin, on reliance, we're talking about, now, how did the
corporation rely on so-called opinions?  He was put up as the
guy who knows it all.  And you read -- I think you read part
of the transcript.  He knew little or nothing.

15:41:35  There was no reference to this letter at all because
he didn't remember anything.  And you are absolutely right.
Counsel was there, had a perfect opportunity to refresh his
recollection, and nothing was done.  And that's all we were
given on the reliance witness, for reliance on opinion of
counsel.

15:41:56  Prior to that, when Mr. Nelson was testifying, we were
shut down.  We weren't permitted to ask any questions because

688

privilege was invoked.  And they said, we'll give you a

witness.  We'll give you the head of the company, Mr. Bagin.

And You saw what Mr. Bagin knew.  He didn't know anything.

15:42:14  THE COURT:  I didn't discern anything that was

presented in his testimony that would reflect this in any way.

15:42:22  MR. KITTREDGE:  He wasn't asked about it, and his

testimony was very weak.

15:42:26  THE COURT:  But if it is significant and if it is

material, one would reasonably expect that the Rule 30(b)(6)

witness would identify it.  Do you disagree with that?

15:42:38  MR. KITTREDGE:  I completely agree with that.  He was

not asked about it now.

15:42:42  THE COURT:  But even at the time when you all were

designating the depositions, it seems that this issue would

have come up much earlier.  Is this the witness?

15:43:04  MR. KITTREDGE:  No, that's the technical expert.

15:43:07  THE COURT:  If you've got the document, why would you

challenge the authenticity of the document?

15:43:13  MR. VEZEAU:  It's not an authenticity matter, Your

Honor.  We don't challenge --

15:43:16  THE COURT:  Well, that's all I was asking about, is

whether you contest the authenticity of the document.

15:43:20  MR. VEZEAU:  I do not.  I do not.

15:43:23  THE COURT:  Then we don't need the witness to testify

to authenticate the document.  It's just the issue of whether

it's admissible or not.

15:43:30        MR. VEZEAU:  Correct.

15:43:31        THE COURT:  Okay.  Well, I'll mark it for
identification only.

15:43:33        MR. VEZEAU:  Thank you.

15:43:35        MR. SAWYER:  Thank you, Your Honor.  We don't have
further questions for Ms. White.

15:43:38        THE COURT:  Do you have any cross examination?

15:43:40        MR. PRICE:  No, we'll stand.

15:43:40        THE COURT:  Okay.

15:43:42        MR. KITTREDGE:  Your Honor, following Ms. White I
think we have a real short deposition, a transcript or two to
read in, then our next witness is stuck on an airplane.

15:43:52        THE COURT:  We'll just adjourn.  We'll just adjourn.

        You can bring the jury in, Mr. Marshal.

15:44:29        (Jury in.)

15:44:32        THE COURT?  Any cross examination of the witness White
on behalf of the plaintiff?

15:44:35        MR. PRICE:  No, Your Honor.

15:44:37        THE COURT:  All right.  Any further proof on behalf of
the defendant?

15:44:43        MR. SAWYER:  Yes, Your Honor.  And we have some
deposition testimony by video clip.  Your Honor, however, the
parties do have some other housekeeping matters on those
deposition designations.

15:45:01  1        THE COURT:  All right.  Well, we finished the last

2    witness, and hopefully I think we'll be able to finish one

3    more, and we'll call it a day.  But I do need additional time

4    with the lawyers.  I apologize.  That's on me, not them.

5    Hopefully it will be a short recess.

15:45:17  6        Please don't discuss the case amongst yourselves until

7    you receive all of the evidence, the argument of counsel, and

8    the charge of the Court.

15:45:50  9        (Jury out.)

15:45:53  10        MR. LIPSHIE:  Your Honor, I can release Ms. White;

11    correct?

15:45:56  12        THE COURT:  Oh, yes.  You're free to go.

15:45:59  13        Now, which witness is this, and what are the

14    objections?

15:46:08  15        MR. PRICE:  Your Honor, I apologize.  We got an e-mail

16    that Mr. Sawyer sent to us while in trial today saying he was

17    going to present this this afternoon.  It just took us by

18    surprise.  We do not even have our sheet with the objections

19    to articulate it.  We have had discussions with them off and

20    on about this.  We didn't know they were going to --

15:46:30  21        MR. SAWYER:  Well, Your Honor, we obviously got cut a

22    little bit shorter than we thought we would.  We thought we

23    presented -- we are happy to share the transcript and discuss

24    them now.

15:46:38  25        THE COURT:  Well, let me ask you this.  How many more

witnesses have we got for the defense?

15:46:45    MR. KITTREDGE:  We have our expert on liability, Mr.
James Slayden, and the inequitable conduct expert.  Oh, I'm
sorry, and our damages expert, Carl Bagin.

15:46:59    THE COURT:  How long is this deposition that's at
issue going to take?

15:47:03    MR. SAWYER:  The deposition designations, Your Honor,
are all, I think --

15:47:09    THE COURT:  No, if they are going to have to read the
depositions to identify their objections, how long is the
deposition they have to read?

15:47:15    MR. SAWYER:  Not very long.

15:47:16    THE COURT:  How long is not very long?

15:47:19    MR. SAWYER:  We could -- I'm not quite sure I'm
answering Your Honor's question, but I'm going to try, which
is we have a few objections to short snippets of deposition
testimony.

15:47:30    THE COURT:  I'll tell you what.  You show them what
you are going to introduce, and I will give you all a chance
to talk, and we'll see how far you get.

15:47:42    MR. SAWYER:  Thank you.

15:47:47    THE COURT:  We're in recess.

15:58:55    (Recess.)

15:58:58    THE COURT:  Any outstanding issues on this last
deposition to be played?

MR. SAWYER:  Your Honor, we've resolved some of the

2  issues.  We have a short video clip that we could play, and we

3  could read another deposition into the record.  There are a

4  few deposition designations of some other witnesses that we

5  still have outstanding issues of that the parties are pretty

6  confident we could work out in the next couple of hours, but

7  that means really over the weekend.

THE COURT:  Well, do we have anything we could show

9  the jury for the balance of the day?

MR. LIPSHIE:  We probably have maybe 25 minutes or so

11  that we could do today.

THE COURT:  Okay.  I would like to maximize the time.

13  Let's just go ahead and do that.  Are you all ready?  Are you

14  all ready?

You can bring the jury in, Mr. Marshal.

(Jury in.)

THE COURT:  You can be seated.

You may call your next witness.

MR. SAWYER:  Defendant calls Sean Callahan by

20  deposition.

THE COURT:  By deposition.

(Video playing:)

Q.    *What's your position at iLight?*

A.    *My title is president and CEO.*

Q.    *How long have you had that title?*

16:01:59  1          A.    I believe I've had that title for a little more
        2  than two years.
16:02:06  3          Q.    Have you had a different title at iLight
        4  Technologies?
16:02:08  5          A.    Yes.
16:02:11  6          Q.    What was that?
16:02:15  7          A.    It was either just president or interim
        8  president.
16:02:19  9          Q.    And when was that?
16:02:29 10          A.    That was from the end of May 2006 until August,
       11  that's when I became permanent president and CEO.
16:02:39 12          Q.    When you say August, you mean August 2006?
16:02:42 13          A.    Yes, 2006.
16:02:49 14          Q.    Do you hold any other titles?  Are you a board
       15  member?
16:02:52 16          A.    Yes, director.
16:02:55 17          Q.    Do you have any other titles that -- do you
       18  work for any other companies beside iLight Technologies?
16:03:06 19          A.    I have another company called Shoreland
       20  Capital.
16:03:12 21          Q.    Do you hold a position at Shoreland Capital?
16:03:12 22          A.    Yes.
16:03:13 23          Q.    What position?
16:03:19 24          A.    I think it's managing member of the LLC.
16:03:23 25          Q.    What's the relationship between iLight and

Shoreland?

16:03:29    A.    Shoreland is an investor -- Shoreland is
affiliated with a fund that's an investor of iLight.

16:03:41    Q.    And when was the investment made by Shoreland
to iLight?

16:03:46    A.    I believe that was in February of 2006.

16:03:54    Q.    At some point did Shoreland make an investment
in iLight?

16:03:59    A.    Yes.  Well, the vehicle that's affiliated with
Shoreland.  I mean, technically it wasn't Shoreland Capital,
it was another entity that was set up to make the investment.

16:04:13    Q.    Is Image Works your injection molding
specialist?

16:04:19    A.    We can do injection molding in a variety of
ways.  One way is working with them.  Another way is -- molds
directly.

16:04:28    Q.    You have injection mold capabilities at one of
your facilities?

16:04:36    A.    We don't, no.  We contract manufacturing that.

16:04:39    Q.    Do you currently sell products that are
injection molding?

16:04:49    A.    I'm thinking there is -- some of those Camel
signs still -- that was some of the business we did this year,
and I'm trying to think of other components.  Just bluntly, we
were hoping we would be making a bunch of injection molding

signs for Anheuser-Busch and other companies.

    Q.    You have the capabilities; right?  You currently don't do any injection molding in any of your plants?

    A.    We do not.  We have the capability to do 5,000 signs or 300,000 signs or a million signs.  It's -- the physical execution of making the signs is not something we do, and it would be a business decision whether we hire to do that.  We know how, the capability to manage the process and execute it successfully is something that we do have.

    Q.    Exhibit 65?

    A.    Thank you.

    Q.    Yes.  All right.  You see I've handed you a document which is marked as Exhibit 65.  Do you see that?

    A.    Yes.

    Q.    It's a string of e-mails that iLight produced to us.  At the very top is an e-mail from you, Sean Callahan.  Do you see that to Timothy Newhold?

    A.    Right.

    Q.    If you flip over to the back of the document, the e-mails go in kind of a string, so it refers back to the first e-mail.  Do you understand that?

    A.    Yes.

    Q.    There is an e-mail there that you are cc'd on, and it says:  Next Tuesday, October 24, I will be presenting

to DIA -- DAI, I'm sorry, -- Subway's parent company.  In this
                meeting we will have five prototype signs.  Do you see that?

16:07:09        A.      Yes.

16:07:12        Q.      Do you know if that meeting took place on
        October 24?

16:07:15        A.      I have no recollection on that.

16:07:15        Q.      Did you guys sell signs to Subway's parent,
        DAI?

16:07:19        A.      We sold -- I don't believe we sold signs there
        to them.

16:07:27        Q.      See the second to the last paragraph there, it
        says, where do we stand with the two production methods?  Are
        we in a position to discuss with customers?  On injection
        molding are we concerned about the universe of potential
        conflicts and issues?  Do you see that?

16:07:39        A.      Yes.

16:07:42        Q.      Do you know what potential conflicts and issues
        they are talking about there?

16:07:49        A.      I don't recall.

16:08:04        Q.      If you go to clip four, two more pages, there
        is an e-mail there, it says original, at the bottom of 33454.
        It's an e-mail from Sean Callahan.

16:08:15        A.      Uh-huh.

16:08:16        Q.      From Jack _____.  Do you see that?

16:08:17        A.      Yes.

1          Q.      It says:  Question.  Where do we stand with the

2     two production methods.  Do you see that?

3          A.      Yes.

4          Q.      And if you go -- flip to the next page, it

5     says, you say:  On injection molding are we concerned about

6     Image Works and potential conflicts and issues.  Do you see

7     that?

8          A.      I'm sorry, which page?

9          Q.      The following page, 33455.  Right there at the

10     top?

11          A.      Uh-huh.

12          Q.      And sorry, go back to 33454.

13          A.      33454?

14          Q.      Yes.

15          A.      Okay.

16          Q.      It says, Tom Cockrell has extensive experience

17     in both vacuum molding and injection molding and is very

18     capable of managing such projects.  Correct me if I'm wrong.

19     Do you see that?

20          A.      Yes.

21          Q.      And then the e-mail before that is an e-mail,

22     looks like, from Mike Marie to you?  Do you see that?

23          A.      Yes.

24          Q.      It said, I personally feel more comfortable

25     presenting to customers who have demonstrated more competency,

who are comfortable with the vacuum forming. Do you see that?

16:09:45     A.     Yes.

16:09:47     Q.     Is it true that you were primarily vacuum forming signs at that time?

16:09:52     A.     I don't recall what the mix was.

16:09:53     Q.     Okay. The very next sentence says, the injection molding we have is trivial compared to making complex signs. Do you see that?

16:10:00     A.     Right.

16:10:02     Q.     Does that help you remember the vacuum forming with injection molding?

16:10:11     A.     No.

16:10:17     Q.     Then do you see on Page 33453. Do you see that?

16:10:18     A.     Uh-huh.

16:10:20     Q.     There is an e-mail at the bottom there from Sean Callahan. Do you see that?

16:10:23     A.     Yes.

16:10:30     Q.     To you -- from you to Mike Marie. Do you see that?

16:10:31     A.     Yes.

16:10:34     Q.     It says, Tom is an expert on this, so I would defer to them. And you go on to say, he has told me that making injection molding sign similar to those at Fallon would be trivial for him. Do you see that?

16:10:45   1           A.      Yes.

16:10:48   2           Q.      And the reference to Fallon there is the

           3   defendant in this case?

16:11:00   4           A.      Yes.

16:11:04   5           MR. SAWYER:  Your Honor, that's the video testimony

           6   for Mr. Callahan.  We have another witness to call by

           7   deposition, if you would like.

16:11:13   8           THE COURT:  All right.  I take it that included all

           9   that you wanted?  All right.  You may call your next witness.

16:11:23  10           MR. SAWYER:  The defendants call David Wayne Nagle

          11   from the law firm of Stites & Harbison.  Ladies and gentlemen

          12   of the jury, I will read this one.  We don't have a video

          13   clip.  And I'm going to say question, and then answer.  So I

          14   hope you can follow me.

16:11:47  15           Question.  Mr. Nagle, can you state your full name for

          16   the record.

16:11:56  17           Answer.  David Wayne Nagle, Junior.

16:11:59  18           Question.  Are you affiliated with the law firm of

          19   Stites and Harbison?

16:12:04  20           Answer.  Yes, I am.

16:12:08  21           Question.  What is your relationship to Stites and

          22   Harbison?

16:12:15  23           Answer.  I'm a member or a partner of the firm.

          24           Question.  Do I understand correctly that you are a

          25   registered patent attorney?

16:12:23  1          Answer.  Yes, I am.

16:12:27  2          Question.  Have you practiced as a patent attorney

          3  anywhere beside Stites & Harbison?

16:12:34  4          Answer.  Yes, I practiced with Wheat, Smith & Barris,

          5  and Wheat, Smith & Barris merged into Stites & Harbison.

16:12:46  6          Question.  And did you start with Wheat, Smith &

          7  Barris out of law school?

16:12:49  8          Answer.  Yes.

16:12:51  9          Question.  How long ago was that?

16:12:56 10          Answer.  I graduated from law school in '98.  I

         11  started with Wheat, Smith & Barris in February of '97.

         12          Question.  I -- on the first page of Exhibit 2, it

         13  indicates that this law firm, Vance Smith and David Nagle,

         14  were responsible for prosecuting this patent.  Do you see

         15  that?

16:13:18 16          Answer.  Yes, I do.

16:13:20 17          Question.  What was your role in the preparation or

         18  prosecution of the patent that is marked as Exhibit 2?

         19          Answer.  I was not involved in the preparation of the

         20  actual application, but assisted Vance, and at some point

         21  during the process assumed responsibility for prosecuting the

         22  applications.

16:13:42 23          Question.  Do you know if you assumed responsibility

         24  while the '238 Patent was still pending?

16:13:48 25          Answer, yes, I did.

16:13:51 1          *Question.  Do I understand from your earlier testimony*

2   *that you were not involved in the preparation of the*

3   *provisional patent application that is Exhibit 1?*

16:14:00 4          *Answer.  I was not.*

16:14:04 5          *Question.  Did you help prepare or were you involved*

6   *in the preparation of the -- not the provisional patent*

7   *application, but the patent application that became the '238*

8   *Patent?*

16:14:15 9          *Answer.  I was not involved in the original*

10   *preparation.*

16:14:24 11          *Question.  If you could take just a few minutes and*

12   *flip through the file wrapper of the '238 Patent and tell me*

13   *-- if you can tell when you believe you took over prosecution*

14   *of the patent application that became the '238 patent?*

16:14:44 15          *Answer.  Well, I -- My recollection is, when the*

16   *initial office action issued in this case, Vance Smith*

17   *prepared the response, but I did look at it and talked with*

18   *him about it at that time.  And that was when I was introduced*

19   *to this application.*

16:15:00 20          *Question.  So it was sometime after the response to*

21   *the initial office action that you would have taken over the*

22   *full responsibility for the prosecution of the '238 Patent?*

23          *Answer.  Correct.*

16:15:14 24          *Question.  All right.  Put that aside.  I'm going to*

25   *hand you a document that has previously been marked as*

Defendant's Exhibit 8, which is an office action from the file
history of the '238 Patent.  And my question, Mr. Nagle, is,
is Defendant's Exhibit 8 the office action that you were
referring to just a moment ago?

16:15:38    Answer.  Yes, it would appear to be this office
action.

16:15:44    Question.  I'm going to draw your attention to the
page of Exhibit 8 with the production number ending with this
numbers 13198.

16:15:55    Answer.  Yes.

16:15:58    Question.  The underneath, the -- do you see the
section at the top where they are quoting some of the statute?
Underneath that section.  The second sentence where it says,
Slayden discloses.  Do you see that?

16:16:12    Answer.  Yes, I do.

16:16:16    Question.  Quote:  Slayden discloses an illuminated
device for simulating neon lighting comprising a substantially
rod-like waveguide, 10, having a predetermined length, close
quote.  I read that correctly, didn't I?

16:16:32    Answer.  Yes, you did.

16:16:36    Question.  Do you remember discussing this rejection
of the '238 Patent application with Mr. Smith?

16:16:46    I don't have any specific recollection of that, no.

16:16:49    Question.  Do you have any recollection of discussing
the Slayden reference with Mr. Smith during the prosecution of

the '238 Patent?

16:16:59    Answer.  I am familiar with the Slayden reference, but
I don't have any recollection of any specific conversation
about the Slayden reference.

16:17:08    Question.  I'm going to hand you a document previously
marked as Defendant's Exhibit 9.  Do you recognize this
document?

16:17:19    Answer.  Yes.  This appears to be the response to this
office action that was marked as Exhibit 8.

16:17:26    Question.  And do I understand correctly that Mr.
Smith prepared this response?

16:17:34    Answer.  To the best of my recollection, yes.

    Question.  And that he may have discussed it with you,
but you otherwise had no real involvement in preparing the
response that has been marked as Exhibit 9?

16:17:47    Answer.  I may have, I may have done so, or talked to
him about the act, I mean, this response.  I may have done
some proofreading of it, but I did not draft -- I did not
draft it.

16:17:59    Question.  Draw your attention to the page of Exhibit
9 that end with the production number 13220.

16:18:08    Answer.  220?  Yes.

16:18:12    Question.  If I could read the second full paragraph,
or maybe not the full paragraph, but do you see where it says,
quote, as the above discussion, end quote.

16:18:21   1          Answer.  Yes, I do.

16:18:27   2          Question.  All right.  Quote:  As the above discussion

           3   points out, comma, to achieve the desired light intensity and

           4   uniformity, comma, the rod must preferentially direct light

           5   along its length while also urging the light out of the

           6   lateral surface, period.  This requires an essentially solid

           7   rod with optical waveguide and light scattering

           8   characteristics, period.  Neither sided art reference teaches

           9   or suggests the use of an essentially solid rod, close quote.

          10   Did I read that correctly?

16:19:08  11          Answer.  Yes, you did.

16:19:11  12          Question.  Do you recall discussing with Mr. Smith the

          13   fact that the invention of the '238 Patent requires a solid

          14   rod?

16:19:19  15          Answer.  Yes.

16:19:22  16          Question.  And what was that discussion?

16:19:26  17          Answer.  What I remember that we talked about in these

          18   references, we talked about the invention, can't say it was at

          19   the time preparing this response, but I do recollect

          20   discussing, just talking about what iLight was trying to

          21   achieve with its products.

16:19:42  22          Question.  And the fact that it required a solid rod?

          23          Answer.  Yes.

16:19:47  24          Question.  Let's go ahead and look at the previously

          25   marked Defendant's Exhibit 10.  Do you recognize Exhibit 10?

1    Answer.  Yes. U.S. Patent 6,361,186.

16:20:04  2    Question.  This is the Slayden reference that was used

3    by the examiner to reject patent claims in the office action

4    that has been marked as Exhibit 8; is that correct?

16:20:14  5    Answer.  That is correct.

16:20:21  6    Question.  -- I'm sorry, question.  It also -- It's

7    also the Slayden reference that is addressed in response to

8    the office action which has been marked as Exhibit 9 in a text

9    we just read into the record; is that correct?

16:20:34  10    Answer.  Yes.  That is correct.

16:20:37  11    Question.  Now, if you turn to page -- actually, turn

12    to figures two and four of the Slayden reference, Exhibit 10?

16:20:45  13    Answer.  Okay.

16:20:47  14    Question.  You understand that those are

15    cross-sectional profiles of the light emitting member of the

16    Slayden patent?

16:20:58  17    Answer.  Yes, they appear to be cross section.

18    Question.  And by reviewing these, is it your

19    understanding or your belief that the interior space on figure

20    two represents a hollow space?

16:21:10  21    Answer.  Yes.

16:21:15  22    Question.  Look at the space -- the interior space of

23    figure two.  Is it your belief that it is a hollow space?

24    Answer.  Yes, it is.

16:21:23  25    Question.  And is it your belief that, because of that

*hollow space, this embodiment of the light transmitting member*

*of the Slayden patent is not a solid rod?*

16:21:32    *Answer.  Yes.*

16:21:36    *Question.  Now, if we turn to the embodiment depicted*

*in figure four of the Slayden reference, again, we see some*

*interior space.  Is it your belief and understanding from the*

*Slayden reference that the interior space we know, where you*

*see the number 21 and 23 is empty open space as well?*

16:21:53    *Answer.  Yes.*

16:21:57    *Question.  Now, you might call that hollow.  You might*

*not, because it's closed.  I'm sure if you would call that*

*hollow or not -- would you?*

16:22:07    *Yes, I would still call it hollow.*

16:22:10    *Question.  And because of that empty space, it's your*

*belief and understanding that the embodiment of the Figure 4*

*of the Slayden reference is not a rod as required by the*

*invention in the '238 Patent?*

16:22:27    *Answer.  Yes.*

16:22:28            THE COURT:  Does that constitute it?

16:22:31            MR. SAWYER:  That concludes.  Thank you, Your Honor.

16:22:34            THE COURT:  Is there any other proof that can be

presented today?

16:22:36            MR. KITTREDGE:  Not today, Your Honor.  Our next

witness will be here Monday morning.

16:22:40            THE COURT:  All right, ladies and gentlemen.  We're

going to call it a day.  Please don't discuss the evidence

amongst yourselves or with anyone else until you receive all

of the evidence, the argument of counsel, and the charge of

the Court.  If you will give your notepads to the Marshal, he

will take custody of them until Monday.  I will ask you to

come Monday at shortly before 9:00, we'll try to get started

promptly.  I expect we'll move the case along efficiently and

it won't be much longer hopefully.  Are there any other

matters for the jury?  You are free to go.  The other Marshal

will collect your notebooks if you have any of those.

16:23:16   MR. VEZEAU:  Your Honor, there may be one more matter.

That was clarifying on Tuesday what's going to happen.

16:23:20   THE COURT:  We'll take that up on Monday.

16:23:25   MR. VEZEAU:  We have some witnesses flying out this

weekend.

16:23:27   MR. PRICE:  May we approach, Your Honor?

16:23:36   THE COURT:  I will ask all the jurors to go except Mr.

Whitehead.  If you will stay, Mr. Whitehead.  All the other

jurors can go.

16:24:07   All right.  Mr. Whitehead, if you will step out just

for one second, but stay close, because you will be coming

back.

16:24:12   (Jurors out.)

16:24:15   THE COURT:  You all can have a seat.

16:24:19   How many witnesses do you all -- would the Court be

hearing on this materiality of the omission of this lawsuit?

16:24:27   MR. KITTREDGE:  It's a defendant's affirmative defense.  We're going to present one witness.

16:24:32   THE COURT:  One witness?  How long is the direct examination going to take?

16:24:36   MR. KITTREDGE:  A small deposition, so --

16:24:38   THE COURT:  Well, how long is the direct examination of this one witness going to take?

16:24:43   MR. KITTREDGE:  An hour?  About an hour.

16:24:46   THE COURT:  How long is the excerpt of the deposition that he just referred to going to take?

16:24:52   MR. SAWYER:  Probably half of what I just read, Your Honor.

16:25:10   THE COURT:  Okay.  We can bring Mr. Whitehead back in.

16:25:10   (Juror in.)

16:25:14   THE COURT:  Mr. Whitehead, the Court wants to inquire, if we release you from approximately 11:30 until 2:00 or 1:30, in terms of any personal presentation that you would have to make, would that allow you time to do that?

16:25:39   THE JUROR:  No, sir, it really won't.  But Your Honor, I'm one person, and we've got a lot at stake here, I know.  We've got two banks, we're in good shape compared with a lot of the rest.  I don't think we'll fail because of this.

16:25:56   THE COURT:  Okay.  Well, the Court greatly appreciates your accommodating us.  We were going to try to accommodate

1    you, but it's a delicate balance.

16:26:05    2            THE JUROR:  I appreciate that.

16:26:06    3            THE COURT:  I know how much you would like to be

        4    there, but my thought was we could get you there for a good

        5    part of it, that that might allay your concerns about not

        6    being there at all.

16:26:18    7            THE JUROR:  My meeting is really out of town, it's in

        8    another town, but we'll make it fine.  We'll just arrange.

16:26:23    9            THE COURT:  All right.  Well, i appreciate it.  Thank

       10    you very much, Mr. Whitehead.

16:26:31   11            Does that resolve it for everybody?

16:26:34   12            MR. KITTREDGE:  Does that mean we're going to --

16:26:37   13            THE COURT:  We'll go on schedule.  We'll take a recess

       14    at 11:30 and go until, I guess about 1:30.  The jurors will

       15    get a long lunch, but the lawyers won't.

16:26:46   16            MR. PRICE:  Just for clarity, we will -- on that day

       17    we also have a responsive expert witness.  And Mr. Nagle may

       18    personally appear.

16:26:56   19            THE COURT:  Okay.  How long do you think your rebuttal

       20    proof on that -- your responses to it will be?

16:27:02   21            MR. VEZEAU:  I have a sense, Your Honor, both

       22    witnesses will probably be about an hour and a half.

16:27:08   23            THE COURT:  Combined or individually?

16:27:11   24            MR. VEZEAU:  Yeah, combined.  But we also have a

       25    motion pending before Your Honor to strike that.  It's one of

1   our motions in limine.

16:27:22   2          THE COURT:  Well, the motion in limine to exclude any

3   evidence -- it appeared to me that, if that's an affirmative

4   defense, that's a cognizable affirmative defense, isn't it?

5   My understanding of patent law.

16:27:41   6          MR. VEZEAU:  It must be pled, Your Honor, yes.  The

7   problem is, it was not pled at all.

16:27:57   8          MR. PRICE:  In other words, Your Honor, inequitable

9   conduct must be pled with particularity.  Here not only was it

10  not pled in particularity, it wasn't pled at all.

16:28:10   11         THE COURT:  Well, they make a reference to statements

12  and a witness statement that puts you on notice, and, in fact,

13  one of your expert witnesses responded to it, so that you had

14  actual notice.

16:28:23   15         MR. PRICE:  There is no dispute, Your Honor, that in

16  the second supplemental, some report after close of the

17  discovery he first raised this.

16:28:31   18         THE COURT:  Who first?

16:28:33   19         MR. PRICE:  Their expert, after close of discovery.

16:28:35   20         THE COURT:  And when was this?  What's the date of

21  this expert's report?

16:28:38   22         MR. PRICE:  I want to say November 11th, but I could

23  be off a day or two.

16:28:41   24         THE COURT:  Do you dispute that?

16:28:48   25         MR. KITTREDGE:  No, I do not.  But, Your Honor, the

expert reports were produced.  They had no trouble getting
their own expert.  They weren't surprised by this, their
expert was ready, and he produced a report back, a rebuttal
report.  Those are the two experts he just had.  They have
been fully engaged.

16:29:08    THE COURT:  Well, I mean, but it seems -- the key, to
me, is whether a party had an opportunity to conduct discovery
on it.  If it was disclosed during discovery, and the party
had an opportunity to conduct discovery on it, then there is
no question of fairness.

16:29:22    MR. KITTREDGE:  And that's what we have here.  Both
sides have full expert reports.

16:29:26    THE COURT:  But he's saying that you all didn't
disclose this until after discovery, so that they didn't have
any discovery on this.  They may have gotten an expert to
respond, but they didn't get a chance for discovery.

16:29:37    MR. PRICE:  That's correct.

16:29:39    MR. KITTREDGE:  Let me explain, Your Honor.  The
expert report was served within a matter of days after the
deposition of Mr. Nagle.  And it was the deposition of Mr.
Nagle that raised this specific defense.  And we supplemented
the report as quickly as we can, and they had a full
opportunity to respond.  And any other discovery -- we're
talking about activities that are all within the plaintiff's
control.  Any other discovery into this defense is -- they

have it.  It's them.  There is no discovery from us on.  The

            issue is whether or not they understand the defense we're

            raising.  And they fully understand it.  The issues have been

            fully engaged.

16:30:19    They never objected to the expert report.  We didn't

            object to their expert report.  We all know what it's about.

            It's just a question of whether the Court hears those experts,

            read their transcripts.

16:30:30    MR. PRICE:  Your Honor, there is one additional point

            on that.  Both sides had the burden to prove, to present their

            experts on the issues on which they bear the burden of proof,

            and I believe it was in mid-October, somewhere in that time

            frame.  We did get a report from Mr. Stoner at that time

            regarding a different issue, which they have since abandoned.

            It wasn't until November 11th or so, after the November 7th

            discovery cut-off that for the first time we submitted a

            supplemental report raising the '970 patent litigation

            disclosure issue for the first time.

16:31:07    Once again, after discovery, after the deadline.  And

            there still has been no motion for leave filed to date.

16:31:12    THE COURT:  Well, I was looking at final pretrial

            order.  They asserted it as a defense in the final pretrial

            order.  Usually pleadings are amended to conform to the

            pretrial order.

16:31:25    MR. PRICE:  You are absolutely right.  If you note in

there, we had the normal supplant language, and then two
paragraphs for each of the parties. There we specifically
contested this issue of supplanting. And there was dialogue
going back and forth because of that particular supplanting
language.

16:31:44      THE COURT: Wherein is the prejudice by allowing this,
given that both sides have got experts?

16:31:49      MR. PRICE: We do not dispute, Your Honor, that when
the issue was finally brought, we, of course, took appropriate
measures and responded in kind. And we're not going to
contest otherwise. But that does not take away from their
obligation to plead what is a very serious allegation with
specificity.

16:32:08      THE COURT: What if we handle it this way. What if
the Court takes its expert proof, I will allow you to, in
effect, make your Rule 50 motion at the conclusion of their
proof, and we'll look at that as to whether it states the
particularities required for the claim as well, I guess, as
the intent issue. And we'll see where it is at that point.

16:32:32      MR. PRICE: I think that's fair, Your Honor.

16:32:34      MR. VEZEAU: We're going to do that, and

16:32:36   particularly --

16:32:40      THE COURT: Given the fact that you all filed a
responsive report, and there is no actual prejudice, like
Judge Morton used to tell me when I tried cases, I don't want

714

to see this case twice. So I don't want to have this case

come all the way back on account of we didn't hear their

unclean hands defense, or whatever it is. And I would be more

inclined to just let it in, and then we'll evaluate it.

16:33:08 MR. KITTREDGE: It's all scripted testimony, Your

Honor.

16:33:08 MR. PRICE: That's true.

16:33:11 MR. KITTREDGE: We exchanged scripts. There aren't

any objections.

16:33:19 MR. PRICE: So we will have Mr. Godici, and we will

have Mr. Nagle.

16:33:22 THE COURT: Okay. That's fine. And what we may do,

with the defense proof, we may go with the jury until maybe1

2:00, and then put the other proof on for the rest of the day,

just in the event that about 1:30 we are not through and it

runs little bit longer than everybody contemplates.

16:33:36 MR. PRICE: Fair enough.

16:33:38 MR. KITTREDGE: So we're going to have the jury until

2:00?

16:33:42 THE COURT: Probably the jury until about 2:30. I

would like to get in as much proof as I can. It depends on

where the proof is at around 2:00. If we're at a good

breaking point, we'll break. If we need to go a little bit

longer or whatever. We'll just see where we are.

16:33:52 MR. KITTREDGE: Thank you.

715

16:33:52  1          MR. PRICE:  Thank you.

16:34:11  2          THE COURT:  All right.  We're in recess until Monday

          3     morning at 9:00.

16:34:14  4                          *  *  *  *  *

16:34:14  5

16:34:14  6

16:34:14  7

16:34:14  8

16:34:14  9

16:34:14  10

16:34:14  11

16:34:14  12

16:34:14  13

16:34:14  14

16:34:14  15

16:34:14  16

16:34:14  17

16:34:14  18

16:34:14  19

16:34:14  20

16:34:14  21

16:34:14  22

16:34:14  23

16:34:14  24

16:34:14  25