1          IN THE UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF TENNESSEE, COOKEVILLE DIVISION

3    ------------------------------------------------------------

4    ILIGHT TECHNOLOGIES,            )

5              Plaintiff,       )

6                                    )

7    v.                          )   CASE NO. 2:06-0025

8                                    )

9    FALLON LUMINOUS PRODUCTS,    )

10             Defendant.       )

11   ------------------------------------------------------------

12                    TRANSCRIPT OF PROCEEDINGS

13                         VOLUME VI

14   ------------------------------------------------------------

15   DATE:           April 27, 2009

16   TIME:           9:00 A.M.

17   BEFORE:         HONORABLE WILLIAM J. HAYNES, JR.

18                   And a Jury

19   ------------------------------------------------------------

20

21

22

23   COURT REPORTER:     PEGGY G. TURNER
                         OFFICIAL COURT REPORTER
24                       801 BROADWAY, ROOM A-837
                         NASHVILLE, TENNESSEE 37203
25                       PHONE:  (615)726-4893
                         Peggy_Turner@tnmd.uscourts.gov

```
 1              A P P E A R A N C E S:

 2   For the Plaintiff:   Timothy J. Vezeau
                          Stephen Price
 3                        Melissa Hunter
                          Bill Ferrell
 4                        John Scruton

 5   For the Defendant:   Mark Kittredge
                          Jonathan Rose
 6                        Samuel Lipshie
                          Brandy McMillion
 7                        Douglas Sawyer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              W I T N E S S E S :

 2   KEVIN HATHAWAY
     Direct Examination by Mr. Sawyer              Page 761
 3   Cross Examination by Mr. Scruton              Page 821

 4   CARL GEORGE DEGEN
     Direct Examination by Mr. Lipshie            Page 902
 5   Cross Examination by Mr. Price               Page 932

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

12:18:28    THE COURT:  We have one juror I think we're waiting

on, but I understand there are some preliminary matters?

12:18:29    MR. KITTREDGE:  Yes, Your Honor.  The first one is

probably the business of the Court.  We took the Court's

admonition and tried to find a way to speed things up and cut

things out.  We decided to be safe we're going to drop the

witnesses that we were going to bring in for the inequitable

conduct defense because at this time it's we don't need him.

12:18:30    THE COURT:  Okay.

12:18:31    MR. KITTREDGE:  The second issue is, the motion that

was filed in the middle of the night last night with respect

to one of the fact witnesses, Mr. Slayden.

12:18:31    THE COURT:  Okay.  Fact or expert?

12:18:31    MR. KITTREDGE:  He's a fact witness.

12:18:31    THE COURT:  Okay.  Is that the Slayden of the Slayden

patent?

12:18:31    MR. KITTREDGE:  That's the Slayden of the Slayden

patent.

12:18:31    THE COURT:  All right.  What's the issue?

12:18:31    MR. KITTREDGE:  Do you want to go first?

12:18:32    MS. HUNTER:  Yes, Your Honor.  The issue is that we

weren't aware whether he was designated as a fact or expert

witness.  We received notice that he wasn't expected to be

called as a witness and the 24 hour notification the parties

1  agreed to undertake.  And Mr. Slayden was first identified as

2  a person who might have material knowledge or information

3  relating to Fallon's claim to defenses on literally the last

4  day of fact discovery at 5:04 p.m.

12:18:35  5      So after the close of discovery, hours before the

6  close of discovery, but effectively at the very end of

7  discovery, and so we were unable to depose him or obtain any

8  of the information from him due to this.  And so we would ask

9  that he be precluded from testifying as an expert or fact

10  witness because he has not been properly disclosed to satisfy

11  requirements of Rule 26(a).

12:18:37  12      MR. KITTREDGE:  Your Honor, iLight is suggesting that

13  they first realized Mr. Slayden was going to be a live witness

14  in the past 24 hours.

12:18:38  15      THE COURT:  Well, I understood the objection to be a

16  little different.  He wasn't listed as a witness under Rule

17  26(a)(1), is what I understood her objection to be.

12:18:39  18      MR. KITTREDGE:  26(a)(1), we filed that notice, we

19  finally found him, and identified him as someone that --

12:18:39  20      THE COURT:  Let me back up, at least for my purposes.

21  When was he disclosed under Rule 26(a)(1) as a person who may

22  have knowledge of material matters?

12:18:40  23      MR. KITTREDGE:  The last day of discovery.

12:18:40  24      THE COURT:  Do you dispute the time of 5:04 p.m. or

25  whatever it is, the close of business hours?

12:18:41  1          MR. KITTREDGE:  I'm not sure I understand the

2      question.

12:18:42  3          THE COURT:  Well, she said you didn't disclose him

4      until after 5:00, which is after the close of business.

12:18:42  5          MR. KITTREDGE:  That's true, too, Your Honor.

12:18:42  6          THE COURT:  Okay.  Now, when is he expected to be

7      called?

12:18:42  8          MR. KITTREDGE:  This afternoon.

12:18:42  9          THE COURT:  All right.  What is going to be the

10     essence of his testimony?

12:18:43  11          MR. KITTREDGE:  He is going to testify as to what he

12     did to develop his invention.  It's going to be very brief

13     testimony.  He's going to show the prototype he created so the

14     jury can see it.  And this is critical testimony, because they

15     have already opened the door with Mr. Slayden.  They had their

16     damages expert testify basically that he understood it doesn't

17     work.

12:18:45  18          They are going to put on expert testimony from Dr.

19     Roberts saying the same thing.  The jury has a right to see

20     his device plugged in so they can decide for themselves

21     whether or not it works.

12:18:46  22          If I might address -- there is a fundamental fairness

23     issue on our side of this, if I might take a brief moment,

24     Your Honor.

12:18:47  25          THE COURT:  All right.

MR. KITTREDGE:  This is the witness list that was

filed on March 30th pursuant to the Federal Rules of Civil

Procedure and pursuant to Your Honor's pretrial order.  We

identified Mr. Slayden.  You can see him on Page 2 as a

witness that we will call at trial at that time.  The Federal

Rules and Your Honor's order also gives iLight 14 days, two

full weeks, to raise any objections they have to witnesses.

They did file objections to exhibits.  They never objected to

Mr. Slayden.

That would have been after April 3.  Had they raised

that objection then, we could have addressed it at the April 6

pretrial conference.  They didn't object then.  They didn't

object at the April 6 conference.  They didn't object all the

way up to trial.  We relied on that, told the jury that, based

on that reliance, they are going to get to meet Mr. Slayden,

and they are going to got hear from him.

Now at the 11th hour they are trying to convince the

Court to keep him out, really, so that they can tell the jury,

or the jury will walk out with the impression that we didn't

bring a key witness that we told them they were going to meet.

And we wouldn't have told the jury that in opening statement

if this issue was pending.

They have known he was a live witness since March

30th.

THE COURT:  You all can have a seat.  Let him finish.

1   You all can have a seat.  Let him finish.  All right.
12:18:54  2           MR. KITTREDGE:  I guess the other point I would make
         3   is, there were a number of depositions that happened after the
         4   close of discovery.  If the plaintiffs had ever asked, we
         5   would have certainly not opposed them taking his deposition.
         6   If they had raised it at the pretrial conference, we wouldn't
         7   have opposed them taking his deposition.
12:18:57  8           But again, he's only going to be up on the witness
         9   stand, I would hazard to guess, depending on cross, 10 to 20
        10   minutes.  It will be very simple, very factual, testimony.
12:18:57 11           THE COURT:  All right.  Anything else?
12:18:58 12           MR. KITTREDGE:  That's it, Your Honor.
12:18:58 13           THE COURT:  For the plaintiff?
12:18:58 14           MS. HUNTER:  Yes, Your Honor.  We don't dispute the
        15   fact that we received their witness list and that he was
        16   included on their witness list on March 30th, along with a
        17   number of other witnesses that never actually made it to
        18   trial.  And we maintain that we simply did not have an
        19   opportunity to obtain fact discovery from Mr. Slayden.  His
        20   patent speaks for itself.
12:19:00 21           Furthermore, he should not be allowed to offer expert
        22   testimony under the guise of being a fact witness.  That's why
        23   we brought in experts, and that's why we had experts analyze
        24   Mr. Slayden's patent.  He cannot opine as to the breadth of
        25   his claims or about the subject matter that they encompass.

12:19:02  1        THE COURT:  Well, what do you say to his contention

2    that you didn't object, even at the time of the opening

3    statement?

12:19:03  4        MS. HUNTER:  At the time of the opening statement?

12:19:03  5        THE COURT:  Yes.  Your argument was that there were a

6    lot of people listed as potential witnesses, but you didn't

7    know if he was going to be called or not.  Well, you would

8    have known that at the time of opening statement, given the

9    reference to him.

12:19:04  10        MS. HUNTER:  Yes, Your Honor.  We did not object, and

11    we do not contend that we did.  We did not want to interrupt

12    the flow of Mr. Kittredge's testimony.  But at that point, we

13    had not been put on notice that he was actually intended --

14    that they had actually intended to call him as a trial

15    witness.  We had, in fact, notice that he might appear as a

16    trial witness, along with perhaps 15 or 20 other individuals.

17    But that was first time that we were actually put on notice

18    that he was going to be called as a witness in this matter, as

19    a fact witness or an expert witness.

12:19:08  20        THE COURT:  Well, let me ask the defense, how was he

21    testifying other than as a person with specialized knowledge?

12:19:08  22        MR. KITTREDGE:  He is going to testify as a person

23    with knowledge of what he did to create his patent, to create

24    the device that led to his patent application.  He is not

25    going to testify about the scope of his patent, he is not

going to testify about the scope of his claims.  He is going
to testify about what he built and show it to the jury.  This
is a device that plaintiffs have put on expert testimony that
says it doesn't work.  The jury can look at it themselves and
decide.

As to their statement about the number of witnesses,
there were seven witnesses on our will call list.  They didn't
object to any of them.  They could have.  The rules provide
for that so we can deal with it.  If they had made any
objections to them, we would have addressed it and not
mentioned him in our pretrial -- excuse me, in our opening
statement, if we knew there was a potential issue.

Frankly, Your Honor, we have been sandbagged.  We tell
the jury about an important witness in opening statement, with
reliance on the fact that they haven't objected.  The jury has
been hearing about this patent all week long.  They know they
have been told that we'll hear from this witness.  And they
want to let this jury go out thinking, boy, that lawyer told
us we were going to get to meet Mr. Slayden, then he never
brought him.  That is just patently unfair.  Pardon the pun.

THE COURT:  Well, there is also an unfairness that
they didn't get a chance to conduct discovery.  If the
standard were, we listed him in our pretrial disclosures -- in
our final trial disclosures, and somebody is listed there for
the first time, then the other party doesn't get a chance to

```
1    conduct discovery.

2         MR. KITTREDGE:  There is absolutely an issue about

3    that, Your Honor.  I will tell you categorically, that was

4    five months ago.  Had they raised the issue, we would have

5    certainly not objected to any deposition.

6         But a little bit more important than that is, had they

7    raised that issue, had we known they were going to complain

8    about that, we wouldn't have mentioned his name in opening

9    statement.  They waited until the eleventh hour to raise that

10   issue just to put us in the position we are in now.  If they

11   had raised the issue, we would never have mentioned his name.

12   And again, they had an authority, by putting on testimony

13   already in this case.  That game just doesn't work.  They are

14   going to put on more today with Dr. Roberts.

15        THE COURT:  Well, why didn't the plaintiffs object or

16   seek an extension of discovery?

17        MS. HUNTER:  Again Your Honor, we were unaware that he

18   was actually going to be called as a trial witness until the

19   opening statement.  He was identified at the close of

20   discovery.

21        THE COURT:  Well, he's listed under the expects to

22   present category on March 20th.

23        MS. HUNTER:  Yes, Your Honor.  Well, first of all, I

24   would like to discuss the Slayden commercial embodiment, the

25   Lektron device.  It is not actually prior art.  So even if he
```

is allowed to testify, his testimony is going to be -- it's

not really relevant to anything that is at issue here because

it's not prior art.

12:19:28    THE COURT:  Well, do you dispute that your expert

referred to it in his report?

12:19:28    MS. HUNTER:  I do not dispute that, absolutely.  The

Slayden patent is material, as it's prior art that does need

to be addressed.  It was addressed at length, and the

prosecution has mentioned these patents.  But we maintain that

the patent itself speaks for itself.  And our expert covered

the patent, not Mr. Slayden as an individual.

12:19:30    THE COURT:  So is this Mr. Slayden just going to get

on the stand and say, I applied for a patent for a product,

this is my product, and here it is?  Is that all he's going to

say?

12:19:32    MR. KITTREDGE:  Almost.  He is going to say, this is

what I did to create the device.  He's going to show the

prototype that he created before the patent application was

filed, let the jury look at it, and say, that's the patent

application.

12:19:33    THE COURT:  Well, the prototype before the patent.

I'm a little con--

12:19:33    MR. KITTREDGE:  He built one.

12:19:34    THE COURT:  I got that part.  But is he only going to

show the product for which he obtained the patent?  Or is he

```
 1   going to show something else?
 2        MR. KITTREDGE:  He's going to show the prototype,
 3   because that is what he made, and that is what their expert --
 4        THE COURT:  Well, is the prototype different from what
 5   he got the patent for?  That's what I'm trying to get at.
 6        MR. KITTREDGE:  Structurally, no.  It looks a little
 7   rougher, because it was something he glued together in his
 8   garage.
 9        THE COURT:  What does structurally no mean?
10        MR. KITTREDGE:  Well, let me make sure I understand
11   Your Honor's question.
12        THE COURT:  I mean, if he had several prototypes that
13   he built before he got the patent, then it seems to me the
14   only relevant one would be the product that was actually
15   patented, not the prototype for the patent.
16        MR. KITTREDGE:  I understand, Your Honor.  This is the
17   prototype that the patent was based on.  Now, I planned to
18   also have him authenticate and identify the commercial
19   embodiment.  That was made after the patent application was
20   received.  And that was the only point that counsel objected
21   to a moment ago.
22        I think that is also relevant.  He can authenticate
23   it.  And again, that is one of the things that their expert
24   says doesn't work.
25        THE COURT:  Well, this commercial representation -- is
```

that something he did?

12:19:40 MR. KITTREDGE:  The company he worked for did, so he
can authenticate it.  And you can look at these and see, they
look exactly like the figures in his patent.  That's no more
complicated than that.  The jury can look at it.  He is not
going to provide any more testimony like, yeah, those are made
like -- from my patent drawings.

12:19:43 It really is factual testimony, Your Honor.  And
again, I know I keep harping on this, but the jury has been
told they are going to hear from him.  They were told that --

12:19:44 THE COURT:  Yeah, but you can't unilaterally estop a
nondisclosure -- an untimely disclosure under the rules.

12:19:45 MR. KITTREDGE:  I'm not sure I understand the
question, Your Honor.

12:19:45 THE COURT:  By saying that I am going to produce him,
I don't think you can necessarily use that as a basis to
excuse a noncompliance with the rules.

12:19:46 MR. KITTREDGE:  Well, I do think we complied with the
rules, Your Honor.  It was late, it was at the end of the day
of discovery.  They could have asked for his deposition, we
would have allowed it.  They never asked.  They could have
objected when we put him on our witness list.  And there's
only seven on our will call list, and I think only one that
wasn't called, Tim Fallon.  And Tim Fallon left the company.

They could have objected, and we would not be where we

are today.  They wait until this -- literally the 11th hour
after we have been telling the jury they are going to get to
hear from him, and we have been completely sandbagged.  It's
simple, relevant testimony, I'm talking about, like I said, 10
to 20 minutes.

12:19:51    THE COURT:  Anything further?

12:19:51    MR. VEZEAU:  Your Honor, with the Court's permission,
may I make just couple of comments on this?

12:19:52    THE COURT:  Yes.

12:19:52    MR. VEZEAU:  Here's the problem we have with Mr.
Slayden and the basic bottom line problem.  He's going to give
technical testimony as to the nature of opinions as to devices
we have had no discovery on, namely so-called prototypes.  And
then later some commercial embodiment that's not even prior
art.  The prototypes aren't prior art, the commercial
embodiments.  So he apparently is going to testify it's not
prior art.

12:19:54    And that's the issue.  This is technical testimony.
It should have been in a narrative form for us to review ahead
of time, as the Court admonished the parties.  All our experts
did this.

12:19:56    And so that is the real issue here.  If he's going to
come in and say, I'm Mr. Slayden, and this is my patent,
frankly, their device is built around the Slayden patent.  And
as Your Honor knows, that patent speaks for itself.

That's their defense on obviousness and participation.

Not these other devices.

THE COURT:  Well, let me ask you this.  Was the

4  Slayden patent disclosed at the close of the discovery

5  deadline?

MR. KITTREDGE:  Oh, the Slayden patent, absolutely,

7  Your Honor.  We have no problem with the patent.  But these

8  other devices, no.

THE COURT:  Well, were these other devices listed

10  under Rule 26(b)(a)(1)?

MR. PRICE:  Your Honor, I can address that.  The first

12  mention of Lektron in discovery was in the supplemental Rule

13  26(a) disclosures that came in after 5:00.  In that same

14  reference to Slayden, they listed that Slayden had factual

15  knowledge of, among other things, this Lektron device.  That's

16  when it first came up in discovery.

THE COURT:  What was the electronic device disclosed?

18  Was it just his prototype and the commercial application or

19  what?

MR. VEZEAU:  It was just merely mentioned as Lektron

21  products.  That's all actually it was, Your Honor, that was

22  mentioned.

MR. KITTREDGE:  The device that was mentioned

24  initially in disclosure statement was a commercial embodiment.

THE COURT:  Well, does anybody have the Rule 26(a)(2)

             1   disclosures?

12:20:03     2         MR. KITTREDGE:  That was the only device we were aware

             3   of.  We didn't know he had prototypes until recently.

12:20:05     4         THE COURT:  Well, I'm a little concerned about whether

             5   the plaintiffs examined the products that are going to be

             6   introduced or had the opportunity to do so.

12:20:05     7         MR. KITTREDGE:  Well, with the commercial embodiment,

             8   that was sum of all these supplemental expert reports that the

             9   parties agreed on.  It has been fully covered by our expert

            10   witnesses.

12:20:06    11         THE COURT:  But are you representing to the Court that

            12   they have examined -- the other experts have examined these

            13   Lektron products?

12:20:07    14         MR. KITTREDGE:  They have had every opportunity to.

12:20:07    15         THE COURT:  But I don't know how many products Lektron

            16   produces.  Did they get a chance -- are you saying you

            17   produced to them the product that Slayden is going to

            18   identify?

12:20:08    19         MR. KITTREDGE:  There's two products, two devices

            20   here.  One is the prototype.

12:20:08    21         THE COURT:  I got that part.  What I'm trying to

            22   figure out is whether the plaintiffs and their experts

            23   received the commercial product from the Slayden patent that

            24   you're going to ask him about.

12:20:09    25         MR. KITTREDGE:  That commercial product -- and I'm

willing to take that out of his testimony -- that commercial
product has been the subject of expert reports.  They have had
every opportunity to examine it.  I don't know if they went
and bought one, but they have been given access to it, we
provided access to it.  I don't know if they bothered to look
at it.  They have had every opportunity, and their expert has
opined on it.

12:20:12     THE COURT:  Do you dispute that your expert opined on
the Lektron products?

12:20:13     MR. KITTREDGE:  Our dispute has -- our expert has --

12:20:13     THE COURT:  I'm trying to figure this out for myself.

12:20:13     MR. KITTREDGE:  I'm sorry.

12:20:13     THE COURT:  I'm asking the plaintiffs.

12:20:13     MR. SCRUTON:  Your Honor, our expert has never seen
the Lektron device.

12:20:14     THE COURT:  What do you say to the contention that
your expert referred to it in his report?

12:20:14     MR. SCRUTON:  The only report where he referred to it
-- there has been a series of supplemental reports.  And there
was a supplemental report where the defendant's expert, Mr.
Hathaway, referred to Lektron device, and our expert
essentially said, well, as far as he understands, the Lektron
device, since it's not prior art, is not relevant to this
case, something with which we agree.

12:20:16     So far there has been nothing to establish that the

Lektron device is actually covered by the patent.  There has

been no expert testimony on that.  Mr. Slayden was not

competent to provide that testimony.

12:20:17    THE COURT:  Well, what is it that the defense expert

said about the Lektron products again?

12:20:18    MR. KITTREDGE:  He says it works real good, completely

in contradiction to plaintiff's expert who says --

12:20:18    THE COURT:  Well, no, I'm trying to get an idea -- I

mean, the contention was just made that there is no -- that

there might not be testimony to tie the Slayden patent to the

Lektron products.  So does the expert identify the Lektron

product that he refers to as something that was made that in

his opinion is covered by or is a product of the Slayden

patent?

12:20:21    MR. KITTREDGE:  The defense expert does.  He says this

is -- and it's not that it's covered by its claims, it was a

device that was disclosed in it.  And you can really tell that

quite simply by looking at the drawings in the patent and

looking at the device.

12:20:22    THE COURT:  Well, if he's going to refer to the

Lektron products, is Slayden, then, in essence, testifying

that this product is covered by my patent?

12:20:23    MR. KITTREDGE:  Who?

12:20:23    THE COURT:  Slayden.

12:20:23    MR. KITTREDGE:  He is going to say that if we let him

go to commercial embodiment.

THE COURT: Well, isn't that getting in the range of expert testimony? Because it requires specialized knowledge of, first, what his patent is, and then of how this product was made and whether it falls under his patent.

MR. KITTREDGE: It goes to the inventor who created the invention, who said, look at my drawing, it's the same.

THE COURT: Yes, but that's what I'm talking about. It's more than lay testimony. It's testimony of a person with specialized knowledge.

MR. KITTREDGE: Well, and this is the thing we're talking about. And it's not complicated. It all comes down to what you see here.

THE COURT: Well, it's not a matter of me looking at it and saying it's not complicated, it's a matter of whether it's admissible or whether it actually constitutes expert testimony for which Rule 26)a)(2) would have required a report.

MR. KITTREDGE: Well, I don't believe it is, Your Honor. It's marked with a patent number. But again, we're just talking about commercial embodiment.

THE COURT: Well, I'm going to exclude Slayden from testifying about the Lektron products. If the experts have already testified about it, anything else would be cumulative. I'm concerned that the comparative -- testimony comparing the

products puts it in a category of expert testimony for which a
Rule 26(a) 2002 report would have been required.

12:20:32  Now, as to the testimony about his patent, what time
do you all expect to call him today?

12:20:32  MR. KITTREDGE:  This afternoon.

12:20:33  THE COURT:  We'll take a brief recess.  We'll be in
recess for a few minutes.

12:20:33  (Recess.)

12:20:33  THE COURT:  I don't want to the keep the jury.  I want
to move things along.  It seems to me there are two issues.
The first issue is whether untimely disclosure under Rule
26(a)(1) precludes of testimony of the disclosed witness.  The
other issue to me is whether an inventor's testimony about his
patent is expert testimony subject to Rule 26(a)(2).  So since
he's not going to be called until this afternoon, that will
give me time during the lunch hour to do some more research,
and we'll just go on with the next fact witness.

12:20:37  MR. KITTREDGE:  Your Honor, if I may address that last
point.  Mr. Cleaver, one of the inventors in this case,
testified extensively about all of iLight's signs and that all
of those signs come within his patent.  He has not been
disclosed as an expert witness in the case.  They have never
produced an expert report on him.

12:20:38  We didn't object, because that's not improper
testimony.  Inventors testify like that all the time.  We're

```
 1    just asking for the same consideration for Mr. Slayden.

 2              THE COURT:  Well, we'll see.

 3              MR. SCRUTON:  Your Honor, we also have several

 4    objections to Mr. Hathaway's testimony.

 5              THE COURT:  All right.  Let's see the objections to

 6    Hathaway's testimony.

 7              MR. SCRUTON:  I have a copy which is chapter and verse

 8    for the Court.  Generally, they -- I think they fall into

 9    three or four categories.  One is --

10              THE COURT:  Well, can I have his narrative?

11              MR. SAWYER:  Your Honor, I have a copy of that, I

12    believe has all of the --

13              THE COURT:  Well, if somebody refers to page, and

14    sometimes it's necessary to put things into context.

15              MR. SAWYER:  All -- this is highlighted as well for

16    Your Honor.

17              THE COURT:  Well, that's all right.  All right.  Page

18    16?

19              MR. SCRUTON:  Your Honor, the first couple of ones --

20    there are two objections.

21              THE COURT:  Well, let me just --

22              MR. SCRUTON:  All right.

23              THE COURT:  Your specific objections.

24              MR. SCRUTON:  All right.  One is that they deal with

25    the color of one of iLight's products, of the sidewalls in the
```

product.  And we believe that was contrary -- well, and that
goes to the issue of whether reflective sidewalls should be
white.  We believe that's contrary --

12:20:45      THE COURT:  Let me -- I just got these documents.
Just hold on for a minute.

12:20:46      MR. SCRUTON:  All right.

12:20:46      THE COURT:  Now, the first one is that he didn't refer
to the Lektron products until his supplemental report?

12:20:47      MR. SCRUTON:  Well, okay.  This first reference here
on Page 16?

12:20:47      THE COURT:  No, sir, the introduction.  You've got
slides 30 to 38 to 42.

12:20:48      MR. SCRUTON:  I'm sorry.  Yes, that goes to the
history of the disclosure in discovery of Lektron device.

12:20:48      THE COURT:  Where is the discussion about the Lektron
device in his narrative?

12:20:48      MR. SCRUTON:  Okay.  That's toward the end.  And it
begins I believe on Page 40, which is at the bottom of the
third page of this document that I have handed you.

12:20:50      THE COURT:  I don't know if I am going to have an
expert talking about the references to lawyerly arguments.
Well, the reference is he wasn't familiar with Lektron device,
and it looks to me like he's describing it in some detail.

12:20:51      MR. SCRUTON:  This is their expert, Mr. Hathaway.  And
he is familiar with Lektron, Your Honor.

12:20:52  1          THE COURT:  Well, what is the basis for this

          2  introductory paragraph about slides 38 to 42?

12:20:53  3          MR. SCRUTON:  I'm sorry?

12:20:53  4          THE COURT:  What is this introductory paragraph on

          5  your objections to 38 to 42, then?

12:20:54  6          MR. SCRUTON:  Okay.  That paragraph goes to -- well,

          7  it goes to a couple of things.  One is the lack of disclosure

          8  in discovery.  Second is that, while --

12:20:55  9          THE COURT:  Wait a minute.  Hold on.  It was in his

          10  supplemental report?

12:20:55 11          MR. SCRUTON:  Yes.

12:20:55 12          THE COURT:  Was the supplemental report filed

          13  consistent with the dates set out in the Court's order?

12:20:56 14          MR. SCRUTON:  The supplemental report was filed, I

          15  believe, on March 30?  Yes.

12:20:56 16          MR. SAWYER:  Judge, we exchanged a number of

          17  supplemental reports on the technical experts by agreement of

          18  the parties, Your Honor.

12:20:57 19          THE COURT:  Okay.  You say here that the report does

          20  not analyze the Lektron device, it merely asserts it as an

          21  embodiment of the Slayden patent.  It doesn't even allege that

          22  the device itself was available before iLight's application

          23  was filed.

12:20:58 24          He does say on one of the pages I just read that the

          25  Slayden patent -- that this product was made after the iLight

1    patents were filed.

12:20:59 2        MR. SCRUTON:  Right.  So he's not alleging that the

3    Lektron device was prior art in this incident, was made before

4    the iLight patent was filed.  And so -- there are two ways.

12:21:00 5        THE COURT:  So you're saying the first objection is to

6    exclude slides 38 to 42 --

12:21:01 7        MR. SCRUTON:  Yes.

12:21:01 8        THE COURT:  -- or are you talking about excluding

9    narrative as well?

12:21:01 10       MR. SCRUTON:  Both.

12:21:01 11       THE COURT:  Well, what pages of the narrative do you

12   want to exclude under this paragraph?

12:21:01 13       MR. SCRUTON:  Okay.  If you will turn to the third

14   page of my -- the chart there at the bottom.  I've got page

15   and line.  The first section is Page 40, the last four lines

16   to the first four lines of Page 41.

12:21:03 17       THE COURT:  What do you say to the contention -- and

18   I'm now dealing with the third page of this document of

19   objections, Page 40 -- that if it was made after the iLight

20   patents were filed, it could not have been prior art, and,

21   therefore, isn't relevant?

12:21:05 22       MR. SAWYER:  Your Honor, we're not contending it's

23   prior art.  It's relevant for two independent reasons.  First,

24   both Mr. Bratic, iLight's expert witness, opened the door on

25   this and said the Lektron device would not be a noninfringing

alternative and wouldn't work.  And so we want to demonstrate

that it certainly does work.

12:21:07     And second, Dr. Roberts is going to put on testimony

that when he tried to build one based on the patent, it didn't

work.  And this demonstrates again that it does work.

12:21:08     So we're not offering it as prior art.  We're offering

the Slayden patent as prior art, and potentially the Slayden

prototype.  But not this.

12:21:09 MR. SCRUTON:  Nobody has analyzed the Lektron device

to determine, A, whether it's covered by the Slayden patent,

and, B, whether it would be a significant improvement to the

Slayden patent.

12:21:10 MR. SAWYER:  Just two quick points to respond to that.

The first is, it seems odd to me that iLight is in the trim

business, and this is assimilated neon trim that they didn't

have access to.  It seems very odd to me that they couldn't

have access to it.  The second is that it doesn't have to be

covered by a patent to be a noninfringing alternative.

12:21:13 MR. SCRUTON:  Yeah, if it's not much of a

noninfringing alternative, if it's architectural trim, and if

it's determined to be an alternative for signage, which is a

current product.

12:21:14 MR. SAWYER:  I believe that's a close point.

12:21:15 THE COURT:  Well, if your expert testified about this

Lektron product, doesn't that open the door to this testimony?

1       MR. SCRUTON:  Well, our expert has not testified about

2       the Lektron product -- well, I guess did Mr. Bratic?

3       MR. PRICE:  Mr. Bratic had a one sentence rebuttal

4       snippet about the Lektron device.

5       THE COURT:  But the number of references I'm not sure

6       is so important as the fact that it was raised.  If he raised

7       it in his report, then I think they have an opportunity to

8       comment.  I will overrule the objection to Page 40, the last

9       four lines, to the first four lines on Page 1.  Objection

10      overruled.

11      Now, let's go back to the first page.  Page 16, Line

12      2.

13      MR. SCRUTON:  Right.  And there they are talking about

14      iLight's Camel sign that we saw where it has white paint on

15      the inner sidewalls.  And so what they are doing --

16      THE COURT:  Hold on just a minute.  Hold on.  Page 16,

17      last two lines.  Okay.  Okay.  Now, what is the objection

18      here?

19      MR. SCRUTON:  Okay.  The objection here is, one, they

20      are comparing iLight's product to try to determine what

21      iLight's patent means, which is not proper, because iLight's

22      product is not necessarily the sum and substance of the

23      patent.  And the second is, the Court had indicated in our

24      understanding that color was not the issue with regard to

25      whether interior sidewalls were reflective or not.

Essentially what Mr. Hathaway is saying here is these

aren't reflective -- well, he is saying if you want them

reflective, they should be white, and Fallon's are not

reflective because they are black.  And that goes through

several of these objections.

        MR. SAWYER:  Your Honor, we're not suggesting that the

patent requires white sidewalls.  What I believe Mr. Hathaway

is testifying is he is getting a demonstration of two types of

reflectivity, one is specular, one is diffuse.  And in his

opinion, he -- there is a difference between specular and

diffuse.  And as an example of a diffuse diffuser, he points

to the iLight patent or the iLight sign to help illustrate

that point to the jury.  He is not basing his infringement

position on whether or not -- or at least to this limitation,

on whether or not the inner sidewall is white.  It's simply an

exemplar for the jury, because some of these terms I think are

difficult for the jury to understand.

        MR. SCRUTON:  The Court can read it for yourself, but

it certainly appears to me that he's saying in these quoted

snippets that iLight's is white, Fallon's is black, therefore,

Fallon's is not reflective.

        MR. SAWYER:  And the only point I would make is,

actually, the -- in Mr. Hathaway's testimony is, in his

opinion, to be favorably light reflective, a diffuse --

something diffuse might be better than specular.

12:21:34   1        THE COURT:  Well, the Court is concerned it's a back

   2   door to the Court's construction of the claim for which the

   3   Court ruled that the light was not relevant.  So I sustain the

   4   objection.

12:21:35   5        MR. SAWYER:  Your Honor -- that's all right.  Thank

   6   you.

12:21:35   7        THE COURT:  Page 19.

12:21:35   8        MR. SCRUTON:  Lines 11 to the end.  That's essentially

   9   the same objection, Your Honor.

12:21:36  10        THE COURT:  Again, I think that's a back door on the

  11   Court's ruling on construction.  That will be excluded.

12:21:37  12        Slide 15?  Which page?

12:21:37  13        MR. SCRUTON:  That goes to the same point.

12:21:37  14        THE COURT:  What page?  It just makes a reference --

12:21:37  15        MR. SAWYER:  Your Honor, if we could -- we're going to

  16   delete those sections.  We agree that we should take that

  17   slide out.

12:21:38  18        THE COURT:  Okay.  All right.  That's agreed,

  19   excluded.

12:21:38  20        MR. SAWYER:  Yes, sir.

12:21:39  21        THE COURT:  Page 20, Lines 3 through 8.

12:21:39  22        MR. SCRUTON:  Okay.  Now, this goes to the exterior

  23   light absorbing --

12:21:39  24        THE COURT:  But there is no reference to color.

12:21:39  25        MR. SCRUTON:  That's true.  Here he says that it's --

1   it's his opinion that the Fallon signs don't have exterior
       2   light absorbing surface.
12:21:40  3        THE COURT:  I will overrule the objection on that one.
12:21:41  4        MR. SCRUTON:  All right.
12:21:41  5        THE COURT:  Page 24, Lines 1 through 4?
12:21:41  6        MR. SCRUTON:  That one goes to the color on light
       7   reflecting again.
12:21:42  8        MR. SAWYER:  Your Honor, I don't believe it goes to
       9   color.  What you will find in the testimony, and you'd have to
      10   -- I'd have to --
12:21:42 11        THE COURT:  Well, the thing is, I'm concerned about
      12   his use of color in terms of what the Court has defined in
      13   terms.
12:21:43 14        MR. SAWYER:  Exactly.  And let me just -- if I could
      15   just take one minute of your time, Your Honor.  The point is
      16   that both Dr. Roberts and Mr. Hathaway did some extensive
      17   testing on whether something is reflective or not reflective.
      18   I think Mr. Hathaway's testimony will be there are lots of
      19   things you can do to have very favorably reflective sidewalls.
      20        However, in this case, the very black nature of the
      21   sidewalls, not the color black itself, means it's just a very
      22   a poor reflective surface and is not favorable as the Court
      23   defined it.
12:21:46 24        THE COURT:  Well, I still think that it back door's
      25   the Court's ruling on light reflecting.  So the objection on

1    24 will be sustained.

12:21:47   2          MR. SAWYER:  Your Honor, if I can, there are a number

3    of these cites.

12:21:48   4          THE COURT:  I'm just dealing with them as they are

5    listed.

12:21:48   6          MR. SAWYER:  I know, but may I make a suggestion on

7    this?  It would be appropriate -- or I'll ask the plaintiff if

8    we just strike the, from black plastic -- can we just say the

9    interior sidewalls are constructed of a material that is a

10   poor reflective and, therefore, cannot be considered light

11   reflecting?  Because that's consistent with the testimony.

12          And if Your Honor is concerned about the color in

13   there, I think we can adjust that to take that out.  I mean,

14   this is not infringement opinion.

12:21:51  15          THE COURT:  I think also there was expert testimony

16   that all colors are reflective.

12:21:51  17          MR. SAWYER:  And Mr. Hathaway is going to agree to

18   that.

12:21:52  19          THE COURT:  But what he's saying here is that he is

20   automatically excluding a color from being reflective.

12:21:52  21          MR. SAWYER:  I think he's -- he will admit that

22   everything -- and if you look at the --

12:21:53  23          THE COURT:  I'm just providing further rationale for

24   the Court's ruling.

12:21:53  25          MR. SAWYER:  So is it okay, adjusting the language a

1  little?

12:21:54  2       THE COURT:  Well, for clarity of the record I would
3  like to deal with what the specific objection is.  If these
4  rulings render a number of these other objections moot, and
5  you all want to work it out, because, as I understand it, this
6  is the next witness, so --

12:21:55  7       MR. SAWYER:  It is the next witness, Your Honor.

12:21:55  8       THE COURT:  So we just need to go ahead.  So the
9  objection to Page 24, Lines 1 through 4 are sustained.

12:21:55  10       MR. SAWYER:  And I don't mean to ask Your Honor a
11  second time if you have already ruled on this, but can we
12  change the language from constructed from black plastic to
13  constructed from a material that is a poor reflective
14  material?  Something along those lines?  Because I think this
15  is important to our noninfringement issue.

12:21:57  16       THE COURT:  Well, I don't want to be in the position
17  of rewriting testimony.  This is the narrative, this is what
18  was in it.  We're going to rule on this.

12:21:58  19       MR. SAWYER:  Thank you, Your Honor.

12:21:58  20       THE COURT:  All right.  Page 25, Lines 10 and 11?

12:21:58  21       MR. SCRUTON:  That's the same issue again, Your Honor.

12:21:59  22       THE COURT:  That's in the third paragraph, last line.
23  That will be sustained.

12:21:59  24       MR. SCRUTON:  Okay.  The next one, Page 25, Lines 13
25  to 15.  That goes back to the exterior light absorbing.

12:22:00   1            THE COURT:  13 to 15?  Hold on.

12:22:00   2            MR. SCRUTON:  So I think that would follow.

12:22:01   3            THE COURT:  I think that one is okay.  So Page 25,

4   Lines 13 to 15, is overruled.  Objection is overruled.  Page

5   26, Lines 7 and 8.

12:22:01   6            MR. SCRUTON:  We're back to the black plastic.

12:22:02   7            THE COURT:  That one is sustained.  And then on Page

8   27, lines 5 through 11.  I think that one is all right.

9   Overruled.

12:22:03  10            Page 28, Lines 3 to 5.  Sustained.

12:22:04  11            Page 29, Lines 5 to 7.  Sustained for the reasons

12   stated on earlier language.

12:22:05  13            Page 30, Lines 4 to 6, which is actually the second

14   paragraph, I take it, on Page 30.  That's sustained.

12:22:05  15            Page 40, we've already addressed.

12:22:06  16            Page 41, Line 6 through 7.

12:22:06  17            MR. SCRUTON:  Here he is comparing the Lektron device

18   to the Fallon device and the iLight device, essentially to

19   determine infringement.  And we think the Lektron device is

20   being improperly substituted for the Slayden patent.

12:22:08  21            MR. SAWYER:  Your Honor, it does not go to

22   infringement.

12:22:08  23            THE COURT:  Well, I'm going to strike "very lawyerly"

24   from this.

12:22:08  25            MR. SAWYER:  Very well, Your Honor.

12:22:09 1          THE COURT:  Now, on Page 41, Lines 6 and 7.  I mean,

2    similar in thickness is -- it's a factual type contention.  I

3    don't see the problem with that.

12:22:10 4          MR. SCRUTON:  Well, the problem is that the Lektron

5    device is irrelevant.  The only point of this is whether the

6    Fallon device infringes.  And he's saying, well, it's similar

7    to the Lektron device, but the Lektron device is not the

8    saving patent.

12:22:12 9          THE COURT:  Well, I think that can be brought out on

10   cross.

12:22:12 11         Page -- Lines 12 to 20.  And the basis for this is the

12   reference to your expert's referring to the Lektron product in

13   his report.  And, therefore, I think that opened the door for

14   them to have an opportunity to comment on that as well.

12:22:14 15         MR. SCRUTON:  Okay.

12:22:14 16         MR. PRICE:  Your Honor, may I just real briefly tell

17   you exactly what he testified to, because it was very limited,

18   and it may have bearing on the infringement argument.

12:22:15 19         This is what Mr. Bratic said in rebuttal testimony.

20   He said, Mr. Degen cites to noninfringing alternatives in

21   marketing, including Everlight's LED products, Enhanced

22   America's LED products, and Lektron products.  However,

23   Everbright's product is a flat piece of plastic.  It does not

24   look like neon.  Enhance America has very little market in the

25   LED signs that look like neon.  And Lektron's products can't

be used in tight bends and is not as bright as neon.

12:22:17          That goes to noninfringing commercial alternatives,

which their damages expert -- will be addressed.  That's a

different issue than infringement.

12:22:18          THE COURT:  Again, I think that the reference he made

opens the subject.  So I will overrule the objections to lines

12 through 20 on Page 41.

12:22:19          Slide 38 through 43.

12:22:20          MR. SCRUTON:  That one compares dimensions.

12:22:20          THE COURT:  Consistent with the ruling, that will be

overruled.

12:22:21          Page 42, Lines 5 through 13.

12:22:21          MR. SCRUTON:  That's a similar issue, Your Honor.

12:22:21          THE COURT:  For the reasons stated earlier, that will

be overruled.

12:22:21          Page 44, lines 2 --

12:22:22          MR. SCRUTON:  Here he's comparing the reflectivity of

the Lektron device to the reflectivity of other devices, not

particularly relevant to whether it's a commercial alternative

but whether the sidewalls are reflective or not.

12:22:23          MR. SAWYER:  I think this is the same objection which

is Lektron device.

12:22:24          THE COURT:  Well, the last two lines make reference to

color.

12:22:24          MR. SAWYER:  We're willing to strike the last two

lines, Your Honor.

12:22:25  THE COURT:  Willing or not, they are gone.

12:22:25  MR. SAWYER:  Fair enough.

12:22:25  THE COURT:  Page 44, objected as to the last two
lines.  Otherwise, they will be admitted.

12:22:26  MR. SCRUTON:  And let's go to slides.

12:22:26  THE COURT:  Text on Page 40 -- all of 45 is going out.
I'm going to sustain that one.

12:22:26  MR. LIPSHIE:  Which one, Your Honor?

12:22:27  THE COURT:  Page 45, except for the last paragraph.
No, wait a minute.  The top line is out on Page 45 based on
the Court's ruling about the bottom of Page 44.  The first
complete paragraph on Page 45 is sustained.  The last
paragraph, likewise, referring to color is sustained.

12:22:29  MR. SAWYER:  If I might just, Your Honor, in this
particular section he's actually demonstrating your point that
color doesn't have -- it doesn't have to be white or something
like that.  He is actually testifying that many colors can be
reflected.

12:22:31  THE COURT:  Well, there is a reference to the black
sidewall on the Fallon product.

12:22:31  MR. SAWYER:  You mean on the bottom, the third line?

12:22:32  THE COURT:  And it talks about the red portion of the
spectrum, the Lektron housing sidewalls becoming more
reflective.

12:22:32 1          MR. SAWYER:  Okay.  He's just demonstrating the

2 reflectivity in a broad spectrum of light.

12:22:33 3          THE COURT:  But there is a color with respect to the

4 wall, isn't it?

12:22:34 5          MR. SAWYER:  No, that's the color of light that's

6 being reflected off.

12:22:34 7          THE COURT:  Well, the bottom paragraph is out.  What

8 do you say to the first complete paragraph on Page 45, that

9 the color it is in reference to is just a glow?  Do you

10 dispute that?

12:22:35 11          MR. SCRUTON:  It seems to me that he is talking about

12 the color of the device, but I confess that --

12:22:36 13          THE COURT:  Well, it says red LEDs and very deep red

14 output color.

12:22:36 15          MR. SCRUTON:  Right.

12:22:37 16          THE COURT:  And that was a reference to some of your

17 products, red, wasn't it?  The red color generally?

12:22:37 18          MR. SCRUTON:  Some of our products are red.

12:22:37 19          THE COURT:  I will overrule the objection as to the

20 first complete paragraph on Page 45.

12:22:38 21          All right.  Now we're on Exhibit 1080.

12:22:38 22          MR. SAWYER:  I think that's consistent with the script

23 that Your Honor has already let in.

12:22:39 24          THE COURT:  Well, I have no way of finding this.  On

25 what page is it?

734

12:22:40  1          MR. LIPSHIE:  Sure.  I can give you a copy of the

         2     slide, but I believe it's on Page 43, Your Honor.  It's the

         3     top slide.

12:22:41  4          THE COURT:  Any objection to the -- what is the

         5     objection to the top slide?

12:22:41  6          MR. SCRUTON:  Well, I think counsel is right, that

         7     that is consistent with prior rulings on this device.

12:22:42  8          THE COURT:  The remaining objections, then, should be

         9     overruled, unless there is some showing --

12:22:42 10          MR. SAWYER:  Your Honor, I believe we're probably -- I

        11     just need to check the slide to make sure.  I think where Your

        12     Honor excluded testimony about the slide, we'll probably take

        13     the slides out.

12:22:44 14          THE COURT:  Do you all need time to --

12:22:44 15          MR. SAWYER:  I think that's the only one.

12:22:44 16          THE COURT:  Yes, sir.

12:22:45 17          MR. VEZEAU:  Before the Court possibly takes a moment

        18     off, may I ask the Court to consider an issue which I think

        19     may confuse the jury.  We've been talking about the Lektron

        20     device, and we've been talking about the Slayden patent.  The

        21     defendant is basing invalidity on the Slayden patent, not the

        22     Lektron device.

12:22:47 23          The defendant admits the Lektron device is not prior

        24     art.  But the problem is these narratives mix and match and

        25     they blend together.  I'm very concerned the jury may be

confused about what is prior art and what is not.  I would ask
that the Court consider a simple cautionary instruction to the
jury that the Slayden patent is the prior art defense of the
defendants here, but this Lektron device was a commercial
device, it is not prior art to these patents.

12:22:51   MR. KITTREDGE:  That's acceptable to Fallon, Your
Honor.

12:22:51   THE COURT:  All right.  When the first reference is
made to Lektron, the Court will inform the jury that the
parties agree that the Lektron device is not prior art, was
produced after the plaintiff filed its patent application, and
its admissibility is limited as to whether the -- is
introduced on the parties' contention as to whether the
Slayden patent would work.

12:22:53   MR. KITTREDGE:  Thank you, Your Honor.

12:22:53   MR. VEZEAU:  I don't think we actually questioned
whether it would work.  The question is, is this a
noninfringing alternative.  I accept the -- I think I can live
with Your Honor's -- the way you are going to phrase it.

12:22:54   THE COURT:  Well, I will put it whether the Lektron
product is a noninfringing alternative.

12:22:55   MR. VEZEAU:  Yes.  And that goes to the issue of
damages, Your Honor.

12:22:55   MR. KITTREDGE:  You absolutely need to say that, Your
Honor.

12:22:55 1        THE COURT:  I'm going to make sure the Court Reporter

2   reproduces it for me.

12:22:56 3        MR. KITTREDGE:  There is also an issue of whether it

4   works.  Because that is rebuttal testimony that he Slayden's

5   patent won't work.  You had it right the first time.  We don't

6   disagree if you added whether it would work, whether it would

7   not --

12:22:56 8        THE COURT:  Do you dispute that your expert said the

9   Slayden patent wouldn't work?

12:22:57 10        MR. VEZEAU:  For signage, but not for architectural

11   trim, which is what it is.  The problem with signage, Your

12   Honor, is Your Honor saw with these signs, they have very,

13   very tight curves.  And this piece is just linear.  So that

14   thing only sends -- and what they are bringing in is

15   architectural trim, not bringing in signage.  So that the only

16   thing we're saying, we're not saying the Slayden patent

17   doesn't work.  We're just saying it's not -- it was not

18   available for signage.  It is certainly available for

19   architectural trim.

12:22:59 20        THE COURT:  Well, let me see the expert report with

21   the reference to the Lektron again.  Or Slayden.  What's the

22   portion of the expert's opinion?

12:23:01 23        MR. SAWYER:  Maybe I might -- and they can correct me

24   if I'm wrong, Your Honor.  Their expert creates a mock-up.

12:23:01 25        THE COURT:  Well, everybody is making their

characterization of what the expert said. I would just like
to see what he said.

12:23:02    MR. SAWYER:  I understand.

12:23:02    MR. SCRUTON:  It goes on at some length.

12:23:03    THE COURT:  And we need to make a record of what
portions of it we're referring to.

12:23:03    MR. SAWYER:  I think I can find that, Your Honor.

12:23:03    MR. SCRUTON:  What happens is that our expert tries a
few different versions of this Slayden device with different
tubes and he finds that --

12:23:04    THE COURT:  Well, let me see it.  I just want to see
it, see what it says for myself.

12:23:04    MR. SCRUTON:  Okay.

12:23:04    MR. SAWYER:  Your Honor, I believe it starts on -- I
don't have the photos with me, but it starts on Page 21 of, I
believe, the rebuttal, and it goes on through -- 21 all the
way through 30.  So it's eight pages of script.

12:23:06    THE COURT:  Well, let me see it.

12:23:06    MR. SAWYER:  This is the section of the expert report.
It has our notes on it.

12:23:07    THE COURT:  Well, I've got the expert report without
notations, so that's why I would rather see --

12:23:07    MR. SAWYER:  Okay.  Thank you, Your Honor.  This has
the pictures.  That was the only reason we thought it might be
helpful.

12:23:08  1          THE COURT:  Now, let me see the pictures.  Unless you

      2    all can agree to all the pictures where he's showing his --

      3    making his reference to the Lektron or the Slayden patent --

      4    are those all signage pictures?

12:23:10  5          MR. SCRUTON:  No, from the portion that you are

      6    reading, the pictures are pictures of these devices that he

12:23:10  7    is --

12:23:11  8          THE COURT:  Are they elements of the devices?  Well,

      9    let me see the pictures.  Let me see the pictures.

12:23:11 10          MR. SCRUTON:  Can we bring those up?

12:23:11 11          THE COURT:  Has anybody got a hard copy?

12:23:12 12          MR. SCRUTON:  Well, no, not these slides, our slides.

     13          THE COURT:  Well, can you all --

12:23:12 14          MR. SAWYER:  Again, it may have our notes on it.

12:23:13 15          THE COURT:  Well, show it to the other side.

12:23:13 16          MR. KITTREDGE:  I don't want to give him my reports.

12:23:14 17    Don't you have a copy of his report?

12:23:14 18          MR. SCRUTON:  At the top of 27.

12:23:14 19          THE COURT:  Well, just show me the slides.  Show me

     20    the slides to which he refers when he is talking about the

     21    Slayden patent.  It seems to me the only relevant product

     22    market in this case is the signage.  Would you all disagree

     23    with that?

12:23:16 24          MR. SAWYER:  Your Honor, I believe in the Slayden

     25    patent there is a discussion that you can make it into a sign.

1    And in addition to that, our expert will testify that you can

2    use the Slayden patent to make a sign.  If they think it's

3    not, they can ask him why not.

12:23:17  4        THE COURT:  Well, the question was a modifying

5    instruction to the effect of, this is limited for the limited

6    purpose of whether the Slayden product can be made -- provides

7    an alternative noninfringing product for signage products

8    under the plaintiff's patent.  Is that a fair statement?  Do

9    you all agree on that?

12:23:19  10        MR. VEZEAU:  Yes, Your Honor.  We apologize for taking

11    the Court's time on this.

12:23:19  12        THE COURT:  My sympathy is with the jury.  They are

13    having to sit back there for about an hour and fifteen

14    minutes.

12:23:20  15        MR. VEZEAU:  I think the curative instruction Your

16    Honor suggested before would be just fine.  Let's just go on

17    with this.

12:23:20  18        THE COURT:  Well, i will ask the Court reporter to

19    print out the rough draft of those pages, of the last 30

20    pages, I think will probably cover it.

12:23:21  21        MR. VEZEAU:  Thank you, Your Honor.

12:23:21  22        THE COURT:  If we get to a point where I haven't had a

23    chance to do that, I will just try and restate it, then if

24    anybody has an objection, you all can tell me, and I will

25    consider it.

12:23:22  1          Are there any other preliminary matters before we

        2   bring the jury in?

12:23:23  3          MR. VEZEAU:  Not with this witness, Your Honor.

12:23:23  4          THE COURT:  All right.  You may bring the jury in, Mr.

        5   Marshal.

12:23:23  6          MR. SAWYER:  Your Honor, I'm sorry.

12:23:23  7          THE COURT:  Hold on.

12:23:23  8          MR. SAWYER:  We do have to take a minute or two to

        9   modify the script to just make sure we're --

12:23:24 10          THE COURT:  We'll be in recess.  Let me know when

       11   you're ready.

12:23:24 12          (Recess.)

12:23:24 13          THE COURT:  I'm going to return the Hathaway report

       14   that was given to me earlier.  If you all have got your

       15   laptops, you may want to -- I will ask you to give the

       16   opportunity to review.  Innogenetics NV v. Abbott

       17   Laboratories, 512 F.3d 1363, Pages 1375, 1376, a federal

       18   circuit case dealing with late identification of a patent.

       19   And you all will have a chance to look at that.

12:23:27 20          The other thing that I will ask you all to address

       21   when we come back after lunch is whether, in light of the

       22   expert's -- defense expert's testimony about the Slayden

       23   product, whether the Slayden testimony would be cumulative.

       24          You can bring the jury in, Mr. Marshal.

12:23:28 25          Are you all ready?

MR. VEZEAU:  I'm sorry, Your Honor.  I didn't hear the

2     last part.

12:23:29  3          THE COURT:  Whether, in light of the defense expert's

4     testimony about the Slayden patent and this other product,

5     whether Slayden's testimony would be cumulative.

12:23:29  6          You can bring the jury in, Mr. Marshal.

12:23:29  7          (Jury in.)

12:23:29  8          THE COURT:  Good morning, ladies and gentlemen of the

9     jury.  The Court wants to apologize for you all having to sit

10    out for a while, but that was necessary for the Court to

11    discuss certain matters with counsel.  If there was any

12    inconvenience due to the waiting, put it on me, not the

13    parties.

12:23:30  14         You may call your next witness.

12:23:30  15         MR. SAWYER:  Thank you, Your Honor.  The defense calls

16    Kevin Hathaway.

12:23:30  17         THE COURT:  Mr. Hathaway.

12:23:30  18         (Witness sworn.)

12:23:30  19         COURT REPORTER:  Please state your name for the

20    record.

12:23:30  21         THE WITNESS:  Kevin Joseph Hathaway.

12:23:30  22         MR. SAWYER:  Good morning.

12:23:31  23         Mr. Kevin Hathaway is being offered by Fallon Luminous

24    Products Corporation as a technical expert in illumination

25    design.  Mr. Hathaway is the founder, chief technology

officer, and chief executive officer of Display Engineering

Incorporated.

Mr. Hathaway and his company developed and produced

display systems with solid state lighting sources for

consumer, military and industrial applications.  In addition,

he and his company designed and developed specialty LED

lighting products which take care advantage of his and his

company's design and development knowledge in solid state

lighting and nonimaging optics.

Mr. Hathaway is married, has two children.  He has a

bachelor of science degree in nuclear chemistry and master's

degree in physical chemistry with postgraduate work in optics

from San Jose State University.

He has over 35 years of experience in the

illumination, design and engineering field as a developer of

display applications, display lighting systems, optical

systems and nonimaging optical systems.

During his career, he obtained extensive experience in

the field of back lay for displays, nonimaging optics and high

performance illuminations.

In addition to his education and his general

background, he has also additional experience relating to the

technology in this case.  Some of the examples are:  In 1972

he joined Microma International, which at the time was owned

by Intel Corporation, one of the first liquid crystal.  He was

initially a technician doing synthesis of liquid crystal materials, and then developed liquid crystal materials for several years.

In 1980, Mr. Hathaway, along with a few partners, started his current company, Display Engineering.  The company does consulting to liquid crystal display manufacturers.  In addition, he developed and built some of the world's first LCD-based electronic public information systems which were used as portable scoreboards in outdoor sporting events such as the Coors' Classic bicycle race.

Since he has worked as a consultant with avionics, he has also worked as a consultant with the avionics division of General Electric.  During this time he developed manufacturing processes for the fabrication of cockpit LCD panels.

In addition, he worked on the design of the display and lighting portions of the subsystem.  The lighting in the system uses small incandescent lamps and prisms.

Mr. Hathaway has also worked as a consultant for Black & Decker.  He has worked out a hanging electronic kitchen calendar containing multiple lighting calendar numeric displays.  He also advised a company called Olivetti as a consulting engineer responsible for the LCD sub-system and one of the first laptop computers.

In 1985 his consulting relationship with Compaq began. He became their flat panel display expert.  He consulted on

all of Compaq's early flat panel display based products,
including the 4x2, which was the first fully portable
computer.

12:23:47　　He was part of Compaq's design team for the first
laptop computer called the SLT.  This laptop used a backlit
LCD panel.  Also as part of his work with Compaq he developed
the wedge light backlight, as well as other backlit products
for which more than 300,000 units were produced.

12:23:49　　Mr. Hathaway has also advised a silicon wafer
processing equipment manufacturer involved in developing and
building rapid thermal processing systems used by companies
such as Intel, Samsung, Texas Instruments, and Motorola, only
to name a few.

12:23:50　　In the production of --

12:23:50　　He developed and tested detailed computer simulations
of new types of very high powered rapid thermal processing
optical distribution systems which are in some ways a little
bit similar to a heating lamp like those found in a restaurant
to keep food warm.

12:23:52　　Mr. Hathaway has been actively engaged in consulting,
design and development of LCD and back lighting systems for a
variety of display applications, including pen based cabinet
computers, high brightness LCDs, light displays, aerospace
displays, point of sale displays, and displays for hand held
tests and diagnostic instruments.

12:23:54 His experience with optical waveguides and with

designing multiple light sources into an illumination system

is extensive.  He has been awarded U.S. Patent numbers 505,946

and 5,202,950, both of which utilize a precisely designed

waveguide to uniformly illuminate a liquid crystal display.

Mr. Hathaway, does that accurately describe your

background?

MR. HATHAWAY:  Yes, that does.

MR. SAWYER:  Your Honor, we would offer Mr. Hathaway

as an expert.  And with the Court's permission, I will ask him

to provide his opinions and testimony to the Court and the

jury.

THE COURT:  You may do so.

THE WITNESS:  Good morning.  My name is Kevin

Hathaway.  I live in Saratoga, California.

I have been retained by Fallon to offer an opinion on

whether the accused Fallon signs infringe the iLight patents.

My opinion is that the accused Fallon signs do not infringe

the iLight patents.  My opinion is based on my findings after

careful study that the Fallon designs do not use many of the

elements that the patents require and that must be present by

law to find infringement.

The required elements that the Fallon products do not

have are rod or rod-like waveguide, as defined by the Court.

Instead, they have a thin walled diffuser.  Next, the Fallon

1   products do not have a waveguide that preferentially scatters

2   light, which again is required by the patents.  The Fallon

3   products do not have light reflecting surfaces or exterior

4   light observing surfaces as those limitations were defined by

5   the Court.  There are several other elements that the products

6   lack, but it is important to note that if only one element of

7   the claim is missing from the Fallon products, then the entire

8   product not infringe that claim.

12:24:06  9       I have also been retained by Fallon to offer an

10  opinion as to whether the iLight patents are invalid.  It is

11  my opinion that the patents are invalid.  This is especially

12  true in light of how iLight has positioned its patents against

13  the Fallon signs.  My opinion is that the patents do not claim

14  something that is new.  In other words, the patents are

15  anticipated.  In fact, the technology claimed in the iLight

16  patents was invented in disclosed and the United States Patent

17  granted to James Slayden, who worked for another lighting

18  company, before iLight filed for its patents.

12:24:09  19      In addition, the patents would also have been obvious

20  based on the Slayden patent and based on a number of other

21  uses for LEDs that were known before iLight applied for its

22  patents.

12:24:10  23      It is my opinion that one skilled in the art would

24  have considered the combination of known elements found in the

25  iLight patents was a predictable use of these known elements

according to their established function.  This means in my
opinion that someone working in the sign industry could have
easily combined some basic parts with known functions of
several signs and come up with what the iLight patents now
claim is new.

I am going to explain my opinions as to both (1) why
Fallon does not infringe iLight's patents; and (2) in any
event, why those patents are invalid.  I will discuss
noninfringement and invalidity in that order, and I will let
you know when I shift gears, but in this case the two are very
closely related, so a fair amount of my testimony will
overlap.  That is, at times why I'm explaining
noninfringement, I will also give you some invalidity
explanations.

I want to tell you what I did in this case.  Almost a
year ago, Fallon contacted me to ask if I could use my
experience and knowledge in this industry to examine the
patents and the Fallon products.  I was not asked to give a
certain opinion, nor would I just give an opinion if asked.  I
only formed my opinion that the patents are not valid and not
infringed after a long and careful study.  I am now going to
give you some background on how I came to those conclusions.

       First, as you have heard by now, one of the basic
principles I followed in this case was to examine the patents
and products, keeping in mind what one of ordinary skill in

the art would have thought at the time the patents were

applied for.  And that time frame then is 2001.

I also had to determine what I thought one skilled in

the art would be.  It is my opinion that someone of ordinary

skill would include individuals with a bachelor of science or

master's degree in general engineering science or engineering,

with a background in physics, and at least five years

experience in the illumination design and/or engineering field

or an individual with a master's or doctorate degree in

optical engineering and two years of experience in

illumination design and/or engineering field.

In addition to my definition of one of ordinary skill,

I believe that practical experience in lighting design is

important in this case.  I will explain this more -- in more

detail later.  Dr. Roberts' explanation of the technology

involved was very complicated and technical.  He conducted a

lot of tests to try to show what he referred to as technical

requirements.

But in reality, what iLight now claims the Fallon

signs infringe in their patents is a design that is

essentially the same as what you see in a plastic lampshade

put into an attractive package.  Therefore, some of the

concepts we will discuss sound complicated, and indeed, if

applied correctly, may be complicated.  However, iLight, at

least in this case, is accusing signs that do not use

complicated technology and would not require advanced degrees
in physics to design and understand.

When I get to my validity of portion of my testimony,
we will talk about some of those people who designed these
exact devices before iLight did so.

I have told you my opinion in this case is that
Fallon's signs do not infringe and that the patents are
invalid.  To simplify things, I want to first talk about
infringement.

It is important to remember that in order to find
infringement, you must find that each and every element of the
asserted claim is present in the accused device.  Therefore,
if even a single element is missing, there is no infringement.
During my analysis, I examined all of the asserted claims.

THE COURT:  Excuse me.  Ladies and gentlemen of the
jury, you will receive an instruction from the Court on what
constitutes infringement.  And you are bound to accept the
Court's instructions on what constitutes infringement.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Uh-huh.

THE WITNESS:  However, many of the same terms are used
in many of the claims of the patent.  You have also heard that
these three patents are what we call continuation patents,
which means they are part of the same family of patents.  If
they have -- they have the same specification and drawings.

It is just the claims at the end of the patents that are

supposed to be a little different.

12:24:41 I understand that since all of the patents are

identical except for the claims, the argument made to the

Patent Office during the prosecution apply equally to all of

the patents.  To make it a little easier and to introduce you

to many of the issues I found important, let's take a look at

one of the claims at issue in this case, claim 8 of the '238

Patent.

12:24:43 May I have the next slide?  It's up.

12:24:43 So this is the entire claim.

12:24:44 And may I have the next slide?

12:24:44 And these are the portions of the claim that we

consider to be focused -- relevant in the case.

12:24:45 As you can see from this slide, this patent claim has

many elements which are often referred to as limitations that

the accused product must have in order to find infringement.

It is my opinion that the Fallon signs do not have all of

these limitations.  What is very interesting, and I will spend

more time on this later, the bolded limitations found in this

slide which I have just told you are not found in the Fallon

signs are the very same features that will be important in my

testimony about invalidity, and how iLight convinced the

Patent Office its invention was different than the prior art.

12:24:50 Okay.  Looking at this next slide, we can focus on the

term "rod-like".  The Fallon signs do not use a rod or

rod-like member.  Many of the claims that iLight is asserting

against the Fallon signs require a rod or rod-like member.

12:24:51    I started my review of the patent record with the

provisional patent application filed by iLight.  The

professional patent application is the first filing with the

Patent Office that is supposed to show what the inventors

thought they invented.  I was informed that a professional

patent application is simply a place holder; the Patent Office

does not review it to see if it discloses something new or

patentable.

12:24:54    Now I'm going to go through several arguments iLight

made during the prosecution of the patents.  The back and

forth with the Patent Office is often referred to as the

prosecution of the patents.  During these arguments back and

forth, Patent Office issued rejection based on U.S. Patent

Number 6,361,186.  The inventor was James Slayden of Tulsa,

Oklahoma, and U.S. Patent Number 6,158,882, and the inventor

was a person named Bischoff.

12:24:57    The rejection was something referred to as an office

action, which simply is a document in which the Patent Office

tells the applicant the reasons why the patent should not be

allowed.  In this case, the Patent Office told the applicants

that the prior art had already disclosed what iLight was

saying was new.

12:24:59    1          May I have Exhibit 626 brought up?  And can you go to

         2    the highlighted portion, please.

12:25:00    3          In the office action, the Patent Office told iLight

         4    that the Slayden patent disclosed LEDs mounted below an

         5    elongated translucent diffuser and that the Slayden patent

         6    described the diffuser as producing a neon-like agree.

         7    Bischoff displaced LEDs mounted in a hollow tube-like

         8    structure that diffused the light.

12:25:02    9          This next slide shows the relevant figures from

        10    Slayden and Bischoff that illustrate the hollow tube and

        11    hollow arch-shaped diffusers.

12:25:03   12          Do you mind if I point those out?

12:25:03   13          THE COURT:  You may do so.

12:25:03   14          THE WITNESS:  Thank you.  So this is the Slayden

        15    patent, and this is the arch-shaped diffuser.  And then down

        16    there is the Bischoff patent, and there is the arch shape

        17    there.

12:25:04   18          In response to the Patent Office's rejection based on

        19    the Slayden and Bischoff diffusers that produce a neon-like

        20    glow, iLight told the Patent Office:

12:25:05   21          First that Slayden disclosed the use of a hollow thin

        22    walled, translucent diffuser.

12:25:06   23          Next they told the Patent Office:

12:25:06   24          Neither Slayden or Bischoff teaches or suggests the

        25    use of an essentially solid rod.  ILight explained that the

patents did not cover diffusers.  Let's look at what they told
the Patent Office.

As the above discussion points out, to achieve the
desired light intensity and uniformity, the rod must
preferentially direct light along its length while also urging
the light out of a lateral surface.  This requires an
essentially solid rod with optical waveguide and
light-scattering characteristics.

I found it important that when iLight described its
concept to the Patent Office, it used the words solid
waveguide to distinguish over a thin diffuser.  We will talk
more about the difference between waveguides and diffusers,
but let's look at the word "solid".

Using the term solid to describe the rod or rod-like
member makes sense, especially when you look at the pictures
in the iLight patents as opposed to the Slayden and Bischoff
patents.  To make it easier to see, let's compare Figure 3 of
the patents and the Slayden diffuser.

May I have next slide?

And again, here, this is the iLight patent, and this
is their solid member.  And then this is the prior art Slayden
diffuser, which again is hollow.  It's one of the embodiments
of the Slayden prior art.

As you can see, the rod-like member that the patents
disclosed has a depth or is solid as opposed to the thin

curved diffuser of Slayden.

12:25:16 Next let's look at the products iLight has told us are covered by the patents.

12:25:16 May I have the next slide.

12:25:16 As you can see, Figure 3 looks almost exactly like the solid rod-like member used by iLight in its products. It is solid and also rounded at the top, and solid all the way through and flattened at the bottom.

12:25:18 So there is the patent figure in the iLight patents, and there is the product.

12:25:19 Now let's look at the diffuser used by the Fallon signs.

12:25:19 Doug, may I have Exhibit 754 Y. And also may I have the next slide.

12:25:20 This is the piece of diffuser that comes from the Fallon products, from one of the Fallon products. And as you can see, it is open and hollow. It corresponds to that photograph right there, which is showing the open and hollow ending.

12:25:22 As you can see, Fallon's signs use a thin hollow diffuser. It is definitely not a rod. As a scientist, I think you have to apply these terms in the same way when you look at the prior art, Slayden for example, and when you look at the accused products. The inventors told the Patent Office that thin walled diffusers were different than rods or

rod-like waveguides.  The Fallon thin walled diffuser can't be

considered rod or rod-like and, therefore, cannot infringe.

12:25:26    Take a look at this next slide which shows a picture

of the Fallon diffuser and the diffuser used in Slayden.

There again, this is the Slayden -- from the Slayden

patent, and that's the diffuser, an open diffuser and that's

the Fallon open diffuser.

12:25:27    Therefore, it is my opinion that the Fallon signs do

not have rod or rod-like members.

12:25:28    Another key term, and again, one that iLight used to

convince the Patent Office that its concept was different than

the prior art is "preferentially scatters light".

12:25:29    May I have the next slide?

12:25:29    Again, this shows the language in the patent.  The

patent itself explains this term.  And let's look at the

patent.

12:25:31    Can I have Exhibit 1, the '238 Patent?  And now

highlight Column 6, lines 52 to 57.

12:25:31    THE COURT:  Would counsel approach the bench.

12:25:31    (Whereupon, a bench conference was held, out of the

hearing of the jury, to wit:)

12:25:32    THE COURT:  The Court defined preferentially scattered

light.  And I'm concerned about him reading the portions of

the patents as defining that, which would be the conflict of

what the Court --

775

12:25:33  1          MR. SAWYER:  Your Honor, I don't believe he's going to

          2    read portions that conflict with Your Honor's definition.

12:25:34  3          THE COURT:  Well, it's not a definition.

12:25:34  4          MR. SAWYER:  No, it's not a definition at all.  He has

          5    just explained about how the term applies to a rod-like

          6    member, because there is an interplay between the rod and

          7    preferentially scatters.

12:25:35  8          THE COURT:  Do you agree?

12:25:35  9          MR. SCRUTON:  I'm a little concerned also.

12:25:36  10         THE COURT:  Either you have an objection or you don't.

          11   I don't have it in front of me.

12:25:36  12         MR. SAWYER:  It wasn't objected to earlier, Your

          13   Honor.  They have had the script.

12:25:37  14         THE COURT:  All right.  All right, sir.

12:25:37  15         (Conclusion of bench conference.)

12:25:37  16         THE WITNESS:  Continue?  Thank you.

12:25:37  17         So I will read from the patent.  It bears repeating

          18   that the quintessential feature of the present invention,

          19   however, is the careful spreading or distribution of the

          20   individual light patterns of the point's light sources such

          21   that the light patterns are preferentially expanded along the

          22   light emitting surface and form an oblong or oval light

          23   intensity pattern.

12:25:40  24         This means that the waveguide rod must actually

          25   preferentially scatter light according to how the Court

construed the claims.  However, I think it is helpful to again look at the patent.  We see a picture of the concept in Figure 7.

12:25:42  Could you pull up the next slide, please.

12:25:42  You can see from the figures that the light pattern must be oblong or extended in one direction more than another. So by that I mean there is an elliptical oriented rather than round.  And the orientation of the long axis is along the long axis of the diffuser.

12:25:44  As I said before, iLight used this concept of preferentially scattering light to convince the Patent Office that what it is doing is new; indeed, that it is whole point of the patent's assertions that it uses -- it is using a waveguide as opposed to a simple diffuser.

12:25:46  Now look at what iLight told the Patent Office about the term "preferentially scatter" and the difference between a diffuser and a waveguide.

12:25:47  May I have Exhibit 627.  And now the highlighted portion, please.

12:25:48  A leaky waveguide is a structural member that functions both as an optical waveguide and light scattering member.  As a waveguide, it tend to preferentially direct light entering the waveguide, including the light entering a lateral surface thereof along the axial direction of the waveguide.

577

Basically, diffusers don't preferentially scatter
light.  Instead, the scattering of the light is uniform in all
directions.  This is in contrast to the waveguide which
preferentially scatters light, just like we saw in Figure 7 of
the patents.

In my opinion, the Fallon signs do not have a
waveguide member that preferentially scatters light.

In order to show you that the Fallon sign uses a
diffuser and not a waveguide, I want to repeat a small
demonstration here that I previously performed in my lab.  I
tested the diffusive material found on the Fallon signs to
determine if it directs light in one direction more than
another.  That is, if the diffuser preferentially scatters
light like a waveguide.  As we know, this is required by the
patents.

As I stated earlier, the Fallon signs use a good
diffuser that is really more than a plastic lampshade.  The
diffusers on Fallon's sign were not wide enough to tell if the
scattering of the light was preferential or uniform because
the diffusers are fairly narrow.

And again, they are narrow this way.

I asked for samples of the lens material used by
Fallon that was wide enough to test the scattering effect and
determine if there was any preferential scattering.  Remember,
iLight told the Patent Office, in order to get its patent

allowed, that they were not using a diffuser, but that its

concept must be a waveguide that directs light in one

direction more than another.

12:25:59 4    May I have Exhibit 888?  Thank you.

12:26:00 5    This is the sample that was provided by Fallon.  It is

a square that is roughly 4" on a side and is about 80/1000ths

of an inch thick.

12:26:01 8    As a side note, during my years of experience, I have

encountered many commercially available translucent diffusers

just like this.

12:26:01 11    This square is roughly the same thickness as I

measured for the Fallon diffuser -- Fallon diffusers that are

found on the signs I studied.  In other words, this thickness

here is the same as that thickness there.  Very, very close.

12:26:03 15    I understand the sample was made in Fallon's

manufacturing facility by the same process used to make the

actual diffusers, only it is wider.  To test the light

propagation characteristics of this material, I directed a

green laser at the center of the test piece with normal

incidence.

12:26:05 21    Please pull up Exhibit 884, which shows the basic test

set-up.

12:26:05 23    And that is a photograph showing this diffuser sample,

and then a green laser -- in fact, this exact green laser.

And there is the lazer right there in the background.  And

it's shining directly at the back surface of the diffuser
material.  And by normal incidence, that means that it's
shooting at straight at it, and there's not an angle between.

My tests confirmed that the lens material did not
preferentially scatter light, but instead, uniformly diffused
light equally in all directions.  This is exactly what iLight
said their patents did not cover.

Now show the slide that compares the laser image on
the Fallon diffuser material to the figure.

As you can see, this is very different.  The laser
light pattern is circular, not oblong, as required by the
patents.

And again, if you compare, this is the circular
pattern produced by the Fallon material, and this is what is
called out for in the iLight patent.  So that should be oblong
rather than round.

As is obvious from the photographs, the Fallon
diffuser material is quite symmetric in its scattering
properties.  There is no preferential axis upon which the
light propagates through this material.

And let me show you that exact experiment.

MR. SAWYER:  Your Honor, can Mr. Hathaway come down
and demonstrate?

THE COURT:  You may do so.

THE WITNESS:  I happen to have two of these.  So

again, this is the exact set-up, except that I'm holding it
instead of using it in my lab.  And so what I did is I just
shot the laser into the back of that.  As you can see, the
pattern produced is round.  In fact, very round.  And it is
not oblong.

12:26:16  MR. SAWYER:  Your Honor, is it permissible to hand the
jury that piece of material, the exhibit and the laser?

12:26:16  THE COURT:  You may pass it, without objection.

12:26:16  MR. SAWYER:  Don't shine it in your eyes.

12:26:17  THE COURT:  Give it to the Marshal.  Step back from
the jury box.

12:26:17  THE WITNESS:  You want to stay back and shoot it, not
at your eye.

12:26:17  THE COURT:  If you will step back from the jury box.

12:26:17  MR. SAWYER:  I'm just worried about the safety, Your
Honor.

12:26:18  THE COURT:  Well, you can do it at a distance.

12:26:18  THE WITNESS:  So what you can do --

12:26:18  BY MR. SAWYER:

12:26:19  Q.    Mr. Hathaway, why don't we return to the script
and let the jury --

12:26:19  A.    The reality is that the material itself behaves
in an isotropic manner.  That is, it has no preferred
propagation axis.  It is simply acting like dropping a pebble
within a pond.  The disturbance moves in all directions

equally.  If iLight performed a similar test, it did not
choose to disclose it.  ILight has argued that the Fallon
diffuser produces a light pattern that is longer than it is
wide when you turn on a single LED on one of its signs.

12:26:23    Please pull up Exhibit 808, which is a picture that
Dr. Roberts relied on to demonstrate his version of
preferentially scatters light.  There are a number of problems
with iLight's claims.

12:26:24    First, this supposed elongation is, in fact, caused
entirely by the physical truncation of the diffuser in the
short dimension, its width.  This would be true for many
common diffuser set-ups.  For example, you would see this in a
diffuser attachment for a camera flash, or the diffusive glass
or plastic often used in a shower stall.  But bending and/or
cutting the material away simply created a condition in which
the viewer could not see the actual scattering pattern of what
would be a symmetrical pattern.

12:26:28    In addition, iLight does not take into account that
the LEDs used by Fallon by themselves produce an elongated
light pattern.  LEDs with such light patterns were known
before the patents were filed and are commonly used.  ILight's
patents require that the rod waveguide preferentially scatter
light to give an elongated, elliptical pattern.  In my
opinion, this requirement is not satisfied by the use of an
LED that itself produces an elongated light pattern.  It is my

opinion, the elongated light pattern produced by an
asymmetrical LED must be preferentially scattered by the rod
waveguide.

12:26:32    And please pull up Exhibit 886.  To further illustrate
this point, I have taken Exhibit 886 and magnified it somewhat
for clarity.  I cropped the upper and lower portions of the
circular diffusion pattern.  And as you can see in the next
slide, Exhibit 887, except for the bright center spot caused
by the laser beam, note the overall similarity between this
exhibit and Exhibit 808 from Roberts' testimony.

12:26:35    Now that you have seen how the Fallon diffuser works,
let me give you some background on how waveguides work.
Waveguide properties are and have been very well known for
many years, long before iLight filed for its patents, and
there can be no dispute about that.  You can think of these as
light pipes.  You put the light in one end, and it travels
down the pipe until it comes out the other end, just like
water in a pipe.  No leaking out the edges.

12:26:38    MR. SAWYER:  Your Honor, Mr. Hathaway has a
demonstration for the jury.  Can he come out of the box,
please?

12:26:39    THE COURT:  Yes, he has leave to step down.  Thank
you.

12:26:39    THE WITNESS:  I would like to demonstrate a waveguide,
a simple waveguide.

12:26:40 1    This is an ordinary acrylic rod, and this is simply a

2    little flashlight.  What I do is shine the light in the end,

3    and you can see if you look this direction you don't see a lot

4    of light coming out, but if you look this direction, it's

5    quite bright.

12:26:42 6    What's happening is the light is coming down in this

7    end and it's piping down, and it's coming out, so that unless

8    you do something, it will just come out the other end.

12:26:43 9    MR. SAWYER:  Is it permissible to give the jury the

10    flashlight and the --

12:26:43 11    THE COURT:  You may pass it without objection.

12:26:43 12    MR. SAWYER:  Thank you.

12:26:44 13    THE WITNESS:  Another type of waveguide is a leaky

14    waveguide.  Just like the waveguide I showed you, leaky

15    waveguides are not new, and a lot was known about them before

16    the patents were filed.  In the case of a leaky waveguide, it

17    is very much like a waveguide except that the surfaces are not

18    smooth or the material is not uniform.  The rough surfaces and

19    the nonuniform makeup of the waveguide causes to light to

20    deviate and leak, as they call it, out of the waveguide, along

21    its length, as opposed to staying trapped and only exiting out

22    the far side.

12:26:48 23    These two phenomena of light bouncing off of small

24    physical defects in or on an optical material are typically

25    known collectively as scattering.  In both of these

situations, the presumption is that, at any specific point along the waveguide, some to most of the light has not been scattered by the defects, and so this light stays in the material and continues to travel down the guide.

12:26:50 Obviously, the leakiness of the waveguide is something that one skilled in the art understands and could easily control to accomplish the desired optical function of the waveguide.

12:26:51 Now consider the class of optical materials and elements commonly known as diffusers. These have been used for many years to help remove structure or the readily discernible brightness variations associated with the physical location of one or more sources of light. Most of the people would identify a diffuser very quickly by its white, milky or translucent appearance. Other examples of diffusers that everyone is familiar with are lampshades, channel lettering and frosted light bulbs.

12:26:55 Diffusers use both surface roughness and material nonuniform to scatter light in some kind of predetermined manner. The characteristic white, milky or translucent occurrence of diffusers comes from how these elements interact with light.

12:26:56 The best way to understand this behavior is to follow a single light ray as it travels through the diffuser. Whether it occurs on the surface of the material or within its

bulk or some combination of these two effects, a diffuser

causes the input light way to emerge from the material with

some definable output distribution.  This distribution is

usually centered on the direction of the ray input angle.

Can you please pull up the next slide?  And this is

demonstrating that point.

A strong diffuser is one which can scatter the input

rays in all directions so that the directions of the original

input rays are completely lost.  This simply means that you

cannot see the light source.  An example of this is a very

good lampshade.  A weak diffuser is one that scatters the

input rays into a much smaller range of output angles, and the

basic directions of the input rays are still maintained to

some extent.  This simply means that you can identify the

light source, or can think about a cheap lampshade where you

can still see the light bulb.

It is the breaking up of the input ray angles from the

light source that gives a diffuser its hiding power -- or its

ability to break up the image of source so that all that can

be seen is a glow without specific form.

Also, it is this breaking up or scattering of the

input light that gives diffusers their whitish appearance.

As you could see from my experiment, the Fallon signs

do not use a waveguide that preferentially scatters light, but

a simple but strong diffuser that scatters light more or less

uniformly.  Therefore, it is my opinion that the Fallon signs

do not use preferentially scattering of light.

12:27:07  Okay.  Now let's talk about another limitation that is

not found in the Fallon signs.  Interior light reflecting

surfaces.

12:27:08  The Fallon designs do not have interior light

reflecting surfaces as defined by the Court.  In fact, all of

the surfaces inside and out are dark and made of the same

plastic.

12:27:09  MR. SCRUTON:  Your Honor, may we approach?

12:27:09  THE COURT:  Yes.

12:27:09  (Whereupon, a bench conference was held, out of the

hearing of the jury, to wit:)

12:27:10  MR. SCRUTON:  I think he substituted dark for black.

12:27:10  MR. SAWYER:  I think Mr. Hathaway probably understood

that Your Honor was concerned with the term "black".  I didn't

instruct him to do so but, if he had black I think he's trying

to follow Your Honor and substitute the word for it.

12:27:11  THE COURT:  Well, if I struck a word, the word is out.

You can substitute a word for it.

12:27:12  MR. SAWYER:  Your Honor, that part wasn't objected to.

That wasn't part of the objections in the script.

12:27:12  MR. SCRUTON:  The objection -- well, --

12:27:12  MR. SAWYER:  That wasn't specific.

12:27:12  MR. SCRUTON:  That wasn't specific.

| | | |
|---|---|---|
| 12:27:13 | 1 | MR. SAWYER:  You are right, Your Honor.  We didn't go |

12:27:13    1          MR. SAWYER:  You are right, Your Honor.  We didn't go

         2     through line by line to strike every time the word "black",

         3     because -- the signs are black.  We can do that.  I think Mr.

         4     Hathaway I don't think there is a discussion whether black

         5     means it is or isn't light reflecting.

12:27:15    6          THE COURT:  This thing is not working.  What do you

         7     say?  The objection to it wasn't earlier objected to.

12:27:16    8          MR. SCRUTON:  I don't have an objection to from,

12:27:16    9     but --

12:27:16   10          MR. SAWYER:  It's not highlighted in my version.

12:27:16   11          MR. SCRUTON:  I'm not sure what page we're on.

12:27:16   12          MR. SAWYER:  Your Honor, black, I don't believe is --

12:27:16   13          (End of bench conference.)

12:27:16   14          THE COURT:  Ladies and gentlemen of the jury, we're

        15     going to take a brief recess.  Please don't discuss the

        16     evidence amongst yourselves until you receive all of the

        17     evidence, the argument of counsel, and the charge of the

        18     court.  It should be a brief recess.

12:27:18   19          (Jury out.)

12:27:18   20          THE COURT:  I don't recall the specific objection to

        21     the use of the word "dark".

12:27:19   22          MR. PRICE:  Well, the word dark was not used in the

        23     script.  He substituted the word dark in place of the word

        24     black, which was in the script.

12:27:20   25          THE COURT:  I don't want any substitution of words.

1    If I struck a word gone, it's gone.

12:27:20    2              MR. SAWYER:  Your Honor, --

12:27:21    3              THE COURT:  If I struck a sentence, it's gone.

12:27:21    4              MR. SAWYER:  Your Honor, and we agree with that.

12:27:22    5              THE COURT:  No, it's not a matter of agreeing, it's a

            6    matter of compliance.

12:27:22    7              MR. SAWYER:  Your Honor, we complied with everything

            8    Your Honor struck.  This was done earlier.  I believe Mr.

            9    Hathaway heard some of our discussion, and I am certain that

           10    he thought replacing the word black --

12:27:23   11              THE COURT:  No, he can't take it upon himself to

           12    decide what goes into evidence.

12:27:23   13              MR. SAWYER:  I understand, and I will instruct him.  I

           14    will tell him not to do that.

12:27:24   15              THE COURT:  Well, that's the purpose of the narrative

           16    so we don't get into these problems.  He follows the Court's

           17    instructions based upon the narrative that was presented.  He

           18    reads from the narrative and he doesn't improvise.  Because

           19    otherwise, we get into the problems we're having now.  He

           20    starts adding things that nobody has known of before.

12:27:26   21              THE WITNESS:  I'm sorry, Your Honor.  I was doing

           22    exactly that, which is -- it was not struck, and I was trying

           23    to comply with what I thought would be objected.

12:27:27   24              MR. SAWYER:  I will instruct him to just read from the

           25    narrative.

12:27:27  1          THE WITNESS:  Yeah, I will just do that.

12:27:28  2          THE COURT:  Bring the jury back in.

12:27:28  3          MR. SAWYER:  Thank you.

12:27:28  4          (Jury in.)

12:27:29  5          THE COURT:  You may be seated.

12:27:29  6          You may continue.

12:27:30  7          THE WITNESS:  It is important to note that all

        8   material that is visible, even a clear window, is both

        9   reflective and absorptive.

12:27:31  10         I think It might be helpful if I give you a little bit

        11  of background on light reflectivity.  In general, there are

        12  two types of reflectivity:  Specular, or mirror-like, and

        13  diffuse.  It is important that whether a surface reflects in a

        14  specular manner or in a diffuse manner, this will not indicate

        15  which surface reflects more light.  In fact, many diffuse

        16  surfaces such as a good, flat white paint will reflect more

        17  total light than a shiny specular mirror surface.

12:27:34  18         In my opinion, because the principal goal and teaching

        19  of the patent is to achieve an uniform neon-like glow, a

        20  diffuse reflective surface would be better than a specular

        21  one.

12:27:35  22         I find Dr. Roberts' analysis of the Fallon sidewalls

        23  misleading.  He reported that the Fallon sidewalls had a

        24  reflectivity of 5 to 5.5 percent.  In my opinion, and anyone

        25  with knowledge of optical properties of materials in general,

1  it would not only -- it would be not only difficult but very

2  expensive to produce any surface with a reflectivity much

3  below five percent.  So, in essence, Dr. Roberts is calling a

4  surface that is less reflective than most common surfaces a

5  light reflective surface.

12:27:39  6      In addition, the difference between the reflectivity

7  of the outer surface of the Fallon signs and the inner surface

8  is only about 5 to 8 percent.  First, this difference is very

9  minimal and would be undetectable to the human eye.  Second,

10  this only demonstrates that both the outer and inner surfaces

11  of the signs are poor reflective surfaces, not that the inner

12  surface is a reflective surface.

12:27:41  13      To demonstrate the unreasonable nature of iLight's

14  position, in my lab I measured the integrated reflectivity of

15  the Fallon Super Bright Open sign's black sidewalls using an

16  integrating sphere.  This method will produce a much more

17  meaningful result than the method Dr. Roberts testified about,

18  because it takes into account both Fresnel surface reflection

19  and the bulk reflectivity of the material.

12:27:44  20      First I removed a section of the black plastic

21  sidewall from the letter N in the Fallon Super Bright Open

22  sign.

12:27:45  23      Next slide, please.

12:27:45  24      In this picture, Exhibit 1080, it shows the instrument

25  that I used and the test set-up for the measurement.

12:27:46 1        This is the integrating sphere, and this is where the

2     actual sample would go.  That's how the measurement was made.

3        The integrated reflectivity of the inner sidewall of

4     the Fallon Super Bright Open sign was measured to be 3.65

5     percent.  This is a very important result, as it proves by

6     direct measurement that the Fallon black plastic sidewalls are

7     truly black.

12:27:48 8        In contrast to the very poor reflective sidewalls, to

9     show you what -- in contrast to the very poor reflective

10    sidewalls, to show you what a reflective sidewall would be to

11    one skilled in the art, I performed another experiment in my

12    lab.

12:27:50 13       First, using a Fallon Open sign, I measured the

14    surface brightness of a nine millimeter spot of the diffuser

12:27:51 15   located in the lower right-hand quadrant of the letter O.

12:27:52 16   Next, I installed reflective surface films on the inner

17    sidewalls of the O around the location of my measured spot,

18    and extending approximately 5.5 inches in either direction

19    away from the spot.

12:27:53 20       With the reflective films installed, the brightness of

21    the spot was remeasured.  The brightness of the diffuser

22    increased approximately 60 percent as a result of the

23    reflective films.  This clearly shows that the Fallon black

24    plastic sidewalls, the intended use of which is strictly for

25    mechanical mounting of the LED printed circuit boards are

quite poor as reflectors.  Recall that Dr. Roberts' test in
which he removed the black plastic sidewalls altogether only
produced an insignificant decrease in the intensity of the
front diffuser.

This result, combined with my test, conclusively
proves, in my opinion, that the Fallon black plastic sidewalls
are quite absorptive rather than being reflective.

It is simply wrong to assume, as Dr. Roberts does,
that because the inner sidewalls of Fallon's accused signs are
somewhat specular that they are also reflective as required by
the claims.

As shown by Dr. Roberts' measurements, these black
surfaces reflect far too little light to meet the reflective
requirement as defined by the Court.

Finally, let's turn to the exterior light absorbing
surfaces.  As I discussed, the Fallon sign uses the exact same
plastic to form the entire body of the sign.  In my opinion,
this plastic cannot be both reflective and absorptive.  The
absorptive surfaces as defined by the Court must absorb light
on the exterior of the sign.  Again, this concept is easily
identified in the picture of the iLight commercial sign.

All but one of the sidewalls identified by the iLight
-- by iLight on the Fallon products cannot be seen when the
sign is being used.  They are all in the interior of the sign.
Therefore, it is my opinion that the Fallon signs do not have

exterior light absorbing surfaces because they don't have

exterior visible surfaces.

12:28:05    I am now going to go through some detail for some of

the Fallon signs.

12:28:05    Each of the signs, although they look generally the

same, are all constructed a little differently.  Each uses a

different amount of LEDs, different colored LEDs, and

different LED spacing.  This, again, confirms my belief that

Fallon's signs are nothing more than back lit signs using a

diffuser.

12:28:07    Could you bring me -- could you hold up Exhibit 728.

This is the Budweiser Bowtie Opti-Neon sign.  It is an

injection molded sign made of hard black plastic.  It has an

upper body and lower body.  Importantly, all of the inner

components of the sign, the inner surfaces of both the upper

and lower body are made from the same black plastic.  The only

difference in the inner and outer surfaces is that the outer

surfaces of the two bodies are patterned, and the inner

surfaces are smooth.

12:28:11    It is my understanding that the inner surfaces are

smooth due to the injection molding process.  In fact, it is

my understanding that if the inner surface contained a surface

pattern, it would be more difficult to remove the plastic from

the mold.  In addition, the outer and inner surfaces of the

upper and lower bodies have nearly identical optical

properties.  The Bowtie has a white hollow translucent
diffuser that covers the openings that spell out Budweiser.
The letters are back lit using white LEDs.

12:28:15    The sign further includes three hollow translucent
diffusers that cover the Bowtie, which are back lit by red
LEDs.  The Bowtie contains no internal housing in which the
LEDs are mounted.  The diffusers are made of a simple plastic
and are hollow or tubular.  The diffuser is thin and not a
rod, nor is it rod-like.

12:28:18    The diffuser material is a translucent plastic
material of relatively constant thickness that scatters light
in all directions equally.  It is, in my opinion, the same as
the diffusive plastic materials used in channel lighting for
many years.

12:28:19    Doug, please hold up Plaintiff's Exhibit 12.

12:28:20    This is the old Budweiser Bowtie Opti-Neon sign.  Like
the Bowtie, it is an injection molded sign made of hard black
plastic, and it's basically the same as the last sign I showed
you.  One difference is, this sign has three white hollow
translucent diffusers that cover the Bowtie, which are back
lit by red LEDs, instead of the red diffuser.

12:28:23    Also, this sign has an inner housing that is black
which connects to the printed circuit boards.

12:28:24    Doug, next hold up Exhibit 13, the Super Bright sign.

This is the Super Bright sign.  Again, this sign is

constructed like the two Bud signs.  The upper body contains

openings in the shape of Open and also includes five

additional openings that make an oval line art shape around

the word Open.

The Super Bright has a red hollow translucent diffuser

that cover the openings that spell out O-P-E-N.  The letters

are back lit using red LEDs.  The sign further includes five

blue hollow translucent diffusers that cover the oval line art

which are back lit by blue LEDs.

Like the Bud signs, the inner projections that seat

the circuit board are not viewable when the sign is fully

assembled.  Therefore, the outside of the surface --

therefore, the outside of the surface of the projections are

not visible when the sign is being used.

Doug, could you hold up Exhibit 725.

This is the Xenon sign, Open sign.  It is an injection

molded sign made of hard black plastic like the other three

signs.  The difference in this Open sign versus the last one

is it is smaller, and you can see all of the diffusers are

white and back lit with colored LEDs.

Now that you have had a chance to see the signs in

question, and we have discussed generally the claim terms at

issue, I want to talk about some specifics.  Although this may

get a little repetitive, it is important that I go through

each claim and compare all the words of the claim against each

product. In doing this, I will point out in each claim the missing limitations in the Fallon signs.

12:28:34 Let's start with the '238 Patent, Claim 8. Please put up the slide.

12:28:35 The procedure I will go through is I will put up first the entire claim.

12:28:35 And now the next one?

12:28:35 And then only the limitations part of it.

12:28:36 Claim 8 requires "a substantially rod-like member". It is my opinion that the accused Fallon signs do not have a rod-like member. In fact, each of the accused devices contains a hollow curved diffuser.

12:28:37 Claim 8 also requires the device prefer "preferentially scatters light entering said light receiving surface into an elongated light intensity pattern".

12:28:38 It is my opinion that the Fallon signs use hollow diffuser that scatter light in all directions equally. Therefore, they do not preferentially scatter the light.

Claim 8 requires having a "pair of sidewalls".

12:28:40 The Bowtie sign does not contain any sidewalls in the lettering portion. By the way, it is important, because for each of the claims that requires sidewalls, signs without sidewalls would be easy to implement in a satisfactory noninfringing alternative.

12:28:41 Claim 8 requires that the sidewalls contain "an

1    exterior light absorbing surface".

2    As I have explained, the exterior light absorbing
3    surface of the sidewall must absorb light on the exterior.
4    All the sidewalls, except for those on the new Bud Bowtie, are
5    hidden between the upper body and lower body of the sign and
6    are not exterior.

7    Since all of the Fallon signs do not have at least the
8    elements described above, they do not infringe Claim 8.

9    Now let's turn to Claim 25.  Can I have the slide?
10   And now the next slide.

11   Claim 25 requires that the light transmitting member
12   "being comprised of a material that has both optical waveguide
13   and light scattering properties".

14   The accused sign has thin hollow diffusers, not
15   optical waveguides.  Claim 25 requires that light transmitting
16   member "preferentially scatters light entering said light
17   receiving surface into an elongated light intensity pattern on
18   said light emitting surface".

19   Fallon's signs do not preferentially scatter light,
20   but instead contain a diffuser that scatters light equally in
21   all directions.

22   Claim 25 requires that the sidewalls have "an interior
23   light reflecting surface".  As discussed, the Bowtie sign has
24   no sidewalls, and, therefore, no interior light reflecting
25   surface.

Like Claim 8, Claim 25 requires that the sidewalls

2    contain "an exterior light absorbing surface".  Further, as I

3    discussed earlier, the exterior light absorbing surface of the

4    sidewall must be exterior.  The sidewalls of the Fallon signs,

5    except for the new Bud Bowtie, are hidden between the upper

6    body and lower body of the sign and are not exterior.

Since all of the Fallon signs do not have at least the

8    elements described above, they do not infringe Claim 25.

Now turn to Patent '262, Claim 1.  And can you put up

10   the next slide please.  And now the focus slide.  Claim 1

11   requires "an essentially solid, leaky waveguide rod".

The Fallon signs do not have a waveguide rod as

13   defined by the Court.  Claim 1 requires having a housing

14   positioned externally and adjacent to said waveguide rod and

15   defining a volume that encompasses said elongated light

16   source.  The Bowtie sign does not have such housing on the

17   letters.

Claim 1 requires that the "light is preferentially

19   directed along the predetermined length of the leaky waveguide

20   rod exiting said light emitting surface in an elongated light

21   intensity pattern.  In my opinion, this term has the same

22   meaning as preferentially scatter, the hollow diffusers on --

THE COURT:  Ladies and gentlemen of the jury, the

24   Court is going to instruct you to disregard the last remark,

25   statement of the witness.

12:28:58    1          You can start with your next sentence.

12:28:58    2          THE WITNESS:  Okay.

12:28:59    3          All of the Fallon signs do not have at least the

            4    elements described.  They do not infringe Claim 1.

12:28:59    5          Now let's look at Claim 8.

12:29:00    6          First, Claim 8 is dependent on Claim 1.  As you know,

            7    in order to infringe Claim 8, the signs must have all of the

            8    elements of Claim 1, plus the elements in Claim 8.  As I have

            9    just told you that the signs don't infringe Claim 1, they

           10    can't infringe Claim 8.  However, I will go through the

           11    limitations found in Claim 8.

12:29:02   12          Can I have the slide?

12:29:02   13          Claim 8 requires "said sidewalls have externally light

           14    absorbing surfaces".

12:29:03   15          As I have already discussed, the sidewalls must be on

           16    the exterior of the device.  The sidewalls of the Fallon

           17    signs, except for the new Bud Bowtie, are hidden between the

           18    upper body and lower body of the sign and not external.

12:29:04   19          Since all of the Fallon signs do not contain at least

           20    the elements of Claim 8 and those found in Claim 1, they do

           21    not infringe Claim 8.

12:29:05   22          Now turn to the last patent, the '970 Claim 1.

12:29:05   23          Can I have the slide?  And now the next slide?

12:29:06   24          Claim 1 requires "a rod-like member".  As discussed,

           25    the Fallon signs do not have such a rod.  In fact, each of the

accused devices contains a hollow curved diffuser.  Since the Fallon signs do not have at least the elements described, they do not infringe Claim 1.

Now let's look at Claim 5.

Can I have the slide?

Claim 5 requires "an essentially solid, leaky waveguide rod".  As discussed, the Fallon signs do not have such a waveguide rod.  In fact, each of the accused devices contains a hollow curved diffuser.

Since all of the Fallon signs do not contain at least the elements described, they do not infringe Claim 5.

Now let's look at Claim 8.

Can I have the slide?  And the next slide?

Claim 8 requires "a rod-like member".  As discussed, the Fallon signs do not have such a member.  In fact, each of the accused devices contains a hollow curved diffuser.

Since all of the Fallon signs do not contain at least the elements described, they do not infringe Claim 8.

Now I want to talk about invalidity.  As I have told you, it is my opinion that the iLight patents are invalid as anticipated by the Slayden patent.  The Slayden patent, which is assigned to Lektron, another lighting company, disclosed each and every element of the iLight patents before iLight applied for its patents.  The actual Lektron device, as you will see, also functions in exactly the same way as the iLight

patents claim is new and would be a noninfringing alternative.

As I have told you, iLight argued to the Patent
Office --

THE COURT:  Excuse me.  Ladies and gentlemen of the
jury, you are going to hear some reference to some Lektron
products.  The Court is going to instruct you, as I stated
earlier, there will be times during the course of the trial
when evidence is admitted for a limited purpose.  This is one
of those instances.

The testimony about Lektron products related to the
Slayden patent is introduced and to be considered by you for
the limited purpose of whether there is a noninfringing --
whether this Lektron product is a noninfringing alternative,
and whether the Slayden patent works for signage, which is the
principal product at issue here.  The Lektron product was
produced after iLight filed for its patent in this case, and
that is the purpose for which it is being admitted.  Very
limited purpose.

Any objections to the instruction?

MR. KITTREDGE:  No, Your Honor.

MR. SAWYER:  No, Your Honor.

MR. SCRUTON:  No, Your Honor.

THE COURT:  All right.  You may continue.

THE WITNESS:  Thank you, Your Honor.  As I have told
you, iLight argued to the Patent Office that the Slayden

patent was different than it was claiming, and now iLight and
Dr. Roberts have retreated from those arguments.  In fact, if
you use Dr. Roberts' infringement analysis in a consistent
manner, the patents have to be invalid.  You just cannot apply
the patents the way Dr. Roberts does, find infringement,
without capturing the prior art.

The easiest way to see iLight's inconsistency is with
a reference to the Slayden patent.  As you have heard, iLight
now argues that Fallon's thin walled diffusers are covered by
its patent claims.  But iLight told the Patent Office that
Slayden's simulated neon light was different than iLight's
patents because Slayden only disclosed a thin walled diffuser,
and iLight's invention required a solid rod waveguide.

Let me show you really quickly what I mean.

Please put up the slide.

As you can see, the Fallon signs use a thin walled
diffuser, and there is no rational scientific difference
between it and the diffuser disclosed by Slayden's simulated
neon light patent.

There are other important details that I will discuss
later.  But next I would like to give you a broader picture of
my invalidity opinion.

I will begin my analysis with giving you a summary of
what was known prior to the time iLight filed its patents.

As I have already explained, the term "waveguide" has

a specific well-known meaning to one schooled in the art.  A
waveguide with scattering properties, part of a broader
category of components or devices sometimes identified as
leaky waveguides in the art, was also well known and disclosed
in many prior art patents.

To be clear, iLight did not invent leaky waveguides --
excuse me, invent rear lit leaky waveguides, LEDs, reflective
sidewalls, diffusers or simulated neon.  All of these concepts
had been in the past -- had been used in the past.  In fact,
all of these elements were well understood and had very
predictable uses, and any combination of such elements will
produce an expected result.

Please pull up Exhibit 77.

We are now -- now we already talked about the Slayden
patent during the noninfringement portion of my testimony and
how iLight told the Patent Office its concept was somehow
different.  If you look at the application date, which is on
the first page, you can see the patent was filed on August 2,
2000, which is before the filing date of the iLight patents.

Keep this in mind during this discussion, the key
elements iLight highlighted to the Patent Office were:  Solid
rod, preferentially scatters light, and light reflective
surfaces.

Let's take a closer look at what the Slayden patent
discloses.

First, note the title of the patent:  Simulated neon

light using LEDs.  Therefore, we know for sure that iLight did

not invent simulated neon lights.  And especially did not

invent simulated neon lights using LEDs in a channel with a

round plastic member.

An important point that appears to have been missed by

the Patent Office is that Slayden actually teaches a

configuration that would behave exactly as described in the

patents-in-suit -- a diffuser that acts as a combined optical

waveguide, again, as described in the iLight patents and as a

scatterer.  This is now a very important fact, considering how

Dr. Roberts and iLight are now asserting that the thin

diffuser that Fallon uses is somehow different than the

diffuser used in Slayden.

In fact, Slayden correctly and quite accurately

describes the iLight waveguide and light scattering functions

in the Slayden patent specification.

First, let's consider the scattering function.

If we look at Column 1, Line 41, Slayden describes the

diffuser as translucent.  The term translucent refers to the

milky appearance, which is common in diffusers.  In addition,

we can look at Column 4, Lines 45 through 53, stating the

light is refracted.  The term refracted in this case has the

same meaning in my opinion as scattering, only in Slayden the

light must refract through the walls of the diffuser two

times.

THE COURT:  Ladies and gentlemen of the jury, the
Court is going to instruct you to disregard the last reference
to the meanings of claims.  As the Court told you at the
outset of this case, there are two aspects of this Case.  One
is the construction or interpretation of claims.  The other
one is whether the defendant's product, in fact, infringes
upon the claim.  So any testimony concerning what a claim and
a patent means is a question for the Court, not for the
witness.

12:29:54  You may continue.

12:29:54  THE WITNESS:  Thank you, Your Honor.

12:29:55  Only in Slayden the light must refract through the
walls of the diffuser two times -- once on the way into the
bottom portion of the diffuser, facing the light source, and
once on the way out of the upper portion of the diffuser on
the way out toward the viewer.

12:29:56  This transition through the diffuser will scatter or
refract the light and to obscure the particular light source.

Could you please pull up the next slide.

12:29:57  So in this slide we have highlighted some language in
the patent that describes the light scattering properties, and
there are many more examples of this language in the Slayden
patent.

12:29:58  Now let's look at the Slayden patent again.

12:29:59  1          Please pull up Exhibit 77 and go to Column 4, Lines 48

        2   to 50.

12:30:00  3          It describes the iLight waveguide function.  It says:

        4          In addition, the inner and outer walls of the diffuser

        5   10 provide reflective light through the cross section of the

        6   tube, 11.

12:30:01  7          This is exactly the light directing properties claimed

        8   in the patents-in-suit.  You will remember, the waveguide or

        9   light directing function is reflecting the light to keep it

       10   within the waveguide as it travels the length of the

       11   waveguide.

12:30:03  12          So Slayden has explicitly described both waveguide and

       13   scattering properties.

12:30:03  14          Would you pull up the Slayden summary slide?

12:30:03  15          Let's look one more time to the Slayden patent.

       16          Please pull up Exhibit 77.  And again go to Column 4,

       17   Lines 51 to 53.

12:30:04  18          It describes in the very same sentence these two

       19   properties that iLight claimed was new.  It is believed that

       20   this combination of reflected and refracted light in the

       21   translucent tube is what affords the neon-like glow of the

       22   fixture.

12:30:06  23          Please pull up the Slayden summaries slide.

12:30:06  24          Now we have seen that the Slayden patent describes

       25   both waveguide and light scattering properties.  To put that

into terms consistent with the iLight patents, this would be preferentially scattering light.

12:30:07 It is my opinion that the Slayden diffuser as described in the Slayden patent would exhibit both waveguide and diffuser properties and that is, it would preferentially scatter light.

12:30:09 Now let's look at the mechanical set-up of the Slayden device.

12:30:09 Please put up the next slide.

12:30:10 In this slide you can see that the Slayden device is set up in the same way as the iLight patents. In the slide you can see that Slayden shows a row of LEDs in a channel below a rod-shaped member. The channel has sidewalls, and the patent tells us it simulates neon. The Slayden patent does not specifically mention that its sidewalls are reflective, however, as I've already discussed, the way Dr. Roberts and iLight are applying that in this case, in my opinion, any sidewall would meet that limitation.

12:30:13 Now I have just explained that Slayden by itself discloses all of the limitations that the iLight patents claim. But for the record, I need to march through each of the claims of each of the limitations step by step. Again, just bear with me while I do that. I am going to use a chart that I prepared, because I think it will make it easier for to you follow along. Let's take a look at the chart.

1          Please pull up Exhibit 742.

2          This is a claims comparison chart.  On the left will

  3  be the iLight patent, and specifically claims broken up into

  4  little pieces of the claims as it reads.  And then on the

  5  right will be our answer to where we find that same function

  6  in the prior art.

7          If you look at this chart -- and I will read it for

  8  you -- it is my opinion, as one skilled in the art, that

  9  Slayden alone invalidates the patents.  In addition, it would

 10  have been obvious to one skilled in the art to combine the

 11  other patents listed on this chart with the Slayden patent to

 12  come up with all of the elements of the asserted claims.

13          Some of the other patents I rely on in finding the

 14  iLight patents are invalid as obvious are --

15          Would you please pull these up for the jury.

16          Exhibit 73, U.S. Patent Number 4,901,207.

17          Exhibit 75, U.S. Patent Number 6,481,380.

18          Exhibit 748, U.S. Patent Number 6,244,734.

19          Exhibit 76, U.S. Patent Number 6,354,714.

20          And Exhibit 74, U.S. Patent Number 5,016,143.

21          Now please put back up Exhibit 742.

22          So we have on the left, this is the '238 iLight '238

 23  Patent, Claim 8.  And it says, "an illumination device for

 24  simulating neon lighting, comprising".

25          And you see in the Slayden patent, it states, "in

accordance with the invention, the neon light was simulated

using light emitting diodes as a light source".  I consider

those to be the same thing.

12:30:28  "A substantial rod-like member".

12:30:30  If you look at Figures 1 and 2, it shows an obvious

rod-like member in the Slayden patent.

12:30:30  "Having a predetermined length".

12:30:31  In the Slayden patent, it makes a reference to

"preferably the length -- the lights will be constructed in

modular lengths, etc., etc."  So it's clearly predetermined.

12:30:32  "With a lateral light receiving surface and a lateral

curved light emitting surface having a predetermined

circumferential width".

12:30:33  And Slayden says, "An elongated translucent diffuser

of circular cross section".

12:30:33  Also, you can look at the figures in the patent, which

we aren't putting up, if you have them available to you.

12:30:34  Next, "said member being comprised of a material that

has both optical waveguide and light scattering properties

that preferentially scatters light entering said light

receiving surface into a light intensity pattern with a major

axis extending along said predetermined length".

12:30:36  In the Slayden prior art, it talks about "the

plurality of light emitting diodes aligning the linear array

in the chamber, the plurality of diodes is connected in the

electrical power source.  The light emitting from the diodes

can only pass from the chamber into the wall of the diffuser".

So clearly they are making direct reference to the

same thing.

And also, we find similar -- in other prior art, we

find the same type of disclosure.

MR. SCRUTON:  Your Honor, may we approach for a

moment, please.

(Whereupon, a bench conference was held, out of the

hearing of the jury, to wit:)

MR. SCRUTON:  I'm concerned that we're off script.

This is the portion that he said.  Exhibit 752, and now he's

proceeding to read this chart and editorializing.

MR. SAWYER:  Our understanding at the pretrial

conference, that one of the things I think the plaintiff

requested is that we give the experts a little bit of leeway

to explain the charts.  And this is a very important part of

my understanding, Your Honor.

THE COURT:  I think both sides had a little latitude.

MR. SCRUTON:  We had a very, very lengthy discussion.

MR. SAWYER:  Your Honor, this has been represented to

the jury anyway.  He's not going to read it word for word, and

we don't want him to, Your Honor, because we're comparing.

THE COURT:  My concern is he's getting at the context

of the claims.  The contexts are not in exhibit.

MR. SAWYER:  Well, he asked to define -- he has to

²      conclude that Your Honor claim interpretation.  He needs to

³      explain where in his opinion Your Honor's claim construction

⁴      is found in the prior art.  He is not trying to redefine

⁵      claims.  He's trying to say these things in the prior art meet

⁶      these limitations.  He really has to do that.

THE COURT:  Interpreting claims of the patent.  The

⁸      claims in the patent are not claims in the --

MR. SAWYER:  He's trying to use your claim

¹⁰     interpretation to show it's found in the prior art.  He's not

¹¹     interpreting the claims.  He's disclosing specifications,

¹²     discloses the same elements that Your Honor already --

THE COURT:  That's interpreting what the Court's

¹⁴     definition is.

MR. SAWYER:  Your Honor, in order to find obvious

¹⁶     anticipation, one skilled in the art has to find --

THE COURT:  I'm going to take a break.

(Conclusion of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, we're

²⁰     going to go ahead and take our luncheon recess.  Please don't

²¹     discuss the case amongst yourselves until you receive all of

²²     the evidence, the argument of counsel and the charge of the

²³     Court.  You can leave your notebooks on your chairs.  You can

²⁴     pass your note pads to the Marshal.  He will take custody of

²⁵     them until you return.  If you will report upstairs, then the

1    Marshal will come get you when we are ready for you

2    downstairs.  Thank you.

12:30:53  3           (Jury out.)

12:30:54  4           The court:  Are there any matters before we take a

5    recess?

12:30:54  6           MR. VEZEAU:  One thing, Your Honor.  Your Honor, that

7    was my cell phone, and I apologize to the Court.

12:30:55  8           THE COURT:  Under our local rules they are not

9    supposed to be active.

12:30:55  10           MR. VEZEAU:  Yes, I apologize, Your Honor.

12:47:41  11           THE COURT:  Any other matters?  We're in recess.

13:00:16  12           (Recess.)

13:00:44  13           THE COURT:  Are there any preliminary matters?

13:00:48  14           MR. SAWYER:  Just one minor one, Your Honor.  The

15    parties have talked, and that chart that we were discussing at

16    the -- when Mr. Hathaway resumes, I will let the jury know

17    that we're going to enter into evidence and we can move on to

18    sort of move things along and also take care of some of your

19    other questions you had about the chart.

13:01:11  20           THE COURT:  Any matters from the plaintiff?

13:01:15  21           Concerning the Court's earlier remark about whether

22    Slayden would be an expert, I'm persuaded by the opinion in

23    Hynix Semiconductor Inc. v. Rambus Inc. 2009 Westlaw 230039

24    from the Northern District of California, January 27, 2009,

25    that an inventor could be someone who was ordinarily skilled

in the art without being an expert.  At least that's the gist
of what I get from it.  And so I don't think that Slayden
would be an expert.  So that aspect of the issue is resolved.

The question that I had, and the reason I struck a
statement made by the expert, and we had this issue at the
bench conference, is my understanding of federal circuit law,
this is <u>Sundance Inc. v. Demonte Fabricating Limited</u>, 550 F.3d
1356 at 1364, note six, where they are talking about expert
testimony in these cases.  And this was in the context of
obviousness.  And they make a reference to the fact that
whether a qualified expert could testify -- I'm quoting now --

Whether a qualified expert could testify as to the
ultimate question of obviousness is, of course, left to the
discretion of the District Court.  We note, however, that our
court has held that allowing a witness to testify before the
jury on claims construction would be improper.  Citing another
authority of the federal circuit, <u>Cytologix Corp. v. Ventana</u>
<u>Medical Systems Inc.</u> 424 F.3d 1168, 1172, noting that, quote:

The risk of confusing the jury is high when experts
opine on claims construction before the jury.  So whenever I
heard the witness testifying as to -- I think that he can
testify as to whether some technical fact qualifies under what
the Court has defined.  But I heard him testifying as to what
one claim was in one patent and one claim was in another
patent, and to me that's claim construction.  And that's the

```
 1    part I thought was not proper.  So I don't know if that

 2    provides additional guidance to you all on your witness or

 3    not.

13:04:06  4         MR. SAWYER:  It does, Your Honor.  We agree that the

 5    expert is not going to testify about claim construction.

13:04:14  6         THE COURT:  Well, some of his language struck me as

 7    the functional equivalent.  So I just wanted to explain the

 8    rationale for the Court's ruling so you wouldn't think I was

 9    being arbitrary with you.  Call the witness.

13:04:50 10         You can bring the jury in.

13:04:53 11         (Jury in.)

13:05:19 12         THE COURT:  You may be seated.  All right, ladies and

13    gentlemen of the jury, we'll resume with the presentation of

14    this witness.

13:05:24 15    CONTINUED DIRECT EXAMINATION

13:05:24 16    BY MR. SAWYER:

13:05:27 17         Q.    Before we begin your narrative again, Mr.

18    Hathaway, we were discussing Exhibit 742, which is a chart you

19    prepared that summarizes some of your points here.  And the

20    parties have agreed that we'll just enter that into evidence

21    for the jury to review, and you won't have to go through it

22    this afternoon with the jury.  So that will be into evidence.

23    And now you can continue with your narrative, following that

24    section.

13:06:09 25         A.    Okay.  Thank you.  Now that I have shown you
```

what the Slayden patent discloses, I want to show you an

actual light which is marked with the Slayden patent.  I will

call it the Lektron light.

13:06:30  Judge, may I show that to the jury?

13:06:30  THE COURT:  All right.

13:06:31  THE WITNESS:  ILight Exhibit 732.  May I show this to

the jury?

13:07:18  THE COURT:  Yes, sir.  Without objection, you may pass

the exhibit to the jury.

13:07:37  THE WITNESS:  I ran a number of tests on the Lektron

light that demonstrate my points.  First, I want to plug it in

and show you how it works.

13:07:50  Actually, why don't we -- should we let them finish?

13:07:50  BY MR. SAWYER:

13:07:53  Q.    We'll let the jury look at it, and we'll plug

it in in a minute.

13:07:56  A.    Perhaps I should wait.

13:07:58  Q.    No, go ahead.

13:08:02  A.    As you can see, the light produces a neon light

glow.  This would be a noninfringing alternative to simulate

neon.  Remember, this product has the Slayden patent number on

it, but was likely made after the iLight patents were filed.

13:08:27  First I want to talk about rod or rod-like.  It is key

to recognize that the Lektron diffuser is similar in thickness

to the Fallon diffusers.  Since iLight is now telling you that

Fallon's thin diffuser infringes, while the one disclosed in
       the Slayden patent is different, they are making arguments
       that in my opinion fit the common sense of science.  Given the
       physical similarity between the Slayden patent's arch shaped
       diffuser and Fallon's arch shaped diffuser, as a matter of
       science and common sense, we should apply the claims in a
       consistent manner.  If we can't, there is something wrong.
              There is one LED removed from there.  There is a dark
       spot in the middle.  It's because there is an LED removed.
              Please pull the next slide.
              In this chart you can see how thick the diffuser of
       each product is.  You can see from the chart that the Lektron
       diffuser is 0.055 of an inch thick.  The Fallon diffuser is of
       similar thickness at 0.078 of an inch thick.  But remember
       that the light must travel through two thicknesses of the
       Lektron diffuser before it emerges to the outside.  Therefore,
       the minimum total thickness of the Lektron diffuser is 0.110
       of an inch, which, of course, is even thicker than the Fallon
       diffuser.  Compare those thicknesses with the iLight
       waveguide, which is seven times thicker at 0.56 of an inch
       thick.  These measurements in my opinion clearly demonstrate
       the difference between a solid rod and thin diffuser.  In my
       opinion, you cannot call a Fallon diffuser a solid rod and not
       call slayden's patent diffuser a solid rod.
              Next I want to talk about preferentially scatters.

13:10:57  1   This is another important point.  First, you will recall Dr.

2   Roberts makes a big deal about how in the Fallon signs if only

3   a single LED is illuminated, there appears to be an oblong

4   pattern of light on the diffuser.  I showed you earlier that

5   the Fallon diffuser does not preferentially scatter light if

6   you use a larger piece of plastic.  However, if you do the

7   same experiment, that is, light a single LED with the Lektron

8   device, which uses the same mechanical set-up as the Slayden

9   patent, you get the very same oblong or elongated light

10  pattern.

13:11:43  11      The LED pitch in the Lektron device is 0.60 of an

12  inch, which, as can be seen in this next slide, is

13  significantly smaller than the length of the region of what

14  appears to be relatively uniform glow through the output

15  portion of the diffuser.  And by this I mean if you were to

16  measure the bright uniform spot right there, that is larger

17  than the pitch between two LEDs.

13:12:29  18      I observed and this slide shows that the Lektron

19  device produces an oblong light pattern.  In addition, I

20  observed that this design has no problem achieving excellent

21  brightness uniformity, and the LEDs are completely

22  unperceivable from all viewing angles.

13:12:54  23      Now compare this slide to Figure 7 of the patents.

24  Again, oblong.

13:12:59  25      For this next slide you see Lektron device appears to

have the elliptical output consistent with the claim term
preferentially scattering.

13:13:12 Next I want to talk about light reflective surfaces.
As you will recall, any surface that you can see will be
reflective.  The Fallon signs all have black plastic housings,
and you can see them.  They are reflective in the simple
broadest sense of the word.  The term reflective is so broad
as to capture the Fallon signs if the -- excuse me.  If the
term reflective is so broad as to capture the Fallon signs,
then again, the Slayden patent has to also have reflective
sidewalls.

13:13:45 Now if you recall from my discussion regarding
infringement, I tested the inner wall of the Fallon sign to
determine its reflectivity.  Again, I remind you that I found
that the sidewalls were very poor reflective surfaces -- in
fact, so bad, roughly 3.65 percent, that you would have to
spend a lot of money and effort to come up with a worse
reflective surface.

13:14:14 So, now that we are looking at the Lektron device, you
might want to know how reflective its sidewalls are.

13:14:21 Well, good question.  I repeated this same measurement
using the plastic housing of a sample of the Lektron device.
You can see in the set-up of the test I ran in the next slide,
which is the same test I ran on the Fallon inner walls.

13:14:42 In this case, this is the part that was measured.  A

closer look at the actual test data shows an even more

significant result.

13:14:58    Next slide, please.

13:15:02    In this next slide I graphed the reflectivity of both

the Lektron sidewall and the Fallon sidewall.  As you can see

in the yellow-green-blue region of the visible spectrum, the

Fallon and Lektron sidewalls have nearly identical

reflectivity.  Both were very poor reflective surfaces.  But

as the color is shifted into the red portion of the spectrum,

the Lektron housing sidewalls become much more reflective,

rising to over 60 percent reflectivity.

13:15:39    This is expected since the Lektron LED simulated neon

product uses red LEDs and produces a deep red output color,

simulating a red neon light.  Therefore, in the spectral

region of red, the Lektron sidewalls are quite reflective.

However, as you see in the graph, the Fallon sidewall

remains very consistently nonreflective, even in the red

portion of the spectrum.

13:16:06    I want to thank you for your attention, and I will

take only a few more minutes of your time, but I do want to

give you a short summary of my opinions in this case.

13:16:16    Could you pull up the last slide, please.

13:16:19    First, as I have told you, it is my opinion that the

Fallon signs do not infringe the iLight patents.  I have

formed my opinion because the Fallon signs do not have a solid

1   or rod-like waveguide.  Instead, they use a thin walled

2   diffuser.  The Fallon signs do not preferentially scatter

3   light.  They use a use simple diffuser -- again, like Slayden

4   and many other prior art signs.  The Fallon signs do not have

5   light reflective surfaces.  The Fallon signs that do have

6   sidewalls have black plastic channels which are no more

7   reflective than the outer surfaces.

13:17:03  8   The Fallon signs do not have exterior light absorbing

9   surfaces.  Again, the Fallon signs use the same plastic inside

10  and outside of their sign.  So the same material cannot be

11  both reflective and absorptive.  In addition, the signs'

12  absorptive sidewalls are not exterior.

13:17:20  13  It is also my opinion that the iLight patents are

14  invalid as both anticipated and obvious.  I base these

15  opinions on the disclosures of Slayden as well as the other

16  patents I have talked about.

13:17:31  17  In addition, these opinions are especially true in

18  light of Dr. Roberts and iLight's testimony in this case.  It

19  is my opinion their testimony ignores many of the arguments

20  iLight was forced to make to distinguish the iLight concept

21  from the prior art, including and especially Slayden.

13:17:49  22  Again, I want to thank you for your attention.

13:18:07  23  THE COURT:  You may cross examine.

13:18:07  24  CROSS EXAMINATION

13:18:08  25  BY MR. SCRUTON:

13:18:13   1          Q.       Good afternoon, Mr. Hathaway.

13:18:14   2          A.       Good afternoon.

13:18:17   3          Q.       My name is John Scruton, and I represent

4    iLight. First I'd like to talk to you a little bit and ask

5    you a few questions about your background in patents. Now,

6    you are not an expert in patent prosecution, are you?

13:18:22   7          A.       No, I am not.

13:18:24   8          Q.       And you have never worked at the Patent Office?

13:18:27   9          A.       No, I have not.

13:18:30  10          Q.       Have you ever examined a patent to determine

11    whether it was a patentable invention?

13:18:37  12          A.       By examined, do you mean in a legal sense?

13:18:40  13          Q.       Well, to determine whether a patent should be

14    granted, something that a patent examiner would do?

13:18:47  15          A.       No.

13:18:51  16          Q.       And you have had a couple of patents issued.

17    Did you do the prosecution work on those yourself?

13:18:56  18          A.       No, I did not.

13:18:58  19          Q.       Okay. So you had an attorney who was dealing

20    with the Patent Office; correct?

13:19:01  21          A.       That is correct.

13:19:05  22          Q.       And you are not a registered patent agent?

13:19:06  23          A.       No, I am not.

13:19:11  24          Q.       You are familiar with the fact that a patent

25    application has an examiner assigned to it to determine

whether a patent should issue on the application; correct?

13:19:19    A.    Yes.

13:19:22    Q.    And are you familiar with the fact that those
examiners are arranged into sections so that they are dealing
with a particular type of technology so they become familiar
with that type of technology?

13:19:39    A.    Yes.

13:19:42    Q.    And -- well, in prosecuting your patents, do
you recall whether you got office actions?

13:19:47    A.    Yes.

13:19:51    Q.    Do you understand those to be common in
prosecuting patent applications?

13:19:54    A.    Yes, I do.

13:19:57    Q.    Can you tell us just briefly what an office
action is, to your understanding?

13:20:03    A.    That is where the patent examiner sends a
response to your application and is issuing the objections
and/or rejections of the claims that you are making and the
reasons why.

13:20:20    Q.    Okay.  So he or she has initially rejected or
refused issuance of a patent, and then you have a chance to
make changes or arguments; correct?

13:20:32    A.    That's correct.  I'm sorry, I need to
interrupt.  I have been involved in one situation where I was
interacting with the patent examiner.  That's in reference to

```
 1    an answer I gave you previously.

 2           Q.    Okay.  Was that in reference to one of your

 3    applications?

 4           A.    Yes.

 5           Q.    And did you find the examiner to be thorough?

 6           A.    Yes.

 7           Q.    Now, in this case, we've talked -- well, we

 8    talked a fair amount about the Slayden patent, and I'm sure

 9    you will talk some more about it.  Did you happen to notice

10    who the examiner was on this Slayden patent?

11           A.    I don't recall.  I didn't notice.

12           Q.    Okay.  Could you bring up Exhibit 77, please.

13    And in the column on the left, just down at the bottom of the

14    writing, can you expand that, please.

15           Okay.  This one has a primary examiner who is Thomas

16    Sember.  Do you see that?

17           A.    Yes, I do.

18           Q.    Do you happen to know who the examiner was on

19    the iLight patents?

20           A.    No, I do not.

21           Q.    Okay.  Could you bring up Exhibit 1, please.

22    All right.  Let's go to the next page.  There, that's the one.

23    And could you blow up that same part, please.  I'm sorry.

24    Actually, I think it's in a different spot here.  Okay.  The

25    page before.  And it's in about the center of the right-hand
```

```
 1    column.  All right.
 2         And once again, primary examiner, the same fellow,
 3    isn't it?
 4         A.    I see that.
 5         Q.    So it's fair to say the examiner examining the
 6    iLight patent application was aware of the Slayden patent;
 7    correct?
 8         A.    That seems correct.
 9         Q.    It seems likely that he was very well aware of
10    the Slayden patent and knew how it worked, wouldn't you agree?
11         A.    That seems reasonable.
12         Q.    So insofar as you have suggested that iLight
13    had gotten an application that was obvious because -- obvious
14    of over Slayden because both inventions have a rod, both have
15    a housing, both have an LED.  Those are all things that Mr.
16    Sember would have been well aware of, wouldn't you agree?
17         A.    That seems reasonable, yes.
18         Q.    Are you familiar with the presumption of
19    validity of an issued patent?
20         THE COURT:  That's a legal term of art, isn't it,
21    counsel?
22         MR. PRICE:  Well, it goes to the burden of proof of
23    somebody --
24         THE COURT:  I know that, but do you want to rephrase
25    your question?
```

MR. SCRUTON:  Okay.

BY MR. SCRUTON:

Q.    Well, in coming to your opinion that the iLight

4  patents are invalid, did you account in any way for the

5  presumption of validity?

A.    Is that a legal question?

Q.    Well, it's a question for -- you did the

8  analysis, you concluded --

THE COURT:  What, if any, effect -- what, if any,

10  consideration did you give to the fact that the Patent Office

11  patented it?

THE WITNESS:  I considered that to be an important

13  aspect of the -- of why the patent was issued.

THE COURT:  Does that answer your question?

BY MR. SCRUTON:

Q.    And what weight, if any, did you give that in

17  your determination that you thought these patents were

18  invalid?

A.    I guess that started as my starting point.

Q.    Are you familiar with the reexamination process

21  in patents?

A.    The legal part of the process?  No.

Q.    Are you familiar with the existence and the

24  general nature of the process?

A.    I know it exists.  I've never been involved in

```
                 it directly.
13:25:23    2         Q.    Are you familiar with the fact that anybody who
            3    believes a patent has been wrongly issued can ask the Patent
            4    Office to have a second look at it?
13:25:33    5         MR. SAWYER:  Your Honor, could we approach?
13:25:37    6         THE COURT:  Yes.
13:25:41    7         (Whereupon, a bench conference was held, out of the
            8    hearing of the jury, to wit:)
13:25:46    9         MR. SAWYER:  He's going to try and make an argument to
           10    the jury here that Fallon could have gone to the Patent Office
           11    to try and get this patent reexamined.  They brought the
           12    litigation.  This is a patent infringement case.  There has
           13    been no discussion by Mr. Hathaway about reexamination and
           14    some other legal process that the parties could have chosen
           15    but didn't.  This seems well outside the scope of an expert
           16    and certainly is not relevant and very prejudicial because the
           17    jury doesn't understand what exactly that means.  Whether we
           18    have an obligation to do it, whether we choose to do it, what
           19    the burdens are.  It's a totally different legal process.
13:26:35   20         MR. SCRUTON:  I'm willing to withdraw the question,
           21    Your Honor.
13:26:36   22         (End of bench conference.)
13:26:37   23         THE COURT:  Ladies and gentlemen of the jury,
           24    disregard the last question.
13:26:40   25    BY MR. SCRUTON:
```

13:26:44  1          Q.      Now, are you familiar with what we call the

        2    preferred embodiment in patents?

13:26:48  3          A.      Yes.

13:26:52  4          Q.      And can you explain generally what that is?

13:26:56  5          A.      That is the version of the invention that the

        6    inventor or inventors consider to be the most important of the

        7    various -- of the variations that would be possible on their

        8    idea.

13:27:11  9          Q.      And is that typically something that they

       10    disclose in the patents?

13:27:18 11          A.      I believe so.

13:27:29 12          Q.      Do the drawings typically go to the preferred

       13    embodiment in your experience?

13:27:30 14          A.      In my experience, yes.

13:27:34 15          Q.      But the scope of the patent is determined by

       16    the claims, wouldn't you agree?

13:27:39 17          A.      It's my understanding that the scope of the

       18    patents is the claims as well as the entire patent is.  So all

       19    of the patent has to be taken into account.  But the claims

       20    are by far the most important single aspect.

13:27:55 21          Q.      Would you agree that the fact that an invention

       22    incorporates a number of previously known elements does not

       23    prevent it from being patentable?

13:28:04 24          A.      I agree with that.

13:28:09 25          Q.      So the fact that simulated neon lighting was

not invented by iLight doesn't prevent iLight from obtaining a
patent on a particular type of simulated neon lighting?

13:28:18    A.    That's correct.

13:28:20    Q.    And the same with the use of LEDs.  The fact
that they were previously known doesn't mean that all uses are
obvious?

13:28:31    A.    That's correct.

13:28:42    Q.    Now, could you bring up Exhibit 77 again.  And
let's see.  I don't have a page cite for you, but I think it's
about the third page in.  I would like to get to the figures.
Okay.  That's good.  Well, let's be on to the next one, next
page.

13:29:00          You see Figure 4 there.  And we've seen that figure a
number of times.  Now, Mr. Slayden in his patent talks about
his diffuser having a circular cross section.  Are you
familiar with that?

13:29:17    A.    Yes.

13:29:21    Q.    In fact, a circular cross section is in the
claims; correct?

13:29:22    A.    Yes.

13:29:25    Q.    And would you consider Figure 4 to have a
circular cross section?

13:29:29    A.    In a general sense, yes.

13:29:39    Q.    Okay.  Now, let's back up to the previous page.
Okay.  And would you agree that this has a circular cross

section?

13:29:48   A.   Yes.

13:29:58   Q.   Would you bring up Exhibit 29 TT, please.  Do
you recognize this?

13:30:00   A.   Yes, I do.

13:30:01   Q.   And what is that?

13:30:05   A.   That is an end-on view of the -- I believe it's
the Opti-Neon sign that's a diffuser from the Fallon Opti-Neon
signs.

13:30:17   Q.   So that would be one of the Budweiser Bowtie
signs that we have seen; correct?

13:30:19   A.   Oh, actually, you are right.  It says
Opti-Neon, but I do recall from the report that it was the
Budweiser Bowtie sign.

13:30:30   Q.   Now, would you consider that to have a circular
cross section?

13:30:48   A.   In a strict sense, no.

13:31:00   Q.   Thank you.  Do you consider what you've called
the diffuser in the Fallon devices to be the same as the
diffuser in the Slayden device?

13:31:12   A.   I'm sorry, do you mean the -- do they look the
same?  Do they operate the same?  How do you mean that?

13:31:19   Q.   Well, do they operate the same?

13:31:22   A.   They have similarities, yeah, but they don't
operate identical, no.

13:31:27  1       Q.     Mr. Slayden, in his patent, indicates that the

2   tubular cross section or the circular cross section was an

3   important part of his invention, didn't he?

13:31:38  4       A.     Yes.

13:31:43  5       Q.     And -- all right.  Let's go back to Exhibit 77.

6   And I would like to go to Column 4, which is several pages in.

7   I would say it's about Page 7.  All right.  Now, on the -- on

8   Column 4, can you highlight on, let's say, beginning with --

9   or can you expand, please, beginning with Line 40 down to the

10   end.  That's good.  Okay.  And then I will ask you to

11   highlight beginning at Line 45 and to about Line 58.  Okay.

13:32:40  12       Here Mr. Slayden is talking about some of the benefits

13   of his design.  And first he says:  Since the diodes, 53 and

14   55 -- and those are the LEDs; correct?

13:32:53  15       A.     That's correct.

13:32:56  16       Q.     Since they are external to the outer diameter

17   of the diffuser -- and the diffuser is the tube; correct?

13:33:06  18       A.     Yes.  The one at the top; right.

13:33:10  19       Q.     Correct.  That retracted light could be emitted

20   from the fixture only after being twice refracted by the

21   diffuser.  Now, do you understand that to mean that the light

22   comes in to the tube and then it's refracted, goes through the

23   inside, and then it's refracted again?

13:33:32  24       A.     Yes.

13:33:40  25       Q.     And then Mr. Slayden then, as we proceed, he

1    says:  In addition, the inner and outer walls of the diffuser

     2    -- again, that's the walls of the tube -- provide reflective

     3    light throughout the cross section of the tube 11.

13:33:59  4         So you understand him to say there that the light, in

     5    addition to being refracted when it passes through the walls

     6    of the diffuser, then it's reflected inside the diffuser?

13:34:10  7         A.    No.

13:34:14  8         Q.    No.  What do you understand that to be?

13:34:16  9         A.    I understand that to be somewhat broader of a

     10   term that than how you are using it.  I understand that to

     11   mean that it is reflecting light into the air inside the

     12   diffuser as well as into the diffuser.

13:34:28  13        Q.    Right.  Okay.  You probably said it better than

     14   I did, but that was what I was trying to get at.  So it's

     15   reflected inside.  And it bounces all around in there, doesn't

     16   it?

13:34:40  17        A.    Yes.

13:34:44  18        Q.    Okay.  Then Mr. Slayden goes on to say:  It is

     19   believed that this combination of reflected and refracted

     20   light in the translucent tube is what affords the neon-like

     21   glow of the fixture.  Do you see that?

13:34:55  22        A.    Yes.

13:34:58  23        Q.    And so he's attributing importance to this

     24   tubular design, isn't he?

13:35:02  25        A.    Yes.

13:35:18 1         Q.     Now, let's go back to 29 TT, please.  Okay.

2  Now, In this design -- this is, again, the Opti-Neon sign --

3  and so this is the light emitting surface here, right?  Up at

4  the top.

13:35:25 5         A.     Right.

13:35:29 6         Q.     That is, when we look at the sign, we look from

7  out here, and we look at the illuminated surface there.  Would

8  you agree?

13:35:34 9         A.     Yes, I would agree.

13:35:38 10        Q.     Okay.  And so if we were to draw out where the

11  device comes -- there are sidewalls down here, and then the

12  LED would be somewhere down in this general area; correct?

13:35:49 13        A.     Yes, probably further than your light; but yes.

13:35:51 14        Q.     Perhaps further down, perhaps closer in.

13:35:51 15        A.     Right.

13:35:55 16        Q.     And so the light from the LED is going to come

17  up, and it's going to hit directly that lower surface;

18  correct?  Or at least some of it?

13:36:03 19        A.     Yes.

13:36:06 20        Q.     Okay.  But you are not going to get that effect

21  that Mr. Slayden talks about where the light first passes

22  through when it's refracted twice; correct?  Because you don't

23  have this under surface there?

13:36:23 24        A.     Well, you will get that, too, in a more limited

25  degree off of the sidewalls.  Because the light will also

enter the bottom of the sidewalls and accomplish the same sort

of thing.

13:36:36   Q.   To the degree that those sidewalls are exposed?

13:36:38   A.   Yes, that's exactly right.

13:36:44   Q.   But then you're not -- well, see, I believe

that the surface of the sign is about here, isn't it?  About

where I'm indicating?

13:36:50   A.   That's correct.

13:36:53   Q.   Okay.  So you're not going to get all of this

reflection -- like, for example, if a beam of light comes up,

first it's not going to be refracted in here because there's

nothing to refract it as it would be in the Slayden device.

Would you agree?

13:37:10   A.   Let me make sure I'm clear.  You are only

referring to the preferred embodiment?

13:37:15   Q.   Right.  The full circle device.

13:37:16   A.   Yes, okay.

13:37:19   Q.   But even if we talk about the alternative

embodiment where it's got the slot, it's a relatively narrow

slot; correct?  I mean -- well, who knows what's relevant in

there.

13:37:33   A.   Right.  It's a slot.

13:37:36   Q.   At least some of that light coming up is going

to hit the bottom part of that -- of the tube, some of it

would proceed through -- through the slot and not be refracted

1    that first time?

13:37:46  2         A.    That's correct.

13:37:49  3         Q.    But some of it is going to get doubly

4    refracted, would you agree?

13:37:54  5         A.    Yes.

13:37:58  6         Q.    Then some of it -- well, we'll move on to that

7    other -- to the Figure 4.  But in this case, for example, a

8    beam that comes up and hits here, to the extent it's

9    reflected, it's going to be reflected more or less back down;

10   correct?

13:38:11  11        A.    (Respite.)

13:38:15  12        Q.    Some of it may be reflected this way, some of

13   it may be reflected in another direction?

13:38:24  14        A.    That's a diffuser, so it will be going in all

15   directions.  So some of it will be down, and some of it will

16   be up and through.

13:38:32  17        Q.    But very little of it is going to bounce around

18   on the inside and then bounce back out through the light

19   emitting surface?  Because there's nothing down here for it to

20   bounce out of, would you agree?

13:38:39  21        A.    Yeah, I would agree with that.

13:38:41  22        Q.    And that, as I interpret it, that's one of the

23   big advantages of Slayden's device.  Would you agree with

24   that?  At least as Slayden explains it, he says it's the

25   refraction and reflection, correct, that gives the neon glow?

13:39:02  1          A.      That's right.

13:39:19  2          Q.      Let's go back to 77 and to the fourth page of

       3      Exhibit 77.  Okay.  Here's what we've been calling the slotted

       4      embodiment.  I believe Mr. Slayden calls that a slotted tube.

       5      And we've called that the alternative embodiment.  Here you

       6      have the LEDs down in this area, and the light from them would

       7      come up -- some of it would hit the bottom of the tube, some

       8      of it would come up into the slot.  And then once it comes

       9      through the slot, some of it will be refracted through and

       10     emitted; correct?

13:39:59 11          A.      Yes.

13:40:03 12          Q.      And some of it will be reflected off the

       13     surface onto other interior surfaces of that slotted tube.

       14     Would you agree?

13:40:08 15          A.      Yes.

13:40:13 16          Q.      So that's -- that will have at least some of

       17     the benefits that Mr. Slayden attributes to the tubular form,

       18     although perhaps not as much as the full tube; correct?

13:40:37 19          A.      I would agree with that.

13:40:40 20          Q.      All right.  Can we go to Column 3.  That will

       21     be three or four pages from -- okay.  And now, if you can

       22     expand the bottom two paragraphs of Column 3, please.  All

       23     right.  Now looking at Figure 4, and that was the figure with

       24     the slotted embodiment, he says that it's in all respects the

       25     same as the diffuser except that it has a lengthwise slot

through the tube.  So he seems to be attributing -- he thinks

        it's going to function in most respects the same.  Okay.

        Let's go -- I'm sorry, let's go to Column 4.  And if we can

        expand, oh, from Line 50 to the bottom of that column, please.

        Okay.

13:42:06   6        And here again, he's talking about the slotted

        embodiment of the diffuser.  And he says that that reduces the

        quality of neon simulation, doesn't he?

13:42:25   9        A.      Yes, he does.

13:42:28  10        Q.      Wouldn't you agree with that, that that would

        be the likely result of the slotted embodiment?

13:42:36  12        A.      In comparison with the other one, yes, I would

        agree.

13:42:39  14        Q.      He does attribute a benefit to the slotted

        embodiment, which is that it's easier to click into the

        housing; correct?

13:42:50  17        A.      That's correct.

13:42:53  18        Q.      Have you ever seen a working version of the

        slotted embodiment of the Slayden device?

13:42:59  20        A.      No, I have not.

13:43:05  21        Q.      And you did some computer modeling of the

        Slayden patent for your report, although we didn't talk about

        that here.  Do you recall that?

13:43:11  24        A.       Yes, I do.

13:43:16  25        Q.      But you did not model the slotted embodiment?

13:43:22  1      A.     No, I did not.

13:43:27  2      Q.     I believe your analysis, your computer

3  modeling, was essentially it pretty much agreed with what Mr.

4  Slayden was saying about the benefits of the multiple

5  infraction and reflection?

13:43:43  6      A.     ILight shows that all sidewalls channel light,

7  is what it really showed.  Which I agree with what you're

8  saying, but what it shows was a little broader than that.  But

9  all of the sidewalls of any diffuser like that would channel

10  light into the plastic to some degree.

13:44:03 11      Q.     Okay.  So that when the light hits the wall of

12  the tube, then it's going to -- when you say channeled, is

13  that the same as waveguide, and it's going to travel inside

14  the tube?

13:44:19 15      A.     Yes.  To some degree it's going to travel

16  inside the plastic.

13:44:22 17      Q.     And that will be -- it will travel -- if the

18  light is down below, then it's largely going to be traveling

19  up the tube; correct?

13:44:31 20      A.     Well, it would travel in all directions, but

21  including inside the tube.

13:44:37 22      Q.     So it will be spread?

13:44:39 23      A.     Yes.

13:44:42 24      Q.     And that will be spread -- assuming it's a

25  diffuser as you described, it's going to be spread evenly, not

preferring any direction over another?

13:44:52    A.    That's correct.

13:45:09    Q.    Okay.  In your testimony, of course, I have the
benefit of being able to read your testimony, so I can cite
you to what you said.  You said the Fallon signs use a thin
walled diffuser, and there is no rational scientific
difference between it and the diffuser disclosed by Slayden's
simulated neon light patent.  Do you recall that?

13:45:29    A.    Yes.

13:45:34    Q.    But the Fallon diffuser, or rod, or whatever we
want to call it, it's not going to have that effect of
reflecting back up into the sign?  It's certainly not going to
have all the interior reflections that you get with the full
tube shown in Slayden; correct?

13:45:53    A.    It won't have the entire same complement.  It
will have all of the same physics will be going on the same
way, it's just that the bottom half won't be there.

13:46:01    Q.    Right.  So the physics of where the light
bounces off the bottom and bounces back up to the top, that's
not going to happen?

13:46:07    A.    That's right.

13:46:11    Q.    And furthermore, Mr. Slayden seems to think
that the twice refracted is important.  So it goes -- the
light comes up, it hits the bottom of the tube, and then it
goes to the inside, and then it hits the top of the tube, and

it's refracted each time it goes through the tube.  We're not

going to have that, certainly not to the degree that we had it

in Slayden, in the Fallon device, are we?

13:46:41   A.     That's correct.

13:46:45   Q.     Do you agree with Mr. Slayden that the internal

reflections are important to his device?

13:46:53   A.     Yes.

13:46:58   Q.     All right.  Now, the next exhibit I would like

to show is Defendant's Exhibit 627.  I would like to go to

Page 13, please.  Now, this you may recall, or you may

recognize this, the response to the office action, where --

just to put us back in perspective, Mr. Sember, the examiner

who had examined the Slayden patent is now examining the

iLight patent, and he brings up Slayden.  And iLight responds.

And let's see.  Can you -- there are a couple of parts

I would like to highlight.  Let's see.  One, two, three, up in

that area.  Can you follow?  Okay.  That's good.  So iLight

here says that the 168 patent describes the use of a hollow

thin walled translucent diffuser.

13:48:20   Now, several times in your testimony you talked about

how iLight distinguished Slayden on the grounds that it was a

thin walled diffuser.  Do you recall that?

13:48:30   A.     Yes.

13:48:33   Q.     But I was watching you, and several times you

left out the word hollow, which is right there.  And it's

1   there; right?

13:48:43  2          A.      It's there.  I didn't intentionally leave it

        3   out.

13:48:47  4          Q.      Okay.  And at least according to Mr. Slayden,

        5   hollow is important, isn't it?  Because that's what gives us

        6   all those reflections, those internal reflections?

13:49:01  7          A.      Right.

13:49:07  8          Q.      Okay.  And now, once again, I'm sorry if this

        9   is hard for you to see.  I would like to highlight those two

       10   lines there.  Great.  Thank you.

13:49:20 11          So here iLight is distinguishing its invention.  And

       12   it says that its invention requires an essentially solid rod

       13   with waveguide and light scattering characteristics.  Now,

       14   since the Slayden device is characterized as hollow, then I

       15   think Mr. Sember understood -- well, strike that.  Don't you

       16   think the examiner would understand that they were

       17   distinguishing a hollow device from a nonhollow device?

13:49:54 18          A.      Yes.

13:49:58 19          Q.      Yes.  So they are saying that there are

       20   different qualities to this solid device and hollow device.

       21   And the hollow device may be good, but ours is different?

13:50:12 22          A.      Yes.

13:50:32 23          Q.      And let's see if I can find this part.

       24   Somewhere in here he's saying that Slayden does not teach an

       25   essentially solid rod.  So -- and that's true, isn't it?

Slayden is not teaching a solid rod, he's teaching a hollow

tube?

13:51:02  A.    That's strictly true, yes.

13:51:08  Q.    Now, let's see.  At some point you did -- you

showed a picture of the Slayden device illuminated by LEDs.

And I wanted to compare that.  There was talk about the oval

type spreading that the iLight patents talk about, and whether

that was present in the Fallon device or was present in the

Slayden device.

13:51:48  Could you bring up Exhibit 29HHH, please.  Okay.

13:51:54  It's a little hard to see with the lights on, but do

you recognize what we're looking at there?

13:51:57  A.    Yes.

13:52:00  Q.    Okay.  And do you recognize that as a Budweiser

Bowtie sign?  I won't hold you to which version.

13:52:12  A.    Right.  I could recognize it as a Bowtie sign.

13:52:16  Q.    Would you agree that's an oval shape there?

13:52:19  A.    The shape I'm seeing is oval, yes.

13:52:24  Q.    And it's clearly elongated; right?

13:52:28  A.    Yes.

13:52:36  Q.    Now, in the Slayden patent, -- and you've

reviewed the Slayden patent fairly thoroughly, I assume?

13:52:41  A.    Yes.

13:52:44  Q.    Do you recall anything in there where he

advocates the use of internal reflecting sidewalls in the

housing where the LEDs sit?

13:52:57 A.    No, I don't recall he did that.

13:53:04 Q.    And you did some experiments with the Lektron

device.  Did you do anything to determine the actual

contribution to the sidewalls in the light emitting portion in

the Lektron device?

13:53:32 A.    No.

13:53:35 Q.    All right.  Now I'd like to shift gears and

talk a little bit about diffusers and waveguides.  Now,

diffusers and waveguides share some elements in common;

correct?

13:53:46 A.    Yes.

13:53:48 Q.    And I believe I understand your testimony in

your report to be to the effect that the difference between

the two is largely based on the configuration with respect to

the light source and the waveguide or the diffuser.  Do you

agree with that?

13:54:06 A.    Yes.  And there's a lot of semantics involved

in the whole process.

13:54:13 Q.    Well, but one piece of plastic could function

as a waveguide and as a diffuser, depending on where we put

the light, wouldn't you agree?

13:54:23 A.    Yes.

13:54:26 Q.    And that's something that somebody of ordinary

skill in the art would be aware of; agree?

13:54:33 1     A.    I would agree.

13:54:36 2     Q.    And somebody of ordinary skill in the art, when

3   they are reading the iLight patents, would certainly

4   understand the configuration that has been discussed there

5   where the light, instead of -- well, let me back up.  In a

6   conventional waveguide, we do, as you have demonstrated

7   earlier with an acrylic rod, we're going to put the light in

8   one of the ends and expect to it proceed along the length of

9   the waveguide; correct?

13:55:04 10    A.    That's correct.

13:55:07 11    Q.    And then also, for example, if we -- you had

12  your flat piece of diffusive plastic, little square, and if

13  you were to shine the light into the edge, that would at least

14  to some degree have a waveguiding effect, wouldn't it?

13:55:23 15    A.    Yes.

13:55:29 16    Q.    And somebody of ordinary skill in the art would

17  understand that when they were reading the iLight patent;

18  correct?

13:55:36 19    A.    Presumably.

13:55:39 20    Q.    Presumably they would see not only the

21  configuration where the LEDs, instead of being placed at the

22  end of the waveguide, they were placed under the waveguide,

23  and they would presumably understand that that was maybe not

24  the typical way we talk about a waveguide.  Would you agree

25  with that?

13:56:00  1          A.      I'm sorry, do you mean when you talk about a

2      waveguide, you wouldn't -- could you repeat the question.

13:56:06  3          Q.      Yes.  It probably was a poor question.

4      Normally when someone in the scale of the art thinks of a

5      waveguide, they think of it where we are putting the light

6      into the end; right?

13:56:17  7          A.      I would agree with that.

13:56:21  8          Q.      And so it's somewhat unconventional to put it

9      in the side as we're seeing in the iLight patents?

13:56:30 10          A.      It is less common than on the end.  It is

11      common, however.

13:56:33 12          Q.      I'm sorry?

13:56:35 13          A.      It is less common, but it's simply less common.

13:56:36 14          Q.      Okay.  But somebody of skill in the art would

15      -- they would understand the common way it's done, they would

16      understand that this is perhaps a less common way; right?

13:56:48 17          A.      If you are using the term waveguide, you get

18      less -- it would be less common to use that term when you are

19      illuminating the back.

13:56:59 20          Q.      But somebody who is reading the patent, if I am

21      an optical engineer or something, I'm reading this patent,

22      that would be instantly obvious to me; right?

13:57:09 23          A.      I would presume so.

13:57:10 24          Q.      So I wouldn't see the term waveguide and be

25      confused because it wasn't coming in the side, I could just

see, they are using this in a slightly different way than what
I'm used to.  Would you agree with that?

13:57:24  A.      That's possible.

13:57:28  Q.      Certainly they would know that it was side lit
instead of end lit?

13:57:34  A.      That's correct.

13:57:37  Q.      Now, in order to have a waveguide effect, you
need to have reflections off surfaces of the waveguide;
correct?

13:57:48  A.      That is typical, yes.

13:57:53  Q.      Well, you've said in your report, quote, in
general, without the surface reflection, there is no continuum
of the light and there is no waveguide effect.  Do you recall
that?

13:58:04  A.      Yes.

13:58:06  Q.      So I may have asked you in a way that allows
that there are a few atypical examples, but that's usually the
way a waveguide works; right?

13:58:16  A.      Yes.

13:58:20  Q.      So we put the light in the edge, or we put the
light in the end, and the light, as long as it's at the proper
angle, it's going to bounce off the inside surfaces, and it's
going to just travel down that waveguide unless it leaks out
or it's absorbed.  Is that basically correct?

13:58:42  A.      Let me make sure I've got you right.  You are

```
1    saying that you are dealing with a waveguide, and you

2    illuminate the back, that you are expecting that it's going to

3    be bouncing off -- the light is going to be bouncing off the

4    walls of the waveguide?

5          Q.    Yes.

6          A.    I would agree with that, yes.

7          Q.    Yes.  And that's what causes it to be a

8    waveguide; right?

9          A.    In general.

10          Q.    Right.  And Dr. Roberts went through total

11    internal reflection and everything.  And I think you mentioned

12    that.  And that's the phenomenon that happens there.

13          A.    That's not the only way to accomplish that, but

14    that is the most common way, yes.

15          Q.    Now, you showed us the little piece of

16    diffusive plastic.

17          A.    Yes.

18          Q.    And you showed us the photo where you had shone

19    a laser into the sheet of plastic and it provided a circular

20    diffusion pattern.  Do you recall that?

21          A.    Yes.

22          Q.    In that experiment, you are not providing any

23    surfaces that can waveguide, are you?  Wasn't it perfectly

24    predictable that that was going to give us a circle?

25          A.    That's a question of whether asymmetry is
```

coming from the material itself or whether it's coming from
the walls.

14:00:09    Q.    But, well, for example, let's talk about the
rod.  You showed a rod, and that made a pretty nice waveguide,
where you have shone a light into the end, and it was very
bright on the opposite end?

14:00:18    A.    Right.

14:00:21    Q.    And I think you said that was made of acrylic?

14:00:21    A.    That's correct.

14:00:25    Q.    And there is nothing about acrylic per se that
preferentially scatters light in a directional way, is there?

14:00:33    A.    Not that I'm aware of.

14:00:38    Q.    So if we were to take a sheet of acrylic like
your sheet of diffusive plastic, boom, it's going to go right
through it, and it's not going to waveguide to any significant
degree, either, is it?  That is if we shone it through the
flat sign?

14:00:55    A.    I'm sorry, you say to a significant degree.  Do
you mean if you were to do a power analysis of where all the
energy is going?

14:01:04    Q.    Let me change the question, then.  If you were
to flatten that piece of acrylic out, that rod, or take the
same type of acrylic and make a flat pane, just like you were
showing with the diffusive plastic, and you've shone a laser
through it and you took a picture of it, that's going to

```
 1    provide a circular pattern, too, isn't it?
 2         A.    Yes.
 3         Q.    Probably not much diffusion.  It's probably
 4    mostly just going to be the laser going straight through;
 5    right?
 6         A.    Should be.
 7         Q.    And yet that same material, when formed into a
 8    rod, makes a very nice waveguide, doesn't it?
 9         A.    Right.
10         Q.    And wouldn't somebody -- well, the iLight
11    patents specifically talk about acrylic, don't they?  Making
12    their rod out of acrylic?
13         A.    That's correct.
14         Q.    So wouldn't somebody of ordinary skill in the
15    art be well aware that you could take acrylic, and if you
16    configure it in a certain way such as a flat pane, and you
17    shine it in the flat side, it's not going to be much of a
18    waveguide?
19         A.    That's correct.
20         Q.    And yet if you form it into a rod, then it
21    could be a waveguide?
22         A.    That's correct.
23         Q.    Somebody would understand that, too; right?  If
24    they were of ordinary skill in the art?
25         A.    So let me understand, because you are using two
```

terms.  You are using scattering and waveguide.  You are only
referring to a waveguide aspect of it?

14:02:37    Q.    That's what I've been talking about
principally, yes.

14:02:39    A.    Okay, yes.

14:02:42    Q.    And I feel we're -- well, if there were
scattering -- for example, if we used a diffusive form of
acrylic, if it had some sort of scattering defects in it, then
we would expect that if it's in a rod and we shine it in the
rod, at the end of the rod, that's going to have a waveguiding
effect, and it's also going to scatter light; correct?

14:03:09    A.    Right.  It's the question of preferential
scattering, is the question that we were trying to get to.

14:03:15    Q.    But if you shine it in the end, it's going to
preferentially send the light down the length of the tube,
isn't it?  Or I'm sorry, the length of the rod?

14:03:25    A.    This is a rod with definitely no scattering
material in it?

14:03:30    Q.    Regardless.  If it has some amount of
scattering material, it's still going to have some waveguiding
effect, depending on how much scattering material it has?

14:03:45    A.    That's right.

14:03:54    Q.    But in any event, your experiment was designed
in a way that it was perfectly predictable that we were going
to get a circular pattern, because we really knew going in

```
 1   that there is nothing about that plastic that's going to

 2   preferentially direct the light in one way or another if it's

 3   formed into a sheet, as what you saw?

 4        A.    Right.  The issue of preferentially scattering.

 5   That's what that was trying to show.  No preferentially

 6   scattering.

 7        Q.    Right.  But the iLight patent doesn't talk

 8   about using a sheet of plastic, does it?

 9        A.    No, it doesn't.

10        Q.    No.  And Fallon's device doesn't use a sheet of

11   plastic, either?

12        A.    No.

13        Q.    Now, how did you happen to choose to use a

14   laser for that experiment?

15        A.    I had one readily available.

16        Q.    Did you have any LEDs readily available?

17        A.    I had some, but the test was much faster and

18   easier to set up with the laser, and much less confusing in

19   terms of interpreting the result.

20        Q.    Well, but the patents, the iLight patents,

21   don't talk about using a laser as a light source, do they?

22        A.    No.

23        Q.    And the Fallon devices don't use a laser for a

24   light source?

25        A.    No.
```

14:05:47 1          Q.      Is there a difference between the light that

2    comes out of a laser and a light coming out of an LED in terms

3    of its orientation?

14:05:55 4          A.      Yes.

14:05:59 5          Q.      Light coming out of a laser is parallel beams

6    of light; right?

14:06:02 7          A.      That's correct.

14:06:05 8          Q.      Very little dispersion.  That's why it's so

9    useful for pointing out and such?

14:06:10 10          A.      That's exactly correct.

14:06:11 11          Q.      And an LED, on the other hand, different ones

12    are going to disperse differently, but they typically have a

13    range of dispersion at a much broader angle than a laser;

14    would you agree?

14:06:20 15          A.      Yes.

14:06:23 16          Q.      They are not -- I believe the word is

17    columnated?

14:06:27 18          A.      Columnated.

14:06:29 19          Q.      Columnated.  And that refers to the very

20    parallel beams of light?

14:06:31 21          A.      That's correct.

14:06:38 22          Q.      And an LED sends light out in a noncolumnated

23    way, it's disbursed?

14:06:42 24          A.      That's right.

14:06:49 25          Q.      So a laser shining into the flat side of a pane

of acrylic or plastic, diffusive or not, is really not very

representative of these devices as they are in real life, is

it?

14:07:03    A.    That wasn't the intention of the experiment.

But I would agree with what you said, yes.

14:07:15    Q.    Because light from an LED comes out at an

angle, would you agree that some of that, if it hit -- even if

it hit the pane on the flat side, if it's a diffusive pane, do

you believe that that would create at least some waveguiding?

Where the light rays from the LED are hitting at an angle?

14:07:46    A.    This is on a diffuser or on a -- what kind of

material?

14:07:55    Q.    Either way.  Diffuser, painted glass?

14:07:57    A.    So the -- could you ask the question again?

14:07:59    Q.    Okay.  The question is -- I will see if I can

demonstrate it here.  If we've got a sheet up here, we've got

an LED down here, and you're going to have rays coming up at

an angle sort of like this?

14:08:13    A.    Right.

14:08:16    Q.    Some are going to go straight up, some are

going to come out at an angle, and, depending on the LED, that

may be a broader angle or narrower, but when these ones coming

out at an angle hit the sheet of glass, is there likely to be

some waveguiding effect?  It's going to be refracted; right?

14:08:42    A.    It's going to be refracted, and it's going to

be refracted more strongly, as the angle --

14:08:49 Q.     Right.  So depending on the angle, it may be

refracted such that we've got at least a little bit of

internal reflection so it will spread the light around?

14:08:58 A.     You will get internal reflection with the laser

as well.  All of those will give you internal reflection.

14:09:03 Q.     But with the laser do you think it's going to

be equivalent?  Aren't you going to get a lot more internal

reflection when the beams are hitting at an angle other than

90 degrees?

14:09:18 A.     Well, you will get a different amount of

bending in the material.  It's a lens effect.  So as the angle

is increased, the amount of bending of the light inside the

material will increase.  I will agree with that.  But it won't

trap.

14:09:38 Q.     Right.  It's probably --

14:09:41 A.     It won't waveguide, in the sense that

waveguiding -- I mean, if waveguiding refers to a trapping of

the light in the material, it will not trap.

14:09:51 Q.     Okay.  Well, won't that depend on the angle?

14:09:51 A.     No.

14:09:53 Q.     No.  So if it comes in --

14:09:57 A.     It will come out.  If it comes in the back, it

will come out the front.

14:10:07 Q.     Okay.  Is that true with a diffusive sheet

1    also?

14:10:07        2        A.      No.

14:10:12        3        Q.      So some of that will waveguide?

14:10:14        4        A.      Yes.

14:10:19        5        Q.      Did you try your laser tests with a narrow

                6    strip of material?

14:10:31        7        A.      You mean a narrow strip of any material?

14:10:36        8        Q.      Well, you did your laser test with what I'm

                9    calling a pane, I think it was about a 4" by 4" square of

                10   plastic.

14:10:47        11       A.      That's right.

14:10:50        12       Q.      Did you try it with a strip of that material,

                13   maybe three quarters of an inch by 4"?

14:10:56        14       A.      Yes.

14:10:59        15       Q.      But you didn't show us that test?

14:10:59        16       A.      No.

14:11:04        17       Q.      And did you try it with a curved surface?

14:11:04        18       A.      Yes.

14:11:13        19       Q.      And you didn't show us that test, either?

14:11:15        20       A.      No.

14:11:24        21       Q.      And the patent -- the iLight patents and the

                22   specification, which I think as you've pointed out, the

                23   specification is the same or nearly the same in all three of

                24   these patents -- they talk about how, when the acrylic

                25   material is formed into a rod, it takes on a waveguide

1    characteristics.  Do you recall that?

14:11:48   2          A.     I believe so.

14:11:50   3          Q.     Well, let's --

14:11:52   4          A.     Could you point out that?

14:12:00   5          Q.     Absolutely. let's bring out Exhibit 1, please.

6    Okay.  And if you can go to Column 5, which is going to be

7    several pages in, probably about -- oh, I'm guessing 12 pages.

14:12:24   8          Keep going.  Okay.  There is four.  Next page.  All

9    right.  Now, Column 5 is the left-hand column.  And if we can

10   expand up at the top here, about the top ten or twelve lines.

11   Yeah, that's fine.  Okay.  And let's highlight -- actually,

12   here's the good part.

14:12:58   13         So here they talk about acrylic material treated to

14   scatter light and its various benefits.  And then, well, can

15   you read this sentence?

14:13:10   16         A.     When shaped into the profiled rods, the rods

17   take on the desired leaky waveguide characteristics.

14:13:16   18         Q.     Okay.  So they are not suggesting, are they,

19   that it's anything inherent in the material that causes the

20   waveguiding effect that they talk about, or preferential

21   scattering.  Aren't they saying that when it's shaped into

22   rods, it does it?

14:13:34   23         A.     Okay.

14:13:40   24         Q.     Okay.  But your laser test was not a rod?

14:13:45   25         A.     No, it was not.

14:14:01  1          Q.     Now, is it your understanding that all of the

2    claims that are asserted against the Fallon devices require

3    that the material the rod is made of preferentially scatters

4    light?

14:14:18  5          A.     I'm sorry, all of the claims?

14:14:20  6          Q.     All of the asserted claims.

14:14:25  7          A.     I would have to review all of them to -- it's

8    generally commonly in there.

14:14:30  9          Q.     Let me help you out.  Let's go to Exhibit 2,

10    please, Page 15.  And now let's go one more page.  And

11    another.  Okay.  Here we go to the claims.  Let's expand Claim

12    1, which is -- okay.  All right.

14:15:21  13          Now, do you see anything in there that requires that

14    the materials that the rod is made of preferentially scatters

15    light?

14:15:51  16          A.     In this case it says preferentially directed.

14:15:54  17          Q.     Right, but is that talking about the material

18    there?

14:15:56  19          A.     No, talking about the light.

14:15:58  20          Q.     Right.  It says a housing position externally

21    and adjacent, whereby said housing includes sidewalls having

22    internally reflecting surfaces, serves to collect and direct

23    light.

14:16:19  24          And that's the housing that serves to do that, right?

14:16:19  25          And directs it into such lateral light receiving

surface such that the light is preferentially directed along

the predetermined length.

14:16:28    So it doesn't say anything about the material of the

rod doing that, does it?

14:16:31    A.    Yes, that's correct.

14:16:39    Q.    Okay.  And let's do the same thing with Exhibit

3.  And what we're looking at here is part of the '262 Patent,

the first claim.  So if we can go to the '970 Patent, which is

Exhibit 3.  And let's go to the back of that, where the claims

are.  I hope they are at the back.  Sometimes they have some

more drawings.  Okay.  It's Page 3.  There we go.  Okay.  And

can you expand the first claim up here.  All right.

14:17:34    Do you see anything there that requires that the

material the rod is made of, or the rod-like member in this

case, that the material preferentially scatter?

14:17:50    A.    I don't see that term there.

14:17:54    Q.    I don't either.  Okay.  Let's move down that

page a little bit to -- I think it should be the fifth claim.

Yes.  All right.  Do you see anything there requiring that the

material the rod is made of preferentially scatter?

14:18:22    A.    No, I don't.

14:18:25    Q.    Okay.  And now let's move down to the other

independent claim, which I believe is Claim 8.  Yes.  All

right.

14:18:37    And the same question there.  Do you see anything that

1    requires the material the rod is made of to preferentially

2    scatter?

14:18:58   3        A.     No, I didn't.

14:19:03   4        Q.     Now, in your testimony you have said that the

5    diffusers on Fallon's signs were not wide enough to determine

6    whether the scattering of the light was preferential.  Do you

7    recall that?

14:19:16   8        A.     Yes.

14:19:19   9        Q.     And that was when you went to this experiment

10   with the sheet?

14:19:22  11        A.     Right.

14:19:26  12        Q.     So you don't know one way or the other whether

13   those are preferentially scattered, do you?

14:19:35  14        A.     Yes, I do.

14:19:38  15        Q.     Well, according to your testimony, they weren't

16   wide enough to tell?

14:19:43  17        A.     Those weren't wide enough to test.  But we

18   since, very recently, have found a way to do that.

14:19:53  19        Q.     Okay.  Did you use the same sort of set-up that

20   you used in your --

14:19:56  21        A.     No.

14:20:01  22        Q.     Okay.  Not in your laser test?

14:20:03  23        A.     No.

14:20:09  24        Q.     Do you read some requirement into the patents

25   as to how much waveguiding has to occur?  That is, how much

degrees of light within the rod, in order for it to be covered

by the patent?

14:20:24    A.    I think that's -- I don't.  That's my problem

with evaluating some of these things.

14:20:33    Q.    All right.  Now, I'm going to shift gears on

you again.  I think -- well, you looked at two Bowtie signs.

Do you recall that?  Budweiser Bowtie?

14:20:45    A.    Yes.

14:20:49    Q.    And one of them we generally call the newer

Bowtie, and one we call the old Bowtie or sometimes the

Opti-Neon?

14:21:01    A.    I've only looked at the new Bowtie sign.  I

have seen the report on the old Bowtie sign.

14:21:07    Q.    Okay.  So you understand from the report,

though, that the old Bowtie sign does have internal channels

around the LEDs, don't you?

14:21:12    A.    Yes.

14:21:17    Q.    And did you conclude that the new Bowtie does

not have channels around the Bowtie shape?

14:21:29    A.    My evaluation was that it didn't seem to have

what we were calling channels anywhere.  But on the outside

section, there were walls that were much closer to the

diffuser than throughout the scattering area.

14:21:45    Q.    Right.  So in the Bowtie there are what we

could call sidewalls at least?

1          A.      Yes.

2          Q.      On either side of the LED?

3          A.      Right.

4          Q.      And those do have external sidewalls, while you

5    are contending that a lot of the other signs don't have

6    external sidewalls?

7          A.      That's right.

8          Q.      Okay.  Here's another little snippet from your

9    testimony.  You are talking about various of the elements that

10   were put together in the iLight patents.  And this is on Page

11   33 of your testimony, if you want to look at it.  You say, in

12   fact, all of these elements were well understood and had very

13   predictable uses, and any combination of such elements will

14   produce expected results.  Do you recall that?

15         A.      Yes.

16         Q.      So does that mean that no combination of these

17   elements could be patentable, if they are only producing

18   expected results?

19         A.      If it's only producing expected results that

20   would seem to be reasonable.

21         Q.      And you are saying that any combination of

22   these elements will produce an expected result.  So that would

23   seem to dictate that nothing in the area of art could be

24   patentable.  Does that sound right to you?

25         A.      I think with regard to the materials and the

system that we're talking about right now, I don't think I was

trying to make that a general statement to all possible

circumstances.  But within the confines of a discussion of the

elements and materials and the embodiments that we're talking

about, that's what my statement was in regard to.

14:23:39    Q.    All right.  Well, are you saying the Slayden

patent was invalid for obviousness, because it produces merely

an expected result?

14:23:52    A.    No.  It's expected in light of where we were at

that time frame, 2001.

14:23:57    Q.    Well, was Slayden groundbreaking in combining

these elements?

14:24:01    A.    Well, he got a patent.

14:24:04    Q.    He got a patent.  But it wasn't the first one

to simulate neon, was it?

14:24:10    A.    Not to my knowledge.

14:24:14    Q.    Okay.  A little bit later in your testimony you

say that Slayden -- and I'll quote here, and this is on Page

34 if you want to read along -- it says, Slayden actually

teaches a configuration that would behave exactly as described

in the patents-in-suit, a diffuser that serves as a combined

optical waveguide, again as described in the iLight patents,

and as a scatterer.

14:24:40    Do you recall that?

14:24:41    A.    Yes.

14:24:46  1          Q.    So are you saying now that the iLight device

        2   does act as an optical waveguide?

14:24:50  3          A     No, what I'm saying is that that description is

        4   exactly fit by the Slayden device.  That's what I'm saying.

14:25:00  5          Q.    All right.  I want to talk about a little bit

        6   about the interior light reflective sidewalls.  Now, you have

        7   concluded that the Fallon devices don't have interior light

        8   reflecting sidewalls; correct?

14:25:16  9          A.    That's correct.

14:25:20 10          Q.    How much light, in your view, do the interior

       11   sidewalls have to reflect in order to be reflective under the

       12   patents?

14:25:26 13          A.    Do you want a number?

14:25:29 14          Q.    Well, if you have a number.

14:25:33 15          A.    Well, since the Court has defined that as

       16   favorably, I believe is the term, favorably sounds to me like

       17   it's more than what you would get if you used the blackest

       18   possible material that happens to have an index of refraction

       19   that's around 1.5, which is what most common materials have.

14:25:57 20          Q.    Well, if it has the effect of increasing the

       21   light output from the light transmissive member, isn't that

       22   favorable?

14:26:04 23          A.    It doesn't seem that way to me.

14:26:07 24          Q.    So you think that that's either favorable or

       25   unfavorable that it increases the light output?

14:26:14  1          A.      I think the difference that you accomplish is

2    insignificant and irrelevant and an indication that it's a bad

3    reflector.

14:26:25  4          Q.      Now, have you looked at the actual devices and

5    seen whether you can see reflections in the sidewalls of the

6    LEDs?

14:26:31  7          A.      Yes.

14:26:37  8          Q.      Let's bring up exhibit -- and here I hope I

9    have the right number, I believe it's 588, and I believe 588

10   is several photos.  What I'm after is the eighth photo.

14:26:58  11         MR. SCRUTON:  Your Honor, may we dim the lights?

14:27:30  12         THE COURT:  Yes.

14:27:34  13         MR. SCRUTON:  Okay.  Well that's probably a different

14   photo.  Let's try 29-P.  Okay.  This one will be fine.

14:27:54  15   BY MR. SCRUTON:

14:27:56  16         Q.      Do you understand what we're looking at here?

14:27:58  17         A.      Yes.

14:28:04  18         Q.      This is the E from the neon Open sign with the

19   light transmissive member removed.  And here we see a line of

20   LEDs.  And here we see a line of reflection of LEDs.  And here

21   we see another line of reflections of LEDs.  So are you

22   telling us that this is not reflective?

14:28:27  23         A.      Yes.

14:28:40  24         Q.      Okay.  Now, you have indicated in your

25   testimony that the intended use of the sidewalls in the Fallon

devices -- and I think we can relight the lights -- is from

mounting the circuit boards.  Do you recall that?

14:28:55  A.    Yes.

14:28:59  Q.    Have you seen inside the Super Bright Open sign

that is the newer of the two Open signs?

14:29:05  A.    Yes.

14:29:09  Q.    So you are familiar with the fact that the blue

accents around the outside do not have sidewalls; correct?

14:29:13  A.    That's correct.

14:29:15  Q.    And you are also familiar with the fact that

the letters do have sidewalls?

14:29:18  A.    Right.

14:29:26  Q.    Now, Fallon was obviously able to make a design

holding circuit boards without sidewalls, weren't they?

Because they did that with Super Brights.

14:29:42  A.    That's right.

14:29:44  Q.    Have you talked to them, whether they did that

with the letters of the Super Bright sign?

14:29:51  A.    No.  I'm sorry, do you mean did we discuss in

the context of the patent about that?

14:29:55  Q.    In the context of --

14:29:58  A.    I mean, I'm not a design consultant.

14:30:00  Q.    Right.  I understand.  Anyway, you didn't have

occasion to ask them why they didn't do the same thing around

the letters that they had done around the Xs?

14:30:09   1            A.    No.

14:30:11   2            THE COURT:  I think we're at the point of our

           3    afternoon break.  Ladies and gentlemen, we're going to take

           4    our afternoon break.  It will be about a 15 minute break.

           5    Please Don't discuss the evidence amongst yourselves or with

           6    anyone else until you receive all of the evidence, the

           7    argument of counsel and the charge of the Court.  If you all

           8    are more comfortable upstairs, you can go back upstairs.

           9    There's a little bit more room.

14:30:59  10            (Jury out.)

14:31:15  11            THE COURT:  Who is the next witness for the defense?

14:31:22  12            MR. KITTREDGE:  Mr. Carl Degen.

14:31:26  13            THE COURT:  Do you contemplate getting to Slayden

          14    today?

14:31:29  15            MR. KITTREDGE:  I hope to get to him this afternoon

          16    also.  His is going to be very short.

14:31:36  17            THE COURT:  Did you all read the federal circuit case

          18    cited by the Court?  Does anybody want to be heard on that?

14:31:43  19            MR. KITTREDGE:  I did, Your Honor.

14:31:59  20            THE COURT:  You all can have a seat.

14:32:02  21            MR. KITTREDGE:  The case with respect to the late

          22    disclosed patent states that that patent could not be used

          23    because the expert witnesses had never had an opportunity, the

          24    parts had already been exchanged, and they didn't have an

          25    opportunity to deal with that patent.  That's not the

situation we have here.  The experts have had full opportunity

to deal with all aspects of the Slayden device.

14:32:26  The case also, on Page 1375, discusses inventor

testimony and mentions of prior art and their testimony and

how it is relevant to come in and explain what they did and

how they did it, to come up with their patent.  That's all we

want Mr. Slayden to do.  And like I said, it's going to take

10 or 15 minutes to do that.  And that will be

14:32:44  non-conflicting.

14:32:46  THE COURT:  Yes, sir.

14:32:49  MR. VEZEAU:  The basic problem -- I think Page 1375 is

pretty instructive in that area, Your Honor.  The basic

problem we have is what this witness did in coming up with

this patent is really, in our view, irrelevant to this case

because it is his patent per se that was issued, the piece of

paper with everything on that piece of paper that is the prior

art, not what he might have done before that or prototypes he

might have built.

14:33:20  All of that is frankly not part of the opinion you

have just heard.  That really is going down the rod that is a

distraction, it's not prior art.  And it's in my opinion going

to be cumulative.  Any relevant testimony, if there is any

from this man, would be cumulative to what we just heard.  But

frankly, there is no relevant testimony, because all he can do

is come on and say, I'm Mr. Slayden, here's my patent.  Well,

we don't doubt this is his patent.  It's in evidence.

So really, he can't contribute much of help in our view to this jury.  What he did before to get his patent is frankly irrelevant.  It's his patent that they are relying on as prior art.

MR. KITTREDGE:  The Seventh Circuit discussed exactly issue, and they did say that the patent speaks for itself, and the patent is the key piece of evidence as prior art.  But it also acknowledged that the inventor can come in and testify about what he did to come up with the invention.  And that that is admissible and relevant evidence.

THE COURT:  But that's not the focus really of the motion.  The motion is, we got this name really on the close of discovery.  We didn't have adequate opportunity to conduct discovery from him.  The name comes in on, I guess it was the 20th or the 30th.

But the thing that the Court noted was that, when he was disclosed on the last day of the discovery, his address was listed as unknown.  So the signal that sent to me was, even if they knew about him, if you didn't know where the address was, in all likelihood it may have been futile or semi-futile to try and take the deposition.

I think we've had expert testimony about the Slayden patent and how it relates to this patent.  And in light of the fact that there was this discovery disclosure so late, I'm

1    going to exclude it, but I'm also going to preclude the

        2    plaintiffs from saying that the defense promised you this

        3    witness and didn't produce it.

14:35:43    4         MR. KITTREDGE:  I appreciate that, Your Honor.  I

        5    would ask one other instruction that I think would help

        6    alleviate any prejudice in that regard, and that is if Your

        7    Honor would tell the jury --

14:35:53    8         THE COURT:  Well, I'm going to give them a standing

        9    instruction, they don't have to call everybody whose name is

       10    mentioned in the lawsuit or may have something to do in the

       11    lawsuit.  That's a standard instruction.

14:36:03   12         MR. KITTREDGE:  But I made a promise to them, and I'm

       13    just asking you if you could tell them the Court has

       14    determined his testimony would be duplicative, and, therefore,

       15    you're not going to hear it.  Nothing more than that.

14:36:14   16         THE COURT:  Well, my thought was, there has been so

       17    much water under the bridge since opening statements, I don't

       18    know if they recall your promise.

14:36:24   19         MR. KITTREDGE:  I think they will because they have

       20    been hearing about Slayden all trial long, and that's what I'm

       21    concerned about.

14:36:29   22         THE COURT:  I'll think about it.

14:36:29   23         MR. KITTREDGE:  Thank you.

14:36:29   24         THE COURT:  Anything else?

14:36:32   25         MR. PRICE:  There are a handful of instructions with

respect to Mr. Degen's narrative.  We've got three separate

ones.  We can discuss that now.

14:36:39    THE COURT:  Mr. Who?

14:36:43    MR. PRICE:  Mr. Degen.  He is their damages expert.

He will be next.

14:36:50    THE COURT:  Well, where are those objections?

14:37:01    MR. PRICE:  Your Honor, we basically have three

objections.  The first one is an additional quotation as to

the Goldscheider article that was added to the narrative.  And

while we have not objected, frankly, to certain other quotes

that were added that were not in his report, this one we

particularly objected to because it amounts to an improper

legal opinion.

14:37:25    Basically, the article quotes extensively from an old

Sixth Circuit case, and he's using that to suggest that's the

applicable law here.  Frankly, that's not the case.  There is

a recent federal circuit case that came out very differently.

This would be an improper legal opinion from a damages expert.

14:37:42    THE COURT:  Yes, ma'am.

14:37:47    MS. MCMILLION:  Your Honor, we would submit that this

is not outside the four corners of his report.  This article

was attached to his report and is referenced in his report.

Plaintiff had their damages expert comment and

critique the rule of thumb, and why it is not accepted and why

it's not used.  And this article merely allows our expert to

come in and say why it is accepted, why it is used, and why it
was the basis of his reliance in making his opinion.

14:38:10   MR. PRICE:  Your Honor, I completely agree.  And they
have cited extensively from this article about the rule of
thumb.  We have no issue with that.

14:38:18   Here, this quote is almost verbatim from a Sixth
Circuit case, and they are trying to impose a legal opinion
which, frankly, is inaccurate.  That is the real problem and
the crux here.

14:38:34   And I would note, Your Honor, at one point in Mr.
Bratic's cross examination he began to make reference to a
court case, and Your Honor appropriately cut him off from
doing so.  They are basically asking to do the same here.

14:38:47   THE COURT:  Well, it's the interpretation of the
language of the Court that gives me concern.  Let me see his
report.  I need a little bit more context.

14:39:10   MS. MCMILLION:  Would Your Honor like the original
report or the script?

14:39:30   THE COURT:  Whatever he's going to testify to that has
been looked at.  On Page 8, Paragraph 3.  These other two
documents I can hand back to defense counsel.

14:40:17   Page 8, Paragraph 3.  Well, on Page 8, Line -- and has
been accepted by courts in numerous cases, I'm going to strike
that.  I don't think the witness is competent to testify to
that.  He can say, as taught in many textbooks.

14:40:39  1          Now, the plaintiff's damages expert made references to

       2   Georgia-Pacific.

14:40:42  3          MR. PRICE:  Right.  And we have no problem with the

       4   reference to Georgia-Pacific, Your Honor.  Both sides have

       5   done it.

14:41:06  6          THE COURT:  All right.  Well, the third paragraph --

       7   well, what is the language in this third --

14:41:14  8          MR. PRICE:  What we're objecting to, Your Honor?  Is

       9   that what you are asking?

14:41:21 10          THE COURT:  Yes, calling for analysis of hypothetical

      11   negotiation just prior to first infringement.

14:41:25 12          MR. PRICE:  I'm looking at Page 8, Paragraph 3, and

      13   slot number six that goes with it.  It's quoted verbatim in

      14   the text in that handout I gave you, Your Honor.

14:41:36 15          THE COURT:  That's it.  On Page 8, third paragraph, I

      16   don't see ordinarily royalty rights.  I don't see that.

14:41:41 17          MR. PRICE:  The pagination may have changed, Your

      18   Honor.

14:41:49 19          Okay, Your Honor.  Apparently the pagination changed

      20   slightly.  It's now Page 7, the line starting at the bottom.

      21   My pagination, frankly, is different than what they have now.

      22   Is yours the same as his?

14:42:12 23          MR. KITTREDGE:  I gave him the pagination of your

      24   print-out.

14:42:17 25          THE COURT:  We'll adjust as we go along.  I'm not

amenable to experts electing quotation from cases. So I will

sustain the objection to what is now revised Page 7, the

bottom paragraph, continuing to the top of Page8.

14:42:41 4     Now, the next one is on Pages 26 and 27. Are those --

14:42:43 5     MR. PRICE: This is the section dealing with the

Lektron product which obviously Your Honor has already dealt

with in part. Our particular objections here is we have a

damages expert going way beyond the noninfringing alternative.

He is blending the Slayden patent.

14:43:03 10    THE COURT: Wait a minute. Let me locate it first. I

don't have a Page 26.

14:43:08 12    MR. PRICE: I'm sorry. It is actually quoted verbatim

in that text I gave you.

14:43:11 14    THE COURT: I got that part, but where is it in this

document?

14:43:15 16    MR. PRICE: I don't know. Their pagination is

different than mine.

14:43:17 18    THE COURT: Okay. Well, let me -- if you don't mind,

let's see if we can get there. Where is it now?

14:43:23 20    MS. MCMILLION: Page 25.

14:43:29 21    THE COURT: Page 25? Is that where it is, ma'am?

14:43:32 22    MS. MCMILLION: I believe so, Your Honor. Yes. That

copy is printed with the plaintiff's objection on it, but this

is the script as printed.

14:43:44 25    THE COURT: I don't see the quote, here you can see

1     iLight's Plexineon on Page 25.  Which is what he's quoting.

14:44:07  2          MR. PRICE:  Actually, it looks like it's the bottom of

3     24 on their copy.  In short, Your Honor, --

14:44:26  4          THE COURT:  Well, hold on.  Where is it?  Here you can

5     see language?  I don't see that.

14:44:33  6          MR. PRICE:  Apparently we have another copy we're

7     going to give you now.

14:44:37  8          THE COURT:  Well, which one is he going to be reading

9     from?

14:44:42  10          MS. MCMILLION:  That's the one he's reading from, Your

11     Honor.

14:44:43  12          THE COURT:  Which one?

14:44:45  13          MS. MCMILLION:  That one.

14:44:46  14          THE COURT:  This one?

14:44:51  15          MS. MCMILLION:  Yes.

14:45:01  16          THE COURT:  All right.  What's the objection here?

14:45:04  17          MR. PRICE:  Your Honor, here he has gone way beyond

18     what a damages expert would say about the outer look or

19     whatever of a, quote, noninfringing alternative.  Here he's

20     blending once again the Slayden patent, using prior art

21     language again, going into internal structural discussions.

22          Basically what I have highlighted, Your Honor, I

23     submit should be taken out.  And the language that is not in

24     bold in italics I think is acceptable if all we're talking

25     about is a noninfringing alternative argument.  Which is all

he can do as a damages expert.

14:45:41 MS. MCMILLION:  Your Honor, defendant would believe that the Court has already ruled on the Lektron device.  Mr. Bratic opened the door to this testimony yesterday when he gave -

14:45:50 THE COURT:  Yes, but his real question goes to the competence of this witness to testify about it.  He is a damages expert, and now he's comparing products.

14:45:58 MS. MCMILLION:  And what we would submit here, Your Honor, is just what he understood about these products in terms of making his assessment.

14:46:12 THE COURT:  His assessment of what?

14:46:14 MS. MCMILLION:  In order to address the noninfringing alternative issue in terms of his damage calculations.  Here is just his understanding of the information that was given to him.

14:46:25 MR. PRICE:  Your Honor, an example of which is why in that context does he need to make any reference to, quote, prior art of the iLight patent.  How is that relevant whatsoever to the issue of noninfringing alternative.  This is the exact blending of the discussion that Your Honor went through before with that cautionary instruction.

14:46:45 Here this is not the technical expert; this is just the damages expert.  In fact, I would suggest he is getting more extensive in his discussion than we even heard from their

1    technical experts.

14:46:57  2        THE COURT:  Well, for example, they include LEDs in a

3    channel with sidewalls and a thin diffuser which produces a

4    uniform neon glow.  I don't know that he has taken that apart

5    and done that kind of analysis.  As a damages expert?

14:47:12  6        MS. MCMILLION:  Well, he has been told all of this

7    information in terms of explaining to him the aspects of the

8    noninfringing alternatives and whether that should affect his

9    damage calculation.

14:47:22  10        THE COURT:  I don't know that there was testimony that

11    the Lektron product was covered by a patent that's the prior

12    art of iLight's.

14:47:31  13        MR. PRICE:  Exactly.

14:47:34  14        THE COURT:  The Court gave the instruction that the

15    Lektron product was produced after iLight applied for its

16    patent.  That was the instruction given by the Court.

14:47:46  17        MR. PRICE:  Exactly.

14:47:48  18        THE COURT:  This is contrary to the instruction given

19    by the Court.

14:47:55  20        MR. PRICE:  And that's my concern bluntly, Your Honor.

14:47:58  21        MS. MCMILLION:  Your Honor, I believe that an

22    instruction by the Court was that the Lektron product was

23    after the iLight's patent.  However, there has been testimony

24    that the Lektron product is marked with the Slayden patent.

14:48:11  25        THE COURT:  Well, I'll tell you what.  I'm going to

exclude beginning the second line, they include LEDs, all the
way down to the next to the last line of the bottom paragraph
so that it will read:

14:48:28    Here you can see iLight's Plexineon product and a
noninfringing alternative manufactured by Lektron.  The
products look very similar when lit and the comparison of
these products are very similar and accomplish the same neon
light glow.  Everything else is out.

14:48:48    Now, on Page -- well, is it Page 30 or is it 29 now?

14:48:52    MR. PRICE:  I don't know, Your Honor.  I would guess,
based on the last one, that it's going to be a page or two
back.

14:49:12    MS. MCMILLION:  Your Honor, it's Page 30.

14:49:14    THE COURT:  Where is the "you can see" language on
Page 30?

14:49:20    MS. MCMILLION:  It's at the very bottom of the page.

14:49:22    MR. PRICE:  It says, counsel please hold up the
original redesigned Newon signs.  Is that not the right page?
Sorry, Your Honor.  I was just going by the pagination.

14:49:39    THE COURT:  It's on Page 31.  The next to the last
paragraph on 31.  I'm inclined to agree with defense, I don't
recall any of the comparative analysis that the expert did
that's similar to what this guy is saying.

14:50:24    MR. PRICE:  In fact, the second paragraph in there,
which we did not object to, that's what was included in the

```
 1   original report.  We had a picture of the redesigned sign only

 2   in the paragraph that follows.  There was none of this first

 3   paragraph in that report, no comparison to what they refer to

 4   as the old Newon sign and the redesigned sign.  So it's beyond

 5   the report, beyond his technical expertise.

 6        MS. MCMILLION:  Your Honor, we would submit that this

 7   is not beyond the scope of his report.  The pictures and the

 8   photographs were in the report.

 9        THE COURT:  For example, he refers to it as being

10   injection molded like the Fallon sign versus vacuum formed

11   like the old Newon sign.  That's technical expert-type

12   testimony; that's not damages expert testimony.  And I don't

13   remember the technical expert testifying to that.

14        MS. MCMILLION:  We heard testimony, Your Honor, on how

15   the signs are made.  And part of his damages analysis --

16        THE COURT:  Well, but I'm talking about references to

17   these two signs.

18        MS. MCMILLION:  With respect to these two signs being

19   injection molded, part of his damages analysis and one of the

20   Georgia-Pacific factors deals with what Fallon has contributed

21   in terms of its sign in its design.  And part of that being

22   that we have an injection molded sign which creates a very

23   different product than the iLight product.  And that being the

24   basis of one of the factors for his damages assessment.

25        THE COURT:  Well, if somebody else testified to that
```

1    and he considered it relevant, I might let it go, but I don't

2    remember anybody testifying to this.

14:52:00  3         MS. MCMILLION:  I believe that we have heard from Mr.

4    Nelson as well as from Mr. Cleaver as to how signs are made.

14:52:07  5         MR. PRICE:  Not in terms of this particular --

14:52:12  6         THE COURT:  Yes, but not in terms of the Newon signs.

7    There was a general reference as to how they used this

8    injection molding.  I do remember clear references to that.

9    But the problem, the difficulty I have, is this extended

10   analysis of the Newon signs that I don't recall from anybody's

11   testimony.

14:52:29 12         MR. PRICE:  And it wasn't in his expert report.

14:52:32 13         THE COURT:  That's the part that I have difficulty

14   with.  We'll leave first sentence in on page -- on you can see

15   the stark differences, I will leave that sentence in, and then

16   strike the rest of that paragraph.  And then you can pick up

17   with the success of.

14:52:47 18         MS. MCMILLION:  Okay.

14:52:53 19         THE COURT:  Does that care of all those?

14:52:55 20         MR. KITTREDGE:  We have another witness today.

14:52:56 21         THE COURT:  Let me finish him.  Are all of your

22   objections taken care of?

14:52:58 23         MR. PRICE:  That's it, Your Honor.  Thank you.

14:53:00 24         THE COURT:  Okay.  I'm going to return, with my

25   markings on it, the exclusions from the Degen report.  Are

there any other matters before we take a recess?

14:53:09    MR. KITTREDGE:  One other witness today, Elizabeth Randgaard, that's a short videotaped deposition.  She will be our last witness now that Mr. Slayden won't be here.  And I know there are a couple objections about that, if counsel wants to address that now at this point before the jury comes back.

14:53:23    MR. PRICE:  If Your Honor wants to take that up now, we can.

14:53:25    THE COURT:  Objections to whom?

14:53:28    MR. KITTREDGE:  Elizabeth Randgaard.

14:53:31    MR. PRICE:  This is a deposition clip that they want to play, Your Honor, with respect to Elizabeth Randgaard.

14:53:47    MS. HUNTER:  Yes, Your Honor.  Do you want me to hand you the transcript.  I don't have this transcript highlighted, but I will call out Fallon's designations.

14:53:51    THE COURT:  All right.  What page and line?

14:53:54    MS. HUNTER:  We're starting on Page 47, Line 4, through Page 49, Line 7.

14:54:14    THE COURT:  How far down are you going on 47?

14:54:17    MS. HUNTER:  47, Line 4, all the way down to the through the end of the page, all of 48, and then 49, Line 7, would be the stop of that particular designation.

14:54:42    THE COURT:  Okay.  What is the basis for the objection?

14:54:46  1          MS. HUNTER:  Your Honor, our concern with this

       2    particular designation is that it's attempting to create an

14:54:55  3    unpleaded design infringement cause of action against iLight.

       4    And we have conducted discovery.  Through discovery we found

       5    that Fallon did, in fact, analyze the iLight Open sign and

       6    concluded that it did not, in fact, infringe Fallon's design

       7    patent on their Open sign.  And we're concerned that any

       8    indications otherwise might confuse the jury into believing

       9    that there is, in fact, a meritorious design infringement

      10    claim against iLight when, in fact, Fallon's own counsel

      11    concluded otherwise.

14:55:28 12          And Your Honor, I have the document, one of the

      13    relevant e-mails, in which Fallon's --

14:55:33 14          THE COURT:  Hold on.  Let me see.

14:55:35 15          What do you say to that objection?

14:55:37 16          MS. MCMILLION:  Your Honor, nothing in this

      17    designation at all addresses a design infringement case or a

      18    claim for design infringement.  What this passage in Ms.

      19    Randgaard's testimony does address is the fact that we have

      20    the Fallon neon sign, and the plaintiff has told the jury that

      21    the reason we are successful with the Fallon neon sign is that

      22    we copied their product.  But this evidence goes to show that

      23    we had a successful product that we were just attempting to

      24    make a new version of.  There is nothing in here that

      25    references a design infringement case, there is no reason for

the jury to think that this would at all deal with a design

infringement case, and we would, therefore, submit that it is

relevant.

14:56:18    THE COURT:  Well, I have more basic considerations.

At the bottom of Line 47, the question is:

14:56:23    What Fallon sign are you referring to?

14:56:26    I don't recall.  Then she doesn't recall any of the

others.  And then you get down:

14:56:32    Do you know if he's referring to cutting out the foam

in the Fallon Open sign?

14:56:35    Answer:  I don't know.

14:56:38    Is this witness competent to testify to these matters

on which --

14:56:39    MS. MCMILLION:  Yes, sir.

14:56:41    THE COURT -- if she doesn't recall it and she doesn't

know what sign it is?

14:56:46    MS. MCMILLION:  This is her own e-mail, Your Honor.

And the documents through which we are taking --

14:56:47    THE COURT:  No, ma'am.  I'm talking about -- you can

ask her about her e-mail.  But then she goes on and says she

doesn't know what sign that this other person in the e-mail is

referring to.  So she can't give it any context, it seems to

me.

14:57:04    MS. MCMILLION:  But you will see in the e-mail, Your

Honor, that -- in the original e-mail where you are talking

she doesn't recall from that, we also take her through the

        series of e-mails in that e-mail chain, and she does

        substantiate that the Fallon design of the product was what

        was in the market at that time.

14:57:23  THE COURT:  Where do you want to stop on Page 48 or

        49?  From 4 of 47 to how far?

14:57:35  MS. HUNTER:  We --

14:57:37  MS. MCMILLION:  Your Honor, if you would like, we

        could --

14:57:39  THE COURT:  Wait a minute.  I'm asking the person who

        is objecting.  How far does your objection go?

14:57:41  MS. HUNTER:  Your Honor, our objection goes to the

        entire excerpt.

14:57:46  THE COURT:  Yeah, but it's got some beginning and some

        ending.

14:57:51  MS. HUNTER:  From 47 -- on Page 47, Line 4 to Page 49,

        Line 7.  Our concern in particular is, this CAD drawing was

        not Elizabeth Randgaard's.  Apparently somebody from U.S.

        Stamp said that they included it as an attachment.  We haven't

        been able to recover that particular attachment.  The

        witnesses, as you said, cannot --

14:58:17  THE COURT:  Let me see the e-mails now so I can put

        this in context.  How does this tend to prove or disprove --

        how does this tend to prove any defense or disprove the

        plaintiff's case?  This reference to foam?

14:59:07 1          MS. MCMILLION:  Your Honor, this evidence goes to show

2     that Fallon had the successful neon product.  You will see

3     that the evidence do reference the famous Fallon Open sign,

4     and that Fallon was simply attempting to introduce an LED

5     version of its current neon successful sign, which the

6     plaintiff itself recognizes in this e-mail.

14:59:30 7          Nothing in this e-mail at all references a Fallon

8     patent, a design infringement case, or anything of that

9     nature.

14:59:36 10         THE COURT:  I'm sorry, say that again, ma'am?

14:59:39 11         MS. MCMILLION:  Nothing in this e-mail references a

12    Fallon patent, a design infringement case, or a design patent.

14:59:48 13         MS. HUNTER:  I think the important thing about this

14    excerpt is, the e-mail is from 2002.  It was more than two

15    years before Fallon would even begin to start selling LED Open

16    signs.  This is a --

15:00:03 17         THE COURT:  I'm still trying to prove what -- trying

18    to understand what it tends to prove or disprove.

15:00:12 19         MS. MCMILLION:  Your Honor is on the very first

20    section, but the designation does continue in that discussion.

15:00:18 21         THE COURT:  I've got all of it before me.

15:00:21 22         MS. MCMILLION:  And on Page 52, and if you look at

23    Lines 1 through 15, 16, somewhere around there.  Specifically

24    Lines 9 through 14 is where the witness is addressing that

25    there is the, you know, in a vacuum formed bag like the famous

Fallon sign with the two arcs and the back stopping the light.

15:00:51 And then also, further down in the designation, she goes on to say that, it's the Fallon sign with the little swoosh thingies.

15:00:57 MS. HUNTER: Your Honor, I would like to note that on Page 52, we are talking a different exhibit. Page 47 we're discussing Exhibit 71 to the deposition. And starting on Page 50 we're talking about Exhibit 72 to the deposition.

15:01:28 THE COURT: Again, if you could help me out. At what part of the plaintiff's case does it tend to disprove or --

15:01:34 MS. MCMILLION: Your Honor, I think --

15:01:37 THE COURT: Let me finish, if you don't mind, ma'am.

MS. MCMILLION: All right.

15:01:40 THE COURT: And what defense does it tend to prove?

15:01:41 MS. MCMILLION: It goes to show that Fallon's development of this product was not a willful infringement.

15:01:47 THE COURT: That Fallon's development of this product?

15:02:01 MS. MCMILLION: Yes, Your Honor. That Fallon's success with its LED signs was based on its desirable design from its neon product, not from willfully copying iLight's product.

15:02:20 MS. HUNTER: Well, I would say two things to that. First, I would say that willfulness should focus on the accused infringer's conduct, certainly not the patentee's conduct. And second, that the willfulness inquiry also

1   focuses on the defendant's knowledge of --

15:02:39  2       THE COURT:  The only thing I get out of this is, you

3   copied some of our stuff, too.  It doesn't relate to the

4   infringing product.  Is that what it is?  That's all this

5   strikes me as saying.

15:02:49  6       MS. MCMILLION:  No, Your Honor.  I believe that in

7   there we talk about the famous Fallon design, and that's the

8   current -- that was the neon design that was in the market.

15:03:54  9       THE COURT:  Well, frankly, I still don't quite

10  understand the relevance of it, but out of an abundance of

11  caution I'm going to overrule that objection.  What's the next

12  objection.  I overrule the objection, Page 47, Lines 4 through

13  Line 7 on Page 49.  What's the next objection?

15:04:11  14      MS. HUNTER:  Your Honor, the next one, I believe --

15  AND if I may show the Court, next we have Page 50, Lines 4

16  through 11.  And that's just authentication of a document that

17  we were objecting to on the same grounds as Exhibit 72.  And I

18  have that for Your Honor.  Again, it's conflating --

15:04:38  19      THE COURT:  All right.  It starts on Line 4, Page 50

20  and goes through where?

15:04:42  21      MS. HUNTER:  Just through 11, just to authenticate the

22  document.  And then really the meat of it starts, what Ms.

23  McMillion mentioned, on Page 51, Line 20 through Page 53, Line

24  17.  And it's more of the same confusion, more of the same

25  design infringement allegations that have gone unpleaded for

the reason that we have pulled up a trial exhibit.  Patent's
counsel has concluded that -- patent's opinion counsel has
concluded that there is no design infringement because
Fallon's design patents at the time were based on their neon
sign.

15:05:21    And they made the decision not to go after iLight for
design infringement.  And any sort of evidence to the contrary
in this case is only going to confuse the jurors as to the
read of the matter.

15:05:32    MS. MCMILLION:  Your Honor, we would submit that there
is no reference to design infringement in either of these
e-mails.

15:05:41    THE COURT:  Yes, ma'am.  But the core of this evidence
concerns some assertion of copying by the plaintiff of some
aspect of the defendant's work.  Now, they characterize this
as a potential design infringement claim.  Do you agree?

15:05:58    MS. MCMILLION:  Yes.  I believe that is how plaintiff
characterizes it.

15:06:01    THE COURT:  No, but do you agree that this
characterization would only be relevant on a design
infringement claim?

15:06:08    MS. MCMILLION:  No, Your Honor.  We would submit that
the evidence is relevant also to show the success of Fallon's
sign that their LED sign was based off of.

15:06:18    THE COURT:  Well, the question isn't really success.

1  The question is infringement.  I don't see how it relates to

2  infringement of the plaintiff's patent or would be a defense

3  to the plaintiff's patent.

15:06:29  4          MS. MCMILLION:  Your Honor, we would submit that it

5  goes to the defense to willful infringement.  That that's the

6  a totality of the circumstances case.

15:06:38  7          THE COURT:  That's what I'm getting back.  If you

8  agree that it relates to the design infringement, I'm not

9  really sure design infringement -- what this is talking about

10  is relevant to what was infringed.  Do you all have any other

11  observations on that?

15:06:58  12          MS. MCMILLION:  Your Honor, it's not the design

13  infringement of our sign.  It's the lines that we discussed

14  just briefly, the 9 through 14.

15:07:08  15          THE COURT:  I mean, I had trouble understanding why

16  those were coming in.  But out of an abundance of caution, I

17  let them in.  Now it's getting even more opaque to me.

15:07:18  18          MR. KITTREDGE:  It really goes to damages.  Plaintiffs

19  have been alleging all week long --

15:07:23  20          THE COURT:  Do you agree with my characterization that

21  what this is, is they copied some of our stuff, so consider

22  that in whether --

15:07:28  23          MR. KITTREDGE:  Not at all.  Not at all.  They have

24  been alleging all week long that all of the success Fallon has

25  achieved with its LED product is based on stealing their

technology.  This shows that they understood we had a famous
shape, a famous sign, and it's that shape, that sign, that
Sam's Club wanted, that is the real value of the product and
allows it to be successful.

15:07:56      That's the real relevance, to show that we really had
a successful sign shape and carried it on into the LED
products.

15:08:32      THE COURT:  Yeah, but it seems to me the issue in this
case is whether the plaintiff's patent, which is for these LED
shaped signs, which is different from the neon signs, which
was gas -- whether that patent was infringed.

15:09:02      MR. KITTREDGE:  Absolutely.

15:09:06      THE COURT:  I mean, if you made the -- if you contend
-- and there is actually testimony that there is, at least in
storage -- you still have the old neon gas signs in storage.

15:09:16      MR. KITTREDGE:  Absolutely.

15:09:18      THE COURT:  And they are still offering them for sale
on the Internet and may have some in the stores.

15:09:22      MR. KITTREDGE:  Yes.

15:09:25      THE COURT:  So the issue is not those.  The issue is
whether the -- not the design of that, but whether the patent
was infringed.

15:09:31      MR. KITTREDGE:  There is also an issue of damages.

15:09:34      THE COURT:  That's what I'm trying to figure out.  The
damages would relate to the infringement.

15:09:38 1          MR. KITTREDGE:  Absolutely, but the damages allegation

2     is more than that.  It's that Fallon would not have had a

3     successful product but for infringing.  And there is a lot of

4     success in this product that comes from the fact that this

5     shape, this -- it's design was so desirable.

15:09:54 6          THE COURT:  Which is why I go back to my earlier

7     point.  If that were true, that there are other factors, why

8     wouldn't the neon gas sign be selling like the other ones are

9     selling?

15:10:08 10          MR. KITTREDGE:  There is a desire for the LED and --

11    we don't have --

15:10:11 12          THE COURT:  So that's really the only relevant one.

13    It's not so much design but the composition of the material

14    that composes the product.

15:10:19 15          MR. KITTREDGE:  I don't agree with that, Your Honor,

16    but we don't have anything further to add.  I'll tell you

17    that.

15:10:28 18          THE COURT:  I'll tell you what.  We'll mark these

19    pages, both pages -- Page 47, 48, 49, 50, 51, 52 and 53, those

20    will be marked as a separate exhibit that was admitted for

21    identification only.  I'm having difficulty understanding --

22    to me, the issue is infringement.  And the design, based on

23    the other proof, I don't think is shown to be relevant.  Any

24    other objection?

15:11:21 25          MS. HUNTER:  Yes, Your Honor.  The final excerpts are

1   on Page 65 and 66.  And it's a related issue.  On Page 65, 6

2   through 14, it's authentication of Deposition Exhibit 76.  And

3   then the deposition designation is on Page 66, 2 through --

4           Would you agree, 17?

15:11:53  5         MS. MCMILLION:  Yes.

15:12:31  6         MR. VEZEAU:  2 through 17 on Page 66.

15:12:35  7         THE COURT:  Now, this is -- now, this might be more

8   probative.

15:12:43  9         MS. HUNTER:  Yet again, Your Honor, we do feel that

10  this is attempting to conflate the real issues here.

15:12:50 11         THE COURT:  But this one, when it makes reference to

12  the generic one, I take it it's to the generic one that iLight

13  is producing with the LEDs.

15:12:57 14         MS. HUNTER:  The generic one that iLight is producing

15  with Identity Group, I believe.

15:13:01 16         THE COURT:  With what?

15:13:03 17         MS. HUNTER:  With Identity Group in a joint venture.

18  iLight and another company.

15:13:04 19         THE COURT:  Yes, but it was with LEDs?

15:13:06 20         MS. HUNTER:  Yes.  Yes, Your Honor.

15:13:08 21         THE COURT:  Well, then the two -- at least according

22  to this, there is some comparability between the two.

15:13:13 23         MS. HUNTER:  Yes, Your Honor.  We're talking about the

24  nice Fallon neon Open sign.  And the design of a competing --

25  an LED sign that is going to have another aesthetically

pleasing design but have all of the advantages that neon does

not offer.  And we feel that this is attempting to use --

15:13:34   THE COURT:  I will allow this -- I will overrule the

objection as to Page 66 in Defense Exhibit 76.  I think it may

go to the issue of willfulness.  Anything else?  We're in

recess.

15:22:34   (Recess.)

15:22:36   THE COURT:  Any preliminary matters before we bring

the jury in?  How many more defense witnesses after this

witness do we have?

15:22:44   MR. SAWYER:  Your Honor, we'll have our damages

expert, and then a very short video clip that we just

discussed, and then we'll be done.  And Your Honor, I don't

know when you would like us to move in exhibits, but whatever

is convenient for Your Honor.

15:23:03   THE COURT:  We can move in the defense exhibits --

I've been letting this go a little bit because I understood

there was really no objection to most of the exhibits.  So you

all can move them in en masse after the witness has come down

from the stand.  Then you can introduce all of the exhibits

relating to that witness.

15:23:21   MR. SAWYER:  Thank you, Your Honor.

15:23:24   THE COURT:  Now, how much longer do you plan to go

with this witness?

15:23:31   MR. VEZEAU:  Very short.  Probably five minutes or so.

15:23:32  1          THE COURT:  How long is your damages --

15:23:35  2          You all can have a seat.

15:23:38  3          How long is your damages expert report?

15:23:41  4          MR. LIPSHIE:  Just about an hour, Your Honor.  Maybe a

          5  little bit less.

15:23:55  6          THE COURT:  Okay.  How long is the deposition clip?

15:23:59  7          MR. SAWYER:  Two or three minutes, Your Honor.

15:24:02  8          THE COURT:  We'll see if we can finish today.  If we

          9  finish today, I'm going to ask the jury to come back tomorrow

         10  at maybe 11:00.  Is there going to be any rebuttal proof?

15:24:18 11          MR. VEZEAU:  Yes, we'll have I believe one rebuttal

         12  witness, Your Honor.

15:24:23 13          THE COURT:  And who is that going to be?

15:24:24 14          MR. SCRUTON:  Dr. Roberts.

15:24:27 15          THE COURT:  On what issue?

15:24:29 16          MR. VEZEAU:  Their invalidity case, Your Honor.

15:24:30 17          THE COURT:  Okay.  How long do you expect Roberts to

         18  take?

15:24:37 19          MR. SCRUTON:  Probably an hour to an hour and a half

         20  on direct.

15:24:49 21          THE COURT:  We'll just see how it goes.

15:25:00 22          You can bring the jury in, Mr. Marshal.

15:25:36 23          (Jury in.)

15:25:40 24          THE COURT:  All right.  You can be seated.  You may

         25  continue with your cross examination of this witness, counsel.

CONTINUED CROSS EXAMINATION OF MR. HATHAWAY

15:25:47  2   BY MR. SCRUTON:

15:25:50  3        Q.    Welcome back, Mr. Hathaway.

15:25:50  4        A.    Thank you.

15:25:54  5        Q.    I won't detain you much longer.  With regard to

6   exterior light absorbent sidewalls, which is a requirement in

7   at least some of the claims.  As I understand it, it's your

8   position that the exterior sidewalls must be visible to the

9   observer, to an observer of the sign?

15:26:21  10       A.    Yes.

15:26:24  11       Q.    You are hesitating there.  I don't want to

12   mischaracterize your testimony, but as I understand it, for

13   example, that your understanding is that the exterior light

14   absorbing sidewalls would have to be outside of the housing,

15   for example, in the Fallon signs; is that right?

15:26:45  16       A.    Yes.

15:26:47  17       Q.    Okay.  I'm wondering where that comes from.

18   How do you know that?

15:26:51  19       A.    How do I know it's the exterior?

15:26:53  20       Q.    Right.  Why isn't the outside of the wall of

21   the inner channel -- why isn't that the one that we're looking

22   at to see whether it's an exterior light absorbent --

23       A.    It's not a visible part of the product.  So I

24   guess in any functional sense I don't see how it enters into a

25   design or a plan.  I guess that's my viewpoint of it.

15:27:22  1          Q.      So you are reading that into the patent?  There

2    is no language in the patent itself that you contend requires

3    that other than your understanding?

15:27:34  4          A.      Would you like to go through the patent?

15:27:37  5          Q.      Well, I would be happy to.  If you can point me

6    to something that gives you that understanding, I would be

7    grateful.  Let's bring up Exhibit 1.  And this is the '238

8    Patent.  And I am at your service in terms of directing her

9    because I don't know where it is.  Do you want to go to the

10   claims?

15:28:01  11         A.      Yeah.

15:28:15  12         Q.      Okay.  So let's go to probably Page 13.  Page

13   15.  All right.  There we are, Page 18.  The first claim in

14   issue here is Claim 8.  If you could expand that.  And sir, if

15   it's in there somewhere else that I'm not directing her to,

16   let me know.  The housing is discussed down here.

15:29:01  17         A.      So I think the issue comes down to the

18   exterior.  Since it doesn't have an exterior surfaces in

19   reference to those sidewalls, pair of sidewalls, they are all

20   interior.

15:29:14  21         Q.      Okay.  So you would consider -- well, let's

22   see.  Let's bring up Exhibit 29 Q.

15:29:28  23         A.      Okay.  This is Dr. Roberts' diagram of the

24   housing, with light transmissive member, et cetera.  So here

25   is the interior sidewall.  And you agree that that's an

interior sidewall?

15:29:40   A.   Yes.

15:29:45   Q.   And then here is, I guess, what's in issue.
This is what you're saying is not an exterior sidewall if
there is a further housing outside?

15:29:56   A.   Right.  As I understood the whole entire
concept of the unit and the design of the claims it was
anticipated that an exterior sidewall would -- the whole
purpose of it was to make it not visible to the viewer, to a
potential viewer.  So it seems to be completely nonsensical to
apply that to something that's completely unrelated to the
actual element.

15:30:20   Q.    But that sidewall is not visible to the
viewer, is what you're saying?

15:30:22   A.   That's right.  It's an interior -- to the
product it's interior.

15:30:27   Q.   Now, let's suppose there were not an exterior
housing as in the Fallon signs, but this were just a line, a
linear device.  Are you saying that if we were to put another
sidewall, maybe an eighth of an inch here outside that wall,
then that would absolve this of being an exterior surface and
everything would be forgiven?  That is, it would not infringe?

15:31:01   A.   In my view, yes.

15:31:16   Q.   Okay.  Now, you testified -- and this, I
believe, was at Page 16 of your testimony -- all material that

is visible, including a clear window, is both reflective and
absorptive?

15:31:26   A.      Yes.

15:31:30   Q.      And then elsewhere -- and unfortunately, I
don't have a page citation for this, but -- and you said, as I
discussed, the Fallon sign uses the same plastic to form the
entire body of the sign.  So in your opinion this plastic
cannot be both reflective and absorptive?

15:31:51   A.      Right.  Were you asking me a question about
that?

15:31:54   Q.      I was asking you if that is your testimony.

15:31:58   A.      Yes.

15:32:01   Q.      So you're saying the same material can't be
both reflective and absorptive for the purposes of this
patent?

15:32:08   A.      Yeah, I'm saying that if you are calling the
same material reflective, it's the same material.  So in one
section you're calling it reflective, in the other section
you're calling it absorptive.  It's still the same material.
So it also seems rather nonsensical to me.

15:32:29   Q.      Does the surface of the material affect how
reflective or absorptive it is?

15:32:33   A.      Minimally.

15:32:45   Q.      Now, you have been through the claims of this
various patents.  So are you familiar with the fact that that

absorptive exterior is only a requirement of claims -- well,

Claim 8 of the '262 Patent and Claims 8 and 25 of the '238

Patent among those that are at issue in this case?

15:33:08    A.    Okay, I am not so intimately memorized and

familiar with them, I would have to review them all. But I

could take your word on that.

15:33:15    Q.    But you would agree that it's not implicated in

all of the claims that are in issue?

15:33:22    A.    I believe that's true.

15:33:25    Q.    I want to talk very briefly about the Lektron

device that we looked at. Do you have that up there?

15:33:31    A.    Yes, I do.

15:33:37    Q.    And are you able to turn it on up there?

15:33:42    A.    I can turn it on on there, or perhaps --

15:33:46    Q.    Or better, I could turn it on.

15:34:05    A.    Here. Thank you. Yes.

15:34:07    Q.    Whoa, no doubt about that.

15:34:10    A.    No doubt it's an LED sign.

15:34:12    Q.    At least they are tough. Have you done any

analysis to determine whether this device is covered by the

Slayden patent?

15:34:23    A.    You mean a claims analysis?

15:34:25    Q.    Yes.

15:34:27    A.    Not a -- no. Other than visually, if you look

at the images in the patent, in the Slayden patent, it pretty

```
 1   much immediately appears identical.
```
15:34:37   2        Q.      Okay.  But you have not gone through the

 3   Slayden patent?

15:34:41   4        A.      I haven't done a detailed analysis.

15:34:45   5        Q.      Okay.  Now, what does the word opaque mean to

 6   you?

15:34:48   7        A.      Opaque?  It means you can't see through it.

15:34:54   8        Q.      Can't see light through it?

15:35:04   9        A.      (Respite.)  I would -- to me, if you are asking

10   as a technologist, I would say, no, opaque means that

11   generally no image will get through it at all, and it's

12   probably quite a bit darker than a diffuser type of material,

13   but I don't think that implies that no light would get through

14   it.

15:35:26  15        Q.      Okay.  A diffuser material, well, there is the

16   word translucent.  That's what I think of, as something that

17   light can come through, but it has been diffused, so you can't

18   see an image through it, but you can still see a light through

19   it.

15:35:45  20        A.      It's a continuum for many, many things.  So

21   that's kind of an issue of where do you suddenly call

22   something one thing versus another.

15:35:52  23        Q.      Okay.  Would you call this opaque here?  Do you

24   see where I'm indicating where we can see a band of light

25   there?

15:35:58  1          A.      Yes.

15:36:02  2          Q.      Would you call that opaque?

15:36:05  3          A.      Yes.

15:36:11  4          Q.      Okay.  Have you ever seen this type of Lektron

         5     device made into a sign?

15:36:17  6          A.      No.

15:36:20  7          Q.      And have you looked at a portion of the patent

         8     specification that talks about how you could use it to make a

         9     letter?  Do you recall that?

15:36:31 10          A.      I don't recall that.

15:36:34 11          Q.      Okay.  This is referring to the Slayden patent.

        12     Can we bring up Exhibit 77, please.  And -- all right.  Let's

        13     go to Column 5, which is going to be on the eighth page.

        14     There we are.  And about the middle of page, a few lines on

        15     either side of Line 30.  Okay.  And what I wanted to focus on,

        16     he talks -- well, it appears to me that Mr. Slayden was

        17     indicating that these are pretty good for being straight, but

        18     not so good for other things.  He indicates, for example, four

        19     90 degree connectors can be used to connect four straight

        20     modules into an O configuration.  Does that suggest to you

        21     that it's not very adaptable for use as a sign?

15:38:08 22          A.      No.

15:38:10 23          Q.      Do you think something like this would be

        24     adaptable for use, say, as a Budweiser sign like that?

15:38:17 25          A.      Yes.

15:38:20  1          Q.     But you've never seen it?

15:38:20  2          A.     No.  It's pretty new technology in general.

3  These things are generally fairly new, so I actually never saw

4  that particular device -- that technology until I saw that

5  device.

15:38:28  6          Q.     I never have either.

15:38:30  7          THE COURT:  Well, like I told the other lawyer, you

8  don't get to testify, you get to ask questions.

15:38:38  9          MR. SCRUTON:  Okay.  And that is my final question,

10  Your Honor.  Thank you.

15:38:43 11          MR. SAWYER:  Your Honor, the defense doesn't have any

12  redirect.

15:38:44 13          THE COURT:  You may step down, sir.

15:38:47 14          You may call your next witness.

15:38:49 15          THE WITNESS:  Thank you, Your Honor.

15:39:23 16          MR. LIPSHIE:  Fallon calls Carl Degen.

15:39:25 17          THE COURT:  What exhibits for the defense?

15:39:29 18          MR. SAWYER:  The exhibits for the defense are Exhibit

19  626, Exhibits 627, Exhibit 754 Y, Exhibit 888, Exhibit 884,

20  Exhibit 808, which I actually think is a duplicate of 29 B,

21  Exhibit 887, Exhibit 886, Exhibit 1081, Exhibit 728, Exhibit

15:40:10 22  726, Exhibit 725, Exhibit 877, Exhibit 738, Exhibit 754 Z,

23  Exhibit 72 -- I'm sorry, 74, 73, 75, 748, 76, 74, 742, 732,

24  and Your Honor, I believe this covered the reports as well,

25  but if there was -- if that didn't include the reports, there

```
 1    will be those to go in as well.

 2         THE COURT:  All right.  Without objection, the

 3    exhibits will be admitted.

 4         MR. VEZEAU:  Your Honor may we reserve?  We need to

 5    check that we don't have any objection.

 6         THE COURT:  To the reports?

 7         MR. VEZEAU:  Pardon me?

 8         THE COURT:  To the exhibits?

 9         MR. VEZEAU:  The reports are fine.  The reports are

10    fine.  It's the other long list, if we may just check that

11    first.

12         THE COURT:  All right.

13         (Witness sworn.)

14         COURT REPORTER:  Please state your full name for the

15    record and spell your last, please.

16         THE WITNESS:  Carl George Degen, D-e-g-e-n.

17    DIRECT EXAMINATION

18    BY MR. LIPSHIE:

19         Q.    Carl G. Degen is being offered by Fallon

20    Luminous Products Corporation as an expert on damages.  Mr.

21    Degen is currently the president of Christensen Associates, an

22    economics research and consulting firm located in Madison,

23    Wisconsin.  Christensen Associates has provided economic

24    consulting both nationally and internationally for over 30

25    years.  Mr. Degen joined Christensen Associates in 1980 as an
```

economist and has progressed senior economist, vice-president, and now president. He has conducted analysis for a variety of industries and provided litigation support for various cases, including numerous intellectual property disputes. Mr. Degen also provides intellectual property valuations outside the context of litigation.

Mr. Degen is married with one college-age daughter and resides in Madison, Wisconsin. He received a bachelor of science degree from the University of Wisconsin Parkside in mathematics and economics in 1977 and a masters degree from the University of Wisconsin Madison in Economics in 1979. Mr. Degen has served as the vice-president of the Wisconsin Business Economic Association and has authored numerous professional publications on various economic topics.

As an economist for the last 30 years, Mr. Degen has studied economic relationships and valued economic phenomena in terms of costs and benefits. He has testified regarding damages in many types of cases, including intellectual property, antitrust, breach of contract, and general torts.

Mr. Degen has measured damages for patent infringement in more than 100 cases; and out of these cases he has had to testify in depositions more than 30 times and has had to testify in court 12 times.

Your Honor, I offer Mr. Degen as a qualified expert on damages and ask that he be permitted to share his opinions and

testimony with the Court and jury.

2          THE COURT:  You may do so.

3          THE WITNESS:  Thank you.

4          Greetings.  My name is this Carl Degen, and I'm here

5    to talk to you about damages, assuming infringement.  I was

6    hired by the defendant, Fallon Luminous Products, to provide

7    my opinion regarding an appropriate measure of damages if you

8    decide that the patents are valid and that Fallon has

9    infringed them.  Of course, validity and infringement is

10   beyond the scope of my expertise as an economist, and I don't

11   have an opinion on that.  Before I begin, I want you to assure

12   you all that my compensation is in no way dependent on my

13   opinion.

14          It is my opinion that the damages in this case should

15   be a reasonable royalty of at most two percent of Fallon's

16   accused net sales; but where there are alternative designs, as

17   I understand there were in this case, the royalties should be

18   what it would have cost Fallon to make one of those

19   alternative designs.  Therefore, an appropriate damage award

20   should be no more than approximately $590,274, which is two

21   percent of Fallon's accused net sales through September 2008.

22          If you estimate the sales, as Mr. Bratic did, through

23   the end of trial, this would increase by $118,000.  But if you

24   agree that those alternative designs don't infringe and were

25   available, it should be $30,000 to $40,000, which is

approximately how much it would have -- it would have cost

Fallon to rebuild its tools and restructure its manufacturing

to make a different product.

15:45:29 As I will explain to you today, I calculate the two

percent royalty using the rule of thumb and a method known as

the Georgia-Pacific factors.  My royalty ends up being on the

lower end of the rule of thumb range because of, one, the lack

of direct competition between iLight and Fallon for the

accused sales; two, the substantial contributions of Fallon in

terms of design and customer relationships; and three, the

existence of acceptable noninfringing alternatives.

15:46:06 Mr. Bratic, iLight's damages expert, calls for a

reasonable royalty of seven percent.  His rate is much too

high because:  One, Fallon only expected 7.7 percent net

operating profit, which means Mr. Bratic would have Fallon pay

a royalty equal to nearly its entire net profit; two, there

was no direct competition between iLight and Fallon for the

accused sales; three, Fallon contributed its relationships

with customers and its product design; and four, there were

noninfringing alternatives available in the market.

15:46:48 In order to form my opinion, I reviewed documents from

both companies, the websites of both companies, relevant

industry articles, the report of Mr. Bratic, and I spoke with

Fallon employees and Fallon's technical expert, Mr. Kevin

Hathaway.  I needed enough information to be able to generally

understand the technology, the market, the nature of the infringement, and the availability of noninfringing designs. This information enabled me to form my expert opinion.

In order to understand my analysis, it's important to understand a couple of concepts related to damages. First is that when you value damages in a patent case, you have to assume that the products at issue infringe the patents. This is not to say that I personally believe that to be the case here. However, to provide damages opinion, I have to make that assumption.

Most patent damage cases involve a concept called reasonable royalty. Both parties agree that the proper measure of damages in this case is a reasonable royalty. The royalty has to be reasonable, which means that a licensee -- I'm sorry, which means it has to be something that reasonable business people would agree on -- the amount a licensee would be willing to pay and the patent holder would be willing to accept for the use of the technology. The licensee still needs to be able to make a reasonable profit from the use of the invention. Otherwise, it would not take the deal. Where Mr. Bratic and I disagree is what that rate should be.

From my review of the evidence and my research, I learned that iLight designs, manufactures and markets lighting which uses light emitting diodes, or LEDs. ILight's Plexineon product embodies the patented technology.

The signs that are at issue in this litigation all use LEDs as the light source. The vast majority of Fallon's accused sales consist of oval shaped Open signs sold to Sam's Club and custom beer signs sold to Anheuser-Busch. The first accused sale to Sam's Club occurred in late 2005. And the first accused sale to Anheuser-Busch occurred in 2006. As of September 27, 2008, total net accused sales were approximately $29.5 million.

I spoke with Tim Fallon, the national accounts manager, to learn about Fallon's relationship with Sam's Club. It is my understanding that relationships are very important in this market. In the late 1980s, Fallon began supplying various types of neon Open signs to Sam's Club. For a short period around 2004, Sam's Club was test marketing LED Open signs from a group called Identity Group Inc. The Identity Group signs were manufactured by iLight. ILight licensed Identity Group to sell iLight's LED signs under the brand name Newon.

Counsel, would you show the jury the original Newon sign.

Here you can see the Newon sign Identity Group offered to Sam's Club. This is the sign that was sold to Sam's Club by Identity Group prior to 2005. You can see that the design includes solid raised letters spelling OPEN with an oval around its perimeter. The back of the sign is made of black

plastic covered by flimsy foam.

Fallon has also developed an LED Open sign and offered a prototype to Sam's Club during the test period. Sam's Club chose the Fallon LED Open signs and began selling them in early 2005. I understand that Sam's Club did not choose the Identity Group's sign because it was not as sturdy and it was not considered a good value. Had Fallon not been able to offer an acceptable noninfringing product, Sam's Club could have chosen an LED sign from another supplier, such as Everbright, Prolite, or Enhance America, which all produce LED signs.

In his deposition, Mr. Cleaver, CEO of iLight, pointed out that he didn't know if iLight would have received the Sam's Club business even if Fallon did not get the sales, recognizing that there were other manufacturers that potentially could have received the sales.

I also spoke with Tim Fallon regarding the relationship with Anheuser-Busch. Fallon began selling neon signs to Anheuser-Busch before 1980. Around 2005, Fallon approached Anheuser-Busch about purchasing LED signs. ILight was trying to sell its Plexineon signs to Anheuser-Busch at that time. At some point in 2006, Anheuser-Busch made its decision to purchase Fallon's LED signs, but not iLight's. I understand that one of the reasons that Anheuser-Busch did not choose iLight was that Anheuser-Busch did not have a good

relationship with iLight's sales representative, Eric
Loberfeld.

Again in his deposition, Mr. Cleaver noted that iLight
only hoped they would have gotten the Anheuser-Busch business.
They would have expected it -- quote, expected it, but he
admits he has no way of knowing whether iLight would have
gotten the business -- would have gotten this business if
Fallon did not.

Even if Fallon had not been able to offer an
acceptable non-infringing substitute, Anheuser-Busch most
likely would have just increased purchases from its other LED
suppliers.  While Fallon currently has the largest share of
LED sign sales to Anheuser-Busch, Everbright and Enhance
America also supply LED signs to Anheuser-Busch.  ILight does
not.  I conclude that iLight would not have made Fallon's
accused sales, even if Fallon had not been in the market.

To determine a reasonable royalty for iLight's
patents, I used a Georgia-Pacific analysis, including the
commonly used across-industry rule of thumb.  This rule says
that a royalty rate will typically fall between a quarter and
a third of the infringer's expected net operating profits.

Sometimes known as the 25 percent rule, the rule of
thumb is widely accepted as a starting point for calculating a
reasonable royalty.  It is discussed in textbooks and articles
on patent valuation.  I consider the rule of thumb in valuing

patents both inside and outside of litigation.

15:54:37 The rule of thumb is generally attributed to Robert Goldscheider, who published an article observing an empirical relationship between royalty rates and the net profit rates for licensed products.  He first wrote about the rule in 1971 but noted that in some form it has been used by valuation experts prior to his writings.

15:55:05 In this case, Fallon expected net operating profits of 7.7 percent of revenues, so the rule of thumb says a starting point would be 1.9 to 2.6 percent.  I will discuss this more in a few minutes, but I would like you to keep in mind the starting range as I go through my analysis.

15:55:25 There is a well-known patent case called Georgia-Pacific from the 1970s that sets forth a widely used method for determining a royalty.  The Georgia-Pacific case is also taught in many textbooks and has been accepted by courts in numerous cases.  I use a Georgia-Pacific analysis, including the rule of thumb, to determine the appropriate royalty in this case.  Mr. Bratic, iLight's damages expert, also employs a Georgia-Pacific analysis.

15:56:01 The Georgia-Pacific framework calls for an analysis of a hypothetical negotiation just prior to first infringement. This hypothetical negotiation assumes that there are reasonable business people on both sides.  It identifies 15 factors to be considered -- the 15th being the amount a

licensor, the patentee, and the licensee, the accused
infringer, with full information, would agree to if both were
willingly trying to reach agreement.  The Georgia-Pacific
framework provides a context to construct what would have
happened had the parties reached agreement, taking into
account the kinds of considerations most parties would
consider in that situation.

Not every factor is always relevant in each case.
Some are neutral and some just don't apply.  In this case, Mr.
Bratic and I agree on the impact of five factors.

This slide shows the factors about which Mr. Bratic
and I basically agree.

Factor 2 is the rates paid by the licensee for the use
of other patents comparable to the patents at issue in this
case.  Fallon has not been party to any utility patent
licenses, so this is neutral.

Factor 3 is the nature and scope of the hypothetical
negotiations -- or, sorry, is the nature and scope of the
hypothetical license.  Both Mr. Bratic and I agree that the
hypothetical license between Fallon and iLight would have been
nonexclusive, causing the royalty rate to be lower.

Factor 6 is the effect of selling the patented
technology in promoting sales of other products.  Here, both
Mr. Bratic and I agree there is no evidence that the accused
sales generated sales of any nonpatented items.  This calls

for a lower rate.

15:58:05 Factor 7 is the duration of the patent and the terms of the license.  At the time of the hypothetical negotiation, the patents would have had most of their protection remaining. I consider this factor neutral, and Mr. Bratic appears to agree.

15:58:22 Lastly, Factor 14 is the opinion of testimony from qualified experts such as Mr. Bratic and me.  We have both provided our opinions in this matter.  My analysis of the other factors explains my differences with him.

15:58:41 I will now take you through the remaining factors and explain how I believe each of these affects a reasonable royalty in this case.

15:58:51 Factor 1 is the rights received by the patentee, the licensing of patents to others, which proves or tends to prove an established royalty.  In other words, we look at how iLight has licensed its patents to determine how it would have licensed Fallon.  ILight entered into agreements with three companies related to its Plexineon product.  As I understand it, the Plexineon product embodies the patented technology at issue.

15:59:23 The first agreement, shown here, was between iLight and the Identity Group on November 12, 2002.  Identity Group was granted exclusive distribution in the office products market, the mass retail channel, and for sign franchise

retailers.  And iLight was required to use best efforts to
supply products to Identity Group as it requested them.

On April 2, 2003, Identity Group and iLight entered
into an interim supply and license agreement, shown here.
This agreement granted Identity Group the right to have the,
quote, printed circuit boards populated with light emitting
diodes, end quote, manufactured for generic signs such as Open
with iLight's proprietary waveguide technology.  iLight agreed
because iLight lacked both the requisite business relationship
with Sam's to compete for the sales and the manufacturing
ability to meet expected demand.  ILight did not receive any
royalty from Identity Group for these sales.  This agreement,
which extended into May 2005, was in effect at the time of the
hypothetical negotiation.  ILight would have known at the time
of the hypothetical negotiation that it lacked the requisite
relationships and capacity to make Fallon's accused sales.

The Identity Group agreements are the only iLight
agreements that I'm aware of that were consummated prior to
the hypothetical negotiation in January 2005.

On September 2, 2005, iLight entered into a Letter of
Intent:  Profit Revenue Sharing Point of Agreement with Image
Works.  The products included Plexineon signage and other POP,
that's point of purchase, products which were going to be
purchased by R.J. Reynolds.  ILight was to contribute, quote:
Its patented and patent pending proprietary technology,

including Plexineon, engineering, manufacturing capabilities,
and global sourcing expertise, end quote.  And Image Works was
to contribute, quote, its considerable expertise in retail
displays, in-depth design work, engineering, project
management, and project presentation, end quote.  Essentially,
this relationship was to be a joint venture, not a one way
patent license.

16:02:16    In comparing this agreement to the hypothetical
negotiation, it is important to note that Image Works was the
party that had the business relationship with R.J. Reynolds
that made this project possible.

16:02:31    In deposition, Mr. Cleaver talks about Image Works
having invoiced the customers because they had the
relationships.  ILight needed Image Works' relationships to
compete for the business just as it had needed Identity
Group's relationships with Sam's Club to compete for that
business.

16:02:54    Profits under the Image Works agreement were to be
split 50/50.  Looking to the hypothetical negligence, a 50/50
split of Fallon's expected net operating profit of 7.7 percent
results in a royalty of approximately three and a half to four
percent.  However, Fallon was only negotiating for patent
rights.  ILight had manufacturing duties under its deal with
Image Works, but it would have had none with Fallon.
Therefore, the rate to Fallon would be substantially lower.

Further, Fallon contributed its own superior design of
the accused products, which Image Works did not do.
Therefore, the analogous royalty rate for a license agreement
with Fallon would have been substantially less than three and
a half percent.

16:03:54
The last of the agreements was between iLight and
Color Kinetics.  Here, in 2006, iLight was on the other side.
It was the licensee.  The agreement allowed iLight to use 35
separate Color Kinetics utility patents and some patent rights
of its affiliates.

16:04:19
Under this agreement, iLight agreed to pay a royalty
of 4 percent for the first 18 months and a royalty of 5
percent thereafter for all of the patents.  There were other
royalty rates included in the agreement, but the other royalty
rates were on categories for which iLight had no products.

16:04:44
Mr. Bratic erroneously interprets the Color Kinetics
iLight patent license as an agreement for iLight to pay Color
Kinetics a royalty of the greater of $10 or 9 percent of net
revenues on sales of competitive licensed products.  Yet there
was not a single product listed in the license agreement to
which these terms would have applied.  The list of products
paying 9 percent is blank.

16:05:19
Mr. Bratic also cites -- Mr. Bratic cites no evidence,
nor am I aware of any evidence, that compares the technology
at issue here to the technology in the 35 Color Kinetics

1   patents in terms of the importance of the technologies and the

2   expected profitability of the profits made using those

3   Technologies.

16:05:46   4   The royalty rates for products actually covered by the

5   Color Kinetics license are 4 to 5 percent.  Comparability for

6   the technology in this case is unknown and purely speculative.

7   But even so, Mr. Bratic's 7 percent royalty is higher than

8   what iLight paid for the 35 Color kinetics patents.

16:06:09   9   Under this factor, Mr. Bratic also cites a

10   conversation with Mr. Kallmes.  Claiming industry experience,

11   Mr. Kallmes told Mr. Bratic that royalty rates would generally

12   range from 5 to 9 percent of sales for the LED lighting and

13   light control technology.  However, Mr. Kallmes does not

14   provide any license where 5 to 9 percent were made, nor does

15   he provide any evidence regarding the technology and

16   circumstances of the negotiation at issue in this case

17   relative to those represented by his, quote, general range.

18   Mr. Kallmes' representations are contradicted by the

19   actual licenses produced in this case.  The Color Kinetics

20   license was for 4 to 5 percent, and it was for 35 patents

21   covering different technologies.  The Identity Group license

22   was royalty free.  And the Image Works license left iLight

23   with 50 percent of the profit for its patents and its

24   manufacturing.

16:07:20   25   Mr. Bratic further errs in citing Mr. Kallmes and

arguing that there should be a royalty premium for competition
when iLight could not compete for the accused sales.

Factor 1 calls for a lower royalty rate. The current
iLight licenses do not create an established royalty. Mr.
Bratic's 7 percent royalty for Fallon, where iLight had no
manufacturing obligation, would be well above the Image Works'
50/50 split of the 7.7 percent expected profit margin. His
opinion is higher than the average of the Color Kinetics
rates, and he is 7 percent above iLight's free license to
Identity Group.

Factor 4 is the licensor's established policy or
marketing program aimed at maintaining a patent monopoly where
they either do not license to others or only license under
special circumstances, or under special conditions to preserve
their patented monopoly.

The evidence indicates that iLight lacked the
requisite relationships and design to compete for Fallon's
accused sales.

In deposition, Mr. Cleaver stated that Fallon and
iLight did not compete for the business at Sam's Club. As I
discussed earlier, iLight entered into a marketing agreement
with Identity Group, and even allowed Identity Group to
partially manufacture the products under the terms of the
license. ILight entered into the joint venture agreement with
Image Works because iLight needed those relationships to be

able to compete for those sales.

16:09:17 The question to Mr. Cleaver was, did they, Fallon and iLight, compete with each other for the Sam's business?  His response was, compete is the wrong word.

16:09:30 For all these reasons, Factor 4 calls for a lower royalty rate.  ILight would be giving up few, if any, sales by licensing Fallon.

16:09:43 The fifth factor is the commercial relationship between Fallon and iLight, whether they are competitors in the same territory, in the same line of business, or whether they are an inventor and promoter.  ILight and Fallon both sell LED signs in the U.S. market, so in that broad sense, they are competitors.  However, as I just explained, iLight knew it could not compete for Fallon's accused sales.

16:10:19 The effect of Factor 5 is to lower the royalty.  Mr. Bratic and I disagree on this factor.  He claims direct competition for Fallon's accused sales, which is contradicted by the evidence.  Mr. Bratic's opinion is too high because he overstates the level of competition.  My royalty opinion of 2 percent reflects the lack of direct competition between iLight and Fallon for the accused sales, which were nearly all to Sam's Club and Anheuser-Busch.

16:10:49 Factor 8 is the profitability of the products made under the patent.  Are they a commercial success?  And how popular are they at the time of the hypothetical negotiation?

This factor is an analysis of whether Fallon would be
licensing a proven product.  ILight's products, made under the
patent, were not profitable.  It was not a proven technology.

You can see from this table that, through 2004, the
time of the hypothetical negotiation, iLight reported a
negative net profit each year.  In 2004, iLight lost over $1.8
million on sales of $7 million.

Mr. Bratic says that iLight's products were profitable
because iLight showed positive gross profits.  But gross
profits don't tell the whole story.

Gross profits are revenues less the cost of making the
products.  Net profits are determined by further subtracting
selling, general and administrative expenses.  ILight's
negative net profits show that its profits were not covering
all of their costs.  The complete story is the fact that, at
the time of the hypothetical negotiation, iLight had not
demonstrated that its products could be profitable.

Since the hypothetical negotiation, iLight continues
to show negative profits.  It has positive profit in only one
year to date.  The evidence indicates that Fallon would have
been licensing an unproven product, which would have resulted
in a lower royalty rate.

Additionally, this slide shows that at the time of the
hypothetical negotiation, LED penetration of the neon sign
market was low.  Mr. Bratic claims that there was commercial

success of Plexineon recognized by the lighting industry.  But
the patented technology had not -- and still has not -- made a
large impact on the neon sign industry.  Signs alleged to
include iLight's technology still continue to have a
relatively small share of the overall neon sign market, less
than 2 percent in 2007.

16:13:35        Fallon would not have been willing to pay nearly all
of its expected operating profit, as proposed by Mr. Bratic,
for an unproven technology with minimal market penetration.

        The patented technology was unproven.  It had neither
established profitability nor strong commercial success as of
January 2005.  Therefore, the royalty should be lower.

16:14:09        Factors 9, 10 and 11 relate to the value of the
technology and its use.  Factor 9 is the utility and
advantages of the patented technology over older devices that
were used to work out similar results.  Factor 10 is the
nature of the patented invention and the benefits to those who
have used it.  And Factor 11 is the extent and value of
Fallon's use of the invention.

16:14:37        While Fallon's LED sales have grown to be a
substantial portion of its business, the evidence indicates
that Fallon could have achieved similar sales using
noninfringing alternatives at Sam's Club and at Anheuser-Busch
because of the relationships it had with these two customers
and the availability of acceptable substitutes.

In evaluating Factors 9 and 10, Mr. Bratic overstates

     2    the benefits associated with iLight patents.  He believes that

     3    the products are, one, effective simulation of neon lighting

     4    with even light distribution and comparable brightness; two,

     5    lightweight and having superior handleability characteristics;

     6    three, rugged and resists breakage that normally would be

     7    expected for neon lighting components, or counterparts; four,

     8    environmentally friendly, requiring no neon gas and running on

     9    significantly less electricity, using LEDs as illumination

    10    sources; and five, easy to install without complex high

    11    voltage electrical installations.

16:15:51  12              But Mr. Bratic fails to realize that all of these

    13    advantages are not specific to the patents at issue.  There

    14    are other ways to make neon-looking signs that I understand

    15    are not protected by the patents.  ILight does not have an

    16    overall patent on LED simulation of neon signs, or on products

    17    that are more rugged than neon, or products requiring no neon

    18    gas.  Mr. Bratic's royalty is overstated because he relies on

    19    too broad an understanding of what the patents cover.

16:16:28  20              It is my understanding that every asserted claim of

    21    the patents-at-issue requires reflective sidewalls connecting

    22    the circuit board to the round plastic rod that acts as a lens

    23    in an LED sign.  Fallon redesigned one of its products in 2008

    24    to remove its sidewalls.

16:16:50  25              Mr. Bratic points out in his expert report that, when

evaluating Factors 9 and 10, the ability of the alleged

infringer to design around the patents must be considered.

I agree.  At the time of the hypothetical negotiation, Fallon

could have simply retooled its manufacturing facilities to

make its current noninfringing design.

          According to Richard Huo, Chief Operating Officer of

Fallon, the cost of retooling would have been approximately

$30,000 to $40,000.  This is the amount Fallon was avoiding by

licensing and would have been willing to pay on the eve of

infringement.  The only benefit of using the patented

technology would have been to avoid or delay the cost of that

retooling.

          I understand there were no other benefits to keeping

the sidewalls.  They do not increase brightness, uniformity or

other neon-like appearances.  I also understand that solid

sidewalls make the LED signs heavier, which is generally less

desirable and more expensive to produce.

          Counsel, would you hold up the redesigned Budweiser

sign.

          I don't know if you can see this or not, but the

plastic lenses are attached directly to the cover, and, as

we've heard in testimony, there are no sidewalls extending

from the circuit board to that cover inside those letters.

Because Fallon had the ability to manufacture this sign at the

time of the hypothetical negotiation, it would not likely have

16:18:46

1   been willing to pay a royalty in excess of its retooling

2   costs.

16:18:46   3        Mr. Bratic, in his opinion, recognized the need to

4   consider design arounds, but failed to consider that Fallon

5   could have and actually did design around the patents-in-suit.

6        Mr. Bratic overstates the significance of the advance

7   that the patents-in-suit represent over old molds or devices.

8   He also says that any attempted to design around, at the time

9   of first infringement, would have required time, money and

10   effort, and the resulting product would have been more

11   expensive to manufacture.

16:19:21   12        However, in the normal course of its business, Fallon

13   has been able to implement the simple design around, and I

14   understand could have employed -- could have been employed

15   around the time of the hypothetical negotiation.

16:19:35   16        The patents are not a major breakthrough, and there

17   are other alternatives to simulate neon.  Other manufacturers

18   have also developed noninfringing alternatives, none of which

19   are accused of infringement.

16:20:02   20        Counsel, would you show the jury the Lektron and

21   Plexineon signs.

16:20:07   22        MR. PRICE:   May we approach, Your Honor?

16:20:10   23        THE COURT:  Yes, sir.

16:20:10   24        (Whereupon, a bench conference was held, out of the

25   hearing of the jury, to wit:)

MR. PRICE:  He just changed the script from products

to signs, and he's bringing out two pieces of product, not

signs.

MR. LIPSHIE:  Your Honor didn't say that we couldn't

show those lights.

MR. PRICE:  No, no, no.  That wasn't it.  He just

changed the script.  He said, I show you two signs, not the

products.

(Conclusion of bench conference.)

THE COURT:  If you will stay with your narrative, sir,

as worded.

THE WITNESS:  Here you can see iLight's Plexineon

product and a noninfringing alternative manufactured by

Lektron.  The products look very similar when lit.  In this

comparison, you can see that the products are very similar and

accomplish the same neon-like glow.  This noninfringing

alternative is further evidence that iLight's patent is not a

significant advance and that a lower royalty is appropriate.

Factors 9 and 10 argue for a lower royalty.  Mr.

Bratic fails to account for the many ways to produce

neon-looking alternatives and ignores that Fallon could have

and actually did accomplish it without infringing the

patents-in-suit.

Factor 11, on the other hand, could argue for an

increase in the royalty rate.  Fallon has been successful with

the use of the technology, and its products have done

reasonably well, though the evidence indicates its design and

relationships were likely responsible for most of that

success.  Overall, these factors, considered together, support

the lower royalty rate.

Factor 12 is a portion of the profit or selling price

that is customary in the sign industry or in comparable

industry that would allow for the use of the invention or

analogous inventions.  Beyond the licensing I just discussed,

I'm unaware of any customary profit allocations specific to

this industry.  However, as I explained earlier, I employed

the widely accepted cross industry rule of thumb as my

starting point for calculating the reasonable royalty.  The

rule of thumb says that a starting point would be one quarter

to one third of expect net profits.

The hypothetical negotiation would have occurred in

January 2005.  As part of it normal course of business, Fallon

had developed a forecast of its overall expected profitability

for 2005.

Table 4 here shows Fallon's expected net operating

profit for -- was 7.7 percent for 2005, which was up from 5.7

percent in 2004.  Fallon's CFO, Leah White, told me that this

would have been Fallon's best measure of its expected

profitability on LED products at the time of the hypothetical

negotiation.  This amount is also in line with Mr. Bratic's

analysis showing actual net operating profits of 8 percent
from Fallon's LED products.

As Table Five shows, using Fallon's expected 7.7
percent net operating profit, the rule of thumb suggests a
starting point for a royalty between 1.9 and 2.6 percent.  The
other Georgia-Pacific factors determine the final royalty.

Mr. Bratic errs in his evaluation of this factor
because he incorrectly uses gross rather than net profits.
Gross profits do not determine the viability of a company.
Companies consider net profits when determining whether to
offer a product and what they are willing to pay to license
technologies for that product.

This slide is an excerpt from Mr. Goldscheider's
article that we looked at earlier.  He makes it very clear
that the rule of thumb applies to net, not gross, profit.  The
rule of thumb is intuitively appealing.  Most people expect
that a company's willingness to pay for something would be
some portion, but not all, of the profits it expects to make.

Mr. Bratic's profit analysis focuses on a comparison
of Fallon's accused and nonaccused products, but he does no
analysis of the details of the underlying sales to determine
what other factors, such as high volume customers, may have
caused the observed differential in profits.

A more meaningful analysis would be would to compare
Fallon's expected operating profit for 2005, which is 7.7

percent, with the accused products, to its actual operating
product in 2004, which is 5.7 percent, without the accused
products.  The difference is 2 percent.

Fallon is in business to earn a bottom line profit.
Fallon would not have taken on the business risk for the
accused sales if it had to pay nearly all of its expected net
operating profits and license fees.  At the time of the
hypothetical negotiation, Fallon expected a net profit of 7.7
percent, which is very close to the operating margin it has
actually achieved on the accused sales.

Mr. Bratic's 7 percent royalty is clearly
unreasonable, given Fallon's profit expectations.  A more
appropriate royalty would be the 2 percent as I have explained
it to you.

Factors 13 is the portion of the realizable profit
that should be credited to the invention as distinguished from
nonpatented elements, the manufacturing process, business
risks, or significant features or improvements added by
Fallon.  As we have discussed, Fallon took on the business
risk of developing and manufacturing its own product.  At the
time of the hypothetical negotiation, Fallon's products were
very different from iLight's products because of Fallon's own
design efforts.

As I discussed earlier, Fallon's product was
sufficiently superior in overall quality, that Sam's Club

chose it over the iLight product offered by the Identity
Group.  Sam's Club would not have purchased additional iLights
from the Identity Group, even if Fallon had left the market.

Fallon's products are more profitable than iLight's
products.  I understand that the principal drivers of Fallon's
profits are its design and use of LEDs in its products.
ILight's invention focuses on the solid rod waveguide and
reflective sidewalls.  I understand that neither of these
characteristics are drivers of Fallon's profit margin.

16:28:35  It is also my understanding that Fallon's accused
products included a curved lens, where iLight's products have
a solid rod lens.  The curved lens requires less material,
making it less expensive to produce and lighter in weight,
which are both desirable characteristics not attributable to
the patented technology.

16:29:00  Another indicator of Fallon's contributions beyond the
patented products is the fact that, after iLight failed in
selling its Plexineon product to Sam's Club, and after iLight
terminated its relationship with the Identity Group, the
Identity Group created a redesigned product which looks very
similar to Fallon's.  The Identity Group subsequently sold its
Fallon-like product to Sam's Club under the Newon brand.  I
understand that the Identity Group's product is not accused by
iLight and pays no royalty to iLight.

16:29:38  Counsel, please hold up the original and redesigned

```
 1    Newon signs and the accused Fallon sign.

16:29:54  2         MR. LIPSHIE:  These are Exhibits 734 A, 735 and 725,

 3    Your Honor.

16:30:04  4         THE COURT:  All right.

16:30:07  5         THE WITNESS:  You can see the stark differences

 6    between this redesign, redesigned Newon sign, and the original

 7    Newon sign, as well as the similarities between it --

16:30:21  8         MR. PRICE:  May we approach?

16:30:36  9         THE COURT:  Yes.  Hold on.

16:30:36  10        (Whereupon, a bench conference was held, out of the

 11    hearing of the jury, to wit:)

16:30:38  12        MR. PRICE:  Unless I'm missing something, this is

 13    exactly what was struck.

16:30:42  14        MS. MCMILLION:  Your Honor said that the first

 15    sentence of that paragraph would be read and was not struck

 16    from the script.

16:30:52  17        MR. PRICE:  All I got was after stark differences,

 18    boom.  Because everything else is comparing the two signs.

16:30:59  19        MS. MCMILLION:  And he did not read it into the

 20    record.

16:31:02  21        MR. LIPSHIE:  He did not.

16:31:18  22        THE COURT:  Where is his testimony?

16:31:21  23        MR. PRICE:  I haven't seen the markup, Your Honor.

 24    Yours is different than what I wrote down.  That may be my

 25    bad.
```

16:31:43  1                    (Conclusion of bench conference.)

16:31:49  2           MR. LIPSHIE:  All right, Mr. Degen.  You can proceed.

16:31:51  3           THE WITNESS:  Where do I proceed?

16:31:54  4           THE COURT:  The last sentence you read, sir.  Start

5       with the first paragraph.  The first sentence of that

6       paragraph near the bottom of the page.

16:32:01  7           THE WITNESS:  Okay.  You can see the stark differences

8       between -- you can see the stark differences between this

9       redesigned Newon sign and the original Newon sign, as well as

10      the similarities between it and the Fallon sign.

16:32:30  11          The success of Identity Group with its redesigned

12      product, which appears to be modeled after Fallon's original

13      LED product, demonstrates the value of Fallon's design

14      contribution to the accused products beyond the patented

15      technology.

16:32:49  16          The Identity Group sign also demonstrates another

17      noninfringing design.  Finally, Identity Group's success is

18      another example of the importance of relationships in this

19      market.

16:33:04  20          Fallon's substantial contributions call for a lower

21      royalty rate.  My reasonable royalty, unlike Mr. Bratic's,

22      reflects the fact that Fallon made significant contributions

23      in terms of design and took on the business risk of developing

24      and manufacturing its own unique product.

16:33:23  25          Also, Fallon contributed existing business

relationships that were important to making the accused's
sales. Mr. Bratic fails to account adequately for Fallon's
contribution. The result is his overstated royalty rate
opinion.

16:33:43 The last Georgia-Pacific factor would be to determine
the amount that iLight and Fallon would have agreed upon at
the time the infringement began if both had been reasonably
and voluntarily trying to reach an agreement. In essence,
this factor is a summarizing factor which takes into account
all the other 14 factors.

16:34:09 From a review on a factor by factor basis, only one
factor can arguably support a higher royalty. When all
factors are considered together, the facts and circumstances
of this case call for a lower royalty. It is my opinion that
a reasonable royalty would be no more than two percent of
infringing revenues. This represents over 25 percent of
Fallon's expected profit.

16:34:40 This slide summarizes my opinion. A royalty of 2
percent falls within the across-industry rule of thumb based
on expected profitability. It is at the lower end of the rule
of thumb because of the lack of direct competition, the
substantial contributions of Fallon in terms of design and
relationships, and the existence of several acceptable
noninfringing alternatives.

16:35:05 Therefore, the damages in this case should be a

reasonable royalty of at most 2 percent of Fallon's net sales,

which is $590,274, based on the actual sales through September

2008.  If you estimate the sales as Mr. Bratic did through the

end of trial, it wouldn't change -- through the end of trial,

it wouldn't change the 2 percent royalty percentage, but it

would increase the royalty payment by approximately $118,000.

But if you agree that Fallon's current, nonaccused

technology could have been implemented, then the appropriate

damage award would be $30,000 to $40,000, which is

approximately how much it would have cost Fallon to rebuild

its tools and restructure its manufacturing.  This would be

more than iLight's opportunity cost inasmuch as the evidence

indicates that iLight lost no sales.

From Fallon's side, paying the retooling cost as a

royalty would have allowed it to continue selling without

having to retool, though it may have done so anyway as it

improved its product.

MR. LIPSHIE:  Thank you, Mr. Degen.

THE COURT:  You may cross examine.

CROSS EXAMINATION

BY MR. PRICE:

Q.    Good afternoon, Mr. Degen.  I'm Stephen Price.

We met earlier.  I'm one of the attorneys representing iLight

in this case.

A.    Good afternoon.

1          Q.     I'm going to first start out by asking you some

2     questions about this 7.7 percent expected net operating

3     profits figure that you used.  If I understood your testimony,

4     you believe Mr. Bratic's 7 percent royalty rate is too high

5     because Fallon only expected a 7.7 percent net operating

6     profit in 2005; is that correct?

7          A.     Not completely.

8          Q.     Well, I'm quoting verbatim from your narrative.

9     Is that inaccurate?

10         A.     Well, but I also explained in my narrative that

11    Leah White told me that that would have been their best

12    estimate of what their expected profitability would be from

13    their LED lights.  So both of those things I relied on.

14         Q.     I see.  You led me right to my next question.

15    I appreciate that.  Because you specifically testified later

16    that Fallon had, quote, developed a forecast of its overall

17    expected profitability for 2005, including an, quote, expected

18    net operating margin of 7.7 percent; isn't that correct?

19         A.     That's correct.

20         Q.     So the 7.7 Figure you rely on is the overall

21    expected net operating profits in 2005 for all of the products

22    solid by Fallon, including its neon signs; isn't that correct?

23         A.     I rely on it.  It was historically the forecast

24    going forward, but I was also told by Leah White that it would

25    be their best estimate of what would have been earned on the

LED lights.  In fact, Mr. Bratic's analysis confirmed that
their actual profit on the LED lights was 8.1 percent in terms
of net operating profit, so they are all very consistent.

16:38:26     THE COURT:  It would be helpful, sir, listen to his
question.  Respond to his question.  If there is some
clarification, the other lawyer is going to get back up and
clarify.

16:38:38     THE WITNESS:  Okay.

16:38:38 BY MR. PRICE:

16:38:38     Q.    The reason you are relying on the overall
expected profitability, because those are the only damages --
I'm sorry, those are the only figures that Fallon was then
tracking at the time of the hypothetical negotiation; isn't
16:38:48 that correct?

16:38:50     A.    That's correct.  It's always the case that
there is no actual profitability for the accused product
because it hasn't been made yet, so it's a very, very standard
approach.

16:39:02     Q.    I realize -- they weren't tracking that data
for just LED sales or for just the neon sales at that time,
were they?

16:39:11     A.    They couldn't.  There were no LED sales prior
to the first sale that was accused.

16:39:17     Q.    But they didn't track it at all, even on the
actual, at that point; isn't that correct?

16:39:20  1          A.     I'm guess I'm missing something.  It didn't

         2    exist.  They could not track it.  There were no LED sales.

16:39:26  3          Q.     I understand.  But even on the actuals in 2005,

         4    they were not segregating that data between neon versus LED on

         5    the operating cost manner.  So when you are looking at overall

         6    net profit margin, you are looking at the overall products,

         7    neon included, not just LED; isn't that correct, sir?

16:39:45  8          A.     I guess I'm confused.  When you are talking

         9    about 2005, are you talking about January before the

        10    hypothetical negotiation?  Or are you asking about all of

        11    2005, even after the first accused sale?

16:40:00 12          Q.     Well, A, when you are using the 7.7 figure,

        13    once again, you are looking at only the overall net operating

        14    profit, which would be applicable to both neon signs as well

        15    as the LED signs; isn't that correct, sir?

16:40:17 16          THE COURT:  Well, his question is, for what year?

16:40:20 17          MR. PRICE:  Yes, I know.  And I'm talking about 2005.

16:40:22 18          THE COURT:  At the end of 2005 or the beginning of

        19    2005?

16:40:24 20    BY MR. PRICE:

16:40:33 21          Q.     Well, we actually covered both.  And at the

        22    beginning, the 7.7 figure you are talking about, it was a

        23    forecast Figure for 2005; correct?

16:40:37 24          A.     That's correct.

16:40:38 25          Q.     And that forecasted figure was not broken down

between the net operating profit margin for LED signs as

        opposed to neon signs; correct?

16:40:41    A.     That's correct.

16:40:44    Q.     And they didn't break their data down in that

        type of manner in the forecast?

16:40:47    A.     They did not.

16:40:50    Q.     So the 7.7 figure you are relying on is not the

        expected net operating margin for only the accused LED signs

        at issue; isn't that true?

16:41:03    A.     As I've already explained, --

16:41:04    Q.     Is it true or not?

16:41:07    A.     The 7 percent -- 7.7 percent Figure I'm relying

        on, I'm relying on because Leah White told me it would have

        been their best available estimate of what their expectation

        for LED was.  Expectation is a relevant concept.  And Leah

        White told me it was the best evidence of their expectation.

        I was also aware at that point that Mr. Bratic's own

        analysis was confirmatory of that expectation.  So I was very

        comfortable relying on her representations to me that that's

        what I -- Fallon would have expected in January of 2005 when

        it was negotiated.

16:41:54    Q.     And Ms. Leah White, the CFO, so advised you

        because they did not track that data segregating between the

        accused products, the LED signs, and the neon products that

        are not at issue?

16:42:08 1        A.     I didn't explore with her why she told me that,

2   but in her opinion, as the CFO of the company, if they were

3   negotiating in 2005, in January of 2005, she told me that

4   their expected profit for their LED sales would be consistent

5   with their overall expected profit, which was 7.7 percent.

16:42:31 6        Q.     Ms. White did not have those expected figures

7   based only on LED signs, did she?  She only had them on the

8   overall product line, neons included?

16:42:42 9        THE COURT:  Did they do any projection of LED sales

10  for 2005?  In January?

16:42:48 11       THE WITNESS:  Not that I had seen in this case.

16:42:48 12  BY MR. PRICE:

16:42:49 13       Q.     Thank you.

16:42:52 14       A.     And not separate from their overall business.

16:42:54 15       Q.     Exactly.  And that's my point.

16:42:57 16       THE COURT:  Well, ask questions.

16:42:59 17       MR. PRICE:  Thank you, Your Honor.  I apologize.

16:42:59 18  BY MR. PRICE:

16:43:03 19       Q.     Let me ask you some more questions about the 25

20  percent rule of thumb.  Now, isn't it true that you then

21  applied the Goldscheider 25 percent rule of thumb to this 7.7

22  percent figure as your starting point, to come up with a

23  royalty range of 1.9 percent to 2.6 percent; is that correct?

16:43:23 24       A.     No.  Goldscheider's 25 percent rule of thumb is

25  an older version of the rule of thumb.  The rule of thumb I

1  employed is a quarter to a third.  And that's why I got a

2  range rather than a number.  So the 1.9 to 2.6 represents what

3  I think is a current embodiment of the rule of thumb, which is

4  a quarter to a third as the starting range.

16:43:47  5       Q.    I see.  So you applied this rule of thumb to

6  the 7.7 figure to come up with that 1.9 percent to 2.6 percent

7  range?

16:43:55  8       A.    That's correct.

16:43:56  9       Q.    Okay.  After discussing the Georgia-Pacific

10  factors, you then concluded that the applicable rate should be

11  2.6 percent here?

16:44:04  12       A.    That's correct.

16:44:09  13       Q.    And there is only a 0.6 percent difference

14  between the 2 point -- the 2 percent royalty rate you

15  recommended on the upper end that you started with, isn't that

16  correct?

16:44:18  17       A.    I think you need to do that one again.

16:44:23  18       Q.    I apologize.  Sometimes numbers --

16:44:26  19       THE COURT:  It only came down .6 percent from your

20  original projection of the range, the ultimate figure, is that

16:44:31  21  it?

16:44:35  22       THE WITNESS:  Well, the original range is a range, and

23  two percent is .6 below the upper bound and .1 below the lower

24  bound.  Does that answer your question?

16:44:41  25  BY MR. PRICE:

Q.    Yes.  So your ultimate recommendation was 2

percent, and that was a 0.6 percent difference from the upper

range you started with?

16:44:54  4          A.    Correct.

16:44:57  5          Q.    And it was only a 0.1 percent difference

between the lower end of the range you started with?

16:45:00  7          A.    Correct.

16:45:02  8          Q.    You also had mentioned, in discussing the

Georgia-Pacific factors, that you and Mr. Bratic you thought

agreed on certain factors.  You specifically testified that

both Mr. Bratic and you agreed that the hypothetical license

between Fallon and iLight would have been nonexclusive,

causing the royalty to be lower, didn't you?

16:45:20 14          A.    Yes.

16:45:23 15          Q.    Now, you did review Mr. Bratic's expert report

and narratives, did you not?

16:45:25 17          A.    Yes, I did.

16:45:27 18          Q.    But Mr. Bratic never said in his report or in

his narratives that this factor caused the royalty to be

lower, did he?

16:45:33 21          A.    I thought he did.

16:45:36 22          Q.    Would you be surprised to find that he never

did?

16:45:39 24          A.    A little bit.

16:45:43 25          Q.    So that was your conclusion, was it not?

16:45:46  1          A.    I don't recall that he made a big deal about

2    it.  I thought he had at one point indicated that exclusive

3    was generally worth less than nonexclusive.  I would be

4    surprised if he wouldn't admit that.  So whether he actually

5    came out and said it, or whether it was his admission that it

6    was nonexclusive, I just read into that that anybody who is in

7    licensing knows nonexclusive means lower.

16:46:17  8          Q.    So you inferred that?

16:46:17  9          A.    I may have.

16:46:18  10         Q.    Okay.

16:46:18  11         A.    Again, I can't point to where he said it, and I

12   may have inadvertently said that.  But usually nonexclusive

13   means lower.

16:46:26  14         Q.    You also testified that, quote, both Mr. Bratic

15   and I agree that there is no evidence that the accused sales

16   generated sales of any nonpatented items, and this calls for a

17   lower rate, did you not?

16:46:39  18         A.    Yes.

16:46:41  19         Q.    But once again, Mr. Bratic never said in his

20   report nor in his narratives that this factor calls for a

21   lower rate, did he?

16:46:48  22         A.    Again, I may have just been inferring it from

23   the fact that there were no ancillary sales, which means it's

24   going to be lower.  Whether he actually came out and said that

25   or not, I don't recall.  But I do recall him for sure

admitting that there were no ancillary sales.

16:47:05    Q.    But once again, this was your conclusion, not
Mr. Bratic's, that it called for a lower rate, wasn't it?

16:47:13    A.    Again, reading that there were none, I may have
inferred that.  I apologize if I did.  But if we both agree
that there are no ancillary sales, I think that argues for a
lower rate, and I don't see him disagreeing.

16:47:28    Q.    Well, suffice it to say I understand he does.
But we can move on.

16:47:31    A.    Okay.

16:47:33    Q.    Let's talk about noninfringing alternatives.
It is your position I understand that, quote, had Fallon not
been able to offer an acceptable noninfringing products, Sam's
Club could have chosen an LED sign from another supplier,
16:47:46 isn't it?

16:47:46    A.    Yes.

16:47:49    Q.    But you personally don't have the technical
expertise to do such a product comparison, do you?

16:47:55    A.    I'm not a technical expert.

16:47:55    Q.    Yes.

16:48:02    A.    I do note that Sam's did buy the redesigned
Newon sign, which I believe Mr. Cleaver said is not accused.
So I have a market observation of them, of Sam's Club, willing
to accept a design with a squared off waveguide in -- I can't
remember if it was 2006 or 2007.

16:48:22 1      Q.      So you are you're talking about the sign they

2      held up with the big block letters, a much bigger size than

3      what neon comes in?  Is that what you are talking about?

16:48:37 4      A.      I'm talking about the redesigned Newon sign.  I

5      think it has hours at the bottom of it.  But the open part of

6      it -- my understanding is the open part of it is made with a

7      squared off waveguide, and that's why it doesn't infringe.

16:48:51 8      Q.      Exactly.  It's a classic back lit sign.  I'm

9      with you.  Okay.  But in fact, you don't know whether Sam's

10     Club would have found any such signs to be a, quote, unquote,

11     acceptable alternative, do you?

16:49:03 12     A.      Well, they are currently selling it.  I'm

13     opening the book of wisdom a little bit to say they like it

14     now, they clearly view it as acceptable, in today's market I'm

15     not aware that anything has changed.

16:49:17 16     Q.      But you're not suggesting, sir, that the

17     redesigned Newon sign with the big block letters is attempting

18     to simulate neon, are you?

16:49:25 19     A.      It sure looks that way to me.

16:49:31 20     Q.      Okay.  Now, --

16:49:33 21     A.      It's not a neon sign.

16:49:37 22     Q.      Absolutely.  No contest on that.  Mr. Degen,

23     you also personally don't have the personal expertise to opine

24     as to whether the Lektron and Plexineon products are

25     comparable in structure, do you?

16:49:52  1          A.     No, I do not.

16:49:55  2          Q.     Now, you asked Fallon's counsel to come up here

          3    and show the Lektron architectural trim product as well as the

          4    Plexineon architectural with trim product, didn't you?

16:50:05  5          A.     Correct.

16:50:09  6          Q.     You have never seen that Lektron product ever

          7    been made into a sign, have you?

16:50:15  8          A.     I don't think it has ever been made into a

          9    sign, is my understanding.

16:50:21  10         Q.     Exactly.  Let me ask you about some of the

          11   agreements that you discussed iLight had.  Specifically, you

          12   assert that, quote, Mr. Bratic's analysis is contradicted by

          13   the fact that iLight has licensed its LED patents to other

          14   sign companies, don't you?

16:50:34  15         A.     Yes.

16:50:38  16         Q.     Now, when you make that assertion, are you

          17   referring to iLight's agreements with the Identity Group and

          18   Image Works?

16:50:43  19         A.     Yes.

16:50:46  20         Q.     Now, both the Identity Group's and Image Works'

          21   agreements with iLight involved cooperative partnerships to

          22   jointly make and sell LED signs to certain customers or

          23   markets, didn't they?

16:51:02  24         A.     Correct.  Specifically in the IDG case, Sam's

          25   Club, which is the sales that were at issue at the time of the

hypothetical negotiation. So we're talking about iLight

entering into an agreement with Identity Group to access the

very customer that they are not claiming they would have

gotten separate sales for.

16:51:23    Q.    But this is a collaborative effort; right?

ILight made certain parts of the waveguide, it marked it up,

sold it to Identity Group, made a profit from it, from the

mark-up, then they in turn sold it to people like Sam's Club;

correct?

16:51:37    A.    Yes.

16:51:39    Q.    Okay.  Now, on the other agreement, Image

Works, I believe you specifically described it as a joint

venture to sell LED signs to R.J.R.?

16:51:50    A.    That's the way I understood it, yes.

16:51:54    Q.    And not a one-way patent license as involved in

the negotiation here; correct?

16:51:56    A.    Correct.

16:51:58    Q.    Now, on the other hand, Fallon -- they were

competing with iLight to sell LED signs to R.J.R., weren't

they?

16:52:06    A.    No.  My understanding is that iLight really

wasn't in a position to sell to R.J.R.  Only through these

kinds of joint ventures --

16:52:15    Q.    I don't think you heard my question.  My

question was, on the other hand, Fallon was competing with

iLight, and in a sense Image Works with iLight, to sell LED

signs to R.J.R., weren't they?

16:52:28    A.    Correct.

16:52:31    Q.    So on the one hand you had collaborative

relationship between people like Image Works and iLight, on

the other hand, you had a competitive relationship between

iLight and Fallon?

16:52:42    A.    Is that a question?

16:52:43    Q.    Yes.

16:52:46    A.    Okay.  Let me respond then.  What these

licenses demonstrate to me is that iLight, basically an

architectural trim company, is finding it necessary to form

agreements to share its technology in order to access the sign

market, because it doesn't have the relationships, it doesn't

have the design power.  It tried to do that with IDG, and it

produced a junky sign that Sam's didn't want.  It did it

successfully with R.J. Reynolds, and they were able to sell

the Camel sign.

16:53:30    But they competed in numerous other places, even where

Fallon was not the winning sign, and they couldn't get the

business.

16:53:35    So all of this discussion is under the Georgia-Pacific

factor, in terms of the competitive relationship, and are they

working to maintain their monopoly?  Are they trying to keep

it all for themselves?

16:53:43  1        And I think pretty clearly what's happening here is

2    that iLight realized that they needed to share their

3    technology, they needed to partner, they needed to license, to

4    access the sign market.

16:53:57  5        Q.    Mr. Degen, you referred to the Identity

6    Group/iLight sign as junky, flimsy.  You are referring to a

7    sign they made together back in 2004; right?

16:54:05  8        A.    Yes.

16:54:08  9        Q.    You weren't talking about the sign that iLight

10    made separately, an Open sign, that it then took on its own to

11    Sam's Club?

16:54:15 12        A.    In 2006?

16:54:16 13        Q.    Yes.

16:54:16 14        A.    Yes.

16:54:19 15        Q.    You weren't talking about this sign?

16:54:22 16        A.    I was not.  Although I understand Sam's didn't

17    want this one, either.

16:54:25 18        Q.    Correct.  And at that time, Fallon was then

19    selling its accused products to Sam's Club already.  They

20    started that in 2005, did they not?

16:54:35 21        A.    Well, I think the e-mail from the Loberfeld

22    made it clear that Sam's didn't like the appearance.

16:54:43 23        Q.    That's not my question.

16:54:44 24              Your Honor, the witness --

16:54:46 25              THE COURT:  Please answer the question.  The other

```
 1   side will get in.  He will ask it.

 2          THE WITNESS:  Okay.

 3   BY MR. PRICE:

 4          Q.    I asked you, at the time that iLight went to

 5   Sam's with their own redesigned sign, there is no foam backing

 6   or anything on this one?

 7          A.    That's correct.

 8          Q.    At that time Fallon had already come in and

 9   solid the accused signs in 2005 to Sam's Club, had they not?

10          A.    That's correct.

11          Q.    Okay.  Oh, and the sign I'm holding, Your

12   Honor, is Plaintiff's Exhibit TX-6-D.

13          Let me ask you about the competition you are referring

14   to.  It's your position, as I understand it, that there was

15   no, quote, direct competition between iLight and Fallon with

16   respect to Sam's Club and Anheuser-Busch; correct?

17          A.    Correct.

18          Q.    Would you display TX 26, please.  Particularly,

19   will you focus on the first full paragraph in that e-mail,

20   please.

21          We're looking at an e-mail dated December 3, 2005 from

22   Tim Demmond, Fallon's vice-president of sales.  In that e-mail

23   Mr. Demmond says:

24          AB said they are going to order 70,000 units these

25   products --
```

AB being Anheuser-Bush.

-- and they absolutely need to have Version 2 in their

3   hands next week.  We either deliver or they buy from iLight.

4   Our fate is in our hands.

16:56:39  5          Is it still your position that iLight was not

6   competing with respect to Anheuser-Busch, sir?

16:56:45  7          A.     Yes.  That same e-mail includes references to

8   three companies -- Pepsi, Coors and Costco, where iLight had

9   prototypes.  Fallon did not get those sales, and neither did

10   iLight.  The idea that iLight would have gotten these sales in

11   the absence -- I think when Tim Fallon was asked about this in

12   his deposition, he said the reference to iLight was just to

13   stir up the troops.

16:57:09  14         But what's clear is that it's just pure speculation

15   that iLight would have gotten these sales in the absence of

16   Fallon, because this very e-mail contains three examples where

17   that wasn't true.

16:57:21  18         Q.     But sir, isn't it also pure speculation for you

19   to say that, if Fallon had not been able to make those accused

20   sales, that they, in turn, would have accepted some sort of

21   noninfringing alternative as you have suggested?

16:57:36  22         A.     Well, we know --

16:57:39  23         Q.     Sir, you do know not know whether they would

24   have accepted a noninfringing alternative, do you?

16:57:44  25         A.     But we know that Bud did not choose iLight as

the second or third provider.  They chose three providers, and

iLight wasn't in the top three.

16:57:53  Q.    Let me get this straight.  So you recognize

that iLight was specifically solicited by Anheuser-Busch to

submit a bid for the same projects which Fallon ultimately

sold the accused sales to Anheuser-Busch.  You know that;

right?

16:58:09  A.    Correct.

16:58:13  Q.    So iLight was solicited, there were a couple

more people solicited, three I think ultimately submitted bids

-- iLight, Fallon and one other company.  But you are saying

iLight didn't compete simply because Fallon ultimately got

chosen?

16:58:26  A.    No, I'm saying iLight didn't compete because my

understanding is that Anheuser-Busch buys LED signs from three

companies, and iLight is not on the list.  So if Fallon isn't

going to be chosen, I think the next logical company would be

the number two or the number three spot on the list.

16:58:44  Q.    Would you broaden that again?

16:58:48  THE COURT:  Let me see.  Would you agree, based on the

language in the first paragraph of that e-mail, that at some

point Fallon viewed iLight as a serious competitor?

16:59:05  THE WITNESS:  Not necessarily.  I've seen those kinds

of e-mails where they say, you know, they are trying to fire

up the group.  I don't think it's the case that Fallon would

have believed that, if we're not a competitor, iLight would

have gotten the business.

16:59:21 THE COURT: That wasn't my question. The question is

whether you perceived them as a competitor.

16:59:31 THE WITNESS: As some level of competitor, yes. As a

default competitor who would have won the sales in the

absence, yes.

16:59:38 BY MR. PRICE:

16:59:41 Q. I've got a follow-up. Would you pull up TX 51,

please. And go to the last page.

16:59:49 Now, in preparing for your report, you view various --

could we turn that the other way, please. In preparing your

report, you viewed various forecasts and other financial

documents that were provided to you by Fallon; correct?

17:00:01 A. Correct.

17:00:03 Q. This, in particular, is the last page of the

fiscal year 2006 forecast. In particular, I want to direct

your attention to Line 79. This is comments that were made to

that forecast. Will you blow that up for me on 79, please.

Right there it says:

17:00:29 R.J.R. is looking at Fallon's LED unit. We will be

producing a prototype and competing against iLight. Too soon

to add to forecast.

17:00:36 Now, we've already talked about this. In fact,

iLight, in its collaborative relationship with Image Works, it

1    got that business with R.J.R., did it not?

17:00:49  2         MR. LIPSHIE:  Your Honor, could we approach briefly?

17:00:53  3         (Whereupon, a bench conference was held, out of the

4    hearing of the jury, to wit:)

17:00:56  5         MR. LIPSHIE:  What is the date of this document?

17:00:58  6         MR. PRICE:  It was made in 2005.  It was a fiscal year

7    2006 forecast.

17:01:05  8         MS. MCMILLION:  2006.  It would have been after the

9    date of the hypothetical negotiations.

17:01:09 10         THE COURT:  He's asking a question about --

17:01:14 11         MR. LIPSHIE:  Can we just ask if he knows what it is,

12    let him lay a foundation.

17:01:18 13         MR. PRICE:  This question is not going to the

14    forecast.  It's part of the sales forecast.  The question is

15    going to what he knows about the competition.

17:01:34 16         THE COURT:  Overruled.

17:01:34 17         (Conclusion of bench conference.)

17:01:34 18    BY MR. PRICE:

17:01:36 19         Q.    If I may direct your attention once again to

20    Line 79 on the last page of the fiscal year 2006 sales

21    forecast.  In those comments, Fallon states:

17:01:49 22         R.J.R. is looking at Fallon's LED unit.  We will be

23    producing a prototype and competing with against iLight.  Too

24    soon to add to forecast.

17:01:57 25         Now, in fact, iLight and Image Works in their

collaborative relationship -- they got that business, did they not?

17:02:00    A.    Yes, they did.

17:02:03    Q.    Fallon did not get the business, at least at that time?

17:02:04    A.    That's correct.

17:02:07    Q.    So is it your opinion then that Fallon was not a competitor, was not competing, against iLight, despite what they say here?

17:02:14    A.    At the time of the hypothetical negotiation, the joint venture with Image Works did not exist. And as a predominantly manufacturer of architectural neon, I do not believe that Fallon would have considered iLight a serious contender. The relationship with Image Works made them a serious contender, because it gave them access to design and to relationships, but that was not known at the time of the hypothetical negotiation.

17:02:43    Q.    I think you are familiar with the book of wisdom, are you not?

17:02:45    A.    I am.

17:02:48    Q.    And under the book of wisdom, persons in your shoes are not limited purely to looking at what was going on in January 2005 and behind. You don't have to put on your blinders, do you?

17:03:00    A.    You do not, unless there is evidence indicating

that it's counter to what would have been expected.  And I
would argue, at the time of the hypothetical negotiation, in
negotiating a license with Fallon for assess to the sign
industry, it would in some sense have precluded a joint
venture with Image Works.

17:03:23    What's clear is that iLight needed access to the sign
market, which if it got it by licensing Fallon, it wouldn't
have needed to go to Image Works for such a relationship.

17:03:40    Q.    I ask you again.  Fallon did not get R.J.R.'s
business, did they not?

17:03:42    A.    They did not.

17:03:45    Q.    Would you, therefore, consider that Fallon was
not a competitor with iLight and Image Works for the R.J.R.
business?

17:03:52    A.    The same answer.  That would not have been
known at the time of the hypothetical negotiation, and it
could not have been anticipated, and is not an appropriate
application of the book of wisdom, because the hypothetical
negotiation itself was, in fact, a negotiation for iLight to
get access to the sign market.

17:04:44    Q.    I don't think we're going to get on the same
page here, so let's move on.

17:04:49    THE COURT:  No editorial comments.  Just ask your
questions.

17:04:51    MR. PRICE:  Thank you, Your Honor.

17:04:51  1    BY MR. PRICE:

17:04:55  2        Q.    You testified, Mr. Degen, that it was your,

        3    quote, understanding that every asserted claim of the patent

        4    requires reflective sidewalls, and that Fallon redesigned its

        5    products in 2008 to remove its sidewalls, didn't you?

17:05:09  6        A.    That's correct.  That's my understanding.

17:05:11  7        Q.    You weren't here when Dr. Roberts testified at

        8    trial, were you?

17:05:13  9        A.    I was not.

17:05:16 10        Q.    Now, are you aware that in his supplemental

       11    expert report and in his testimony here in court he testified

       12    that those redesigned signs do have sidewalls in part and that

       13    they do, in fact, infringe?

17:05:32 14        A.    I am aware that the Bowtie itself has

       15    sidewalls, but the lettering portion does not have sidewalls

       16    exactly.

17:05:42 17        Q.    The red Bowtie portion on that Budweiser sign

       18    right there, that has sidewalls; does it not?

17:05:44 19        A.    Again, that's my understanding, yes.

17:05:46 20        Q.    And you are not here suggesting that the entire

       21    sign has to have sidewalls to be infringing, are you?

17:05:50 22        A.    No.

17:05:53 23        Q.    Okay.  So if the jury were to disagree with you

       24    and agree with Dr. Roberts and find this sign is redesigned

       25    -- the sign to be infringing, then your retooling costs

1    estimate would no longer hold?

17:06:12  2        A.    No, that's a little confused.

17:06:15  3        Q.    I will be glad to rephrase.  The whole basis

4    for your retooling costs damages estimate assumes that the

5    redesigned products do not infringe.  Isn't that's correct?

17:06:32  6        A.    Not quite.  It assumes that the product could

7    be made as the letters are currently made without sidewalls.

8    Not that exact product, but that a product could be made that

9    would not infringe, just as the lettering section was done.

17:06:50 10        Q.    Well, no, you specifically said, and you quote,

11    that Fallon redesigned its products in 2008 to remove the

12    sidewalls, that they actually did it in 2008?

17:07:01 13        A.    Correct.  And they did with respect to the

14    lettering portion of that sign.

17:07:05 15        Q.    Oh.  So only a portion of the sign, not the

16    sign in its entirety?

17:07:09 17        A.    That's my understanding, yes.

17:07:12 18        Q.    So once again, you are not suggesting that if

19    only a part of the sign has sidewalls, that that makes it

20    noninfringing, are you?

17:07:20 21        A.    No.  To be noninfringing, they would have to

22    extend their redesign to the entire sign beyond the letters.

17:07:26 23        Q.    Which they haven't done, have they?

17:07:28 24        A.    Not that I'm aware of.

17:07:30 25        Q.    So if the jury were to agree with Dr. Roberts

that these redesigned signs have sidewalls in part and they

do, in fact, infringe, then they don't need to be applying the

retooling cost damages estimate, do they?

17:07:45   A.   That's incorrect.  If the jury believes that

the redesign that was applied to the letters could be applied

to the entire sign, then they can award the retooling cost

numbers.

17:08:03   Q.   I'm not sure I'm following you, but I will

leave it at that.

17:08:09   In any event, Mr. Degen, you assert that, quote, at

the time of the hypothetical negotiation, which in this case

would be January 2005, Fallon could have simply retooled its

manufacturing facilities to make its current noninfringing

design, don't you?

17:08:22   A.   That's my understanding.

17:08:26   Q.   But in fact, Fallon waited over three years

after the hypothetical negotiations, as well as two years

after this lawsuit was filed, to retool and redesign its

signs, didn't they?

17:08:41   A.   That's correct.

17:08:43   Q.   And in fact, as you just noted, they didn't

even remove all of the sidewalls, only a part of them?

17:08:47   A.   That's correct.

17:08:49   Q.   Now, you further assert that the, quote, cost

of retooling would have been approximately $30,000 to $40,000,

and that this is the amount that Fallon would have been

willing to pay on the eve of infringement, don't you?

17:09:04  A.    No, I say it's my understanding that that's the

cost of retooling.  That's not an assertion on my part.  But

to the extent that does represent the cost of retooling, my

assertion is that's what they would be willing to pay.

17:09:18  Q.    On the eve of infringement?

17:09:19  A.    Correct.

17:09:25  Q.    Now, this whole hypothetical negotiation -- you

are supposed to determine what a reasonable business person

would negotiate; correct?

17:09:34  A.    Correct.

17:09:38  Q.    So would a reasonable business person spend

$1.5 million in legal fees to pursue a lawsuit when they could

simply do a $40,000 retooling?

17:09:41  MR. LIPSHIE:  Your Honor, --

17:09:42  THE COURT:  Sustained.

17:09:44  Ladies and gentlemen of the jury, disregard the last

statement of counsel.

17:09:46  MR. PRICE:  May I approach?

17:09:56  THE COURT:  Yes, sir.

17:09:59  MR. PRICE:  Lincolnshire, the venture capital behind

them, produced a document which shows last fall they estimated

$1.5 million in legal fees for this lawsuit.  He is taking the

position that a reasonable business person would have simply

retooled for $30,000 to $40,000.  It makes no business sense
to spend $1.5 million for litigation, when you could have only
retooled for $30,000 to $40,000.  And I've got a document to
back it up if he doesn't agree.

17:10:31 5          MR. LIPSHIE:  He hasn't seen it.

17:10:32 6          MR. PRICE:  I'll gladly show it.

17:10:35 7          MR. LIPSHIE:  He needs to be careful.  If you want to
open the door on an insurance motion, we'll get into how much
these people are paying their attorneys to have their own
lawsuit.

17:10:48 11          MR. PRICE:  It has nothing to do with it.

17:10:49 12          MR. LIPSHIE:  I think it has plenty to do with it.

17:10:52 13          THE COURT:  The question is whether --

17:10:55 14          MR. PRICE:  My question, is it a reasonable business
question.  The estimate is $1.5 million.

17:11:01 16          MR. LIPSHIE:  Your Honor, the prejudicial value
clearly outweighs any probative value.

17:11:08 18          MR. PRICE:  That's not the point.  He's making an
assessment based on what reasonable business people do.

17:11:23 20          MR. LIPSHIE:  What are you offering it for, if not to
prove the truth of the matter asserted?

17:11:29 22          MR. PRICE:  Going straight to the assessment of what a
reasonable business person would do on a hypothetical
negotiation.  My position is that a reasonable business person
would not -- if he could retool for $30,000, 40,000 three

1    years ago as he suggests, then why the heck would you then

2    proceed forward on a $1.5 million in litigation.

17:11:47  3         MR. LIPSHIE:  He thinks legal fees ought to be under

4    the Georgia-Pacific cases, Your Honor, and they are not.  He

5    has made them so.

17:11:57  6         THE COURT:  How much longer are you going with this?

17:12:04  7         MR. PRICE:  This is it.

17:12:06  8         MR. LIPSHIE:  Is this the same document you tried to

9    get in yesterday and couldn't?

17:12:12  10         MR. PRICE:  It's a different document, Sam.  I didn't

11    need the other document.

17:12:20  12         MR. LIPSHIE:  This will open up a can of worms.  We'll

13    get into their legal fees too, and motivation.  That is an

14    issue for Your Honor, legal fees.

17:12:42  15         MR. PRICE:  It's not going to legal fees.  It's going

16    into hypothetical negotiation whether a reasonable prudent

17    business person could spend $1.5 million in litigation when

18    they could simply retool for $30,000 or $40,000.

17:12:54  19         THE COURT:  Counsel, would you agree that he has

20    configured the numbers of all of the factors, the prior seller

21    pay off.  Has nothing to do with this.

17:13:11  22         MR. PRICE:  I agree.  All I'm focusing on is --

17:13:14  23         THE COURT:  what he calculated from May of 2009 has

24    nothing to do with this.

17:13:15  25         MR. PRICE:  I agree.  And the only reason I would

focus on this document at all would be the $1.5 million

estimate of iLight litigation and legal fees.

THE COURT:  Well, it's got a Bates stamped number on

this.

I take it, Sam, this is one of you all's documents?

MR. LIPSHIE:  Yes, sir.  Was it was produced by

Lincolnshire, a nonparty to this litigation.  Has to do with a

capital associated with financing --

MR. PRICE:  The venture capital fund behind them.  The

president of Fallon is the senior director of Lincolnshire.

THE COURT:  Yes, but I think you have to show that

that was a decision made by iLight -- I mean, by Fallon.

(Conclusion of bench conference.)

THE COURT:  Ladies and gentlemen of the jury, I'm

going to have to excuse you for a few minutes.  Please don't

discuss the case amongst yourselves until you receive all of

the evidence, the argument of counsel and the charge of the

Court.

Is there any juror who is going to be seriously

inconvenienced if we go about another 20 minutes?  Anybody?

If so, please let me know.  All right.  If we can't resolve

this matter shortly, we're going to adjourn for the day.  All

right.

(Jury out.)

THE COURT:  I'm not really sure I -- this apparently

was generated in discovery.

17:15:07 MR. PRICE:  Yes.

17:15:09 THE COURT:  There have been some references to these
different entities, but I'm a little uncertain as to the
relationship -- if any, the exact relationship between these
various entities, to understand what this means.

17:15:24 MR. PRICE:  I believe the evidence in the record, and
I'm sure Mr. Kittredge will correct me if I misstate this --
is that Lincolnshire, as a venture capital fund -- there is a
fund at Lincolnshire which essentially owns what is Fallon
Visual Products.  And Fallon Luminous is a subsidiary of
Fallon Visual products.  Is that a correct statement?

17:15:49 MR. KITTREDGE:  Lincolnshire is a private equity
company, Your Honor.  They own a number of companies.
Somewhere down the chain is Fallon Luminous Products.
Lincolnshire is not a party to this lawsuit.  This document
was produced under separate subpoena.  And it looks clear to
me like what they are trying to use is information that looks
like attorney-client privilege and attorney work product
information and was inadvertently disclosed, and they should
not be allowed to use it with this witness or anyone else.

17:16:19 MR. PRICE:  I do not see any privileged information in
there.  What they have is in there is an estimate of fees.

17:16:24 MR. KITTREDGE:  For a specific lawsuit.  And that's
clearly work product.

1    THE COURT:  Well, it seems to me sort of like a cross

2    benefit analysis of different courses of conduct.

3    MR. PRICE:  Exactly.

4    THE COURT:  But my concern is what -- it may represent

5    the committee's view, but I think you've got to look at it

6    from Fallon's -- whether Fallon would make the same decision.

7    MR. KITTREDGE:  Not only that, Your Honor, the

8    question he is asking is, would a reasonable person decide to

9    do this back in 2004.  This is dated 2008.  It's not Fallon.

10   It's four years later.  It's probably work product and

11   privileged.  It's not a document that anybody is here to

12   sponsor.  It's just entirely inappropriate.

13   MR. PRICE:  Actually, what he has testified to is

14   that, way back at the beginning, in January of 2005, that they

15   could have retooled for $30,000 or $40,000, when, in fact,

16   they didn't even redesign until three years later in 2008.

17   And Doug Begen, President of Fallon, is Senior Director of

18   Lincolnshire.  These guys are all intertwined with each other.

19   That's why they are making fee estimates.

20   MR. KITTREDGE:  There's no witness to sponsor this

21   document, Your Honor.  It's four years after the hypothetical

22   negotiation he is talking about.  Everything else counsel just

23   said, he has already crossed him very effectively, Your Honor.

24   This is a document that there is nobody to sponsor.  And we

25   don't even know what it is.  And he shouldn't be able to put

1   it in front of this witness, in front of this jury.

17:17:57  2        MR. PRICE:  Your Honor, at the end of the day, the

3   hypothetical negotiation is what a reasonable business person

4   could do.

17:18:04  5        THE COURT:  Well, I think what you could -- the only

6   -- a fair question, in light of what's being pursued, and --

7   is -- I'm not sure you can use that document.  I don't think

8   it has been authenticated.  It's from a third party.  It's

9   dated 2008.  And it could be backward-looking in terms of

10  forward-looking, which you do when you try and formulate a

11  reasonable surety rate.  And the litigation didn't come until

12  2006.  So I'm not sure if he's talking about a decision in

13  January of 2005, that litigation in 2006 --

17:19:01  14       MR. PRICE:  And they didn't redesign until 2008,

15  either, but this witness has taken the position they could

16  have done it back in 2005.

17:19:08  17       MR. KITTREDGE:  He is not taking the position.  He

18  says, I was informed of that.  And counsel has already crossed

19  him, you don't know, you have only been informed.

17:19:21  20       THE COURT:  Well, he testified that he -- to my

21  recollection, he testified that he was aware they didn't do

22  the product until 2008.  He said he was aware of that.

17:19:32  23       MR. KITTREDGE:  That's established, very effectively.

17:19:37  24       THE COURT:  If the agreement is -- and I think both

25  experts agree that the issue is what would you have done in

January of 2005.  And if that's the -- if they agreed that

that is the standard by which you evaluate this, I don't know

that they can use a post-event to establish the basis -- the

reasonable projection.

17:19:58    MR. PRICE:  There is a lot of case law on what they

call the Book of Wisdom, Your Honor.  The Book of Wisdom says

you don't have to put blinders on and not look at anything

past January of 2005.

17:20:15    THE COURT:  He gave his justification as to why he

thought that was an exception to the Book of Wisdom.

17:20:18    MR. KITTREDGE:  Your Honor, we can't even tell what

this document --

17:20:20    THE COURT:  Well, I think that document is going out.

The only issue that may be relevant is whether -- how would

you evaluate litigation costs as part of the formula of

deciding whether you want to arrive at a license fee.  I think

that's a legitimate question.

17:20:42    MR. PRICE:  Would you say that again?  I want to make

sure I don't run afoul.

17:20:46    THE COURT:  Well, I don't want to ask your questions

for you.

17:20:50    MR. PRICE:  No, I know.  I don't want to ask something

that's going to put us right back here again.

17:20:55    THE COURT:  I think he is entitled to ask, if there is

this recognized exception to the book of wisdom, that you can

consider subsequent events. He can ask him what the impact of
this litigation and the litigation cost for a three year
period would have on his calculation of a fee. If he has one.
I don't know what he's going to say, but he can ask him.

17:21:18    MR. KITTREDGE: I don't think it's a proper question,
because the whole hypothetical negotiation assumes both
parties agree there is infringement, the patent is invalid.
The litigation is not relevant to that. If that's Your
Honor's decision, I will sit down.

17:21:35    THE COURT: But the thing is, in 2005 they started
being served with notice that there was a consideration of
patent infringement.

17:21:40    MR. PRICE: That's correct.

17:21:42    THE COURT: So it would have been -- it's not that
distant a factor to consider as to what the cost and the
impact of patent infringement litigation would be on this
issue of $30,000 to $40,000.

17:21:56    MR. KITTREDGE: That's part of the assumption that's
built into the hypothetical negotiation. I don't have
anything more to say.

17:22:07    THE COURT: Well, I think he can ask that question.
Now, how he's going to address it, I have no idea.

17:22:11    MR. PRICE: If I can confer with co-counsel, we may
decide whether or not that's worthwhile. There is one other
line of questioning which I may or may not go down. I think

if you will give me a few minutes, we may decide to --

17:22:18  THE COURT:  Well, I'm kind of concerned about the jury.  I think they are about worn out.

17:22:23  MR. PRICE:  I know.  If you will give me two minutes, we'll wrap this up.  Thank you.

17:23:43  THE COURT:  We'll be in recess for two minutes.

17:23:43  (Recess.)

17:23:45  THE COURT:  Is the issue resolved?

17:23:47  MR. PRICE:  We're going to move on from that issue.  I do have one last line of questions on a different issue.

17:23:52  THE COURT:  How much longer are you going to question this witness?

17:23:55  MR. PRICE:  I'm guessing about 15 minutes.

17:23:56  THE COURT:  Do you have any redirect?

17:23:58  MR. LIPSHIE:  Not right now, Your Honor.

17:24:01  THE COURT:  Well, I'll tell you what.  I think the jury is tired.  I'm going to send them home, and we'll come back.

17:24:07  MR. PRICE:  That's fine, Your Honor.  This won't take long in the morning.

17:24:10  THE COURT:  I don't know what you are going to ask, and I don't know if that impacts his projection.  I usually double it.  I will go about thirty minutes --

17:24:20  MR. PRICE:  A handful of questions on one page.

17:24:21  THE COURT:  -- about six o'clock.

17:24:49  1        Bring the jury in, Mr. Marshal.

17:24:52  2        (Jury in.)

17:25:08  3        THE COURT:  All right, ladies and gentlemen of the

        4    jury.  We're going to call it a day.  I'm going to ask you to

        5    please come back tomorrow shortly before 9:00, we'll try and

        6    get started promptly.  I'm concerned that there will be

        7    additional questioning that may take us beyond your patience.

        8        So if you will hand your notepads to the Marshal, he

        9    will take custody of them until you return in the morning.

       10    And you can leave your notebooks on the chairs and the Marshal

       11    will collect them and have them there for you tomorrow.

17:25:41 12        So please don't discuss the evidence amongst

       13    yourselves until you receive all of the evidence, the argument

       14    of counsel, and the charge of the Court.  You are free to go.

17:26:09 15        (Jury out.)

17:26:17 16        THE COURT:  You all can have a seat.  Counsel, I have

       17    a draft of the jury instructions.  It's my belief that it has

       18    incorporated most of the -- what you all have agreed upon, but

       19    there may be some additional requirements.  So to move things

       20    along, I thought I would give you what we've got now, and I

       21    know there will be some additional language on infringement.

       22    Are there any other matters?

17:26:54 23        MR. KITTREDGE:  Could we talk briefly about the

       24    schedule, Your Honor?

17:26:58 25        THE COURT:  Well, as I understand it, for the defense,

we've got to finish this witness, we've got a short

deposition, and they have rebuttal of Mr. Roberts.

17:27:10        MR. KITTREDGE:  Do we get to close tomorrow afternoon?

17:27:12        THE COURT:  It depends on when we finish the jury

instructions.  If we can -- if we finish around 11:00

tomorrow, we'll have a jury instruction conference, and we'll

just see how it goes.  I will tell the jury to come back.  If

we finish around 11:00, I will ask the jury to come back

around 1:30.  And if we have the jury instructions finished,

then we'll have closing arguments tomorrow.  If it takes

longer to work out the jury instructions, I will tell them to

come back tomorrow morning, Wednesday morning.

17:27:45        MR. KITTREDGE:  One other issue besides the jury

instructions is the verdict form.  There is some dispute on

that.

17:27:54        THE COURT:  Well, I've been working on other matters.

You all look at the verdict form and see if there has been an

agreement.  See if it reflects your agreement.

17:28:04        MR. VEZEAU:  We'll work with that, Your Honor.

17:28:06        MR. KITTREDGE:  We filed something today with the

Court, Your Honor, that points out the current differences.

We'll see what we can do.  The current differences are pretty

extreme.

17:28:18        THE COURT:  Well, if they are extreme, then --

17:28:21        MR. KITTREDGE:  I'm afraid you may have to deal with

this.  We're pretty far apart.  Maybe we'll have some great

progress this evening.

17:28:31    MR. VEZEAU:  We haven't yet, of course, Your Honor,

seen what they filed, so we can't comment.

17:28:34    THE COURT:  I will encourage everybody to look and

talk.  And if you have talked ahead of time, then we'll be

able to maybe make the issues a little clearer.  We're in

recess.

17:28:45              * * * * *

REPORTER'S CERTIFICATE

2

3          I, Peggy G. Turner, Official Court Reporter for

4    the United States District Court for the Middle

5    District of Tennessee, with offices at Nashville, do

6    hereby certify:

7          That I reported on the Stenograph machine the

8    proceedings held in open court on April 27, 2009, in the

9    matter of ILIGHT V. FALLON, Case No. 2:06-0025; that said

10   proceedings in connection with the hearing were reduced to

11   typewritten form by me; and that the foregoing transcript,

12   Pages 717 through 969, is a true and accurate record of said

13   proceedings.

14         This the 17th day of May, 2009.

15

16

17

18                             _____
                               S/Peggy G. Turner, RPR
19                             Official Court Reporter

20

21

22

23

24

25