1            IN THE UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF TENNESSEE, COOKEVILLE DIVISION

3    ------------------------------------------------------------

4    ILIGHT TECHNOLOGIES,          )

5                 Plaintiff,       )

6                                  )

7    v.                            )  CASE NO. 2:06-0025

8                                  )

9    FALLON LUMINOUS PRODUCTS,     )

10                Defendant.       )

11   ------------------------------------------------------------

12                   TRANSCRIPT OF PROCEEDINGS

13                   VOLUME V - AMENDED

14   ------------------------------------------------------------

15   DATE:              April 24, 2009

16   TIME:              9:00 A.M.

17   BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

18                      And a Jury

19   ------------------------------------------------------------

20

21

22

23   COURT REPORTER:     PEGGY G. TURNER
                         OFFICIAL COURT REPORTER
24                       801 BROADWAY, ROOM A-837
                         NASHVILLE, TENNESSEE 37203
25                       PHONE:  (615)726-4893
                         Peggy_Turner@tnmd.uscourts.gov

```
 1                  A P P E A R A N C E S:

 2  For the Plaintiff:   Timothy J. Vezeau
                         Stephen Price
 3                       Melissa Hunter
                         Bill Ferrell
 4                       John Scruton

 5  For the Defendant:   Mark Kittredge
                         Jonathan Rose
 6                       Samuel Lipshie
                         Brandy McMillion
 7                       Douglas Sawyer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      W I T N E S S E S:

2    WALTER BRATIC
     Continued Statement by Mr. Bratic          Page 478
3    Cross Examination by Mr. Lipshie           Page 496
     Redirect Examination by Mr. Price          Page 558
4
     ERIC ERIKSSON
5    Video Deposition of Eric Eriksson          Page 567

6    TIMOTHY FALLON
     Video Deposition of Timothy Fallon         Page 576
7
     TIM DEMMOND
8    Video Deposition of Tim Demmond            Page 595

9    DOUG BAGIN
     Video Deposition of Doug Bagin             Page 603
10
     RICHARD HUO
11   Video Deposition of Richard Huo            Page 622

12   CHARLES RICHARD NELSON
     Direct Examination by Mr. Kittredge        Page 634
13   Cross Examination by Ms. Hunter            Page 658
     Redirect Examination by Mr. Kittredge      Page 668
14
     LEAH WHITE
15   Direct Examination by Mr. Sawyer           Page 670

16   SEAN CALLAHAN
     Video Deposition of Sean Callahan          Page 693
17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

08:57:28  THE COURT:  Any preliminary matters before we get started, either side?

08:57:33  MR. VEZEAU:  No, we're fine.

08:57:37  THE COURT:  I don't mean to be preachy, but I think it would be helpful if you all picked up the pace.  Direct examination is a planned examination.  You have full discovery to prepare for cross examination.  If you would make your points on cross examination and move on, I think it would be appreciated.  Because I'm having to reschedule a number of matters on my calendar to accommodate and avoid any disruption of this trial.  And I would very seriously hate to adjourn this trial and then regather at a later date, but the slower this goes, the more likely that might happen.

08:58:22  MR. PRICE:  Your Honor, as a reminder, that Tuesday issue with the juror who had the conflict, if we could figure that one out at some point today so that the witnesses, if that happens on Tuesday, could be so notified.

08:58:35  THE COURT:  Who are the other witnesses for today?

08:58:37  MR. PRICE:  Today we're going to have Mr. Bratic on direct and then cross, we should have some video clips, --

08:58:46  THE COURT:  Video clips of what?

08:58:47  MR. PRICE:  Deposition testimony.

08:58:48  THE COURT:  Whose depositions?

08:58:49  MS. HUNTER:  Your Honor, it's the deposition testimony

```
            1   of Eric Eriksson, Tim Demmond, Tim Fallon, Richard Huo and
            2   Doug Bagin.
08:59:02    3          THE COURT:  Are there any -- do we still have
            4   outstanding objections on those designations?
08:59:05    5          MR. KITTREDGE:  Actually, there is one issue that I
            6   think you ruled on, and I'm just a little unclear, and that
            7   was with respect to Richard Huo.  His testimony was all about
            8   manufacturing in China that hasn't been designated.  And I
            9   wasn't sure, Your Honor, whether it was testimony about South
           10   Carolina or maybe about manufacturing in China.
08:59:28   11          THE COURT:  Well, on cross examination of the
           12   plaintiff's first witness, you raised the issue about him --
           13   them manufacturing parts of their products out in foreign
           14   countries.  So if you have raised that issue, I think that
           15   that puts it in a different context.
08:59:49   16          MR. KITTREDGE:  I understand what you are saying.  I
           17   didn't think I had raised it, but it just came out in an
           18   answer, but --
08:59:55   19          THE COURT:  Well, you were exploring other places
           20   where they manufacture other than Cookeville.  And one of
           21   those, it raised the issue.  So it will be overruled.  The
           22   China reference will be permitted.
09:00:07   23          MR. PRICE:  Your Honor, we believe we will be done
           24   with our case in chief this morning, depending upon how long
           25   cross lasts.
```

09:00:14  1          THE COURT:  Okay.

09:00:16  2          MR. KITTREDGE:  We'll be prepared to call Chuck

          3   Nelson, Leah White and John Hardaway today, Your Honor, this

          4   afternoon.  We are trying to get our expert witness in also,

          5   but he is stuck on an airplane.

09:00:29  6          MR. VEZEAU:  Your Honor, we're going to have a real

          7   problem, discussing with the Court, with Mr. Hardaway.  Mr.

          8   Hardaway is one of Fallon's attorneys.  And they want to put

          9   one of their attorneys on the stand to testify as a purported

         10   fact witness on issues that aren't in dispute.  The reason

09:00:42 11   I --

09:00:45 12          THE COURT:  Well, we'll take that up later.  Let's

         13   bring the jury in.

09:00:50 14          MR. VEZEAU:  Yes, Your Honor.  That's fine.

09:01:19 15          THE COURT:  Let's bring the jury in, Mr. Marshal.  I

         16   think there was one other juror that had an issue about the

         17   29th or 30th, Juror Number 1.  If we're lucky we'll make the

         18   30th, I think.  But we'll see.

09:01:56 19          (Jury in.)

09:01:57 20          THE COURT:  Good morning, ladies and gentlemen of the

         21   jury.  You can be seated.  Before we start with the --

         22   continue with the examination of this witness, Mr. Whitehead,

         23   you had made a reference to a meeting on Tuesday?

09:02:10 24          THE JUROR:  Yes, sir.

09:02:13 25          THE COURT:  What's the time of that meeting?

09:02:13  1           THE JUROR:  It's really all day.

09:02:16  2           THE COURT:  It's an all day meeting?

09:02:17  3           THE JUROR:  Yes, sir.

09:02:19  4           THE COURT:  Was there any part of the meeting for

          5  which you are indispensible?

09:02:28  6           THE JUROR:  I could -- I really need to be there at

          7  about 11:00.

09:02:32  8           THE COURT:  Okay.  So if we adjourned at 11:00 and

          9  reconvened at 1:00 or 1:30, would that accommodate you?

09:02:42  10          THE JUROR:  It's all of the afternoon.

09:02:45  11          THE COURT:  Well, we'll see.  We'll discuss the matter

          12  further, okay?

09:02:47  13          THE JUROR:  Thank you.

09:02:50  14          THE COURT:  All right.  You may continue.

09:02:50  15  CONTINUED DIRECT EXAMINATION

09:02:55  16  BY MR. PRICE:

09:02:58  17          Q.    Mr. Bratic, you may now continue with your

          18  narrative.

09:03:07  19          A.    Okay.  Good morning.  Yesterday I focused my

          20  damages analysis -- my analysis in testimony regarding damages

          21  suffered by iLight, assuming the patent was a valid

          22  infringement.  Now I'm turning my attention to the opinions of

          23  Mr. Degen, who is Fallon's damages expert.  It is Mr. Degen's

          24  opinion that the appropriate measure of damages in this case

          25  is a reasonable royalty.  Mr. Degen concluded that the royalty

478

would mostly likely be equal to the cost of retooling to
implement Fallon's current design, which would be $30,000 to
$40,000, but no more than $590,274 based a royalty of two
percent of net sales.

09:03:52      Mr. Degen and I agree that a reasonable royalty is the
correct measure of damages in this case.  However, I disagree
with the amount of royalty damages that Mr. Degen concluded
were appropriate in this matter.

09:04:07      First, I would like to outline summary of my
disagreements with Mr. Degen and then provide some additional
detail on those agreements.  I disagree with Mr. Degen's
opinion that the royalty would be capped at $30,000 to $40,000
or Fallon's cost of redesigning the accused products.

09:04:36      Would you please put up TX 32 R-1.

09:04:51      According to Dr. Roberts, Fallon's products, though
redesigned in 2008, still infringed the patents-in-suit.

09:05:01      Would you please put up Trial Exhibit 32 R-2.

09:05:10      ILight filed this lawsuit against Fallon in March
2006, and it took Fallon two years to retool to make its
current design, which is still infringing, according to Dr.
Roberts.  In addition, there is no evidence that Fallon could
have designed around the patents-in-suit at the time of first
infringement, which is January 2005.

09:05:40      Would you please put up Exhibit TX 32 R-3.

09:05:49      Remember that all Fallon's infringing sales were to

Sam's Club and to Anheuser-Busch.  Fallon would not be able to
general its actual accused sales with either Sam's Club or
Anheuser-Busch if it had taken Fallon more than two years to
develop an alleged noninfringing design.

09:06:09    Please go to TX 32 R-4.

09:06:14    Now, Mr. Degen has arrived at another measure of
royalties if the design around argument is not successful.  To
get his royalty rate, Mr. Degen simply multiplied Fallon's
suspect profitability of 7.7 percent times 25 percent, which
equals about two percent.  Multiplying his two percent royalty
rate times $29.5 million equals about $500,000.

09:06:43    Also, Mr. Degen's royalty here is understated because
he has only included accused sales through September 2008.
Which I brought them out to April 2009.

09:07:02    Please go to TX 32 R-5.

09:07:16    Mr. Degen's royalty rate was based upon an accrued
rule of thumb known as the 25 percent rule of thumb.  It has
been widely criticized for being crude and arbitrary.
Generally, there is no economic basis for the figure 25
percent.  There is no consideration of specific circumstances
that determine the value of the patent at issue.

09:07:42    The author of the rule of thumb, Robert Goldscheider,
has said that the licenses which were the basis of his 25
percent rule of thumb included ongoing transfer technology in
trademarks.  None of that is part of the hypothetical

negotiations in this case.  And there is no consideration of
incremental value of using the patented technology.

09:08:05    Mr. Degen has not relied upon anything else but the 25
percent rule of thumb as his starting point for his royalty
rate analysis.  As such, Mr. Degen's royalty rate lacks any
economic basis and is speculative.

09:08:20    Mr. Degen also overstates the claim that iLight would
not have made the accused sales.  ILight was competing with
Fallon and other companies for AB's -- AB, Anheuser-Busch --
LED sign business, and it is speculative to conclude that
iLight would not have made the sales in Fallon's place if
Fallon did not make the accused sales.

09:08:36    Mr. Degen has no basis to state that Anheuser-Busch
was not interested in iLight's signs.  AB, Anheuser-Busch, was
purchasing iLight's products from iLight before Fallon became
involved in the bidding process for that work.  Mr. Degen had
no basis for statement that iLight had a poor relationship
with Anheuser-Busch other than his interview of Tim Fallon.
And for a short period of time around 2004, Sam's Club stopped
purchasing oval neon Open signs from Fallon while it was
testing LED Open signs made by IDG.

09:09:18    It is speculative to state that Sam's Club would not
work with IDG and iLight to come up with a satisfactory LED
sign product if Fallon was unable to sell the accused products
in January 2005.

481

09:09:33 1          I would like now to discuss in more detail my

2     disagreements with Mr. Degen, and I have organized my opinions

3     into the five Georgia-Pacific buckets, which are the same

4     buckets I discussed earlier in my direct examination

5     yesterday.

09:09:50 6          Could you bring up 30 R-6.  Okay.

09:09:56 7          The first bucket I want to discuss is the licensing

8     bucket on the far left.

09:10:26 9          Could you bring up 32 R-7.

09:10:28 10         With regard to the iLight/IBG agreement, IBG did not

11    receive a royalty-free license with respect to its main factor

12    of LED signs Mr. Degen claimed.  IBG and iLight formed a

13    strategic partnership through which iLight obtained the

14    opportunity to sell into the sales channels and gain access to

15    particular customer bases it had not entered into before and

16    make profits by providing the waveguiding surfaces to IBG.

17         ILight approached Sam's Club with a better designed

18    LED Open sign, and if Fallon had not infringed the

19    patents-in-suit, iLight would have had a better chance to get

20    Sam's Club business.  Nevertheless, Mr. Degen and I agree that

21    this particular agreement was not instructive to the royalty

22    rate in a bare patent license for the two patents-in-suit.

23         With respect to the iLight/Image Works agreement, it

24    is correct that this iLight/Image Works relationship was a

25    joint venture.  It was not a one way license and not

482

applicable to the situation of a hypothetical negotiation.

09:11:24     Mr. Degen argues that if one apply the terms of the Image Works agreement at the time of the hypothetical negotiation when Fallon expected net profits of 7.7 percent, a 50/50 split of those profits would have resulted in a royalty rate of 3.5 to 4 percent. It is not appropriate to apply the terms of the iLight Image Works agreement to the hypothetical negotiation. ILight and Image Works had a cooperative relationship with iLight, whereas iLight and Fallon had a competitive relationship as discussed below.

09:12:01     However, as I discussed during my earlier testimony, Fallon enjoyed a profit premium in the range of 15 percent on its sales of accused products from January 2005 to September 2008, compared to its nonaccused neon sign sales. If one were to apply the terms of the Image Works agreement, as Mr. Degen suggests, a 50/50 split of the profits would have resulted in a royalty rate of approximately 7.5 percent.

09:12:34     Would you please pull up TX 32 R-8.

09:12:40     With respect to this CK iLight patent license agreement, Mr. Degen and I agree that the patented technology covered by the CK license allows for colored changing. The patents-in-suit generally relate to lighting devices for the simulation of neon lighting using optical waveguides and high intensity low voltage light sources and are ideally adapted for signage and advertising uses.

Case 2:06-cv-00025    Document 287    Filed 05/19/2009    Page 12 of 246

| | |
|---|---|
| 09:13:07 | 1 |

        Mr. Degen also states that the CK license covers

almost 12 times the number of patents at issue in this case,

and it would appear that the patents in the CK license are not

comparable to those in suit.  The patented technology in this

matter is more fundamental and the scope is broader than that

which is covered in the CK license.

        The number of patents covered in the license do not

necessarily have a correlation with the royalty rate.  It

depends on specific situations such as the importance of

coverage in patent technology, the relationship between the

parties, and other terms involved in the agreement.

        ILight approached CK to enter into this license

regarding color changing technology, and at the time the CK

license was entered, iLight had not produced or sold any color

changing LED products yet.  Thus, iLight's existing products

were not considered competitive products.

        ILight recently introduced its Hypnotica full color

changing products.  It is my understanding that iLight is

paying a royalty of five percent to CK for this line of

products.

        As discussed under Georgia-Pacific factor five, the

competitive relationship between iLight and Fallon would make

the nine percent instead of the 4.5 percent royalty rate in

this CK license more comparable.  The rates are consistent

with Mr. Paul Kallmes' -- the prior Director of Licensing in

484

CK -- experience and understanding of CK's licensing
practices.

09:14:44    Now I'm going to turn to 25 percent or above in more
detail.  Under the factors listed in the licensing
characteristics bucket, Mr. Degen states that there is a
commonly used across-the-industry rule of thumb that says a
royalty rate will typically fall between one-quarter and
one-third of the infringer's expected net operating profit,
and that this 25 percent rule is widely accepted as a starting
point for calculating a reasonable royalty.

09:15:11    As discussed earlier, the 25 percent rule of thumb is
widely criticized for being crude and arbitrary.  Generally,
there is no economic basis for the figure 25 percent.  This
rule gives no consideration of specific circumstances that
determine the value of the patent at issue.

09:15:25    In addition, there is no consideration of the
incremental value of using the patented technology.

09:15:34    Mr. Degen argues that, based on Fallon's expected net
profit for 2005 of 7.7 percent, up from 5.7 percent in 2004,
that the rule of thumb suggests a royalty rate of between 1.9
and 2.6 percent.  He states that this is only a starting
point, and his final rate includes analysis of all the
Georgia-Pacific factors.

09:15:55    Mr. Degen has not relied upon anything but the 25
percent rule as a starting point for royalty rate analysis.

485

```
 1   As such, Mr. Degen's royalty rate lacks any economic basis and

 2   is speculative.

 3        I'm now going to talk about the technology.  If we can

 4   go to TX 32 R-9.

 5        I would like now to discuss Mr. Degen's evaluation of

 6   the factors under the technology bucket.  In evaluating the

 7   technology bucket of factors, Mr. Degen claims that, because

 8   Fall's redesign does not include reflective sidewalls, it is

 9   not accused of infringement.  However, according to Dr.

10   Roberts, Fallon's products redesign in 2008 still infringed

11   the patents-in-suit.

12        In addition, Mr. Degen claims that the cost of

13   retooling, the $30,000 to $40,000, would represent an amount

14   that Fallon may have been willing to pay for a license to the

15   patents-in-suit.  However, iLight filed the lawsuit against

16   Fallon in March 2006, and it took Fallon two years to retool

17   or make its current design, which is still infringing.

18   Therefore, there is no basis for Mr. Degen to assume that

19   Fallon could have designed around the patent-in-suit at the

20   time of the hypothetical negotiation.

21        Mr. Degen cites to alleged noninfringing alternatives

22   in the market, including Everbright's LED products, Enhance

23   America's LED products, and the Lextron products.  However,

24   Everbright's product is flat piece of plastic.  It does not

25   look like neon.  Enhance America has very little market in the
```

LED signs that look like neon. And Lextron's products can't
be used in tight bends and is not as bright as neon.

09:17:59 In evaluating the technology factors, Mr. Degen claims
that I erroneously attributed all of the advantages of
neon-looking LED to the products of patents-in-suit. He
states that the technology at issue is simply one of many ways
of making neon-looking LED signs, and his royalty rate opinion
reflects a more accurate assessment of the patents' utility
and advantages in the context of a range of acceptable
alternatives. However, Mr. Degen has not provided any
evidence of any noninfringing alternative with similar
characteristics.

09:18:32 I am now going to turn to a third bucket, commercial
success. Can you turn to TX 32 R-10, please.

09:18:43 I would like now to discuss the factors in the
commercial success bucket.

09:20:26 Please put up TX 32 R-11.

09:20:30 Mr. Degen states that for 2002 through 2004, iLight
had negative profits each year, and moreover, iLight continues
to show negative profits and it has only one year earned
profits, which was five percent of sales. However, without
Fallon's infringement, iLight had a good chance to continue to
increase the sign sales and make profits.

09:20:53 Mr. Degen claims that Sam's determined iLight IBG sign
to be not of acceptable quality based on low sales in its test

stores, and that iLight management did not believe its
products were viable with Sam's as of March 17, 2006.
However, according to Mr. Cleaver, the LED Open signs that
iLight designed and approached Sam's Club with was a much
better design compared with IBG's original design.

09:20:58    However, Sam's Club declined to even consider the
redesigned sign since Fallon had already come up with the
accused products.

09:21:27    Mr. Degen states that the LED penetration of the neon
sign market was low at the time of the hypothetical
negotiation, and it continues to have a relatively small share
of the overall neon sign market.

09:21:38    Mr. Degen states that iLight's and Fallon's combined
2007 sales represent less than two percent of the neon sign
market they were targeting.  Neither Fallon nor iLight are
significant market players in the signage market.  What
matters is how important the patented technology is to the
parties at the hypothetical negotiation.

09:22:01    In that regard, Mr. Fallon testified in his deposition
that AB was desperate to replace their major brand purchases
with LEDs as opposed to neon just because of the sort of
stigma some of their wholesalers have with neon.  There has
been a push at Anheuser-Busch to replace neons with other
technologies -- LEDs, back-lit signs, stuff like that, that
has been going on since early 1990s.

488

And that's from the deposition testimony of Timothy

          2   Fallon.

From Mr. Fallon's perspective, sales of accused

          4   products increased to be more than 50 percent of its total

          5   company sales, and 100 percent of its accused product sales

          6   were to Sam's Club and Anheuser-Busch.  Without the patented

          7   technology, Fallon would have likely lost business to both

          8   Sam's Club and Anheuser-Busch.

With regard to the amount of profit that should be

          10   credited to the iLight patents, Mr. Degen states that Fallon

          11   took on the business risk of developing and manufacturing its

          12   own LED products.

But Mr. Degen overstates this risk.  The following

          14   facts indicate that Fallon would have run more risk of losing

          15   a significant portion of its existing business to competitors

          16   without developing and manufacturing its own LED product.

          17          Sam's Club stopped purchasing Fallon's neon signs in

          18   2004 in order to test LED products.  Fallon's document dated

          19   March 12, 2005 indicate that, quote:  We really believe LED is

          20   critical to future growth, quote.

Fallon's document dated September 2005 indicated that,

          22   quote:  Sam's is asking Fallon to launch the LEDs immediately,

          23   and we have issues with that, quote.

And Anheuser-Busch was, quote:  Desperate to replace

          25   their major brand purchases with LEDs as opposed to neon,

quote.

Mr. Degen states that Fallon's accused products were also sturdier, and were perceived to be higher quality than iLight products at the time. Mr. Degen failed to provide any basis or evidence to support in the statement other than an interview Mr. Fallon.

Mark Cleaver did not at all agree with this statement. For a short period of time around 2004, Sam's Club stopped purchasing oval neon Open signs from Fallon while it was test marketing LED Open signs made by IBG. In the absence of infringement, it is very likely that Sam's Club would have worked with IBG/iLight to come up with a satisfactory LED sign product if Fallon was not able to offer the accused products in January 2005 because Sam's Club expressed an interest in this kind of sign made by IBG and iLight.

ILight would probably continue the cooperation with IBG if they were able to make the sales to Sam's Clubs. Mr. Degen argues that my analysis of gross profits is inappropriate, as is his comparison of ex-post operating profits for the LED products to the operating loss for the non-LED products.

Mr. Degen states that gross profits do not determine the viability of a company, and a rational business would look at net operating profit, not gross, in determining whether payment of a royalty was viable.

However, Fallon's average gross profit premium of

selling accused products versus neon products, which is 15.3

percent, is almost the same as its average operating profit

premium, which is 14.3 percent.  This indicates that Fallon is

able to generate more profits from selling accused products

covered by the patented technology.

Mr. Degen argues that I did not do analysis of the

details of the underlying sales to determine what other

factors may have caused the observed differential profits in

that factors such as customer volume can be an important

determinance of demand.  However, Fallon has not produced any

evidence regarding customers or other factors that could have

caused the profitability difference in the LED business versus

non-LED business of Fallon.

Mr. Degen, as an expert for Fallon, was able to

investigate this issue by interviewing Fallon management, but

he chose not to do that.  Mr. Degen argues that a more

meaningful analysis would be to compare Fallon's expected

operating profits for 2005 of 7.7 percent to its actual

operating profits in 2004, which is 5.7 percent, which yields

a difference of two percent.

However, Fallon's neon business could have begun to

deteriorate in 2004 because its existing customers decided to

convert to LED products.  Therefore, it does not make sense to

use 2004's operating profit margin as a benchmark.

1          I'm now going to turn to the competition bucket, the

2     fourth bucket.  And could you please put up TX 32 R-12.

09:27:11  3          I would like now to discuss some of the factors in the

4     competition bucket.

09:27:21  5          Would you please pull up TX 32 R-13.

09:27:24  6          Mr. Degen claims that he has seen no evidence of an

7     expressed licensing policy by iLight, and cites iLight's

8     willingness to license in the IDG and Image Works agreements.

9     However, around the time of the hypothetical negotiation,

10    iLight's LED sign sales increased significantly.

09:27:45  11         According to Mr. Cleaver, iLight's LED sign business

12    increased in 2005, and iLight geared up, expecting to win more

13    business in that channel.  As discussed in my report, iLight

14    entered into agreements with IBG and Image Works for

15    cooperation and expansion of its business, and the situation

16    is not comparable to the hypothetical negotiation.

09:28:08  17         Mr. Degen argues that I overstated the level of

18    competition between Fallon and iLight with respect to the

19    allegedly infringing sales to Sam's Club and Anheuser-Busch.

20    With respect to Fallon's sales of the accused products to

21    Sam's Club, Mr. Degen states that primary factors -- primary

22    competitors for Open signs included Everbright, Pro Light, and

23    Enhance America.

09:28:31  24         However, Mr. Degen failed to provide any basis for his

25    statement regarding Fallon's primary competitors for Open

signs other than his interview of Tim Fallon.  According to

Mr. Cleaver, Everbright and Pro Light products do not have all

of the desired features, such as brightness, uniformity, and

neon-like appearance.

09:28:50 For example, Pro Light signs show dotted LED lights

clearly, while Enhance America's website does not list any LED

signs in its products being offered.

09:29:04 Another argument Mr. Degen asserts is that Fallon had

not been able to offer an acceptable, non-infringing product,

Sam's Club would have chosen another supplier, not iLight.

However, to avoid losing its business with Sam's Club, Fallon

developed the accused products, which are the LED Open sign

products, and offered it to Sam's Club.  Fallon may have lost

its business with Sam's Club without offering the accused

products.

09:29:31 For a short period around 2004, Sam's Club stopped

purchasing oval neon Open signs with Fallon while it test

marketed LED Open signs made by IBG.  It is speculative to

state that Sam's Club would not work with IBG/iLight to come

up with a satisfactory LED sign product if Fallon would not be

able to sell the accused products in January 2005.

09:29:53 With regard to Anheuser-Busch, Mr. Degen failed to

recognize that Anheuser-Busch was, quote, desperate to replace

their major brand purchases with LEDs as opposed to neons,

quote.  And Fallon would not have won Anheuser-Busch's

493

business in 2006 without offering the accused products.

Other than his interview with Mr. Fallon, Mr. Degen failed to provide any basis for his statement that Anheuser-Busch did not choose iLight because of its alleged bad relationship with Mr. Loberfeld of iLight.

There is no basis for Mr. Degen to claim that Anheuser-Busch would not likely have chosen iLight, but would have increased purchases from other companies that it had selected as suppliers. For example, there is an Anheuser-Busch document which indicates that both iLight and Fallon were involved in bidding on AB's or Anheuser-Busch's LED sign business.

Also, as I discussed previously, other noninfringing signs in the market do not have all of the desired features, such as brightness, uniformity, and neon-like appearance.

I am now going to talk about fifth bucket dealing with experts and the hypothetical negotiation.

Would you pull up TX 32 R-14.

I'm now going to discuss some of the factors in competition bucket, and ask that you please put up TX 32 R-15.

Mr. Degen argues that a seven percent royalty would have left Fallon expecting to lose two percent of revenues on its sales of the accused products. However, Fallon may have initially implemented an aggressive pricing strategy in order to guard the business of Anheuser-Busch. And if Fallon

increased its price by a small percentage, such as three
percent, the extra profits would increase the operating
profits by the same percentage.

In addition, I understand the reasonable royalty then
should not be limited to operating profits made by the
defendant.  Mr. Degen's opinion that Fallon could design
around iLight's patent for $30,000 to $40,000 is unfounded
because, according to Dr. Roberts, Fallon's redesigned
products in 2008 still infringed the patents-in-suit.

Also, there is no evidence that Fallon could have
designed around iLight's patents at this time of first
infringement in January of 2005.  Mr. Degen has not relied on
anything else but the 25 percent rule as a starting point for
his royalty analysis, which is an arbitrary, speculative rule
that has no economic basis.

The seven percent royalty rate is reasonable because
the 15 percent profit premium Fallon earned on its accused
products; the CK/iLight license agreement; Mr. Kallmes'
experience in the industry and at Color Kinetics; iLight and
Fallon are competitors; and there was commercial success of
the products.

Fallon should pay iLight $2.5 million in reasonable
royalty damages, which is based on a reasonable royalty of
seven percent.

THE COURT:  You may cross examine.

09:33:07  1          MR. LIPSHIE:  Yes.

09:33:07  2    CROSS EXAMINATION

09:33:09  3    BY MR. LIPSHIE:

09:33:28  4          Q.     Good morning, Mr. Bratic.

09:33:29  5          A.     Good morning.

09:33:32  6          Q.     I'm Sam Lipshie, one of the lawyers for Fallon.

        7    And we have not met; correct?

09:33:41  8          A.     No, we met in the restroom yesterday.

09:33:42  9          Q.     That's correct.  We saw each other.

09:33:43  10         A.     We'll leave it at that.

09:33:46  11         Q.     Now, sir, you haven't been retained or

        12   qualified to testify or give any opinions about patents or

        13   whether my client, Fallon, may have infringed any patents of

        14   iLight; correct?

09:33:58  15         A.     Oh, that's absolutely correct.

09:34:01  16         Q.     And you are not qualified to do so, are you,

        17   sir?

09:34:01  18         A.     That's correct.

09:34:04  19         Q.     So, in your testimony about the damages you

        20   claim that iLight is entitled to recover from Fallon, you are

        21   assuming that there has been patent infringement?

09:34:10  22         A.     Correct.

09:34:13  23         Q.     And you are also assuming, are you not, sir,

        24   that what you were told by Mr. Fallon and other

        25   representatives of -- Mr. Cleaver and other representatives of

```
 1   iLight was true; correct?

 2        A.    Correct.  As well as Dr. Roberts.

 3        Q.    That's the iLight damages expert -- I mean, the

 4   iLight technical expert?

 5        A.    Correct.  He was here yesterday.

 6        Q.    Now, you will recall yesterday you strayed from

 7   the written narrative a few times.  And you testified that the

 8   patents lasted for 17 years.  Do you recall that?

 9        A.    I believe I said 17 years from -- my narrative

10   said 17 years from date of issue.

11        Q.    Your narrative, sir, says 16 years from the

12   date of the entry.  It's on Page 15.

13        A.    Did you say Page 15?

14        MR. PRICE:  He may not have his direct right here.

15   Would you like me to get that for you?

16        THE WITNESS:  Actually, I do.  Yes, it says here

17   approximately 16 years after the date of the hypothetical

18   negotiation.

19   BY MR. LIPSHIE:

20        Q.    So that was just a mistake; correct?

21        A.    Correct.

22        Q.    The Identity Group agreement.  Do you recall

23   that?

24        A.    Yes.

25        Q.    With iLight?
```

09:35:46  1          A.     Yes.

09:35:50  2          Q.     And you testified on direct that you reviewed

3    agreements between iLight and the Identity Group Inc. and

4    between iLight and Image Works Display Marketing Group that

5    were not instructive to the royalty rate that would have been

6    agreed to between iLight and Fallon; correct?

09:36:07  7          A.     Correct.

09:36:15  8          Q.     Now, Identity Group was the strategic partner

9    of iLight, who licensed IDG to sell iLight products to Sam's

10   Club; correct?

09:36:30  11         A.     Well, they were partners for the purpose of

12   developing products that were sold or going to be sold to

13   Sam's Club and other people.

09:36:40  14         Q.     And that is the agreement that was in force

15   when iLight -- when the iLight signs were sold to Sam's Club;

16   is that correct?

09:36:49  17         A.     Well, there were two agreements, I believe,

18   between the parties.  So I'm not sure which one.

09:36:55  19         Q.     Well, let's put them up.

09:36:57  20         A.     Do you have a copy?

09:37:03  21         Q.     It's TX 45.  Do you have a hard copy?

09:37:05  22         A.     Yes.

09:37:20  23         Q.     This is Plaintiff's premarked Exhibit 45.

09:37:21  24         A.     Thank you.

09:37:30  25         Q.     Okay.  The sales that iLight licensed IDG to

1    make in its supplemental license, which I think is called the

2    Interim Supply and License Agreement, which is on the

09:37:39   3    screen --

09:37:43   4         A.    Let me look.  Yes.

09:37:47   5         Q.    -- were for sales to Sam's Club, isn't that

6    correct?

09:38:35   7         A.    Let me double check.  I don't have the

8    information here regarding the first agreement.  So if this is

9    the most current agreement in place at that time, then yes,

10   this would have been the operative agreement.

09:38:47   11        Q.    So iLight was willing to license another firm

12   to make sales to Sam's Club; isn't that correct, sir?

09:38:56   13        A.    Under their terms of their overall

14   relationship, yes.

09:38:59   15        Q.    All right, sir.  Now, under the supplemental

16   license, Identity Group got to sell to Sam's Club royalty

17   free; correct?

09:39:12   18        A.    I'm sorry, repeat that?

09:39:12   19        Q.    Okay.  Yes or no.

09:39:15   20        A.    I'm just saying to repeat.

09:39:17   21        Q.    The Identity Group license with iLight was

22   royalty free for the sales that were made to Sam's Club?

09:39:25   23        A.    Under their overall agreement, yes.

09:39:27   24        Q.    Pay no royalties?

09:39:28   25        A.    I'm sorry?

09:39:31  1          Q.      Pay no royalties?

09:39:33  2          A.      Right, based on the overall agreement between

          3    the parties, not just limited to that one.

09:39:37  4          Q.      And Identity Group still sells signs to Sam's

          5    Club without any partnership to iLight, doesn't it?

09:39:42  6          A.      That I don't know.

09:39:43  7          Q.      You don't know that?

09:39:44  8          A.      I know they were selling, but whether they do

          9    it today, I don't know.

09:39:49  10         Q.      Do you know that they continued to sell to

          11   Sam's Club after their so-called strategic partnership with

          12   iLight was terminated?  Do you know that, sir?

09:39:58  13         A.      At that time they were selling some products to

          14   Sam's Club.  How much I don't know.  Whether they continue to

          15   do that today, I have no information to indicate that that's

          16   the case.

09:40:08  17         Q.      And no information to indicate it's not?

09:40:09  18         A.      Correct.

09:40:13  19         Q.      So Identity Group doesn't have to have iLight

          20   to sell LED sign products to Sam's Club, does it?

09:40:20  21         A.      Not under the agreement they have reached.

09:40:20  22         Q.      Pardon?

09:40:22  23         A.      Not based on their relationship, no.

09:40:24  24         Q.      They are free to do it?

09:40:27  25         A.      Well, apparently, under whatever terms they

1    agreed to.

09:40:32            2          Q.     All right.  Then you talked about a CK or Color

                    3    Kinetics agreement that iLight has?

09:40:35            4          A.     Yes.

09:40:39            5          Q.     You testified about that at length in your --

                    6    particularly your direct testimony.  Under that license that

                    7    iLight had from CK?

09:40:46            8          A.     Right.

09:40:50            9          Q.     And so the jury understands, that was from CK

                   10    as opposed to CK?

09:40:53           11          A.     Correct.

09:40:55           12          Q.     What was iLight able to do that it otherwise

                   13    could not have done?

09:41:02           14          A.     Well, it was able to introduce products that it

                   15    didn't have a license to sell before.

09:41:17           16          Q.     Let's put up TX 43, which is Plaintiff's 43.

                   17    Now, you testified earlier that the CK license is instructive

                   18    to you on the hypothetical negotiation between iLight and

                   19    Fallon, which forms the basis for your testimony regarding a

                   20    reasonable royalty; correct?

09:42:00           21          A.     No, that's not correct.  It's part of the

                   22    basis.  It doesn't form the basis.

09:42:04           23          Q.     I just said it was instructive.

09:42:07           24          A.     I thought you said it was the basis.

09:42:07           25          Q.     No, sir.

| | | |
|---|---|---|
| 09:42:11 | 1 | A. Then I misunderstood your question. |
| 09:42:11 | 2 | Q. To be specific -- |
| 09:42:13 | 3 | MR. PRICE: Your Honor, objection, argumentative. |
| 09:42:15 | 4 | THE COURT: Well, asked and answered. Let's go on. |
| 09:42:16 | 5 | BY MR. LIPSHIE: |
| 09:42:19 | 6 | Q. Did you consider that? |
| 09:42:20 | 7 | A. Did I consider it? Absolutely. |
| 09:42:22 | 8 | Q. You found it instructive? |
| 09:42:23 | 9 | A. Yes. |
| 09:42:26 | 10 | Q. And isn't it true that, under the CK license |
| | 11 | agreement with iLight, there was never a nine percent royalty |
| | 12 | paid on any licensed products? |
| 09:42:37 | 13 | A. No, no royalty was paid. There was an |
| | 14 | agreement to pay when competitive products were introduced. |
| 09:42:46 | 15 | Q. Were any competitive products ever introduced? |
| 09:42:47 | 16 | A. Not yet. |
| 09:42:49 | 17 | Q. Never have been, have they? |
| 09:42:52 | 18 | A. No, but the agreement is not terminated yet. |
| 09:42:57 | 19 | Q. Just listen to my question. Let's go to the |
| | 20 | license agreement where it identifies what competitive |
| | 21 | products were there. Page nine, I believe. See Page nine, |
| | 22 | you've got the agreement, it has a place to identify |
| | 23 | competitive licensed products which would bear a nine percent |
| | 24 | royalty rate. Do you see that, sir? |
| 09:43:21 | 25 | A. Excuse me. Page nine of the agreement says -- |

09:43:25  1          Q.     It's not Page nine, it looks like 13.  It's a

       2   schedule.

09:43:29  3          A.     Oh, you are talking about the schedule?

09:43:29  4          Q.     Yes, sir.

09:43:33  5          A.     Yes.  There is nothing on Page nine.

09:43:35  6          Q.     Look at Page 13.

09:43:39  7          A.     13 is Schedule B to the agreement.

09:43:42  8          Q.     Uh-huh.  Look under competitors licensed

       9   products that would bear a nine percent royalty rate, wouldn't

      10   it?

09:43:47 11          A.     Right.

09:43:47 12          Q.     That's blank, isn't it?

09:43:47 13          A.     That's right.

09:43:49 14          Q.     To your knowledge, there has never been

      15   anything filled in in the blank?

09:43:52 16          A.     Not yet.

09:43:54 17          Q.     To your knowledge, there has never been a

      18   royalty rate in excess of four to five percent under that

      19   royalty license agreement that you found instructive; right?

09:44:08 20          A.     That's correct.

09:44:13 21          Q.     So under its lengthy relationship with CK,

      22   iLight never had any reason to care what the nine percent

      23   royalty rate was for competitive license products; correct?

      24   Because there weren't any?

09:44:26 25          A.     No, that's not true at all.  It's a

1   misstatement.

09:44:29       2            Q.    You can explain it if you want.

09:44:31       3            A.    Sure.  This agreement is a ten year agreement

                        4   which was executed in May 2006.  This still has to run through

                        5   2016.  We're only roughly three years into this agreement.

                        6   This agreement provided for a scenario, whenever competitive

                        7   products are introduced, that the parties both agree and

                        8   determine are competitive products, that iLight will then

                        9   agree to pay a nine percent royalty.

09:45:01      10            There is no reason -- because I do licensing work for

                       11   clients and execute these kind of agreements -- that companies

                       12   would sit down and negotiate an agreement and write in terms

                       13   that they didn't think were possibly occurring sometime during

                       14   the existence of the license.

09:45:22      15            So the mere fact that iLight has not introduced a

                       16   competitive product yet does not mean that the nine percent

                       17   provision for competitive products during the life of this

                       18   agreement, which has another 17 years to go, is irrelevant.

09:45:32      19            Q.    But they haven't yet, and there is no assurance

                       20   they ever will, correct?

09:45:36      21            A.    They haven't yet.

09:45:39      22            Q.    And there is no assurance they ever will;

                       23   correct?

09:45:41      24            MR. PRICE:  Your Honor, asked and answered.

09:45:45      25            THE COURT:  That's argumentative.  Let's go on.

BY MR. LIPSHIE:

Q.    How much has iLight actually paid in royalties

   3   to CK under that license agreement?

A.    I don't know.

Q.    Would it surprise you if it was less than

   6   $20,000 in 2008?

A.    No, it wouldn't surprise me.

Q.    It would or would not?

A.    Would not.

Q.    ILight's total revenues were $7.1 million for

   11  January through September of 2008; is that correct?

A.    I'm sorry, you're trailing.  Your voice is

   13  dropping off.

Q.    I'm sorry, sir.  Your report reflects that

   15  iLight's total revenues were $7.1 million from January through

   16  September 2008?

A.    Well, I don't --

Q.    Is that correct?

A.    I don't have my report in front of me, but

   20  that's my general recollection.

Q.    Okay.  Let's put up Exhibit 542.  That's

   22  Defendant's.  Could you tell me, sir, looking at Defendant's

   23  Exhibit 542, what the total amount of royalty and licensing

   24  fees were?

A.    Let me look.

                                                                    505

09:48:15  1          Q.     Look on Page two -- let's see if we can speed

       2     this up -- and look for an $18,280 figure.

09:48:33  3          A.     Page two?  There it is.  I found it.  There was

       4     another $18,000 figure.  Yeah, it's account number 57,650,

       5     royalty and license fees.

09:48:45  6          Q.     Right.  To the best of your knowledge, that's

       7     the CK royalty; correct?

09:48:52  8          A.     Well, I don't know if it's CK.

09:48:55  9          Q.     You are not aware of any other royalty or

      10     licensing income for intellectual property licenses that

      11     iLight would have received during that year?

09:49:01  12         A.     I'm not aware of any.

09:49:07  13         Q.     And what percentage of the revenues of $7.1

      14     million would $18,280 be?

09:49:14  15         A.     Well, it would be a very, very small

      16     percentage.

09:49:17  17         Q.     Roughly a quarter of one percent?

09:49:20  18         A.     It would be less than one percent.

09:49:23  19         Q.     Less than half of a percent?

09:49:25  20         A.     Well, on total sales.  I don't know if all

      21     those sales would cover.

09:49:30  22         Q.     Your testimony, what you have told the jury, is

      23     that iLight hasn't paid any nine percent royalties for

      24     competitive products under the license, but it wants to

      25     recover -- you believe it has reasonable rights of seven

```
 1    percent or almost $2.5 million from Fallon; correct?
 2        A.    I'm sorry.  Could you repeat the last part of
 3    your question?
 4        Q.    Your testimony as to what's a reasonable
 5    royalty yesterday and today was about seven percent, it's
 6    seven percent of Fallon sales, which is about $2.5 million;
 7    correct?
 8        A.    Yes.
 9        Q.    And that is not withstanding that iLight has
10    not paid CK under its license agreement in excess of four to
11    five percent; correct?
12        A.    Well, yes, but my opinion based on all of the
13    factors I considered, not just the CK licensing.
14        Q.    You talked a lot about Mr. Kallmes?
15        A.    Yes.  Mr. Kallmes.  That's how I pronounced it.
16        Q.    Kallmes.  And he was the prior director of CK;
17    is that correct?
18        A.    Correct.  He was at CK when they instituted the
19    iLight license.
20        Q.    Okay.  What date was that?
21        A.    Right before I filed my report, so it would
22    have been in December of 2008 or the early part of 2009.
23        Q.    Did you go there?  Where did you meet?
24        A.    We talked on the phone.
25        Q.    And did you talk to him or did one of your
```

09:49:50
09:49:54
09:50:09
09:50:13
09:50:23
09:50:30
09:50:36
09:50:37
09:50:42
09:50:44
09:50:45
09:50:52
09:50:54
09:50:56

507

assistants?

09:50:59    A.    No, I talked to him.

09:51:02    Q.    And was Mr. Kallmes a director of licensing
when the iLight licensing arrangement was negotiated and put
in place?

09:51:12    A.    That's my recollection.

09:51:19    Q.    Let me ask you a few more questions about the
use of the invention, okay?

09:51:23    A.    Sure.

09:51:26    Q.    And that's part of the bucket of the
Georgia-Pacific factors that you testified about and showed a
number of charts; correct?

09:51:33    A.    Yes.

09:51:35    Q.    Now, you testified about the benefits
associated with the patented technology, including the rugged
and breakage resistance of the product; correct?

09:51:50    A.    Yes.

09:51:52    Q.    Now, you can have a rugged or breakage
resistant LED light without the patented technology; correct?

09:52:04    A.    I don't know, I'm not a technical person,

09:52:09    Q.    Well, you also testified that non-neon gas was
a benefit of the patented technology.  Do you recall that?

09:52:16    A.    Yes.

09:52:22    Q.    But iLight doesn't hold or claim a patent on
non-neon lighting, do they, sir?

09:52:29  1        A.     You mean in the three asserted patents?

09:52:29  2        Q.     Yes.

09:52:31  3        A.     Not that I know of.

09:52:35  4        Q.     They don't own a monopoly to manufacture and

          5   sell simulated neon lighting, do they?

09:52:42  6        A.     I don't know.  That's a technical question.

09:52:50  7        Q.     And you testified also that the product for

          8   which iLight claims a patent is easy to install; correct?

09:52:56  9        A.     Yes.

09:53:00 10        Q.     But it doesn't require patented technology to

         11   develop the easy to install LED product, does it, sir?

09:53:08 12        A.     Well, that I don't know.  All I know is these

         13   are what I understand the benefits of practicing with that

         14   are.

09:53:15 15        Q.     Because with respect to those matters, you just

         16   know what you are told; correct?

09:53:19 17        A.     Well, what -- my understanding is based on my

         18   interviews.

09:53:23 19        Q.     And what you were told during your interviews;

         20   correct?

09:53:24 21        A.     That's correct.

09:53:29 22        Q.     And as to all of those, at the time of this

         23   hypothetical negotiation between iLight and Fallon to

         24   determine a reasonable royalty in January 2005, both parties

         25   would have known the answers to those questions, wouldn't

they?

09:53:48   A.   I assume so.

09:54:01   Q.   Slide 24, please.  Do you recall that chart
sir?

09:54:08   A.   I do.

09:54:28   Q.   You testified about a profit premium for
Fallon's LED versus its neon products, did you not, sir?

09:54:37   A.   Versus its nonaccused neon products; right.
That's correct.

09:54:41   Q.   And you testified that these profit premiums
would have been an important consideration in determining a
reasonable royalty at the time of the hypothetical
negotiation?

09:54:51   A.   That's correct.

09:54:58   Q.   Now, in January of 2005, neither parties, to
your knowledge, had any reason to believe that Fallon expected
to lose money on its future neon signs, did you?

09:55:07   A.   I'm sorry, you are saying --

09:55:11   Q.   At the time of the hypothetical negotiation, to
the best of your knowledge, neither party had any reason to
anticipate that Fallon would lose money in the future on the
sale of its neon sign product; is that correct?

09:55:27   A.   On the neon products?

09:55:27   Q.   Yes, sir.

09:55:32   A.   No, that's not true.  They had losses in 2004.

The only products they sold in 2004 at Fallon were neon

            products.  So they knew they were losing money.

09:55:43   Q.      You said they sold to Fallon.  Who were you

            talking about?

09:55:48   A.      No, I'm saying Fallon as a company, in 2004,

            the year before they introduced their accused products, they

            lost money.  In fact, they lost money every year since they

            introduced the accused products.  And if it wasn't for the

            profits of the accused products, the company's losses would be

            even higher than they were.

09:56:10   Q.      Well, I understand that is your testimony about

            the profits.

09:56:13   A.      Well, that's a fact.

09:56:17   Q.      Fallon experienced a very large overall 2007

            loss on its neon products; right?  In 2007?

09:56:27   A.      Well, let me look.  Let's see.  In 2007?  I

            don't have the breakdown of 2007 on its neon.  Let me see.  I

            had the combined.

09:56:36   Q.      It was your Exhibit 6 to your report.

09:56:40   A.      I just don't have my report in front of me.

09:56:43   Q.      Do you recall if it reflected a 15 percent

            negative operating margin on the end products in 2007?

09:56:52   A.      That wouldn't surprise me.  Well, let's assume

            that's the case.  Two years prior at the hypothetical

            negotiation, Fallon would not, to your knowledge, have had any

reason to believe that two years later Fallon would have that

high an operating loss on its neon products; correct?

09:57:13    A.    No, I wouldn't agree with that.  They knew

their neon business was in a decline.  That's why they were

rushing to get into LED sign business, because people at

Anheuser-Busch and Sam's were insisting on migrating to LED

signs, not neon signs.  So they knew that business was on the

decline.

09:57:32    Q.    Well, let me ask it this way.  To the best of

your knowledge, did Fallon continue to invest money in product

development, sales, marketing, other promotional and

development expenses, for its neon signage after 2005;

correct?

09:57:49    A.    Well as to R & D spending, I don't have any

evidence of R & D spending by Fallon on neon products.

09:57:56    Q.    But you would not expect a company that would

continue for years to invest in producing, manufacturing and

selling a product which, although it might not have done well

the prior year, you wouldn't expect them to do that if they

expected it to continue for years in the future to run a much

larger operating loss; correct?

09:58:18    A.    I'm not sure what your question is.

09:58:26    Q.    I will withdraw it.  You testified that both

Plexineon and Fallon's accused products have been commercially

successful and profitable.  Do you recall that?

09:58:41  1        A.      Yes.

09:58:44  2        Q.      And I think you testified that iLight has

          3   several markets -- architectural trim, signs, POP, and slot

          4   machines?

09:58:54  5        A.      It's not that it has several markets.  Those

          6   are markets that target to sell its products.

09:59:00  7        Q.      Targeted markets?

09:59:00  8        A.      Yes.

09:59:05  9        Q.      How much of iLight's gross revenues in 2007

         10   resulted from the sales of the LED signs that are at issue in

         11   this case?

09:59:16 12        A.      I don't have that information.

09:59:19 13        Q.      Do you have any recollection from your

         14   analysis?

09:59:20 15        A.      Not offhand, no.

09:59:23 16        Q.      About what percentage of iLight's gross

         17   revenues resulted from the sales of LED sign products in 2008

         18   such as are at issue in this?

09:59:35 19        A.      I don't have that in front of me.

09:59:38 20        Q.      Well, let me ask you, do you know about what

         21   percentage of Fallon's total revenues resulted from the sale

         22   of the architectural trim product?

09:59:50 23        A.      No, I don't have a breakdown of those markets.

09:59:53 24        Q.      The same question regarding P-O-P.

09:59:56 25        A.      The answer would be the same.  I don't have a

1   breakdown.

09:59:58    2        Q.      Slot machines?

10:00:01    3        A.      Slot machines?  No, I don't have a breakdown.

                 4        Q.      Do you know, sir, that Fallon is not in the

                 5   architectural trim, signage or lighting business?

10:00:10    6        A.      No, I don't know.  They have a lot of

                 7   divisions, several divisions.  I'm not sure of all of the

                 8   divisions.

10:00:16    9        Q.      But as far as you know, Fallon competes with

                10   iLight in the illuminated architectural trim business?

10:00:23   11        A.      I don't know.

10:00:26   12        Q.      You just don't know?

10:00:29   13        A.      Well, as to that, I don't.

10:01:24   14        Q.      Let's put up on the screen Exhibit 955.  This,

                15   sir, is an iLight produced document, is it not?  A financial

                16   document?

10:01:32   17        A.      It's a document.  It's from my report that I

                18   prepared based on their information.

10:01:34   19        Q.      Okay.  You prepared this?

10:01:34   20        A.      Yes.

10:01:41   21        Q.      So you are very familiar with it.  The way I

                22   read it, it appears that iLight lost over $800,000 on its

                23   products using the patented technology for each of the prior

                24   three years before the hypothetical royalty negotiation in

                25   January of 2005; is that correct?

                                                                             514

10:02:02  1          A.    I'm sorry, would you repeat the question.

10:02:03  2          Q.    As part of your exhibit --

10:02:03  3          A.    Yes.

10:02:09  4          Q.    -- hasn't iLight lost over $800,000 on its

        5   products that use the patented technology for each of the

        6   prior three years before the hypothetical negotiation in

        7   January of 2005?

10:02:23  8          A.    Well, at the net profit line at the very

        9   bottom, yes.  At the gross margin line, no, they were very

       10   profitable.

10:02:32 11          Q.    That's right.  I asked you about net profits.

10:02:35 12          A.    Yes.  At net profit, I agree, when you took

       13   into consideration all of the company's sales, all of the

       14   expenses it had lost in the three years leading up to the

       15   hypothetical issue.

10:02:45 16          Q.    And you would agree with me that net profits is

       17   a very important measurement and concept in for-profit

       18   business?

10:02:53 19          A.    It's one of several important factors,

       20   analytical tools, that you look at.

10:03:00 21          Q.    And in the last seven years, according to your

       22   own prepared exhibit, iLight has shown a net loss in six of

       23   those years; is that not correct?

10:03:07 24          A.    Yes, it has.

10:03:12 25          Q.    So iLight has had a net operating profit only

```
1   one year out of those seven.  Isn't that correct?
2        A.    Let me look.  No, that's not true, because it
3   has had a net operating profit all those years.  It's just
4   that it has only had a net profit for one of the six.
5        Q.    So it had a net loss for six out of the seven
6   years; correct?
7        A.    Right.  But operating profits, and operating
8   profits, all of those years, positive operating profits.
9        Q.    I'm talking about negative net losses, no
10  profits for six out of the last seven years; correct?
11       A.    At the net profit line, yes.  Let's be clear.
12       Q.    Okay.  I'm with you.  They lost money six out
13  of seven years?
14       A.    Correct.  At the net profit line.
15       Q.    You also testified about iLight's sales having
16  increased 930 percent; correct?  Do you recall that?
17       A.    Yes.  On its LED products.
18       Q.    Right.  The products at issue here?
19       A.    Right.
20       Q.    Well, didn't they start from just virtually
21  zero?
22       A.    ILight was a start-up company.  It started in
23  2000.  So as a start-up company, it's not surprising it would
24  have losses in earlier years, because they're investing in the
25  company.
```

10:04:31  1          Q.    It's also not surprising it would have a large

2     increase in sales associated with LED products?

10:04:38  3          A.    Right, because of demand for LED products.

10:04:41  4          Q.    They hadn't sold any before, so anything they

5     sold would is going to raise that level very high?

10:04:46  6          A.    Right, because there is a demand for LED

7     products.

10:04:49  8          Q.    During that period of time, iLight sold

9     products other than LED products; correct.

10:04:52 10          A.    My understanding is they did.

10:04:55 11          Q.    But you don't know what percentage that breaks

12    up into?

10:04:56 13          A.    Not offhand, no.

10:05:00 14          Q.    Now, during that period of the 930 percent

15    increase in iLight sales attributable to LED signs?

10:05:04 16          A.    Yes.

10:05:08 17          Q.    Are you with me?  Didn't it include the sale of

18    approximately 30,000 Camel signs to R.J. Reynolds for a total

19    price of approximately $2.4 million?

10:05:22 20          A.    Yes, I believe that would have been included in

21    that transaction.

10:05:28 22          Q.    And in fact, those signs weren't sold by iLight

23    to R.J. Reynolds, were they?  They were sold by its partner,

24    IDG?

10:05:40 25          A.    Well, I don't know who made the sale.  What I

```
 1    know is, I focused on iLight's revenues that it generated or

 2    reported based on the sale of LED signs to R.J. Reynolds.

 3    They got sales data from that, because under their profit

 4    sharing agreement with IDG, they got to record revenues and

 5    profits on those LED sales.

10:06:04  6        Q.    That's my point.  That's what they booked as

 7    income as a result of those Camel signs?

10:06:07  8        A.    Sure.

10:06:14  9        Q.    Through their partnership with IDG?

10:06:14 10        A.    Revenues and income.

10:06:15 11        Q.    Right.  It was only one year, wasn't it?

10:06:16 12        A.    Yes.  That transaction.

10:06:17 13        Q.    It was a nonrecurring sale, wasn't it?  That

14    one was.

10:06:18 15        A.    Yes.

10:06:22 16        Q.    All those $2.4 million comprised of sales of

17    Camel cigarette LED signs to R.J.R. Reynolds -- that was a one

18    off deal, wasn't it?

10:06:33 19        A.    I don't know if it was a one off deal; it was

20    one large transactions.

10:06:38 21        Q.    They sold it, they hoped to sell more, and they

22    didn't; correct?

10:06:40 23        A.    I assume they hoped to sell more.

10:06:43 24        Q.    Do you know, sir, that Fallon never competed to

25    try and sell Camel LED signs to R.J.R. Reynolds?
```

```
10:06:51   1        A.    I don't know that to be true.

10:06:54   2        Q.    You don't have any reason to believe they were

           3   trying to compete with iLight with respect to those sales that

           4   were associated with $2.4 million of revenue, do you?

10:07:07   5        A.    That was in -- that transaction was in 2003, I

           6   believe.  And Fallon didn't even have a product, neon -- a

           7   non-neon product in 2003, so how could they compete for an LED

           8   product?

10:07:19   9        THE COURT:  You get to answer questions.  You don't

          10   get to ask them.

10:07:22  11        THE WITNESS:  Sure.

10:07:22  12   BY MR. LIPSHIE:

10:07:25  13        Q.    So you think that was in 2003?

10:07:29  14        A.    2003 or 2004, but I don't believe Fallon had a

          15   product then.

10:07:39  16        Q.    Well, in any event, in your testimony, you are

          17   not attempting to connect or to blame Fallon for iLight's

          18   continued inability to sell additional Camel signs to R.J.R.,

          19   are you?

10:07:59  20        A.    Well, I don't know what R.J.R. or R.J.

          21   Reynolds' strategy has been, what its business plan has been,

          22   regarding acquiring LED signs beyond that one transaction.  I

          23   haven't seen any documentation in this case, so I can't

          24   speculate as to what R.J. Reynolds would or wouldn't do, or

          25   who they are buying products from, whether they are buying
```

from anybody.

10:08:25    Q.    Forget about you.  ILight and Fallon, when they sat down in their hypothetical negotiation in January of 2005, they would have known, wouldn't they?

10:08:32    A.    Would have known what?

10:08:36    Q.    The specifics with respect to customer relationships to sell signs to R.J.R., Camel, LED signs that resulted in $2.4 million prior to that hypothetical negotiation; correct?  They wouldn't have -- that would have been a factor in their negotiation?

10:08:54    A.    What would have been a factor?  I don't understand your question.

10:08:57    Q.    Well, you are saying hypothetical negotiation. You are looking at all these factors, revenues, increases in sales at iLight, decreases at Fallon, increases at Fallon. And then you're going back to the hypothetical negotiation of January of 2005, and you're evaluating all those factors, and you are determining what a reasonable royalty rate is; correct?

10:09:22    THE COURT:  Let me see.  Is the question whether the sales to R.J. Reynolds -- would the plaintiff's sales, a joint venture or otherwise, have been a factor in determining what a reasonable royalty was in 2005?

10:09:40    THE WITNESS:  If that's the question, Your Honor, the answer is, no, it's not relevant.

BY MR. LIPSHIE:

10:09:43     Q.    It's not relevant?

10:09:43     A.    No.

10:09:46     Q.    Even though you factored in sales for iLight to R.J. Reynolds on the Camel signs in coming up with your conclusion that there is $2.5 million in reasonable royalties owed at a rate of seven percent?

10:10:03     A.    No, that's not my analysis. My analysis didn't include any Fallon sales to R.J. Reynolds. That was strictly Anheuser-Busch and Sam's Club.

10:10:11     Q.    But you also evaluated the iLight revenues, and they weren't just limited to Sam's Club and Anheuser-Busch; isn't that correct, sir?

10:10:22     MR. PRICE: Objection, Your Honor. We're getting argumentative.

10:10:26     MR. LIPSHIE: He asked the question.

10:10:30     THE COURT: I think he answered your question about what he considered in forming his opinion about what a reasonable royalty rate was, so I believe we've exhausted that.

10:10:42     MR. LIPSHIE: All right. Let's move on.

10:10:42 BY MR. LIPSHIE:

10:10:50     Q.    Okay. You testified, sir, that Fallon might have lost Sam's Club business without the LED Open sign; correct?

```
10:10:54    1         A.      Right.

10:10:56    2         Q.      Now, that's speculation on your part; correct?

10:11:00    3         A.      Well, no, I wouldn't say it's speculation,

            4    because Sam's went to Fallon, and Fallon started making an LED

            5    sign, because they knew that Sam's wanted to move away from

            6    neon to LED signs.

10:11:12    7         Q.      Well, iLight didn't have any sales relationship

            8    with Sam's Club at the time, did it?

10:11:19    9         A.      No, but my point is, we're talking about --

10:11:21   10         Q.      Just answer my question.

10:11:24   11         A.      Well, repeat your question, please.

10:11:27   12         Q.      ILight didn't have any direct sales

           13    relationship with Sam's Club at the time, did it, sir?

10:11:32   14         A.      I don't know if they had a direct sales

           15    relationship with them or not.

10:11:37   16         Q.      You do know that Sam's Club was a long

           17    established sign customer of Fallon, don't you?

10:11:44   18         A.      Yes, it was a neon sign customer.

10:11:50   19         Q.      Were you aware that Fallon had, at Sam's Club's

           20    request, developed and produced additional products that Sam's

           21    Club bought during that period of time?

10:11:59   22         A.      I don't know what you mean by additional

           23    products.

10:12:02   24         Q.      Different times types of products that were

           25    requested by Sam's Club?
```

10:12:04  1          A.      Oh, different products?  That wouldn't surprise

       2  me, because Sam's club was requesting an LED sign product too.

10:12:11  3          Q.      Were you aware that, in connection with

       4  examining LED products, that Sam's Club expressed interest in

       5  having the Fallon oval neon design?  Did you know that, sir?

10:12:27  6          A.      Yes.  That's my understanding, is that Sam's

       7  Club expressed an interest in an oval neon sign -- non-neon

       8  design -- non-neon sign.

10:12:37  9          Q.      But that was Fallon's oval design; right?

10:12:42 10          A.      That was a design that Fallon presented to

      11  Sam's Club.

10:12:43 12          Q.      And it had been selling to them for their neon

      13  signs; correct?

10:12:47 14          A.      Yes, but they also stopped buying that product

      15  while they were testing IDG/iLight oval non-neon LED.

10:12:55 16          Q.      Yes, sir.  So can you tell the jury that

      17  Fallon's marketing and sales relationship with Sam's Club

      18  wasn't important in Fallon retaining the Sam's Club sign

      19  business of LEDs?

10:13:11 20          A.      Well, I'm not saying it wasn't important.

      21  There's a number factors that drive sales in customer

      22  relationships.  Pricing, technology, customer relationships.

      23  There's a variety of factors.  The simple issue is, if you

      24  assume the patents are valid you infringe.  And if you assume

      25  you don't a design around that, you won't make those sales.

1    You have to remove that product from the market.
10:13:38      2              Q.     That's really not my question, sir.
10:13:40      3              THE COURT:  Well, he was trying to answer the last
              4    question, so --
10:13:41      5    BY MR. LIPSHIE:
10:13:44      6              Q.     Are you aware that the board of directors and
              7    management of iLight --
10:13:48      8              MR. PRICE:  Objection.  Your Honor, may we approach?
10:13:49      9              THE COURT:  Ladies and gentlemen, we're going to
             10    excuse you for just a few minutes.  Please don't discuss the
             11    evidence amongst yourselves until you receive all of the
             12    evidence, the argument of counsel, and the charge of the
             13    Court.
10:14:10     14              (Jury out.)
10:14:11     15              THE WITNESS:  May I step down?
10:14:25     16              THE COURT:  Yes.  Yes, sir.  Your objection.
10:14:27     17              MR. PRICE:  Yes, Your Honor.  We have a pending motion
             18    in limine that addresses this exact issue.  This question
             19    relates to a board meeting that occurred right at the time
             20    this lawsuit was filed.  At that meeting, or after the
             21    meeting, there was a circulated draft of board minutes that
             22    included discussions with patent counsel regarding the lawsuit
             23    and potential settlement possibilities.
10:14:50     24              This particular document was inadvertently produced
             25    during the production of massive amounts of documents.  When

                                                                          524

this document was brought out for first time by Fallon's

counsel in Mark Cleaver's deposition, I immediately requested

that that document be returned, said that it was privileged,

explained the situation, invoked our rights as well as the

protective order, and asked for it back.

10:15:20    Subject to that objection, he did ask questions

conditionally regarding it.  But at all times we asserted it

and requested it back.  And now they are requesting to use it.

10:15:31    THE COURT:  I don't remember a motion in limine on

that issue.

10:15:34    MR. PRICE:  Yes, it's -- which motion in limine

number?

10:15:38    MS. HUNTER:  Your Honor, I believe it's Number 5.

10:15:41    MR. PRICE:  It is one of the five, and if you want to

know the exact number, Your Honor, we'll get that for you.

10:15:47    THE COURT:  If you will get me the docket entry

number, that will be helpful.

10:15:52    MR. LIPSHIE:  Your Honor, do you want me to put it up

on the screen for you so you can see what it is we're talking

about?

10:16:03    THE COURT:  If somebody has got the motion, just let

me see it.

10:16:37    MR. PRICE:  It's docket entry number 154, Your Honor.

10:16:41    THE COURT:  Well, I ran a motions report.  When we had

those arguments on motions in limine, I thought all had been

addressed.

10:16:49   MR. PRICE:  No, Your Honor.  We addressed their
motions.  We did not address ours on day one.

10:16:55   THE COURT:  Well, I was going through all of them that
were on my motions report.

10:16:58   MR. PRICE:  Roughly, Your Honor, there were four or
five on each side.  We did cover all of theirs, but we did not
cover any of ours.  Maybe one of ours.

10:17:41   THE COURT:  What do you say to their contention that
there was an inadvertent disclosure and, therefore, there is
no waiver?

10:17:47   MR. KITTREDGE:  Your Honor, this did come up in the
deposition of Mark Cleaver, and Mr. Price said that he would
request to have it back.  We were waiting to get that request
in writing, and we never did.  We went ahead and used it in
the expert report that we served last fall and never heard a
thing about it since then.  We don't believe they have had --

10:18:03   THE COURT:  Well, if there is no dispute they
requested it back, which reflects that they were asserting the
privilege.  There is no doubt about that, is there?

10:18:16   MR. KITTREDGE:  I thought there was.  I was waiting --

10:18:19   THE COURT:  What was your ambiguity about requesting
it back?

10:18:23   MR. LIPSHIE:  They were supposed to request it in
writing.  They never did.  The real question is whether it's

1   attorney-client.

10:18:28        2           MR. KITTREDGE:  I believe it's whether or not it's

                3   privileged and they have met their burden in demonstrating it.

10:18:30        4           MR. PRICE:  Your Honor, I could not have requested it

                5   back more clearly on the record.  I will be glad to run this

                6   transcript up if we really want to talk about that.  These are

                7   portions quoted.

10:18:46        8           MR. LIPSHIE:  Your Honor, we do not dispute that Mr.

                9   Price said that the portion of the document he was claiming

               10   the privilege of.  The only point there is, they never got

               11   back and told us which portion it was.

10:18:57       12           MR. PRICE:  No, that is absolutely not true.  We had

               13   an explicit discussion on the record exactly which portions of

               14   that document were privileged and which were not.  That is

               15   absolutely inaccurate.

10:19:07       16           MR. LIPSHIE:  Okay.  Well, I apologize if that's

               17   inaccurate.

10:19:11       18           MR. KITTREDGE:  What Mr. Price said is correct, Your

               19   Honor.  We discussed a portion on the record.  And our

               20   position in that, as we wrote in our brief, is we don't

               21   believe that they carried their burden of proving that it's

               22   actually privileged.

10:19:25       23           THE COURT:  It's at a board meeting, it's a statement

               24   of their counsel in connection with litigating pending.

10:19:32       25           MR. KITTREDGE:  It's not a statement of counsel.

There is no evidence of that.

10:19:37     THE COURT:  Let me see the document.

10:19:39     MR. PRICE:  He wants to see the actual board minutes.

Is that correct, Your Honor?

10:19:45     THE COURT:  Yes, sir.

10:19:50     MR. PRICE:  Do you all have the slide?

10:19:57     THE COURT:  Give me the document, if you don't mind.

10:19:57     MR. PRICE:  I apologize, Your Honor.  I was planning

on doing this --

10:20:00     THE COURT:  Well, it's attached to your motion.

10:20:02     MR. KITTREDGE:  It's attached to the motion and might

be attached to our response as well.

10:20:21     MR. PRICE:  Your Honor, here's the document.

10:20:23     THE COURT:  It reflects that they discussed the merits

of the patent infringement cases, and Nagle, patent counsel,

participated in much of the discussion.

10:20:40     MR. PRICE:  That is correct, Your Honor.  In short,

they are discussing the lawsuit they are just about to file

and what the potential settlement possibilities are in that

lawsuit with their counsel.

10:20:57     THE COURT:  I would consider this probably qualifying

as attorney-client as well as work product.

10:21:02     MR. KITTREDGE:  Very well.

10:21:12     THE COURT:  Objection sustained.  Now, I'm getting a

little concerned here.  There is a reference -- one of these

questions appears to be directed as to which company was

commercially successful.  And it seems to me that the issue is

whether that was an infringement, and if so, what the

reasonable royalty was.

10:21:44    You asked a lot of questions about other products and

profitability on other products.  And I'm not sure that's

really relevant.

10:21:51    MR. LIPSHIE:  Your Honor, in his testimony and report,

what he has done in applying the factors on the reasonable

royalty is he has attributed substantial importance to the

revenues of both companies and done a comparative analysis to

determine, in his opinion, that you ought to add on for this

factor and that factor.

10:22:11    THE COURT:  Well, my recollection of what his

testimony was, was that -- is that Fallon was losing money on

the neon gas signs.  And that prompted a need to get into the

non-neon gas product lines to be commercially successful.

That was my reference -- understanding of his testimony on

that.

10:22:39    MR. LIPSHIE:  Well, he has testified to a great deal

on that.  He has relied upon a lot of hearsay statements that

his people told him that go to other issues in the case, on

competition, who was competing with who, on which customers.

He has given his opinion as to the likelihood --

10:22:59    THE COURT:  Yes, but I guess for lack of a better

term, it's the relevant product market that should be at
issue.  And the relevant product market in this case is not
architectural lighting but the signage part of the business.
That's the relevant market in this case.

10:23:19          MR. LIPSHIE:  Well, let me give you an example, Your
Honor.  Just that he was testifying about -- he was saying,
and he makes -- on several occasions he attributes a lot of
importance to how successful iLight's commercial LED lighting
was.  And he -- evidences that, both in his testimony and in
his reports, both direct and rebuttal.

10:23:44          THE COURT:  He testified about the signage and the
impact of signage on the --

10:23:50          MR. LIPSHIE:  Their revenues went up 930 percent.
Well, that

10:23:53          THE COURT:  But he attributed that in his testimony to
the sale of the Joe Camel product.  He didn't -- that was the
testimony, as I recall it.

10:24:04          MR. LIPSHIE:  I did; he didn't.  On cross I brought
that point out.

10:24:07          THE COURT:  No, I think he -- that was what I
understood on direct.

10:24:15          Well, bring the jury in, Mr. Marshal.

10:24:45          MR. LIPSHIE:  Your Honor, I will try and move on.

10:24:45          (Jury in.)

10:25:06          COURT:  All right, counsel.

1    BY MR. LIPSHIE:

2         Q.    Mr. Bratic, you also testified that in 2006

3    Fallon competed with iLight and other companies to sell custom

4    made signs to Anheuser-Busch.  That's in your report; correct?

5         A.    Yes.

6         Q.    Do you know if any of the other companies still

7    make sales to Anheuser-Busch?

8         A.    No, I don't know.

9         Q.    Do you know if iLight makes any sales to

10   Anheuser-Busch?

11        A.    I don't believe they do, not anymore, not

12   currently.

13        Q.    You went on to testify that Fallon may have

14   initially implemented an aggressive pricing strategy in order

15   to garner the business of Anheuser-Busch.  Was it pricing or

16   the accused technology in your opinion that allowed Fallon to

17   acquire the Anheuser-Busch signage business?

18        A.    Well, it was both.  Anheuser-Busch wanted the

19   LED signage.  And it appears to me, based on -- if you look at

20   the economics of it, if you had a choice between who you are

21   going to get the same technology from, and one company sells

22   the sign for $100 and another one sells it for $180, you are

23   going to make a business decision to take and adopt that same

24   technology from the lower cost provider, which happened to be

25   Fallon.

10:26:26   1        Q.    Okay.  And you say Fallon was the lower cost

           2   provider?

10:26:30   3        A.    Well, they provided it at a lower cost.  In

           4   other words, they sold their signs to Anheuser-Busch, the LED

           5   accused signs, in 2005, when that order was issued, awarded by

           6   Anheuser-Busch.  They were selling for an average of roughly

           7   $100 a sign, whereas Fallon had been selling them -- the ones

           8   that they sold, the LED signs to Anheuser-Busch, for $180 a

           9   sign.  That's a pretty big gap.

10:26:57  10        Q.    Couldn't that depend on the product mix that

          11   has been sold to the customer?

10:27:03  12        A.    I'm just saying, I have information -- I don't

          13   have information about their product mix sold by Fallon.  What

          14   I do have is pricing information that has been produced in

          15   this litigation as far as what Fallon sold those LED accused

          16   products to Anheuser-Busch and what iLight had been selling

          17   them for at the time they lost the account.

10:27:24  18        Q.    So you are comparing it to iLight -- are you

          19   saying Fallon undercut its own price and started selling for

          20   less and less a price?  Are you doing a comparative analysis?

10:27:36  21        A.    I'm doing both.  I also had the information

          22   that shows that after Fallon got the Anheuser-Busch account,

          23   once they locked that account in, they started raising their

          24   prices, to the point now they are almost $170 a sign.

10:28:13  25        Q.    Let's look at Exhibit #934.  And that's Exhibit

8 to your report.  I don't know if you have your exhibits.

10:28:23  2          A.      I do not have my exhibits.

10:28:24  3          Q.      Let's give this to you.

10:28:28  4          A.      Thank you.  Thank you very much.

10:28:40  5          Q.      Could you look at Page three.  Doesn't that
        6  indicate that seven of Fallon's products that were sold to
        7  Anheuser-Busch went down in price the next year?

10:28:55  8          A.      I'm sorry?  On Page three?

10:28:56  9          Q.      Yes, sir.

10:28:57  10          A.      Okay.

10:29:00  11          Q.      Does that not indicate on Page three that seven
        12  of the Fallon accused products sold to Anheuser-Busch went
        13  down in price the next year?

10:29:12  14          A.      I don't know what you mean, seven products.
        15  The total sum of all these products on Page three is a series
        16  of more than seven products.

10:29:22  17          Q.      That's my question.  Seven of them went down,
        18  didn't they, and only two went up the next year?

10:29:28  19          A.      Well, I have to look.  You have to look at them
        20  individually.  Some of them, they didn't sell some in some of
        21  the earlier years and introduced some in later years, so --

10:29:37  22          Q.      Do you have any quibble with that, that seven
        23  of them went down the next year, and two of them -- only two
        24  went up?

10:29:44  25          A.      I'm sorry, which -- is that what you highlight

1    as being the seven ones up there?

10:29:47    2         Q.     Yes, sir.

10:30:26    3         A.     All right.  Well, let's take a look at that.  I

                    4    see six up there that show between 2007 and 2008 that the

                    5    price went down.

10:30:37    6         Q.     Okay.  You say six, and I say seven.

10:30:39    7         A.     I'm looking at the yellow highlights.

10:30:41    8         Q.     You see two?

10:30:45    9         A.     I'm sorry, between what years?

10:30:49   10         Q.     I think that's 2006 and 2007; right?

10:31:02   11         A.     No, you are comparing 2007.  Oh.  Well, --

                   12    between 2006 and 2007, on that page alone, there's just two

                   13    products.

10:31:25   14         Q.     Two what?

10:31:28   15         A.     Two products on that page.

10:31:34   16         Q.     Good.  And the average price per product when

                   17    you look at that, sir?

10:31:36   18         A.     Yes.

10:31:39   19         Q.     Didn't it go up because the product mix

                   20    changed?  Isn't that correct?

10:31:44   21         A.     Well, you would have to look at it.  These

                   22    aren't weighted numbers.  In other words, these numbers are

                   23    not weighted by the volume and the price.  So I can't answer

                   24    that question.

10:31:55   25         Q.     Let me put it this way.  If one of the products

was a small sign that sold for $50, and then they changed the

mix, so the next year they are selling a 7' sign, naturally

that's going to cost a lot more than the very small one;

correct?

10:32:16      A.     I would expect so. It's a different product.

10:32:20      Q.     You do know, sir, that Fallon's gross margin on

its LED sales decreased in 2007 compared to 2006; correct?

10:32:31      A.     Well, now, I have to look. I don't know if I

have that information. I'm sorry, would you repeat the

question.

10:32:45      Q.     Did not Fallon's gross margin on the LED sales

decrease in 2007 compared to 2006?

10:33:00      A.     Now, are you -- excuse me. It's gross margin?

10:33:01      Q.     Gross profit margin.

10:33:06      A.     No, that's not true. In fact, Fallon broke out

their retail and custom business for LED products. And while

in 2006 the gross profit margin was 33 percent on retail, in

2007 the gross margin dropped to 28 percent. But the custom

business, the gross margin in 2006 was 20 percent and went up

to 26 percent in 2007.

10:33:31      Q.     All right, sir. You testified earlier about an

e-mail dated December 3, 2005 from a guy named Tim Demmond; is

that right?

10:33:43      A.     There were some e-mails I testified about.

10:33:44      Q.     Pardon?

1          A.     There were several e-mails I testified about.

2          THE COURT:  Well, listen carefully to the question.

3    He's focusing on one.

4          THE WITNESS:  One, December?  I believe there was one,

5    yes.

6    BY MR. LIPSHIE:

7          Q.     And you quoted that particular one?

8          A.     Yes.

9          Q.     Now, the hypothetical negotiation took place on

10   January 20th -- or January of 2005; correct?

11         A.     Right.  On or about January of 2005.

12         Q.     But that e-mail was about a year later?

13         A.     I'm sorry, what was the date of the e-mail?

14         Q.     12/3/05.  12/3/05.

15         A.     Oh, yes.

16         Q.     So that wouldn't have had any effect on the

17   hypothetical negotiation, would it?

18         A.     No, that's not true.

19         Q.     All right.  You recall your reasonableness

20   check and how that related to the Georgia-Pacific factors that

21   you testified about?

22         A.     Generally.

23         Q.     Okay.  Let's put up 32 TT, which was up there

24   previously during the witness's testimony.  That's your

25   reasonableness check; right?  That's how you entitled that?

10:34:57  1          A.    Yes.

10:34:59  2          Q.    You've got seven percent reasonable royalty

          3    that's up there.  Now, what percent of seven -- what percent

          4    is seven of 7.7?

10:35:20  5          A.    Of 7.7?  I don't understand the question.  What

          6    is seven percent of 7.7?

10:35:27  7          Q.    No.  You've got a seven percent reasonable

          8    royalty rate?

10:35:30  9          A.    Yes.

10:35:38 10          Q.    And Fallon's profits were 7.7; right?

10:35:41 11          A.    Their -- Fallon's -- which profit are you

         12    talking about?

10:35:45 13          Q.    Which one do you think was 7.7?

10:35:47 14          A.    Million, you mean?

10:35:47 15          Q.    Percent.

10:35:51 16          A.    Oh, that's their company-wide projected

         17    operating margin.  In other words, that was a projected

         18    operating margin, company-wide for 2005 that was prepared in

         19    2004.

10:36:05 20          Q.    All right.  Well, that has already happened;

         21    right?

10:36:08 22          A.    Well, no.  It never happened.  It was a

         23    projection.  And it was for company-wide.  There were no

         24    specific projections ever prepared by Fallon for the accused

         25    products.

| 10:36:19 | 1 | Q.    I'm not talking about projections, sir.  I'm |
| 10:36:24 | 2 | talking about actual results. |
| 10:36:24 | 3 | A.    Well, I'm sorry. |
| 10:36:29 | 4 | THE COURT:  You all, you did ask about projections at |
|  | 5 | the beginning. |
| 10:36:29 | 6 | BY MR. LIPSHIE: |
| 10:36:33 | 7 | Q.    You are talking about 7.7 percent reasonable |
|  | 8 | royalty rate.  That's seven percent of what? |
| 10:36:38 | 9 | A.    It's seven percent of sales, of accused |
|  | 10 | products, of $35 million in products, accused infringing |
|  | 11 | products. |
| 10:36:52 | 12 | Q.    Do you know what Fallon's made on its sales of |
|  | 13 | infringing product? |
| 10:36:57 | 14 | A.    Well, -- |
| 10:36:59 | 15 | Q.    7.7 percent, wasn't it? |
| 10:37:04 | 16 | A.    No, I don't believe that's correct.  And that's |
|  | 17 | the profit after they allocated a bunch of arbitrary expenses |
|  | 18 | to the product.  But Fallon made a lot of money on the gross |
|  | 19 | profit margin and not the operating profit level. |
| 10:37:21 | 20 | Q.    They allocated expenses that businesses often |
|  | 21 | allocate? |
| 10:37:24 | 22 | A.    No, that's not true, not in this case, because |
|  | 23 | Fallon actually had roughly $3 million in what they call SG&A |
|  | 24 | sales, general and administrative expenses, going back before |
|  | 25 | they introduced the LED signs.  And they have had about the |

same volume of SG & A or sales, general and expenses during
the time period that they reintroduced the LED signs.  So that
was a new business line that didn't cause them to spend any
more money in terms of buying the CEO an extra car, or buying
him a bigger office or buying him extra phones or those kind
of expenses.  And if you look at what Fallon has actually
done, and I have a chart that shows, all they did was
arbitrarily take the total company sales in general
administrative expenses as a percentage of total sales and
just arbitrarily applied that to the accused products without
any analysis to support that.

10:38:17    Q.    All right.  Thank you for that answer.  You
disagree that there was a 7.7 figure, as Dr. Degen testified
yesterday?

10:38:31    A.    No, that's not true.  What Dr. Degen testified
to in his report was a 7.7 projected profitability of
products.  All I'm saying is those projections in 2004 were
company-wide.  They were not for the accused products.
There's no documents in this case that Fallon has ever
produced showing projections of its accused products sales
10:38:52  and --

10:38:53    Q.    I'm with you now.

10:38:58    A.    I just wanted to be sure it's clear.

10:39:02    Q.    Okay.  You disagree with Mr. Degen on a lot of
things.  If you take his projections as correct -- and we know

you disagree with them, you don't need to explain again why --

                     do you see that little blue thing, that blue sliver?

10:39:20    3        A.      Yes, I do.

10:39:23    4        Q.      That would be the .7 percent of remaining

            5   profit to Fallon out of that whole pie; correct?

10:39:28    6        A.      No.

10:39:33    7        Q.      No?  If you've got --

10:39:38    8        A.      That's 7.7 percent if you take the reasonable

            9   royalty out.

10:39:42   10        MR. PRICE:  Objection, Your Honor.  There is a lack of

           11   foundation.

10:39:43   12   BY MR. LIPSHIE:

10:39:45   13        Q.      That's your chart, isn't it, without the

           14   sliver?

10:39:48   15        A.      That's not my chart.  It's your chart.

10:39:51   16        Q.      Is that not your chart that has been adapted to

           17   show roughly what proportion .7 percent has to your reasonable

           18   royalty of seven percent, which we just saw on your prior

           19   chart?

10:40:04   20        A.      That's my chart that you took and modified.

10:40:06   21        Q.      That's right.  That's all I'm saying.

10:40:07   22        A.      Okay.  If you asked me that question, yes.

10:40:08   23        Q.      Well, that was the question, sir.

10:40:11   24        THE COURT:  Well, it wasn't too clear to me.

10:40:12   25   BY MR. LIPSHIE:

1          Q.      So that's all that would be left for Fallon to

2     cover such things as business risk, design, marketing,

3     customer relationships, changes in the economy, things of that

4     nature; correct?

5          A.      No, that's not true at all.

6          Q.      Okay.  Don't you think if Fallon had to pay

7     seven percent of total sales from the accused product, LED

8     signs, to iLight, they would have to raise their price?

9          A.      No, they wouldn't have to raise their price.

10          Q.      So they could just -- they could just pay a

11     large amount of what they were otherwise managing to take in

12     as profit, leaving them with some smaller amount of profit,

13     and would not have to raise their prices?  Is that right?

14          A.      They would not have to raise price at all,

15     because they would still keep half of their profits.  They

16     would pay seven percent royalties and still keep seven percent

17     of the sales price as profit.  So essentially, you're

18     splitting their profits on the product 50/50.

19          Q.      All right.  So you are saying that if you are

20     Sam's Club or Anheuser-Busch, and you are a vendor, let's say

21     the vendor is not making enough profit.  They have got more

22     costs, which includes seven percent of the total sales price

23     that it gets, you don't think that sometimes like the price

24     goes up seven percent of sales, say a large increase in the

25     price of gas or something of that nature, that the seller

```
       1    would not have to raise the price of its product?  That's

       2    supply and demand, isn't it, sir?

10:41:54  3             A.     We are talking about what actually happened.

       4    We know there has been $35 million in sales of these products.

       5    We know that Fallon has enjoyed a 15 percent profit premium

       6    over its losing neon business.  We know that without this

       7    product line, this accused product line, Fallon would be in a

       8    world of hurt.  They would have been more than happy to split

       9    their 15 percent profit premium, and they wouldn't have had to

      10    raise their prices because we are dealing with their prices

      11    that they actually sold their products at.  There's no

      12    guessing here.

10:42:23 13             Q.     I understood.  So your testimony is the law of

      14    supply and demand is not an appropriate factor?

10:42:30 15             THE COURT:  No, sir, that's not what he said.  That's

      16    not what he said.

10:42:31 17    BY MR. LIPSHIE:

10:42:35 18             Q.     Rule of thumb.  You testified you don't like

      19    Mr. Bagin's rule of thumb; correct?

10:42:41 20             A.     I disagree with him on the rule of thumb.

10:42:45 21             Q.     You disagree with him vociferously.  The

      22    Georgia-Pacific factors -- that's not all he did, is it?  He

      23    didn't just apply rule of thumb and ignore the Georgia-Pacific

      24    factors that you testified about, did he?

10:43:00 25             A.     No, but his starting point for his entire
```

542

analysis was the Georgia-Pacific rule of thumb as to what he
thought were projected or expected sales of the accused
products, which is not true.  And he came up with 1.9 percent
to 2.6 percent, and then he went through the Georgia-Pacific
analysis and ended up with 2 percent.

10:43:20  Q.    Right.  He just used it as a starting point.
That's the point I'm trying to make, to get across to the
jury.  Then he applied the Georgia-Pacific factors.  You
disagreed with his analysis.  But he didn't just apply a rule
of thumb and that was it, he went through the analysis.

10:43:37  MR. PRICE:  Your Honor, counsel is testifying.

10:43:37  MR. LIPSHIE:  Is that correct?

10:43:40  THE COURT:  Well, he can ask him about the other
expert's report.  Go ahead, Mr. Lipshie.

10:43:49  THE WITNESS:  He did use a 25 percent rule of thumb.
And as I already discussed in my rebuttal testimony, he did go
through a Georgia-Pacific analysis because I walked the jury
through my criticisms and disagreements with him on his
analysis of the Georgia-Pacific analysis.

10:44:00  BY MR. LIPSHIE:

10:44:07  Q.    You don't know why Mr. Degen went through the
George Pacific factors?  You just testified yesterday.

10:44:13  MR. PRICE:  Your Honor, asked and answered.

10:44:13  THE COURT:  Sustained.

10:44:13  BY MR. LIPSHIE:

10:44:17  1          Q.    The 25 percent rule of thumb has been used as a

2    starting point in expert damages analysis for decades, hasn't

3    it, in court cases?

10:44:28  4          A.    Sure.  It has also been widely criticized in

5    court cases, too.

10:44:31  6          THE COURT:  Well, we're not going to argue about court

7    cases.  We can argue about what people in the field do.

10:44:34  8    BY MR. LIPSHIE:

10:44:37  9          Q.    But it has been widely used, even though you

10    disagree with it?

10:44:44  11         A.    It has been widely used and widely criticized.

10:44:47  12         Q.    And the fact that you chose not to do it and

13    Mr. Bagin chose to use the 25 percent rule of thumb as a

14    starting point before he then engaged in his Georgia-Pacific

15    analysis doesn't deem his testimony unreliable per se, does

16    it?

10:45:04  17         A.    I'm not going to sit in judgment of what is

18    reliable -- his testimony is reliable.  That's for the jury to

19    figure out, not for me to determine.  I can just tell you what

20    he did and where I disagree with him.  It's ultimately for the

21    jury here to make their decisions about what is reasonable and

22    what makes sense.

10:45:24  23         Q.    All right, sir.  In your background

24    qualifications, it was revealed that you have testified many

25    times as a damages expert on patent infringement in federal

court proceedings such as this one; correct?

10:45:37   A.   Correct.

10:45:41   Q.   And that's part of your curriculum vitae, your
resume and your qualifications; right?

10:45:46   A.   Yes, sir.

10:45:49   Q.   Have you ever been disqualified as an expert
witness as to your testimony on damages from patent
infringement?

10:45:57   A.   No.   I have had a report excluded, but have not
been disqualified.

10:46:09   Q.   All right, sir.   Did you know or would it
surprise you if I told you that the Northern District of
California --

10:46:24   THE COURT:   Hold on, Mr. -- hold on.   Wait a minute.
Would counsel approach the bench?

10:46:26   (Whereupon, a bench conference was held, out of the
hearing of the jury, to wit:)

10:46:28   THE COURT:   We're not going to have witnesses
testifying about other court cases.

10:46:35   MR. LIPSHIE:   I just asked him a question has he ever
been disqualified as a witness, and he has been.   They listed
it in his CV.

10:46:45   THE COURT:   Let me see the language of the case.

10:46:47   MR. PRICE:   He's qualified as a technical expert.
There's no damages.

10:46:52  1          THE COURT:  That's why -- that's the reason.  Let me

2    see the case.

10:46:54  3          (Conclusion of bench conference.)

10:46:55  4          THE COURT:  Ladies and gentlemen of the jury, we're

5    going to excuse you for a few minutes.  Please don't discuss

6    the case amongst yourselves or with anyone else until you

7    receive all of the evidence, the argument of counsel, and the

8    charge of the Court.

10:47:31  9          (Jury out.)

10:47:34  10         THE COURT:  If somebody has got an opinion, hand it

11   up.

10:47:41  12         From the Court's perspective what we have here is a

13   characterization of what some judge ruled, and I think that

14   that's a matter that the Court needs to address before

10:47:49  15  counsel --

10:47:50  16         MR. LIPSHIE:  I agree, Your Honor.  And I didn't stick

17   it up there.  I expected to bring it to Your Honor's

18   attention.

10:47:59  19         MR. PRICE:  It has now been put out in front of the

20   jury, though.

10:48:00  21         THE COURT:  Well, wait a minute.

10:48:01  22         MR. LIPSHIE:  Go ahead and read it.

10:48:01  23         MR. PRICE:  Excuse me?

10:48:04  24         THE COURT:  Let me read it.

10:48:05  25         MR. PRICE:  Oh absolutely, absolutely.  I apologize.

That's not what I'm inferring.

10:50:20    THE COURT:  The difficulty I have with this is that
we're going to get into a factual determination.  For example:

O2 Micro fails to show any effort it took to get all
of the information necessary for its expert to provide a
reasonable royalty calculation that does not rely upon
unreasonable inferences or speculation.

10:52:29    Part of this is a legal issue, too.  The reference to
the flaws in his report refers to the defendant's argument.
It really doesn't articulate the basis upon which the Court
grants summary judgment.  He granted it, but --

10:52:50    MR. LIPSHIE:  They strike his testimony as to damages,
and they give the reason why.

10:52:57    THE COURT:  He doesn't strike it.  What you have here
are critiques of the testimony.  He didn't strike it.  He just
said it wasn't sufficient -- the appropriate construction
would be, the Court grants summary judgment in favor of the
defendants, O2 Micro has presented no evidence of damages.

10:53:16    MR. LIPSHIE:  And he is the damages expert and they
struck his testimony, Your Honor.

10:53:22    THE COURT:  Well, they didn't strike it.

10:53:22    MR. LIPSHIE:  They excluded it.

10:53:23    THE COURT:  They didn't exclude it.  They found it
inadequate.

10:53:27    MR. LIPSHIE:  Unreliable under Daubert grounds.

| 10:53:29 | 1 | THE COURT:  Well, that's what the defendants argue, |
| | 2 | but the Court doesn't adopt that language. |
| 10:53:33 | 3 | MR. LIPSHIE:  Well, they kicked it out because -- |
| 10:53:36 | 4 | THE COURT:  Well, you keep saying they kicked it out. |
| | 5 | He didn't kick it out.  He obviously considered it.  If he |
| | 6 | considered it, he didn't kick it out. |
| 10:53:41 | 7 | MR. LIPSHIE:  All right, Your Honor.  I will defer to |
| | 8 | Your Honor's reading of this. |
| 10:53:46 | 9 | THE COURT:  Well, that's why I think we needed a |
| | 10 | discussion, because you are characterizing the matter. |
| 10:53:51 | 11 | MR. LIPSHIE:  Can I see it? |
| 10:53:53 | 12 | THE COURT:  Well, I thought you would have seen it. |
| 10:53:55 | 13 | MR. LIPSHIE:  I have seen it. |
| 10:53:55 | 14 | THE COURT:  Well, I thought you had read it before. |
| 10:53:55 | 15 | MR. LIPSHIE:  I have read it, Your Honor. |
| 10:53:56 | 16 | MR. PRICE:  Your Honor, my concern is, now this has |
| | 17 | come out before the jury without context.  And my |
| | 18 | understanding is, part of the reason -- |
| 10:54:01 | 19 | THE COURT:  I'm going to see if, after the Court's |
| | 20 | references to this, whether he's still going to ask this |
| | 21 | question.  And if he is, then I will ask accordingly. |
| 10:54:13 | 22 | MR. PRICE:  Unfortunately, I believe he already got |
| | 23 | out the first one. |
| 10:54:17 | 24 | THE COURT:  I think he got out -- he said, have you |
| | 25 | been disqualified.  And he said -- |

```
10:54:19    1            MR. LIPSHIE:  He said no.

10:54:23    2            THE COURT:  He said, no, I was not disqualified.  He

            3    said the report was rejected.  Or the report --

10:54:26    4            MR. LIPSHIE:  Was excluded.

10:54:27    5            THE COURT:  Was excluded.  I don't think it was

            6    excluded.  If it was excluded, the Court never would have

            7    considered it.  He obviously considered it and didn't find it

            8    adequate.

10:54:39    9            Part of the inadequacy was that they didn't give him

           10    enough information.  His client didn't give him enough

           11    information.  That, I think, is a reasonable construction of

           12    that language.

10:54:47   13            MR. PRICE:  I believe in this particular case it also

           14    had to do with the technical expert issues that underlie it.

10:54:53   15            THE COURT:  Well, I didn't see all that.

10:54:55   16            MR. PRICE:  That's why you are only getting the

           17    highlighted versions.  It actually, if you read the whole

           18    thing in context, they have major issues with the technical

           19    person.  You have to assume in damages --

10:55:06   20            THE COURT:  Well, the Court separately discussed the

           21    issue of damages.

10:55:08   22            MR. PRICE:  You are correct, Your Honor, that that

           23    didn't play into context of the summary judgment ruling.

10:55:14   24            THE COURT:  Well, I mean, he had a separate ruling on

           25    the issue of damages.  And I think the Court can consider that
```

separately in a motion.  For the issues before the Court.  To
say it was excluded I don't think is appropriate, because the
Court obviously considered it.  It was -- I think the most
reasonable construction is the Court did not feel that it was
adequate to show -- to prove the element of damages in that
case.

10:55:42          MR. LIPSHIE:  ILight says -- here would be what I
would point to, Your Honor.  And this could be a close call.
I have never been in this particular argument before.  It
says, third, it goes, as defendants point out, which is what
Your Honor was talking about, Mr. Bratic's report does not
account for the law of supply and demand.  Mr. Bratic
hypothesizes a royalty that would triple the average selling
price for MPS's accused products, but he makes no allowance
for the impact that increased prices would have had on demand.

          Then they go ahead, they cite a case, they say, O2
Micro, who had hired Mr. Bratic, attempts to distinguish this
case, noticing the plaintiffs there sought lost profits, not a
reasonable royalty.  This difference is inconsequential.  Then
they cite to the parties' arguments.  They say, defendants
have not offered evidence from an economist or other expert,
put they do point to flaws in Mr. Bratic's report that, when
combined, are serious enough to render it unreliable and
inadmissible.  As a result, O2 Micro has not met its burden of
proving damages.  The Court grants summary judgment in favor

1   of defendants on -- that O2 Micro has presented no evidence of

2   damages.

10:57:12   3        That's what I would rely upon.  And that's all.  It

4   goes from right there to the last highlighted.  I think they

5   do --

10:57:19   6        THE COURT:  Well, here's the difficulty that I have,

7   my understanding of this.  What the plaintiffs seek are a

8   reasonable royalty of actual past sales.  And an injunction

9   against any future production or sales by the defendant of

10   their product.

10:57:37   11        If you have an injunction, then there's no more sales

12   by the defendant.  So that the issue of whether there is an

13   increase in price is really for the plaintiff.

10:57:49   14        MR. LIPSHIE:  Well, that's not the only thing they

15   mention.

10:57:52   16        THE COURT:  No, but --

10:57:54   17        MR. PRICE:  Obviously it is a reasonable royalty

18   situation and not lost profits, either.

10:58:01   19        MR. LIPSHIE:  Well, this is a reasonable royalty case.

10:58:02   20        THE COURT:  It is on reasonable royalty.  But it's on

21   past sales, on sales that have actually occurred, is what they

22   are seeking.  It's a form of disgorgement, is what it is.

10:58:14   23        MR. LIPSHIE:  I think it is there, too, Your Honor.

10:58:17   24        THE COURT:  But in terms of future prices, if you are

25   asking for an injunction that the defendant not make the

product anymore, then it seems to me whether it increases what

the price -- what a price -- a price increase of the defendant

is irrelevant, because they don't make the product anymore.

10:58:34    MR. LIPSHIE:  But that's what they are looking at.  He

has given a reasonable royalty on past sales.  They are

saying, what you did is you didn't take into account that your

reasonable royalty would have increased the price and caused a

reduction in demand.

10:58:48    THE COURT:  But that speaks to future sales.  If there

are future sales, it may raise the price.  But if you are

asking for an injunction that you don't sell it anymore, then

the future price of the defendant is irrelevant.

10:59:00    MR. LIPSHIE:  Even if you go back to 2005 and look at

the hypothetical negotiations?

10:59:03    THE COURT:  No, but we're not -- that's the point.

You are looking at what the actual sales price was.  The sale

has been consummated.

10:59:11    MR. LIPSHIE:  Well, he's doing both, and then he's

grasping back on to the reasonable royalty rate.  His theory

that if you paid all this additional money for past sales, it

wouldn't have caused iLight to have to raise the price to make

the same amount of sales.  That's -- that's my point, Your

Honor.  I think that's what their point is.  But I will leave

it to Your Honor.

10:59:37    MR. PRICE:  Your Honor, the underlying sales data was

supplied by Fallon.  Both sides relied on the exact same data.
The only projection was the forecasting because we didn't have
supplementation.

10:59:49    MR. LIPSHIE:  We're not arguing about forecast.

11:00:21    THE COURT:  Well, it seems to me that -- well, --

11:00:25    MR. LIPSHIE:  Your Honor, may I make a suggestion?  He
has listed it in his expert report, and it was part of his
qualifications, and he has said --

11:00:34    THE COURT:  Well, I will allow you to ask him whether
any of his reports have been rejected by a court as inadequate
to show a reasonable royalty.

11:00:51    MR. LIPSHIE:  That was going to be my suggestion.

11:00:54    THE COURT:  Yeah, but the way you characterized it
before is a bit of mischaracterization.

11:00:58    THE COURT:  Let me try it and see what Your Honor
says.

11:01:00    MR. PRICE:  I take it, Your Honor, then I can put it
in context?

11:01:05    THE COURT:  Well, what do you mean put it in context?

11:01:07    MR. PRICE:  If he's going to open this door, I'm going
to be able to ask Mr. Bratic his understanding of why that
occurred.

11:01:14    MR. LIPSHIE:  Your Honor, that's why I was going to
make that suggestion.  If he then goes back into it --

11:01:20    MR. PRICE:  The bottom line is, they are highlighting

very narrow issues and losing the big picture.  If they are
going to project this situation onto here where Mr. Bratic has
testified in hundreds of cases, and they pick out one --

11:01:34     THE COURT:  You know, here's the difficulty I have.
For example, the Court in this case points out to the
arguments, but it doesn't reflect which rationale it's
following.  It doesn't make an express ruling that he's
disqualified under Daubert as unreliable.

11:01:52     MR. PRICE:  Correct.

11:01:54     THE COURT:  It only says he grants summary judgment.
If you grant summary judgment, it seems to me you had to
consider the evidence in some context.

11:02:02     MR. PRICE:  That's correct.

11:02:08     THE COURT:  I think to me it's a little bit ambiguous.
But I think it's fair to say that the Court found it
inadequate, or the Court rejected it as inadequate to
determine a reasonable royalty under the facts of that case.
Otherwise, we're going to get into a debate about the merits
of that case, and I don't want to take this too far, because
everybody is going to be trying to characterize the Court's
ruling.  So what are you going to ask?

11:02:40     MR. PRICE:  Well, at a minimum, Your Honor, we're
going to have to put it in context that this is one of
hundreds of matters in which he has testified.

11:02:55     THE COURT:  Well, I mean, that point I think is -- I

```
       1   don't see any problem with that.

11:02:58 2           MR. PRICE:  I understand.  I mean, the problem is,

       3   Your Honor, we're kind of getting into a Rule 403 situation

       4   where they are, in my opinion, taking this out of context.

11:03:07 5           THE COURT:  No, but I mean, I think they are entitled

       6   to point out if there was an occasion when a court didn't

       7   accept his calculation of what a reasonable royalty was.  I

       8   think they are entitled to point that out.

11:03:21 9           MR. PRICE:  And, Your Honor, in turn, am I entitled to

      10   ask this witness his understanding of why that occurred in

      11   that case?

11:03:27 12          THE COURT:  No, because actually he would be speaking

      13   for the court.  You can point out things that the court cited.

      14   For example, it said the defendant -- Micro failed to show any

      15   effort to get all of the information necessary for its expert.

      16   I'm trying to confine this, because I think it could get a

      17   little bit out of control.

11:04:08 18          MR. PRICE:  That's my concern, Your Honor.

11:04:10 19          THE COURT:  I think he could ask that it was rejected,

      20   and I think he could point out the language about whether the

      21   client in that case got all of the necessary information for

      22   its expert to provide a reasonable royalty calculation.  I

      23   think that is the extent to which you can go.

11:04:30 24          MR. LIPSHIE:  Maybe we can avoid this.  How did the

      25   record end up before the jury went out?  He answered --
```

555

| | | |
|---|---|---|
| 11:04:38 | 1 | THE COURT: Well, I will ask the court reporter to |
| | 2 | read it back. |
| 11:04:40 | 3 | MR. LIPSHIE: Because we might could stop right there |
| | 4 | if that's acceptable. |
| 11:04:46 | 5 | THE COURT: No, sir. There was a very big inference |
| | 6 | raised by you. |
| 11:04:49 | 7 | MR. PRICE: I was going to say, a cautionary |
| | 8 | instruction. |
| 11:04:52 | 9 | MR. LIPSHIE: Didn't the witness just say, my |
| | 10 | testimony was excluded or something? |
| 11:05:29 | 11 | THE COURT: Hold on. Stop. |
| 11:05:31 | 12 | MR. PRICE: I'm inclined to let the record stand if |
| | 13 | we're to go beyond this point. |
| 11:05:36 | 14 | MR. KITTREDGE: That's fine. |
| 11:05:39 | 15 | THE COURT: We'll just leave it be. |
| 11:05:41 | 16 | MR. LIPSHIE: We'll be here all day. |
| 11:05:42 | 17 | MR. PRICE: That's my concern. |
| 11:05:44 | 18 | THE COURT: Everybody gets to interpreting what the |
| | 19 | court said, and we've got enough to deal with rather than |
| | 20 | interpret another decision. |
| 11:14:00 | 21 | MR. LIPSHIE: We did end up with an answer. |
| 11:14:00 | 22 | COURT REPORTER (Reading): |
| 11:14:00 | 23 | Q. Have you ever been disqualified as an expert |
| | 24 | witness as to your testimony on damages from patent |
| | 25 | infringement? |

556

11:14:00 1        A.     No.  I have had a report excluded, but have not

2   been disqualified.

11:14:00 3        Q.     All right, sir.  Did you know or would it

4   surprise you if I told you that the Northern District of

5   California --

11:14:00 6        THE COURT:  We're in recess.

11:14:00 7        (Recess.)

11:14:05 8        THE COURT:  Let me -- you all can have a seat.  Let me

9   be clear on two court evidentiary rulings.  Or one was a

10  remark as opposed to a ruling.

11:14:20 11       On the issue of appearance, if the issue is whether

12  the products -- earlier there was testimony about a customers'

13  reaction to a product to show obviousness.  To the appearance

14  of a product to show obviousness.  Well, obviousness, as I

15  stated, quoting from the Supreme Court decision, for the

16  purpose of obviousness, it has to be someone, a person who is

17  learned in the art.

11:14:49 18       Where the issue is the appearance of whether this

19  plaintiff's product gives the full appearance -- gives the

20  appearance of neon lighting, that is one aspect of the claim

21  for which that testimony would be admissible.

11:15:09 22       On the issue of the reasonable royalty, I think that

23  the reference to law and demand may be relevant only insofar

24  as it would have affected the determination of price at the

25  time of sale, which I think is a separate issue from what the

1    issue of damages are, which is -- which slightly different,

2    however, than the issue of damages.

11:15:43  3         Anybody else?

11:15:59  4         You can bring the jury in.

11:16:02  5         How much longer do you expect to go?

11:16:05  6         MR. LIPSHIE:  About 22 seconds.

11:16:12  7         THE COURT:  I will hold you to it.

11:16:15  8         (Jury in.)

11:16:19  9         THE COURT:  You can be seated.

11:16:23  10        Mr. Lipshie.

11:16:25  11        MR. LIPSHIE:  Your Honor, I think I have heard enough

12    from this witness.

11:16:30  13        THE COURT:  Well, I just asked for a question.  You've

14    got one or you don't.

11:16:33  15        MR. LIPSHIE:  What I would like to do is just admit

16    into evidence what has been marked as Plaintiff's 43,

17    Plaintiff's 45, Defendant's 542, Defendant's 955, and

18    Defendant's 954, all of which were passed up to this witness.

11:16:53  19        THE COURT:  Without objection, they will be admitted.

20        Any redirect of this witness?

11:16:56  21        MR. PRICE:  Yes, Your Honor.

11:16:57  22        MR. LIPSHIE:  Thank you, sir.

11:16:57  23   REDIRECT EXAMINATION

11:16:57  24   BY MR. PRICE:

11:17:01  25        Q.    Mr. Bratic, Mr. Lipshie asked you some

questions about the IDG agreement with iLight?

11:17:06  A.    Yes.

11:17:09  Q.    Specifically about whether it was a, quote, royalty free agreement?

11:17:10  A.    Yes, sir.

11:17:13  Q.    And you said that you were looking at it based on the overall agreement.  What did you mean by that?

11:17:19  A.    Well, I mean, it's no different than when Intel, for example, makes a chip that they sell to Dell, puts it into a Dell computer.  Well, Intel gives Dell Computers a license for its technology and its intellectual property rights because Deal is buying its product.

11:17:39  In the IDG agreement, they had an overall business relationship because they were sharing and using iLight's technology.  To make the product, the LED neon product, they had to have a license or the right to use iLight's technology.  So it was a collaboration, a joint development agreement, that is radically different than a bare patent license between two competitors, iLight and Fallon.  There is no collaboration at all, say iLight gives for licensing Fallon, iLight gives that it's going to lose sales down the road.

11:18:15  Q.    Mr. Lipshie was also asking you about the Color Kinetics/iLight agreement.  And in that context he was asking you how much royalties have been paid by iLight.

11:18:29  A.    Yes.

11:18:31  1          Q.      Do you know what iLight products were affected

       2    by the Color Kinetics license?

11:18:36  3          A.      My recollection was certain Plexineon signs.

11:18:40  4          Q.      Do you recall anything about the Hypnotica

       5    product?

11:18:42  6          A.      Well, I just recall that that's a new product

       7    that was recently released.

11:18:48  8          Q.      Do you know whether that product was affected

       9    by the Color Kinetics agreement?

11:18:53  10         A.      I'm not sure which product it is, but one of

      11    those products we are paying a four to five percent royalty

      12    on.  It's a noncompetitive product within that license

      13    agreement, so they pay the four percent royalty initially for

      14    18 months, then it switches to five percent royalty.

11:19:10  15         Q.      And there were two different rate structures

      16    within the agreement?

11:19:15  17         A.      Well, there was that, but the noncompetitor

      18    products was four to give percent.  And then there was for the

      19    competitor products, which iLight had the right to bring out

      20    during the length of the license which expires in 2016, they

      21    would end up paying nine percent royalty on those products.

11:19:40  22         Q.      Mr. Lipshie was also asking you about some

      23    exhibits, specifically some deposition testimony exhibits in

      24    December of 2005, and asking you whether you could consider

      25    something in December relevant to the January 2005

hypothetical negotiation, and you indicated you could.  Why is
that?

11:20:00   A.    Well, because even the Supreme Court of the
United States and a number of federal courts --

11:20:03   MR. LIPSHIE:  Your Honor?

11:20:05   THE COURT:  Sustained.  Disregard the last statement.
Do you want to restate your question?

11:20:08   BY MR. PRICE:

11:20:10   Q.    If you could answer without reference to court
cases.

11:20:13   A.    Sure.  Well, there is a well-known concept in
patent damages called Book of Wisdom.  And the Book of Wisdom
is a concept that you can take information that wouldn't
exactly be knowable, for example, in January 2005 but occurred
after January 2005, and have considered it at the hypothetical
negotiation.

11:20:36   Q.    Mr. Lipshie was also asking you, with respect
to the hypothetical negotiation, what profits you may have
considered in 2004, 2005, and 2006 in your examination of the
profits during that time frame, and specifically iLight sales
of the LED products at issue.  What impact did you see in that
time frame with respect to those type of sales by iLight?

11:21:04   A.    Well, iLight's product sales obviously started
declining after Fallon came on the market with its LED signs.

11:21:23   Q.    At some point, Mr. Lipshie and you were talking

about the R.J.R. sales.  Now, the R.J.R. sales -- that related

to Image Works?

11:21:32  A.      That's my recollection.

11:21:34  Q.      Not Identity Group?

11:21:35  A.      That's correct.

11:21:38  Q.      Okay.  I just wanted to clear up.  I think

there was a mistaken reference to IDG there.

11:21:44      And Mr. Lipshie also indicated that Fallon had not

competed with respect to R.J. Reynolds and asked you about

what you were aware of in that regard.

11:21:53  A.      Right.

11:21:54  Q.      And I believe you indicated that you weren't

aware of that?

11:21:59  A.      I think what I said was, I wasn't privy, you

know, I didn't have access to R.J. Reynolds' own documents to

know who was competing for the R.J. Reynolds account.  That

kind of information has never been available in this lawsuit.

11:22:15  Q.      Let me see if I can help you with that.

11:22:25      Will you pull up TX 51, please.

11:22:27      Do you recognize this document?

11:22:30  A.      I'm having a hard time seeing it from over

here.

11:22:49  Q.      Well, it was -- well, let me make this easier.

Let's just cut to the chase.

11:22:54      Will you pull up the last page of this document,

please, nine.  And specifically, will you pull up -- can you

focus on 79.

11:23:36    In this Fallon sales forecast, comment number 79, will

you please read that?

11:23:41    A.    Sure.  It says, R.J.R., which is R.J.

Reynolds, is looking at Fallon's LED unit.  We will be

producing a prototype and competing against iLight.  Too soon

to add to forecast.

11:23:57  BY MR. PRICE:

11:24:19    Q.    Thank you.  Let's pull up a link.  This is a

follow-up document.  This is an entire document.

11:24:31    MR. LIPSHIE:  Your Honor, this is redirect.  He hasn't

testified as to any familiarity with any of these documents or

that he has seen them.

11:24:40    THE COURT:  It wasn't raised on cross.

11:24:42    MR. PRICE:  Your Honor, I believe we should approach.

11:24:42    (Whereupon, a bench conference was held, out of the

hearing of the jury, to wit:)

11:24:49    THE COURT:  It wasn't raised on cross.  What did you

ask him on cross?

11:24:54    MR. PRICE:  Mr. Lipshie was asking about whether

Fallon had competed with iLight with respect to R.J.R.

Reynolds.  And he declared that they had not.  In fact, this

Lincolnshire document that Fallon didn't produce but that

their venture capital company did, showing, in fact --

| | |
|---|---|
| 11:25:13 | 1 |

         I'm sorry.  The Lincolnshire document shows that

2   Fallon did not.  And this document is showing that Fallon also

3   in 2008 was still going after the business.  If you will turn

4   to the last page, you will see the drawing of the Camel sign

5   that they were submitting to R.J.R. at that time.

11:25:28   6        THE COURT:  What do you say?

11:25:30   7        MR. LIPSHIE:  He can't introduce that through this

8   witness, Your Honor.  He's testifying he doesn't know.

11:25:34   9        MR. PRICE:  They opened that door, Your Honor.

11:25:36   10        MR. LIPSHIE:  That's not an open door.  That's an

11   expert witness who has already testified.  He already

12   testified he didn't know about it.  It's not our witness.

11:25:48   13        MR. PRICE:  He asked -- he declared they didn't

14   compete and asked him whether he knew.

11:25:53   15        MR. LIPSHIE:  I asked whether they were entering that,

16   and he said he did not know.

11:26:02   17        MR. KITTREDGE:  It's not on anything he reviewed, Your

18   Honor.

11:26:04   19        MR. PRICE:  You are absolutely correct.  But they

20   opened the door.

11:26:09   21        THE COURT:  They have opened the door.  The question

22   is whether this witness knows about it.

11:26:16   23        MR. PRICE:  I understand.

11:26:18   24        MR. LIPSHIE:  He can use another witness.

11:26:21   25        THE COURT:  You can introduce this through another

1    witness.

11:26:38    2              MR. PRICE:  Fine, Your Honor.  Thank you.

11:26:38    3              (Conclusion of bench conference.)

11:26:38    4    CONTINUED EXAMINATION

11:26:38    5    BY MR. PRICE:

11:26:42    6         Q.    Mr. Lipshie was asking about the 25 percent

            7    rule of thumb.

11:26:44    8         A.    Right.

11:26:45    9         Q.    And you mentioned that this was widely

            10   criticized in the industry.

11:26:48    11        A.    Correct.

11:26:49    12        Q.    Would you please explain that.

11:26:53    13        A.    Well, in the real world, where people negotiate

            14   licenses all the time, I have never experienced a situation,

            15   and I have negotiated licenses for clients for over 300, 400

            16   times in my career in 30 years.  And if I ever came to a

            17   client and said, well, let's talk about a royalty with the

            18   other side, and let's start out with a rule of thumb, 25

            19   percent of this, or 25 percent of that, they would say, well,

            20   why am I hiring you?  You are not adding anything of substance

            21   to the analysis, you are just taking 25 percent of a number; I

            22   could do that.

11:27:26    23             So the point is, it's arbitrary, and I say it's

            24   arbitrary because, if it were the case that everybody used the

            25   25 percent rule of thumb in every single industry, you would

                                                                        565

have uniformity or consistency of royalty rates, and that's

not the case.  In all kinds of industry you pick, royalty

rates are -- can be all over the board.  And why?  Because

there are many unique facts and circumstances to each

individual unique negotiation.  That's why taking an arbitrary

25 percent of a number is just totally arbitrary, in my view

just speculative.  It adds no value.

11:27:58  MR. PRICE:  Thank you, Your Honor.  And thank you, Mr.

Bratic.  That's the end of my questions.

11:28:01  THE COURT:  Any recross?

11:28:02  MR. LIPSHIE:  None, Your Honor.  Thank you.

11:28:07  THE COURT:  You may step down, sir.

11:28:07  THE WITNESS:  Thank you, Your Honor.

11:28:09  THE COURT:  Does the plaintiff have a short witness?

11:28:13  MR. PRICE:  Your Honor, at this juncture we have video

clips.

11:28:14  THE COURT:  How long is the first one?

11:28:17  MS. HUNTER:  Your Honor, a total of five witnesses who

will testify by video deposition.  It will take approximately

an hour and a half.

11:28:32  THE COURT:  Do you have two that will cover 30?

11:28:35  MS. HUNTER:  Two?  Yes, Your Honor.

11:28:38  MR. PRICE:  We believe we can run two for about 30

minutes.

11:28:40  THE COURT:  All right.  You may call your next

566

witness.

11:28:43    MS. HUNTER:  Your Honor, if I may, a brief

introduction.

11:28:48    THE COURT:  All right.

11:28:49    MS. HUNTER:  Ladies and gentlemen, at this point we

intend to call an individual by video deposition.  Actually,

we will present five individuals who had their depositions

taken.  And the parties have agreed to show particular clips

to you, so please excuse the rough cuts and transitions.

11:29:08    At this point we'll call Mr. Eric Eriksson, one of the

inventors of the patents-in-suit.

11:29:49    And your Honor, if we may dim the lights.

11:29:49    (Video playing:)

11:29:50    Q.    *(By Mr. Kittredge) Can you state your full name*

*for the record?*

11:29:54    A.    *Eric Rudolph Eriksson.*

11:29:56    Q.    *And what is your home address?*

11:30:00    A.    *3816 Russett Lane, in Glenview, Illinois,*

*60026.*

11:30:04    Q.    *Are you still employed by iLight Corporation?*

11:30:06    A.    *No.*

11:30:12    Q.    *Actually, could you describe for me your*

*education and background following high school?*

11:30:21    A.    *I went to IIT, Illinois Institute of*

*Technology, in the architecture program.  It's a five year*

program for a bachelor of science in architecture.  I have not
gone on to master's work or higher education beyond that.

11:30:37    Q.    When did you get your B.S. in architecture?

11:30:37    A.    '78.

11:30:43    Q.    And when did you join iLight?

11:30:49    A.    I joined iLight at the very first in, oh, 2000.
There was a period of time when I was not employed, but I
worked half-time with the team and then eventually became
employed.

11:31:06    Q.    When you say you were attached to the team, do
you mean the team of iLight?

11:31:08    A.    ILight.

11:31:10    Q.    Was that in 2000?

11:31:10    A.    Yes.

11:31:13    Q.    So you first started out working half-time at
iLight?

11:31:14    A.    Yes.

11:31:17    Q.    Basically a contract employee?

11:31:18    A.    I suppose.

11:31:22    Q.    Okay.  Were you -- at what point did you become
a full-time employee?

11:31:29    A.    I do not recollect exactly, but I believe it
would be November of 2000, late 2000.

11:31:37    Q.    So it was a relatively short time that you were
working on a part-time basis?

11:31:43  1          A.     I worked part-time over half a year, less than

       2     one year.

11:31:46  3          Q.     And is it -- do I understand correctly that you

       4     worked full-time at iLight from about November of 2000 until

       5     you left in June of 2007?

11:31:53  6          A.     Yes.

11:31:54  7          Q.     So if I understand correctly, from the time you

       8     got your B.S. in architecture until the time you started

       9     working in iLight, your career was as an architect?

11:32:03 10          A.     Yes.

11:32:07 11          Q.     Was that all in the Chicago area?

11:32:07 12          A.     Yes.

11:32:10 13          Q.     Were you the vice-president of product

      14     development until you left there in June of 2007?

11:32:19 15          A.     I was vice-president of product development.  I

      16     did have some different titles in my time at iLight.  So it

      17     was not necessarily continuous.

11:32:31 18          Q.     Okay.  You were vice-president of product

      19     development.  You left in June of 2007?

11:32:34 20          A.     Yes.

11:32:38 21          Q.     But somewhere in between obviously 2001 and

      22     June 2007 you had --

11:32:42 23          A.     Yes, yes.

11:32:43 24          Q.     Is it fair to say that George Hulse was a

      25     member of the team who was the real expert in waveguides?

1          A        George's specialty was in optics, more so than

2    me.  I am a generalist as an architect.

3          Q.       Do you recall any visiting Fallon?

4          A.       It seems to me I visited Fallon years later up

5    further north of Chicago, closer to Milwaukee, I believe.  I

6    did on at least one occasion, yes.  I recall another visit

7    with them going to --

8          Q.       Go ahead.

9          A.       -- to be --  I visited Fallon at their trade

10   show in Vegas once and spoke with one of their senior

11   engineers.  At the time -- this was later, but at the time I

12   had a functioning piece of our prototype product in my pocket.

13   It was neon -- light neon with LEDs.  I remember pointing to a

14   Fallon sign, put my finger on the neon sign and asking, can

15   this ever been made out of LEDs.  And he looked at me and

16   said, no, it can't be done.  That was the only other time I

17   can remember interacting regularly with -- that is, knowingly

18   interacting with Fallon.

19         Q.       Do you remember when that was?

20         A.       It was pretty early on in that it was one of

21   our earliest working prototypes.  So early in iLight's

22   history.

23         Q.       2000, 2001?

24         A.       I don't know the year, but it would be just

25   very early.  Shortly after accomplishing what we did here as

described in our patent, my lab books.  2001, perhaps.

11:34:54    Q.    Do you remember the name of the person you spoke with?

11:34:58    A.    No, that would be a stretch.  He was there with Fallon for 15-plus years, he said.  He was a senior engineer type, was well versed in neon and neon transformers, and was familiar with LEDs.

11:35:22    Q.    Did you identify yourself as somebody from iLight?

11:35:28    A.    I don't believe I introduced myself.  I simply approached him in his trade booth at what was probable a sign -- ISA's annual sign show, probably.

11:35:41    Q.    That would have been my next question.  Do you remember the name of the trade show?

11:35:48    A.    Most likely the ISA trade -- annual trade show.

11:35:51    Q.    And did you show him the prototype you had in your pocket?

11:35:56    A.    No, I did not, because he -- no, I did not show it to him.

11:36:03    Q.    Did you show that prototype to anyone at the trade show?

11:36:08    A.    I know I showed it, but I don't know who I showed it to.

11:36:21    Q.    Was it shown to a company or two that had a booth at the show?

1          A.     The striking memory I had was when he said, no,

2     it can't be done.  But after that, I don't remember any

3     particular -- any one other instance except that I -- I

4     remember showing it, because I was sort of proud of it,

5     because it was a big deal.  So know I showed somebody.

11:36:49  6          Q.     To somebody at this trade show?

11:36:51  7          A.     Professionals in the trade.

11:36:52  8          Q.     More than one?

11:36:55  9          A.     Yes, no doubt.

11:36:59 10          Q.     Was this after the time that iLight had filed

11    this patent application?  Do you remember?

11:37:04 12          A.     It would be -- it would have been after the

13    time of application.

11:37:12 14          Q.     It wasn't Las Vegas, was it?

11:37:16 15          A.     Yes, almost certainly.

11:37:17 16          Q.     Las Vegas is -- I'm not making fun.

11:37:23 17          A.     To the best of my memory, it was Las Vegas.

11:37:26 18          Q.     The question I had was really simple about it's

19    a sign that says Camel store on it.  Do you do see that, sir?

11:37:32 20          A.     Yes, I do.

11:37:34 21          Q.     Is this a product that was made by iLight?

11:37:35 22          A.     Yes, it was.

11:37:38 23          Q.     Is it your understanding that this sign, the

24    Camel store sign, was made in accordance with the '238 Patent,

25    Exhibit 2 that we have been discussing?

| | | |
|---|---|---|
| 11:37:50 | 1 | A.    I would say yes. |
| 11:37:54 | 2 | Q.    The -- looking at the blue outline of the |
| | 3 | Camel? |
| 11:37:59 | 4 | A.    Yes. |
| 11:38:03 | 5 | Q.    Is that what you would describe as an optical |
| | 6 | waveguide? |
| 11:38:10 | 7 | A.    That is the classic piece of our patented |
| | 8 | Product, the both diffusing and optical waveguiding elements. |
| 11:38:20 | 9 | Q.    I will ask a quick question about the Camel, |
| | 10 | the blue outline of the Camel that we are talking about.  Is |
| | 11 | that what you consider a rod-like member? |
| 11:38:32 | 12 | A.    It is one -- yes. |
| 11:38:35 | 13 | Q.    And not sure I've described this, two circles |
| | 14 | that are green and interlocked.  Do you recognize this sign, |
| | 15 | Mr. Eriksson? |
| 11:38:39 | 16 | A.    Yes, I do. |
| 11:38:41 | 17 | Q.    What is it? |
| 11:38:47 | 18 | A.    This is for Kool cigarettes. |
| 11:38:50 | 19 | Q.    And is the sign we were talking about, the |
| | 20 | green one for Kool cigarettes, is it your understanding that |
| | 21 | that was made accordance with the '238 Patent? |
| 11:39:00 | 22 | A.    Yes. |
| 11:39:06 | 23 | Q.    Do you recognize the red striped device that |
| | 24 | I'm holding? |
| 11:39:07 | 25 | A.    Yes. |

573

11:39:08  1          Q.     What is this?

11:39:13  2          A.     That would be our classic standard plastic neon

3      product.

11:39:18  4          Q.     Is this a product sample used for a sales

5      package?

11:39:22  6          A.     It would be a typical salesman's sample.

11:39:24  7          Q.     And what causes this to be red?

11:39:27  8          A.     There are red entities in it.  If we turn it

9      off, we would see if there is any red pigmentation in the

10     plastic.  It comes --

11:39:40  11         Q.     So it might have pigmentation and might not?

11:39:43  12         A.     It could.

11:39:46  13         Q.     I see.  The outer housing here -- can you tell

14     me what the outer housing of this device is made of?

11:39:55  15         A.     It's an opaque plastic acrylic.  This

16     particular one is red in color.

11:39:59  17         Q.     How does it apply?

11:40:06  18         A.     It is extruded with the light diffusing

19     waveguiding metal elements all at one time.

11:40:14  20         Q.     And are the LEDs then added later?

11:40:16  21         A.     LEDs are added after the fact.

11:40:20  22         Q.     I see.  And is it your understanding that this

23     red device is manufactured in accordance with what you

24     understand of the '238 Patent?

11:40:31  25         A.     Yes.

11:40:33  1          Q.    You would agree, wouldn't you, that the idea of

2    having a reflective wall or walls around a lighting element

3    was not an invention created by iLight?

11:40:48  4          A.    Simply reflecting light is not an invention

5    created by iLight.

11:40:55  6          Q.    Do you know where iLight purchased the LEDs

7    that it used in its products while you were employed there?

11:40:59  8          A.    What was the question again?

11:41:02  9          Q.    Where did iLight purchase the LEDs that it

10   used?

11:41:07  11         A.    Are you asking am I aware of it, or do I know

12   where they got them?

11:41:11  13         Q.    Do you know where they got them?

11:41:11  14         A.    Yes.

11:41:11  15         Q.    Where?

11:41:17  16         A.    They are made by Cotco.

11:41:21  17         Q.    Do you spell that C-o-t-c-o?  And do you know

18   where Cotco manufactures them?

11:41:30  19         A.    I actually presume it's China.  I suppose they

20   have alternate locations that I'm unaware of.

11:41:36  21         Q.    Do you know if are there any manufacturers of

22   LEDs in the United States?

11:41:44  23         A.    I believe there are, but I must admit in all my

24   dealings they always seem to be made in Korea -- in Asia,

25   basically.

11:41:53  1          Q.     So to the best of your knowledge, all of the

               2     LEDs ever used by iLight were manufactured in Asia?

11:42:01  3          A.     Oh, I would supposed so, yes.  Yes.

11:42:11  4          MS. HUNTER:  Your Honor, next the plaintiff would like

               5     to call Timothy G. Fallon by video deposition.  And Mr. Fallon

               6     is national accounts manager at Fallon.

11:42:24  7          Q.     (By Mr. Price) Good morning, Mr. Fallon.

11:42:25  8          A.     Hi.

11:42:28  9          Q.     Would you state your full name.

11:42:29 10          A.     Timothy G. Fallon.

11:42:31 11          Q.     What's your middle name?

11:42:32 12          A.     Gale.

11:42:34 13          Q.     Are you a junior or senior?

11:42:34 14          A.     No.

11:42:37 15          Q.     What's your position with the defendant Fallon

              16     on this?

11:42:41 17          A.     I'm employed as a national accounts manager.

11:42:46 18          Q.     How long have you been in that capacity?

11:42:50 19          A.     I don't recall specifically.  2002, somewhere

              20     in there, maybe.

11:42:57 21          Q.     Before you were national accounts manager for

              22     Fallon, did you have any other position with Fallon?

11:43:00 23          A.     Yes.

11:43:01 24          Q.     And what was that?

11:43:05 25          A.     I was what they called engineering clerk.

| | | |
|---|---|---|
| 11:43:08 | 1 | Q. How long were you an engineering clerk? |
| 11:43:11 | 2 | A. A year and a half, approximately. |
| 11:43:14 | 3 | Q. Before you were an engineering clerk, did you |
| | 4 | have another position with Fallon? |
| 11:43:16 | 5 | A. No. |
| 11:43:19 | 6 | Q. So your first time to be employed by Fallon was |
| | 7 | as an engineering clerk? |
| 11:43:23 | 8 | A. Yes. |
| 11:43:27 | 9 | Q. So it was approximately the 2000, 2002 time |
| | 10 | frame? |
| 11:43:33 | 11 | A. 2000. |
| 11:43:36 | 12 | Q. Somewhere in 2002 you became national accounts |
| | 13 | manager? |
| 11:43:37 | 14 | A. Correct. |
| 11:43:40 | 15 | Q. I take it you didn't have a position with |
| | 16 | Fallon other than clerk and national accounts manager? |
| 11:43:49 | 17 | A. No. |
| 11:43:51 | 18 | Q. Where were you employed prior to Fallon? |
| 11:43:53 | 19 | A. United States Air Force. |
| 11:43:54 | 20 | Q. How long were you there? |
| 11:43:55 | 21 | A. Four years. |
| 11:43:57 | 22 | Q. What was the approximate time frame? |
| 11:44:00 | 23 | A. '96 to 2000. |
| 11:44:03 | 24 | Q. Did you have any relatives that have ever been |
| | 25 | employed by Fallon? |

```
11:44:05  1              A.    Yes.

11:44:06  2              Q.    Who is that?

11:44:07  3              A.    My father.

11:44:09  4              Q.    Who is he?

11:44:11  5              A.    Tim Fallon.

11:44:13  6              Q.    And what's his middle name?

11:44:15  7              A.    Ross.

11:44:21  8              Q.    Is your father still associated with Fallon?

11:44:21  9              A.    No.

11:44:25 10              Q.    When did he stop being associated with Fallon?

11:44:26 11              A.    I don't recall specifically.

11:44:29 12              Q.    Do you know approximately?

11:44:36 13              A.    2003 to 2004, something like that.

11:44:40 14              Q.    Obviously, the defendant is called Fallon

         15    Luminous.  Is that because of your father's name?

11:44:44 16              A.    Yes.

11:44:48 17              Q.    Was your father founder of the company?

11:44:48 18              A.    Yes.

11:44:51 19              Q.    When was the company founded, if you know?

11:44:52 20              A.    I don't know.

11:44:56 21              Q.    Do you know what your father's role was with

         22    the company until 2002?

11:45:06 23              A.    Varied.  I'm not sure specifically.

11:45:10 24              Q.    Do you know who he was primarily responsible

         25    to?
```

11:45:16  1          A.      Yes, but it changed.

11:45:18  2          Q.      How so?

11:45:21  3          A.      He sold the company in 2000, so he was no

       4     longer the owner.  But he was still the president as far as I

       5     know.  That's my understanding.  I don't have specific

       6     knowledge.

11:45:34  7          Q.      That's okay.  I'm not trying to -- I'm really

       8     just looking for some generalities here.  To whom did your

       9     father sell the company in 2000?

11:45:49  10         A.      Lincolnshire Management.

11:45:54  11         Q.      Why did your father leave Fallon in 2002?

11:45:55  12         A.      I don't know.

11:46:00  13         Q.      You never had that discussion with him?

11:46:02  14         A.      No.

11:46:06  15         Q.      So did you grow up in Spartanburg, South

       16    Carolina?

11:46:08  17         A.      Not really.

11:46:10  18         Q.      Where did you grow up?

11:46:13  19         A.      Kind of everywhere.

11:46:19  20         Q.      Predominantly?

11:46:25  21         A.      The state of South Carolina.

11:46:34  22         Q.      When you returned from the Air Force and joined

       23    Fallon in approximately 2000, were you living in South

       24    Carolina at the time?

11:46:43  25         A.      Yes.

11:46:47 1        Q.      Why did you change positions from engineering

2    clerk to national accounts manager?

11:46:52 3        A.      I was offered the job.

11:46:56 4        Q.      How did that come about?

11:47:01 5        A.      They asked me, would you like to call on

6    Anheuser-Busch?  Sure.  Okay, here's the position.  Thank you.

7    It's that simple.

11:47:14 8        Q.      So who asked you if you wanted this position,

9    if you remember?

11:47:20 10       A.      At the time I believe it was the president of

11   the company, Keasler Tanner.

11:47:25 12       Q.      Keasler?

11:47:28 13       A.      Uh-huh.

11:47:37 14       Q.      So your father had departed Fallon by this

15   time?

11:47:39 16       A.      No.

11:47:42 17       Q.      You may have misunderstood me.  I thought you

18   said he was the president of Fallon until his departure.

11:47:46 19       A.      Uh-huh.

11:47:48 20       Q.      Is that correct, or -- ?

11:47:51 21       A.      Again, I'm not familiar with the structure at

22   that time.  He was still there operating as the head, but

23   Keasler was also over the operations, titles, either way.

11:48:07 24       Q.      I'm with you.  So your father was still

25   effectively the head of Fallon at the time you were offered

the national accounts manager position?

11:48:16　A.　Keasler was the head of operations.

11:48:18　Q.　And your father was the overall head of the
company?

11:48:24　A.　That's my understanding, yeah.

11:48:28　Q.　Had you inquired about this position before it
was offered to you?

11:48:31　A.　No, it didn't exist.

11:48:33　Q.　Oh, it didn't exist at all?

11:48:35　A.　No.

11:48:38　Q.　Had you -- I guess at this point in time had
you been involved in any sales related positions with Fallon?

11:48:43　A.　No.

11:48:46　Q.　Does Fallon have any other U.S. production
facilities outside of Spartanburg?

11:48:49　A.　Yes.

11:48:52　Q.　Where is the other facility?

11:48:55　A.　In Andigo, Wisconsin.

11:48:58　Q.　Currently what products of Fallon are made in
Andigo?

11:49:01　A.　Neon signs.

11:49:03　Q.　Has Fallon, to your knowledge, ever sold any
product to Anheuser-Busch before you became national accounts
manager?

11:49:08　A.　Yes.

| | | |
|---|---|---|
| 11:49:10 | 1 | Q. What were those products? |
| 11:49:12 | 2 | A. Primarily neons. |
| 11:49:15 | 3 | Q. Do you know what type of neon products? |
| 11:49:17 | 4 | A. Neon signs. |
| 11:49:22 | 5 | Q. Do you know the approximate time frame? |
| 11:49:22 | 6 | A. No. |
| 11:49:25 | 7 | Q. When you became the national account manager, |
| | 8 | then Fallon was not making any products at all for |
| | 9 | Anheuser-Busch? |
| 11:49:33 | 10 | A. That's correct. |
| 11:49:39 | 11 | Q. Do you know why Fallon was not selling any |
| | 12 | products to Anheuser-Busch at that time? |
| 11:49:43 | 13 | A. Not specifically. |
| 11:49:49 | 14 | Q. How about generally? |
| 11:49:53 | 15 | A. My understanding is that Fallon had chosen not |
| | 16 | to sell anything to Anheuser-Busch. |
| 11:49:59 | 17 | Q. Why? |
| 11:50:00 | 18 | A. I don't know. |
| 11:50:05 | 19 | Q. You don't have any understanding as to why? |
| 11:50:05 | 20 | A. No. |
| 11:50:09 | 21 | Q. I take it when you became the national account |
| | 22 | manager, you were specifically assigned to Anheuser-Busch. I |
| | 23 | believe it was your only customer at that time; correct? |
| 11:50:18 | 24 | A. Correct. |
| 11:50:22 | 25 | Q. I guess in 2002 they finally decided they did |

582

want to sell products to Anheuser-Busch?

11:50:26     A.    Correct.

11:50:29     Q.    Previously they decided they did not?

11:50:30     A.    That's my understanding.

11:50:35     Q.    So why in 2002 was Fallon identified in selling
             products to Anheuser-Busch again?

11:50:39     A.    I don't know.

11:50:42     Q.    You weren't told anything about why we are
             going to start calling on Anheuser-Busch again?

11:50:51     A.    No, I was -- I was told things, but --

11:50:53     Q.    What were you told?

11:50:56     A.    I was told that Anheuser-Busch was looking for
             a second domestic neon supplier and asked us to come back in
             and talk about being a vendor again.

11:51:10     Q.    Who was their other neon supplier at that time?

11:51:14     A.    They had three.  They were looking for another
             domestic one.  The other domestic supplier was Everbright.

11:51:26     Q.    So when you initially were calling on
             Anheuser-Busch, that was to sell neon products?

11:51:35     A.    No.

11:51:37     Q.    What were you trying to sell to Anheuser-Busch
             on behalf of Fallon when you became the national accounts
             manager?

11:51:46     A.    All of Fallon's products, the entire range of
             offerings.

11:51:50 1          Q.      Did that include LED products?

11:51:52 2          A.      Yes.

11:51:59 3          Q.      Did you have any LED-only products at that time

4     at Fallon?

11:52:02 5          A.      I don't recall specifically.

11:52:05 6          Q.      If I recall correctly, you indicated earlier

7     that was the 2004-2005 time frame when Fallon first started

8     selling LED-only products to Anheuser-Busch?

11:52:19 9          A.      Correct.

11:52:24 10         Q.      How did that come about where you all were

11    selling only LED products?

11:52:37 12         A.      We don't sell only LED products.

11:52:40 13         Q.      I'm only asking about the LED products.  I

14    realize that you continue to sell neon products.  I'm asking

15    you, how did it come about in the 2002-2004 time frame that

16    Fallon started selling to Anheuser-Busch only LEDs?

11:52:57 17         A.      My recollection is that Anheuser-Busch had

18    asked for several suppliers, different designs, that they were

19    buying in neons, to be made in LED, is my recollection, again.

11:53:26 20         Q.      So I take it that you responded to that request

21    on behalf of Fallon?

11:53:35 22         A.      Yes.

11:53:40 23         Q.      And at some point in time, in the 2004-2005

24    time frame, Anheuser-Busch chose to buy these LED signs from

25    Fallon?

11:53:45  1          A.      Yes.

    11:53:48  2          Q.      Whom were you dealing with primarily at

              3  Anheuser-Busch in this regard?

    11:53:57  4          A.      No one specific person primarily.

    11:54:01  5          Q.      Well, who did you primarily call upon at

              6  Anheuser-Busch?

    11:54:05  7          A.      There was an array of people.

    11:54:08  8          Q.      How about for the LED signs?

    11:54:11  9          A.      An array of people.

    11:54:14  10         Q.      There were a handful of people you primarily

              11  dealt with?

    11:54:19  12         A.      I would call it a handful, yeah, five or six.

    11:54:21  13         Q.      Who were they?

    11:54:24  14         A.      Various people from merchandizing and

              15  procurement.

    11:54:29  16         Q.      Do you recall any of their names?

    11:54:31  17         A.      I do.

    11:54:34  18         Q.      Will you tell me who they are?

    11:54:39  19         A.      The procurement manager was Matt Walland.  His

              20  boss was Greg Cook.  And his boss was Kirby Billmeyer.  And

              21  then for merchandising -- I'm sorry, there was also Bob

              22  Manilotti, from procurement.  Chris Rowell in merchandizing,

              23  Mike Ivaster.  Mike Ivaster.

    11:55:06  24         Q.      Mr. Fallon, can you identify this document,

              25  Exhibit 1?

| | | |
|---|---|---|
| 11:55:06 | 1 | A. Yes. |
| 11:55:08 | 2 | Q. What is that, please? |
| 11:55:14 | 3 | A. It's an e-mail from me to Sharon Van Roo, a |
| | 4 | copy to Tim Alford, Chuck Nelson, Joe Clay and Tim R. Fallon. |
| 11:55:23 | 5 | Q. This is a memo you sent to Ms. Van Roo December |
| | 6 | 2, 2003? |
| 11:55:26 | 7 | A. Yes, looks like. |
| 11:55:30 | 8 | Q. You mentioned that Ms. Van Roo was a buyer for |
| | 9 | Sam's Club? |
| 11:55:31 | 10 | A. Yes. |
| 11:55:36 | 11 | Q. Who is Jim Alford? |
| 11:55:40 | 12 | A. Jim Alford at the time was running the neon |
| | 13 | factory in Spartanburg. |
| 11:55:44 | 14 | Q. In the next sentence of that same paragraph, |
| | 15 | you say this new product, referring to Fallon's product, I |
| | 16 | take it, will look similar to iLight's Newon. Do you see |
| | 17 | that? |
| 11:55:57 | 18 | A. I'm with you. |
| 11:56:03 | 19 | Q. What do you mean there? |
| 11:56:08 | 20 | A. Well, I can't tell you what I mean. I think I |
| | 21 | can recall my objective of this sentence is to, you know, use |
| | 22 | something that she knows to describe something she had never |
| | 23 | seen before. So when I say it would look similar to iLight, |
| | 24 | she has seen that, I assume she is looking at it, I don't |
| | 25 | recall if this time she is testing it or not, but obviously |

586

1    she is familiar with it.  And my objective is to refer to that

2    to let her know, you know, what ours is going to look like.

3           Again, I think to this point, I think we can -- we

4    have gone through a couple of revolutions, and maybe I've

5    shown her pictures.  I can't remember all the details

6    involved.  But my basic objective was to refer to something

7    that she knew, to describe what I was going to show her, and

8    then also talk about the differences.

11:57:14  9           Q.    So Ms. Van Roo at this point in time had seen

10   and was familiar with iLight's LED Open sign?

11:57:21  11          A.    I believe so, yes.  I'm not sure.  I don't know

12   this specifically.

11:57:24  13          Q.    That was your understanding?

11:57:24  14          A.    Correct.

11:57:27  15          Q.    And you are telling her that you are going to

16   have Fallon's LED Open prototype sign for her in approximately

17   three weeks; correct?

11:57:34  18          A.    Correct.

11:57:37  19          Q.    And that you anticipate that this new product,

20   the Fallon Open sign LED prototype, is going to look similar

21   to iLight's LED Open sign; is that correct?

11:57:53  22          A.    Again, I'm writing that as a point of reference

23   for her.  You know, again, our objective was on --

11:57:58  24          Q.    I understand.  You explained that.  I'm asking

25   you.

11:58:02 1      A.      Are you asking me to read what I wrote?

2      Because I can do that.  You know, I can read it.

11:58:08 3      Q.      So I'm asking you specifically, when you say

4      this new product, you are referring to the Fallon LED Open

5      sign prototype?

11:58:15 6      A.      Correct.

11:58:17 7      Q.      Once again, and I apologize I'm having to

8      repeat this, when you say this new product, you are referring

9      to the Fallon LED prototype; correct?

11:58:26 10     A.      To one that we were going to show her, yes.

11:58:29 11     Q.      And you are saying that prototype will look

12     similar to iLight's Newon, and you are referring to the iLight

13     LED Open sign; correct?

11:58:41 14     A.      That's what I wrote here, yes.  That's what I

15     -- I believe that's what we are referring to, yes.

11:58:47 16     Q.      And that's what you meant when you wrote it,

17     too?

11:58:50 18     A.      Again, I don't recall specifically even writing

19     this e-mail, like I said, but I have no reason to believe I

20     didn't write this.

11:58:57 21     Q.      At the top of the next page of that e-mail, you

22     reference, when I make my next trip.  How often did you visit

23     with Ms. Van Roo at Sam's Club?

11:59:13 24     A.      Again, I don't recall specifically, but on

25     average probably once a month maybe.

1          Q.      And I assume that would be in Bentonville,

2    Arkansas?

3          A.      Sometimes, not always.

4          Q.      Trade shows, things like that?

5          A.      Trade shows, club openings, factory visits.

6          Q.      And you specifically note iLight and Newon as

7    being, I guess, other players in the LED sign industry?

8          A.      Well, my understanding at this point is that

9    they are one and the same, yeah.

10         Q.      Your understanding is that iLight and Newon

11   were working together, for lack of a better description, to

12   make LED signs at this time?

13         A.      No, that was not my understanding.

14         Q.      What was your understanding?

15         A.      My understanding is they are the same people.

16         Q.      Fairly early on in this deposition I believe is

17   when we were discussing Exhibit 1.  I asked you whether you

18   personally have been involved in obtaining an iLight sign, and

19   if so, when.  My vague recollection is that you weren't sure

20   as to either.  Fallon's -- your counsel supplied a

21   supplemental response to a particular interrogatory request

22   that we made back in December of 2006.  And they state, and

23   I'll just quote it to you, it says:

24         ILight's Open sign was obtained in December 2003 by

25   Tim G. Fallon, national accounts manager, (636)332-9725 for

1    product comparison.

12:01:15    2        Does that ring a bell to you?

12:01:19    3        A.    Not specifically, no.  Like I said, I -- that

4    may be accurate.  I don't know.

12:01:24    5        Q.    As you sit here, you don't know whether, A,

6    whether you actually acquired one, and, B, what it was?

12:01:30    7        A.    Right.  What was the date again?

12:01:31    8        Q.    December of 2003.

12:01:33    9        A.    No, I don't recall anything.  Like I said, I

10    may have been involved in it; I may have inquired myself.  My

11    recollection is it came from a dealer.  I don't recall

12    specifically.  That may be accurate.

12:01:46    13        Q.    (By Mr. Kittrell) Do you remember those

14    questions that Mr. Price was asking you about, the show in

15    October 2002?

12:01:52    16        A.    I do.

12:01:56    17        Q.    Apparently you saw a sign there that had LED

18    lights with some kind of plastic covering that maybe looked

19    like -- a little bit like a neon sign; is that correct?

12:02:09    20        A.    It is.

12:02:11    21        Q.    Do you know -- at the time did you know whose

22    sign that was?

12:02:14    23        A.    No, not specifically.

12:02:17    24        Q.    Now, you also testified that at some point you

25    developed an understanding that it was an iLight sign, at some

```
 1    point after the show.  Is that accurate?
 2         A.    Yes.
 3         Q.    Do you know where you got that understanding?
 4         A.    No, I don't.
 5         Q.    Do you know, as you sit here today, whether or
 6    not the sign you saw in October of 2002 was actually an iLight
 7    sign?
 8         A.    No.  Again, it was in the U.S. Stamp design
 9    booth.  And the only -- I saw a new one, I think, if I
10    remember correctly.
11         (Conclusion of video.)
12         THE COURT:  Is that it?
13         MS. HUNTER:  Yes, Your Honor.
14         THE COURT:  All right.  Ladies and gentlemen of the
15    jury, we're going to take our noon recess.  As I stated to you
16    earlier, if any of you would like lunch delivered here to the
17    courthouse, if you will write down what you would like, and
18    we'll see what that it gets delivered to you.  Please don't
19    discuss the case amongst yourselves or anyone else until you
20    receive all of the evidence, the argument of counsel and the
21    charge of the Court.
22         If you have a lunch order, if you will give it to the
23    Marshal, and we'll make the arrangements.  We're in recess.
24         (Jury out.)
25         THE COURT:  How many more witnesses?
```

591

12:04:03  1          MS. HUNTER:  We have three more video depositions to

        2     present.

12:04:05  3          THE COURT:  How long do you think those will --

12:04:09  4          MR. VEZEAU:  Which will take about 45 minutes, 45 to

        5     50 minutes, maybe an hour at tops.

12:04:13  6          MR. PRICE:  Your Honor, we also have -- for

        7     bookkeeping purposes, we have a lot of exhibits, as you know,

        8     to get into the record before we close our case in chief.  I

        9     don't know if you want to do that now.

12:04:25 10          THE COURT:  Why don't you do that now.  What exhibits

       11     do you want to admit into the record.  Which exhibits?  Just

       12     read the exhibit numbers.

12:05:06 13          MR. PRICE:  I'm going to first start with Mr.

       14     Bratic's.

12:05:09 15          THE COURT:  It doesn't matter whose testimony.  Just

       16     admit the exhibits.

12:05:15 17          MR. PRICE:  We've got to divide it up.  TX 32 A.

12:05:18 18          THE COURT:  Any objection?  Is there any objection to

       19     any of these?

12:05:24 20          MR. KITTREDGE:  I haven't seen the list.  There is a

       21     good chance there isn't any.  We could review this over lunch.

12:05:32 22          THE COURT:  Why don't you all look at it over lunch,

       23     you come back in, and we'll take it up first thing.

12:06:11 24          (Recess.)

12:59:59 25          THE COURT:  Are there any preliminary matters before

we get started?  Did we resolve the exhibits issue?

13:00:08  MR. PRICE:  I think we're ready to go.

13:00:09  THE COURT:  Okay.  Will you announce for the record
which exhibits you want to move into evidence?

13:00:16  MR. PRICE:  Yes, Your Honor.  Ms. Gregory, do you want
me just to simply --

13:00:20  THE COURT:  If you will just give the exhibit number,
counsel.

13:00:22  MR. PRICE:  That's what I was asking.  Thank you.

13:00:25  THE COURT:  That's all right.

13:00:40  MR. PRICE:  TX 32, 32 A, TX 32 A-1, TX 32 B, TX 32 D
as in dog, TX 32 E, TX 32 F, TX 32 G, TX 32 H, 326 I, 32 J,

13:01:14  TX 32 K, TX 32 L, TX 32 N, TX 32 O, TX 32P, TX 32Q, TX 32 R,
TX 32 S, TX 32 T, TX 32 U, TX 32 V, TX 32 W, TX 32 X, TX 32 Y,
TX 32 Z, TX 32 AA, TX 32 BB, TX 32 CC, TX 32 DD, TX 32 EE, TX
32 FF, TX 32 GG, TX 32 HH, TX 32 II, TX 32 JJ, TX 32 KK, TX
32 LL, TX 32 MM, TX 32 NN, TX 32 OO, TX 32 PP, TX 32 QQ,

13:02:59  TX 32 RR, TX 32 SS, TX 32 TT, TX 32 UU, TX 32 VV, TX 32 R-1,
TX 32 R-3, TX 32 R-4, TX 32 R-5, TX 32 R-6, TX 32 R-7, TX 32
R-8, TX 32 R-9, TX 32 R-10, TX 32 R-11, TX 32 R-12, TX 32
R-13, TX 32 R-14, TX 32 R-15.

13:03:52  TX 59, TX 88A, TX 65, and TX 51.

13:03:55  That's the first portion of the documents we would
move into evidence.  And we now so move.

13:04:05  THE COURT:  They will be admitted.

593

13:04:08  1          MR. KITTREDGE:  No objection.

13:04:09  2          MR. PRICE:  Ms. Gregory, would you like these

       3   documents?

13:04:11  4          MS. GREGORY:  Yes.

13:04:15  5          MR. SCRUTON:  All right.  The second set is from Dr.

       6   Roberts' testimony.  These will all be preceded by the letters

       7   TX.  So I will just read the numbers.  9 A, 11, 11-A, 12, 13,

       8   14, 29, 29 A, 29 C, 29 E, 29 F, 29 G, 29 H, 29 I, 29 J, 29 K,

       9   29 L, 29 M, 29 N, 29 O, 29 P, 29 Q, 29 R, 29 S, 29 T, 29 U, 29

      10   V, 29 W, 29 Y, 29 Z, 29 AA, 29 BB, 29 CC, 29 DD, 29 EE, 29 FF,

      11   29 GG, 29 HH, 29 II, 29 JJ, 29 KK, 29 LL, 29 MM, 29 NN, 29 OO,

      12   29 PP, 29 QQ, 29 RR, 29 SS, 29 TT, 29 UU, 29 VV, 29 WW, 29 XX,

      13   29 YY, 29 ZZ, 29 AAA, 29 BBB, 29 CCC, 29 DDD, 29 EEE, 29 GGG,

      14   29 FFF, 29 III, 29 JJJ, 29 KKK, 29 LLL, 29 MMM, 29 NNN,

      15   29 OOO, 29 PPP, 29 QQQ, 29 RRR, 31, 31 A, 31 B, 31 C, 31 D,

13:08:02 16   31 E, 31 F, 31 G, 31 H, 31 I, 31 J, 31 K, 31 L, 31 M, 31 N, 31

      17   O, 31 P, 31 Q, 31 R, 31 S, 31 T, 83 A and 83 B.

13:08:24 18          We move those into evidence.

13:08:27 19          THE COURT:  Without objection, they will be admitted.

      20   Any other matters?

13:08:32 21          MS. HUNTER:  And finally, we had one more short list,

      22   Your Honor.  TX 19, TX 20, TX 21, TX 22, TX 23, TX 24, TX 26,

      23   TX 27, TX 41, TX 47, TX 57, TX 58, TX 60, TX 61, TX 62, TX 63,

      24   TX 587, and TX 588.

13:09:11 25          And Your Honor, we would move these into evidence.

```
13:09:13   1            THE COURT:  Without objection, they will be admitted.
           2   Any other matters?
13:09:16   3            You can bring the jury in.
13:09:19   4            MR. PRICE:  Your Honor, we now ask to provide those
           5   documents to the courtroom deputy.
13:09:25   6            THE COURT:  All right.  Before we have closing
           7   arguments, there will be an exhibit conference at which
           8   counsel go over the exhibits that the clerk's records reflect
           9   have been admitted for both of each party, and if are there
          10   any deficiencies, we'll take them up at the conclusion of that
          11   conference.  You can pass up your exhibits.
13:09:59  12            Are there any other matters, either side?
13:10:24  13            You may bring the jury in, Mr. Marshal.
13:10:45  14            (Jury in.)
13:10:48  15            THE COURT:  You all can be seated.  Defense may call
          16   its next witness.  I'm sorry, the plaintiff may call its next
          17   witness.
13:10:55  18            MS. HUNTER:  Yes, Your Honor.  ILight calls Tim
          19   Demmond by video deposition.  And at the time of this
          20   deposition, Mr. Demmond was the vice-president of sales and
          21   marketing for Fallon.  And if we can dim the lights, please.
13:11:12  22            (Video playing:)
13:11:47  23        Q.    Are you vice-president of sales and marketing?
13:11:47  24        A.    I am.
13:11:50  25        Q.    How long have you been vice-president of sales
```

595

and marketing?

13:11:54        A.    Since 2 -- April of 2004.

13:11:56        Q.    To make it easy, give you a little trial run
here in a deposition, if you can tell me, if you will, your
educational background subsequent to high school, I would
appreciate it.

13:12:08        A.    Sure, Western Michigan University, marketing
degree.

13:12:12        Q.    When did you get that?

13:12:18        A.    1987 I graduated.

13:12:21        Q.    Is that a B.A. or B.S.?

13:12:22        A.    B.S.

13:12:28        Q.    When did Fallon commence the sales of LED
products?

13:12:37        A.    To the best of my recollection, 2005, I
believe.

13:12:49        Q.    And to whom were the first sales of LED
products?

13:12:49        A.    To Sam's Club.

13:12:55        Q.    And is that a no consignment?

13:12:56        A.    It is.

13:12:58        Q.    Now, we have couple of signs, you have probably
noticed, on the table here.  One is a big sign, which we will
identify a bit later, but it says Open.  Do you recognize that
sign?

13:13:03  1           A.     I do.

13:13:03  2           Q.     And do you recognize that as a Fallon sign?

13:13:03  3           A.     I do.

13:13:17  4           Q.     Is that the type of sign that was provided or

          5     sold by Fallon to Sam's Club?

13:13:20  6           A.     It is.

13:13:24  7           Q.     Now, were you involved in the decision to get

          8     into LED signage products?

13:13:28  9           A.     No.

13:13:30 10           Q.     Who was?

13:13:33 11           A.     I'm not exactly sure who was instrumental or

         12     involved.  I know that Tim Fallon had a part, Chuck Nelson.

13:13:44 13           Q.     Anyone else?

13:13:50 14           A.     Probably Joe Clay.

13:13:53 15           Q.     Anyone else?

13:13:56 16           A.     Not to my knowledge, no.

13:13:59 17           Q.     Were you consulted in connection with a

         18     decision to begin to manufacture and sell LED products?

13:14:07 19           A.     No.

13:14:11 20           Q.     It was announced as a fiat to you, or how did

         21     you find that out?  Too many questions here.  Let me see if I

         22     can be more specific.  How did you learn that the company had

         23     made a decision to get into the LED products for sale?

13:14:26 24           A.     When I first learned was when I took the

         25     position of sales, vice-president of sales and marketing.

That's how I first learned of the product, that they were
working on this developing product.

13:14:37    Q.    Okay.  That was 2004?

13:14:37    A.    That was 2004.

13:14:39    Q.    And what do you recall learning about it at
that time?

13:14:43    A.    That they were just working on an LED product.

13:14:44    Q.    Who told you?

13:14:47    A.    Chuck Nelson.

13:14:48    Q.    Do you recall what he told you?

13:14:54    A.    No, I don't recall.  Just mentioned he had a
product.

13:14:58    Q.    Do you recall that anyone explained to you why
the company was moving into these products?

13:15:04    A.    Chuck Nelson was explaining that we were moving
towards the LED product because it was driven by the customer.
The customer was very interested in going green, the
environmental issues, so, therefore, we were trying to satisfy
their needs and replace the neon with a product that was more
environmentally friendly.

13:15:31    Q.    The customer in this case you are referring to
-- was that Sam's Club?

13:15:38    A.    Yes.

13:15:48    Q.    Now, please explain to me why the LED sign
compared to the neon sign is more environmentally friendly?

13:16:05  1          A.     Okay.  Low voltage, less energy consumption,

          2   UPS shippable, adds to less gas consumption, fuel consumption.

13:16:23  3          Q.     Anything else?

13:16:36  4          A.     No mercury.

13:16:43  5          Q.     You say UPS shippable.  How were the neon

          6   products shipped?

13:16:47  7          A.     Pallets.

13:16:52  8          Q.     But apparently they had to be shipped by -- how

          9   were they shipped, though?  They weren't shipped by UPS?

13:17:00 10          A.     No, freightage.

13:17:06 11          Q.     Do you believe that is a feature, an advantage,

         12   if you will, of the LED signage products over the neon

         13   products?  That is, less breakage?

13:17:12 14          A.     Yes.

13:17:15 15          Q.     And could you explain that to the jury, why

         16   there is less breakage?

13:17:24 17          A.     Sure.  A neon product is a glass product, it is

         18   very fragile.  And an LED is -- the LED product that we

         19   produce is plastic.

13:17:30 20          Q.     And when the neon tube would break, do you

         21   understand then there is the potential of releasing mercury

         22   into the environment?

13:17:42 23          A.     If it was a mercury filled tube, yes.

13:17:49 24          Q.     With respect to sales to Budweiser of signage

         25   products, do you still sell -- I'm sorry, let's call it

599

```
 1   Anheuser-Busch.  Do you still sell neon signage products to

 2   Anheuser-Busch?

13:18:01   3            A.    We do.

13:18:05   4            Q.    And you sell -- I assume you sell LED products

 5   to Anheuser-Busch?

13:18:09   6            A.    We do.

13:18:21   7            Q.    Do you know -- do you still sell neon signage

 8   to Sam's Clubs, Open signs?

13:18:29   9            A.    We do.

13:18:33  10            Q.    Do I understand you do sell Open signs to Sam's

11   Clubs that use LEDs as opposed to neon?

13:18:38  12            A.    Yes.

13:18:43  13            Q.    Does the company produce a product referred to

14   as Super Bright?

13:18:46  15            A.    We do.

13:18:47  16            Q.    Okay.  What was that?

13:18:51  17            A.    It's actually a product we're producing now.

13:18:52  18            Q.    For?

13:18:52  19            A.    For Sam's.

13:18:54  20            Q.    Is that an Open sign?

13:18:55  21            A.    It is.

13:18:57  22            Q.    Anything else other than Open?

13:18:58  23            A.    No.

13:19:01  24            Q.    Okay.  Is that called the Xenon light?

13:19:01  25            A.    No.
```

13:19:04  1        Q.      It's just called the Super Bright?

13:19:05  2        A.      Yes.

13:19:07  3        Q.      When did you start producing that for Sam's

          4  Club?

13:19:11  5        A.      We are currently going through the transition

          6  now.

13:19:14  7        Q.      Transition from what to what?

13:19:22  8        A.      From the current oval LED, which is the 1877,

          9  large oval.

13:19:25 10        Q.      When you say the transition, is the Super

         11  Bright to replace the large Xenon Open sign?

13:19:37 12        A.      It is.

13:19:39 13        Q.      Can you explain for us the differences between

         14  the Super Bright version compared to the large Xenon Open

         15  sign?

13:19:53 16        A.      Super Bright is the Open, the word Open is

         17  double stroke.

13:19:56 18        Q.      What is that?

13:20:00 19        A.      It means it's sort of block letter.  The sign

         20  is five inches longer.  And by virtue of adding the LEDs, the

         21  double stroke is brighter.

13:20:24 22        Q.      Any other differences that come to mind?

13:20:30 23        A.      No.

13:20:34 24        Q.      How did the Super Bright come about?  Was that

         25  driven by the customer, or was that pitched maybe by Fallon to

the customer?

13:20:49    A.    Excuse me.  It was driven by the customer to
update the image.

13:20:56    Q.    I place before you Plaintiff's Deposition
Exhibit 516 bearing production number AL 16629.  So the e-mail
at the bottom of this exhibit is yours, is that correct, from
December 3, 2005?

13:21:12    A.    Yes; correct.

13:21:14    Q.    To Chuck Nelson?

13:21:16    A.    Correct.

13:21:22    Q.    Then later on it says, Chuck, AB --

13:21:25          -- AB is Anheuser-Busch; correct?

13:21:25    A.    Correct.

13:21:27    Q.    -- said that they are going to order several
thousand units of this product, and they absolutely need to
have Version 2 in their hands next week.  We either deliver,
or they buy from iLight.  Our fate is in our hands.

13:21:46          How did you learn that if you did not deliver that
Anheuser-Busch would buy from iLight?

13:21:51    A.    Information from the sales guy.

13:21:54    Q.    Sales guy being?

13:21:56    A.    Tim Fallon.

13:21:58    Q.    For the record, will you please identify
Exhibit 524.

13:22:03    A.    This is an Open sign produced by Fallon.

13:22:05  1        Q.     And that is for Sam's Club?

13:22:06  2        A.     Yes.

13:22:08  3        Q.     Sold by Fallon to Sam's Club?

13:22:08  4        A.     Yes.

13:22:12  5        Q.     And again, that is also depicted in the
        6   photograph previously marked as Plaintiff's Deposition Exhibit
        7   522?

13:22:19  8        A.     Yes, it appears to be.

13:22:24  9        Q.     Now, in the initial vertical leg to the end,
       10   how many rows or strips, if you will, of LEDs are there?

13:22:29 11        A.     I see one row.

13:22:31 12        Q.     Okay.  Do you see a reflection of that LED
       13   strip?

13:22:37 14        A.     Yeah, I see a reflection of a row, yes.

13:22:42 15        Q.     Okay.  And do you know whether or not the
       16   reflective surfaces that you are seeing are important to the
       17   operation of it?

13:22:55 18        A.     I have no idea.

13:23:02 19        Q.     Who at Fallon would be most conversant with
       20   that aspect of the design of this sign, if anyone?

13:23:19 21        A.     Chuck Nelson.

13:23:28 22        MS. HUNTER:  ILight will now call Mr. Doug Bagin by
       23   video deposition.  Mr. Bagin is the CEO of Fallon Visual
       24   Products Corporation, as well as the Chief Executive Officer
       25   of Fallon Luminous Products Corporation.

603

13:23:52  1          (Video playing:)
13:23:55  2          Q.    (By Mr. Vezeau) This deposition is, as was
          3     indicated, being taken pursuant to a notice of you, Mr. Bagin,
          4     as an individual.
13:23:58  5          MR. VEZEAU:  I understand, Mark, the witness is here
          6     to testify as the designated witness of Fallon with respect to
          7     opinions?
13:24:07  8          MR. KITTREDGE:  The opinion of counsel topic, yes.
13:24:09  9          Q.    (By Mr. Vezeau) when did you then become
          10    involved with -- well, let me ask it this way.  Do I
          11    understand correctly that you have a position of
          12    responsibility with Fallon?
13:24:21  13         A.    Yes.
13:24:27  14         Q.    Do you have that with Fallon Visual Products
          15    Corp?
13:24:28  16         A.    Yes.
13:24:30  17         Q.    What position do you have?
13:24:35  18         A.    Chief Executive Officer.
13:24:44  19         Q.    When did you become that?
13:24:46  20         A.    I believe it was December -- November, December
          21    of 2005.
13:24:50  22         Q.    And are you also CEO of Fallon Luminous
          23    Products Corp?
13:24:52  24         A.    Yes.
13:25:01  25         Q.    When did you first become aware of a company --

of iLight Technologies?

A.     I became aware of iLight Technologies when the
company received a letter from iLight.

Q.     That is from iLight's counsel?

A.     Yes.

Q.     Is that one of the -- did you review documents
yesterday?

A.     Some documents, yes.

Q.     Did any of those documents refresh your
recollection as to events that occurred in the past?

A.     No.

Q.     I will hand that exhibit to you.  And ask you
if that is a letter you referred to as occasionally as being
the first instance in which you became aware of iLight.

A.     Yes, I believe this is when I first became
aware of -- aware of the company.

Q.     Do I understand from Mark correctly that you
misspoke earlier, that you now believe you became CEO in late
2004 --

A.     That's correct.

Q.     As opposed to 2005?

A.     That's correct.

Q.     Thank you.  So when this letter from Joe Buries
of Stites & Harbison came to the company, Fallon Luminous
Products Corporation, you were then CEO of the company; is

that correct?

13:27:05    A.    That's correct.

13:27:08    Q.    What, if anything, did you do when this letter was brought to your attention?

13:27:17    A.    I instructed the people to send it to our counsel.

13:27:24    Q.    And who did you instruct?

13:27:24    A.    (Respite.)

13:27:33    Q.    Let me ask it this way. Do you remember who you instructed?

13:27:37    A.    I would say basically it would be -- it came to my attention. We had several officers in the room looking at it. We made a decision to immediately send it to our counsel. I don't know if it was one person or another, but --

13:27:58    Q.    Do you remember that meeting?

13:28:00    A.    Yes.

13:28:03    Q.    You said you had several officers in the room discussing it. Who was in the room?

13:28:17    A.    Leah White, Joe Clay.

13:28:20    Q.    Who else?

13:28:27    A.    Joe Clay.

13:28:29    Q.    Anybody else?

13:28:31    A.    That may be it. I'm not sure who else was there.

13:28:35    Q.    At the time, Leah White was CFO?

13:28:35  1          A.      Yes.

13:28:40  2          Q.      And Joe Clay was what?

13:28:41  3          A.      President.

13:28:46  4          Q.      Do you remember the discussion with Leah White

          5  and Joe Clay pertaining to this letter?

13:28:53  6          A.      I remember asking him to send it to our patent

          7  counsel.

13:28:55  8          Q.      Do you remember anything else about the

          9  discussion?

13:28:57 10          A.      No.

13:29:01 11          Q.      Did you ask who in the heck this iLight

         12  Technologies is?

13:29:04 13          A.      Not that I remember.

13:29:06 14          Q.      Okay.   But I thought previously you had

         15  indicated this was the first time you became aware of the

         16  company; is that correct?

13:29:13 17          A.      To the best of my recollection.

13:29:15 18          Q.      All right.   Now, at the time this letter came

         19  in and you instructed someone, whether it was Mr. Clay or Ms.

         20  white, to send this to your counsel, this, being the letter,

         21  Defendant's Deposition Exhibit 550, were you then

         22  manufacturing LED signage products?

13:29:59 23          A.      Yes.

13:30:02 24          Q.      At the time you were issued instructions to

         25  send this letter to counsel for Fallon, had -- did you issue

instructions to put the sales of the Fallon LED Open signs on
hold?

A.    No.

Q.    Do you know if it was sent to your counsel?

A.    I didn't deliver it, but there was a response
to it, so it was sent to my counsel.

Q.    What response are you referring to?

A.    A letter that basically -- I believe it was to
counsel from iLight, which indicated that we did not infringe,
or -- based on their opinion, we did not infringe.

Q.    Do you know when that letter went to iLight's
counsel?

A.    The exact date, no.

Q.    Did you have -- before that -- let me withdraw
that.  The letter you are referring to that went to iLight's
counsel, I assume that was from Fallon's counsel to iLight's
counsel --

A.    Yes.

Q.    -- is that correct?

Okay.  Prior to -- did you receive a copy of that
letter?

A.    Yes.

Q.    Prior to receiving a copy of that letter, had
you discussed the infringement or noninfringement situation
with anyone other than this initial meeting when you said,

send it to counsel?

13:32:04    A.    Yes.

13:32:08    Q.    And tell me about that.  What discussions

occurred?

13:32:16    A.    I don't recall the exact discussion, but it was

simply the fact that the letter indicated that we did not

infringe.  That was all that was important to me.

13:32:29    Q.    Do you recall the basis for that conclusion?

13:32:30    A.    Excuse me?

13:32:33    Q.    Do you recall the basis for that conclusion?

13:32:38    A.    I believe it had to do with the waveguide.

There were a couple of issues -- a couple of facts that were

put in the opinion, but I can't tell you.  I'm not a patent

attorney.  So I've read the -- read the letter.  The most

important thing to me as CEO was that we did not infringe.

13:33:07    Q.    Now, you indicated that the letter referred to

as the basis for the noninfringement, I thought you mentioned

the term waveguide.  Am I correct?

13:33:18    A.    Yes.

13:33:22    Q.    What do you mean by waveguide?

13:33:27    A.    My understanding of a waveguide is something

that could be a lampshade, it could be anything that diffuses,

or light passes through it.

13:33:45    Q.    Did the Fallon LED Open sign we've been talking

about have a waveguide?

13:33:52   1            A.      I didn't call it a waveguide.  It was not

           2    necessarily -- restate the question, please.  It had a lens.

13:34:04   3            Q.      Is that a waveguide?

13:34:07   4            A.      To me it was a lens.

13:34:10   5            Q.      You used the term waveguide.  I'm trying to

           6    understand what you mean.

13:34:12   7            A.      That was in the patent.

13:34:17   8            Q.      You say your product used a lens?

13:34:19   9            A.      That is what I call it.

13:34:22  10            Q.      Okay.  That's what you call it.  Do you know if

          11    that lens is a waveguide?

13:34:28  12            A.      I'm not sure where you are going with this.  I

          13    call it a lens, you call it a waveguide, or -- I'm not sure

          14    what you are getting at.

13:34:38  15            Q.      I need to know whether or not there is any

          16    difference between what you call a lens and the waveguide.

13:34:44  17            A.      Do I know?

13:34:44  18            Q.      Yes.

13:34:46  19            A.      If there is a difference?

13:34:47  20            Q.      Yes.

13:34:49  21            A.      I don't know.

13:34:56  22            Q.      Okay.  Prior to your receiving a copy of your

          23    counsel's letter to iLight's counsel, did you have discussions

          24    with your counsel?

13:35:07  25            A.      Personally, no.

| | | | |
|---|---|---|---|
| 13:35:11 | 1 | Q. | Do you know if anyone at the company did? |
| 13:35:12 | 2 | A. | I believe so. |
| 13:35:14 | 3 | Q. | Who? |
| 13:35:20 | 4 | A. | Probably Leah White, Chuck Nelson. |
| 13:35:20 | 5 | Q. | Do you know -- |
| 13:35:22 | 6 | A. | Could have been several individuals. |

13:35:27  7      Q.    Do you know -- you say could have been.  Do you
       8  know for a fact that that occurred?

13:35:36  9      A.    I wasn't at the meeting.

13:35:39 10      Q.    You weren't at the meeting.  Do you understand
      11  -- let me ask you this.  Do you know -- assuming any such
      12  discussion occurred, do you know what was discussed?

13:35:55 13      A.    I believe that counsel for Fallon discussed the
      14  -- their belief that it was a noninfringement of the patent
      15  we're talking about.  And why, they told why, our counsel
      16  believed there was no infringement.  And they went through the
      17  issues, whatever they were.

13:36:17 18      Q.    Do you recall the issues?

13:36:19 19      A.    I wasn't at the meeting.

13:36:21 20      Q.    Were those issues important to you?

13:36:31 21      A.    It was not that important to me.

13:36:35 22      Q.    Other than the issue you referred to of a lens
      23  versus a waveguide, do you recall any other basis for the
      24  opinion by Fallon's counsel that there was no infringement?

13:36:57 25      A.    I relied on the letter.  That was what was

important to me.  If you would repeat the question again.

13:37:14    Court reporter:  Other than the issue you referred to
of a lens versus a waveguide, do you recall any other basis
for the opinion by fallon's counsel that there was no
infringement?

13:37:21    THE WITNESS:  Not Fallon's counsel, no.

13:37:21  BY MR. VEZEAU:

13:37:24    Q.    To continue with my identification, I will
place before you what has been identified as Defendant's
Deposition Exhibit 551, a letter to Fallon's counsel from
iLight's counsel dated December 23, 2005.  I ask you to take a
look at that and let me know if you have seen that document
before.

13:37:56    Have you seen that letter before?

13:37:56    A.    Yes.

13:37:59    Q.    When?

13:38:03    A.    Probably shortly after it was delivered.

13:38:13    Q.    How did you get a copy of this letter?

13:38:23    A.    Typically, if it was sent to counsel, we would
get a copy of it.  What I'm referring to, the second
paragraph, I think -- I believe I've seen other patent numbers
and development by iLight.

13:38:42    Q.    What, if anything, did you do or did the
company do when you became aware of this letter, this letter
being Defendant's Deposition Exhibit 551?

13:39:04 1          A.      We compared -- I know we compared the product

2     that iLight produced under their patent.  We looked at it,

3     found it basically the same design -- the same patent, the

4     same sign as described in the patent, compared it to our own.

5     This was during -- between the first letter that you showed me

6     and the second letter.  I did personally look at both signs

7     and found that they were -- there was basically -- they were

8     totally different.

13:39:50 9          Q.      What -- how -- what is the basis for your

10    benefit that they were totally different?

13:39:56 11          A.      The construction of the sign.

13:39:57 12          Q.      Pardon?

13:39:59 13          A.      The construction of the sign.

13:40:03 14          Q.      This is iLight's physical sign versus the

15    Fallon physical LED Open sign?

13:40:11 16          A.      Yes.

13:40:22 17          Q.      When did Fallon -- since you did the comparison

18    -- let me withdraw that question.  Since you did the

19    comparison, do I assume correctly that Fallon had an iLight

20    Open sign?

13:40:28 21          A.      Yes.

13:40:30 22          Q.      Where did you get that?

13:40:36 23          A.      I'm not sure exactly who picked up the sign or

24    purchased the sign, but the first time I saw the sign was in

25    Knoxville, Tennessee.

| | | |
|---|---|---|
| 13:40:49 | 1 | Q. Do you remember when that was? |
| 13:40:56 | 2 | A. It was in 2005, after the opinion letter that |
| | 3 | we received from our counsel. That's when I looked at it. |
| 13:41:06 | 4 | Q. The letter you are referring to is the one that |
| | 5 | your counsel sent to iLight's counsel? |
| 13:41:13 | 6 | A. Yes. |
| 13:41:16 | 7 | Q. Who in Fallon did the actual comparison of the |
| | 8 | physical products, that is, iLight's Open sign versus Fallon's |
| | 9 | Open signs, the LED versions? |
| 13:41:32 | 10 | A. Most likely it was Chuck Nelson. |
| 13:41:36 | 11 | Q. Did he give you anything, a written report on |
| | 12 | that comparison? |
| 13:41:41 | 13 | A. Not that I'm aware of. |
| 13:41:44 | 14 | Q. Did you discuss that comparison with him? |
| 13:41:48 | 15 | A. I don't believe so. |
| 13:41:50 | 16 | Q. How did you become aware that this comparison |
| | 17 | was done in Fallon? |
| 13:42:03 | 18 | A. I saw -- I believe I saw a memorandum of some |
| | 19 | sort. |
| 13:42:07 | 20 | Q. From whom? |
| 13:42:12 | 21 | A. From our counsel. I understand it was |
| | 22 | discussed with Chuck. |
| 13:42:23 | 23 | Q. In 2005, were you aware of the construction of |
| | 24 | the Fallon LED Open sign? |
| 13:42:27 | 25 | A. Yes. |

13:42:29  1          Q.     Had you seen it?

13:42:30  2          A.     Yes.

13:42:34  3          Q.     Had you seen it disassembled and assembled,

          4   that is, in both conditions?

13:42:37  5          A.     Yes.

13:42:49  6          Q.     Had you compared the inner surfaces of the sign

          7   in the channel that held the LED lights to the outer surface

          8   of the sign?

13:43:06  9          A.     You are talking -- you are speaking about the

          10   molding case?

13:43:09 11          Q.     Yes.

13:43:11 12          A.     Did I look at the outer and inner?

13:43:12 13          Q.     Yes.

13:43:13 14          A.     Yes.

13:43:15 15          Q.     And what did you observe, if anything?  In

          16   other words, can you describe that for the jury?

13:43:22 17          A.     Yes, I could describe it.

13:43:24 18          Q.     Please do so.

13:43:33 19          A.     It's a plastic injection molded case with a

          20   textured outside finish and a -- I believe it actually had an

          21   area to put the lens in, dropped into it.  The inside of the

          22   molded -- the injection molded case was basically a -- what

          23   you would expect to see inside of a molded product.  The

          24   design is on the outside, basically the inside is typically

          25   regular plastic.

13:44:46 1          Q.    What do you mean by regular plastic?

13:44:48 2          A.    Plastic like that type of plastic on a bottle

3     or a computer, just generic type of plastic.

13:45:01 4          Q.    Now, you referred to the outside finish as

5     being textured.  What do you mean by that?

13:45:16 6          A.    I believe it had some texture to it basically.

13:45:27 7          Q.    Can you describe that for the jury?

13:45:35 8          A.    It was rough in nature.  It basically had very

9     small lines or a texture to it.  I'm not -- I can't really

10    describe it to you other than it had a texture to it.

13:45:54 11         Q.    Do you know the reason for that?

13:46:01 12         A.    No.  It was similar to what we had for other

13    signs.  It was black in color.

13:46:16 14         Q.    Now, you also referred to the inner surface of

15    the molded product that is that in which the LEDs were placed.

16    Was that also textured?  In other words, rough in surface?

13:46:31 17         A.    No.

13:46:34 18         Q.    Why not?

13:46:41 19         A.    The consumer didn't see it.  The outside of the

20    mold costs money to produce a mold of that type, to produce

21    the product.  The actual surface, that would be -- that the

22    consumer would be looking at would be on the outside, not the

23    inside of the product.

13:47:13 24         Q.    Do you know if anyone at Fallon ever measured

25    the reflectivity of the outer surface that you referred to,

the textured outer surface, compared to the inner surface of

the molded product?

13:47:31 A.    No.

13:47:34 Q.    Do you know if your attorneys ever did that?

Do you know if your opinion counsel ever did that?

13:47:43 A.    I really didn't know.

13:47:51 Q.    Did you, or to your knowledge, anyone at Fallon

ever explain to your opinion counsel the difference between

the textured outer surface that you referred to of the product

compared to the inner surface?

13:48:14 A.    No.  Not that I know of.

13:48:17 Q.    I will hand you Plaintiff's Deposition Exhibit

522 and ask you to take a look at it and tell me if you can

recall seeing that document before yesterday.

13:49:00 A.    Yes, I've seen this.

13:49:04 Q.    When?

13:49:06 A.    The spring of '05.

13:49:08 Q.    Pardon me?

13:49:11 A.    In the spring of '05.

13:49:13 Q.    Do you recall those discussions being reported

to you that the other employees had with your counsel at that

time?

13:49:21 A.    I knew there was a meeting, yes, that they

discussed why the sign in question, in their opinion, was not

an infringement.

13:49:32  1          Q.     Do you recall the details of those discussions

          2    as reported to you?

13:49:37  3          A.     No.

13:49:42  4          Q.     Did you read this document in 2005, this

          5    document being Defendant's Deposition Exhibit 552?

13:49:55  6          A.     I'm sure I did.

13:50:01  7          Q.     Did I say Defendant's?  I apologize.  Back

          8    through my notes I wrote it as D.  It should be Plaintiff's

          9    Deposition Exhibit 552, the document we've been discussing.

13:50:15  10         In 2005, how much time did you spend reviewing this

          11   exhibit, Plaintiff's Deposition Exhibit 552?

13:50:29  12         A.     As long as it took to read.  My interest in

          13   this, after seeing the letter from our attorney that said we

          14   did not infringe, and subsequently seeing the signs out of my

          15   own curiosity, probably after receiving this, and saw that

          16   there was -- there was no -- no likelihood that these signs

          17   had any relation to each other, they were totally different,

          18   that was the end of my deep involvement in this, if you want

          19   to call it deep involvement.  When my lawyer said it doesn't

          20   infringe, when I see the signs and they don't look like each

          21   other, I go on to something else.

13:51:18  22         Q.     Now, I want to direct your attention to the

          23   last page of that memorandum with Production Number FAL

          24   122525.  And to the paragraph starting, as set forth.  This

          25   sentence -- the second sentence in that paragraph says, the

housing is of singular construction.  Do you know what housing
is being referred to there?

13:52:03  A.    I believe I understand what it means, yes.

13:52:06  Q.    And do you understand what is being referred to
as the channel in the Fallon LED Open sign in which the LEDs
sit?

13:52:25  A.    I know the LEDs sit in a channel.  Is that what
you are talking about?

13:52:32  Q.    Yes.  Do you understand that's the housing
being referred to in this sentence?

13:52:40  A.    I really can't answer the question the way --
like I told you before, I saw the opinion that we didn't
infringe, I saw the signs.  I am not a technical person.
That's enough for me as CEO to go on with other business.  So
I'm not going to get into technical things here, whether it
refers to this or that, because that's not my job.

13:53:11  Q.    But it was your job to make a decision as to
whether to continue manufacturing and selling the Fallon LED
Open sign; is that correct?

13:53:19  A.    That is correct.

13:53:21  Q.    The buck stopped on your desk?

13:53:24  A.    Theoretically, yes.

13:53:26  Q.    And you made a decision to continue; is that
correct?

13:53:29  A.    Based on my attorneys and based on seeing the

```
  1    signs, that is correct.

  2         Q.    Earlier in your testimony, you referred to the

  3    correspondence you became aware of in the spring of 2005 from

  4    your counsel to iLight's counsel.  I'm asking you, is this the

  5    correspondence you were referring to?

  6         A.    No.  The correspondence that I referred to was

  7    the original letter claiming infringement.  That was the --

  8    that was which -- we received a letter from our counsel which

  9    said we do not infringe, and that was basically the end of the

 10    story for me as far as where I was being involved.

 11         Q.    And is the letter you are referring to from

 12    your counsel the memorandum that was marked as Plaintiff's

 13    Deposition Exhibit 552?  Or is it something else?

 14         A.    I saw that, too.

 15         Q.    Pardon me?

 16         A.    Yeah, I saw this also.

 17         Q.    Is that what you are referring to?

 18         A.    I'm referring to the April 1st letter?  550?

 19         Q.    Yes.

 20         A.    I did see 552.  555, I probable saw it, but it

 21    was not a -- it probably went from my in-box to my out-box,

 22    because I wasn't following the legal goings-on between the

 23    attorneys.  Once I had an indication from our attorney that we

 24    did not infringe, and once I saw the two signs, I became very

 25    disinterested in this.  It was apparent to me that this is not
```

1   something I should waste my time on.

13:55:49   2          Q.    The e-mail which I -- I had asked you some

3   questions generally about this earlier in your dep, and you

4   didn't recall it, but I'm referring to the Thursday, March 31,

5   2005 e-mail.

13:56:08   6          On the second page of Exhibit 561, there is a

7   reference to -- his reference in his e-mail to you:  We can

8   only submit a patent application for the LED Open sign with

9   broken borders, but I don't believe it will receive approval,

10  and if iLight gets a whiff of our filing and files an

11  objection, we are dead in the water.

13:56:33  12          Do you know -- the LED Open sign referred to in that

13  sentence, do you believe that's in reference to the Fallon LED

14  sign it was then providing to Sam's Club?

13:56:46  15          A.    Would you repeat the question, please?

13:56:48  16          Q.    (Mr. Vezeau) Would you read that back.

13:56:48  17          (Record read.)

13:57:04  18          A.    Yes, I believe so.

13:57:13  19          Q.    Okay.  So apparently before you received -- and

20  I realize it's close in time, but before you received

21  Plaintiff's Exhibit 551 or became aware of it -- I'm sorry,

22  the first exhibit we looked at today, Plaintiff's Exhibit 550,

23  I believe you previously testified that that was the first

24  time you heard of iLight?

13:57:47  25          A.    (Respite.)

621

Q.    It's not a trick question.  Obviously the dates

are close.  But my question is, is it fair to say that you

were made aware of iLight at least prior to your becoming

aware of Exhibit 550?

13:58:11  5          A.    I guess by 12 hours it appears.

13:58:15  6          Q.    Well, do you know when you actually received a

copy of Exhibit 550?

13:58:20  8          A.    Exactly when I received a copy?

13:58:22  9          Q.    Yeah, what day?

13:58:30 10          A.    I don't know.  Soon after it was received.

13:58:31 11          Q.    Pardon me?

13:58:39 12          A.    Soon after it was received.

13:58:44 13          Q.    Now, Mr. Huo refers to:

13:58:49 14      ILight does have a patent filing for their LED

product.  Please see the attached pdf.

13:59:03 16      Do you recall what the pdf was?

13:59:11 17          A.    I would assume it's the patent.

13:59:15 18      MS. HUNTER:  And finally, the plaintiff iLight calls

Richard Huo by video deposition.  Mr. Huo is the Chief

Operating Officer of Fallon Visual Products Corporation, and

he is also the President of Fallon Shanghai.

13:59:39 22      (Video playing:)

13:59:41 23          Q.    (By Mr. Vezeau) What are your current

responsibilities with Fallon Luminous Products?

13:59:46 25          A.    I'm currently the Chief Operating Officer of

```
  1   Fallon Visual Products Corporation, as well as a Managing

  2   Director of Lincolnshire Management.

14:00:01  3          Q.     Currently are all of Fallon Luminous's LED sign

  4   products that are sold to Sam's Club and Anheuser-Busch -- are

  5   they made at this facility in China?

14:00:12  6          A.     No.

14:00:13  7          Q.     Where are they made?

14:00:18  8          A.     We still -- we outsource some of the products.

14:00:21  9          Q.     What percentage are made at the facility in

  10  China?

14:00:26  11         A.     I don't have an exact number.

14:00:29  12         Q.     Okay.  But at least some are?

14:00:29  13         A.     Yes.

14:00:32  14         Q.     All right.  Where are the other facilities?

  15  Geographically where are the other facilities that you

  16  outsource these products to?

14:00:44  17         A.     They are in Shanghai.

14:00:49  18         Q.     Does the facility that you set up in Shanghai

  19  still manufacture neon products?

14:00:53  20         A.     Yes.

14:00:57  21         Q.     Do you know what percentage of its production

  22  is neon versus LED?

14:01:01  23         A.     No, I don't.

14:01:04  24         Q.     Do you have any continuing responsibilities

  25  with respect to that facility in Shanghai?
```

14:01:14  1          A.    I'm still the President of Fallon Shanghai.

14:01:16  2          Q.    What is the relationship between Fallon

          3   Shanghai and Fallon Luminous Products?

14:01:24  4          A.    Fallon Shanghai is a supplier to Fallon

          5   Luminous Products Corporation.

14:01:36  6          Q.    Does Fallon Luminous Products Corporation

          7   itself make any LED signage products?

14:01:45  8          A.    No.

14:01:52  9          Q.    Does it make any neon products itself?

14:01:52 10          A.    Yes.

14:01:57 11          Q.    Where does it make the neon products?

14:01:59 12          A.    In Andigo, Wisconsin.

14:02:04 13          Q.    All of the LED products it sells are made in

         14   Shanghai?

14:02:09 15          A.    Yes.

14:02:12 16          Q.    Does Fallon Shanghai also make a product that

         17   is referred to as a Super Bright product?

14:02:22 18          A.    Yes.  It is a new Open sign.

14:02:25 19          Q.    Can you describe that for us?

14:02:31 20          A.    It's an Open sign with an enclosure, LEDs and a

         21   diffuser.

14:02:36 22          Q.    For whom is that product made?

14:02:38 23          A.    For Sam's Club.

14:02:43 24          Q.    And how does that product differ, if it does at

         25   all, from the prior LED Open sign product sold by Fallon to

1    Sam's Club?

14:02:58    2              A.      I believe it's brighter.

14:03:02    3              Q.      And how does it achieve that brighter

            4    characteristic?

14:03:10    5              A.      I believe there's more LEDs in that particular

            6    product.

14:03:15    7              Q.      Anything else?

14:03:15    8              A.      No.

14:03:21    9              Q.      Do you know whether the Super Bright sign on

            10   one or more of the letters includes a second, if you will,

            11   channel containing a strip of LED lights?

14:03:48    12             A.      There are two colors, I believe, in the O.  Is

            13   that your question?

14:03:53    14             Q.      It may be.  Maybe you're explaining it better.

            15   Is that a difference from the prior product?

14:03:59    16             A.      Yes.  I believe -- again, I don't have the, you

            17   know, the picture of the product in front of me, so, you know,

            18   it's difficult for me to --

14:04:08    19             Q.      You don't remember the product that well?

14:04:13    20             A.      I try not to remember the product.

14:04:17    21             Q.      Do you know whether the second color you

            22   referred to, those lights that form the second color or

            23   provide the second color, are in the same channel, if you

            24   will, or enclosure as the lights for the first color?  Are

            25   they in a separate enclosure?

A.      There are different PCB boards for different

2     colors.  We do not maintain multiple colors on the same

3     printed circuit boards.

14:04:50 4          Q.      Do those printed circuit boards for the

5     respective colors sit in the same channel or a different

6     channel?

14:04:57 7          A.      We treat it as an enclosure, so --

14:05:03 8          Q.      So do they just sit side by side?

14:05:07 9          A.      They sit within that enclosure.

14:05:12 10         Q.      Now, what I'm wondering, with the second

14:05:13 11    color --

14:05:13 12         A.      Right.

14:05:18 13         Q.      -- Does that -- is that then fit into the same

14     enclosure?  Or is there a separate --

14:05:26 15         A.      The enclosure is compartmentalized.

14:05:30 16         Q.      So it sits in a separate compartment?

14:05:33 17         A.      Yes.

14:05:38 18         Q.      Other than the second compartment or a second

19    color of LCDs?

14:05:48 20         A.      LEDs.  You said LCDs.

14:05:56 21         Q.      I did, it's LEDs.  Is the construction of that

22    Super Bright product different than the prior Open sign

23    product for Sam's Club?

14:06:08 24         A.      The methodology is the same.

14:06:21 25         Q.      Now, in 2005 you became aware that iLight had

pursued patent protection for the LED sign; is that correct?

14:06:35    A.    I don't recall.  I don't recall.

14:06:38    Q.    You will see some documents in front of you.
There are stickers at the bottom.

14:06:41    A.    Okay.

14:06:43    Q.    Can you open to Plaintiff's Deposition Exhibit
561.

14:06:48    A.    Yes.

14:06:49    Q.    Do you have that?

14:06:49    A.    Yes.

14:06:53    Q.    There is an e-mail string there.  And I want
you to focus on your e-mail that bridges the first and second
pages of the exhibit.

14:07:02    A.    Okay.

14:07:07    Q.    Tell me when you finish reading it.

14:07:09    A.    Okay.  Yes.

14:07:14    Q.    All right.  Now, you referred in that e-mail
message, iLight does have a patent filing for their LED
product.  Do you see that?

14:07:20    A.    Yes.

14:07:25    Q.    You say, please see the attached pdf.

14:07:25    A.    Yes.

14:07:32    Q.    So at least by March 31, 2005, 5:15 p.m. --

14:07:33    A.    Uh-huh.

14:07:36    Q.    -- you were aware of a patent filing by iLight

```
 1    for its LED product; is that correct?

 2          A.      I don't recall, but based on that e-mail, I

 3    would say yes.  Yep.

 4          Q.      And do you know what was attached to this as a

 5    pdf?

 6          A.      No, I don't recall that.

 7          Q.      Now, you also indicate in the -- going back up,

 8    that e-mail message, that we can always submit a patent

 9    application for the LED oval sign with broken borders, but I

10    don't believe that we will receive approval.  Why didn't you

11    believe it would receive approval?

12          A.      Because there was prior -- I believe that there

13    was prior art in this type of product.

14          Q.      And you said if iLight gets a whiff of our

15    filing and files an objection, we are dead in the water.  Why

16    did you believe that?

17          A.      That's just my opinion of what the patent

18    process was.

19          Q.      What did you mean by that?

20          A.      I don't recall.

21          Q.      You don't know what you meant?

22          A.      Based on that -- again, this was written four

23    years ago, so based on that, my interpretation right now would

24    be that it could possibly block -- dead in the water.  Again,

25    my interpretation was that there was prior art on the patent,
```

1    and that's why it wouldn't get the approval.  I don't recall
           2    why I said that we would be dead in the water.
14:09:25   3             Q.      You are President of Fallon Shanghai; correct?
14:09:25   4             A.      Yes.
14:09:30   5             Q.      Fallon Luminous imports products from your
           6    company; right?
14:09:32   7             A.      Yes.
14:09:35   8             Q.      So in that sense your company is part of
           9    importation and shipping products?
14:09:42  10             A.      Fallon Shanghai exports products to Fallon
          11    Luminous Corporation.
14:09:45  12             Q.      Those products are then shipped to Fallon
          13    Luminous in the United States; correct?
14:09:52  14             A.      We export to Fallon Products -- yes, yes, to
          15    Corporation in South Carolina.
14:09:58  16             Q.      Right.  Who arranges the shipping?
14:10:04  17             A.      The shipping is arranged by -- by Fallon
          18    Products Corporation.
14:10:10  19             Q.      And I only have this fax copy, so I will let
          20    you look at it.  But what I want to direct your attention to
          21    is one of your e-mails from May 10, 2005 to Tim Demmond.
14:10:24  22             A.      Demmond.
14:10:29  23             Q.      The subject is:  Get my hands on an iLight
          24    product.  Tim --
14:10:38  25             Because it also went to Tim Fallon.

                                                                        629

14:10:38   1           A.    Okay.

14:10:40   2           Q.    I would like to get my hand on an iLight Open

           3    sign.  I tried in northern California, and I had no luck.  Can

           4    you guys try?  We need three or four.  Regards, Richard.

14:10:56   5           I will show that to you.  Dated May 10, 2005.

14:10:56   6           A.    Okay.

14:10:59   7           Q.    What was the need for three or four iLight

           8    signs?

14:11:06   9           A.    I don't recall.

14:11:11  10           Q.    Do you recall getting iLight LED Open signs in

          11    2005?  Or 2006?

14:11:32  12           A.    I don't recall getting an iLight sign.

14:11:36  13           Q.    So you have no recollection what the need was

          14    there, referred to in your e-mail?

14:11:41  15           A.    No, I don't recall.

14:11:50  16           THE COURT:  Does that conclude the plaintiff's proof?

14:11:54  17           MR. VEZEAU:  Yes, Your Honor.  That concludes the

          18    plaintiff's case, the live witnesses, and the deposition

          19    testimony.  We have entered our exhibits.

14:12:03  20           THE COURT:  Are there any other exhibits?

14:12:04  21           MR. VEZEAU:  Pardon me?

14:12:10  22           THE COURT:  Are there any other exhibits?

14:12:12  23           MR. VEZEAU:  I believe not, Your Honor.  I believe

          24    we've taken care of that subject further -- with counsel you

          25    referred to and, therefore, we rest.

1          THE COURT:  For the defense?

2          MR. KITTREDGE:  Your Honor, we have a Rule 50 motion.

3          THE COURT:  Ladies and gentlemen of the jury, I'm

4     going to excuse you for a few minutes.  Please don't discuss

5     the case amongst yourselves until you receive all of the

6     evidence, the argument of counsel, and the charge of the

7     Court.

8          (Jury out.)

9          THE COURT:  All right, counsel.  Yes, sir.

10         MR. KITTREDGE:  We went ahead and filed a motion, Your

11    Honor.  I didn't know how much, if you would want to hear it

12    or not.  We believe as a matter of law that iLight has not

13    proved its case of infringement, that the evidence of

14    infringement presented by Dr. Bratic just doesn't meet the

15    legal requirements.

16         In particular, he was not able to provide any kind of

17    rational explanation of when a rod becomes solid versus what I

18    think he called hollow, no rationale explanation of his human

19    observer test, it was inadequate as a matter of law that he

20    was applying.  There was no evidence of any scientific

21    analysis or measurements of Fallon's plastic lens cover to see

22    if it has any actual waveguide properties.  Similarly, no

23    measurement or analysis to see if it does preferentially

24    scatter light.  All he did was look at it and apparently apply

25    his human observer test.

14:14:02  1          Similarly, with respect to preferentially scatters

2  light, no rational explanation of what does and what does not.

3  Apparently anything does.  And the differences between

4  interior light reflecting surfaces and exterior light

5  absorbing surfaces was, again, inconsistent and just

6  inadequate to the meet the burden of proof.

14:14:30  7          THE COURT:  For iLight?

14:14:32  8          MR. VEZEAU:  Thank you, Your Honor.  We were just

9  handed this motion, of course, and haven't had time to look at

10  it.

14:14:38  11          THE COURT:  It wasn't filed.  It's not on the docket

12  yet.  So if you will pass up a copy.

14:14:45  13          MR. KITTREDGE:  I think we have it electronically

14  filed just in case.  We're not sure how you filed after that.

15  I've got a couple of copies for the Court.

14:14:56  16          MR. VEZEAU:  If the Court would like, we, of course,

17  will file an opposition.  But just very briefly, I think the

18  Court sat through quite a bit of testimony from -- it wasn't

19  really on this issue, Dr. Bratic -- I think counsel misspoke,

20  but Dr. Roberts.

14:15:11  21          MR. KITTREDGE:  I'm sorry, Dr. Roberts.

14:15:13  22          MR. VEZEAU:  That's fine.  And Dr. Roberts went into

23  excruciating detail over each of the claims, provided jury, we

24  think, with more than enough evidence that a reasonable juror

25  could finding infringement in this case of the asserted claims

1    by the accused products.

14:15:30    2          We think frankly, the evidence, we think, was very

3    strong, but certainly it meets the standard sufficient to

4    mandate that judgment as a matter of law is not appropriate at

5    this time.

14:15:42    6          THE COURT:  Anything further?

14:15:44    7          MR. KITTREDGE:  I have nothing further to add, Your

8    Honor.

14:15:49    9          THE COURT:  Okay.  Considering the testimony of Dr.

10   Roberts as well as all the other proof presented by the

11   plaintiff, viewed in a light most favorable to the plaintiff

12   as required under a Rule 50 motion, the Court concludes that

13   the plaintiff has presented sufficient evidence to show

14   infringement as well as damage.  And the motion for judgment

15   as a matter of law is denied.

14:16:28   16          MR. VEZEAU:  Thank you, Your Honor.

14:16:30   17          THE COURT:  Are you ready with your first witness?

14:16:30   18          MR. KITTREDGE:  Yes, Your Honor.

14:16:36   19          THE COURT:  You can bring the jury in, Mr. Marshal.

20          (Jury in.)

14:17:16   21          THE COURT:  Are there any matters for the defendant?

14:17:18   22          MR. KITTREDGE:  Your Honor, the defense calls Mr.

23   Chuck Nelson.

14:17:22   24          THE COURT:  Mr. Nelson, if you will come around,

25   please sir.

14:17:35  1              (Witness sworn.)

14:17:41  2              COURT REPORTER:  Please state your full name for the
          3     record.

14:17:45  4              THE WITNESS:  Charles Richard Nelson.

14:17:45  5     DIRECT EXAMINATION

14:17:45  6     BY MR. KITTREDGE:

14:17:50  7         Q.    Are you employed by Fallon?

14:17:52  8         A.    Yes, I am.

14:17:52  9         Q.    What is your position?

14:17:53 10         A.    National Accounts Manager.

14:17:55 11         Q.    Where do you live?

14:17:57 12         A.    Spartanburg, South Carolina.

14:18:00 13         Q.    How long have you lived in Spartanburg?

14:18:02 14         A.    Twenty-- well, practically my whole life.

14:18:06 15         Q.    And are you married?  Do you have children?

14:18:09 16         A.    I'm married, three children, 18, 15 and a two
         17     year old.

14:18:16 18         Q.    Could you for the jury describe your kind of
         19     post-high school educational background?

14:18:22 20         A.    Technical college, two different technical
         21     colleges, and a bunch of other classes, part-time classes and
         22     so forth.  That's pretty much it.

14:18:32 23         Q.    What type of course work did you study?

14:18:35 24         A.    Practical engineering, mechanical engineering.

14:18:40 25         Q.    And if you could also for us describe your job

history up to Fallon.

14:18:49    A.    Up to Fallon, I previously worked a couple of other small part-time jobs.  I worked for two years at another neon company where I learned how to bend glass, basically all the production aspects of neon.

14:19:04    Q.    The neon company that you worked at before Fallon -- was that a sign company?

14:19:09    A.    Yes, it was.  The name of the company was Neon Commitment Group.

14:19:13    Q.    And what kind of signs did it make?

14:19:18    A.    Neon signs, backlit signs, all types of POP signs.

14:19:20    Q.    All types of POP?

14:19:24    A.    Point of purchase displays.

14:19:29    Q.    And can you describe what a backlit sign is?

14:19:34    A.    It's a sign, a plastic sign, that is lit with some type of light source, be it neon, florescent, compact florescent, whatever.

14:19:45    Q.    Why is it called back lit?

14:19:49    A.    That's essentially what it is.  It's lit from the back.

14:19:51    Q.    What is lit from the back?

14:19:54    A.    The plastic face.

14:19:58    Q.    And what kind of light is used to light it?

14:20:01    A.    Anything.  Any type of light.  Any type of

light that's available or economical.

14:20:05    Q.    Fluorescent bulbs?

14:20:10    A.    Fluorescents, compacts, neons, LEDs, whatever
            was available.

14:20:15    Q.    And when did you join Fallon Luminous Products?

14:20:19    A.    I joined Fallon Luminous Products in 1988, late
            '88.

14:20:23    Q.    What was your first job at Fallon?

14:20:27    A.    I was their only engineer at the time.

14:20:29    Q.    So what were your responsibilities when you
            started at Fallon?

14:20:37    A.    Design drawings, creatives, I did a lot of
            different things from prototypes to mold making.  We didn't
            have a lot of people back then, so --

14:20:48    Q.    And is this all for sign products, or did
            Fallon make other things?

14:20:51    A.    This was all for sign products.

14:20:53    Q.    Are they all lighted signs?

14:20:54    A.    All lit.

14:20:58    Q.    If you can walk us through how your career
            progressed, what different job positions you have had while
            you have been at Fallon.

14:21:07    A.    From the engineering aspect of it, I went
            through -- well, starting as an early engineer, as the company
            grew, we started hiring more engineers, and we got to a point

where we had three or four engineers.  And then I was promoted

to engineering manager.  And I stayed at that position for a

while, then I was promoted to vice-president of engineering.

And I was at that position for many years, then moved to

vice-president of research and development, and then to the

position I'm at right now.

14:21:49    Q.    Throughout your career at Fallon, have you been

involved in designing and developing signs?

14:21:52    A.    Yes.

14:21:54    Q.    Can you describe some of the types of signs you

have worked on?

14:22:05    A.    Everything from lit signs, to CD holders, to

posters, to any kind of -- different retail items for Sam's

Club, Spencer's Gifts, you name it.  If it had lights on it or

it was a type of display, we would make it at a customer's

request.

14:22:27    Q.    And what's a combination sign?

14:22:29    A.    A combination sign?

14:22:32    Q.    Yeah, maybe I misunderstood something.

14:22:38    A.    We would make compact disk holders, a CD holder

for Sam's that had a lit tube in it.

14:22:47    Q.    I see.  I think this would be a good time to

look at one of the exhibits that has been entered.

14:22:52    Your Honor, can I get one of the exhibits up and show

it to the witness?

637

14:22:57  1          THE COURT:  Yes.  As I stated before, all counsel and

        2   witnesses have leave to either leave the witness stand or

        3   leave the podium as necessary to present proof.  It's a

        4   standing directive I gave at the beginning.

14:23:13  5          MR. KITTREDGE:  I apologize for forgetting.

14:23:24  6          Can we show the witness Plaintiff's Exhibit TX 83 A.

14:23:27  7   BY MR. KITTREDGE:

14:23:31  8      Q.     Do you recognize Exhibit 83 A?

14:23:31  9      A.     Yes.

14:23:33 10      Q.     What is it?

14:23:37 11      A.     It's an embedded oval Open neon.

14:23:39 12      Q.     And I'm going to ask you to explain to the jury

       13   what that means, embedded.  But would it be easier for you to

       14   come down?

14:23:45 15      A.     Yeah, probably.

14:24:09 16      Q.     Let me get an easel for you.

14:24:13 17      A.     The phrase embedded is -- well, what this is,

       18   it's a vacuum-formed plastic enclosure that houses the Open

       19   sign.  The neon being fragile glass, it was the manner in

       20   which to encapsulate the glass to allow us to ship it into

       21   Sam's, to get it to the customer without breaking, as well as

       22   just hanging in the window, where if you bump the glass with a

       23   window washer, you can't really disturb it in any way.  It

       24   ships better, it hangs better, the end user can operate it

       25   better.

14:24:49   1          What it is, it is the face and cage of a vacuum-formed

        2     part.  But the face is formed and shaped in the Open with a

        3     channel, which pre-exists that patent on this as well.  And it

        4     just completely encapsulates.  The plastic has a hair cell on

        5     it, and that hair cell plastic just eliminates all the

        6     fingerprints on it.  And that's something since we started

        7     making the Opens and started make it black as a standard

        8     procedure.

14:25:24  9          Q.    Okay.  You can sit down, I think.  Now, Exhibit

        10    83 A, the neon Open sign, were you involved in developing this

        11    product?

14:25:32 12          A.    Yes.

14:25:34 13          Q.    What was your involvement?

14:25:36 14          A.    Complete.  I handled everything from, I think

        15    I've got the first vacuum-formed tool made from when I pulled

        16    the first part.

14:25:43 17          Q.    Can you explain what vacuum forming means.

14:25:47 18          A.    Vacuum forming or therma-forming is a type of

        19    forming where you take a flat sheet of plastic and you

        20    basically clamp it into a frame, you push it into an oven, and

        21    when it comes out, it's molten hot.  And then you drape that

        22    over into a mold or your imprint, and you use vacuum to pull

        23    out the air between the two parts, thus creating the shape.

        24    And when it cools, you've got a hardened shape.

14:26:13 25          Q.    And I think you described it as being -- was it

639

```
                 hair cell?
14:26:14    2         A.      It's a texture -- it's a common texture in the
            3    plastics industry.  We buy the plastic pretextured for that
            4    part.
14:26:23    5         Q.      Did Fallon develop this hair cell?
14:26:27    6         A.      No, that came straight from the plastics
            7    industry.
14:26:31    8         Q.      Who did Fallon sell this sign to?
14:26:31    9         A.      Sam's Club.
14:26:34   10         Q.      Was it a successful product for Fallon?
14:26:42   11         A.      Yeah, we sold that one for many years.
14:27:05   12         Q.      Can we have the exhibit -- Plaintiff's Exhibit
           13    TX 9 A.  Mr. Nelson, do you recognize Exhibit 9 A?
14:27:18   14         A.      Yes, I do.
14:27:21   15         Q.      What is Exhibit 9 A?
14:27:25   16         A.      It is our Opti product.  It's an LED lit
           17    product.
14:27:29   18         Q.      Did you have any involvement in developing this
           19    product?
14:27:33   20         A.      Yes, I did.
14:28:35   21         Q.      Why did Fallon begin development on -- of the
           22    sign that has been marked as Exhibit 9 A?
14:28:41   23         A.      It was at the request of our customer.
14:28:43   24         Q.      What customer was that?
14:28:43   25         A.      Sam's Club.
```

14:28:47  1          Q.      When did this happen?

14:28:47  2          A.      2004.

14:28:55  3          Q.      Did Sam's Club stop buying the neon oval Opens

       4     while you were working on the development of the LED sign?

14:29:02  5          A.      Never.

14:29:09  6          Q.      Did Sam's Club keep buying the oval neon signs

       7     all through 2004?

14:29:13  8          A.      Yes.  They still carry them on their website.

14:29:14  9          Q.      To this day?

14:29:18 10          A.      Yes.

14:29:24 11          Q.      And the oval Opens that Sam's Club carries on

      12     its website -- where are they made?

14:29:27 13          A.      Excuse me?

14:29:33 14          Q.      The oval neon opens that Sam's Club carries on

      15     its website -- where are they made?

14:29:38 16          A.      It's old inventory.  They were made in

      17     Spartanburg originally.

14:29:43 18          Q.      So what was Fallon's reaction when Sam's Club

      19     came to it and asked it to make an LED version of the neon

      20     Open?

14:29:49 21          A.      Could you repeat that?

14:29:52 22          Q.      What was Fallon's reaction, the company's

      23     reaction, when Sam's Club came to it and asked if it could

      24     make an LED version of its neon Open sign?

14:30:07 25          A.      We immediately jumped on it, as always.

14:30:13  1          Q.      And whose responsibility was that?

14:30:19  2          A.      Mine.

14:30:19  3          Q.      So, can you describe for the jury how you came

          4   up with the LED Open sign?  What did you do?

14:30:20  5          A.      Well, other than the obvious, the shape being

          6   the exact same shape, I took the blueprints that I used

          7   basically to create the vacuum formed version and transferred

          8   it over to create the LED version.  I created the center lines

          9   for our LED vendors to start laying out the boards and the

         10   internal components.  And then started looking at vacuum

         11   formed components, printed components, and we made several

         12   different molds and different pieces of plastic to act as

         13   diffusers, so that when the LED components came in, we could

         14   start knocking out samples.

14:30:58 15          Q.      How long did this process take?

14:30:59 16          A.      Several months.

14:31:08 17          Q.      How did you decide -- maybe I could hand you an

         18   item we've marked as Defendant's Exhibit for Identification

         19   655 A.  Do you recognize Item 655 A?

14:31:26 20          A.      Yes, it's a letter N.

14:31:29 21          Q.      And is it from one of Fallon's signs?

14:31:30 22          A.      Yes, that's correct.

14:31:32 23          Q.      And is this similar to some of the mock-ups you

         24   were working with originally?

14:31:38 25          A.      They weren't this -- this pretty, but yes.

14:31:43 1         Q.    How did you decide how far apart to put the

2   LEDs?  I'm talking about initially when you were developing

3   this.

14:31:50 4         A.    It was just more common sense than anything.

5   If it was a half an inch, we played around with different

6   spacings and just kind of ended up with around a half an inch.

7   And it just seemed to fit with the length of the letter.  When

8   you start spacing the LEDs out from one end of the channel to

9   the other, it just kind of ends up that way.

14:32:14 10        And if -- the spacing isn't always exactly a half

11   inch.  Sometimes it's a little more, sometimes it's a little

12   less, sometimes it's a lot more, depending upon the length of

13   the letter.

14:32:23 14         Q.    Why does it have to be different, depending on

15   the length of the letter?

14:32:28 16         A.    Well, you don't want two LEDs too close

17   together or too far apart, or you end up with a dark spot or a

18   hot spot.  And you always want one at the end, or when you get

19   to the end of the letter, you will end up with a dead spot.

14:32:39 20         Q.    So you have to make sure the spacing is even?

14:32:41 21         A.    Somewhat even.

14:32:44 22         Q.    Can I hand you and the deputy hand you an item

23   we've marked as Defendant's Exhibit 655 B.  Do you recognize

24   Item 655 B?

14:33:02 25         A.    Yes, it's a plastic letter from the Open sign.

643

14:33:05  1          Q.      Is that similar to the plastic that you were

          2    using in earlier mock-ups?

14:33:08  3          A.      The same type of plastic, yes.

14:33:09  4          Q.      And what is that?

14:33:13  5          A.      It's acrolite, cyroacrolite, is what it is.

          6    It's a common trade plastic sold in the industry.

14:33:19  7          Q.      How did you decide to use that type of plastic?

14:33:25  8          A.      I just pulled it out of a chip selection I had

          9    in my desk, basically.  It was the one that looked the best.

14:33:35 10          Q.      So you have channels, you have LED, you have

         11    the lens.  How did you decide the distance that you should

         12    have between the plastic letter and the LED?

14:33:49 13          A.      Well, based on past history, -- it's the same

         14    distance as we have for our backlit plates on neon signs,

         15    actually.  The two inches wasn't anything magical.  It was

         16    just -- that was what we typically used for a backlit sign was

         17    two inches, so we just -- it just kind of worked out to be two

         18    inches.  We're actually a little thinner than that now, but we

         19    started with two inches, because that's where the neon was.

14:34:23 20          MR. KITTREDGE:  Your Honor, can we approach real

         21    briefly?  I want to ask a question without stepping over a

         22    line.

14:34:32 23          THE COURT:  Pardon?

14:34:32 24          MR. KITTREDGE:  I'd like to ask a question, but I

         25    don't want to cross a line and need to check.

```
14:34:33   1            THE COURT:  Ladies and gentlemen, we're going to
           2    excuse you for a few minutes.  Please don't discuss the case
           3    amongst yourselves or with anyone else until you receive all
           4    of the evidence, the argument of counsel, and the charge of
           5    the Court.
14:35:10   6            (Jury out.)
14:35:12   7            THE COURT:  All right.
14:35:14   8            MR. KITTREDGE:  I was -- I apologize.  I may have made
           9    this more complicated than I needed to.  I was going to move
          10    those two items into evidence that he has been looking at.
          11    They were part of a sign that was on our exhibits we
          12    exchanged, but they themselves hadn't been pulled out and
          13    tagged a number.  I didn't want to do that in front of the
          14    jury.  Mr. Vezeau might object.  I didn't know if he would.
14:35:40  15            MR. VEZEAU:  Your Honor, if I might make a suggestion.
          16    Perhaps counsel want to wait until the end like we did with
          17    most of our other witnesses so we don't interrupt.  We're not
          18    going to object to these particular exhibits.
14:35:51  19            MR. KITTREDGE:  I just want to make sure I don't get
          20    lost.  And I'm not going to have very many exhibits.  And I
          21    don't think it's going to be that long.
14:35:59  22            THE COURT:  Well, if there is no objection to the
          23    exhibits.
14:36:09  24            Bring the jury in, Mr. Marshal.
14:36:28  25            (Jury in.)
```

14:36:32   1          THE COURT:  You can be seated.

14:36:34   2          Counsel.

14:36:35   3          MR. KITTREDGE:  Your Honor, I would like to offer

           4   Exhibits 655 A and 655 B into evidence.

14:36:42   5          THE COURT:  Without objection, it will be admitted.

14:36:43   6   BY MR. KITTREDGE:

14:36:46   7          Q.    Mr. Nelson, when you were developing the LED

           8   version of the Open sign, were you trying to simulate a neon

           9   sign?

14:36:53  10          A.    Oh, yes.  That was the point.

14:36:56  11          Q.    Why did you want to simulate a neon sign?

14:37:01  12          A.    Well, that's what we made was neons.  We were a

          13   neon company, and we were trying to get close to a neon sign.

14:37:06  14          Q.    What did you think of the results that you

          15   ended up with?

14:37:10  16          A.    I thought they were pretty good, and I still

          17   do.

14:37:12  18          Q.    Well, did you think that the glow on your

          19   letters were nice and uniform?

14:37:18  20          A.    I thought so, yes.

14:37:20  21          Q.    Did you like the brightness?

14:37:21  22          A.    Yes, I do.

14:37:23  23          Q.    Did you use any kind of -- you testified about

          24   how you figured out the distances and everything, but did you

          25   use any kind of mathematical modeling program to help you

```
 1   figure out whether you had things arranged properly?

 2       A.   We don't have that kind of software available

 3   to us.

 4       Q.   Did you do any kind of luminescence analysis on

 5   your LEDs to plot how they spread out lights to make sure you

 6   were getting -- spreading the right way?

 7       A.   No, sir.

 8       Q.   Well, how did you get that nice uniform look?

 9       A.   I'm going to say experience, you can say look,

10   whatever.  We just did it.

11       Q.   Now, the oval -- let me make sure I'm reading

12   the exhibit numbers.  Exhibit 9 A, the LED version, -- is that

13   made by vacuum molding?

14       A.   No, sir.  That is injection molding.

15       Q.   What's the difference between injection molding

16   and vacuum molding?

17       A.   Injection molding is a different process where

18   you take a liquid plastic and you pipe it hot into a two part

19   steel mold, male/female, and the liquid goes in and creates

20   the part.  And then when it's pulled apart, after the parts

21   harden, you end up with actually that, or -- typically

22   computer parts, cell phones, there's multiple things in this

23   room that are injection molded.  It's a common process.

24       Q.   And is this surface on the outside of Exhibit

25   9 A, the LED version, is that -- would you still call it a
```

1  hair cell?

2      A.      It's a texture of hair cell.  The hair cell is

3  really an industry name for it, but it's a texture, yes.

4      Q.      Was the purpose on Exhibit A for that texture

5  the same as it is for the old neon sign?

6      A.      Again, it's basically to make the product more

7  durable on the assembly line, wear and tear in the field,

8  doesn't show dust as well, doesn't show fingerprints.  So when

9  you're handling it down the assembly line, when the customer

10  picks it up, they don't see fingerprints, you don't have to

11  dust it as often as if it's a nice glossy piece.  If you just

12  leave it gloss, or make it a shiny part, it's going to show

13  fingerprints and dust, and it's not going to look as

14  attractive in the window.

15      Q.      Can we hand the witness Exhibit 11.  Now,

16  Exhibit 11 -- do you recognize what Exhibit 11 is?

17      A.      Yes.

18      Q.      What is it?

19      A.      One of our original LED Opens we provided to

20  Sam's.

21      Q.      And Exhibit 11 has the plastic piece removed

22  from the letter E?

23      A.      Yes.

24      Q.      And if you look inside that letter E, the

25  channels are shiny.  Is that fair?

14:40:28  1        A.    Yes.

14:40:38  2        Q.    Can you maybe hold it up for the jury so they

3    can see what we're talking about.  And my question is, why is

4    that surface shiny?

14:40:45  5        A.    Well, imagine a steel tool going into that

6    little slot, and then having to have pull back out of that

7    slot.  If I've got this same texture on it, it's kind of like

8    sandpaper locking it in.  You're not going to be able to get

9    it off as easy.  You're going to break the parts getting them

10   off the mold.

14:41:01  11       That part has to be a little bit more polished than,

12   say, I don't know if you can see it or not, but the inside is

13   not -- these flat parts are not as shiny because it's a flat

14   surface.  It's just got tool marks all over it because it's

15   just flat to flat.  It comes right off.

14:41:20  16       So it's part of the process.  You have to polish some

17   parts more than other parts to physically be able to get it

18   off the tool.

14:41:23  19       Q.    When you say polish some parts, are you talking

20   about the sign?

14:41:28  21       A.    Parts of the tool.  There is a front and a

22   back, or a male and a female part of the tool.  And the inside

23   here would probably be the -- the female portion of the tool,

24   and it would have to be polished more than the other side.  So

25   the two come apart.  So you end up with a more glossier

1  looking component.

14:41:45  2       Q.     Does that have something to do with the size of

3  the opening that's there?

14:41:50  4       A.     Well, the size of the opening makes it -- you

5  are going to want to polish it a little more, the smaller the

6  opening.

14:41:57  7       Q.     What happens to the tool if you don't polish

8  it?

14:41:59  9       A.     Well, you're going to start cracking the tool

10  and you'll break the parts as you're getting them off.  You

11  will end up with a lot of damaged parts, you will slow the

12  production down, you will increase your part cost, you will

13  have a lot more tool repair as well.

14:42:13  14       Q.     Now, I think you said a little while ago -- and

15  I think we can take that away from you so it's out of your

16  way.  I think you testified a little while ago that the LED

17  Open sign is injection molded.  What's the advantages of

18  injection molding?

14:42:54  19       A.     The advantage of injection molding is you get a

20  little bit cleaner, crisper part.  The seams are less, you can

21  get less tool marks than you can in vacuum forming.  We would

22  run an injection molding part when we're running a really high

23  volume.  We ran the other parts as well, but we had our own

24  vacuum forming facility, so we tried to keep everything we

25  could in house.

14:43:20  1          But typically, it was when you had a really high
         2    volume or you needed a really crisp looking part.
14:43:28  3          Q.    Let's shift topics a little bit and talk about
         4    the competitive nature of the sign business.  How do you
         5    decide what drives the sign development in your business?
14:43:40  6          A.    For the most part customers and the industry.
         7    You look and see what is out in the field, and you try and
         8    make a determination of where the industry is going, and based
         9    on that and the customer's needs.
14:43:54 10          Q.    Do you -- as part of your own business,
        11    Fallon's business practices, does it look at competitors'
        12    products?
14:44:01 13          A.    Yes.  I am sure they look at ours.
14:44:02 14          Q.    Why is that?
14:44:05 15          A.    Well, they look at ours.
14:45:07 16          Q.    Okay.  Mr. Nelson, I'm going to have the deputy
        17    hand you Exhibit 1081-A.  Do you recognize Exhibit 1081-A?
14:45:23 18          A.    Yes, I do.
14:45:24 19          Q.    What is it?
14:45:26 20          A.    It's one of -- our newest model of LED Open
        21    signs for Sam's.
14:45:31 22          Q.    Does have a name?
14:45:33 23          A.    They call it Super Bright Open.
14:45:36 24          Q.    What was the purpose of making this new design?
14:45:40 25          A.    Sam's typically, if not once a year, every --

651

1    sometimes twice a year, but at least once a year requests a

2    new model.  They want to see a new model of product or a new

3    model of sign very often.  They want new, fresh Open designs.

4    Not just the -- it doesn't have to be that it's -- excuse me,

5    that it's a different channel or anything else, they just want

6    it to have a new look as far as the shape of the Open, the

7    layout of it.  They want something fresh.

14:46:56  8         Q.     Okay.  Can I have that back for a minute.  If

9    you could come down here, maybe I could ask you some questions

10   and the jury can see what we're talking about.  We're looking

11   at the inside of Exhibit 1081-A.  I would like you to explain,

12   if you look at the outside of the blue, the blue swoop here,

13   there is no sidewall; is that right?

14:47:19 14         A.     That's correct.

14:47:23 15         Q.     And why did you make that without a sidewall?

14:47:27 16         A.     Less plastic.  And it was a redesign to make

17   the product lighter, and it didn't change the look.

14:47:34 18         Q.     Would it be possible to do this similar process

19   without the sidewalls on letters as well?

14:47:40 20         A.     Not for this particular model it wouldn't be,

21   because you would have light leaks from the red over to the

22   blue board, and you would end up with a pinkish colored board

23   instead of a blue board.

14:48:00 24         Q.     But you could put a wall between them?

14:48:03 25         A.     You could put a character.

14:48:05  1          Q.    And then you could do it without the sidewalls?

14:48:07  2          A.    That's correct.

14:48:14  3          Q.    And don't you have -- let me get the exhibit.

          4    If you could sit back down.

14:48:45  5          If we can show Exhibit 728 A.  Do you recognize

          6    Exhibit 728 A?

14:48:50  7          A.    Yes, sir.  It's a Bud Light Bowtie.

14:48:52  8          Q.    Take off the back.  I would like to draw your

          9    attention to -- and one of those pieces of PCB boards will

          10   lift up, I believe.  And hold that up to the jury so they can

          11   see it.  Not the PCB board, the sign.

14:49:16  12         And the question for you, Mr. Nelson, is, the letters

          13   that are exposed there -- do those have sidewalls?

14:49:21  14         A.    No, they don't.

14:49:25  15         Q.    And that's the type of process and feature we

          16   were talking about that could be done on other signs as well?

14:49:30  17         A.    That's correct.

14:49:52  18         Q.    We can take that back.

14:49:53  19         MR. KITTREDGE:  Your Honor, I would like to offer

14:49:56  20   1081 A into evidence.

14:50:36  21         THE COURT:  Without objection, it will be admitted.

14:50:40  22   For clarity of the record, if you refer to the exhibit number.

14:50:42  23         MR. KITTREDGE:  I'm sorry, I didn't mean to hand that

          24   to the witness.  I was just handing it to the Court since it

          25   was going to be offered into evidence, and I didn't think I

was going to need it again.  I apologize.

BY MR. KITTREDGE:

Q.    Could we hand the witness Exhibit 40.  Mr.
Nelson handed you a document, Exhibit 40.  Do you recognize
Exhibit 40?

A.    Yes, I do.

Q.    What is it?

A.    It's a letter from our attorneys to the iLight
attorneys stating that we don't infringe on their patent.

Q.    Do you recall when you first saw this letter?

A.    End of April, first of May, probably.

Q.    Of which year?

A.    2005.

Q.    And what was the context of you seeing it?

A.    I agreed with it.  I had seen -- I had seen the
product, and there was no comparison.  It was a solid rod
plastic piece, and there -- just didn't look the same at all.

Q.    And the question I meant to ask -- and I
apologize if it wasn't clear -- is, how did you get this?  Who
-- when did you see the letter?  What was the context of you
seeing the letter?

A.    Seeing the letter?

Q.    Yes.

A.    I'm not sure who sent me the letter.  It came
through the office.

| | | |
|---|---|---|
| 14:52:28 | 1 | Q. I see. You described you had seen the product. |
| | 2 | Are you referring to ILight's product? |
| 14:52:42 | 3 | A. Well, it was Newon. |
| 14:52:45 | 4 | Q. We're going to hand you an exhibit that has |
| | 5 | been marked 734 A. You feel do you recognize the item marked |
| | 6 | 734 A? |
| 14:53:01 | 7 | A. Yes, I do. |
| 14:53:03 | 8 | Q. And what is it? |
| 14:53:04 | 9 | A. It's a Newon Open sign. |
| 14:53:08 | 10 | Q. When you said you saw the product, is this the |
| | 11 | sign you are referring to? |
| 14:53:13 | 12 | A. This wasn't the exact sign, but I'm familiar |
| | 13 | with this sign. I believe it was -- it might have been in |
| | 14 | Costco's or something. |
| 14:53:21 | 15 | Q. You describe seeing a sign. Let me back up. |
| | 16 | Did I understand that you did develop your own personal |
| | 17 | opinion about whether or not you infringed? |
| 14:53:30 | 18 | A. Yes. I looked through the product and compared |
| | 19 | it to our product, and I don't see as there was a comparison. |
| 14:53:42 | 20 | Q. Did you study the patent? |
| 14:53:45 | 21 | A. I wouldn't say study. I looked through the |
| | 22 | patent. I'm not a patent attorney, but I looked through it to |
| | 23 | the best of my abilities. And based on what I read, I'm not |
| | 24 | sure exactly when, or if it was at this time, but based on |
| | 25 | what I read on it, I still don't -- I still to this day don't |

think we infringed.

14:54:07 Q.    Could I have the sign back?

14:54:15 Your Honor, I would like to offer 734 A into evidence.

14:54:33 THE COURT:  Without objection, it will be admitted.

14:54:33 BY MR. KITTREDGE:

14:54:37 Q.    Is your employment relationship with Fallon changing?

14:54:40 A.    Yes, it is.

14:54:43 Q.    And how is it changing?

14:54:51 A.    I will be shortly leaving Fallon, pursuing some personal career choices and doing some consultant work and starting my own thing.

14:55:08 Q.    If you are leaving Fallon, why are you sitting at counsel table with us?

14:55:13 A.    Because I developed the product.  It's mine.

14:55:15 Q.    Do you have a personal commitment to the product?

14:55:18 A.    As everything I did at work.

14:55:22 Q.    Do you know what an ISA trade show is?

14:55:23 A.    I'm very familiar with it.

14:55:26 Q.    What is an ISA trade show?

14:55:27 A.    It's the International Sign Association.

14:55:30 Q.    Why are you familiar with the International Sign Association?

14:55:36 A.    Because up until December 31 of this year I sat

656

on the ISA board of directors.

14:55:40    Q.    You are currently on the board of directors?

14:55:43    A.    It ended as of this year, 2009.

14:55:46    Q.    And how long had you been on the board of
directors?

14:55:52    A.    Since 2004.  Affiliated with them since 2000.

14:55:56    Q.    Does the ISA have a trade show in Las Vegas?

14:55:59    A.    It alternates between Las Vegas and Orlando
every other year.  One year it's in Orlando; one year it's in
Vegas.

14:56:08    Q.    So on you are on the board of directors.  Did
Fallon have a booth at that show?

14:56:11    A.    Never.

14:56:12    Q.    Never?

14:56:16    A.    Never.  We never exhibited at the ISA trade
show, ever.

14:56:18    Q.    Why not?

14:56:20    A.    They didn't feel they needed to exhibit at the
ISA trade show because it was for our vendors, not our
customers.

14:56:28    Q.    Who is they?

14:56:29    A.    Fallon.

14:56:32    Q.    Did you want Fallon to attend and have a booth
at the trade show?

14:56:39    A.    I tried repeatedly for years.

14:56:40 1        MR. KITTREDGE:  I have no further questions.

14:56:52 2        THE COURT:  You may cross examine.

14:56:52 3    CROSS EXAMINATION

14:56:54 4    BY MS. HUNTER:

14:56:57 5        Q.    Good afternoon, Mr. Nelson.  My name is Melissa

6    Hunter, and I have a few questions for you.  I understand that

7    you began working at Fallon in 1988; is that correct?

14:57:07 8        A.    I think it was late '88, that's correct.

14:57:09 9        Q.    Late '88.  So a little over twenty years of

10    experience with Fallon?

14:57:12 11        A.    Yes, ma'am.

14:57:14 12        Q.    And between the time that you started working

13    at Fallon and the end of 2003, did you or did anyone at Fallon

14    ever design, or manufacture, or sell any LED products that

15    simulate the appearance of neon?

14:57:35 16        A.    LED products that simulate the appearance of

17    neon?

14:57:37 18        Q.    Yes, sir.

14:57:39 19        A.    No, ma'am.

14:57:41 20        Q.    So no time until after 2003?

14:57:41 21        A.    That is correct.

14:57:44 22        Q.    When was your first sale of an LED sign that

23    simulates neon?

14:57:50 24        A.    I think it was 2004, but don't hold me to that.

25    I don't know when the actual sale was.  I wasn't on the sale

1    side then, I was on the development side.

14:57:56    2         Q.    Is it safe to say it was sometime a little

            3    after 2003?

14:57:58    4         A.    That's correct.

14:58:00    5         Q.    Well, so at some point when you began

            6    developing this idea, this LED product that simulates the

            7    appearance of neon, in fact, that was your goal from what I

            8    understand, you had already actually seen iLight's solution to

            9    this very problem you were trying to solve, hadn't you?

14:58:20   10         A.    I don't recall seeing iLight's solution to this

           11    problem, no.

14:58:25   12         Q.    You don't recall seeing an ILight sign before

           13    sometime in 2004 when you began developing the sign?

14:58:34   14         A.    We started developing in early 2004 so I don't

           15    -- no, ma'am, I don't.

14:58:38   16         Q.    You don't recall.  Can I see Trial Exhibit 19,

           17    please.

14:58:42   18         THE COURT:  Plaintiff's 19?  Are we talking about

           19    Plaintiff's Exhibit 19?

14:58:52   20         MS. HUNTER:  Yes, Your Honor.  It's in evidence.

14:58:52   21    BY MS. HUNTER:

14:58:54   22         Q.    Mr. Nelson, are you able to see this, or would

           23    you like the hard copy?

14:59:03   24         A.    It can see it from here.

14:59:07   25         Q.    Mr. Nelson, this is an e-mail from Tim Fallon

                                                                         659

to Sharon Van Roo; is that correct?

14:59:17  A.    Tim Fallon, yes, that's correct.

14:59:19  Q.    Can you tell me who Sharon Van Roo is?

14:59:22  A.    She was the head buyer at Sam's, I believe, at
the time.

14:59:25  Q.    And I see you are copied on this e-mail?

14:59:25  A.    That's correct.

14:59:27  Q.    So I'm looking right now, and looking in
particular, in the first paragraph, it looks like what's going
on is, at this point in 2003, you were selling this neon Open
sign to Sam's Club, were you not?

14:59:40  A.    Yes, we were.

14:59:43  Q.    And it appears that from this e-mail, am I
reading this correctly, that Sam's Club was deciding to
replace the neon sign with another sign; is that right?

14:59:57  A.    I can't speculate what -- this is what Tim
Fallon wrote.  I don't know what Sharon's expectations were.
It also says, in developing our other technology.  So it
appears we were developing it prior to 2004 as well.

15:00:11  Q.    I understand.  I understand.  My question was,
in particular, that Tim Fallon was contacting the buyer for
Sam's Club, and what he was contacting her about was a sign
that she appears to be replacing the neon sign with; is that
right?

15:00:28  A.    (Respite.)

1          Q.     And I will direct your attention actually to

2     the third sentence in this e-mail.  And if you will read that

3     out loud for me?

15:00:41 4          A.     Previously aware?  Okay.  Highlight it.  Thank

5     you.  I was told that the item you are planning on replacing

6     the oval Open neon with is the same one you and I looked at

7     the SHOPA show.  I don't know what that is.  I wasn't at the

8     SHOPA show.

15:00:58 9          Q.     I understand.  But it looks like in this

10     e-mail, would it be fair to say that one of your biggest

11     customers right here is looking at replacing your neon sign

12     with another sign, a sign seen at a SHOPA show?

15:01:11 13          A.     Well, being Sam's Club, I'm sure they have a

14     thousand people walk through the door every day trying to take

15     business that we've had for 20 years.

15:01:18 16          Q.     I'm sure they do.  And in the very next

17     sentence of this e-mail -- and I realize you weren't the

18     author of this e-mail, but you were copied on it.  At the time

19     were you Vice-President of Engineering?

15:01:25 20          A.     Yes, ma'am; I was.

15:01:27 21          Q.     It looks like, you are right, you say, in

22     developing our alternate technology in the past months, we

23     have looked at a couple of iLight's products?

15:01:35 24          A.     That's correct.

15:01:38 25          Q.     So it's fair to say that, as of the time that

```
 1   you started developing your alternate technology sometime in

 2   late 2003, you had already seen iLight's solution?

 3        A.    Well, Tim Fallon had at the SHOPA show.  I

 4   hadn't.

 5        Q.    You hadn't seen the iLight sign?

 6        A.    No, ma'am.

 7        Q.    But my understanding was, from your testimony,

 8   that you were the person who worked on developing this

 9   alternate technology?

10        A.    Well, I am.

11        Q.    But you didn't look at the iLight sign?

12        A.    Well, I didn't have it available to me.  It was

13   at a SHOPA show.

14        Q.    But this is talking a sign that was examined in

15   the past three months.

16        A.    Well, I personally didn't see it.  Tim Fallon

17   had access to a lot.  He wrote the e-mail.  I can't say as

18   what he did or didn't look at.  I worked off making it as

19   close to the neon as possible because it was a neon

20   replacement.

21        Q.    And let's go down to the very bottom paragraph

22   in this particular page.

23        A.    One of the things, Tim was in St. Louis and I

24   was in South Carolina, too.  So if that helps you understand

25   why some of the things he saw and I didn't see, we were in two
```

different states.

15:02:53   Q.    So I'm sure that there's two -- there are some things that go on that the one party doesn't see that the other does.  But my question is, it's clear that you are developing this alternate technology.  And then we go down to this first couple of sentences and the bottom paragraph, what this says is, we have decided on the alternate technology that we are going to offer.  And based on your testimony that you started in 2004, is this the preliminary stages?

15:03:36   A.    It sounds very similar, yes.

15:03:40   Q.    And then the second sentence you -- Tim Fallon -- pardon me, Tim Fallon writes, this new product will look similar to iLight's Newon.

15:03:53 So sometime as early as December of 2003, or three months prior to that, Tim Fallon and possibly others at Fallon had seen iLight's solution to the problem that is neon signs; is that correct?

15:04:08   MR. KITTREDGE:  Objection, Your Honor.

15:04:10   THE COURT:  Overruled.

15:04:12   THE WITNESS:  Well, at that time there was only few of us left at the Spartanburg facility.  So if I didn't see it, then I can't speak for who else did, but I don't know what Tim physically viewed, took apart, or what he did in St. Louis.

15:04:25   Q.    But someone at Fallon was aware?  Someone who was working on developing the alternative technology?

15:04:31  1          A.      It appears Tim has seen it, yes.

15:04:33  2          Q.      Was Tim involved in developing the alternate

          3   technology?

15:04:36  4          A.      Yes, he was.

15:04:39  5          Q.      He was?  And he didn't pass the information

          6   along to you?

15:04:42  7          A.      Tim didn't pass a lot of information along to

          8   me.

15:04:45  9          Q.      I understand.  You don't have any reason

          10  necessarily to believe that he would be dishonest to one of

          11  your biggest customers?

15:04:51  12         A.      No, I don't.

15:04:57  13         Q.      Okay.  I heard you testify a little bit about

          14  this Exhibit 83 A, the embedded neon sign that was sold to

          15  Sam's Club, and that Sam's Club is also selling it on line?

15:05:09  16         A.      Yes, ma'am.

15:05:12  17         Q.      You said something about inventory.  Are you

          18  still shipping and producing the neon sign for Sam's Club at

          19  this time?

15:05:20  20         A.      We're not producing new product, no.

15:05:22  21         Q.      So they are kind of -- they are selling the

          22  rest of the inventory?

15:05:25  23         A.      That's correct.

15:05:27  24         Q.      Do I understand correctly that they have

          25  switched away from this product altogether?

15:05:32  1     A.      Well, they are still using up the old

       2   inventory, but they have switched to the new product, yes.

15:05:38  3     Q.      They are placing new orders for neon?

15:05:41  4     A.      Correct.  It wouldn't be that neon even if we

       5   were still making neons, because they change every year.

15:05:47  6     Q.      Okay.  Okay.  And you testified that the neon

       7   sign was made in several different places.  Where is your LED

       8   sign manufactured?

15:05:55  9     A.      The LED sign is manufactured at our Shanghai

      10   facility in China.

15:06:05 11     Q.      Now, I'd like to go a little bit back to the

      12   development process.  We saw this e-mail.  If we could bring

      13   back Trial Exhibit 19 just in general.  It's authored December

      14   2, 2003, yet your first sale of an LED product that simulates

      15   neon wasn't until January of 2005; is that right?

15:06:30 16     A.      That's correct.  Well, I don't know when the

      17   first sale it was.  If that's what they are reporting.  Like I

      18   said, I couldn't tell you when the first sale was.

15:06:39 19     Q.      So it was more than a year after you began

      20   developing your alternate technology, according to Tim Fallon?

15:06:47 21     A.      That was when the first production shipped

      22   maybe.

15:06:50 23     Q.      The first production shipped -- I'm sorry?

15:06:54 24     A.      The first production product arrived at Sam's

      25   in 2000, I would speculate.  But it had to have been made --

15:06:59 1          THE COURT:  2000?

15:07:05 2          THE WITNESS:  2005.  The dates that you were saying,

3     2005.

15:07:06 4          MS. HUNTER:  Right, right.

15:07:07 5          THE WITNESS:  That would have been when the production

6     would have arrived at Sam's.  It would have had to have been

7     on a boat or assembled from somewhere else 14 to 15 weeks or

8     20 weeks out, and then there's a 20 week -- or a 12 week

9     tooling time as well.

15:07:23 10    BY MS. HUNTER:

15:07:31 11         Q.    Okay.  Okay.  You also testified about how it

12    was important to have a uniform appearance.  And it's clearly

13    a property of a neon sign for it to look nice and uniform.

14    And you are really not sure exactly how you came about the

15    design.  You just started plugging in LEDs until it gave you a

16    neon sign?

15:07:55 17         A.    Well, no, I believe I said it was based on

18    experience, and experience in the neon industry, with the

19    lighting industry 20 years.  I used the same technology I

20    used, for the same experience I used to lay out a neon backlit

21    sign, and the space and the gaps between neon tubes backlit

22    plate at two inches, and assumed the same principles would

23    apply with the LEDs and just went by that.

15:08:17 24         Q.    And would your basis of experience also include

25    the competitor analysis of other signs?

15:08:23  1          A.     No, not at that level, no.

15:08:28  2          Q.     Not at that level.  And I just have one final

        3   matter to raise.  Well, actually, I would like to get back

        4   Trial Exhibit 728 A.

15:09:00  5          Mr. Nelson, this is the Budweiser sign that you looked

        6   at just a moment ago.  And I would just -- you testified that

        7   about sidewalls.  Are there sidewalls in the red part of the

        8   Bowtie, this red Bowtie that goes around?

15:09:20  9          A.     Do you want me to come down?  Could I come down

       10   there and see what you are talking about?

15:09:32 11          Q.     Yes.  I'm asking specifically about this red

       12   portion that forms the outer -- the Bowtie outline.  Are there

       13   sidewalls in this particular product?

15:10:01 14          A.     There are sidewalls, yes.

15:10:07 15          Q.     And finally Mr. Nelson, you talked a little bit

       16   about Exhibit 40, which is a letter that was sent on behalf of

       17   iLight.  And you mentioned that you -- you did receive the

       18   letter, and that you did conduct an analysis on your own.  You

       19   talked about comparing the product to the product.  And you

       20   really didn't focus a whole lot on the comparison of the

       21   patent, iLight's patent, to Fallon's product; is that correct?

15:10:38 22          A.     Well, I reviewed the patent.  I didn't compare

       23   -- what it is, I reviewed the patent, looked at it, and the

       24   patent matched the product, and I compared the product to the

       25   patent -- or the product to the product.

                                                                    667

15:10:50 1      Q.    Just to make sure I understand, so you compared

2      iLight's product to Fallon's product rather than going

3      directly, comparing the patent?

15:10:59 4      A.    No, that's not what I said.  I compared the

5      patent to iLight's product, and their product matched their

6      patent.

15:11:04 7      Q.    And then from iLight's product to Fallon's

8      product?

15:11:08 9      A.    That's correct.

15:11:10 10     MS. HUNTER:  I think I understand.  Thank you, Mr.

11     Nelson.

15:11:12 12     THE COURT:  Any redirect?

15:11:13 13     MR. KITTREDGE:  Just a couple of questions, Your

14     Honor.

15:11:14 15     REDIRECT EXAMINATION

15:11:14 16     BY MR. KITTREDGE:

15:11:19 17     Q.    When you had a successful LED version of the

18     oval Open sign, did Sam's Club immediately switch out the neon

19     signs?

15:11:27 20     A.    No.  It was an overlap.

15:11:29 21     Q.    Was there a test period?

15:11:31 22     A.    Somewhat of a test period, yes.

15:11:35 23     Q.    Did it go into all of Sam's Club stores during

24     that test period?

15:11:38 25     A.    Not immediately, no.  They never do.

668

15:11:40  1          Q.      And so during that time period, did you

        2   continue selling the neon?

15:11:43  3          A.      That's correct.

15:11:45  4          Q.      Are you still selling -- is Fallon still

        5   selling any neon signs today?

15:11:49  6          A.      Right now I would say the production is about

        7   even.

15:11:51  8          Q.      About even between --

15:11:53  9          A.      LEDs to neons.

15:11:54 10          Q.      Can you give me an example of somebody

        11  purchasing neon signs today?

15:12:06 12          A.      Well, Anheuser-Busch, for instance, in the last

        13  sales meeting, their last six months sales, they bought a

        14  little over 6,000 LED units and over 9,000 neons.

15:12:15 15          MR. KITTREDGE:  That's all I have.

15:12:17 16          THE COURT:  Any recross of this witness?

15:12:19 17          MS. HUNTER:  No, Your Honor.

15:12:21 18          THE COURT:  You may step down, sir.

15:12:24 19          You may call your next witness.

15:12:27 20          MR. KITTREDGE:  Defendant's next witness will be Leah

        21  White.

15:13:07 22          (Witness sworn.)

15:13:10 23          COURT REPORTER:  Please state your full name for the

        24  record and spell it.

15:13:18 25          THE WITNESS:  Leah Ann White. Leah, L-e-a-h, Ann,

A-n-n, White, W-h-i-t-e.

15:13:18  DIRECT EXAMINATION

15:13:18  BY MR. SAWYER:

15:13:30      Q.    Good afternoon, Ms. White.

15:13:30      A.    Hi.

15:13:33      Q.    Can you just tell the jury where you live,
where are you from?

15:13:40      A.    I live in Glen Alpine, North Carolina, a town a
little bit smaller than Cookeville.

15:13:45      Q.    Ms. White, can you tell us who you work for?

15:13:48      A.    Fallon Luminous Products Corporation.

15:13:52      Q.    Okay.  And can you tell us your current title?

15:13:53      A.    CFO.

15:13:56      Q.    And what is CFO?

15:14:00      A.    I'm sorry, Chief Financial Officer.

15:14:07      Q.    And can you give us a little bit of your
educational background after you graduated high school?

15:14:12      A.    I went to the University of North Carolina at
Chapel Hill, and I graduated December of 1980.  And I received
my bachelor of science degree in business administration,
specializing in accounting.

15:14:25      Q.    And can you tell the jury if you have any other
certifications, those kinds of things?

15:14:31      A.    I'm a certified public accountant.  I received
that designation in 1987.  And I've just recently received my

1    Certification in Financial Forensics, my CFF.
15:14:50      2          Q.    You just indicated that you are a CFO of
                    3    Fallon.  When did that employment start?
15:14:55      4          A.    When I started with the company in March of
                    5    2000.
15:14:58      6          Q.    Okay.  Now, can you give us a little bit of
                    7    background of your employment history just from after you
                    8    graduated college to 2000?
15:15:09      9          A.    Let's see.  I started with the American Life
                    10   Insurance Company, then went to work for the Holding Company
                    11   in Atlanta Georgia.  I went to work then for Scientific
                    12   Atlanta in Atlanta, Georgia, wanted to move home.  So I went
                    13   to work for A & E Products Group which is located -- or was
                    14   located in Forest City, North Carolina.  And then from there
                    15   we moved to Phoenix, had a big move to Phoenix.  And then Tyco
                    16   International purchased the company.  When they purchased, I
                    17   operated for my pay-out moved back to Charlotte, went to work
                    18   for Collins & Aikman.  And then from there worked for Briggs
                    19   Plumbing in Duncan, South Carolina, and then finally to
                    20   Fallon.
15:15:59     21          Q.    When you started with Fallon, which you said
                    22   was March of 2000?
15:16:01     23          A.    Correct.
15:16:03     24          Q.    What was your title when you started?
15:16:06     25          A.    Chief Financial Officer.

                                                                          671

15:16:07  1          Q.     Same title as today?

15:16:12  2          A.     Yes, sir.

15:16:19  3          Q.     Okay.  Have you held any other titles at Fallon

       4    besides CFO?

15:16:23  5          A.     Yes, I was also Chief Operating Officer.

15:16:29  6          Q.     And what dates were you -- we know you were CFO

       7    from 2000 until the present.  What dates were you COO?

15:16:35  8          A.     I believe that was around August of 2005

       9    through February of 2008.

15:16:47 10          Q.     And I just want to talk a little bit about the

      11    difference now.  What were some of your responsibilities,

      12    roles, as COO, which is Chief Operating Officer; is that

      13    right?

15:16:57 14          A.     Correct.

15:17:00 15          Q.     So, roles as COO.

15:17:04 16          A.     As COO, I became responsible for engineering,

      17    for manufacturing, distribution, quoting, contract review and

      18    analysis, purchasing.

15:17:21 19          Q.     Okay.  So you were sort of the -- one of the

      20    chief officers at Fallon at that time?

15:17:26 21          A.     Correct.

15:17:30 22          Q.     How about your -- you mentioned agreements.

      23    Does Fallon have any patent license agreements?

15:17:38 24          A.     No, we do not.

15:17:43 25          Q.     Now, I want to talk about CFO.  What are some

```
 1    of your responsibilities as CFO, Chief Financial Officer?
 2         A.    As Chief Financial Officer, I am responsible
 3    for all of the accounts payables, accounts receivables,
 4    payroll, human resources, financial statement consolidations,
 5    budgets, forecasts, internal controls.
 6         Q.    Okay.  That was a lot of stuff.  How about --
 7    when you say financial consolidation, what do you mean?
 8         A.    Every month we prepare our financial
 9    statements, which includes a P & L balance sheet, cash flow
10    statement.
11         Q.    P & L, profit and loss?
12         A.    Profit and loss statement, yes.
13         Q.    And you said budgets and forecasts?
14         A.    Budgets and forecasts.
15         Q.    How often are those prepared?
16         A.    Budgets are prepared annually.  Forecasts we
17    used to prepare quarterly, then we got into a monthly routine
18    with that.  So pretty much monthly now.
19         Q.    And can you -- on the profit and loss
20    statement, the P & L statements that you mentioned, are there
21    sort of categories of numbers or dollars that you typically
22    see in a P & L?
23         A.    Yes.
24         Q.    What are some of those numbers?
25         A.    Let's see.  We have gross sales, which is your
```

top line sales, we have gross margin, operating income, net

income.

15:19:19    Q.    And what's net income?

15:19:25    A.    That's your bottom line profit.  Net profit.

15:19:29    Q.    Is that different than gross profits?

15:19:37    A.    Oh, yes.

15:19:42    Q.    Now, let's talk about gross profits versus net

profits.  What is the difference?

15:19:49    A.    Okay.  I've been doing accounting for a while,

so I don't want to be technical.  Let me --

15:19:54    Q.    Just give a --

15:19:57    A.    Just like your paycheck.  My paycheck is my

take home pay.  I have gross pay and I have take home pay.

From that, I have medical expenses, utilities, house payment,

food, gas, everything else I have to pay for to live, to

exist, and then I have my net cash residual or my net income.

15:20:21    THE COURT:  Before business, the cost of the business

includes the salaries of the people that work for you?

15:20:30    THE WITNESS:  Correct.  That's absolutely right.

15:20:34    BY MR. SAWYER:

15:20:41    Q.    When you say net income, if you were making ten

percent of your -- your net income was ten percent?

15:20:48    A.    Uh-huh.

15:20:50    Q.    If someone asked, a third party wanted ninety

percent of that, is that a relationship that you would want to

1    engage in?

15:20:57    2              A.    Absolutely not.

15:20:58    3              Q.    And why not?

15:21:02    4              A.    I can't afford to give away 90 percent of my

            5    income, my net income.

15:21:10    6              Q.    Okay.  So if there is an analysis between net

            7    income versus gross income, is there a difference there of a

            8    percentage of what you are willing to give a third party?

15:21:21    9              A.    Yes.

15:21:49   10              Q.    Could I have Plaintiff's Exhibit 7.

           11    Plaintiff's Exhibit 7.  We'll just use those.  Great.  Thank

           12    you.

15:22:29   13              Ms. White, do you have Plaintiff's Exhibit 7 in front

           14    of you?

15:22:31   15              A.    I do.

15:22:34   16              Q.    And in April 2005, what position did you have

           17    at Fallon?

15:22:40   18              A.    Chief Financial Officer.

15:22:43   19              Q.    And have you seen this letter before?

15:22:45   20              A.    Yes, I have.

15:22:47   21              Q.    When did you see it?

15:22:52   22              A.    It was around the same time period, first of

           23    April, around the first of April.

15:22:56   24              Q.    Did this letter come to you?

15:22:59   25              A.    No, it did not.

15:23:03   1        Q.     But do you remember receiving it at Fallon?

15:23:04   2        A.     I do.

15:23:06   3        Q.     What, if anything, did you do with that letter?

15:23:09   4        A.     I called our patent attorneys.  They are

  5  located in Greeneville, South Carolina.  And they recommended

  6  that I send this to them immediately, and I did.

15:23:21   7        Q.     Could I have -- that's fine.  You can set that

  8  down.  Plaintiff's Exhibit 40, please.  It has been admitted

  9  already.  I'm going to hand her a copy.

15:23:37 10        A.     Do I have to switch glasses?

15:23:40 11        Q.     Switch to see all those little letters.  Do you

12  recognize this letter?

15:23:45 13        A.     Yes, I do.

15:23:47 14        Q.     And do you remember seeing that letter?

15:23:48 15        A.     Yes, I do.

15:23:51 16        Q.     About when was the first time you saw that

17  letter?

15:23:54 18        A.     About that date, April 14th.

15:23:56 19        Q.     And what is this letter?

15:24:00 20        A.     This is our attorney's response to iLight's

21  attorney that we weren't infringing.

15:24:12 22        Q.     Okay.  Can I have Plaintiff's Exhibit 8,

23  please.  It has been admitted as well.  I will hand you up a

24  copy.  Do you recognize that letter?

15:24:34 25        A.     I do.

15:24:41   1          Q.      And in December 23, 2005 what was your title at

         2    Fallon Luminous?

15:24:47   3          A.      At that time I was both CFO and COO.

15:24:52   4          Q.      When was the first time you saw this letter?

15:24:55   5          A.      I'm thinking it was near the end of 2005, the

         6    beginning of 2006.

15:24:59   7          Q.      And how did you -- I see the letter is not

         8    addressed to you, so how did you end up getting that letter?

15:25:06   9          A.      My attorney sent it to me.

15:25:12  10          Q.      What, if anything, -- I'm sorry, strike that,

        11    Your Honor.  Can I please have Plaintiff's Exhibit 41.  Again,

        12    it has been admitted.  Do you recognize that letter?

15:25:38  13          A.      I do.

15:25:40  14          Q.      And what is that letter?

15:25:44  15          A.      That is a response that our attorney sent to

        16    the iLight attorneys that they were reviewing the patent

        17    applications.

15:25:51  18          Q.      And about that time, did you have any

        19    conversations with the lawyers regarding either this January 9

        20    letter or the December 23 letter?

15:26:00  21          A.      I did.

15:26:01  22          Q.      And what were the substance of those

        23    conversations?

15:26:06  24          A.      Since this was the second receipt from iLight

        25    that we were potentially infringing, I requested that they do

more work and actually prepare an opinion at that point.

15:26:22    Q.    And do you know if an opinion was prepared per your instructions?

15:26:26    A.    It was.  Or they were.

15:26:30    Q.    Can I have Defendant's Exhibit 503, please.

15:26:33    MR. PRICE:  Your Honor, may we approach?  I believe we need to have a conversation.

15:26:36    THE COURT:  Ladies and gentlemen, we're going to excuse you for a few minutes.  Please don't discuss the evidence amongst yourselves until you receive you all of the evidence, the argument of counsel, and the charge of the Court.

15:27:05    (Jury out.)

15:27:09    THE COURT:  All right, counsel.  Does the witness need to be excused?

15:27:12    MR. VEZEAU:  That would be probably a good idea.

15:27:15    THE COURT:  Ma'am, you if you will step out, we'll call you.  The Marshal will come and get you when we are ready for you.

15:27:26    THE WITNESS:  Okay.

15:27:34    THE COURT:  You all can have a seat.

15:27:36    MR. PRICE:  Thank you, Your Honor.  As you know, we filed a motion in limine to exclude the second opinion.  And you also heard Doug Bagin, who was the corporate rep specifically designated to testify about those patent

678

opinions.  And they basically prevented anybody before that
time from testifying about them.  They designated Mr. Bagin to
testify about it, and you heard what he said.  He remembered
little, to anything, of it.

15:28:05    MR. KITTREDGE:  That's correct, Your Honor.  Doug
Bagin was a 30(b)(6) witness.  We understood he had
investigated and he understood more of these opinions, more
than he was able to testify to.  You mentioned yesterday if
there was a witness who could authenticate these opinions, you
might hear the testimony.  And that's why she is here.  She
wasn't identified during discovery --

15:28:30    THE COURT:  No, the discussion yesterday was that he
couldn't identify them, but there was no discussion at that
time whether he was a Rule 306 30(b)(6) witness.  And if you
designate him as a Rule 30(b)(6) witness to speak on behalf of
the corporation, then you are bound by it.

15:28:51    MR. KITTREDGE:  We're done with that issue with this
witness.

15:28:53    THE COURT:  All right.

15:28:57    MR. PRICE:  But that applies to Exhibits 503 and 504?

15:29:01    THE COURT:  I think it was 552 and 553.

15:29:03    MS. HUNTER:  Yes, that was the deposition numbers.
For trial, they are Trial Exhibits 503 and 504.

15:29:08    THE COURT:  Okay.  They will be marked for
identification only.

15:29:29   1          MR. PRICE:  Thank you, Your Honor.

15:29:29   2          THE COURT:  Will there be any further questioning of

        3    this witness?

15:29:29   4          MR. SAWYER:  Could I just check my notes?

15:29:29   5          THE COURT:  Yes.

15:29:32   6          MR. KITTREDGE:  Before you bring the jury back, I

        7    understand --

15:29:34   8          THE COURT:  Pardon?

15:29:35   9          MR. KITTREDGE:  Before you bring the jury back, there

       10    is one issue with the next witness we might address so the

       11    jury won't have to go right back out.

15:29:44  12          THE COURT:  Well, do you think you are done?

15:29:48  13          MR. SAWYER:  I am done, Your Honor.  I apologize.

15:29:48  14          THE COURT:  That's all right.  All right.  What's the

       15    next witness?

15:29:50  16          MR. KITTREDGE:  The next witness is John Hardaway.

       17    He's the lawyer who wrote the letters that we have been

       18    talking about.  And we wanted to present him to explain the

       19    letters.

15:30:01  20          MR. PRICE:  Your Honor, he has never been identified

       21    as an expert.  We have had this same letter identified already

       22    by multiple witnesses.  To put patent counsel up here to

       23    testify for that effect alone is obviously incredibly

       24    cumulative, and we certainly don't want to get in a situation

       25    where Mr. Hardaway is going to offer a quote, unquote, expert

opinion when he has never been so designated.

15:30:25  MR. KITTREDGE:  He has not been designated as an expert witness.  We're not offering him as an expert.  He is a fact witness.

15:30:29  THE COURT:  Well, from the Court's perspective, the letters will speak for themselves.  To the extent that he would be testifying, it appears to be elaborating beyond that he is going to be setting forth reasons other than those stated in defense, stated to the client, that is the basis for the defense in this case.

15:30:57  So -- and beyond that, appears to me that he is basically giving opinion testimony on the merits of the lawsuit.  And actually it's <u>Berry v. City of Detroit</u> where the Sixth Circuit said that you don't allow expert witness to testify on matters that have a distinct legal meaning.  And infringement has a distinct legal meaning.  And whether something infringes is a distinct legal meaning.  So I don't think the testimony would be admissible on several grounds.

15:31:40  MR. KITTREDGE:  The biggest distinction I would make, Your Honor, is that this is a willfulness case, and that makes it relevant.  And he's not testifying about -- it's a subtle distinction, but it's very real one about the case in suit, it's about the analysis that was done at the time.  And we've had witnesses testify about what all kind of documents mean.

15:32:02  THE COURT:  Well, is there going to be any opinion

testimony on the other side challenging, other than the legal
contentions that both sides are going to make about it?  It's
in the record.  You will have the ability to make the argument
as to what the facts set forth in that -- and the reasoning in
that letter is.  I mean, you will be fully be able to present
that in your closing.

15:32:25    MR. KITTREDGE:  Then I've said everything I have to
say.

15:32:28    THE COURT:  Well, on that basis I will sustain the
objection if that's all he's going to testify to.

15:32:33    MR. SAWYER:  Your Honor, I may have one additional
question for Ms. White.  Can I just confer with counsel to
make sure?

15:33:03    THE COURT:  Sure.

15:33:05    MR. SAWYER:  Your Honor, just one more question.  This
is a document that was produced during discovery.  It was not
identified as a trial exhibit, but we would like to present it
for rebuttal.  I will explain quickly the circumstances.

15:33:15    THE COURT:  Okay.

15:33:16    MR. SAWYER:  Mr. Cleaver gave testimony that, after
the January 9th letter, basically, that it was radio silence
from Fallon until they sued us.  And now iLight has told Your
Honor that we should exclude the opinions because they don't
have someone can rely on it, and the implication to the jury
is going to be that we didn't give an opinion, we didn't do

682

anything.

15:33:42   This document that I present to Your Honor is a letter
from Fallon's patent counsel, who is here today -- I can
present this letter with Ms. White, because she is familiar
with it -- in which they reply back in the interim to iLight
and tell them, without a doubt, we've reviewed it, we've done
it, and you don't infringe.

15:34:05   This isn't the opinion.  Now, if Mr. Hardaway was
going to testify, which Your Honor is excluding him, he's
going to say that, in January they engaged us to get an
opinion, and we worked on it, and yes, they did file it before
we completed and gave it to them, gave it to Fallon, but it's
because these things take a long time.  And we offer this as
rebuttal to Mr. Cleaver's testimony that there was basically
radio silence.

15:34:33   THE COURT:  Well, --

15:34:36   MR. SAWYER:  It's just additional correspondence.

15:34:38   THE COURT:  Well, but, see, they are really two
different letters.

15:34:42   MR. SAWYER:  Actually, it's the same letter.  They are
just -- one has notes on it from the attorney.  I thought I
would bring them both.

15:34:53   THE COURT:  No, one talks about filing a declaratory
judgment action.

15:34:59   MR. KITTREDGE:  We can use just the first one, Your

Honor.  We just brought them both for full disclosure of what
we're talking about here.

15:35:08      MR. SAWYER:  Your Honor, it's a letter to Ms. White
from the attorney, just sort of identifying that it went to
Ms. White.

15:35:12      THE COURT:  Yes, but the question -- I mean, we get
back to the issue earlier:  Was this presented during the
deposition of the Rule 30(b)(6) witness.

15:35:25      MR. KITTREDGE:  No, Your Honor.  It was not.

15:35:27      MR. SAWYER:  I'm sorry, I didn't hear Your Honor.

15:35:33      THE COURT:  Was this presented to the -- well, there
are two.  One is to adversary counsel.  So I'm not sure how
the letters to Beres, to Joel Beres, of the plaintiff's
counsel, without it being shown to the company, would be
relevant to show the company's good faith.

15:36:06      MR. SAWYER:  Your Honor, I guess what I would present,
just -- and I really would just like to present the letter
from Mr. Hardaway to Mr. Beres.  And Ms. White can identify
that letter by saying she has received a copy it.  I don't
need that second letter.  And it literally is just like the
other letters, to suggest, you know, that we did have good
faith.

15:36:29      THE COURT:  Let me ask you this.  Other than for the
Beres letter, for the Beres letter, what is the difference
between the Beres letter and what you all have been arguing

here since we have been here?

15:36:38    MR. SAWYER:  I think the difference is, Your Honor,
          our January 9th letter says we're going to further
          investigate.  This letter conclusively states we've done the
          further investigation, and we have concluded.  And this goes
          to the totality of the circumstances of willfulness.

15:36:53    MR. PRICE:  Your Honor, I would note that neither of
          these documents were on any of the exhibit designations for
          this trial.  And we have exchanged multiple ones.

15:37:02    MR. SAWYER:  That's true, Your Honor.

15:37:04    THE COURT:  Well, the thing that I'm concerned about
          is, at the time of the Rule 30(b)(6) deposition
          representative, if this was going to be something that the
          company said we relied upon for our good faith defense, that
          that would have been presented at that time.

15:37:20    MR. KITTREDGE:  It had been produced at that time,
          Your Honor.

15:37:24    THE COURT:  Yes, but I'm talking about the Rule
          30(b)(6) representative would have identified it as something
          that, well, our lawyers told us this, and by golly, that's
          what we were looking at.  And I didn't hear any reference to
          that at all.

15:37:40    MR. KITTREDGE:  They didn't put it in front of you.

15:37:41    MR. PRICE:  That is inaccurate.  He was presented as a
          30(b)(6) witness for the patent case.  They were tried as two

patent opinions.  A very short one right before the lawsuit
was filed and a longer one afterwards.  And with back-up
documents because of that.  That's what was presented at the
30(b)(6).

15:37:56  THE COURT:  Well, you dispute that this -- they are
disputing that this letter was not produced for the Rule
30(b)(6) deposition.

15:38:03  MR. KITTREDGE:  We produced John --

15:38:03  THE COURT:  And I would think --

15:38:03  MR. KITTREDGE:  I apologize.  I didn't mean to speak
over you.

15:38:03  THE COURT:  No, that's all right.  Go ahead.

15:38:07  MR. KITTREDGE:  We produced John Hardaway's entire
file before the 30(b)(6) deposition and just for that
deposition.  And they had it all.

15:38:16  THE COURT:  Well, did you have an opportunity?  Did
you have an opportunity on cross to reflect that --

15:38:30  MR. PRICE:  That's what we received for the 30(b)(6),
Your Honor.

15:38:37  MR. SAWYER:  There is no dispute that this was
produced during discovery; right?  We're not disputing that.

15:38:46  MR. PRICE:  Let him do what he was going to do.

15:38:49  THE COURT:  Are you saying these documents are the
only ones produced?

15:38:53  MR. PRICE:  Yes, sir, Your Honor.

15:38:55 1          MR. KITTREDGE:  I don't understand what is being said

2     here.  What is counsel saying?

15:38:58 3          MR. PRICE:  We have provided him --

15:39:02 4          THE COURT:  The question was, you said we made his

5     file available at the Rule 30(b)(6) deposition.  What they

6     have just handed me is what they represent to the Court that

7     you gave them -- well, this letter is in there.

15:39:21 8          MR. PRICE:  Then it was in there.

15:39:26 9          THE COURT:  Well, was there an opportunity for the

10    defense to -- if, when they asked him about the letters that

11    counsel relied upon, that you could point out the February 6?

15:39:37 12         MR. KITTREDGE:  I had the opportunity to cross him.  I

13    didn't have any questions for him at that time.  I didn't call

14    the witness.

15:39:47 15         THE COURT:  And it's not on the exhibit list?

15:39:50 16         MR. KITTREDGE:  We did not put it on our exhibit list,

17    and we didn't think it was going to matter until Mr. Cleaver

18    testified that there was this period of radio silence.  It was

19    not on our list.  We said that before we showed -- right at

20    the beginning of this conversation.

15:40:30 21         THE COURT:  We'll mark the Beres letter of February 6,

22    2006 for identification only.  And I will decide on its

23    admissibility later.

15:40:41 24         MR. SAWYER:  Would Your Honor like me to, outside the

25    jury's presence, to identify the letter?  If not, we can just

687

move on.  I don't have any further questions.

15:40:49  MR. KITTREDGE:  Does the witness need --

15:40:50  THE COURT:  Well, wait a minute.  I'm confused.  The
Beres letter wasn't written to the witness.

15:40:55  MR. SAWYER:  I realize that, Your Honor.  She will
testify to the fact that it was her communications with the
lawyer that wrote this, and that she was copied on it.  She
got a copy and then reviewed it, saw the letter.

15:41:09  MR. KITTREDGE:  She can authenticate it.

15:41:11  THE COURT:  Well, is there any issue on
authentication?

15:41:14  MR. VEZEAU:  Your Honor, this was the first time -- I
took that deposition.  The corporate representative, Mr.
Bagin, on reliance, we're talking about, now, how did the
corporation rely on so-called opinions?  He was put up as the
guy who knows it all.  And you read -- I think you read part
of the transcript.  He knew little or nothing.

15:41:35  There was no reference to this letter at all because
he didn't remember anything.  And you are absolutely right.
Counsel was there, had a perfect opportunity to refresh his
recollection, and nothing was done.  And that's all we were
given on the reliance witness, for reliance on opinion of
counsel.

15:41:56  Prior to that, when Mr. Nelson was testifying, we were
shut down.  We weren't permitted to ask any questions because

privilege was invoked. And they said, we'll give you a
witness. We'll give you the head of the company, Mr. Bagin.
And You saw what Mr. Bagin knew. He didn't know anything.

15:42:14    THE COURT: I didn't discern anything that was
presented in his testimony that would reflect this in any way.

15:42:22    MR. KITTREDGE: He wasn't asked about it, and his
testimony was very weak.

15:42:26    THE COURT: But if it is significant and if it is
material, one would reasonably expect that the Rule 30(b)(6)
witness would identify it. Do you disagree with that?

15:42:38    MR. KITTREDGE: I completely agree with that. He was
not asked about it now.

15:42:42    THE COURT: But even at the time when you all were
designating the depositions, it seems that this issue would
have come up much earlier. Is this the witness?

15:43:04    MR. KITTREDGE: No, that's the technical expert.

15:43:07    THE COURT: If you've got the document, why would you
challenge the authenticity of the document?

15:43:13    MR. VEZEAU: It's not an authenticity matter, Your
Honor. We don't challenge --

15:43:16    THE COURT: Well, that's all I was asking about, is
whether you contest the authenticity of the document.

15:43:20    MR. VEZEAU: I do not. I do not.

15:43:23    THE COURT: Then we don't need the witness to testify
to authenticate the document. It's just the issue of whether

1    it's admissible or not.

15:43:30    2         MR. VEZEAU:  Correct.

15:43:31    3         THE COURT:  Okay.  Well, I'll mark it for

                4    identification only.

15:43:33    5         MR. VEZEAU:  Thank you.

15:43:35    6         MR. SAWYER:  Thank you, Your Honor.  We don't have

                7    further questions for Ms. White.

15:43:38    8         THE COURT:  Do you have any cross examination?

15:43:40    9         MR. PRICE:  No, we'll stand.

15:43:40   10         THE COURT:  Okay.

15:43:42   11         MR. KITTREDGE:  Your Honor, following Ms. White I

               12    think we have a real short deposition, a transcript or two to

               13    read in, then our next witness is stuck on an airplane.

15:43:52   14         THE COURT:  We'll just adjourn.  We'll just adjourn.

               15         You can bring the jury in, Mr. Marshal.

15:44:29   16         (Jury in.)

15:44:32   17         THE COURT?  Any cross examination of the witness white

               18    on behalf of the plaintiff?

15:44:35   19         MR. PRICE:  No, Your Honor.

15:44:37   20         THE COURT:  All right.  Any further proof on behalf of

               21    the defendant?

15:44:43   22         MR. SAWYER:  Yes, Your Honor.  And we have some

               23    deposition testimony by video clip.  Your Honor, however, the

               24    parties do have some other housekeeping matters on those

               25    deposition designations.

THE COURT:  All right.  Well, we finished the last

witness, and hopefully I think we'll be able to finish one

more, and we'll call it a day.  But I do need additional time

with the lawyers.  I apologize.  That's on me, not them.

Hopefully it will be a short recess.

Please don't discuss the case amongst yourselves until

you receive all of the evidence, the argument of counsel, and

the charge of the Court.

(Jury out.)

MR. LIPSHIE:  Your Honor, I can release Ms. White;

correct?

THE COURT:  Oh, yes.  You're free to go.

Now, which witness is this, and what are the

objections?

MR. PRICE:  Your Honor, I apologize.  We got an e-mail

that Mr. Sawyer sent to us while in trial today saying he was

going to present this this afternoon.  It just took us by

surprise.  We do not even have our sheet with the objections

to articulate it.  We have had discussions with them off and

on about this.  We didn't know they were going to --

MR. SAWYER:  Well, Your Honor, we obviously got cut a

little bit shorter than we thought we would.  We thought we

presented -- we are happy to share the transcript and discuss

them now.

THE COURT:  Well, let me ask you this.  How many more

691

witnesses have we got for the defense?

15:46:45    MR. KITTREDGE:  We have our expert on liability, Mr.
James Slayden, and the inequitable conduct expert.  Oh, I'm
sorry, and our damages expert, Carl Bagin.

15:46:59    THE COURT:  How long is this deposition that's at
issue going to take?

15:47:03    MR. SAWYER:  The deposition designations, Your Honor,
are all, I think --

15:47:09    THE COURT:  No, if they are going to have to read the
depositions to identify their objections, how long is the
deposition they have to read?

15:47:15    MR. SAWYER:  Not very long.

15:47:16    THE COURT:  How long is not very long?

15:47:19    MR. SAWYER:  We could -- I'm not quite sure I'm
answering Your Honor's question, but I'm going to try, which
is we have a few objections to short snippets of deposition
testimony.

15:47:30    THE COURT:  I'll tell you what.  You show them what
you are going to introduce, and I will give you all a chance
to talk, and we'll see how far you get.

15:47:42    MR. SAWYER:  Thank you.

15:47:47    THE COURT:  We're in recess.

15:58:55    (Recess.)

15:58:58    THE COURT:  Any outstanding issues on this last
deposition to be played?

| | | |
|---|---|---|
| 15:59:03 | 1 | MR. SAWYER: Your Honor, we've resolved some of the |
| | 2 | issues. We have a short video clip that we could play, and we |
| | 3 | could read another deposition into the record. There are a |
| | 4 | few deposition designations of some other witnesses that we |
| | 5 | still have outstanding issues of that the parties are pretty |
| | 6 | confident we could work out in the next couple of hours, but |
| | 7 | that means really over the weekend. |
| 15:59:29 | 8 | THE COURT: Well, do we have anything we could show |
| | 9 | the jury for the balance of the day? |
| 15:59:34 | 10 | MR. LIPSHIE: We probably have maybe 25 minutes or so |
| | 11 | that we could do today. |
| 15:59:39 | 12 | THE COURT: Okay. I would like to maximize the time. |
| | 13 | Let's just go ahead and do that. Are you all ready? Are you |
| | 14 | all ready? |
| 16:00:35 | 15 | You can bring the jury in, Mr. Marshal. |
| 16:00:37 | 16 | (Jury in.) |
| 16:00:57 | 17 | THE COURT: You can be seated. |
| 16:01:01 | 18 | You may call your next witness. |
| 16:01:07 | 19 | MR. SAWYER: Defendant calls Sean Callahan by |
| | 20 | deposition. |
| 16:01:13 | 21 | THE COURT: By deposition. |
| 16:01:13 | 22 | (Video playing:) |
| 16:01:43 | 23 | Q. *What's your position at iLight?* |
| 16:01:52 | 24 | A. *My title is president and CEO.* |
| 16:01:55 | 25 | Q. *How long have you had that title?* |

693

16:01:59  1          A.    I believe I've had that title for a little more
           2   than two years.
16:02:06  3          Q.    Have you had a different title at iLight
           4   Technologies?
16:02:08  5          A.    Yes.
16:02:11  6          Q.    What was that?
16:02:15  7          A.    It was either just president or interim
           8   president.
16:02:19  9          Q.    And when was that?
16:02:29 10          A.    That was from the end of May 2006 until August,
          11   that's when I became permanent president and CEO.
16:02:39 12          Q.    When you say August, you mean August 2006?
16:02:42 13          A.    Yes, 2006.
16:02:49 14          Q.    Do you hold any other titles?  Are you a board
          15   member?
16:02:52 16          A.    Yes, director.
16:02:55 17          Q.    Do you have any other titles that -- do you
          18   work for any other companies beside iLight Technologies?
16:03:06 19          A.    I have another company called Shoreland
          20   Capital.
16:03:12 21          Q.    Do you hold a position at Shoreland Capital?
16:03:12 22          A.    Yes.
16:03:13 23          Q.    What position?
16:03:19 24          A.    I think it's managing member of the LLC.
16:03:23 25          Q.    What's the relationship between iLight and

```
        1   Shoreland?

16:03:29   2       A.      Shoreland is an investor -- Shoreland is
        3   affiliated with a fund that's an investor of iLight.

16:03:41   4       Q.      And when was the investment made by Shoreland
        5   to iLight?

16:03:46   6       A.      I believe that was in February of 2006.

16:03:54   7       Q.      At some point did Shoreland make an investment
        8   in iLight?

16:03:59   9       A.      Yes.  Well, the vehicle that's affiliated with
       10   Shoreland.  I mean, technically it wasn't Shoreland Capital,
       11   it was another entity that was set up to make the investment.

16:04:13  12       Q.      Is Image Works your injection molding
       13   specialist?

16:04:19  14       A.      We can do injection molding in a variety of
       15   ways.  One way is working with them.  Another way is -- molds
       16   directly.)))

16:04:27  17       Q.      You have injection molding capabilities at one
       18   of your facilities?

16:04:35  19       A.      We don't, no.  We would contract manufacture
       20   that.

16:04:39  21       Q.      Do you currently sell products that are
       22   injection molded?

16:04:49  23       A.      I'm thinking there's -- some of those Camel
       24   signs still -- that was some of the business we did this year,
       25   and I'm trying to think of other components.  Just bluntly, we
```

1 were hoping we'd be making a bunch of injection molded signs

2 for Anheuser-Busch and other companies.

16:05:12 3     Q.    Except you don't have the capabilities; right?

4           You currently don't do any injection molding in any of

5 your plants?

16:05:25 6     A.    We do not.  We have the capability to do 5,000

7 signs or 300,000 signs or 1 million signs.  It's -- the

8 physical execution of making the signs is not something we do,

9 and it would be a business decision whether we ever want to do

10 that.  The know-how on the capability to manage that process

11 and execute on it successfully is something that we do have.

16:06:08 12     Q.    Exhibit 65?

16:06:11 13     A.    Thank you.

16:06:18 14     Q.    Yes.  All right.  You see I've handed you a

15 document which is marked as Exhibit 65.  Do you see that?

16:06:22 16     A.    Yes.

16:06:24 17     Q.    It's a string of e-mails that iLight produced

18 to us.  At the very top is an e-mail from you, Sean Callahan.

19 Do you see that to Timothy Newhold?

16:06:34 20     A.    Right.

16:06:37 21     Q.    If you flip over to the back of the document,

22 the e-mails go in kind of a string, so it refers back to the

23 first e-mail.  Do you understand that?

16:06:46 24     A.    Yes.

16:06:50 25     Q.    There is an e-mail there that you are cc'd on,

and it says:  Next Tuesday, October 24, I will be presenting

to DIA -- DAI, I'm sorry, -- Subway's parent company.  In this

meeting we will have five prototype signs.  Do you see that?

16:07:09    A.    Yes.

16:07:12    Q.    Do you know if that meeting took place on

October 24?

16:07:15    A.    I have no recollection on that.

16:07:15    Q.    Did you guys sell signs to Subway's parent,

DAI?

16:07:19    A.    We sold -- I don't believe we sold signs there

to them.

16:07:27    Q.    See the second to the last paragraph there, it

says, where do we stand with the two production methods?  Are

we in a position to discuss with customers?  On injection

molding are we concerned about the universe of potential

conflicts and issues?  Do you see that?

16:07:39    A.    Yes.

16:07:42    Q.    Do you know what potential conflicts and issues

they are talking about there?

16:07:49    A.    I don't recall.

16:08:04    Q.    If you go to clip four, two more pages, there

is an e-mail there, it says original, at the bottom of 33454.

It's an e-mail from Sean Callahan.

16:08:15    A.    Uh-huh.

16:08:16    Q.    From Jack _____.  Do you see that?

16:08:17  1          A.     Yes.

16:08:21  2          Q.     It says:  Question.  Where do we stand with the

3     two production methods.  Do you see that?

16:08:24  4          A.     Yes.

16:08:31  5          Q.     And if you go -- flip to the next page, it

6     says, you say:  On injection molding are we concerned about

7     Image Works and potential conflicts and issues.  Do you see

8     that?

16:08:43  9          A.     I'm sorry, which page?

16:08:47 10          Q.     The following page, 33455.  Right there at the

11     top?

16:08:51 12          A.     Uh-huh.

16:08:57 13          Q.     And sorry, go back to 33454.

16:09:00 14          A.     33454?

16:09:01 15          Q.     Yes.

16:09:01 16          A.     Okay.

16:09:06 17          Q.     It says, Tom Cockrell has extensive experience

18     in both vacuum molding and injection molding and is very

19     capable of managing such projects.  Correct me if I'm wrong.

20     Do you see that?

16:09:17 21          A.     Yes.

16:09:19 22          Q.     And then the e-mail before that is an e-mail,

23     looks like, from Mike Marie to you?  Do you see that?

16:09:28 24          A.     Yes.

16:09:34 25          Q.     It said, I personally feel more comfortable

presenting to customers who have demonstrated more competency,

        who are comfortable with the vacuum forming.  Do you see that?

16:09:45    A.    Yes.

16:09:47    Q.    Is it true that you were primarily vacuum

        forming signs at that time?

16:09:52    A.    I don't recall what the mix was.

16:09:53    Q.    Okay.  The very next sentence says, the

        injection molding we have is trivial compared to making

        complex signs.  Do you see that?

16:10:00    A.    Right.

16:10:02    Q.    Does that help you remember the vacuum forming

        with injection molding?

16:10:11    A.    No.

16:10:17    Q.    Then do you see on Page 33453.  Do you see

        that?

16:10:18    A.    Uh-huh.

16:10:20    Q.    There is an e-mail at the bottom there from

        Sean Callahan.  Do you see that?

16:10:23    A.    Yes.

16:10:30    Q.    To you -- from you to Mike Marie.  Do you see

        that?

16:10:31    A.    Yes.

16:10:34    Q.    It says, Tom is an expert on this, so I would

        defer to them.  And you go on to say, he has told me that

        making injection molding sign similar to those at Fallon would

```
  1    be trivial for him.  Do you see that?
16:10:45  2         A.     Yes.
16:10:48  3         Q.     And the reference to Fallon there is the
  4    defendant in this case?
16:11:00  5         A.     Yes.
16:11:04  6         MR. SAWYER:  Your Honor, that's the video testimony
  7    for Mr. Callahan.  We have another witness to call by
  8    deposition, if you would like.
16:11:13  9         THE COURT:  All right.  I take it that included all
 10    that you wanted?  All right.  You may call your next witness.
16:11:23 11         MR. SAWYER:  The defendants call David Wayne Nagle
 12    from the law firm of Stites & Harbison.  Ladies and gentlemen
 13    of the jury, I will read this one.  We don't have a video
 14    clip.  And I'm going to say question, and then answer.  So I
 15    hope you can follow me.
16:11:47 16         Question.  Mr. Nagle, can you state your full name for
 17    the record.
16:11:56 18         Answer.  David Wayne Nagle, Junior.
16:11:59 19         Question.  Are you affiliated with the law firm of
 20    Stites and Harbison?
16:12:04 21         Answer.  Yes, I am.
16:12:08 22         Question.  What is your relationship to Stites and
 23    Harbison?
16:12:15 24         Answer.  I'm a member or a partner of the firm.
 25         Question.  Do I understand correctly that you are a
```

registered patent attorney?

16:12:23    Answer. Yes, I am.

16:12:27    Question. Have you practiced as a patent attorney anywhere beside Stites & Harbison?

16:12:34    Answer. Yes, I practiced with Wheat, Smith & Barris, and Wheat, Smith & Barris merged into Stites & Harbison.

16:12:46    Question. And did you start with Wheat, Smith & Barris out of law school?

16:12:49    Answer. Yes.

16:12:51    Question. How long ago was that?

16:12:56    Answer. I graduated from law school in '98. I started with Wheat, Smith & Barris in February of '97.

   Question. I -- on the first page of Exhibit 2, it indicates that this law firm, Vance Smith and David Nagle, were responsible for prosecuting this patent. Do you see that?

16:13:18    Answer. Yes, I do.

16:13:20    Question. What was your role in the preparation or prosecution of the patent that is marked as Exhibit 2?

   Answer. I was not involved in the preparation of the actual application, but assisted Vance, and at some point during the process assumed responsibility for prosecuting the applications.

16:13:42    Question. Do you know if you assumed responsibility while the '238 Patent was still pending?

16:13:48  1          Answer, yes, I did.

16:13:51  2          Question.  Do I understand from your earlier testimony

          3     that you were not involved in the preparation of the

          4     provisional patent application that is Exhibit 1?

16:14:00  5          Answer.  I was not.

16:14:04  6          Question.  Did you help prepare or were you involved

          7     in the preparation of the -- not the provisional patent

          8     application, but the patent application that became the '238

          9     Patent?

16:14:15  10         Answer.  I was not involved in the original

          11    preparation.

16:14:24  12         Question.  If you could take just a few minutes and

          13    flip through the file wrapper of the '238 Patent and tell me

          14    -- if you can tell when you believe you took over prosecution

          15    of the patent application that became the '238 patent?

16:14:44  16         Answer.  Well, I -- My recollection is, when the

          17    initial office action issued in this case, Vance Smith

          18    prepared the response, but I did look at it and talked with

          19    him about it at that time.  And that was when I was introduced

          20    to this application.

16:15:00  21         Question.  So it was sometime after the response to

          22    the initial office action that you would have taken over the

          23    full responsibility for the prosecution of the '238 Patent?

          24         Answer.  Correct.

16:15:14  25         Question.  All right.  Put that aside.  I'm going to

1    hand you a document that has previously been marked as

2    Defendant's Exhibit 8, which is an office action from the file

3    history of the '238 Patent.  And my question, Mr. Nagle, is,

4    is Defendant's Exhibit 8 the office action that you were

5    referring to just a moment ago?

16:15:38    6         Answer.  Yes, it would appear to be this office

7    action.

16:15:44    8         Question.  I'm going to draw your attention to the

9    page of Exhibit 8 with the production number ending with this

10   numbers 13198.

16:15:55    11        Answer.  Yes.

16:15:58    12        Question.  The underneath, the -- do you see the

13   section at the top where they are quoting some of the statute?

14   Underneath that section.  The second sentence where it says,

15   Slayden discloses.  Do you see that?

16:16:12    16        Answer.  Yes, I do.

16:16:16    17        Question.  Quote:  Slayden discloses an illuminated

18   device for simulating neon lighting comprising a substantially

19   rod-like waveguide, 10, having a predetermined length, close

20   quote.  I read that correctly, didn't I?

16:16:32    21        Answer.  Yes, you did.

16:16:36    22        Question.  Do you remember discussing this rejection

23   of the '238 Patent application with Mr. Smith?

16:16:46    24        I don't have any specific recollection of that, no.

16:16:49    25        Question.  Do you have any recollection of discussing

the Slayden reference with Mr. Smith during the prosecution of

the '238 Patent?

16:16:59    Answer.  I am familiar with the Slayden reference, but

I don't have any recollection of any specific conversation

about the Slayden reference.

16:17:08    Question.  I'm going to hand you a document previously

marked as Defendant's Exhibit 9.  Do you recognize this

document?

16:17:19    Answer.  Yes.  This appears to be the response to this

office action that was marked as Exhibit 8.

16:17:26    Question.  And do I understand correctly that Mr.

Smith prepared this response?

16:17:34    Answer.  To the best of my recollection, yes.

Question.  And that he may have discussed it with you,

but you otherwise had no real involvement in preparing the

response that has been marked as Exhibit 9?

16:17:47    Answer.  I may have, I may have done so, or talked to

him about the act, I mean, this response.  I may have done

some proofreading of it, but I did not draft -- I did not

draft it.

16:17:59    Question.  Draw your attention to the page of Exhibit

9 that end with the production number 13220.

16:18:08    Answer.  220?  Yes.

16:18:12    Question.  If I could read the second full paragraph,

or maybe not the full paragraph, but do you see where it says,

quote, as the above discussion, end quote.

16:18:21  Answer.  Yes, I do.

16:18:27  Question.  All right.  Quote:  As the above discussion points out, comma, to achieve the desired light intensity and uniformity, comma, the rod must preferentially direct light along its length while also urging the light out of the lateral surface, period.  This requires an essentially solid rod with optical waveguide and light scattering characteristics, period.  Neither sided art reference teaches or suggests the use of an essentially solid rod, close quote.  Did I read that correctly?

16:19:08  Answer.  Yes, you did.

16:19:11  Question.  Do you recall discussing with Mr. Smith the fact that the invention of the '238 Patent requires a solid rod?

16:19:19  Answer.  Yes.

16:19:22  Question.  And what was that discussion?

16:19:26  Answer.  What I remember that we talked about in these references, we talked about the invention, can't say it was at the time preparing this response, but I do recollect discussing, just talking about what iLight was trying to achieve with its products.

16:19:42  Question.  And the fact that it required a solid rod?

  Answer.  Yes.

16:19:47  Question.  Let's go ahead and look at the previously

marked Defendant's Exhibit 10.  Do you recognize Exhibit 10?

Answer.  Yes. U.S. Patent 6,361,186.

Question.  This is the Slayden reference that was used
by the examiner to reject patent claims in the office action
that has been marked as Exhibit 8; is that correct?

Answer.  That is correct.

Question.  -- I'm sorry, question.  It also -- It's
also the Slayden reference that is addressed in response to
the office action which has been marked as Exhibit 9 in a text
we just read into the record; is that correct?

Answer.  Yes.  That is correct.

Question.  Now, if you turn to page -- actually, turn
to figures two and four of the Slayden reference, Exhibit 10?

Answer.  Okay.

Question.  You understand that those are
cross-sectional profiles of the light emitting member of the
Slayden patent?

Answer.  Yes, they appear to be cross section.

Question.  And by reviewing these, is it your
understanding or your belief that the interior space on figure
two represents a hollow space?

Answer.  Yes.

Question.  Look at the space -- the interior space of
figure two.  Is it your belief that it is a hollow space?

Answer.  Yes, it is.

16:21:23    1          Question.  And is it your belief that, because of that

            2   hollow space, this embodiment of the light transmitting member

            3   of the Slayden patent is not a solid rod?

16:21:32    4          Answer.  Yes.

16:21:36    5          Question.  Now, if we turn to the embodiment depicted

            6   in figure four of the Slayden reference, again, we see some

            7   interior space.  Is it your belief and understanding from the

            8   Slayden reference that the interior space we know, where you

            9   see the number 21 and 23 is empty open space as well?

16:21:53   10          Answer.  Yes.

16:21:57   11          Question.  Now, you might call that hollow.  You might

           12   not, because it's closed.  I'm sure if you would call that

           13   hollow or not -- would you?

16:22:07   14          Yes, I would still call it hollow.

16:22:10   15          Question.  And because of that empty space, it's your

           16   belief and understanding that the embodiment of the Figure 4

           17   of the Slayden reference is not a rod as required by the

           18   invention in the '238 Patent?

16:22:27   19          Answer.  Yes.

16:22:28   20          THE COURT:  Does that constitute it?

16:22:31   21          MR. SAWYER:  That concludes.  Thank you, Your Honor.

16:22:34   22          THE COURT:  Is there any other proof that can be

           23   presented today?

16:22:36   24          MR. KITTREDGE:  Not today, Your Honor.  Our next

           25   witness will be here Monday morning.

16:22:40 1          THE COURT:  All right, ladies and gentlemen.  We're

2     going to call it a day.  Please don't discuss the evidence

3     amongst yourselves or with anyone else until you receive all

4     of the evidence, the argument of counsel, and the charge of

5     the Court.  If you will give your notepads to the Marshal, he

6     will take custody of them until Monday.  I will ask you to

7     come Monday at shortly before 9:00, we'll try to get started

8     promptly.  I expect we'll move the case along efficiently and

9     it won't be much longer hopefully.  Are there any other

10    matters for the jury?  You are free to go.  The other Marshal

11    will collect your notebooks if you have any of those.

16:23:16 12         MR. VEZEAU:  Your Honor, there may be one more matter.

13    That was clarifying on Tuesday what's going to happen.

16:23:20 14         THE COURT:  We'll take that up on Monday.

16:23:25 15         MR. VEZEAU:  We have some witnesses flying out this

16    weekend.

16:23:27 17         MR. PRICE:  May we approach, Your Honor?

16:23:36 18         THE COURT:  I will ask all the jurors to go except Mr.

19    Whitehead.  If you will stay, Mr. Whitehead.  All the other

20    jurors can go.

16:24:07 21         All right.  Mr. Whitehead, if you will step out just

22    for one second, but stay close, because you will be coming

23    back.

16:24:12 24         (Jurors out.)

16:24:15 25         THE COURT:  You all can have a seat.

16:24:19  1          How many witnesses do you all -- would the Court be

       2   hearing on this materiality of the omission of this lawsuit?

16:24:27  3          MR. KITTREDGE:  It's a defendant's affirmative

       4   defense.  We're going to present one witness.

16:24:32  5          THE COURT:  One witness?  How long is the direct

       6   examination going to take?

16:24:36  7          MR. KITTREDGE:  A small deposition, so --

16:24:38  8          THE COURT:  Well, how long is the direct examination

       9   of this one witness going to take?

16:24:43 10          MR. KITTREDGE:  An hour?  About an hour.

16:24:46 11          THE COURT:  How long is the excerpt of the deposition

      12   that he just referred to going to take?

16:24:52 13          MR. SAWYER:  Probably half of what I just read, Your

      14   Honor.

16:25:10 15          THE COURT:  Okay.  We can bring Mr. Whitehead back in.

16:25:10 16          (Juror in.)

16:25:14 17          THE COURT:  Mr. Whitehead, the Court wants to inquire,

      18   if we release you from approximately 11:30 until 2:00 or 1:30,

      19   in terms of any personal presentation that you would have to

      20   make, would that allow you time to do that?

16:25:39 21          THE JUROR:  No, sir, it really won't.  But Your Honor,

      22   I'm one person, and we've got a lot at stake here, I know.

      23   We've got two banks, we're in good shape compared with a lot

      24   of the rest.  I don't think we'll fail because of this.

16:25:56 25          THE COURT:  Okay.  Well, the Court greatly appreciates

your accommodating us.  We were going to try to accommodate
                 you, but it's a delicate balance.
16:26:05    3         THE JUROR:  I appreciate that.
16:26:06    4         THE COURT:  I know how much you would like to be
            5    there, but my thought was we could get you there for a good
            6    part of it, that that might allay your concerns about not
            7    being there at all.
16:26:18    8         THE JUROR:  My meeting is really out of town, it's in
            9    another town, but we'll make it fine.  We'll just arrange.
16:26:23   10         THE COURT:  All right.  Well, i appreciate it.  Thank
           11    you very much, Mr. Whitehead.
16:26:31   12         Does that resolve it for everybody?
16:26:34   13         MR. KITTREDGE:  Does that mean we're going to --
16:26:37   14         THE COURT:  We'll go on schedule.  We'll take a recess
           15    at 11:30 and go until, I guess about 1:30.  The jurors will
           16    get a long lunch, but the lawyers won't.
16:26:46   17         MR. PRICE:  Just for clarity, we will -- on that day
           18    we also have a responsive expert witness.  And Mr. Nagle may
           19    personally appear.
16:26:56   20         THE COURT:  Okay.  How long do you think your rebuttal
           21    proof on that -- your responses to it will be?
16:27:02   22         MR. VEZEAU:  I have a sense, Your Honor, both
           23    witnesses will probably be about an hour and a half.
16:27:08   24         THE COURT:  Combined or individually?
16:27:11   25         MR. VEZEAU:  Yeah, combined.  But we also have a

                                                                        710

```
        motion pending before Your Honor to strike that.  It's one of
     2  our motions in limine.

16:27:22 3          THE COURT:  Well, the motion in limine to exclude any
     4  evidence -- it appeared to me that, if that's an affirmative
     5  defense, that's a cognizable affirmative defense, isn't it?
     6  My understanding of patent law.

16:27:41 7          MR. VEZEAU:  It must be pled, Your Honor, yes.  The
     8  problem is, it was not pled at all.

16:27:57 9          MR. PRICE:  In other words, Your Honor, inequitable
    10  conduct must be pled with particularity.  Here not only was it
    11  not pled in particularity, it wasn't pled at all.

16:28:10 12         THE COURT:  Well, they make a reference to statements
    13  and a witness statement that puts you on notice, and, in fact,
    14  one of your expert witnesses responded to it, so that you had
    15  actual notice.

16:28:23 16         MR. PRICE:  There is no dispute, Your Honor, that in
    17  the second supplemental, some report after close of the
    18  discovery he first raised this.

16:28:31 19         THE COURT:  Who first?

16:28:33 20         MR. PRICE:  Their expert, after close of discovery.

16:28:35 21         THE COURT:  And when was this?  What's the date of
    22  this expert's report?

16:28:38 23         MR. PRICE:  I want to say November 11th, but I could
    24  be off a day or two.

16:28:41 25         THE COURT:  Do you dispute that?
```

MR. KITTREDGE:  No, I do not.  But, Your Honor, the

     2    expert reports were produced.  They had no trouble getting

     3    their own expert.  They weren't surprised by this, their

     4    expert was ready, and he produced a report back, a rebuttal

     5    report.  Those are the two experts he just had.  They have

     6    been fully engaged.

16:29:08   7            THE COURT:  Well, I mean, but it seems -- the key, to

     8    me, is whether a party had an opportunity to conduct discovery

     9    on it.  If it was disclosed during discovery, and the party

    10    had an opportunity to conduct discovery on it, then there is

    11    no question of fairness.

16:29:22  12            MR. KITTREDGE:  And that's what we have here.  Both

    13    sides have full expert reports.

16:29:26  14            THE COURT:  But he's saying that you all didn't

    15    disclose this until after discovery, so that they didn't have

    16    any discovery on this.  They may have gotten an expert to

    17    respond, but they didn't get a chance for discovery.

16:29:37  18            MR. PRICE:  That's correct.

16:29:39  19            MR. KITTREDGE:  Let me explain, Your Honor.  The

    20    expert report was served within a matter of days after the

    21    deposition of Mr. Nagle.  And it was the deposition of Mr.

    22    Nagle that raised this specific defense.  And we supplemented

    23    the report as quickly as we can, and they had a full

    24    opportunity to respond.  And any other discovery -- we're

    25    talking about activities that are all within the plaintiff's

control.  Any other discovery into this defense is -- they
have it.  It's them.  There is no discovery from us on.  The
issue is whether or not they understand the defense we're
raising.  And they fully understand it.  The issues have been
fully engaged.

16:30:19    They never objected to the expert report.  We didn't
object to their expert report.  We all know what it's about.
It's just a question of whether the Court hears those experts,
read their transcripts.

16:30:30    MR. PRICE:  Your Honor, there is one additional point
on that.  Both sides had the burden to prove, to present their
experts on the issues on which they bear the burden of proof,
and I believe it was in mid-October, somewhere in that time
frame.  We did get a report from Mr. Stoner at that time
regarding a different issue, which they have since abandoned.
It wasn't until November 11th or so, after the November 7th
discovery cut-off that for the first time we submitted a
supplemental report raising the '970 patent litigation
disclosure issue for the first time.

16:31:07    Once again, after discovery, after the deadline.  And
there still has been no motion for leave filed to date.

16:31:12    THE COURT:  Well, I was looking at final pretrial
order.  They asserted it as a defense in the final pretrial
order.  Usually pleadings are amended to conform to the
pretrial order.

16:31:25 1         MR. PRICE:  You are absolutely right.  If you note in

2 there, we had the normal supplant language, and then two

3 paragraphs for each of the parties.  There we specifically

4 contested this issue of supplanting.  And there was dialogue

5 going back and forth because of that particular supplanting

6 language.

16:31:44 7         THE COURT:  Wherein is the prejudice by allowing this,

8 given that both sides have got experts?

16:31:49 9         MR. PRICE:  We do not dispute, Your Honor, that when

10 the issue was finally brought, we, of course, took appropriate

11 measures and responded in kind.  And we're not going to

12 contest otherwise.  But that does not take away from their

13 obligation to plead what is a very serious allegation with

14 specificity.

16:32:08 15         THE COURT:  What if we handle it this way.  What if

16 the Court takes its expert proof, I will allow you to, in

17 effect, make your Rule 50 motion at the conclusion of their

18 proof, and we'll look at that as to whether it states the

19 particularities required for the claim as well, I guess, as

20 the intent issue.  And we'll see where it is at that point.

16:32:32 21         MR. PRICE:  I think that's fair, Your Honor.

16:32:34 22         MR. VEZEAU:  We're going to do that, and

16:32:36 23 particularly --

16:32:40 24         THE COURT:  Given the fact that you all filed a

25 responsive report, and there is no actual prejudice, like

Judge Morton used to tell me when I tried cases, I don't want
to see this case twice.  So I don't want to have this case
come all the way back on account of we didn't hear their
unclean hands defense, or whatever it is.  And I would be more
inclined to just let it in, and then we'll evaluate it.

16:33:08    MR. KITTREDGE:  It's all scripted testimony, Your
Honor.

16:33:08    MR. PRICE:  That's true.

16:33:11    MR. KITTREDGE:  We exchanged scripts.  There aren't
any objections.

16:33:19    MR. PRICE:  So we will have Mr. Godici, and we will
have Mr. Nagle.

16:33:22    THE COURT:  Okay.  That's fine.  And what we may do,
with the defense proof, we may go with the jury until maybe1
2:00, and then put the other proof on for the rest of the day,
just in the event that about 1:30 we are not through and it
runs little bit longer than everybody contemplates.

16:33:36    MR. PRICE:  Fair enough.

16:33:38    MR. KITTREDGE:  So we're going to have the jury until
2:00?

16:33:42    THE COURT:  Probably the jury until about 2:30.  I
would like to get in as much proof as I can.  It depends on
where the proof is at around 2:00.  If we're at a good
breaking point, we'll break.  If we need to go a little bit
longer or whatever.  We'll just see where we are.

16:33:52  1          MR. KITTREDGE:  Thank you.

16:33:52  2          MR. PRICE:  Thank you.

16:34:11  3          THE COURT:  All right.  We're in recess until Monday

          4  morning at 9:00.

16:34:14  5                              * * * * *

16:34:14  6

16:34:14  7

16:34:14  8

16:34:14  9

16:34:14  10

16:34:14  11

16:34:14  12

16:34:14  13

16:34:14  14

16:34:14  15

16:34:14  16

16:34:14  17

16:34:14  18

16:34:14  19

16:34:14  20

16:34:14  21

16:34:14  22

16:34:14  23

16:34:14  24

16:34:14  25

```
16:34:14  1                    REPORTER'S CERTIFICATE

16:34:14  2

16:34:14  3          I, Peggy G. Turner, Official Court Reporter for

16:34:14  4    the United States District Court for the Middle

16:34:14  5    District of Tennessee, with offices at Nashville, do

16:34:14  6    hereby certify:

16:34:14  7          That I reported on the Stenograph machine the

16:34:14  8    proceedings held in open court on April 24, 2009, in the

          9    matter of ILIGHT V. FALLON, Case No. 2:06-0025; that said

         10    proceedings in connection with the hearing were reduced to

         11    typewritten form by me; and that the foregoing transcript,

         12    Pages 472 through 716, is a true and accurate record of said

         13    proceedings.

16:34:14 14          This the 15th day of May, 2009.

16:34:14 15

16:34:14 16

16:34:14 17

16:34:14 18                           _____
                                      S/Peggy G. Turner, RPR
16:34:14 19                           Official Court Reporter

         20

16:34:14 21

16:34:14 22

16:34:14 23

16:34:14 24

16:34:14 25
```

717