08:34:05  2       MIDDLE DISTRICT OF TENNESSEE, COOKEVILLE DIVISION

08:34:05  3   ------------------------------------------------------------

08:34:05  4   ILIGHT TECHNOLOGIES,            )

08:34:05  5                   Plaintiff,     )

08:34:05  6                                  )

08:34:05  7   v.                             )  CASE NO. 2:06-0025

08:34:05  8                                  )

08:34:05  9   FALLON LUMINOUS PRODUCTS,      )

08:34:05  10                  Defendant.     )

08:34:05  11  ------------------------------------------------------------

08:34:05  12                  TRANSCRIPT OF PROCEEDINGS

08:34:05  13                       VOLUME VII

08:34:05  14  ------------------------------------------------------------

08:34:05  15  DATE:              April 28, 2009

08:34:05  16  TIME:              9:00 A.M.

08:34:05  17  BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

08:34:05  18                     And a Jury

08:34:05  19  ------------------------------------------------------------

08:34:05  20

08:34:05  21

08:34:05  22
              COURT REPORTER:    PEGGY G. TURNER
08:34:05  23                     OFFICIAL COURT REPORTER
                                 801 BROADWAY, ROOM A-837
08:34:05  24                     NASHVILLE, TENNESSEE 37203
                                 PHONE:  (615)726-4893
08:34:05  25                     Peggy_Turner@tnmd.uscourts.gov

```
08:34:05   1                    A P P E A R A N C E S:

08:34:05   2   For the Plaintiff:   Timothy J. Vezeau
                                     Stephen Price
08:34:05   3                         Melissa Hunter
                                     John Scruton
08:34:05   4
               For the Defendant:   Mark Kittredge
08:34:05   5                         Jonathan Rose
                                     Samuel Lipshie
08:34:05   6                         Douglas sawyer
                                     Brandy McMillion
08:34:05   7

08:34:05   8

08:34:05   9

08:34:05  10

08:34:05  11

08:34:05  12

08:34:05  13

08:34:05  14

08:34:05  15

08:34:05  16

08:34:05  17

08:34:05  18

08:34:05  19

08:34:05  20

08:34:05  21

08:34:05  22

08:34:05  23

08:34:05  24

08:34:05  25
```

971

```
08:34:05  1                    W I T N E S S E S:

08:34:05  2   VICTOR ROBERTS (Rebuttal)
              Statement of Dr. Roberts                 Page  996
08:34:05  3   Cross Examination by Mr. Kittredge       Page 1010
              Redirect Examination by Mr. Scruton      Page 1055
08:34:05  4   Recross Examination by Mr. Kittredge     Page 1067

08:34:05  5

08:34:05  6

08:34:05  7

08:34:05  8

08:34:05  9

08:34:05  10

08:34:05  11

08:34:05  12

08:34:05  13

08:34:05  14

08:34:05  15

08:34:05  16

08:34:05  17

08:34:05  18

08:34:05  19

08:34:05  20

08:34:05  21

08:34:05  22

08:34:05  23

08:34:05  24

08:34:05  25
```

```
08:34:05   1                P R O C E E D I N G S

09:04:56   2        THE COURT:  Are there any preliminary matters before

           3   we get started, either side?

09:05:01   4        MR. PRICE:  Your Honor, we are not going to ask any

           5   more questions of Mr. Degen.  After a little more reflection,

           6   we realized we can eliminate that last line of questioning.

09:05:11   7        THE COURT:  All right.  I want to first -- I'm sorry,

           8   any matters from the defense?

09:05:14   9        MR. LIPSHIE:  Go ahead, Your Honor.

09:05:16  10        THE COURT:  I want to apologize for the jury -- the

          11   draft of the jury instructions that went out.  There was a

          12   breakdown in communications somewhere.  But I will get to you

          13   all a more meaningful draft sometime today.  But I apologize

          14   for what got distributed.

09:05:32  15        Are there any other preliminary matters before we

          16   bring the jury in?

09:05:35  17        MR. LIPSHIE:  Your Honor, I think we can probably go

          18   ahead and offer into evidence Mr. Degen's exhibits before they

          19   come in.

09:05:46  20        THE COURT:  Well, let's do it in their presence.  We

          21   can do that in their presence.

09:05:47  22        MR. LIPSHIE:  We can what?

09:05:49  23        THE COURT:  We can do that in the jury's presence.  We

          24   can move their admission.  Any other matters

09:05:51  25                        ?
```

Case 2:06-cv-00025   Document 288   Filed 05/20/2009   Page 4 of 149

09:06:21 1          You can bring the jury in, Mr. Marshal.

09:06:31 2          (Jury in.)

09:06:32 3          THE COURT:  Good morning, ladies and gentlemen of the

4       jury.

09:06:42 5          Any further questions of the last witness, either

6       side?

09:06:45 7          MR. PRICE:  No further questions, Your Honor.

09:06:47 8          THE COURT:  Any from the defense?

09:06:49 9          MR. LIPSHIE:  No redirect, Your Honor.  But at this

10      time we would like to go ahead and move for admission into

11      evidence any exhibits that were identified and utilized by Mr.

12      Degan, and we would offer Exhibits 44, 541, 956, 957, 958,

13      959, 960, 961, 962, 963, 964, Exhibit 1010, Exhibit 1011,

14      Exhibit 1037, Exhibit 1039, Exhibits 1040 through 1049,

15      inclusive, and Exhibit 735 into evidence.

09:07:37 16         THE COURT:  Without objection, they will be admitted.

17      The defense may call its next witness.

09:07:46 18         MR. SAWYER:  Your Honor, the defense calls by video

19      deposition Ms. Elizabeth Randgaard, the director of marketing

20      of iLight.

09:08:20 21         THE COURT:  All right.

09:08:20 22         (Video playing:)

09:10:04 23    Q.    Good afternoon, Ms. Randgaard.

09:10:06 24    A.    Good afternoon.

09:10:08 25    Q.    Could you just please state your full name and

```
 1   spell your last name.

 2        A.   Sure.  It's Elizabeth Marie Randgaard, and my

 3   last name is spelled R-a-n-d-g-a-a-r-d.

 4        Q.   Okay.  Ms. Randgaard, what city and state do

 5   you live in?

 6        A.   I live in Evanston, in Illinois.

 7        Q.   Ms. Randgaard, what -- do you currently have a

 8   position at iLight?

 9        A.   Yes, I do.

10        Q.   Okay.  And what is that position?

11        A.   As director of marketing.

12        Q.   And how long have you had that position?

13        A.   I have been with the company for quite sometime

14   and held different positions with the company.

15        Q.   Okay.  And first, when did you start with

16   iLight?

17        A.   I started with iLight when it became iLight.

18   So back in 2000.

19        Q.   2000.  Okay.  So I take it you were one of the

20   first employees of iLight?

21        A.   I was the third employee.

22        Q.   And what was your title in 2000?

23        A.   In 2000, I believe that it was Director of

24   Marketing.

25        Q.   Okay.  Do you have a general understanding of
```

```
 1    Plexineon patents, what you refer to as the Plexineon patents
 2    and the surrounding patents cover?
 3         A.    Very generally I do.
 4         Q.    And what's your general understanding?
 5         A.    LEDs behind a diffuser, creating light.
 6         Q.    See this is an e-mail that has been marked
 7    Exhibit 76 from you to Joseph Yoon?
 8         A.    Yes.
 9         Q.    Do you know Joseph?
10         A.    Yes.
11         Q.    Who is Joseph?
12         A.    A former iLight employee.
13         Q.    What was Joseph's position?
14         A.    He handled some aspects of sales.
15         Q.    In his e-mail to you he says:  We definitely
16    need a nice Fallon-type Open sign.  The generic one just
17    doesn't excite anyone.  Do you see that?
18         A.    Yes.
19         Q.    Then you respond, you say:  I know Eric is
20    working on a similar one at Fallon and Everbright.  Do you see
21    that?
22         A.    Yes.
23         Q.    Is that Eric Eriksson?
24         A.    I would believe that's referring to Eric
25    Eriksson.
```

09:12:35  1          Q.      And he was working on a similar one to the

       2   Fallon Open sign?

09:12:42  3          A.      Yes, I think what he's referring to is design,

       4   with the little swoosh marks.

09:12:50  5          Q.      Do you know -- do you understand what specific

       6   design elements were patented?

09:12:57  7          A.      I have a very generic idea of our patents.  I

       8   don't know the specifics of them.

09:13:02  9          Q.      What's your generic idea?

09:13:05 10          A.      I think I said this earlier, we have a

       11   waveguide, and we have LEDs behind it that creates LED light.

09:13:21 12          MR. KITTREDGE:  Your Honor, that's our last witness.

       13   The defense rests.

09:13:24 14          THE COURT:  All right.  Ladies and gentlemen of the

       15   jury, there was a witness referred to by the defense in its

       16   opening statement, Mr. Slayden.  The Court determined that

09:13:38 17   Mr. Slayden's testimony would be cumulative, given what the

       18   expert testified about the Slayden patent.  So that's the

       19   reason Slayden was not called by the defense as a witness.  So

       20   the Court just wanted you to know that.

09:13:51 21          Is there any other proof on behalf of the plaintiff?

09:13:54 22          MR. VEZEAU:  Yes, Your Honor.  We do have one witness.

       23   But before that, we have a motion under Rule 50.

09:13:58 24          THE COURT:  All right.  Ladies and gentlemen, we're

       25   going to excuse you for a few minutes.  Please don't discuss

the evidence amongst yourselves or with anyone else until you
        receive all of the evidence, the argument of counsel, and the
        charge of the Court.
09:14:34    (Jury out.)
09:14:35    THE COURT:  All right.
09:14:37    MR. VEZEAU:  Your Honor, may I hand the Court a copy
        of our motion?
09:14:40    THE COURT:  All right.
09:16:02    All right.  Whenever you are ready.
09:16:03    MR. VEZEAU:  I was waiting to -- Your Honor, I
        apologize.  Your Honor, the motion, of course, is normally
        made by the parties at the close of the evidence, and we
        understand that it's often pro forma.
09:16:17    We respectfully suggest in this instance there is
        great substance to the motion we're bringing for judgment as a
        matter of law.
09:16:24    There are several defenses that have been asserted in
        this case, some of which there is little or no evidence, or
        certainly insufficient evidence, for a jury to conclude that
        -- that could rule in favor of defendants.
09:16:38    With respect to the first defense I refer to at Page 3
        of the motion, so-called lack of enablement, that's a
        difficult one to prove, because that's precisely what the
        patent examiners in the Patent Office look at.  They look at
        the disclosure of the patent, and they make sure before they

issue a patent that there is enough in that disclosure to

teach one skilled in the art, of ordinary skill in the art to

make him use the invention.

09:17:10   In this case there is a dearth of testimony by the

witnesses, Mr. Hathaway particularly, that the iLight patents

lack an enabling disclosure.  And we respectfully submit that

iLight is entitled to judgment at this stage as a matter of

law on that defense.

09:17:27   Similarly, the defense of indefiniteness is a very

difficult defense for a defendant to prove because, again,

that's precisely what the patent examiner looks at.  Do the

claims reasonably particularly point out and distinctly claim

the invention.

09:17:44   The courts have said, the federal circuit has said,

often this is difficult to determine what claims mean.  But

they said that, even if it's difficult, if the Court is able

to construe the claims, that is, the disputed terms in the

claims, then the claims are not indefinite.

09:18:01   In this case there is no question the Court has

rendered its claim construction.  There is no real evidence in

the case whatsoever that the claims are indefinite, and we

think certainly there is no -- there is insufficient evidence

under the burden, the burden being clear and convincing

evidence, for a reasonable jury to conclude that the claims

are indefinite.

Two other defenses asserted were anticipation.  Now,

2    for anticipation, it is required that there be clear and

3    convincing evidence that each and every element of each claim

4    that's being attacked is present in a single prioric

5    reference.

In this case, that simply is not there.  We even have

7    the admission of Mr. Hathaway, for example, that the inner

8    reflective sidewalls that are present in each claim, that

9    claim element is in each claim, is simply not present in the

10    Slayden patent.  And that was the only patent that was relied

11    on for the anticipation defense.  The parties can argue about

12    rod and that, but some of the claims recite a solid leaky

13    waveguide rod.

And certainly that was not what was in Mr. Slayden's

15    patent.  If you recall, Mr. Slayden relied on a different

16    approach, that was his hollow tube approach.  And so with

17    respect to that, and the lack of what's in every claim

18    reflective in their sidewalls that reflect light, the

19    anticipation defense simply doesn't hold water.  There is no

20    evidence, much less clear and convincing evidence, that each

21    claim of the -- asserted claim of the iLight patents are

22    disclosed in the Slayden patent.

Finally, and similarly, with respect to obviousness,

24    the evidence was totally lacking.  The Supreme Court in Graham

25    v. John Deere said how you go about proving obviousness.  And

the Court said that the first thing you do, you must look at

the scope and content of the prior art.

Well, I think there was of a fair discussion of

Mr. Slayden's patent. We have no quarrel about that. But

then Mr. Hathaway, the only one that really provided proof on

this, just said, well, I looked at, and he rattled off some

other patent numbers. But he really didn't analyze them. He

certainly didn't get into the scope and content of the prior

art.

The differences between the invention and the prior

art must be ascertained. Of course, he didn't discuss that at

all with respect to these other patents. He just mentioned by

number.

The level of skill he did discuss, and we don't

quarrel with that. But then in this analysis the Court says

you also must take into account secondary considerations or

real world indicia of obviousness or nonobviousness. That was

ignored. There was no discussion of that.

But then finally, based on all those considerations, a

determination must be made, not whether individual elements in

the claim are old or may have been done before, but whether

the invention claimed in each claim, considered as a whole,

that is, all the elements looked at together, would have been

obvious to a person of ordinary skill in the art at the time

the invention was made. And, of course, the invention was

1    made back in January 2001.

09:21:28   2        We respectfully suggest that Fallon has not met its
3    burden, which is a high burden, again, clear and convincing
4    evidence, with respect to the obviousness defense.  Mr.
5    Hathaway certainly talked about individual elements, but he
6    never analyzed the claims, and particularly each claim, and
7    considered the evidence as a whole.

09:21:49   8        We think that the analysis required by the Supreme
9    Court in Graham v. John Deere and the federal Circuit in
10   decisions after that is pretty clear and is missing in this
11   case.

09:22:02  12        So Your Honor, for those reasons we respectfully
13   suggest that judgment as a matter of law should be entered,
14   that Fallon has failed to establish by a clear and convincing
15   evidence that the asserted claims in the patents-in-suit are
16   invalid.

09:22:17  17        THE COURT:  All right.

09:22:23  18        MR. SAWYER:  Good morning, Your Honor.

09:22:23  19        THE COURT:  Good morning.

09:22:30  20        MR. SAWYER:  Fallon respectfully submits that we have
21   submitted evidence, and clear and convincing evidence, on
22   invalidity.

09:22:44  23        Your Honor, initially, Slayden -- initially, Fallon
24   will withdraw the lack of enablement defense based on the
25   Court's claim construction.  Based on these constructions, we

won't be pursuing that defense.  However, on indefiniteness,
Your Honor, there was sufficient and clear and convincing
evidence on that issue of law that was presented.

Both Mr. Hathaway and, in fact, Dr. Roberts both
identified that all surfaces are both light reflective and
light absorptive.  Therefore, as a matter of law, one skilled
in the art can't determine what's clearly claimed there and
can't identify what the clear scope of the claims are.

In addition, as to the term "waveguide", Fallon
submits it submitted sufficient evidence, clear and convincing
evidence, that the term "waveguide" as used in the patents is
also indefinite.

Both Mr. Hathaway and plaintiff's expert witness said
any piece of plastic you put on top of these lights would be a
waveguide.  Well, what does that mean?  Is there a clear scope
defined in that particular limitation?

Also, Mr. -- Dr. Roberts and Mr. Hathaway gave
testimony on the indefiniteness of this human observer test,
meaning that the light has to be sufficiently uniform to a
human observer.  We heard testimony from Dr. Roberts that some
of the lights aren't uniform.  But apparently he isn't the
human observer that we're using in this particular case.  It
may be some other human observer.

So again, the definiteness of those claim limitations,
we believe we have presented sufficient evidence on that issue

1    of law to meet our burden.

09:24:47  2          As to anticipation, both Mr. Hathaway and to some

3    extent Dr. Roberts conceded a number of points with respect to

4    the Slayden reference.

09:24:57  5          First, Mr. Hathaway did present a chart which is in

6    evidence that goes through each and every element of each and

7    every claim of the patents that include references to the

8    Slayden device.

09:25:11  9          Mr. -- Dr. Roberts, I should say, on the rod element,

10   admitted that a hollow tube is a rod under the Court's

11   definition.  The only -- there was sufficient evidence that

12   Mr. Hathaway put on that the arched-shape embodiment in

13   Hathaway, similar to the Fallon one that's being accused,

14   would both be solid.

09:25:37  15          The other claim limitation that plaintiff identifies

16   is light reflecting sidewalls.  Well, we just talked about

17   that in the -- somewhat in the indefiniteness context, in that

18   both Mr. Hathaway and Dr. Roberts testified that all sidewalls

19   are reflective and, therefore, it would be inherently

20   disclosed.

09:25:59  21          As Your Honor knows, that anticipation can be proved

22   both by explicit and by inherent disclosures.  If all

23   sidewalls -- if all surfaces reflect light, there is no

24   dispute by the parties, and there was sufficient evidence to

25   demonstrate that the Slayden device had sidewalls and,

984

therefore, inherently disclosed light reflecting sidewalls.

09:26:19    Again, I point Your Honor to the chart in which Mr.
Hathaway has analyzed each and every element of each and every
claim that shows the Slayden patent discloses it.

09:26:35    Now, as to obviousness, again, Mr. Hathaway presented
sufficient evidence and clear and convincing evidence that the
combination of elements are a combination of known elements
with known results, and under the KSR standard, if you combine
elements with known functions and you get the expected
outcome, that's obvious.  And that's under the KSR standard.
And we believe Mr. Hathaway presented sufficient evidence on
that.

09:27:07    That is in addition to Mr. Nelson's testimony on his
combination of the known elements, and putting them together
in an obvious -- into an obvious construction, which gives us
predicted results.

09:27:24    Now, Mr. Hathaway also presented sufficient evidence
and clearly convincing evidence on the combination of certain
references.  Again, on the Slayden reference, the only
discussion here that Mr. Vezeau has raised is whether or not
Slayden disclosed a solid rod, not a hollow rod.  And Mr.
Hathaway presented evidence in his chart that the Sodow and
the Hulse reference can be combined to show reference to a
solid rod.  In addition to the testimony of Mr. Hathaway that
the arch-shaped diffuser, if that's considered solid, so is

the Fallon arch shape would be solid.

09:28:11    In addition to the sidewalls being reflective, Mr. Hathaway points out in his chart a housing that was used with LEDs that have reflective sidewalls.  That combination Mr. Hathaway has presented clear and convincing evidence that one skilled in the art would understand to put reflective sidewalls inside a housing if you wanted to add more light.

In addition, not just those patents, but just one skilled in the art would understand that taking the Sodow reference, adding either a solid rid or reflecting sidewalls would be obvious.

09:28:55    That's all, Your Honor.

09:28:57    THE COURT:  It's your motion.  You get to close.

09:29:00    MR. VEZEAU:  Your Honor, just a couple of comments.  I won't belabor the point.  I wonder if for a second I could pull up 77, which is Mr. Slayden's patent, because that's really what their case is dependent on, to show the Court just one point.  Can you go to -- that's fine.

09:29:19    Now, with respect to these sidewalls, Your Honor, I think you will recall the testimony from Mr. Hathaway, who was Fallon's expert, that the top tube -- and this is Mr. Hathaway, Mr. Slayden's approach -- this top tube here, and the patent says this, is where all the reflections and the refractions occur.  Not from the sidewalls which are down here.  The patent says the only thing these sidewalls do is

986

hold that tube in place.  See those little feet on the tube?
They just latch on to the sidewalls.  The LEDs are shooting
the light right up into the tube, and then the light bounces
back and forth in this long tube.  And that's where the
reflections and the refractions occur.  Mr. Slayden did not
use reflections off these sidewalls.  That's simply a mounting
mechanism.

09:30:16  There's not a word in this patent about these
sidewalls providing any reflective light.  The patent says all
that reflective light only occurs in this tube.  And that's
the reason why, Your Honor, in the claims of the iLight
patent, each -- the reflective sidewalls are specifically on
the housing.  It's a different approach that's used.  It's not
just this hollow tube approach.

09:30:40  And the patent relies on those walls to take the light
from the LEDs and to bounce it up towards the top to this
waveguide.  So it's quite different.  There is no disclosure
on anticipation in Slayden.  And it's required in Slayden.
You can't join other stuff to Slayden.

09:31:01  One final point on indefiniteness.  The Court has
construed the claims, and we cited the cases from the federal
circuit which says that's often a difficult job.  I don't know
how much the Court struggled in this case, but it is often a
difficult job in many cases.  But if these claims are capable
of being construed, they are not indefinite.

Furthermore, in this case the examiner looked at this

² once, twice, three times, and determined, yes, after examining

³ these claims, these are definite, and these claims can be

⁴ issued in the U.S. Patent.

So we do respectfully suggest that there is no

⁶ insoluble ambiguity with respect to the claim terms and

⁷ certainly no clear and convincing evidence of that.  And we

⁸ believe that defense is subject to this motion for judgment as

⁹ a matter of law.  Thank you, Your Honor.

THE COURT:  What does the defense say to the Court's

¹¹ construction and the claims -- the patent examiner's approval

¹² of the patent as an indication that that the claims were not

¹³ indefinite?  Why doesn't that overcome -- what clear and

¹⁴ convincing evidence negates those two evidentiary or legal

¹⁵ points?

MR. SAWYER:  Your Honor, first, I would like to tell

¹⁷ you, we do have a brief that we're planning on filing today

¹⁸ that lays out the law on indefiniteness as we feel it -- it

¹⁹ should be presented.  And I will just point to Your Honor,

²⁰ there are federal circuit cases that, yes, point out that

²¹ defining the claims for the Court is sometimes a very

²² difficult task, and as Your Honor may understand after this

²³ experience.

However, really, the standard in the matter of law is

²⁵ whether or not one skilled in the art, after the Court

                                                              988

construes them, will understand the scope and the definiteness

of the claims.  And that's the difference here, is one skilled

in the art.  Your Honor gave instructions, but now one skilled

in the art, both experts now have said, wait a second.  All

surfaces are light absorptive and light reflective.  And now

they are just defining it as functional, which means -- at

least Dr. Roberts said, as long as we're gathering up light

and sending it to the top, that meets the limitation.

The problem is, Your Honor, you said color isn't at

issue here.  And we've had testimony from both Dr. Roberts and

Mr. Hathaway that all sidewalls are reflective.  All of them

gather the light, no matter what color or what position or how

shiny or not shiny they are.  They all gather light and send

them up to the top.

And we have also testimony on other side on the

absorptive.  We've got both testimony from both Dr. Roberts

and Mr. Hathaway that everything is absorptive, no matter what

color, no matter what -- shiny, not shiny, they are all

absorptive.

And so, Your Honor, one skilled in the art -- and

again, we will present a brief on this -- one skilled in the

art can't accurately and understand what's claimed and what

isn't.  So what meets reflective and doesn't meet reflective.

And it's not because of Your Honor's claim construction.  It's

simply because the nature of the surfaces are based on the

989

1    claims that are in the patent are indefinite.

09:34:39            2            But like I said, Your Honor, we plan on filing a brief

                    3    on that this afternoon.

09:34:46            4            THE COURT:  Well, I'm going to give them an

                    5    opportunity to file a brief in light of what has been

                    6    submitted.  So I'm going to reserve the iLight's motion for

                    7    judgment as a matter of law.

09:35:01            8            Do you all have proof to put on?

09:35:04            9            MR. SCRUTON:  Yes, Your Honor.  We have Dr. Roberts

                   10    for a relatively brief rebuttal.

09:35:08           11            THE COURT:  What about for the defense?  Anything

                   12    further from the defense?

09:35:13           13            MR. LIPSHIE:  We don't anticipate anything, Your

                   14    Honor.

09:35:16           15            THE COURT:  I think what we may do, then, is depending

                   16    -- we'll hear this proof.  When do you all expect filing your

                   17    motion, your brief in opposition?

09:35:30           18            MR. KITTREDGE:  Over the lunch break.  We just have to

                   19    go back to our computers and do it.

09:35:37           20            THE COURT:  Well, if this doesn't take that long and

                   21    we adjourn around 10:30, how long do you think it will take?

09:35:44           22            MR. KITTREDGE:  We'll do it then.

09:35:47           23            THE COURT:  My thought was that we are probably going

                   24    to spend -- send the jury home -- either send them home or

                   25    tell them to come back late this afternoon for final

arguments.  What are you all's --

09:36:00    MR. VEZEAU:  We're prepared, at the Court's direction.
We're prepared to go today, we're prepared to go tomorrow.
I'm sure -- I forget the gentleman's name, but the banker
would appreciate an opportunity to visit his meeting.  We're
prepared to do whatever.  we'll do what the Court thinks is
best.

09:36:19    THE COURT:  I just don't have a gauge on the
discussion of jury instructions.  And I'm going to adopt as
many of the federal circuit instructions as I can.  Although
in reading them, I don't claim to be any great writer, but I
think some of it could be a little simpler than what I've read
and accustomed to in jury instructions.  So I may give a hand
at revisions.  If you all think my revisions do violence to
the draftings, the model instructions, I will reconsider
giving the model instructions.  But I just -- I'm trying to
anticipate how long that might take.

09:37:05    MR. PRICE:  I may be able to help you with that, Your
Honor.  Mr. Sawyer and I had some discussions last night about
the prior draft you sent and what else we might need to fill.
While we're not in agreement completely on everything,
frankly, I think it boils down to about three or four issues.
And the difference between --

09:37:26    THE COURT:  Well, I'm trying to evaluate the
mechanical part of me getting it all done.

09:37:30  1          MR. PRICE:  I understand, Your Honor.  I guess my

2    suggestion to you was, I think we're talking about four issues

3    and about a sentence difference between the respective

4    instructions that the parties want.  We might be able to have

5    that discussion, Your Honor, after the close of the proof

6    today.

09:37:44  7          THE COURT:  How long do you all suspect the

8    plaintiff's closing to be?  Closing argument to last?

09:37:51  9          MR. VEZEAU:  Our closing argument, Your Honor?  We

10   talked about that.  I think there would be two parts.

09:37:56  11         THE COURT:  Assume for a moment that the Court

12   reserves ruling on the motion for judgment as a matter of law.

09:38:01  13         MR. VEZEAU:  Yes.

09:38:02  14         THE COURT:  How long do you think your closing

15   argument would take?

09:38:07  16         MR. VEZEAU:  Total would be approximately, as best I

17   can time it, an hour to an hour and 15 minutes.

09:38:12  18         THE COURT:  What about for the defense?.

09:38:14  19         MR. KITTREDGE:  It won't be any longer than that, Your

20   Honor.  Maybe less.

09:38:18  21         MR. VEZEAU:  Your Honor, may I ask what -- I have set

22   this up and you tell us if it's okay, is the first two issues

23   for which we bear the burden that I know, that they have their

24   closing, then we would come back and basically rebut the

25   defenses, if are there any defenses left, their invalidity

1   defenses.

09:38:39        2       THE COURT:  If it's his defense, then he would get a

                3   chance to come back.

09:38:42        4       MR. VEZEAU:  Pardon me?

09:38:45        5       THE COURT:  What we would have then is the plaintiffs

                6   would address their claim, the defendant would address their

                7   claim of defenses, you would rebut on the defense arguments.

                8   But are you saying that if I ask -- what you are asking for is

                9   a chance to respond to their defenses, their argument?

09:39:02       10       MR. VEZEAU:  All I'm saying is I'm breaking my closing

               11   up into infringement and damages.  And then I would come back

               12   after they give theirs and handle the invalidity defenses.

               13   That's all.

09:39:12       14       THE COURT:  All right.

09:39:15       15       MR. KITTREDGE:  Do I get rebuttal then, Your Honor?

               16       THE COURT:  Well, that's what I was trying to figure

               17   out.  If it's his defenses, is he entitled to a rebuttal?

09:39:24       18       MR. VEZEAU:  I don't think so, because I'm not

               19   rebutting.  For example, when I go on and present my closing

               20   on infringement, I'm not coming back later and rebutting what

               21   they say about noninfringement.  So All I'm saying is, they

               22   are going to come in and say something about their invalidity

               23   defenses.  It's pretty difficult for me to anticipate that

               24   totally in advance.  Some of it I know.

09:39:49       25       So all I want to do is break mine up so that I can

address what they are finally holding onto in their closing

argument on invalidity.

09:39:53    MR. KITTREDGE:  And Your Honor, in this case
infringement and validity really are two sides of the same
coin.  We can't rebut validity without rearguing some of
infringement case.  I think we ought to keep it simple, have
each party get up once and let the jury go.

09:40:14    THE COURT:  Well, let me think about that one some
more.

09:40:17    The thing I'm trying to figure out is, if I ask the
jury to come back at 2:00, and each of you all argue about an
hour and 15 minutes, then we're looking at arguments ending at
about 4:15.  If I give -- if I give -- we probably won't
finish the jury instructions for about 45 minutes or more.
And I'm wondering whether it would be more beneficial to have
-- maybe get the arguments done, but do the jury instruction
in the morning.  Because I don't think they are going to want
to start deliberating at about 5:00, given the way they have
gone.  What's you all's view on that?  Yes, sir.

09:41:01    MR. VEZEAU:  That's fine with us, Your Honor.

09:41:03    MR. KITTREDGE:  I don't have a strong feeling about
that, Your Honor.  I don't know if it would be easier, if
we're not going to get it all done today, just do arguments in
the later or in the morning.

09:41:16    THE COURT:  The other consideration is, I want you all

```
 1   to have a chance to study the jury instructions in preparation

 2   for your argument.  And if I get them done at 1:30, if we get

 3   that done by 1:30, then I'm a little concerned about whether

 4   I've given you all enough time to incorporate them.  What do

 5   you all think?
```

09:41:40  6       MR. VEZEAU:  From my perspective, I'm seriously not

 7   arguing the law as part of my final arguments.  I know the

 8   Court is going to instruct the jury.  I'm really focusing

 9   candidly on the facts of the case and the testimony.  So your

10   instructions we'll deal with, and hopefully everyone will

11   agree.  But I'm not so much focused on telling the jury what

12   the law is, so I'm not too worried about that personally, Your

13   Honor.

09:42:09 14       THE COURT:  Well, sometimes the lawyers have expressed

15   the interest in having the instructions before closing

16   arguments as having an impact.  So I'm trying to evaluate you

17   all's views.  What about for the defense?

09:42:19 18       MR. KITTREDGE:  I don't have strong feelings about

19   that, Your Honor.  I have the same attitude as Mr. Vezeau.

20   I'm never sure until I actually see the instructions if that

21   will surprise me.

09:42:32 22       THE COURT:  Why don't we take this last proof.  I'm

23   going to ask the jury to come back at 2:00.  We'll just see

24   where we are then.

09:43:20 25       THE COURT:  All right, ladies and gentlemen.  Does the

plaintiff have any rebuttal proof?

09:43:29          MR. SCRUTON:  Yes.  The plaintiff wishes to present

Dr. Roberts for a brief rebuttal.

09:43:35          THE COURT:  Dr. Roberts, if you will come around.  You

are under the oath administered to you earlier.

09:43:48          THE WITNESS:  Thank you, Your Honor.

09:43:48 REBUTTAL EXAMINATION

09:43:48 BY MR. STRUTON:

09:43:50          Q.    Dr. Roberts, please proceed.

09:43:52          A.    Thank you, Mr. Scruton.  I have received and

reviewed a copy of the expert report of Kevin J. Hathaway

dated October 21, 2008 and titled Regarding the Validity of

the Asserted iLight Patents.

09:44:08          Mr. Hathaway also testified on behalf of Fallon in

this case, but I was not privy to his testimony before I

prepared this statement of my testimony.  So I will focus on

his report.  Mr. Hathaway's report discusses several patents,

so in addition to his report, I reviewed those particular

patents.

09:44:35          Mr. Hathaway argues in his report that the iLight

patents that are involved in this case are invalid.  Those are

the same patents that I have testified about.  In my opinion

the key feature of the claims of the iLight patents is a

lighting device for use in signs and similar applications that

uses a unique combination of elements such as, but not limited

to, LEDs in a specific way to produce an uniform surface
brightness along, across, and around the axis of a leaky,
rod-like optical waveguide with a curved convex light emitting
surface in order to simulate neon lighting.

09:45:22     The iLight patents do not claim first use of any of
the individual components that are involve in the patents.
They do not claim to have invented LEDs, or LEDs used in a
line, or leaky waveguides, or reflecting surfaces, or light
absorbing surfaces, or external power supplies to operate the
LEDs.  All those things were individually well-known before
the inventors ever filed their patent application.

09:45:52     What the iLight patents claim is a unique combination
of those elements that I have just listed, and using that
combination to produce a neon lamp-like glow from the surface
of the leaky waveguide.  Indeed, that is what is set forth in
the patent claims of the United States Patent -- I'm sorry,
that the United States Patent Examiner found were new and
unobvious over the prior art he reviewed.

09:46:25     Now I would like to talk a little bit about waveguides
and diffusers.  The Hathaway report included an extended
discussion of waveguides and diffusers.  His discussion of the
concept of total internal reflection is consistent with what I
have said about optical waveguides.  In his report, Mr.
Hathaway says that typical waveguide systems are illuminated
through, quote, one or more of the thin edges of the

waveguide, unquote.  He also says, quote, fiber optics,
unquote, are a standard configuration of an optical waveguide.

As he says, when using a fiber optic waveguide, the
light is typically provided by a laser shining in one end of
the rod, which he calls the input port.

He goes on to say, quote, the positioning of the light
sources relative to the input ports is quite important to the
effective operation of the waveguide, end quote.  Although he
doesn't say it, by all of these statements, Mr. Hathaway is
confirming that the optical waveguide of the iLight patents is
not illuminated in a typical manner.  I agree with that.

On Page 15 through 16 of his report, Hathaway
discusses leaky waveguides that allow trapped light to escape
because they have a rough surface or internal scattering
centers.  You will recall that bolt scattering in a light
transmissive material means that the material contains either
air bubbles or other material with different retracting
qualities so that the light passing through the light
transmissive material is scattered when it hits that different
material.

Mr. Hathaway quibbles on whether a structure with bolt
scattering, like the ones we are dealing with here, is
properly called a leaky waveguide.  He does not cite any
references that support his statements about bolt scattering,
which I take to be his personal opinion and which I don't

998

Case 2:06-cv-00025    Document 288    Filed 05/20/2009    Page 29 of 149

agree with.

As I understand it, a patentee may be his own lexographer. That is, if the patent defines a term in a certain way, that definition will apply to that term when it is used in that patent, whether or not that definition will be generally understood to be the same definition used by those skilled in the art.

Since the iLight patents expressly discuss what they call leaky waveguides to have bolt scattering, that is what I understand a leaky waveguide to mean in the context of the iLight patents. The iLight patents specifically define what they mean by a leaky waveguide. In Column 4, Lines 7 to 10 of the '262 Patent and the '238 Patent, they refer to, quote, an element that acts as both an optical waveguide and a light scattering member but permits light to exit laterally out of its surface. And they define that as a leaky waveguide, in quotes. That language is also in the '970 Patent.

The iLight patents also teach that a leaky waveguide is made from a material that has bolt scattering properties. For example, that is found at Column 4, Lines 32 to 34 of the '262 and '238 patents. It is also in the '970 Patent.

Mr. Hathaway also discusses diffusers. He goes back and forth between trying to distinguish between waveguides and diffusers, and then says, quote: The distinction between what constitutes a waveguide and what constitutes a diffuser can be

one of semantics.

Mr. Hathaway later then attempts to distinguish waveguides from diffusers when he says essentially that a waveguide directs light by reflecting it back into the waveguide, and a diffuser scatters light. Again, he cites no supporting references, but merely seems to be arguing with a definition of a leaky waveguide as given in the iLight patents.

However, he again blurs any distinction between a waveguide and a diffuser when he says, quote, now this translucent diffuser is acting like a very leaky waveguide, but as is now clear, all diffusers have this behavior, and they always did, end quote. Later in his report, Mr. Hathaway says he developed a computer model of a leaky waveguide that uses bolt scattering as described in the iLight patents. So in effect, he is conceding such devices are indeed real.

Now I would like to talk about Fallon's obviousness defense. Much of Mr. Hathaway's report discusses various patents known as prior art that individually or in limited combination teach each of the individual physical elements of the device described in the iLight patents. Based on those, Mr. Hathaway concludes that it would have been obvious to combine those preexisting elements to form the device described in the iLight patents.

It is well recognized that inventions typically

combine elements that were ready, well-known, but do it in
some new way.  The fact that a patent combines a series of
elements, and the fact that each of those elements was
individually known in the prior art does not mean that the
combination of those elements would have been obvious.

Inventors of the iLight patents do not claim to have
invented or to be the first to use LEDs, linear arrays of
LEDs, leaky waveguides, reflecting surfaces, light absorbing
surfaces, or external power supplies to operate the LEDs.  All
of these things used before.

What the iLight patents claim is the combination of
elements in a unique way to create a lighting device that
produces a uniform surface brightness along, across and around
the leaky waveguide optic -- I'm sorry, the leaky rod-like
optical waveguide with a curved outer surface in order to
simulate neon lighting.  That is what the United States Patent
Office determined was new and unobvious and merited the award
of the three iLight patents-in-suit.

I have studied each of the prior art patents that Mr.
Hathaway identifies in his report.  Because of the inventions
shown in those patents were generally very different from the
invention covered by the iLight patents, in my opinion it
would not have been obvious to a person of ordinary skill in
the art to combine the elements taught in the identified in
prior art to make the device claimed in the asserted claims in

the iLight patents.

09:53:52 Next I want to address Patents '361 and '186 which I
will refer to as Slayden.  Some documents I will discuss may
refer to this as the '186 patent, the last three digits of the
patent.  Mr. Hathaway discusses this patent extensively.
Slayden teaches the use of a tubular optical diffuser that is
illuminated by LEDs on one side to simulate neon lighting.  Of
the prior art that Hathaway mentions, Slayden is the only one
that has features that are similar to the iLight patents.
Although in my opinion there are many aspects of Slayden that
do not satisfy the conditions necessary to validate the iLight
patents, either by anticipation or obviousness.

09:54:34 The independent experts at the United States Patent
Office also agree with me on this point.  The Slayden patent
was considered by the patent examiner, and he believed the
invention claimed in the three iLight patents was neither
anticipated by nor obvious in view of the Slayden patent,
which is referred to on the second page of the '238 iLight
patents-in-suit.

09:54:57 In fact, Slayden -- I'm sorry, Slayden teaches away
from the approach of the iLight patents -- I'm sorry.  Slayden
teaches away from the approach the iLight patents use.
Slayden Says that a tubular diffuser is necessary to achieve
the desired neon-like glow.

09:55:19 May I have Exhibit 77, at Page 7, Column 4, Lines 45

09:55:45
09:56:22
09:56:59
09:57:09

1    through 53.  And could you expand those.

2         Refracted Light.  There it is, right there.  Starts

3    there.  Refracted light.  Quote:  Refracted light can be

4    emitted from the fixture only after device being refracted by

5    diffuser 10.  In addition, the inner and outer walls of the

6    diffuser 10 provide reflective light throughout the cross

7    section of the tube 11.  Continue further, please.  It is

8    believed that this combination of reflected and refracted

9    light in the translucent tube is what affords the neon light

10   glow of the fixture, end quote.

11        So according to Slayden, there is something special

12   about using a tube, because it provides both reflected and

13   refracted light.  A solid rod, as in the iLight patents, would

14   not provide both reflected and refracted light.  Since Slayden

15   specifically teaches the benefit of using a tube, it would not

16   be obvious to a person of ordinary skilled in the art that

17   Slayden could be improved by abandoning the tube and using a

18   solid rod or rod-like member instead.

19        The patent examiner who reviewed the application that

20   eventually became the '238 Patent considered Slayden in

21   detail, particularly the issue of anticipation by the Slayden

22   '186 patent.

23        iLight filed a response to the patent examiner that

24   included following comments about Slayden.  Quote:  The '186

25   patent describes the use of a hollow thin-walled translucent

1003

1 diffuser that provides no preferential scattering of lighting,

2 a critical feature of the illumination device described in the

3 claimed and present application.  That's iLight's application.

4 The examiner agreed and allowed all the remaining claims in

5 the application of the '238 Patent.  The fact that the

6 examiner allowed these claims indicates that the U.S. Patent

7 and Trademark Office did not believe that the claims of the

8 iLight patent were anticipated by or obvious in view of the

9 Slayden patent.

09:57:54 10          The iLight patents stress the importance of the

11 uniformity of light in order for the claimed illumination

12 device to look like a neon tube.  All three of the iLight

13 patents have language that say, quote:  Thus, an illumination

14 device that is developed to duplicate the effects of neon

15 lighting must also have axially even light distribution over

16 its length and substantially even light distribution around

17 its circumference, end quote.

09:58:27 18          That language is at Column 1, Lines 27 to 31 of the

19 '238 Patent and also in other two iLight patents.  This means

20 that the light looks uniform all along the light-emitting

21 surface and regardless of the angle that you see it from.

22 Summaries of all three of the iLight patents have language

23 that says, quote:  Collective light intensity pattern is

24 perceived as being uniform over substantially the entire light

25 emitting surface when being viewed from a normal head on and

side on perspective, end quote.  That's at Column 2, Lines 59
to 62 of the '238 and '262 Patents and also in the '970
Patent.

09:59:03    The patents also say, quote:  The applicants were able
to obtain an illumination device that rivals or surpasses the
uniform glow of neon tubing, end quote.  That's at Column 4,
Lines 13 to 15 of the '238 and '262 patents and also in the
'970 Patent.

09:59:23    In the iLight patent, the claims also stress the
importance of the uniformity of light.  Claim 25 of the '238
Patent requires that, quote:  The light intensity pattern
collectively emitted from said front surface appears uniform.

09:59:40    Claim 6 of the '262 requires, quote:  The light
intensity pattern collectively emitted from said light
emitting surface appears uniform.

09:59:51    Claims 1 and 5 of the '970 Patent require, quote:
Such light passing through and being scattered by said
rod-like member so as to exit the curved light emitting
surface at a substantially uniform light intensity pattern,
unquote.  And Claim 8 of the '970 Patent requires, quote:
Such light then passing through and being scattered by said
rod-like member into a light intensity pattern that is
perceived as being substantially uniform over the curved light
emitting surface, irrespective of viewing angle so as to
simulate neon lightening, end quote.

1    The iLight patents also stress the importance of

2    brightness of the light emitting surface of the device that is

3    intended to replace neon lighting.  In order to look like

4    neon, the light not only has to be uniform, it has to be

5    bright.  All the iLight patents discuss prior attempts to

6    simulate neon lighting and talk specifically about difficulty

7    of getting the necessary level of brightness.

8    Can I see Exhibit 77.

9    Figure 1, I'm sorry, Page 2.

10   Statements in the Slayden patent itself indicate that

11   the preferred embodiment that Slayden teaches, shown in Figure

12   1 here of the '186 patent, may not simulate neon lighting as

13   taught by the iLight patents.

14   Can I see Column 1, line 54.  Sorry, 54 to 56.

15   Slayden says only the appearance of substantially --

16   okay.  Up here.  The appearance of substantially homogenous

17   light intensity across the exposed surface of the diffuser.

18   That same language is in Claim 9, in Column 6, and Claim 9 in

19   Lines 51 to 53.  Slayden does not discuss substantially

20   homogenous light intensity along the axis of the diffuser, or

21   substantially homogenous light intensity irrespective of the

22   viewing angle, or elongated light intensity patterns of the

23   individual LEDs as taught by the iLight patents.

24   Can I see the same exhibit, Figure 4.  That's it.

25   Exhibit 77.  Can you flip the page.  Figure 4 is the

1006

alternate embodiment of Slayden, with the preferred embodiment

being -- other statements in the Slayden patent indicate that

the alternate embodiment shown in Figure 4 of the Slayden

patent may have additional deficiencies over and above those

of the preferred embodiment.  This is the embodiment that is a

tube of the slot running its length.  Please show Page six,

Column 1, Line 63, to Column 2, Line 5.  That starts at the

bottom of 63 and runs over to Column 2.  At the very bottom.

Last paragraph.

10:03:52    Alternate embodiment.  It's actually an Alternative

Embodiment.  The diffuser has a length slide slot contiguous

with the slot housing so that the light from the diodes is

refracted and reflected over more than 180 degrees of the

diffuser.  This spacing of the diodes from the interior --

that's in the next column, this spacing -- okay, can you move

to the top of Column 2, please.

10:04:21    This spacing of the diodes from the interior of the

diffuser minimizes the appearance of the point light source

intensity in the diffuser.  I'm still quoting.  It may be

desirable in this embodiment to further soften the dispersion

of light by use of wide angle light dispersing diodes, LEDs.

End quote.

10:04:42    This section of Slayden suggests that the light from

the individual LEDs is visible on the surface of the diffuser

of the slot embodiment.  And also that the light intensity on

the surface is not uniform of the full 270 degrees -- may I

see Figure 4 -- the full 270 degrees of the visible arc of the

diffuser since it talks only about refraction and reflection

over, quote, more than 180 degrees.

10:05:14    So the full visible surface runs from there to there,

all the way around to there.  My pointer is acting weird

again, folks.  So it runs from there all the way around to

there.  And yet slayden is talking about a uniform light

intensity pattern over -- only 180 degrees, which goes from

there to there, or more than.  But he never says the full

surface or 270.

10:05:42    The spacing of the diodes -- okay.  I'm sorry.  Either

of these deficiencies alone, the appearance of the point of

light from individual LEDs or uneven light around the axis of

the slotted tube would cause the alternate embodiment to fail

to meet the claims of iLight patents.

10:06:01    The iLight patents all teach such a waveguide provides

a visible, elongated or oval-like light pattern of each LED.

That's at Column 4, Lines 40 and 41 of the '238 and '262

patents, and Column 4, line 45 and 46 of the '970 Patent.

10:06:20    In addition, Claim 8 and 25 of the '262 Patent and

Claim 1 of the '262 Patent each require a member composed of

the material that has both optical waveguide and light

scattering properties and preferentially scatters light,

entering such light receiving surface -- and I'm now quoting

1  -- into an elongated light intensity pattern on such light

2  emitting surface with a major axis extending along said

3  predetermined length.  End quote.

10:06:47  4      There is no indication in Slayden that the light from

5  the LEDs entering the light receiving surface of the Slayden

6  diffuser, in either preferred or alternate embodiment, will be

7  scattered into an elongated light intensity pattern on the

8  light emitting surface as required by the iLight patents.

10:07:06  9  In fact, Slayden teaches the LEDs are preferentially mounted

10  on three 8" centers -- that's in Column 4, Line 18 -- which is

11  only 41 percent of the nine-tenths inch outer diameter of the

12  tube.  Which is given in Column 3, Line 19.

10:07:23  13     This close spacing of the LEDS compared to the

14  diameter of the diffuser implies that the light from a single

15  LED would not be scattered into an elongated light intensity

16  pattern as taught by the iLight patents.  If the Slayden

17  device provided elongated scattering, I would expect the LEDs

18  to be spaced further apart.

10:07:41  19     For comparison, the infringing Fallon Xenon LED Open

20  sign has LEDs that are spaced apart from each other, are

21  approximately one-half inch, which is 80 percent of the 6.25

22  inch diameter -- I'm sorry, width, of the optical waveguide.

23  Almost twice as far apart, measured as a fraction of the width

24  of the diffuser or waveguide as in the Slayden device.

10:08:06  25     As I discussed earlier, individual LEDs in the Fallon

1009

1    Xenon Open sign do create elongated light intensity patterns

         2    of the light emitting surface of the waveguide.

10:08:19  3         I hope my testimony has been helpful to you.  Thank

         4    you for your additional time.

10:08:27  5         THE COURT:  You may cross examine.

10:08:37  6         MR. KITTREDGE:  With the Court's indulgence, I want to

         7    grab a physical exhibit over here.

10:08:55  8         THE COURT:  All right.

10:08:55  9    CROSS EXAMINATION

10:08:58 10    BY MR. KITTREDGE:

10:09:15 11         Q.    Good morning, Dr. Roberts.

10:09:16 12         A.    Good morning.

10:09:18 13         Q.    I will try to be brief this morning.  I'm sure

        14    everyone appreciates that.  In your expert report that

        15    provided the basis for the testimony that you just gave, you

        16    expressed a desire, that you had a desire to look at a

        17    commercial embodiment of the Slayden device, didn't you?

10:09:39 18         A.    I never expressed that desire.  Can you show me

        19    in my report where I expressed a desire to look at a

        20    commercial embodiment?

10:09:46 21         Q.    Let me rephrase it.  Didn't you say you created

        22    a mock-up of the Slayden device because you couldn't find a

        23    commercial device?

10:09:54 24         A.    That is correct.  That is not saying I had a

        25    desire to observe a commercial device.

10:09:56  1          Q.    I understand.

10:09:59  2          A.    I wish you would quote me correctly in the

          3     future.

10:10:02  4          THE COURT:  Well, let's --

10:10:02  5          MR. KITTREDGE:

10:10:06  6          Q.    I apologize.  You created your own mock-up of

          7     the Slayden device because you could not find a commercial

          8     embodiment.  Is that a fair statement?

10:10:17  9          A.    Actually, not exactly.  My intent was to create

         10     a device as taught by Slayden in his patent.  A so-called

         11     commercial embodiment of Slayden could have been an

         12     improvement on Slayden and not accurately represented what was

         13     in the Slayden patent and no more than what was in the Slayden

         14     patent.  So actually, creating a mock-up by reading Slayden

         15     and building one was something better than going out and

         16     trying to find something that might or might not be an

         17     improvement on Slayden.

10:10:47 18          Q.    But, of course, you never said that in your

         19     report, did you?

10:10:49 20          A.    No.  I said I built a mock-up of Slayden.  I

         21     could not find an exact -- I could not find a Slayden device.

10:10:55 22          Q.    Did you bother to get on the computer, get on

         23     the Internet, and Google the company that was the assignee of

         24     the patent, Lektron?

10:11:05 25          A.    No, I didn't.  Is Lektron listed on the Slayden

1    patent as the assignee?

10:11:12   2         Q.    Can we pull up Exhibit 77.  Can you expand the

3    third line on the left, which is assignee?

10:11:19   4         A.    Okay.  No, I did not do that.  But as I said, a

5    device built by another company could easily be an improvement

6    over the patent.

10:11:29   7         Q.    Before today, before right now, did you realize

8    that Lektron was the assignee of the Slayden patent?

10:11:36   9         A.    I was told Lektron was the assignee when I read

10   the Hathaway report.  It was in the statements of the Hathaway

11   report.  At that time I didn't know if it meant the assignee

12   at the time of the filing of the patent or assignee subsequent

13   to the issuance of the patent, through a licensing agreement.

10:11:53  14         Q.    Okay.  Your client is in the lighting industry?

10:11:55  15         A.    My client is the attorneys for iLight.  My

16   client is not iLight.

10:11:59  17         Q.    Did you ask the attorneys for iLight whether or

18   not iLight might be able to get you a sample of the Lektron

19   device?

10:12:05  20         A.    I may have, but I don't remember asking them.

21   As I said, that's not a crucial question.  A crucial question

22   in my mind is what does the Slayden patent say, what does the

23   Slayden patent teach, because the patent has been asserted to

24   be prior art.

10:12:22  25         Q.    Well, then, you never did look at the Lektron

1012

device?

10:12:27    A.    Until yesterday I've never seen it.  I need to amend that slightly.  I saw a photograph of it, a very poor photograph of it, a few days, a couple weeks ago, but with no detail.  I had never seen the physical device until yesterday.

10:12:56    Q.    Can we put Exhibit 77 back up.  And go to the next page, please.

10:13:03    Now, if I remember your testimony correctly from last week, the light transmissive member, Number 10 on top of Slayden, you can agree that that is a rod or rod-like transmissive member?

10:13:17    A.    I agree that this microphone stand is a rod-like member as defined by the Court, and I would, therefore, as defined by the Court, agree that that is a rod-like member.

10:13:29    Q.    Can we go to the next page?  Actually, the page after.  And you agreed Figure 5, I think you keep calling it the slotted tube, was also a rod or rod-like member?

10:13:43    A.    Excuse me, Slayden calls it a slotted tube.  I am simply defining as the inventor defines it, as a slotted tube.  I'm not making that term up.

10:13:49    Q.    So you adopt that because that's what Slayden says?

10:13:53    A.    Slayden calls it a slotted tube.  I'm repeating his definition, his description of that as a slotted tube.

10:13:59  1        Q.    Very good.  But you do agree, back to my

          2   question, that the slotted tube in Figure 4 is a rod or

          3   rod-like member within the Court's definition?

10:14:09  4        A.    Yes.

10:14:12  5        Q.    You also agree that it is made of plastic?

10:14:12  6        A.    Yes, he says it is.

10:14:15  7        Q.    And you also agree that it's a diffuser?

10:14:17  8        A.    Yes.

10:14:22  9        Q.    Now, if we could go back to Figure 1.  When you

          10  take the piece of plastic, the plastic diffuser from Figure 4,

          11  or the one that we see here on Figure 1, arrange it over a row

          12  of LEDs like we see in Figure 1, won't that rod now behave as

          13  a waveguide?

10:14:38  14       A.    Yes.

10:14:45  15       Q.    And it will also behave as a leaky waveguide?

10:14:50  16       A.    Yes.

10:15:08  17       Q.    Can we go to Exhibit 3.  And to Claim 1, which

          18  I believe is Column 10.  Can you just blow up that claim.  So

          19  Slayden gives us a rod-like member, having a predetermined

          20  length and a curved light emitting surface.

10:15:45  21       A.    That's true.  There is no solid -- there is no

          22  solid modifier in that claim as there is in other claims.

10:15:54  23       Q.    It also gives us an elongated light source

          24  extending substantially along the predetermined length of said

          25  rod-like member at a fixed distance from said light emitting

surface?

10:16:03  A.  Yes.

10:16:07  Q.  Also has a housing for said elongated light
source?

10:16:08  A.  Yes.

10:16:10  Q.  That housing has opposing and substantially
parallel sidewalls?

10:16:14  A.  Correct.

10:16:17  Q.  That housing is going to have internally light
reflecting surfaces, because all surfaces reflect?

10:16:23  A.  I never said all surfaces -- well, it may not.
It says, that serve to collect -- continue.  Light reflecting
surfaces that serve to collect and direct light.

10:16:29  Q.  Right.

10:16:31  A.  Yes, I would agree that they may be light
reflecting, even though he says flat black.  I would have to
test that to see how reflective they are.

10:16:40  Q.  Well, are those surfaces going to be inherently
light reflecting within the meaning of the claim?

10:16:46  A.  No, I haven't tested flat black surfaces as he
claims.

10:16:51  Q.  So if your goal, if you look at the Slayden
patent, and your goal is -- you build a device, and your goal
is to make it a little brighter, a brighter glow coming out of
the rod-like member, wouldn't it be obvious for a person with

ordinary skill in the art to make those internal sidewalls

reflecting?

10:17:16     A.    I'm reading the elements of the claim right

now.  I don't quite understand your question.

10:17:19     Q.    Well, this isn't first time you have read these

claims, I'm assuming.

10:17:22     A.    No, I understand that.  But I'm surprised where

you stopped.  You stopped before you got to the part that

Slayden does not practice, which is serving to collect --

probably doesn't practice, which is the housing serves to

collect and direct light emitted by said light source.

10:17:35     Q.    I'm going to take baby steps, and I'm going to

let you get to the points that you want to draw distinctions

on.

10:17:40     A.    Okay.

10:17:41     Q.    But if we could focus on the question I want to

ask is, if I want to improve the brightness of the device

disclosed by Slayden, wouldn't it be obvious to make the

internal sidewalls light reflecting?

10:17:55     A.    Depends where they are -- whether they are

mounted in such a way and those protrusions on his housing get

in the way such that light reflecting surfaces would not

matter.  Slayden's housing has a projection in the way in

between the LEDs where the light from the LEDs would hit the

wall, and the light reflecting from that wall, if it were

reflecting, would get into the housing as these projections to
hold the bottom piece of his diffuser.  It's not clear that
simply adding reflecting material would improve it, but it
could.

10:18:28    Q.    It could?

10:18:30    A.    It could.

10:18:30    Q.    And the mechanical descriptions you're talking
about, the shape of the housing, a person of ordinary skill in
the art could make adjustments there to give you more light
reflecting and a brighter output, couldn't they?

10:18:42    A.    They could change Slayden.

10:18:44    Q.    Change the structure in obvious ways.

10:18:47    A.    They could.  They could change what Slayden has
taught.

10:18:51    Q.    I'm just asking, they could change it in ways
that would be obvious to a person with ordinary skill in the
art?

10:18:56    A.    Yes.

10:19:04    Q.    So with those obvious adjustments to Slayden,
what part of Claim 1 do you think is not made obvious by
Slayden?

10:19:11    A.    Well, the issue of collecting and reflecting
material back -- I'm sorry, collecting and reflecting light
into the rod-like member because of the way his housing is
designed.

10:19:20  1          Q.      And I thought we just covered that by saying we

2     could modify in obvious ways the design of that housing so

3     that it does collect and reflect.

10:19:28  4          A.      Well, in retrospect.  A lot of things are

5     obvious in retrospect.  Slayden designed housing in a

6     particular manner.  He did it for a purpose.  And whether

7     that's an obvious change or not, I'm not sure right now, from

8     Slayden.

10:19:44  9          Q.      You're not qualified today to give an opinion

10    whether a person of ordinary skill in the art could modify the

11    shape of Slayden's housing to get this light reflecting

12    property?

10:19:56  13         A.      I believe they could.

10:20:00  14         Q.      They could make those modifications?

10:20:01  15         A.      They could.

10:20:02  16         Q.      So that would be obvious?

10:20:04  17         A.      To a person -- yes.

10:20:07  18         Q.      To a person of ordinary skill in the art?

10:20:08  19         A.      Ordinary skill in the art, right.

10:20:11  20         Q.      My question is, is there anything left in Claim

21    1 that's not obvious to a person with ordinary skill in the

22    art?

10:20:23  23         A.      Well, it is not clear to what extent, because

24    -- it is not clear to what extent the light would exit in a

25    substantially uniform light intensity pattern.

1018

10:20:36   1        Q.     Can we pull up Exhibit 77.  Actually, before
           2   you do that.  That's what neon light does; correct?
10:20:45   3        A.     Absolutely.
10:20:50   4        Q.     Okay.  Pull up Exhibit 77.  And could you
           5   expand the title.
10:20:59   6        And this is a patent for simulating neon lights;
           7   correct?
10:21:02   8        A.     It's a title of the patent.
10:21:03   9        Q.     And that's what the patent is for?
10:21:07  10        A.     Well, I could make a title of a patent.  I
          11   could title it, an airplane that defies gravity, and that
          12   doesn't mean it is.
10:21:13  13        Q.     Well, this isn't a patent on an airplane.
10:21:13  14        A.     I understand.  The title of the patent is
          15   Simulated Neon Light.
10:21:17  16        Q.     And you understand that's the purpose of the
          17   invention described in this patent?
10:21:20  18        A.     That's the purpose that is described in the
          19   patent as the purpose.
10:21:41  20        Q.     Can we blow up the abstract.  It says right
          21   here that his invention is directed at -- if we can draw your
          22   attention to -- maybe if you can highlight where I'm showing,
          23   Colleen, the reflection and refraction of light by the tubular
          24   diffuser produces a neon-like glow.  So he is disclosing that
          25   that's what his invention does?

10:22:05  1          A.       He is claiming that's what it does.

10:22:08  2          Q.       It's certainly part of his patent.  It says it
        3    does it.

10:22:11  4          A.       It doesn't mean it does it.  It doesn't mean it
        5    will do it when built according to the way he teaches it.

10:22:19  6          Q.       Okay.  But again, you never did look at an
        7    actual commercial one.

10:22:22  8          A.       I looked at one that I believe is actually
        9    closer to what he described in the experiments that you
       10    alluded to earlier.

10:22:32 11          Q.       Now, in those experiments that you -- you
       12    tested a variety of pieces of high density and low density
       13    polyethylene tubing?

10:22:39 14          A.       Right.

10:22:42 15          Q.       You were able to achieve, at least with some of
       16    those, an elongated light pattern?

10:22:48 17          A.       I was able to achieve in one of the four
       18    implementations an elongated light pattern.

10:22:54 19          Q.       And that means it preferentially scatters?

10:22:57 20          A.       When I was using the elliptical LEDs from the
       21    Fallon device which have their own elongated light pattern,
       22    yes.

10:23:04 23          Q.       So maybe that elongation came only from the
       24    LEDs?

10:23:07 25          A.       Since it was very slight, it may have only come

from the LEDs.

10:23:13  Q.    But when you analyzed Fallon's signs, you
didn't do -- take any measurements to separate how much
elongation you got from the light emitting surface versus how
much you had from the elongation you had from those LEDs?

10:23:29  A.    That's correct.

10:23:37  Q.    Can we go back and look at Claim 8 of Exhibit
3.  Now, Claim 8 -- this is Claim 8 of the '970 Patent.  And
again, Slayden does give us a rod-like member.

10:24:10  A.    Yes, yes.  I'm sorry.  I didn't realize you
were waiting.

10:24:13  Q.    I wasn't going to read the whole thing in.  I'm
assuming that if you see something there that you disagree
with, you will jump in.  It gives us the described elongated
light source also, doesn't it?

10:24:22  A.    It did us.

10:24:25  Q.    It also gives us the housing described for said
elongated source, at least up to the sidewalls?

10:24:31  A.    Right.

10:24:33  Q.    And you would agree that it would be obvious to
a person with ordinary skill in the art, with Claim 8 just
like Claim 1, to modify that housing so that it had light
reflecting surfaces, it gathered and sent light up to the
light transmissive member?

10:24:45  A.    Yes.

Q.      So what do you believe in Claim 8 is not either

                2   directly in Slayden or made obvious by Slayden?

A.      Before I was aware of the Court's

                4   interpretation of rod-like, my definition of rod-like excluded

                5   tubular members, okay?  And, in fact, when I bought the

                6   plastics for my experiments, that particular company sold both

                7   rod and tubes, and it was very clear that a rod was solid and

                8   a tube was hollow.  There was no ambiguity in their catalog

                9   when I bought these particular parts.

The current definition for rod-like member, including

               11   hollow -- including devices that are tube-like, in that sense

               12   this version of the patent as opposed to the other version of

               13   the patent does not include the modifier solid with rod, so I

               14   would have to say that there is nothing in here that I would

               15   say is not --

Q.      Okay.  So let's summarize real quickly.  I

               17   assume what you just said about Claim 8 would be equally true

               18   about Claim 1 of the '970 Patent.  And we can put it back up,

               19   if you would like.

A.      Yes.

Q.      Can we put Claim 1 up.  Take your time, sir.

A.      I'm sorry, what are you -- get the complete

               23   issue of --

Q.      My question is, let me ask.  I believe you just

               25   testified that you agree claim 8 of the '970 Patent, based on

the Court's claim construction, is obvious over Slayden?

10:26:25    A.    No, I'm sorry.  Let me go back.  In neither Claim 8 nor Claim 1 do I believe the Slayden device will necessarily produce a uniform light intensity pattern as required by these two particular claims.

10:26:42    Q.    And what would be non-uniform?

10:26:44    A.    Well, going around it.  In going around the device, the full 270 degrees of extent around the surface, as you get -- excuse me.  As you get further around, or the further away from the top, I believe that the light intensity would be dropping off as you get near the bottom.

10:27:03    Q.    Okay.

10:27:05    A.    It would not be neon-like in that extent.

10:27:08    Q.    And --

10:27:10    A.    And that seems to be required by both Claim 1 and Claim -- this is the '970 Patent?

10:27:15    Q.    Yes.

10:27:17    A.    This is the '970.

10:27:18    Q.    This is the '970 Patent.

10:27:21    A.    And there is an additional claim under '970 that specifically calls out angular.

10:27:24    Q.    I understand.

10:27:27    A.    But I interpreted all of the claims to be -- when it says uniform, to be uniform along, across and around.

10:27:34    Q.    I'm just focusing on Claims 1 and Claim 8 at

1    this point.
10:27:36    2              A.      Okay.
10:27:39    3              Q.      And in determining that uniformity of glow?
10:27:40    4              A.      Yes, sir.
10:27:43    5              Q.      That be would based on your human observer
            6    test?
10:27:48    7              A.      Yes, because the word is appears uniform.
10:27:50    8              Q.      Okay.  Is that word appears?
10:27:54    9              A.      Well, actually appears doesn't -- is not in
           10    this particular language, but substantially uniform.
10:27:58   11              Q.      You would apply your human observer test to
           12    this?
10:28:06   13              A.      I would not apply a strict optical measurement
           14    that said a tenth of a percent difference is non-uniform,
           15    because the word substantially is in there.  So whether I
           16    would measure it and allow for some deviation or use my eyes
           17    to do it, either one would apply.  The word substantially is
           18    an important modifier.  It doesn't require absolute
           19    uniformity.
10:28:28   20              Q.      And I appreciate what you're saying.  What I'm
           21    trying to understand is, how would I know?  When can I tell if
           22    it's substantially uniform or not?
10:28:37   23              A.      I interpreted these claims mostly on what they
           24    appear to be, because in other patents the word appears
           25    uniform is there, and I carried it over to the other patents

                                                                        1024

in which it was not in there.

10:28:47   Q.   Okay.  So we're back?

10:28:50   A.   I believe it's also in the specification about appears in uniform.

10:28:52   Q.   So you are reading those limitations into these claims based on what you have read and elsewhere?

10:29:00   A.   Well, I read in another patent that's part of the same family of patents as your own expert has testified to.

10:29:04   Q.   But not in this claim?

10:29:07   A.   The word "appears" is not in this claim.

10:29:10   Q.   And when we talk about "appears", I just want to be clear, we're talking about the human observer test?

10:29:14   A.   Yes.

10:29:16   Q.   And that's the same test that you applied to decide that Fallon's signs are uniform across its -- around its axis?

10:29:26   A.   Yes.

10:29:45   Q.   Could we see Exhibit 1, Claim 25.

10:29:47   A.   Excuse me, which patent is this?

10:29:51   Q.   I'm sorry, this is Exhibit 1, the '238 Patent.

10:29:52   A.   Okay.

10:29:54   Q.   I think it says that right at the top of the page.

10:30:01   A.   I know it's at the top.  It's a little too

small for me to read from where I'm sitting, sir.

10:30:08  Q.  I apologize.  We can get you a copy it.

10:30:08  A.  I don't need a copy.

10:30:12  THE COURT:  Let's move along.

10:30:12  BY MR. KITTRELL:

10:30:14  Q.  Can we blow up the bottom of the page right in there, 25.

You would agree that the Slayden device does have a light transmitting member of predetermined length, I think a substantially curved front surface, a light receiving lateral surface.  That's true, isn't it?

10:30:29  A.  Yes.

10:30:34  Q.  Okay.  You can close that.  And if you can open up the first portion up here.  And I'll add the word from the bottom of the column before, it says, having -- being comprised of a material -- and I'm sure that is supposed to be that -- that has both optical waveguide and light scattering properties.

10:30:59  You testified a moment ago, I believe, that Slayden's rod does have those optical waveguide and light scattering properties?

10:31:05  A.  Yes.

10:31:10  Q.  It's got to preferentially scatter light; is that true?

10:31:12  A.  That's a really interesting question.  There

1    are two -- the other day during our cross examination I

2    mentioned two factors that would make the rod-like surface

3    preferentially scatter light along the elongated surface.  And

4    one is the curved surface of the device and the propensity for

5    the internal light to leak out when going in a curved

6    direction rather than straight.  And the other one is the

7    pattern of light you get from the LED because the LED is

8    dispersive and the front surface is curved.

10:31:50  9       The first of those two effects is there, but very

10   small.  The second of the two effects is absent because of the

11   tubular structure.  Because of having a curved surface on the

12   front that is away from the LED, and a curved light receiving

13   surface on the bottom, that's pointed towards the LED that

14   negates the optical effect of what happens at the top, and

15   there is no elongated light pattern from this dispersive LED

16   in this case.

10:32:21  17      But to the effect that it technically disburses light

18   by some small amount, because it's curved, I might have to

19   agree with that statement.

10:32:30  20      Q.    Okay.  And, in fact, when you analyzed Fallon's

21   sign to see whether or not it preferentially scatters, all you

22   did was look at the lens with the one light shining behind it

23   and see if it was elongated?

10:32:43  24      A.    You are right; I did.

10:32:44  25      Q.    And when you made your mock-up that we

1   discussed a little while ago, you did something similar with

                 2   the device that you made according to Slayden, and it was

                 3   elongated.

10:32:49         4        A.    Right.  One of the four had an elongated light

                 5   pattern.

10:32:54         6        Q.    So it does preferentially scatter?

10:32:55         7        A.    Yes.

10:32:56         8        Q.    Into an elongated light intensity pattern?

10:32:56         9        A.    Yes.

10:32:56        10        Q.    On the light emitting surface?

10:32:59        11        A.    Yes.

10:32:59        12        Q.    With a major access extending along -- it

                13   reached a predetermined length?

10:33:00        14        A.    Yes.

10:33:15        15        Q.    Okay.  We can drop that one.  Can we go down to

                16   the next one.  Pull that up, please.

10:33:18        17        Again, this is the same housing we were talking about

                18   with the other claims.  Slayden does have a housing with

                19   spaced sidewalls.  Doesn't it?

10:33:27        20        A.    Yes, it does.

10:33:30        21        Q.    And those sidewalls abut the light receiving

                22   lateral surface, don't they?

10:33:36        23        A.    Actually, they don't.

10:33:36        24        Q.    Okay.

10:33:39        25        A.    Can you put Slayden up?

10:33:43  1        Q.      Yeah, I would like to -- can we pull up Exhibit

          2   77.  You don't think those sidewalls abut the surface?

10:33:57  3        A.      No, the sidewalls have that shelf on them which

          4   I don't believe is part of the sidewall.  You know, in one of

          5   your own products, I said they didn't abut, because there was

          6   a separation between the light receiving surface and the

          7   sidewall.  I believe that same exclusion would apply to this.

10:34:14  8        Q.      All right.  So that's one difference.  Let's go

          9   back.  But it does have sidewalls and a housing.  You do agree

         10   with that.  Just that they don't abut?

10:34:24 11        A.      They don't -- well, all it takes is one

         12   exclusion, as your own expert pointed out.

10:34:30 13        Q.      I'm not quibbling with you on that point, sir.

         14   I hope it doesn't appear that I am.

10:34:32 15        A.      Okay.

10:34:35 16        Q.      We have established that distinction for you.

10:34:38 17   The sidewalls -- again, you had testified previously that

         18   Slayden doesn't disclose light reflecting interior surfaces,

         19   but it would be obvious to make them that way.

10:34:53 20        A.      Slayden disclose flat black surfaces, which

         21   could, indeed, not be light reflecting in any useful or

         22   functional manner, but it could be -- they could be changed.

10:34:57 23        Q.      And it would be obvious, indeed, to change

         24   them, if you wanted to enhance the brightness of the light?

10:35:01 25        A.      Along with other changes in the Slayden housing

1029

```
 1    in order to make sure that light is reflected toward it, it's

 2    more than just adding -- it could be more than just adding a

 3    reflective surface to the sidewall.

10:35:10  4         Q.    And I apologize, I may be making shorthands

 5    here, but those other changes would also be obvious to a

 6    person with ordinary skill in the art?

10:35:18  7         A.    They should be.

10:35:20  8         Q.    Slayden certainly discloses light absorbing

 9    exterior surfaces?

10:35:24 10         A.    Yes.

10:35:33 11         Q.    Okay.  Can we go to the next element.  Slayden

12    discloses that multiplicity of spaced point light sources

13    housed within a volume, doesn't it?

10:35:43 14         A.    Yes.

10:35:46 15         Q.    And they extend along the predetermined length?

10:35:46 16         A.    Yes.

10:35:51 17         Q.    And they are positioned a distance from the

18    curved front surface to allow a light intensity pattern from

19    each point light source to overlap?

10:36:02 20         A.    Actually, you would have to bring up Slayden to

21    let me know -- to remind me whether Slayden teaches that.

10:36:08 22         Q.    Didn't your own tests show that you could get

23    overlapping patterns when you did your mockup?

10:36:15 24         A.    Using the spacing from the LEDs that I took out

25    of the Fallon sign, not the spacing of the LEDs necessarily
```

recommended by Slayden in his preferred embodiment.  Without

looking at Slayden again and looking at all of the dimensions

he gave, I'm not sure about that particular element of the

claim.

10:36:30     Q.     Okay.  Then let's talk about, again, this

person of ordinary skill in the art.  Your goal here,

obviously, is to achieve a uniform glow; correct?

10:36:39     A.     Yes.

10:36:42     Q.     Wouldn't it be obvious to a person in ordinary

skill in the art, if I'm not getting that uniform glow, one of

the things I might do is adjust the spacing of the LEDs to

make sure I get the right kind of overlapping light patterns?

10:36:59     A.     You might do that.

10:37:02     Q.     Well, it would be obvious, wouldn't it, to a

person of ordinary skill in the art?

10:37:08     A.     Yes.

10:37:14     Q.     So is there anything left in this Claim 25 of

the '238 Patent that isn't either expressly disclosed or made

obvious by Slayden, besides the sidewalls not abutting?

10:37:25     A.     There is the whole issue that I said last time

that you are ignoring again, that I do not believe the light

intensity will be uniform over the full angular extent of the

visible surface of the Slayden device.  And that's really --

you know, in many claims, the most important element is the

one at the end.  You know, A lot of the other ones recite

1031

things that are kind of normal, you get to the end, and that's

                     the thing that distinguishes that claim a lot of times from

                     other things.

10:37:58        And this issue of uniformity of the light over the

                     surface is really key to these patents.  And the Slayden

                     device has problems with its uniformity as described by

                     Slayden.  The device shown in this patent is not -- in my

                     opinion, is not fully uniform over the full extent, the full

                     angular extent.

10:38:25        Q.    And again, if we're talking about the last

                     couple of words, in Claim 25 where it says, appears uniform?

10:38:30        A.    Right.

10:38:33        Q.    And again, here you are applying that human

                     observer test?

10:38:41        A.    Yes.

10:38:54        Q.    Now, there's, I believe, three remaining

                     claims.  Claim 5 of the '970 Patent, Claims 1 and 8 of the

                     '262 Patent.  And those all have that solid language in it

                     that you've talked about before.

10:39:09        A.    Okay.

10:39:12        Q.    I will show you them so you can see them if

                     that helps you.

10:39:14        A.    I will take your word, since there is no

                     objection, that those are the ones with the solid, yes.

10:39:21        Q.    My question is, that's another distinction you

1   see, at least for those claims, between Slayden and the

            2   claimed inventions?

10:39:28    3           A.      And that's a key distinction between the

            4   original iLight patent and the Slayden patent, is the use of a

            5   sold member rather than a hollow member.

10:39:48    6           Q.      Can we go back to Exhibit 77.  And Figure 4.

            7   And I'm not going to belabor this point.  We spent a lot of

            8   time on it last week.  Figure 4 is what Slayden describes as a

            9   slotted tube?

10:39:58   10           A.      Yes.

10:40:01   11           Q.      And, therefore, is hollow and not a solid

           12   rod-like member?

10:40:07   13           A.      I believe it's still hollow.

10:40:12   14           Q.      Yes.  Now, can we put that down and put up

           15   Figure 5.  This is the housing, or one of the embodiments of

           16   the housing, disclosed by Slayden?

10:40:30   17           A.      Yes.

10:40:34   18           Q.      Slayden also describes this housing as a

           19   slotted housing -- I'm sorry, a tubular housing?

10:40:39   20           A.      I noticed that.

10:40:41   21           Q.      And so that, according to Slayden, is a tubular

           22   housing just like the Figure 4 is a slotted tube.  That's what

           23   he used?

10:40:49   24           A.      I understand he used that term.  I find that

           25   term rather strange, but yes, he used that term, tubular, for

the housing.

10:40:58    Q.    And I guess what I would ask you is, if this was a diffusive plastic, would that be a hollow tube or a solid tube?

10:41:11    A.    Where is the light emitting surface?

10:41:13    Q.    Can we turn that over?  Is that possible?

10:41:16    A.    I'm sorry, are you saying it is all a light emitting surface?

10:41:23    Q.    No, I'm saying -- let me see if we can turn it over.  It might make it easier.  If it's not possible, then I will approach the screen.

10:41:31    A.    We don't have to turn it over.  If substantially all that surface is light emitting, I could agree with -- I could agree with Slayden that it's a tube.

10:41:40    Q.    It's a tube?

10:41:43    A.    If substantially all of that is a light emitting surface.

10:41:47    Q.    All?

10:41:48    A.    Substantially all.  The little fingers at the end, at the top, I would agree to stick it into a housing somewhere.  But if substantially all is light emitting, I could agree it's tubular.

10:41:58    Q.    What if light emitting is from zero, where the 30 is all the way around?

10:42:05    A.    I would have problem calling that tubular.

10:42:06  1         Q.      Somewhere down here?

10:42:09  2         A.      I would definitely not call it tubular.

10:42:12  3         Q.      Somewhere between a little ways up here and it

       4  stops being a tube?

10:42:17  5         A.      I was thinking of an analogy between my last

       6  cross and now, about how to explain the difference between

       7  hollow and solid, and how curved pieces can be solid and how

       8  hollow pieces can have holes in them.  And I thought about

       9  using chocolate Easter bunnies, if you will give me a second

      10  to explain this.

10:42:34 11         I think we all know the difference between a hollow

      12  chocolate Easter bunny and solid chocolate Easter bunny.  We

      13  all want the solid ones, because there is more chocolate.

      14  What we know about a hollow chocolate Easter bunny, it has air

      15  on the inside and it's missing the chocolate inside.  It's

      16  definitely a hollow.  There is no distinction that that's

      17  hollow.

10:42:54 18         And then we sometimes, especially when we're kids, we

      19  may break the head off this Easter bunny first, and we have

      20  this object that's no longer completely a shell but still has

      21  a hole in it.  It now has a hole in it, but we still consider

      22  it hollow, because the hole is kind of a small part of the

      23  total surface.  So we have this hollow head of the original

      24  hollow chocolate Easter bunny.

10:43:19 25         Now we break the head apart to actually eat the

pieces.  What we have in our hands are curved pieces -- little
curved pieces, little pieces of chocolate which happen to be
curved or have other shapes.  I don't think we distinguish
those pieces anymore as being hollow.  We think of each of
those pieces of chocolate we now hold in our hands as solid,
but with a curvature.

10:43:40     So, yes, there is some point between being
substantially enclosed with a small opening that we call
hollow, or tubular in this case, and another point where the
device is still curved and not absolutely flat but not
substantially closed in which we no longer call it hollow, or
tubular in this case.  We just have to think of it as a solid
material forming, let's say, the object.  And so there is some
point between there where I would stop calling that tubular.

10:44:11     Q.     Now, the general shape never changes as we cut
off pieces of this?

10:44:14     A.     But the area that's doing the light emitting,
which is what's critical --

10:44:19     Q.     If you would answer my question, we'll go --

10:44:20     A.     Yes.

10:44:22     THE COURT:  Don't talk at the same time.

10:44:24     THE WITNESS:  Okay.

10:44:24 BY MR. KITTREDGE:

10:44:28     Q.     The general shape never changes as I cut out
pieces of it to make it shorter; correct?

10:44:32  1          A.     Correct.

10:44:34  2          Q.     But this shape is a hollow tube with full

3     length on the side; correct?

10:44:37  4          A.     Yes.

10:44:41  5          Q.     At some point when you shorten these legs, it

6     stops being a hollow tube and becomes a solid rod?

10:44:52  7          A.     Yes.

10:45:20  8          Q.     Now, at one point during your direct testimony,

9     you criticized --

10:45:25 10          THE COURT:  Now, this is limited to the scope of his

11    rebuttal.

10:45:27 12          MR. KITTREDGE:  I'm sorry?

10:45:29 13          THE COURT:  This is limited to the scope of his

14    rebuttal.

10:45:33 15          MR. KITTREDGE:  And that's the testimony I was talking

16    about.

10:45:37 17          THE COURT:  Well, I thought you said on direct.

10:45:39 18          MR. KITTREDGE:  Direct testimony he gave today.  The

19    testimony that today that he gave, is what I'm referring to.

10:45:43 20    BY MR. KITTREDGE:

10:45:45 21          Q.     And as the Court suggested, your direct

22    rebuttal testimony today.

10:45:49 23          A.     Yes.

10:45:52 24          Q.     You criticized Mr. Hathaway for saying -- I

25    think the quote is, quote:  The distinction between what

constitutes a diffuser and what constitutes a waveguide can be one of semantics?

10:46:05    A.    I didn't criticized him for the quote.  I criticized him only for going -- for jumping back and forth between first at one point his report saying these are different, a page later saying they really are the same, the next page saying they are different, later saying they are the same, they are different, they are the same, and ending up that they are really the same.  It's one of semantics, about what you call of -- I didn't criticize any individual statement.

10:46:25    Q.    I misunderstood what you were saying there.

10:46:27    A.    Just the changing opinions.

10:46:30    Q.    But you do agree that, whether or not a piece of translucent plastic is acting as a diffuser or as a waveguide will vary, depending on the orientation you put it into the light source?

10:46:43    A.    No, I don't think I ever said that.  I think that in most cases most diffusers will also operate as waveguides.  There are some rare cases where, depending on how the light enters, they won't be a waveguide.  But if they are a diffuser and you send light through them, some of that light will be scattered into angles that are -- into light rays which have angles that are totally internally reflected, and they will end up back in the waveguide.

In some extreme cases, in very high amounts of

2   absorptivity and light scattering, perhaps you would have to

3   modify their argument.  But for normal materials if they

4   scatter, they are going to be both diffusers and waveguides.

10:47:29  5          Q.    When we say normal materials in extreme cases,

6   let me make sure I understand.  The types of materials and the

7   types of applications we're talking about in this trial, most

8   diffusers will act as waveguides?

10:47:38  9          A.    Yes.

10:47:43  10          Q.    And most waveguides will also act as diffusers?

10:47:46  11          A.    Not necessarily true.  There are a lot of

12   waveguides that are made of ultra-pure material to minimize

13   scattering and, therefore, they won't have diffusive

14   properties.  So technically, they always have some scatterers,

15   but they would have so few that they wouldn't be considered to

16   be diffusers.

10:48:05  17          Q.    Getting closer to those ideal type waveguides

18   like fiber optics and things?

10:48:08  19          A.    Waveguides used for long distance

20   communications.

10:48:14  21          Q.    Right.  We're not talking about those kinds of

22   waveguides?

10:48:17  23          A.    No, I was just pointing out that the corollary

24   isn't always true.

10:48:20  25          Q.    I understand.  I'm not arguing with you on that

point.  I just want to make sure we're on the same page.

10:48:22  A.    Okay.  Let me clarify that diffusers need bolt
scattering.  Diffusers that work on surface scattering would
work somewhat differently than waveguides with bolt
scattering.  We're talking about diffusers with bolt
scattering.

10:49:17  Q.    Okay.  Can you pull up Exhibit 627, Page 14.
And if you could blow up that highlighted portion.  And I
believe you read or quoted this very portion of this document
during your direct testimony; correct?

10:49:35  A.    Yes.

10:49:40  Q.    And this is iLight's response to the Patent
Office's rejection of its claims in the '238 Patent; correct?

10:49:45  A.    That is correct.

10:49:48  Q.    And to your knowledge, nobody but iLight got to
participate in this process with the Patent Office, did they?

10:49:55  A.    I wasn't involved in the case at that time.  I
had no information about who participated or did not
participate.

10:50:10  THE COURT:  Would counsel approach the bench?

10:50:10  (Whereupon, a bench conference was held, out of the
hearing of the jury, to wit:)

10:50:15  THE COURT:  Isn't there is a procedure under the
patent -- where they have to serve public notice of the filing
of the patent, to give an opportunity to respond?

1040

1    MR. SCRUTON:  Well, there is a procedure whereby

2    people can respond.  We actually started to ask about that

3    yesterday, the reexamination procedure.

10:50:31 4    THE COURT:  Well, he's making a reference to the

5    patent procedure.  As a matter of patent procedure

6    regulations, people get an opportunity to respond.  I'm

7    worried about this question.

10:50:45 8    MR. KITTREDGE:  They don't at this stage, Your Honor.

9    I think Mr. Scruton is correct, at this stage it's just

10   between the applicant and the Patent Office, and nobody else

11   even knows what's going on.  But I'm going to move on.

10:50:55 12   MR. SCRUTON:  I don't think Mr. Roberts is an expert

13   in that.

10:51:00 14   THE COURT:  I will instruct the jury to disregard the

15   last question.

10:51:04 16   (Conclusion of bench conference.)

10:51:06 17   THE COURT:  Ladies and gentlemen of the jury, the

18   Court instructs you to disregard the last question.

10:51:16 19   BY MR. KITTREDGE:

10:51:19 20   Q.    One of the things that iLight told the Patent

21   Office, and what you quoted, was that the '168 patent, that's

22   Slayden, describes the use of a hollow thin walled translucent

23   diffuser that provides no preferentially scattering of light.

24   Correct?

10:51:36 25   A.    Correct.  I quoted that, yes.

10:51:41  1          Q.     But we have established today that Slayden's

 2      what is described here as thin-walled diffuser is actually a

 3      waveguide?

10:51:45  4          A.     Yes.

10:51:50  5          Q.     And we have established today that it does

 6      provide preferentially scattering.  Under the Court's claim

 7      construction.

10:51:58  8          A.     Under the Court's claim construction?

10:51:58  9          Q.     Yes.

10:52:01 10          A.     I thought we established that under my -- under

11      a definition of how light scatters in circular devices that I

12      provided.

10:52:11 13          Q.     I thought it was both.  But we did establish

14      today that Slayden's rod-like light transmissive member --

10:52:15 15          A.     Can I review the Court's definition of

16      preferentially scatters?

10:52:20 17          Q.     Excuse me?

10:52:24 18          A.     Can I review the court's definition of

19      preferential scatter?

10:52:36 20          Q.     Sure.

10:52:40 21          A.     I do apologize, Your Honor, for not reviewing

22      this before.

10:52:41 23          THE COURT:  That's all right.

10:52:41 24      BY MR. KITTREDGE:

10:52:49 25          Q.     And if you could highlight preferential

scattering.  Just blow it up.

10:52:56  A.    I do not believe it meets the Court's
definition.  I was given a technical definition of the issue
of the way waveguides work in both basically curved and
straight sections to say that it has some amount of scattering
across there, just from that geometric effect, that that is
not consistent with what the Court has defined.  It's far too
small to be consistent with what the Court has defined in the
term wide area throughout the internal.

10:53:27  Q.    I keep interrupting you, and I apologize.
Let's talk briefly about the one sample mock-up you made, high
density polyethylene, that didn't show an elongated pattern.

10:53:35  A.    Yes.

10:53:38  Q.    You don't believe that provides evidence of
preferential scattering?

10:53:44  A.    No, as we both said, that mock-up, as I said,
and as you have agreed to, that particular mock-up was tested
with an elongated LED under my assumption at that time that
the behavior was a system-based behavior of the LED and the
waveguides together.  And that combination provided an
elongated light pattern, but it also using an elongated LED.
A very mildly elongated light pattern, as you will remember
from my report, much less of an elongation based on percentage
than you saw in the Fallon devices.

10:54:19  So I would not agree that it has been demonstrated

that the -- that a tubular device would be -- would meet the

Court's definition of preferentially scatters light.

10:54:32    Q.    And that's because some of the elongation was

as a result of the elongated pattern emitted by the LEDs?

10:54:39    A.    It's because of two things.  It's because --

yes, in the experiment I ran, some of the elongation was due

to the elongation from the LED, in fact, perhaps all of it in

that particular case.  And a geometric analysis of tubes and

curved surface -- curved sections as we have in the Fallon

device, shows that one has a geometric effect that enhances

the elongation, and the other one doesn't.

10:55:01    Q.    But again, you never did anything when you were

studying Fallon's device to actually measure how much

elongation you get from the lens separate from the LED?

10:55:11    A.    You're right.  At that time I was considering

this to be a system definition, the light guide combined with

the LEDs producing an elongated pattern, the LEDs that were

there.

10:55:27    Q.    So do I understand -- can we go back to the

last exhibit, which is 627, I think it is.  Can you expand

that highlighted portion.

10:55:46    Do I understand that you believe a thin-walled or

hollow thin-walled translucent diffuser would not have

infringed the claims that are at issue today?

10:56:00    A.    Using the Court's definition or my definition?

| | | |
|---|---|---|
| 10:56:03 | 1 | Q.    I think we have to use the Court's definition. |
| | 2 | I think we're under an obligation to do so. |
| 10:56:10 | 3 | A.    Let me read that again.  A hollow thin-walled |
| | 4 | diffuser would not provide preferential scattering under the |
| | 5 | Court's definition. |
| 10:56:18 | 6 | Q.    And, therefore, would not infringe? |
| 10:56:26 | 7 | A.    Would not infringe. |
| 10:56:29 | 8 | Q.    Now, -- |
| 10:56:31 | 9 | A.    Let me just make absolutely clear what I said, |
| | 10 | because there has been a tendency to leave out that word, |
| | 11 | hollow, when using the term thin-walled.  My statement is |
| | 12 | hollow thin-walled, both together.  Drop the hollow, and I |
| | 13 | have a different opinion.  Hollow thin-walled is what my |
| | 14 | statements are. |
| 10:56:50 | 15 | Q.    Well, let's clarify that.  I think that's a |
| | 16 | good point.  Thank you.  There are a number of claims that do |
| | 17 | not require solid; correct? |
| 10:56:59 | 18 | A.    That's true.  We just saw those. |
| 10:57:01 | 19 | Q.    They require rod or rod-like? |
| 10:57:02 | 20 | A.    Right. |
| 10:57:04 | 21 | Q.    I think one of them doesn't even require a rod, |
| | 22 | it just requires a transmissive member? |
| 10:57:08 | 23 | A.    Okay. |
| 10:57:10 | 24 | Q.    With those claims, would you agree that a |
| | 25 | thin-walled translucent diffuser would not infringe those |

1    claims?

10:57:20   2         A.    So you want me to not look at what was

3    presented to the Patent Office?  You asked me separate

4    questions.  Do I believe that a thin-walled translucent

5    diffuser -- I believe a thin-walled translucent diffuser with

6    a curved surface would infringe the claims.

10:57:38   7         Q.    Slayden did have a curved surface?

10:57:41   8         A.    Slayden had a hollow thin-walled diffuser.

10:57:43   9         Q.    He had a curved surface?

10:57:47  10         A.    He had a hollow thin-walled diffuser.  That's

11    why Slayden is different.

10:57:53  12         Q.    Do you want me to put up Figure 4 so we can ask

13    if it's curved, or can we just admit it's curved?

10:57:57  14         A.    It's curved and hollow.

10:57:58  15         Q.    Okay.  But again, I'm talking about claims that

16    don't deal with solid.  The claims that allow hollow rods,

17    remember?  There are claims that do not require a solid rod;

18    correct?

10:58:06  19         A.    Correct.

10:58:10  20         Q.    And for those claims, wouldn't you agree that

21    if you have a sign that only uses a thin-walled translucent

22    diffuser, it would not infringe those claims?

10:58:21  23         A.    No, I would agree that claims that use a

24    thin-walled translucent rod as defined by the Court would not

25    infringe those claims.  But I would not agree that a thin

walled translucent diffuser does not -- I mean, you know, you
are taking the Court's definition of rod, you are dropping it,
and putting the word diffuser in its place, and asking me to
agree with the Court's definition of a rod when applied to
something we're not using the Court's definition of a rod for.

10:58:51        Q.     I'm trying to use what iLight told the Patent
Office in order to get these patents.

10:58:54        A.     But they told them that before the Court's
definition was in play.

10:58:58        Q.     And you relied on this to determine that
Slayden did not invalidate the patent?

10:59:02        A.     Because Slayden was hollow.

10:59:03        Q.     You relied on this after the Court's
construction?

10:59:04        A.     Yes.

10:59:08        Q.     So let's talk again about the claims that don't
require solid.

10:59:10        A.     Okay.

10:59:14        Q.     If they don't require solid, would you agree,
as this statement says to the Patent Office, would you agree
that a thin-walled translucent diffuser would not infringe
those claims?

10:59:27        A.     I would agree that a rod-like -- that a hollow
rod, because the Court has defined rods to include hollow,
would -- I'm sorry, I have my feet backwards now. Ask your

```
  1    question one more time.

  2         Q.    I'm excluding the claims that require solid in

  3    my question.

  4         A.    Okay.

  5         Q.    I'm talking about the claims that don't require

  6    solid.  They only require rod or rod-like.

  7         A.    Right.

  8         Q.    Would you agree that, for those claims, a rod

  9    or rod-like thin-walled translucent diffuser would not

 10    infringe those claims?

 11         A.    I'm sorry.  Why would it not infringe the --

 12    see, this is the part where I'm getting -- why would it not

 13    infringe the claims?  The claims are there.  The claims are

 14    presumed valid.  The patent has issued.  There is a

 15    presumption of validity.  They would infringe the claims.  You

 16    are going back to whether Slayden anticipates the patent or

 17    not based on the Court's definition.  I believe that's a whole

 18    different question unless I'm not understanding you correctly.

 19         Q.    You understand, don't you, that in order to

 20    determine whether a piece of prior art anticipates, you look

 21    to see if it has all the elements of the claims?

 22         A.    Right.

 23         Q.    In fact, you made that analysis to support your

 24    opinion that Slayden doesn't anticipate?

 25         A.    Right.
```

11:00:41 1    Q.    Okay.  You understand that, in order to
        2  determine if a product infringes, you look at the same claims
        3  and try to line up and make sure that that product has each of
        4  those elements of those claims?
11:00:53 5    A.    Yes.
11:00:55 6    Q.    So you can see there is a similarity in that
        7  analysis?
11:00:59 8    A.    Yes.  A similarity, but not enough of an
        9  overlap for me to answer one or the other.  It seems like I'm
       10  asked the question in one area -- to answer a question based
       11  on one part of this process with an analysis of another part
       12  of the process, and I'm not sure how those two parts go
       13  together here.
11:01:17 14    Q.    Do I understand correctly that you think you
       15  might apply the claims differently when looking at a piece of
       16  prior art for invalidity than you would a piece of product for
       17  infringement?
11:01:28 18    A.    No.  No.
11:01:31 19    Q.    Okay.  So let's apply them same way.
11:01:32 20    A.    Okay.
11:01:34 21    Q.    Would you agree that a rod or rod-like
       22  thin-walled translucent diffuser would not infringe the claims
       23  that don't require solid?
11:01:49 24    A.    Well, I guess, based on the Court's definition,
       25  it would not.  Wait a second.  Wait a second.  I need to sit

```
     1    back.  Too many nots.  I don't know which side of this thing

     2    you are asking at the moment.  Ask it one more time.  I

     3    apologize to everybody for --

11:02:10  4         Q.    If I have a sign?

11:02:12  5         A.    Yes.

11:02:14  6         Q.    Kind of like Fallon's sign?

11:02:14  7         A.    Yes.

11:02:21  8         Q.    And I use to cover my LEDs a thin-walled

     9    translucent diffuser?

11:02:24 10         A.    Yes.

11:02:27 11         Q.    Does that sign infringe the claims at issue

    12    that don't require a solid rod?

11:02:37 13         A.    I still believe it does.  I don't quite

    14    understand what the inconsistency is here.

11:02:43 15         Q.    You still believe it does infringe?

11:02:45 16         A.    I still believe it does infringe.

11:02:49 17         Q.    Then how is Slayden different, if all it has is

    18    a thin-walled translucent diffuser?

11:02:56 19         A.    Because it's hollow.  You are dropping the word

    20    hollow again.

11:03:00 21         Q.    That only applies to the claims that have solid

    22    in them; correct?

11:03:04 23         A.    When this case was being argued, those claims,

    24    as far as I know, all had solid in them, did they not?

11:03:14 25         Q.    I don't know.  They don't now, though, do they?
```

11:03:16  1          A.     Ask your question one more time.

11:03:19  2          Q.     The claims at issue in this court today do not

        3    all require a solid rod, do they?

11:03:24  4          A.     They do not.

11:03:28  5          THE COURT:  If the Court's instruction required a

        6    solid rod, would it be infringement?

11:03:37  7          THE WITNESS:  I'm sorry.  If the Court's instruction

        8    required a solid rod?

11:03:42  9          THE COURT:  Essentially solid rod.

11:03:45  10          THE WITNESS:  Essentially solid rod, then they would

        11    be infringing.

11:03:48  12    BY MR. KITTREDGE:

11:03:49  13          Q.     Fallon's signs would be?

11:03:51  14          A.     Well, if the Court's instruction required a

        15    solid rod, then the interpretation of the Patent Office action

        16    is different.

11:03:57  17          Q.     Okay.  So let me make sure that I am clear.  If

        18    the Court's instruction required a solid rod, and thin walled

        19    translucent diffusers --

11:04:02  20          THE COURT:  Essentially solid rod.

11:04:04  21          THE WITNESS:  Essentially solid rod.

11:04:05  22    BY MR. KITTREDGE:

11:04:07  23          Q.     Essentially solid rod.

11:04:10  24          A.     If Slayden's device is no longer an essentially

        25    solid rod, this is no longer an essentially solid rod, the

hollowness in this becomes significant, okay?  And everything
can -- a number of things change.  We're back to where I was
before the Court defined for us the term rod-like.  Where I
had initially determined the term rod-like to be essentially
solid, an essentially solid object.

11:04:47  Q.    But that's not the construction we are actually
using to infringement in this lawsuit.

11:04:50  A.    That's true.

11:04:52  Q.    And it's not the construction we're actually
using to determine validity in this lawsuit.

11:04:57  A.    Okay.

11:05:01  THE COURT:  But it was in the language described in
the patent, wasn't it?

11:05:08  THE WITNESS:  Excuse me?

11:05:10  THE COURT:  It was in the language described in the
patent, wasn't it?

11:05:13  THE WITNESS:  I think so, Your Honor, but I -- I mean,
I believe it was.  But in order to answer affirmatively under
oath, I would have to review the patent briefly.  I certainly
believe it was.

11:05:24  THE COURT:  Okay.

11:05:25  MR. KITTREDGE:  I have no further questions.

11:05:29  THE COURT:  Any redirect?  As a result?

11:05:32  MR. SCRUTON:  Yes, Your Honor.  I wonder if we could
approach briefly.

```
11:05:38   1         THE COURT:  Ladies and gentlemen, you have been
           2   sitting a while.  I thought this was going to be brief.  We're
           3   going to take a short recess.  Please don't discuss the
           4   evidence amongst yourselves or with anyone else until you
           5   receive all of the evidence, the argument of counsel, and the
           6   charge of the Court.  You can step down if you would like.
11:06:19   7         (Jury out.)
11:06:26   8         THE COURT:  Yes, sir.
11:06:30   9         MR. SCRUTON:  My question, there has been a lot of
          10   discussion in this questioning on the -- based on Dr. Roberts'
          11   interpretation of the Court's construction of the claims.  And
          12   my intent was to ask him where he -- what it is that causes
          13   him to conclude that the Court's construction includes hollow.
          14   Because when I read the Court's construction of rod, frankly,
          15   I don't see where hollow comes from.  But I don't want to
          16   start asking a bunch of questions that the Court is going to
          17   object to because I'm misinterpreting the Court's claim
          18   construction.
11:07:12  19         THE COURT:  Well, he has made a reference to that in
          20   his testimony, so you can ask him that question.
11:07:17  21         MR. SCRUTON:  Okay.
11:07:18  22         MR. KITTREDGE:  Your Honor, I would object, because
          23   that is now asking him claims construction, and none of the
          24   other witnesses have been --
11:07:26  25         THE COURT:  Well, you have been asking him all along,
```

where do you get this, where do you get this, where do you get
this.  You have been asking him all along.  That was the whole
cross.

11:07:36    MR. KITTREDGE:  I've been asking him how he applies
the Court's construction.

11:07:40    THE COURT:  Well, that's an application of the Court's
construction, whether he gets the term hollow in the Court's
description of rod.

11:07:49    MR. KITTREDGE:  I have nothing further.

11:07:51    THE COURT:  All right.  We'll be in recess for a
couple of minutes.

11:08:06    (Recess.)

11:21:58    THE COURT:  Any preliminary matters before we bring
the jury in?

11:22:04    MR. KITTREDGE:  Your Honor, real briefly, I had one
additional objection I would like to state for the record.

THE COURT:  Okay.

11:22:08    MR. KITTREDGE:  When Mr. Scruton explained his
question, and what he expected to elicit from it, the witness
was still in the witness chair and heard it all.  For that
reason, I also think it would be an improper question.

11:22:29    MR. SCRUTON:  I don't think I said what I expected him
to explain.

11:22:29    MR. KITTREDGE:  You said you expected him to explain
why he thought --

11:22:35  1        THE COURT:  Well, I would expect that he would respond

       2   based upon his competence, not his lawyer's request.  And you

       3   can cross examine him on it.

11:24:07  4        You can come back around, sir.

11:24:07  5        Bring the jury in, Mr. Marshal.

11:24:07  6        (Jury in.)

11:24:08  7        THE COURT:  You may examine.

11:24:08  8        MR. SCRUTON:  Thank you, Your Honor.

11:24:08  9   REDIRECT EXAMINATION

11:24:08 10   BY MR. SCRUTON:

11:24:11 11        Q.     Would you bring up Exhibit 77.  I just have a

      12   few things for you.  Column 4, down toward the bottom, lines

      13   45 through 60.

11:24:29 14        Just to put you into context, what we're looking at

      15   here is part of the specification in the Slayden patent where

      16   he is describing his invention.  And I will direct you to

      17   lines 45 through 55.  Could you highlight those, please.

11:25:11 18        Now, what is Mr. Slayden describing here?

11:25:14 19        A.     He's describing a hollow tube where light goes

      20   through the outer surface -- I'm sorry, comes from here, goes

      21   through plastic, goes into air, and goes through plastic a

      22   second time, and then goes out into air and light emitting

      23   surface.  Meanwhile, at each of those interfaces, it gets

      24   refracted and reflected.

11:25:40 25        Q.     And is that something that Mr. Slayden says is

```
 1   a property of a hollow tube?
 2        A.      Yes.  In order to have these two surfaces and
 3   these two multiple actions, you need -- he says two, you
 4   actually need the four surfaces.  You need the two outside
 5   surfaces and the two inside surfaces.
 6        Q.      And do you need to have the internal reflection
 7   off the inside surfaces of the tube?
 8        A.      He says you do.
 9        Q.      Would you get that with an essentially solid
10   rod?
11        A.      No, you wouldn't.
12        Q.      Let's just -- can you read the part beginning
13   at Line 50, starting with, it is?
14        A.      It is believed that this combination of
15   reflected and refracted light in the translucent tube is what
16   affords the neon-like glow of the fixture.  In the slotted
17   embodiment of the diffuser 10 illustrated in Figure 4, the
18   slot is aligned contiguously --
19        Q.      Okay.  Well, you can actually continue reading.
20        A.      The slot is aligned contiguously with the slot
21   33 in the housing 30.
22        Q.      And then the next sentence.
23        A.      This may somewhat reduce the quality of neon
24   simulation, but does facilitate assembly and maintenance since
25   the diffuser 10 is thus compressible to assist in engagement
```

11:25:45
11:25:59
11:26:03
11:26:09
11:26:13
11:26:17
11:26:23
11:26:46
11:26:51
11:26:53
11:26:56

```
                    1   with channel 39.

11:27:13            2           Q.     All right.  So he's saying, one, the tube is

                    3   especially good for this reason because of the reflections and

                    4   refractions?

11:27:21            5           A.     Yes, I testified to that in my direct rebuttal

                    6   testimony.

11:27:24            7           Q.     And is he also saying that there are some

                    8   problems with the slotted embodiment?

11:27:29            9           A.     It appears to me that he -- in my opinion, he

                   10   adds the slot not to improve the optical functioning of the

                   11   device, but as he says there, to make it easier to assemble.

                   12   And in doing that, he actually degrades its optical

                   13   performance, as he says himself in the patent.

11:27:45           14           Q.     Do the iLight patents teach anything about the

                   15   internal reflection within a tubular structure?

11:27:54           16           A.     No, they don't.

11:27:58           17           Q.     Would a tubular structure be included within an

                   18   essentially solid rod?

11:28:06           19           A.     No, it wouldn't.

11:28:11           20           Q.     Somebody of ordinary skill in the art reads

                   21   Slayden, and they would understand -- well, would they

                   22   understand what Mr. Slayden is describing here in terms of the

                   23   reflections and refractions?

11:28:23           24           A.     Of course they would, yes.

11:28:28           25           Q.     And having read that, do you think it would be
```

1    obvious to go to an essentially solid rod?

2         A.    Well, especially not because Slayden teaches

3    away from that, as I said in my testimony.  Slayden argues

4    that his device is superior to a solid rod because it's

5    tubular and, therefore, anybody reading Slayden would be

6    deincentivized -- I guess that's not a good word, but they

7    would be unlikely to go backwards from what Slayden teaches

8    and to use something which Slayden says is inferior to what he

9    has invented.  It's not an obvious extension to go back to

10   what the inventor says is inferior.

11        Q.    So in your opinion -- so, in fact, that would

12   be -- well, whatever the obvious -- or the opposite of obvious

13   would be?

14        A.    Right.  It would be nonobvious.

15        Q.    Okay.  Could you bring up Figure 6, please.

16   And this may need to be rotated.  This is Figure 6 of this

17   patent.  Could you expand Figure 6 and rotate it, please.

18   Okay.  What are we looking at, sir, in Figure 6?

19        A.    We're looking at the housing on the bottom.

20   We're looking at the housing here.  We have a circuit board

21   across the bottom.  We have an LED sitting on the circuit

22   board.  These things that I at one time thought were

23   reflectors are not reflectors, they are only clips to hold the

24   circuit board pressed down against these lips.  So they don't

25   extend the full length of the housing at all.  They are not

acting as reflectors.

11:30:45          There is the shelf up here that the optical tube sits

on, and there is the optical tube with its flat bottom, its

inside surface and its outside surface.

11:30:57          Q.    And is that the basic configuration that's

taught in the Slayden patent?

11:31:04          A.    That is the preferred embodiment, yes.

11:31:11          Q.    So are the shelves there, numbers 43 and 45 --

maybe shelf isn't a good term, but the shelf-like projections

I think you called them?

11:31:17          A.    Yes.

11:31:20          Q.    Are those an essential part of the Slayden

housing?

11:31:23          A.    Slayden says they are.  They hold the flat

bottom of his device and keep it from falling downward.

11:31:29          Q.    Right.  So they have at least an important

function in this device?

11:31:32          A.    Yes, they do.

11:31:35          Q.    Would it be obvious to get rid of those?

11:31:38          A.    No.

11:31:42          Q.    And assuming those are in place, would those

affect any internal reflection into the -- well, from the LEDs

off the sidewalls into the tubular structure at the top?

11:31:57          A.    I believe they would, in a similar manner that

I found in the new Fallon Bowtie sign where I did not find

that it infringed the claim requiring the walls to reflect

their light into the housing -- I'm sorry, into the light

translucent member, because they were basically too far away

sideways, and light that obviously bounced off them didn't get

into the light transmissive member.

11:32:22   6          Q.      So did you do an experiment on that device?

11:32:27   7          A.      I actually did. I cut the walls away and could

not measure any change in the light intensity of the light

transmissive member in that newer version of the Fallon

Budweiser sign. That's why I found it to not infringe those

claims that require the sidewalls to reflect light and direct

it up into the light transmissive member.

11:32:50  13          Q.      And so would it appear to you that a projection

such as we see in the Slayden Figure 6 would, at least based

on your experiments, have a significant effect on the light

that gets into -- well, on any light that might be reflected

from the sidewalls getting into the tubular diffuser of

Slayden?

11:33:13  19          A.      Yes, it could; right. And also, the distance

from the LED to the top member, the light -- I found that most

of the light comes out about 30 degrees on either side, and

that light has to hit the sidewall that's properly positioned

in order to get it up into the housing.

11:33:32  24          Q.      And would that configuration be properly

positioned?

1          A.      No, as shown in the drawing, the LED is a bit

2    closer than you would like.  I mean, it's so close that you

3    really don't need any reflection, wouldn't use reflector on

4    the sidewalls.

5          Q.      Now, there was talk during your cross

6    examination about obviousness and whether it was obvious to

7    use a reflective sidewall.  Given those limitations of the

8    structure shown in Slayden, do you think it's obvious that

9    somebody of skill in the art would make the changes that would

10   be required to make a reflective sidewall, make any kind of a

11   significant addition?

12          A.      Well, first of all, the distance that Slayden

13   shows the LED, which -- shows the LED, which I wasn't aware of

14   earlier, most of the light from the LED would go into that

15   bottom surface anyway, assuming a normal LED with about a 30

16   or so degree dispersion angle.  Most of the light would go

17   directly up into the bottom surface anyway.  There wouldn't be

18   any light reflecting off the sidewalls.

19          In the Fallon device, I found about half, roughly -- I

20   don't remember the exact numbers, maybe 42 and 58 breakdown,

21   but roughly about half the light went directly into the bottom

22   surface of the light emitting member, and about half of it was

23   reflected off the sidewalls once.  But those LEDs were

24   positioned way down in the housing.  This LED is so close to

25   the device that a similar LED with a similar beam pattern, I

believe almost all of the light would go into that lower

surface up here of the light transmitting member.

11:35:27   Q.   So are you revising your opinion about whether

it would be obvious to make these sidewalls reflective?

11:35:34   A.   What I'm saying is that they -- if -- even if

they were reflective, they would most likely not have a

significant impact, would not have a measurable amount of

light increase in the light transmissive member, because very

little light would bounce off of them, even if were

reflective, and even if you did redesign that housing.

11:35:56   In a sense, the incentive to redesign the housing to

get more light to make them light reflective, doesn't seem to

be there now that I'm looking at the drawing more closely,

because the LEDs are positioned by Slayden so close to that

bottom surface that most of the light would go directly into

the bottom surface, not leaving any left over to be reflected,

or not leaving enough to be reflected to be worth redesigning

the housing.

11:36:22   Q.   Mr. Kittredge asked you about various things

and whether they would be obvious.  Some of them you said yes;

some of them you said no.  But at all times when you were

making that determination, were you aware of the iLight

patents?

11:36:39   A.   Yes, I was aware of the iLight patents.

11:36:41   Q.   You were quite aware of them?

11:36:41   1          A.      Yes.

11:36:45   2          Q.      And you have studied them fairly closely,

           3   haven't you?

11:36:47   4          A.      Yes, I did.

11:36:49   5          Q.      Do you find that -- well, in determining what's

           6   obvious, are you familiar with the idea of hindsight bias?

11:36:58   7          A.      I'm not familiar with that term, but I can

           8   understand what it means.

11:37:04   9          Q.      Well, are there things -- are you familiar with

          10   the idea that lots of things are obvious once you know how

          11   they work?

11:37:08  12          A.      Absolutely.

11:37:11  13          Q.      And do you think that may have been in play in

          14   your discussion with Mr. Kittredge?

11:37:16  15          A.      Well, I think I pointed out in one of my

          16   answers to him that lots of things are obvious after the fact.

          17   So I wasn't familiar with the legal term as you just used it,

          18   but the practical term that, looking at lots of inventions

          19   after they are done, people could say oh, that's obvious.  But

          20   the invention was made, and it wasn't obvious before it was

          21   made, so -- to the rest of the world.  And there are a lot of

          22   inventions one could look at and, after looking at it, say,

          23   that's obvious, you know?  I mean, that happens a lot.

11:37:48  24          Q.      I wish I had thought of that.

11:37:51  25          A.      Right.  I hold 30 patents, and I know there are

a lot of other patents I look at, and I say, why didn't I

patent that thing.  Okay?

11:38:01  Q.    Can you bring up the first page of this Exhibit

77.  Okay.  Now I would just like to focus on the drawing.

11:38:12  A.    Okay.

11:38:18  Q.    Mr. Kittredge asked you about various of the

claims.  And as we saw, certain of the claims of the iLight

patents required require an essentially solid rod.  Do you

recall that?

11:38:30  A.    Yes, I do.

11:38:34  Q.    And is this feature of the Slayden device an

essentially solid rod?

11:38:38  A.    That is not an essentially solid rod.

11:38:41  Q.    So whatever effect the Slayden patent may have

on the iLight patents, any claims that require an essentially

solid rod -- this would not read on them, would it?

11:38:56  A.    Absolutely not.  With the Court's permission,

could I review or look at the rod-like definition of the Court

one more time and comment on it?  Not on it, but comment on my

response to it, my interpretation of it.

11:39:11  THE COURT:  The interpretation or application?

11:39:15  THE WITNESS:  The application of it, sir.  At least I

believe it is.  Not being a lawyer, I hope that I'm correct.

Okay.

11:39:24  And I'm not sure if this is proper, but you will have

1  to -- before seeing this interpretation, I had used rod in a

2  -- rod-like to mean a solid rod-like member.

11:39:36  3      And there is nothing in this definition that changes

4  that interpretation that I had initially of the rod.  This

5  whole issue stems from the identification in my first cross

6  examination of whether this microphone stand, which is

7  tubular, is a rod.  And I said it was.  That was -- I did say

8  it was, that's in my testimony, but it is inconsistent with

9  what I had believed previously to be rod.  It's also

10  inconsistent I believe with what the Court has interpreted the

11  rod to be.  But that was, indeed, my testimony and my cross.

11:40:16  12  From that stems the whole hollow argument.

11:40:16  13  BY MR. SCRUTON:

11:40:19  14      Q.    The claim construction document -- do you have

15  that?  Maybe we'd better switch over to the Elmo.  I hope we

16  can all see this.

11:41:23  17      A.    Yes.

11:41:26  18      Q.    What we're focusing on here is the definition

19  the Court has given for rod.  And I don't recall when you made

20  your comment about this being a rod?

11:41:41  21      A.    Right.  Or rod-like.  I believe my exact

22  testimony was it was rod-like.

11:41:47  23      Q.    Did you have that definition in front of you?

11:41:52  24      A.    I don't know if I had it in front of me, but it

25  was -- I don't know if I had it in front of me.

1          Q.    All right.  Well, in any case, having the

2     Slayden tubular diffuser in mind, and looking at this

3     definition, has that caused you to question whether a tube is

4     a --

5          A.    I never -- I really never questioned myself

6     whether a tube was a rod.  I was asked for an example of a

7     rod-like device.  There was actually nothing solid in front of

8     me.  I pointed to this device.  And from then I have, by my

9     testimony, been in position to accept hollow as rod-like,

10    which is not in the Court's definition and not in my own

11    definition.  But it is what I testified to in my -- I agree to

12    that.

13         Q.    Insofar as the Court's definition does not

14    include a hollow device like what we see in Slayden, then

15    various of those things that you said were obvious in view of

16    Slayden, or Slayden was incorporated in the iLight patents,

17    that would not apply?

18         A.    As long as I'm not forced to include the word

19    hollow, because of my prior agreement that hollow, then those

20    answers are reversed.

21         Q.    Okay.  So you are back to your opinion that

22    Slayden does nothing to invalidate the iLight patent?

23         A.    Because it's hollow, it does not.

24         Q.    Okay.  And I believe you testified -- correct

25    me if I am wrong -- that your conclusion from your experiment

1    with a Slayden mock-up was that it did not provide

2    preferential scattering as that term has been defined by the

3    Court?

11:44:00  4        A.    It does not provide it as defined by the Court;

5    correct.

11:44:07  6        MR. SCRUTON:  I believe that's all I have.

11:44:11  7        THE COURT:  You may recross.

11:44:11  8    RECROSS EXAMINATION

11:44:14  9    BY MR. KITTREDGE:

11:44:21 10        Q.    It's fair to say your testimony between cross

11    and redirect has changed somewhat, hasn't it?

11:44:32 12        A.    It has in the issue of dealing with the -- with

13    the concept of hollow.  I went back and looked again at my

14    copy of the Court's definition of the term and again saw that

15    it did not have or even imply the word hollow.

11:44:46 16        Q.    Does it have the word solid?

11:44:49 17        A.    It does not have the word solid.  it says does

18    say bar.

11:44:52 19        Q.    It also says a wand, doesn't it?

11:44:54 20        A.    It does say a slender bar.

11:44:56 21        Q.    Or a wand?

11:45:02 22        A.    Resembling a wand.  Resembling in shape a wand.

23    A rod is, okay, a slender bar or a strip, both of which I

24    interpreted to be solid.

11:45:09 25        Q.    Is it also fair to say that your testimony has

changed rather dramatically from the testimony you gave last

                Thursday on cross?

11:45:16        A.      My testimony has changed to the extent that

11:45:20        identifying this as -- I believe I said a number of times it

                was rod-like, not rod, really kind of meaning that the outer

                shape was like a rod.  But in that particular regard, you are

                right, I am now saying that what I agreed to was rod-like,

                this hollow tube, in review of the Court's definition of rod,

                I now believe is incorrect, even though I testified to it, and

                I agree I testified to it.

11:45:45        Q.      Now, I asked you last Thursday when you were

                done testifying if all of your opinions on infringement were

                based on the Court's claim construction.  Do you remember

                that?

11:45:52        A.      I do.

11:45:54        Q.      And you answered yes, didn't you?

11:45:56        A.      I probably did, but I don't have that specific

                recollection in mind.  But I will accept that I did if you say

                I did.

11:46:03        Q.      Okay.  So you had the Court's claims

                construction in mind Thursday?

11:46:05        A.      Right.

11:46:08        Q.      And you have in it mind today.  But you have a

                different understanding of what it means now?

11:46:13        A.      Yes.  As I explained when you asked me to point

out rod-like objects, and having no solid object in front of
me, every one of these things is hollow, okay?

11:46:22  Q.    Okay.

11:46:24  A.    I probably should have said there are none, but
I pointed to this as rod-like.

11:46:29  Q.    Since Thursday, have you spoken to anybody at
iLight or a representative of iLight's about the Court's claim
construction?

11:46:36  A.    We've probably spoken, but not about this
issue.

11:46:39  Q.    Have you spoken to counsel for iLight about the
Court's claims construction?

11:46:47  A.    You know, I don't think so.  I was home over
the weekend.  I didn't get back until Sunday night.

11:46:52  Q.    But do you remember or not, did you talk to
counsel about the Court's claim construction?

11:46:59  A.    I don't remember having a conversation with
counsel about claim construction.

11:47:07  Q.    Can we pull up Exhibit 77?  And go to Figure 6,
please.  Are you able to rotate that?  And highlight, expand
just this Figure 6 part.

11:47:32  You just provided some testimony about this on
redirect, something about the distance between the LED and the
light receiving surface?

11:47:37  A.    Right.

1          Q.      And that distance tells you that reflectivity

2     would have no part in how this operates, or something like

3     that?

4          A.      You said no part.  I said minimal part, not

5     worth -- probably not worth making the walls reflective and

6     redesigning the housing in order to capture that additional

7     light.

8          Q.      Is it your understanding that Figure 6 is a

9     scale drawing?

10         A.      I took it to be a scale drawing.  He doesn't

11    say it was a scale drawing, doesn't give dimensions.  I assume

12    it's a scale drawing.

13         Q.      It doesn't say anywhere in the patent that this

14    is a scaled drawing, does it?

15         A.      It does not say it's a scaled drawing.

16         Q.      All right.  Can I see Exhibit 1.  Go to Figure

17    3.  Wouldn't you say -- this is iLight's '238 Patent.  You

18    recognize it, don't you, sir?

19         A.      I do.

20         Q.      Wouldn't you say the LED in this figure from

21    iLight's patent is substantially closer to the light receiving

22    surface than the one we just looked at from Slayden?

23         A.      Appears to be.

24         Q.      So you would agree that light reflecting

25    sidewalls has nothing to do with how this device performs?

| | | |
|---|---|---|
| 11:48:51 | 1 | A. It would probably have very little effect. |
| 11:48:55 | 2 | Q. Would you believe this is a scale drawing also? |
| 11:48:56 | 3 | A. I believe it is. |
| 11:48:58 | 4 | MR. KITTREDGE: All right. No further questions. |
| 11:48:58 | 5 | THE WITNESS: Okay. |
| 11:49:00 | 6 | THE COURT: I take it -- anything further from this |
| | 7 | witness? |
| 11:49:02 | 8 | MR. SCRUTON: No, Your Honor. |
| 11:49:04 | 9 | THE COURT: You may step down, sir. |
| 11:49:06 | 10 | Any other proof on behalf of the plaintiff? |
| 11:49:17 | 11 | (Respite.) |
| 11:49:19 | 12 | THE COURT: Any other proof on behalf of the |
| | 13 | plaintiff? |
| 11:49:21 | 14 | MR. VEZEAU: Except for offering his report, which we |
| | 15 | do, Trial Exhibit 30, we have nothing further on rebuttal. |
| 11:49:28 | 16 | THE COURT: Any further proof from the defense? |
| 11:49:30 | 17 | MR. KITTREDGE: No proof, Your Honor, but we do have a |
| | 18 | Rule 50 motion. |
| 11:49:31 | 19 | THE COURT: All right. Ladies and gentlemen of the |
| | 20 | jury, I'll tell you what I'm going to do. This went a little |
| | 21 | bit -- I'm going to send you all home for the day. There are |
| | 22 | some matters that the Court needs to take up with counsel that |
| | 23 | will require extended discussion. And rather than having you |
| | 24 | all just sit in the room up there waiting on us to finish, and |
| | 25 | we're not certain how long it's going to take, I'm going to |

1    let you all go for the day.  When you come back in the
                2    morning, we will have the final stages of the lawsuit.  You
                3    will hear closing arguments on behalf of the parties.  And
                4    after closing arguments, you will receive the Court's
                5    instructions.  And after that, you will select a foreperson,
                6    and after you have selected a foreperson, you will begin your
                7    deliberations.
    11:50:18    8         But I think that, given the timing, that it's probably
                9    best for you all to come back in the morning.
    11:50:24    10        Please don't discuss the case amongst yourselves or
                11   with anyone else until you receive the closing arguments of
                12   the parties and the Court's instructions.
    11:50:33    13        You may pass your pads to the Marshal, and your
                14   notebooks as well, and they will be here tomorrow when you get
                15   here.
    11:51:25    16        (Jury out.)
    11:51:34    17        THE COURT:  With the motions and the brief and
                18   response to the plaintiff's motion, and what I've got to do, I
                19   just didn't think we could get to closing arguments today.  So
                20   rather than break that up too much, I'll thought it would just
                21   be better to start in the morning.
    11:51:35    22        Your motion?
    11:51:35    23        MR. SAWYER:  Thank you, Your Honor.  I first want to
                24   apologize.  The title of the motion is inaccurate.  It should
                25   be Fallon's motion for judgment of invalidity as a matter of

law.  These were obviously prepared sometimes late at night,

11:51:35  and it's with my apologies that the title is incorrect.

11:51:35          THE COURT:  All right.

11:51:35          MR. SAWYER:  Defendant Fallon respectfully moves this

Court to enter judgment as a matter of law pursuant to Federal

Rule 50 that the asserted claims of the '238 patent, the '262

patent, and the '970 patent are invalid as anticipated and

obvious.

11:51:35          Fallon has presented substantial evidence and clear

and convincing evidence, Your Honor, that the asserted claims

are invalid as anticipated in view of Slayden, the '186

patent.

11:51:35          We've heard testimony from Mr. Hathaway, and now from

Dr. Roberts, that those patents, that the '186 patent

discloses each and every element of the asserted claims.

11:51:35          The one element in which I think both parties agree

that may not be explicitly described in the Slayden patent is

side reflective -- or light reflective sidewalls.  I think

there has been, as Your Honor knows, anticipation can be found

both explicitly and inherently.  And there has been testimony,

sufficient testimony, to prove those light reflecting walls

are present inherently in the Slayden patent.

11:51:35          I believe, as the chart that's attached to the motion

goes into pretty much very detailed analysis of the Slayden

patent and how each and every element of each asserted claim

is found in the Slayden patent.

As to obviousness, Your Honor, we believe that Fallon has presented clear and convincing evidence both of Mr. Hathaway and Mr. Chuck Nelson that the patents would be obvious in light of the -- that the patents are really just a predictable use of known elements according to their established function and would be obvious under KSR.

Essentially, Your Honor, anyone working in the sign industry could easily combine basic parts with known function, assembled signs to come up with what iLight patents now claim is new.  ILight failed to present any evidence to embody this testimony.  Again, both Chuck Nelson and Mr. Hathaway presented evidence on that.  And Mr. --- Dr. Roberts -- excuse me, Dr. Roberts -- has so testified as well, that the combination of Slayden with known effects in the sign industry, including reflective sidewalls, would be obvious. He also testified that the small change in the housing would be obvious.

All of those things, in combination with the Slayden patent, makes the claims asserted in this case obvious.  In addition to the testimony about combining the Slayden patent with just known knowledge, Your Honor, Mr. Hathaway has also identified several patents and also disclosed the potentially missing elements in the Slayden patent.

Mr. Hathaway identified the Sodow reference and also

the Hulse reference, which identifies solid rod waveguides
that could easily -- would be obvious, to one skilled in the
arts, to combine with Slayden to get the exact device in the
11:51:35  asserted claims.

11:51:35      In addition to the Sodow and Hulse reference, which
talk about essentially solid or solid waveguides, leaky
waveguides, in fact, Your Honor, there is a reference to Rose.
Rose specifically discloses LEDs in a channel using light
reflective sidewalls.  Again, mr. Hathaway testified that it
would be obvious to combine Rose with Slayden to get the exact
device now claimed in the iLight patents.

11:51:35      With that, Your Honor, the rest of the detail is in
our motion.  And we respectfully request that you find the
patents anticipated and obvious.  Thank you.

11:51:35      THE COURT:  Thank you.

11:51:35      MR. VEZEAU:  Yes, Your Honor.  If it will help the
Court, we just got handed this motion, of course.  We would be
happy to respond in writing.  But just very briefly, in
general, I think it's somewhat of a mirror image of the JMOL
Rule 50 motion we filed with the Court.  Obviously from the
other side.

11:51:35      We think that the grounds suggested in this JMOL
motion by Fallon are absolutely missing and baseless.  I
pointed out this morning when I discussed this with you the
missing elements in Slayden.

And so, to try to make up for that, Fallon suggests

that, well, you could do this or you could do that, you could

put a solid rod in Slayden and all this.  But there is no

suggestion -- there is no reason to combine.  There is no

suggestion, there is no motivation.

Mr. Slayden said, the key to my whole device here is

this hollow tube, and what I want are a bunch of reflections

and a bunch of refractions in this hollow tube.

There is not one word in that patent about reflections

off any sidewalls, this, that and the other thing.  That's not

what he was interested in.  And that's how he got the effects

he wanted.

Now, to say, well, there's a solid rod in somebody

else's patent, and you could just throw that into Mr.

Slayden's patent doesn't make a bit of sense.  Because what it

is, is saying you can take Mr. Slayden's contribution, his

idea of the hollow tube, and just ignore it.  Well, to

combine, you don't use Monday morning quarterbacking, which is

what's being suggested here.

Now we have the iLight patents.  And what the Patent

Office found was patentable and not obvious over Slayden.  But

we know the solution.  We know the claim.  To look at that,

and to say, okay, could you do this?  Well, sure you could do

it now that you know the solution, but that's not the test.

The test is to put yourself back in January of 2001

1    and look at this through the eyes of one of ordinary skill in

2    the art.

11:51:35   3        At that time they didn't have a solution.  They didn't

4    know what the iLight patent said.  The question was, would you

5    modify Slayden?  Well, the answer is no, because Mr. Slayden

6    says, I want this hollow tube.  And that's his invention.

11:51:35   7        And furthermore, in connection with whole analysis, as

8    pointed out in our motion previously, you must go to each

9    claim and consider each claim as a whole.  And I suggest this

10   focusing on couple of elements there and saying therefore, the

11   patents are obvious, which is what was contended, is not the

12   proper test under Graham v. John Deere.

11:51:35  13        So we suggest the motion is lacking, is baseless, and

14   should be denied.

11:51:35  15        THE COURT:  Yes, sir.

11:51:35  16        MR. SAWYER:  Two very brief points, Your Honor.  I

17   believe what Mr. Vezeau misses is that Slayden teaches exactly

18   what the patent does.  As we heard Dr. Roberts say, a solid

19   rod that is a waveguide, which is what was claimed in this

20   patent, has what's called total internal reflection.  That

21   means the light is reflected within the rod.  There is no

22   difference between a hollow rod and a solid rod.  They each

23   reflect light internally.  That means the light is reflected

24   internally down the length of the entire structure.

11:51:35  25        That is exactly what iLight said Slayden didn't do.

1    Now, iLight said that to the Patent Office.  But now, Your

2    Honor, we've had Dr. Roberts say, no, no, wait a second.

3    You're right, it is a leaky waveguide, because absolutely it

4    reflects light internally, just like our waveguide.

11:51:35  5         So I think Mr. Vezeau is missing the point here.  That

6    hollow or solid doesn't make a bit of difference.  They both

7    function in exactly the same way.

11:51:35  8         And with that, Your Honor, we feel like we have

9    addressed each and every element of each and every claim.  And

10   in fact, Dr. Roberts so identified during his cross

11   examination that at least three of the claims asserted were

12   clearly obvious in light of Slayden.

11:51:35  13        Thank you.

11:51:35  14        THE COURT:  Well, the defense asked for an opportunity

15   to file a written response to the plaintiff's motion.  Does

16   the plaintiff request time for a written response?

11:51:35  17        MR. VEZEAU:  If it will be helpful to the Court, we'll

18   be happy to yes, Your Honor.

11:51:35  19        THE COURT:  I will leave it up to the parties.

11:51:35  20        MR. VEZEAU:  Yes, we'll do that.

11:51:35  21        THE COURT:  If you all could have your written

22   responses back here by 1:30, and come back, give me about a

23   half hour to look at them.  And if you all would have those

24   responses delivered at 1:30, be back in court by 2:00.  And

25   I'm not sure I will have a the jury instructions ready by

1078

1    then, but we'll just have to wait and see.  Are there any
                    2    other matters?
11:51:35            3            MR. PRICE:  Your Honor, in terms of delivery, we may
                    4    have to go back to the hotel to do that.  Should we e-mail
                    5    that to Ms. Gregory?
11:51:35            6            THE COURT:  Yes, you can e-mail it.
11:51:35            7            MR. PRICE:  Thank you.
11:51:35            8            THE COURT:  We're in recess.
11:51:35            9            (Recess.)
11:51:35           10            THE COURT:  We hope to have the jury instructions for
                   11    you shortly.  I reviewed the response and the cross motion for
                   12    judgment as a matter of law of indefiniteness.  And there is a
                   13    motion to modify the Court's construction filed by the
                   14    plaintiff.
11:51:35           15            We have heard argument on the motions, partial
                   16    argument on the motions for judgment as a matter of law.  So
                   17    why don't we take up the responses for the motion for judgment
                   18    as a matter of law.  Let's hear first to the defendant's
                   19    judgment as a matter of law.
11:51:35           20            MR. SAWYER:  Thank you, Your Honor.  To begin with, I
                   21    would like to pass up a case, if I could.  I'll read it into
                   22    the record.  It's KSR International v. Telefex.  And it's 550
                   23    U.S. 398, or 127 -- Supreme Court 727.  I highlighted a few
                   24    portions in there for you, Your Honor.
11:51:35           25            THE COURT:  I think it was attached.

MR. SAWYER:  It was attached, but I wasn't sure if you

had a chance to print it off, so I highlighted a couple of

sections.  But we won't need to talk about that until we get

to obviousness section, but I thought I would hand it up

anyway.

Your Honor, I would like to start with the

indefiniteness section which I told you we'd be filing

something on, and we did.  And I want to address that first.

Initially, Your Honor, we believe Fallon has presented

sufficient evidence that a jury could find by a clear and

convincing evidence that the patent terms are indefinite.

35 U.S.C. 112 states the specification shall conclude

with one or more claims particularly pointing out and

distinctly claiming the subject matter which the applicant

regards as his invention.

Your Honor, there is case law.  Datamize in particular

says claims that require subjective opinion are improper.  And

in fact, they said it requires an objective standard with an

objective anchor.

The human observer test that Dr. Roberts is putting

forward for simulation of neon light absorptive and light

reflective are subjective opinion, and, therefore, indefinite.

Halliburton says claims cannot be defined functionally by what

they do rather than what they are.

Again, this is how Dr. Roberts identified how these

1    claims should be interpreted.  The simulation of neon, it must

         2    simulate.  Again, that's a function.  It must be light

         3    absorptive.

11:51:35 4          We've heard testimony about all surfaces reflect

         5    light.  So if they are light absorptive or light reflective or

         6    just defining functionally how they work.  And then

         7    preferentially scatters as well, Your Honor, we would present

         8    that that's a functional limitation and, therefore,

         9    indefinite.

11:51:35 10         The last point I would like to make, Your Honor, is

        11    Fallon has presented sufficient evidence to show that if an

        12    artisan, someone skilled in the art, is required to make a

        13    separate infringement determination in different embodiments,

        14    so each time something is used, it may infringe or it may not.

11:51:35 15   And that's -- they would have to make a separate infringement

        16    determination on the same infringing element.

11:51:35 17         And that's, again, reflective and absorptive.  In one

        18    instance the same surface could be reflective, and in the

        19    other instance it could be absorptive.

11:51:35 20         In addition, waveguide is same way, Your Honor.  We

        21    heard Dr. Roberts testify that if you put piece of plastic in

        22    a particular arrangement, it's a waveguide; it's also a

        23    diffuser.  The patentee has to definitely define the scope of

        24    his invention.

11:51:35 25         In the patent prosecution, we presented evidence, Your

Honor, that they distinguish over diffusers, thin-walled
diffusers.  Dr. Roberts says, wait a second, a thin-walled
diffuser is also a waveguide.  One skilled in the art has to
make a determination:  Is it a waveguide in this situation, or
is it a diffuser?  And that's indefinite as a matter of law.

11:51:35     Your Honor, we will -- this is a cross motion for
indefiniteness.  And it is a matter of law.  And there is
certainly an opportunity for you to present to the jury an
instruction and ask for an advisory opinion.  We don't think
that's necessary.  We think you can decide that just on the
facts that we've presented in this case.

11:51:35     As to defendant's other contentions that we haven't
presented sufficient evidence to go to the jury on, in
anticipation, I would like to point out that we certainly feel
we have, and I think the evidence will show that.

11:51:35     In their motion they address a number of claim
limitations that they say were not addressed by Fallon.  The
first is reflective inner sidewalls.

11:51:35     Mr. Hathaway testified on direct that -- and I
apologize Your Honor, I should slow down here.  They are
saying that there are certain claim limitations that we did
not address that were found in the Slayden -- the Slayden
patent.

11:51:35     The first is reflective inner sidewalls.  Mr. Hathaway
testified -- thank you.  Mr. Hathaway testified that all

sidewalls are reflective, and, therefore, it's inherently

found in the Slayden reference.

11:51:35 There is no dispute, and Dr. Roberts and Mr. Hathaway

agree, that the sidewalls are present in the Slayden

embodiment.

11:51:35 Now, iLight and Dr. Roberts do not dispute that they

disclosed sidewalls. Their distinction is based on color,

Your Honor. They say that the sidewalls are black and,

therefore, cannot be light reflective.

11:51:35 Your Honor, we submit that that's -- we certainly

presented sufficient evidence that the sidewalls are there and

they are light reflective.

11:51:35 The other term that they address is substantially

rod-like member. Well, we've seen today in cross examination,

first, Mr. Hathaway presented sufficient evidence for a jury

to find clearly -- clear and convincing evidence that the

round member on top of Slayden is a substantially rod-like

member. In fact, the Patent Office called it that, and

indeed, Dr. Roberts called it that on a number of occasions.

And so there is certainly sufficient evidence that it's a

substantially rod-like member.

11:51:35 The other one that they address that they say we

didn't address in Slayden is essentially solid, leaky

waveguide rod. Well, Your Honor, I would like to break that

up into sort of two pieces, because we didn't actually

```
 1    interpret that claim.  The parties didn't and the Court
 2    didn't.
 3         Leaky waveguide rod, well, we had Mr. Hathaway testify
 4    that the hollow tube and the arch-shaped tube on Slayden was,
 5    in fact, a leaky waveguide rod.  And we also had Dr. Roberts
 6    agree with him.  He agreed with him on Thursday, he agreed
 7    with him again today, that there is no doubt in his mind
 8    that's a leaky waveguide rod, and a jury could find so.
 9         Now, essentially solid.  There was some back and forth
10    on whether or not the Slayden device showed an essentially
11    solid leaky waveguide rod.  We submit that we have presented
12    sufficient evidence, Your Honor, that Mr. Hathaway testified
13    that the arch-shaped diffuser that's on top of Slayden is
14    essentially solid, certainly in light of how defendants -- or
15    I'm sorry, plaintiffs say that the arch-shaped diffuser on the
16    Fallon device is solid.
17         So I think we have presented sufficient evidence that
18    a jury could find that the arch-shaped diffuser in Slayden is
19    similarly solid as the arch-shaped diffuser on -- the diffuser
20    on the Fallon devices.
21         Now, the rest of the limitations, we've seen Dr.
22    Roberts admit on the stand that Slayden discloses all of the
23    other limitations.  We have also -- Mr. Hathaway has presented
24    a chart in which he meticulously goes through and points out
25    those limitations in the Slayden device.
```

11:51:35 1          As to obviousness, Your Honor, I did bring to your

2     attention the KSR case, which is not cited in iLight's papers.

3     It is the most current case from the Supreme Court on --

11:51:35 4          THE COURT:  I think I cited it earlier in reference to

5     the issue of whether the person expressing the opinion has to

6     be a person of ordinary skill.

11:51:35 7          MR. SAWYER:  I think that the KSR case clearly lays

8     out the test for obviousness.  And I think that is -- if --

9     and I think that's different than the John Deere test.  And I

10    believe that Dr. Hathaway presented sufficient evidence that a

11    jury could determine that the iLight's patents were a

12    predictable use of known elements, according to their

13    function, which is the standard for obviousness under KSR.

14         In fact, Mr. Nelson testified in the exact same

15    manner, that the development of the accused device and the

16    elements in the accused device, if they are as -- if the

17    iLight patents are read in the way that they are, that the

18    iLight patents would be just a combination of known elements

19    for their predicted use.

11:51:35 20         Finally, Your Honor, we have laid out in our papers a

21    number of combinations.  We believe the Slayden device at a

22    minimum discloses each and every limitation besides what

23    plaintiff has contended is not there, and we have relied on,

24    not just one of ordinary skilled in the art to apply known

25    elements from the sign industry, but also citing particular

patents like Sidow, Hulse and Rose.

And one last point, Your Honor.  I'm certain that Mr. Vezeau will get up and make an argument as well.  I think both parties believe very strongly that they have presented a case here in which the jury can find in their favor on all of these claims.  And we submit that the jury should be able to evaluate the evidence.  Thank you.

THE COURT:  Do you want to argue the response to Fallon's cross motion?

MR. VEZEAU:  I will try to, Your Honor.  I say try to, because I don't have a copy of our response in hand.  We were running late, so we got over here not to be late.

THE COURT:  Do you want me to run it off for you?

MR. VEZEAU:  No, that's okay.  I think I know what is in the response, because basically the response is our motion for JMOL on the issues of anticipation and obviousness.  Those defenses have not been met.  I already discussed that with the Court, and we put quite a bit of detail in our motion that we filed.

Some things I want to cover, though, that counsel just represented.  He talked about KSR.  And the Court already brought that case up to us.  I do recall that.  But he also said that, well, now, that's different than Graham v. John Deere.  And that is not the case.  KSR did not overrule, did not modify, did not criticize Graham v. John Deere at all.

That's a Supreme Court from 1966, which is the seminal case in
the area of obviousness.

And the reason why I want to bring that up, in that
case the Court laid out very clearly what you must do in
challenging the claims in an issued patent based on
obviousness.  And that just simply has not been done in this
case.  There was no focus on each claim.  There was no focus
on the combination of elements as a whole.  The focus was
simply on, well, now that we know the solution, could someone
maybe put a rod in Mr. Slayden's patent and take out his
hollow tube.

Well, of course, if you look at it with Monday morning
quarterbacking and say, could somebody do that today?  Well,
sure, because you know the solution, you have just read the
iLight patents.  The test is to go back in January of 2001,
would somebody having an ordinary skill in the art have done
something like that.

And the answer is pretty clearly no.  We know that
from the testimony that you saw, from Fallon's own engineer.
They said it couldn't be done.  That was the videotaped
testimony we saw from Mr. Eriksson.

We know that it wasn't done.  In fact, that's the real
world test.  Fallon didn't do this until after they saw
iLight's solution.  And frankly, there would be no reason --
it would be contrary to what Mr. Slayden says about his

1   invention to take that hollow tube out of his patent and put

2   something else in there.  You lose all the advantages he got

3   in his approach to try to simulate neon lighting.

11:51:35   4   So we think that the obviousness case falls apart

11:51:35   5   because the claims as a whole, each claim was not considered

6   as a whole.  And the steps that <u>Graham v. John Deere</u> says you

7   have to take in attacking a claim were simply not done.

8   Anticipation.  There is no question, and I talked to

9   you about it, and I showed it to you up there, there is no

10   question that there are sidewalls in Mr. Slayden's patent.

11   But not a word about them.  They don't reflect light.  There

12   is no testimony in this case they were reflecting light up

13   into the tube.  He places his LEDs right under that, his

14   hollow tube.

11:51:35   15   And he says in his patent where he gets light

16   reflections, and where he uses light reflections, are those

17   that are inside his hollow tube.  And he calls them

18   refractions and reflections.  Not from the sidewalls, not one

19   word about that.

11:51:35   20   Whereas the construction in both iLight's patents and

21   in the Fallon infringing products, where you have LEDs at the

22   bottom of the housing, tall sidewalls going up to the top

23   piece, and then it is the additive reflections off those

24   sidewalls bouncing up to the top piece that helps us, iLight,

25   achieve its glow, the neon simulation, if you will, in its

         1    these patents, and Fallon to do the same.  Very different
         2    construction, Your Honor.
11:51:35 3            Finally, on -- so we think at least that claim element
         4    is certainly not present in Slayden, there is no anticipation.
         5    And Slayden doesn't by any means disclose an essentially solid
         6    rod as claimed in some of the claims.  There can be no
         7    anticipation there.
11:51:35 8            They brought up indefiniteness, and I notice they just
         9    filed another JMOL motion on indefiniteness with the Court,
        10    which we were alerted to on the way over here.  So we will
        11    respond as the Court wants to respond to that.
11:51:35 12           But as I see that, and I read that, it seems to me
        13    they are not saying in this motion they just filed that the
        14    claims or the iLight patents as issued are indefinite.  What
        15    they say is the Court's construction demonstrates that the
        16    claims at issue are indefinite and, therefore, invalid as a
        17    matter of law.
11:51:35 18           So we sat here with the Court, and the Court was kind
        19    enough to give us your proposal.  We threw comments back and
        20    forth.  We arrived at a construction.  And this is the first
        21    we're hearing that, because of the Court's construction, they
        22    are now saying these claims are invalid.  We think that's a
        23    bad approach.  We cited the law to you already that, if the
        24    Court can reasonably construe the claims, as a matter of law
        25    they are not invalid.  And we think that's what the Court has

done.

Now, they say that because there is some language
about simulating neon and all that in the claims, that the
claims are indefinite, because somebody has to look at that.

Well, that's, frankly, what this is all about.  It is
always going to be somebody looking and saying, you know, does
that simulate neon?  Of course.  Their own documents say this
is neon simulation.  In fact, in the prior art they cite and
rely on, for example, Mr. Slayden's patent, his Claim 9 says,
a light source, and goes on and on, dials being spaced from a
diffuser so as to provide an appearance of substantially
homogenous light intensity across said diffuser.

In various arts, Your Honor, when you are simulating
neon, when you are coming up with lighting or lighting
effects, of course you've got to look at this from the
standpoint, what does it look like.  That's what your
invention is.  That's what the invention is in this case.
There is no indefiniteness.

The Patent Office certainly looked at this, as I said,
not once, not twice, but three times, and indeed issued other
patents in the same field, believing that was appropriate
language.  For them to now contend that it's indefinite
because somebody has to look at it, we think there is no basis
in the law for that.  And frankly, we think it's coming a
little late in the day in this case.

The final thing, we did file -- in view some of the

comments made in the case so far, we filed a very short

request for the Court to consider.  It's just a request that

the Court look at that.  And if the Court concludes there was

any ambiguity in the Court's claim construction of the rod, we

suggested a minor change that is totally in accord with the

position both parties initially submitted to the Court, and we

think it's appropriate in this case, if the Court does.

          Thank you.

          THE COURT:  Any response to that?

          MR. KITTREDGE:  Could I respond to the last point on

the claims construction, Your Honor.  We just finished an

entire week of trial on the claims construction that were

issued last week, Your Honor.  Changing them at this point,

I'm not going to pretend otherwise I thought from the

beginning that there were some problems with the claims

constructions.  This will not fix those problems.  But any

changes we make at this point means we've got to send that

jury home and pick a new jury and try it again, because all

evidence that has come into the trial, certainly all of the

evidence from defense side of the case is based on the

construction we had last week.  It would just be manifestly

unjust to change the construction now and send the jury out to

deliberate when we haven't presented evidence under this

construction.

THE COURT:  Well, there was evidence presented in references to what the claims actually state in questions to both experts.

MR. KITTREDGE:  The claim construction that my expert was applying did not have the word hollow in the term rod --

THE COURT:  I'm not referring to hollow.  I'm referring to the definition that the -- what the experts considered.  And part of what they considered was what the claims actually said.  There were questions put to both -- all of the experts as to what the claims actually said.

MR. KITTREDGE:  With respect to --

THE COURT:  And then there were questions about the Court's constructions of certain terms within the claims.

MR. KITTREDGE:  With respect to the claim limitations that were not interpreted, there were plenty of questions about those, to those claim limitations.  With respect to the portions of the claim limitations that the Court did interpret, our expert said unambiguously he was applying your construction.

If you change that, that will change his testimony, it very likely will change his opinions.  And if we're going to do that, the jury should get to hear all of that, because it's going to be a different thing.  We altered his expert script dramatically, taking large portions out of it because of Your Honor's claim construction.  And this is part of the reason.

| | | |
|---|---|---|
| | 1 | It's just too late to do this. We've got all the |
| | 2 | evidence in, and we either let this jury decide it, or we pick |
| 11:51:35 | 3 | a new jury. |
| 11:51:35 | 4 | THE COURT: Anything else? |
| 11:51:35 | 5 | MR. KITTREDGE: That's it, Your Honor. |
| 11:51:35 | 6 | THE COURT: Well, with regard to the cross motions for |
| | 7 | judgment as a matter of law, under Duralast, Inc. v. Custom |
| | 8 | Seal, 321 F3d 1098, 1108 (Fed. Cir. 2003), indefiniteness may |
| | 9 | be in a particular case submitted as a factual question for |
| | 10 | the jury. |
| 11:51:35 | 11 | Obviously, in awarding the patent, the patent examiner |
| | 12 | would have been of the view that the claims had sufficient |
| | 13 | definite description to award the patent. |
| 11:51:35 | 14 | As to the obviousness contentions, on the obviousness |
| | 15 | test, under the Supreme Court decision that was cited, KSR |
| | 16 | International Company Teleflex, 550 U.S. 398 at Page 417, the |
| | 17 | Court talks, among other things, about if a person of ordinary |
| | 18 | skill can implement a predictable variation, Section 103 |
| | 19 | likely bars its patentability. |
| 11:51:35 | 20 | It goes on: For the same reasons, if a technique has |
| | 21 | been used to improve one device, a person of ordinary skill in |
| | 22 | the art would recognize that it would approve similar devices |
| | 23 | in a similar way, using the technique is obvious unless its |
| | 24 | application is beyond his or her skill. |
| 11:51:35 | 25 | From the Court's perspective, what a person of |

ordinary skill in a particular market is really a fact-based

determination. So there have been differing opinions from the

experts and others on the obviousness issues in this case.

And I think that that's an issue that should go to the jury.

Also, the questions about the elements, the known

elements, that would constitute the obviousness is, likewise,

a fact-based question from the Court's perspective.

So I'm going to deny both motions for judgment as a

matter of law on all of the issues -- on the issues of

indefiniteness, obviousness.

The Court is considering, for each of the claims

constructed, to quote the actual claim, so that it gives the

jury some perspective. In the claims construction we simply

construed terms, but I think it would be helpful for the jury

to see what the claim actually says.

MR. KITTREDGE: I've seen it done that way before,

Your Honor. I think it's a good idea.

THE COURT: Does anybody object?

MR. VEZEAU: Oh, that's fine, Judge.

THE COURT: And I think the jury is required to

consider the claim and the claim construction. They are bound

by the claim construction, but I think they are required to

consider the claim as well. And so I think when they look at

the two and view the claim construction in context, I think

they will have a better guide as to what the claim

construction is all about.

11:51:35   Because the reference, definition to rod and rod-like, for example, is in the context of Claim 1, a method of making an illuminating device capable of simulating neon lighting comprised of -- forming an essentially solid rod. All I defined was rod, but the jury needs to know that it is an essentially solid rod that was the basis of the claim.

11:51:35   I think with that, the coupling of the two, the claim and the claim construction, I think that cures the issue. Any objections or comments?

11:51:35   MR. KITTREDGE: I think that makes sense, Your Honor.

11:51:35   MR. VEZEAU: No, we appreciate the Court's concern there, and we agree the jury should note all of the claims coupled with the claim construction. I do ask the Court to consider -- and we just ask that you consider --

11:51:35   THE COURT: Well, the problem I have with the hollow, it is fact-specific. It is addressing a specific fact in evidence. So that was my concern with that.

11:51:35   MR. VEZEAU: I follow you, Judge.

11:51:35   THE COURT: I can see both sides' concerns, and I think the appropriate way is to give the jury the actual claim that the Court was construing, and they can look at the claim, and they can look at the claim construction.

11:51:35   MR. VEZEAU: That's fine.

11:51:35   THE COURT: We're in recess.

11:51:35  1          (Recess.)

11:51:35  2          THE COURT:  I'm trying to locate the graph with the

      3   claims that was submitted earlier with each party's

      4   contentions about what they mean.  Can you all put your hands

      5   on that?  I am buried in paper up here.

11:51:35  6          MR. PRICE:  I believe he's talking about that sheet

      7   you all prepared.

11:51:35  8          THE COURT:  I believe that Fallon prepared it.  It was

      9   the chart?

11:51:35 10          MR. PRICE:  Remember the chart you had?

11:51:35 11          MR. KITTREDGE:  I believe we have it back in our

     12   office, Your Honor.

11:51:35 13          THE COURT:  Well, let me see if I can find it up here.

11:51:35 14          MR. PRICE:  It was the summary of disputed terms.

11:51:35 15          MR. VEZEAU:  Your Honor, I don't think that was the

     16   claims, that was just the various terms in dispute.

11:51:35 17          THE COURT:  Yes, but it had the claim number with it.

     18   It had the claim number, the words in dispute, and then each

     19   side's definition of what it was.

11:51:35 20          MR. KITTREDGE:  It's Exhibit 4 to our brief.  I think

     21   I will find it.

11:51:35 22          THE COURT:  I'll see if I can find it.

11:51:35 23          (Recess.)

11:51:35 24          THE COURT:  In light of the recent ruling, I think it

     25   would be better if I held on and we incorporated the relevant

claims before we put in the construction part.  So I apologize

for the inconvenience, but I think it's going to take just a

little while to get those typed.

11:51:35   Yes, sir.

11:51:35   MR. PRICE:  I apologize.  Your Honor, I don't know if

this will help the process or not.  Mr. Sawyer and I have been

discussing the instructions.  We're actually in agreement more

than not.  I think we really are in disagreement only over

three issues, and it's about one sentence in each.

11:51:35   THE COURT:  Well, I don't want this whole case to be

tried and then have an error on jury instructions.  If it

takes you all having to wait a little bit longer, you will

just have to wait a little bit longer.

11:51:35   MR. PRICE:  That's your discretion, obviously, Your

Honor.

11:51:35   THE COURT:  And I want all objections to the jury

instructions resolved before we leave today.

11:51:35   MR. PRICE:  Yes, sir.

11:51:35   THE COURT:  That's the reason I sent the jury home.  I

wasn't sure how long this process would take.  But I wanted to

make sure everything was done so it just goes smoother in the

morning.  We're in recess.

11:51:35   (Recess.)

11:51:35   THE COURT:  While you all are waiting on this, why

don't you all have an exhibit conference with the clerk.

11:51:35  1            MR. VEZEAU:  That's what we're doing,

11:51:35  2            MR. KITTREDGE:  That's what we're doing, Your Honor.

11:51:35  3            (Recess.)

11:51:35  4            THE COURT:  You may be seated.  Has the plaintiff had

       5     an opportunity to review the instructions?  And do they have

       6     any objections?

11:51:35  7            MR. PRICE:  Yes, Your Honor.  We have now had a chance

       8     to review it.

11:51:35  9            THE COURT:  Any objections?

11:51:35 10            MR. PRICE:  There are several points we would like to

      11     discuss.

11:51:35 12            THE COURT:  All right.  We'll cover them page by page,

      13     then we'll go to the defense.

11:51:35 14            MR. PRICE:  Very good.

11:51:35 15            THE COURT:  I've got some changes, too, that I will go

      16     over with you.  And we may read it a little bit more.  But

      17     thus far, there has only been one minor edit.  Go ahead.  What

      18     page?

11:51:35 19            MR. PRICE:  Page 9, Your Honor.  I'm sorry, I know

      20     we're all getting tired, speaking a little low.  Your Honor,

      21     our primary concern on this page is with the last paragraph

      22     where it suggests that the preponderance burden would apply.

11:51:35 23            THE COURT:  Oh, I'm sorry.  That should be burden of

      24     proof by a clear and convincing evidence.

11:51:35 25            MR. PRICE:  Yes, Your Honor.  It should be by a clear

1    and convincing evidence that the claims of the plaintiff's

            2    patents are obvious or otherwise invalid.

11:51:35    3            THE COURT:  That the claims?

11:51:35    4            MR. PRICE:  Yes, it should proved by a clear and

            5    convincing evidence that the claims of the plaintiff's

11:51:35    6    patents --

11:51:35    7            THE COURT:  Okay.

11:51:35    8            MR. PRICE:  -- are obvious or otherwise invalid.

11:51:35    9            THE COURT:  Any objection?

11:51:35   10            MR. SAWYER:  No, Your Honor.

11:51:35   11            THE COURT:  All right.  That should also change by

           12    clear and convincing evidence on Page 11.

11:51:35   13            MR. PRICE:  Yes, Your Honor.  That was my concern with

           14    Page 11 likewise.

11:51:35   15            THE COURT:  All right.

11:51:35   16            MR. PRICE:  I would suggest Page 10 should probably

           17    not be used, or at least rewritten, because it seems to

           18    suggest that either party may bear the preponderance burden.

11:51:35   19            THE COURT:  Well, it may be clear that the

           20    preponderance applies to you and that the clear and convincing

           21    applies to the defendant.

11:51:35   22            MR. PRICE:  For clarity, Your Honor, I would suggest

           23    that we say, where the burden of proof rests upon the

           24    plaintiff, the plaintiff is required.  I do not want to

           25    confuse the jury on this issue.

                                                                          1099

```
11:51:35   1          THE COURT:  Where the plaintiff iLight has the burden

           2   of proof?

11:51:35   3          MR. PRICE:  Yes, Your Honor.  iLight is fine, if you

           4   would like to substitute that.

11:51:35   5          THE COURT:  I'm going to put -- so that paragraph now

           6   reads:

11:51:35   7          In common everyday language, what I have just stated

           8   to you simply means that where the plaintiff iLight has the

           9   burden of proof, iLight must prove its affirmative theory of

          10   infringement of its patents to your satisfaction by a

          11   preponderance of the evidence, that is, something more likely

          12   to have occurred than not.  The defendant, Fallon, has the

          13   burden of proof of its defenses of invalidity and obviousness

          14   by the clear and convincing evidence standard.

11:51:35  15          Is that all right?

11:51:35  16          MR. PRICE:  Yes, Your Honor.  I know later on, Your

          17   Honor, you actually explain clear and convincing when we get

          18   to invalidity.  It would seem to me that if we're going to

          19   deal with the burden of proof up front like this, to tell them

          20   that the defendant has a clear and convincing burden, that we

          21   should also tell them what clear and convincing means back

          22   here on Page nine at the bottom.

11:51:35  23          THE COURT:  I will repeat the last sentence on Page

          24   37, on Page 11.

11:51:35  25          MR. PRICE:  Thank you, Your Honor.  Yes.  That makes
```

1100

sense.

11:51:35    THE COURT:  Okay.  What else?

11:51:35    MR. PRICE:  Your Honor, on Pages 15 and 16 we've got a
description of the plaintiff's and defendant's theory of the
case.

11:51:35    THE COURT:  That's from the final pretrial order.

11:51:35    MR. PRICE:  Yes, Your Honor.  But we also submitted --
the parties submitted and they have agreed upon a summary of
contentions, which are a little bit more narrow to the issues
before the jury here.

11:51:35    THE COURT:  Do you all agree to switch those out?

11:51:35    MR. SAWYER:  Yes, Your Honor.

11:51:35    THE COURT:  Okay.  We'll switch them out.  If you will
pass it up.

11:51:35    MR. PRICE:  Do you want me to pass up the hard copy?

11:51:35    THE COURT:  Yes, pass it up.  I'm going to take out
any reference to an award of cost expenses.  Instead of
theories of the case, do you want me to just give a summary of
the parties contentions?  Is that what you are saying?

11:51:35    MR. SAWYER:  Yes, Your Honor.

11:51:35    MR. PRICE:  Yes, Your Honor.

11:51:35    THE COURT:  All right.  What's next?

11:51:35    MR. PRICE:  Now to Page 24, Your Honor.

11:51:35    THE COURT:  Hold on just a minute.  Yes, because I had
some issues with a possible jury nullification contention

```
 1    being made in the defendant's theory.  But it's moot now.
11:51:35  2           MR. PRICE:  Okay.  Very good.
11:51:35  3           THE COURT:  All right.
11:51:35  4           MR. PRICE:  On Page 24, Your Honor, under the --
11:51:35  5           THE COURT:  There may be some references -- instead of
 6    PTO, we may just put Patent Office.
11:51:35  7           MR. PRICE:  That's fine.
11:51:35  8           THE COURT:  We're going to strike some "the's" before
 9    the word "iLight".  On Page 24?
11:51:35 10           MR. PRICE:  Yes, sir.  We're now on Claim 1 of the
11    '238 Patent.  That's not at issue in this case.
11:51:35 12           THE COURT:  Well, there was a general reference here
13    -- some of these others make a reference, so I thought Claim 1
14    provided an overview.
11:51:35 15           MR. VEZEAU:  Your Honor, if I may, I think we're
16    probably in agreement on this, we're just a little concerned.
11:51:35 17           THE COURT:  All right.  We'll take it out.  Let's go.
18    I've got more to deal with.
11:51:35 19           MR. KITTREDGE:  Claim 8 gives it the good reference
20    they need.
11:51:35 21           THE COURT:  All right.
11:51:35 22           MR. PRICE:  Next, Your Honor, on Page 25, Claim 25,
23    the second full paragraph.
11:51:35 24           THE COURT:  Yes, sir.
11:51:35 25           MR. PRICE:  At the end of the third sentence where it
```

says, entering surface and a light absorbing exterior
surfaces, the "a" should be deleted.  That wasn't in there.

THE COURT:  Having a light reflecting --

MR. PRICE:  Oh, I'm sorry.  So that is accurate?
Your Honor, the certificate of correction for this particular
one removed that "a" at the end of the third sentence of the
second full paragraph of Claim 25.  So it should just read:
Having light reflecting surfaces and light absorbing exterior
surfaces.

THE COURT:  Any objection?

MR. SAWYER:  I believe that's correct, Your Honor, so
no objection.

THE COURT:  All right.  What else?

MR. PRICE:  Farther down that page, Your Honor, under
the '262 Patent, in the second paragraph, about an essentially
solid leaky waveguide, at the end of that line there was
something left out.  It should say, after the "a" there, it
should say, "a lateral light receiving surface" and a lateral
light emitting surface.

THE COURT:  Light receiving?  -- an a --

MR. PRICE:  After the "a" there, it should say a
lateral light receiving surface, and a --

THE COURT:  Any objection?

MR. SAWYER:  No, Your Honor.

THE COURT:  All right.  What's next?

MR. PRICE:  Now on Page 26, under the '970 Patent,

    2   Claim 5.

THE COURT:  All right.

MR. PRICE:  In the first paragraph under illumination

    5   device, the word "length" was left out after predetermined, so

    6   it should say an essentially solid leaky waveguide rod having

    7   a predetermined length and a curved light emitting surface.

THE COURT:  All right.

MR. SAWYER:  No objection.

MR. PRICE:  Now, Your Honor, on Page 29, in the second

    11  paragraph.  I think we're going to need to reword the second

    12  sentence.  There is not a -- among other things not a patented

    13  process at issue here.  I would suggest this can be

    14  simplified.

THE COURT:  I'm going to strike "made by a patented

    16  process, importation" --

MR. PRICE:  Probably should say "importation and sales

    18  of an infringing product", would be my suggestion.

THE COURT:  Any objection?

MR. SAWYER:  Your Honor, the suggestion I would make

    21  is to just strike the last sentence.  Because infringes the

    22  patent includes sales and importation.  So you don't need the

    23  extra sentence.

THE COURT:  Well, I think it spells it out a little

    25  bit clearer for the jury.  I will leave it in there.  Let's

go.  Anything else?  On 29?

11:51:35    MR. PRICE:  Not on 29, Your Honor.

11:51:35    THE COURT:  All right.

11:51:35    MR. PRICE:  On Page 30, at the end of the second full
paragraph, we had included in our proposed instruction a
suggested insertion here that would read, the whole product
need not infringe, thus, if only a part of a product meets all
of the requirements of a claim, the product is still said to
infringe the claim.

11:51:35    A, this is correct as a matter of law; B, it's
particularly applicable here in the discussions of the signs
that have sidewalls in part but not elsewhere.

11:51:35    THE COURT:  Any objection?

11:51:35    MR. SAWYER:  We agree that last -- that line, but --

11:51:35    THE COURT:  Okay.  I think I will add that at the end
of the last paragraph on that page.

11:51:35    MR. PRICE:  Do you want to see the hard copy in the
proposed?

11:51:35    THE COURT:  All right.

11:51:35    MR. SAWYER:  The issue, Your Honor, we do have an
issue with some other things on 30, but if you want us to just
reserve on that.

11:51:35    THE COURT:  Yeah, you'll reserve it.  I will take up
yours line by line just like I'm doing theirs.

11:51:35    MR. SAWYER:  Great.

11:51:35  1          THE COURT:  I will add at the end of the third

          2  paragraph on Page 30, the whole product need not infringe.

          3  Thus, if only a part of a product meets all of the

          4  requirements of a claim, the product -- can we just say the

          5  product is an infringing product?

11:51:35  6          MR. PRICE:  Yes, Your Honor.  That's fine.

11:51:35  7          MR. SAWYER:  That's fine, Your Honor.  No objection

          8  here.

11:51:35  9          THE COURT:  Okay.

11:51:35 10          MR. PRICE:  Next, Your Honor, would be Page 49.

11:51:35 11          THE COURT:  All right.

11:51:35 12          MR. PRICE:  This is the indefiniteness instruction.

11:51:35 13          THE COURT:  Yes, sir.

11:51:35 14          MR. PRICE:  We would suggest repeating the presumption

         15  of validity and the clear and convincing evidence before you

         16  here that was included earlier in the invalidity, so there is

         17  no misunderstanding of what burden is applicable.

11:51:35 18          THE COURT:  To the third paragraph?

11:51:35 19          MR. PRICE:  You could do it really where you want to,

         20  Your Honor.  I was thinking within the first paragraph, but --

11:51:35 21          MR. SAWYER:  Your Honor, this is a question of law.

         22  This is just an advisory -- an advisory for Your Honor to make

         23  the ultimate determination.

11:51:35 24          MR. PRICE:  We fully agree with that, but if we're

         25  going to get an advisory opinion, we might as well get one

1    that's applying the correct burden.

11:51:35    2         MR. KITTREDGE:  That's a factual burden; this isn't

11:51:35    3    A --

11:51:35    4         MR. PRICE:  Then it shouldn't be going to the jury --

11:51:35    5         THE COURT:  I could use less of that.  I think I'm

6    going to add it at the beginning of the first paragraph, and

7    then start the first sentence with the word, yet.  Instead of,

8    to be sufficiently, I'm going to put, the claims of a patent

9    must be sufficiently definite.  Any objection?

11:51:35   10         MR. PRICE:  No, Your Honor.

11:51:35   11         MR. SAWYER:  No.

11:51:35   12         THE COURT:  On that fourth paragraph, I'm going to

13    strike the, or not, from the word whether.  After the word

14    whether.

11:51:35   15         MR. PRICE:  Is this the one that says, will not

16    construe the claims at issue?

11:51:35   17         THE COURT:  Uh-huh.  I did not make any decision as to

18    whether the claims were definite.

11:51:35   19         MR. PRICE:  We have a separate objection to that

20    paragraph, Your Honor.

11:51:35   21         THE COURT:  Okay.

11:51:35   22         MR. PRICE:  In short, as sort of set out in our JMOL

23    motion, we believe that misstates the law.  If the Court can

24    construe the claims --

11:51:35   25         THE COURT:  Yes, but as I said earlier, indefiniteness

can be submitted to the jury in an appropriate fact-specific

situation.

11:51:35  MR. PRICE:  I understand your ruling.  That particular

one we would object to, Your Honor.

11:51:35  THE COURT:  Okay.  Anything else?

11:51:35  MR. PRICE:  One more, Your Honor.  Hold on just a

second, Your Honor.  That's what I was -- okay.  Maybe I

wasn't clear, and Your Honor may have understood it.  We were

suggesting simply deleting that paragraph will not construe

the claims at issue.  The fourth full paragraph.

11:51:35  THE COURT:  Well, I'm inclined to think that they need

to understand, in light of my construing of the claims.

11:51:35  MR. PRICE:  I understand, Your Honor.

11:51:35  THE COURT:  So I think out of an abundance of caution

I'm going to leave it in.

11:51:35  MR. PRICE:  I just want to make sure you understood

what I was suggesting.  One other thing on that page, Your

Honor, within the third paragraph, the second sentence.  It

says when a word or phrase agree, and then it gives examples

of a couple of terms.  We think that's inappropriate because

it's suggesting -- inappropriate for the jury.  We've got

several disputed terms, we shouldn't be giving examples they

need to focus on here.  That's giving unnecessary weight to

those terms in making this decision.

11:51:35  THE COURT:  I will reserve that.  Anything else?

1108

11:51:35 1          MR. PRICE:  I will double check when I sit down, but I

2  believe that covers our concerns.

11:51:35 3          THE COURT:  For the defense?

11:51:35 4          MR. SAWYER:  Thank you, Your Honor.  All right.

11:51:35 5          THE COURT:  All right.

11:51:35 6          MR. SAWYER:  Your Honor, our first would be on Page

7  21.  You may have already addressed this at some earlier

8  point, but we would like to at least raise this for the Court

9  and note our objection.  The third line where it says, the

10  meaning of the specification of the plaintiff's patents that

11  are entitled to legal protection under the patent laws, we

12  would submit that it should be the meaning of the claims.

11:51:35 13          THE COURT:  I'm sorry, which paragraph?

11:51:35 14          MR. SAWYER:  I'm sorry, the very first paragraph,

15  third line down, Your Honor.  We would submit that it should

16  be the meaning of the patents, of the plaintiff's patents.

11:51:35 17          THE COURT:  I will strike that, claims.  All right.

11:51:35 18          MR. SAWYER:  Two lines down from that, defendant's

19  products infringes upon -- I think instead of --

11:51:35 20          THE COURT:  The cited claims?

11:51:35 21          MR. SAWYER:  The asserted claims; correct, Your Honor.

11:51:35 22          THE COURT:  The asserted claims.  Okay.

11:51:35 23          MR. SAWYER:  And then the second full paragraph there,

24  I think we would suggest that that sentence, that first

25  sentence, reads, as to the legal issues the Court has

1    construed or interpreted, the plaintiff's patent claims to

                2    include the following.  And then just strike the rest.

11:51:35        3            THE COURT:  All right.

11:51:35        4            MR. LIPSHIE:  Then on Page 30, Your Honor.

11:51:35        5            THE COURT:  All right.

11:51:35        6            MR. SAWYER:  Your Honor, the only issue in this case

                7    is literal infringement.  ILight is not alleging infringement

                8    under the doctrine of equivalence.  So we would suggest that

                9    we can leave the title direct infringement by literal

               10    infringement, or we could just say direct infringement, just

               11    so there is no confusion for the jury.  But that would be our

               12    first suggestion on this page.  And then we would also suggest

               13    that we just strike the first sentence there, because there

               14    aren't two types of direct infringement in this case, it's

               15    just literal infringement.

11:51:35       16            THE COURT:  Do you agree?

11:51:35       17            MR. VEZEAU:  Your Honor, that's fine.

11:51:35       18            THE COURT:  All right.  I'm going to say direct

               19    infringement or literal infringement.

11:51:35       20            MR. SAWYER:  I think direct infringement or literal

               21    infringement, either one.  But direct infringement by literal

               22    infringement might be a little confusing for the jury.

11:51:35       23            THE COURT:  I'm sorry, what did you --

11:51:35       24            MR. SAWYER:  So our suggestion is just to title it.

11:51:35       25            THE COURT:  Okay.  It's going to read, plaintiff

asserts claims for direct infringement or literal

infringement, period.  A company directly or literally

infringes a claim if, during the time the patent is in force,

the company takes --

11:51:35  MR. SAWYER:  That's perfect, Your Honor.

11:51:35  THE COURT:  Okay.  All right.  There is another iLight

that got struck on the second paragraph, fourth line.

Permission of iLight.  All right.  What's next?

11:51:35  MR. SAWYER:  Then Page 31 and 32, Your Honor, we

suggest that both of those pages just come out, because they

are dealing with doctrine of equivalence.

11:51:35  THE COURT:  Okay.

11:51:35  MR. SAWYER:  Page 3, Your Honor, the second full

paragraph.  We would suggest that that sentence, we strike

neither literally or under the doctrine of equivalence,

because we can just -- we can just say is not infringed, or

you can say does not infringe literally, is fine, too.

11:51:35  THE COURT:  I will just put not infringe directly or

literally.

11:51:35  MR. SAWYER:  Thank you, Your Honor.

11:51:35  THE COURT:  Period.  Okay.

11:51:35  MR. SAWYER:  Page 34, Your Honor.

11:51:35  THE COURT:  All right.

11:51:35  MR. SAWYER:  This is the willfulness instruction.  We

would suggest just a slight rearrangement of that paragraph.

```
 1    And I will try and be clear on it.  But if you go to the one,

 2    two, three, four, five, the sixth line down, we would suggest

 3    striking by clear and convincing evidence in that section

 4    because it seems to modify just .3.  And then we'll move that

 5    that burden down just a little bit further to the sentence

 6    that starts, to prove willful infringement, iLight must

 7    establish that Fallon willfully infringed any of its patents.

 8    And then we added there by clear and convincing evidence,

 9    period.  That is, iLight's proof.  Then new sentence, sorry,

10    that is, iLight's proof of willfulness must leave you with,

11    then through on to the end.

12    THE COURT:  Well, let's try this.  Willfulness

13    requires proof -- I'm going to the third line.  Willfulness

14    requires proof by clear and convincing evidence, one, and then

15    a one, two, three.

16    MR. SAWYER:  That would be fine, Your Honor.  Then

17    maybe just strike it in three there.

18    THE COURT:  Yeah, I'm moving it up.

19    MR. SAWYER:  Perfect.

20    THE COURT:  Okay.  What else?

21    MR. SAWYER:  On Page 35.

22    THE COURT:  Okay.  Go ahead.

23    MR. SAWYER:  Sorry, nothing further on Page 34, Your

24    Honor.  On Page 35.  I think we have some just some

25    duplicative language that has been found in some of the more
```

general sections.  And so we would suggest that we strike --
and this on the sort of the bolded terms there, the sixth line
down -- actually, the fifth line down, just sort of strike
everything in that paragraph after valid, presumed valid.  And
then it would be, period.  And then, Fallon's invalidity
defense is based upon --

MR. PRICE:  Your Honor, we obviously would oppose
that.  I think it's very important here --

THE COURT:  I think it helps explain why there has to
be clear and convincing evidence.

MR. PRICE:  I agree.

MR. SAWYER:  Okay, Your Honor.

THE COURT:  All right.

MR. SAWYER:  Your Honor, we would -- I don't think we
have anything until we get all the way back to 48.

THE COURT:  All right.

MR. SAWYER:  And actually, after 48 it's an insertion.
As you know, the parties had agreed prior to us -- a long time
ago, on the 17th, and Steve and I had some conversations last
night as well, and there is an instruction called combination
of known elements, which is part of the modern rules that
we've been working with.  That isn't included -- and I have a
copy here for Your Honor -- which wasn't included.  An agreed
one is --

THE COURT:  Do you want to add that at the end of 48?

MR. SAWYER:  Yeah, right at the end of -- it's

         2   actually probably another instruction that would sort have

         3   been inserted there at the end there.  Right before 49.

THE COURT:  Okay.  No objection?

MR. PRICE:  Your Honor, just a moment.

MR. SAWYER:  That was the agreed --

MR. PRICE:  I know, I just -- that's fine, Your Honor.

MR. SAWYER:  And then the last point I believe

         9   defendants have, Your Honor, is on Page 60.

THE COURT:  Okay.

MR. SAWYER:  Which is in the verdict form.

THE COURT:  All right.

MR. SAWYER:  And the sentence that says, if you

        14   answered yes to any of the above questions, please proceed to

        15   Section 2.  If you answered no to all of the above questions,

        16   proceed no further.

Your Honor, we have a counterclaim and a declaratory

        18   judgment action of invalidity, so I think if we could --

THE COURT:  Well, the declaratory judgment is one

        20   committed to the Court, isn't it?

MR. SAWYER:  No, Your Honor.  We've filed a

        22   counterclaim and declaratory judgment if the patents are

        23   invalid -- in fact, invalid.

THE COURT:  I know, but a declaratory judgment is

        25   issued by a court, not the jury.

1          MR. SAWYER:  I believe it's still a factual

2    determination by the jury as a -- not just a counterclaim, but

3    the declaratory judgment.  So it's an issue of fact for the

4    jury.

5          THE COURT:  Yes, but the Court could use the jury's

6    findings of fact as the basis for its declaratory judgment

7    ruling.

8          MR. SAWYER:  I don't think so, Your Honor, because if

9    they find that we don't infringe, then they are not going to

10   find whether or not the patents are valid or invalid.

11          MR. KITTREDGE:  Your Honor, that's the real point.  If

12   they find we don't infringe, they still have to make a

13   decision on validity.

14          THE COURT:  All right.  I will strike the phrase, if

15   you answered yes to the above question.

16          MR. SAWYER:  I think, yeah, those two sentences.

17          THE COURT:  Yeah, I struck those.

18          MR. SAWYER:  Great.  Thank you, Your Honor.  That's

19   all I have for now, and I think that's all we have.

20          THE COURT:  All right.  Let me go over a few that the

21   Court added.

22          Well, we struck the theories of the case, so that

23   takes care of some.  I'm going to put at the beginning

24   sentence on Page 15, these theories are merely a summary of

25   the parties' contentions.  And strike the remainder of that

1   paragraph.  Any objection?

11:51:35  2        MR. PRICE:  That's fine, Your Honor.

11:51:35  3        MR. SAWYER:  No objection, Your Honor.

11:51:35  4        THE COURT:  All right.  I've told you about the word

5   "the" before iLight.  And PTO will be changed to Patent and

6   Trade Office.  Page 20, second line -- next to the last line,

7   the usual practice at trial, instead of, in litigation.

11:51:35  8        MR. PRICE:  Fine.

11:51:35  9        THE COURT:  On Page 22, the line above the first

10  complete paragraph, issues of infringement and invalidity.

11:51:35  11       On Page 23, the third line from the top, patents in

12  this lawsuit are each independent claims.

11:51:35  13       Page 27, first paragraph in regular type, not

14  indented.  You should decide those issues that you are being

15  asked to decide.  Instead of that issues.

11:51:35  16       MR. VEZEAU:  Your Honor, I apologize.  That was Page

17  27?

11:51:35  18       THE COURT:  Page 27 with the paragraph beginning, you

19  must accept?  The third line, you should decide those issues

20  that you are being asked to decide.

11:51:35  21       MR. PRICE:  Yes, thank you.

11:51:35  22       THE COURT:  Page 28, the last line on that page, to

23  resemble, strike the word "a" parallel lines to "resemble"

24  parallel lines.  Are we ready?

11:51:35  25       MR. PRICE:  Yes.

11:51:35  1          THE COURT:  Page 30, first -- actually, second

     2   paragraph, permission of iLight, took out the "the".

11:51:35  3          MR. SAWYER:  I'm sorry, I didn't catch that.

11:51:35  4          THE COURT:  Page 30, what was the original second

     5   paragraph, fourth line, "permission of iLight" instead of "the

     6   iLight".

11:51:35  7          Page 34, last line, Factor 4, whether Fallon tried to

     8   cover up its alleged infringement.

11:51:35  9          Everybody ready?  All right.  There may be additional

    10   minor editing, but if there are, we'll cover them with you in

    11   the morning before we bring the jury in.  Any other matters,

    12   either side?

11:51:35 13          MR. SAWYER:  No, Your Honor.

11:51:35 14          MR. PRICE:  No, Your Honor.

11:51:35 15          THE COURT:  We're in recess.  If you all will be here

    16   shortly before 9:00 so if are there any minor edits, I can go

    17   over them with you.

11:51:35 18                         *  *  *  *  *

11:51:35 19

11:51:35 20

11:51:35 21

11:51:35 22

11:51:35 23

11:51:35 24

11:51:35 25

11:51:35   1                    REPORTER'S CERTIFICATE

11:51:35   2

11:51:35   3         I, Peggy G. Turner, Official Court Reporter for

11:51:35   4   the United States District Court for the Middle

11:51:35   5   District of Tennessee, with offices at Nashville, do

11:51:35   6   hereby certify:

11:51:35   7         That I reported on the Stenograph machine the

11:51:35   8   proceedings held in open court on April 28, 2009, in the

              9   matter of ILIGHT v. FALLON, Case No. 2:06-0025; that said

             10   proceedings in connection with the hearing were reduced to

             11   typewritten form by me; and that the foregoing transcript,

             12   Pages 970 through 1117, is a true and accurate record of said

             13   proceedings.

11:51:35  14         This the 20th day of May, 2009.

11:51:35  15

11:51:35  16

11:51:35  17

11:51:35  18                          _____

                                         S/Peggy G. Turner, RPR
11:51:35  19                          Official Court Reporter

             20

11:51:35  21

11:51:35  22

11:51:35  23

11:51:35  24

11:51:35  25