1            IN THE UNITED STATES DISTRICT COURT

2       MIDDLE DISTRICT OF TENNESSEE, COOKEVILLE DIVISION

3   ------------------------------------------------------------

4   ILIGHT TECHNOLOGIES,            )

5               Plaintiff,     )

6                              )

7   v.                         )  CASE NO. 2:06-0025

8                              )

9   FALLON  LUMINOUS PRODUCTS,    )

10              Defendant.      )

11  ------------------------------------------------------------

12                  TRANSCRIPT OF PROCEEDINGS

13                      VOLUME VIII

14  ------------------------------------------------------------

15  DATE:              APRIL 29, 2009

16  TIME:              9:00 A.M.

17  BEFORE:            HONORABLE WILLIAM J. HAYNES, JR.

18                     And a Jury

19  ------------------------------------------------------------

20

21

22

23  COURT REPORTER:    PEGGY G. TURNER
                       OFFICIAL COURT REPORTER
24                     801 BROADWAY, ROOM A-837
                       NASHVILLE, TENNESSEE 37203
25                     PHONE:  (615)726-4893
                       Peggy_Turner@tnmd.uscourts.gov

```
1                    A P P E A R A N C E S:

2   For the Plaintiff:  Timothy J. Vezeau
                        Stephen Price
3                       Melissa Hunter
                        John Scruton
4                       William Ferrell

5   For the Defendant:  Mark Kittredge
                        Jonathan Rose
6                       Samuel Lipshie
                        Douglas Sawyer
7                       Brandy McMillion

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                              P R O C E E D I N G S

08:37:46  1

08:58:37  2        THE COURT:  Before we get started, I received a note

          3  from a juror this morning that I will read to you, and you can

          4  see it if you want to.

08:58:45  5        Judge Haynes, I'm requesting to leave no later than

08:58:51  6  5:00 p.m. today, as I have an appointment at 5:15.  This

          7  appointment was originally scheduled last Wednesday, April 22,

          8  but I missed it as we stayed late that night.  I rescheduled

          9  as late in the day as possible.  Thank you for your

          10  consideration.  Juror Number 6.

08:59:15  11       I'm going to tell the jurors that they are the judges

          12  of the facts, and judges get to set their own schedule.  So if

          13  they want to leave at 5:00 today, that's fine with me.  That

          14  means we'll come back.

08:59:28  15       Now, were there any further objections to the jury

          16  instructions, either side?

08:59:41  17       MR. VEZEAU:  Not from the plaintiff, Your Honor.

08:59:41  18       MR. KITTREDGE:  Nor from the defense, Your Honor.

08:59:55  19       THE COURT:  All right.  Now, there was an issue,

          20  outstanding issue, concerning whether there would be rebuttal

          21  argument on the defenses.  I think the appropriate way to

          22  handle this is if the plaintiff would present its responses to

          23  the defendant's defenses as part of its opening statement.

          24       And that way, when the defense gets to make its

          25  closing, it knows essentially what the arguments of the

plaintiffs are and can respond first to the plaintiff's theory
and then can argue for its own defenses and respond to
whatever comments that were made by the plaintiff about those
defenses.  And then the plaintiff's rebuttal would be limited
to advocating the plaintiff's theory of the case.

09:00:37    If there were any matters stated in rebuttal that
impacted the plaintiff's defenses -- that responds to the
plaintiff's defenses, then we'll take up whether the defense
should be allowed to respond further.  But it would only be
limited to the specific comment made about the defenses.

09:00:56    MR. VEZEAU:  All right.  So as I understand Your
Honor, we'll cover everything in my opening, then if he says
something that I particularly take issue with, I will come up.
But it may be that I will have nothing further.

09:01:14    THE COURT:  Well, if you do take issue, -- we'll just
see what it is at the time.  We'll deal with it at the time.

09:01:23    MR. VEZEAU:  All I'm saying is I am following the
Court's instructions.

09:01:27    THE COURT:  All right.  Are there any other matters,
either side?  Well, the jury -- the printers are a little slow
up here, as are the computers.  So you will get the jury
instructions in due time.  But are you all ready to have
closing statements -- closing arguments?

09:01:41    MR. VEZEAU:  Yes, Your Honor.

09:01:43    THE COURT:  Now, by my estimation, based on what you

all told me, we're looking at probably two and a half to three

hours of closing arguments, which means we'll probably end

around noon without taking a break.  I wonder -- the jury

instructions are around 60 -- more than 50 pages, anyway, so I

figure they will take about an hour to read.  And if we take a

lunch break at 12:00, that means the case doesn't get to the

jury until about 2:00, which means, according to this juror's

note, there will be three hours of deliberations.  I don't

know how long they are going to deliberate.  But that's my

estimate of the schedule.  So does anybody take issue with

that?

09:02:38  MR. KITTREDGE:  No, Your Honor.  We might be a little

faster this morning, but otherwise that sounds right.

09:02:41  THE COURT:  All right.

09:02:53  You can bring the jury in, Mr. Marshal.

09:03:17  (Jury in.)

09:03:18  THE COURT:  Good morning, ladies and gentlemen of the

jury.  Before we get started today, I want to acknowledge a

note received by the juror that I have shared with the

parties, and it concerns how long you all stay today.  And as

I told you at the beginning, that there are basically two

judges.  I'm one of the judges, I'll tell you what the law is,

decide what evidence comes in.  The other judges are you.  And

you judge the facts.  And judges usually set their own

schedule.  So I'm going to let you all set your own schedule

1 and ask you to accommodate the juror who requested to conclude

2 by 9:00.  Ask you all to consider that.  It's early in the

3 morning for me -- 5:00.  So I will ask the jurors to discuss

4 that amongst yourselves, and I will leave that to you all's

5 discretion to honor the request of the other jurors.  The

6 Court is inclined to do so, but as I said, you all set your

7 own schedules, okay?  Does everybody understand that?

09:04:26  8        Now we're at the final stages of the trial.  We will

9 hear closing arguments.  Closing arguments are a summary of

10 what each side believes the proof has found and why you should

11 find in their favor.  We will start out with the plaintiffs,

12 who will give their closing arguments.  Then the defendants

13 will give their closing arguments, and then, because the

14 plaintiff has the burden of proof, the plaintiff the respond.

15 It is expected that, during the course of this presentation,

16 they will not only cover the plaintiff's claims but also the

17 defendants defenses to those claims that the Court will

18 instruct you on in its jury instructions.

09:05:00  19        We'll hear now from the plaintiff.

09:05:00  20        MR. VEZEAU:  Thank you, Your Honor.

09:05:03  21        THE COURT:  Remember that arguments of the lawyers are

22 not evidence.  They are only a summary of the evidence and

23 what the evidence believes.  If there is any difference

24 between what the lawyer says the evidence is and what your

25 recollection of what the evidence is, you are, of course, free

1       to follow your own recollection.

09:05:21  2       MR. VEZEAU:  Your Honor, ladies and gentlemen of the

3       jury, good morning.

09:05:26  4       This is iLight's closing argument, which is our

5       opportunity to tell you, in summary form, that is, I'm not

6       going to repeat everything everybody said in this trial, to

7       everyone's relief.  In summary form.  I'm going to now relate

8       to you what we believe the evidence in this trial has

9       established.

09:05:47  10       And before I get into this in greater detail, we would

11       certainly like to express our deep appreciation for the time

12       and effort you have spent with us here today and for your

13       patience in listening to the evidence that we presented to you

14       over the past week.

09:06:03  15       Stripped to its core, this case contains a very basic

16       principle that we learned very early in life.  No one, no

17       person, and no company, regardless of how rich and powerful

18       that company may be, has the right to take what does not

19       belong to us.

09:06:19  20       The documentary evidence in this case, and much of

21       this -- and the testify you've heard, much of it from Fallon's

22       own witnesses and their own documents, shows that Fallon has

23       taken what did not belong to it.  And that was iLight's

24       patented inventions.

09:06:36  25       Fallon did so for the most basic of reasons.  It made

a lot of money.  Money was at risk, and Fallon just marched

ahead.  And it continues to do the same thing to the present

and for the same reason.  That is not right, ladies and

gentlemen.  And that is why iLight has come to court, in order

to get help in stopping iLight (sic) from committing further

acts of infringement.

09:07:01    In my opening statement to you, I outlined what I

thought the facts in this case would show.  And we believe the

evidence that has been presented to you so far, from the

testimony of the witnesses you have heard live, from the

witnesses you saw on the video, and from the documents we have

put into evidence, established the following.  And I am going

to refer to some notes, because there is so much that we have

tried to digest in this case, so I beg your indulgence if I do

look down at my notes.  But I don't want to miss all the

points I want to make.

09:07:31    We believe the evidence in this case has established

infringement by Fallon, clear infringement.  Fallon has

infringed the claims of each of the three iLight

patents-in-suit by its sale of LED Open signs -- we'll refer

to those in a minute -- to Sam's Club, and by its sales of the

Budweiser sign -- you saw the Budweiser Bowtie signs -- to

Anheuser-Busch.  That infringement by iLight (sic) was by no

means accidental.  In our view it was callous, it was willful

and deliberate.

Also, we had testimony from both sides, damages experts. It's quite clear that iLight in this case has been greatly damaged by Fallon's sales of over $35 million of infringing LED signs from 2005 to the present. An award to iLight of $2.5 million, which is what our damages expert said was appropriate, we believe is appropriate, and the evidence established that.

Fallon's suggestion that, oh, $30,000 or so would be sufficient, frankly, we don't think passes the straight face test. ILight's patents were properly granted. Fallon has not established, by what the Court will tell you is the clear and convincing evidence standard. That's a high burden that each of the asserted claims of the iLight patents are invalid.

The evidence confirms that the experts in the United States Patent Office, who the government has appointed to make the determination about patentability, did their job properly when they examined the iLight application for patent not once, not twice, but three times.

Would you please put up the timeline. Now, we prepared a very summary timeline which does show some of the events that have occurred in this case. And I will discuss them a little bit. But just starting off in the very beginning, you heard the testimony from Mark Cleaver, the Chairman of the board of iLight that has been with us through this trial, and about how he and George Hulse, who live right

here in Cookeville, started to develop a company back in April
of 2000.

09:09:56        And then the events continued. You will see how, I
think -- I will go through these in detail, but I want to put
the timeline up to focus our attention on what happened
between the years 2000 and 2007.

09:10:10        You will recall that Mark told you -- Mark Cleaver,
when he testified -- that he and George decided to give up
their pretty safe day jobs and take a risk and start a new
company right here in Cookeville. If they were, of course,
somewhat unscrupulous, they could have decided, well, why
don't we just copy somebody else's product? Maybe go to Asia
and have it made cheaply and bring it over here and sell it
and undercut possibly whoever is selling that product here.

       Instead, they set their sights higher. They wanted to
try to develop something different, that proverbial better
mousetrap. They wanted to try to develop new technology for
the lighting industry. The thought was to build a business
based on cleaner, safer, more energy efficient, and
environmentally friendly lighting products as a replacement
for the neon lamps that have been used in signage that you
have seen.

09:11:07        And the problems associated with neon. You have heard
what those problems are. Neon is thin glass tubes. I'm sure
you've seen these at home with fluorescent tubes, very

similar. But they break easily, the signs break, you have
glass all over the place, and then you release -- the ones
that hold mercury -- mercury vapor into the environment.

George and Mark, and eventually their colleague from
college, Eric Eriksson, worked hard from 2000, April of 2000,
all the way through to the end of that year and into the next
year. And along the way, they met a lot of problems. You
heard about this. This wasn't easy. This wasn't
straightforward. Because now we're talking basically nine
years ago. And at that time everything wasn't obvious, as
some of the witnesses said it is today.

Of course, once you see the solution -- and the
solution is set forth in the iLight patents -- once you see a
solution to the problems, then everything is obvious.

But the key is to try to put your heads back to the
early part of this decade, the year 2000. And the tests that
you will get to on validity, on the obviousness, was, would it
have been obvious at that time for somebody with ordinary
skill in the art, who hadn't seen iLight's solution, to make
the invention claimed in each of iLight's claims of its
patents.

And that's why the experts in the Patent Office are
particularly adept at making this call. That's what they do
day after day. And that's the test they use, and that's the
test the Court will tell you to use in its closing

1    instructions.

09:12:45  2         Now, this was not easy, it was not straightforward.

3    You heard about a lot of the problems and frustrations that

4    these inventors suffered along the way.  But after a while,

5    they came up with a solution.  And Mark described how that

6    happened at the end or close to the end of January 2001.

09:13:05  7         And he also showed you some of the signs that

8    ultimately resulted from their new concept, their new

9    approach, to lighting.  Those signs, we've seen them, some of

10   them are quite beautiful.  I think you will remember the Camel

11   sign we showed you and all that.  And they are marked.  They

12   will be with you in the jury room.  Those are Trial Exhibits

09:13:28  13  6 A through 6 E.  Those are the iLight signs.

09:13:32  14        Mark described the advantages that met his criteria

15   for the new product.  He felt by the end of January of 2001

16   they had achieved their goal and come up with something that

17   they thought was quite important.

09:13:48  18        ILight's technology, its new LED technology to replace

19   neon lamps, was eventually accepted with open arms by some of

20   the bigger customers of signage, and that includes both Sam's

21   Club and Anheuser-Busch.  These customers began to switch from

22   the traditional neon signs like the companies such as Fallon

23   had to sell, to these newer -- the new generation of LED signs

24   that iLight and its strategic partners were selling.

09:14:15  25        Now, Mark told you that the inventors realized that

after this long road they went down that they thought they had

come up with something quite important.  To protect their

money, time and their effort, they talked to a patent

attorney, prepared a patent application, and filed that with

the Patent Office.

09:14:31  The Patent Office, after examining it quite carefully,

you heard a lot about this experienced examiner called Mr.

Sember.  He examined all of the iLight applications, and he

also examined the application of Mr. Slayden, for Mr.

Slayden's patent.  But after his examination, after the back

and forth with the iLight attorneys, the discussions about Mr.

Slayden's patent and the differences between iLight's

invention and that patent, the Patent Office became satisfied

that the iLight application was in proper condition and met

all of the requirements for patentability.

09:15:09  And those requirements included the claims had to be

clear and definite, they had to be valid over the prior art,

and that prior art was particularly Mr. Slayden's patent and

the other patents that the examiner considered, but they

certainly were not obvious or anticipated by Mr. Slayden's

patent, the hollow tube patent, at least in the examiner's

eyes.

09:15:39  If you will, can you put up Trial Exhibit 1.

09:15:43  Now, this is -- in your juror books, you have a copy

of each of the iLight patents.  This is the '238 Patent.  This

is the first page.  And while that page is pretty, it's also

pretty important.

09:16:01 Can you bring up the first paragraph there.  Right

above United States Patent.  That's correct.

09:16:10 Now, this is what they call the patent grant.  And

this is signed by the head of the Patent Office, the

Commissioner of Patents, whom I will call the Director.  When,

only when, all of the requirements of patentability have been

met, will an applicant have his patent issued and be given

this grant.  It's an acknowledgement that the Patent Office

has received an application for a patent for a new and useful

invention.

09:16:37 The title and description of the invention are

enclosed.  So you will see attached to this grant there is a

patent.

09:16:44 The requirements of law have been complied with, and

it has been determined that a patent on the invention shall be

granted under the law.

09:16:52 It was very serious, this examination was complete,

and the Patent Office believed the claims in the patent are

proper and it should be issued.  And again, these are

officials that have no stake in this battle.  They are totally

independent, sitting up in Washington doing their job.

Eventually, the Patent Office issued two additional patents

for Mark and his colleagues' invention.  Those are Trial

Exhibits 2 and 3 in your folders.

09:17:25  The rights granted to iLight are difficult sometimes
to explain to people.  But it's the right to exclude others
from making, or selling, or importing into this country what
is covered by the claims of the patent.  That's the basic
right of the patent.

09:17:42  Now, infringement.  What is infringement?  Basically,
infringement is the unlawful taking, in this case, of iLight's
patent rights.  Those are the exclusive rights the government
has granted.

09:17:55  Fallon ignored the exclusive rights granted to iLight
by importing from its Chinese suppliers and selling its LED
signs to major companies in the United States, even after
iLight notified Fallon in 2005 of the issuance of its patent.
This was illegal, and this is called patent infringement.

09:18:18  So you are probable asking yourself, why would Fallon
do this?  It was always selling neon signs.  It could just
continue to sell it.  You've heard that the company is still
those signs today.

09:18:28  We suggest that the internal documents from Fallon
tell that story.  There is the story told of desperation and,
frankly, greed.  In 2003, Fallon was shocked to learn that
Sam's Club -- from Sam's Club, the buyer at Sam's Club, that
Fallon's neon sign business was at risk.  Rather than develop
better neon signs, or maybe a new product, Fallon decided to

cut corners and simply had its Chinese supplier build
neon-simulating LED signs that used the invention claimed in
the iLight patents.

09:19:03    Indeed, Tim Fallon -- I think you remember the video
of Tim Fallon -- assured the Sam's Club buyer at that time
that Fallon would provide neon-simulating LED signs that would
look like the iLight sign that Sam's Club was already
purchasing in 2003 from iLight and its partner, Identity
Group, an outfit right here in Cookeville.

09:19:26    By taking iLight's -- by using this shortcut and
taking iLight's patent, iLight's solution that iLight had
found to the problems with neon lamps, Fallon was able to
displace iLight at Sam's Club and at Anheuser-Busch and has
been able to sell over $35 million to date of these what we
believe are infringing neon-simulating LED signs.

09:19:53    Now, on the issue of infringement, iLight only needs
to establish proof of infringement by what the Judge will tell
you is a preponderance of the evidence.  And that means the
scales tip slightly, however slightly, in iLight's favor.  We
think the evidence presented to you in this case shows that
the scales tip even more heavily in iLight's favor.  That's
the burden that iLight has to establish for infringement.

09:20:23    I would like to go through a few exhibits that Dr.
Roberts discussed with you on the issue of infringement.
09:20:30 I'm not going to cover the whole case.  I think you will

breathe a sigh of relief about that. But Dr. Roberts' report
will be back with you in the jury room. The complete details
of his analysis are set forth in his report, which is Trial
Exhibit 29. So if you have any questions, feel free to refer
to that report to get more detail on what I have covered.

09:20:52    Dr. Roberts carefully analyzed four signs of Fallon.
And we've seen those here today. Initially there is a Fallon
Open sign for Sam's Club that's exhibit -- I believe it's 11,
John, is that right? Yes. Exhibit 11. This was the first
LED sign that -- or sign type that Fallon supplied to Sam's
Club after knowing about iLight's LED sign.

09:21:27    Then there is the follow on sign, what's called the
Super Bright Open sign of Fallon that was supplied to Sam's
club, and that was Trial Exhibit 13. And I believe these
signs will also be back with you in the jury room, if you want
to look at them then.

09:21:43    Then there was the original Budweiser Bowtie sign.
That's Trial Exhibit 12. And the newer Budweiser Bowtie sign,
and that's Trial Exhibit 14. And you will see the newer one
has the -- the Bowtie is outlined in this red rod-like wave
cut. That's the difference between the newer and old one.

    Now, Dr. Roberts carefully analyzed each of these
signs in the work he did to see whether or not they were
covered by the claims of the iLight patent. He put his
analysis on each of these signs into the form of what we call

a claim chart.  I will discuss one of those with you in a
moment.  But just for your information, this is his detailed
analysis and summary form for each of these signs.

09:22:41    The claim charts -- I will give you the exhibit
numbers in case you want to refer to them in the jury room --
for the original Xenon or Fallon Open sign for Sam's Club is
Trial Exhibit 29 LL.

09:22:58    The claim chart for what's called Super Bright Open
sign, the bigger one, is Trial Exhibit 31 T as in Tom.  The
claim which shows infringement for the original Bud Bowtie
sign is Trial Exhibit 29 QQQ.  Triple Q.  And finally, the
claim chart that shows infringement for the newer Fallon Bud
Bowtie sign is Trial Exhibit 31 S as in Sam.

09:23:34    These claim charts are basically the summaries of Dr.
Roberts' more detailed opinions that are in his expert report,
which will be back there with you, Trial Exhibit 29.  And I
believe they should be helpful to you if you need to refer to
them on the issue of infringement.

09:23:53    Remember, if you determine that Fallon has infringed
only one claim of one of the iLight patents, Fallon has
committed patent infringement.  In other words, we don't have
to establish that Fallon infringed every claim; one claim is
sufficient.

09:24:09    I'd like to give you now a very brief summary, a top
level summary, of the claims we believe Fallon has infringed

1    in each of the patents.

09:24:18    2         In the '238 Patent, we believe Claims 8 and 25 have

3    been infringed by the Fallon original and newer or Super

4    Bright Open signs sold to Sam's Club.

09:24:32    5         We also believe that the original Budweiser Bowtie

6    sign has been infringed by those same claims, 8 and 25, of the

7    '238 patent.

09:24:43    8         And finally the revised, the newer, red, if you will,

9    Budweiser Bowtie sign we believe has been infringed by Claim 8

10   of the '238 patent.  Now, that's the only claim -- very

11   candidly, that's the only claim that Dr. Roberts found was

12   infringed by the newer Budweiser Bowtie sign.  So that's the

13   only one you have to look at, Claim 8 of the '238 on the newer

14   Budweiser sign.  We haven't accused it of infringing other

15   claims in the other patents.

09:25:12    16        Now, with respect to the '262 patent, that's the

17   second iLight patent, this one will be easy, Claims 1 and 8 in

18   our view have been infringed by the original Fallon Open sign,

19   and the newer or Super Bright Fallon Open sign for Sam's Club,

20   and by the original Budweiser sign.  Again, that's Claims 1

21   and 8 of the '262 Patent.

09:25:37    22        And finally, on the '970 Patent, Claims 1 and 5 have

23   been infringed by the original Fallon Open sign, the Super

24   Bright, the newer Fallon Open sign for Sam's Club, and the

25   original Budweiser sign.

09:25:53  1        In addition, Claim 8 of the '970 Patent has been

      2    infringed by Fallon's sales of the original Open sign and the

      3    original Budweiser sign.

09:26:07  4        Now, I would like to look at the claim chart, just so

      5    you know what that is, for one of the signs for the first

      6    claim of the '238 Patent, and look at some of the slides used

      7    by Dr. Roberts and others to explain Fallon's infringement to

      8    you.

09:26:24  9        Could you put up Trial Exhibit LL, please.

09:26:28 10        Now, this is what you will find back with the exhibits

     11    in the jury room.  It will be a lot easier to read there.  But

     12    this is a claim chart.  Could you just page through this maybe

     13    a couple of sheets.

09:26:39 14        What you are seeing here are the claims of the patents

     15    broken out by claim element.

09:26:42 16        Then stop there for a second.

09:26:46 17        That's on the left-hand column.  That's each of the

     18    claims and its various claim element.  And on the right-hand

     19    side is the explanation of where that claim is found in the

     20    Fallon infringing products.  So that is kind of a guide for

     21    you to show the analysis Dr. Roberts did and how he concluded

     22    claims elements were present, or yes, and the reasons behind

     23    it.

09:27:16 24        If you could go back to the first page of that

     25    exhibit.  The exhibit is 29 LL.  And expand the first couple

of boxes, please.

Just to give you an example, the Claim 8 of the '238
Patent starts with an illumination device for simulating neon
lighting. And that's in every one of the claims. That's what
this is all about. That's what the invention is all about.

So across from there is the explanation, yes, Dr.
Roberts found that was in the Fallon sign, and he explains
why, indeed, Fallon has pretty much admitted that. That's on
their advertising. This is the -- their LED signs have
replaced the traditional neon signs.

09:28:04 Stepping down to the claim, a substantially rod-like
member, the Court has told you and will tell you again what
that means. But basically rod-like means a slender bar like a
rod. And a rod, the Court will tell you, is a slender strip
or a slender bar resembling in shape a wand.

09:28:28 And you will see, and we'll discuss this in a bit, but
the letters and accents on the signs at the top, the waveguide
at the top, are slender strips of plastic that certainly
resemble a wand, if you will, when assembled as part of the
illumination device.

09:28:47 Now, I think you will recall that Fallon's attorney
picked up one of these top pieces and was just waving it
around, saying, is that a wand, or whatever.

09:28:56 But the whole idea is, this invention is to an
illumination device, not an individual piece. So when

assembled in the illumination device as claimed, these do
resemble -- an example at the end here -- a rod or a round
piece.  And the reason for that is they are replacing neon --
small neon lamps that have the same shape that look like a
long wand, if you will.

So that claim element is found, and that's there.
And then there are additional -- I'm going to skip over a
couple -- there are additional claim recitations.  I think you
can look at those.  And frankly, Dr. Roberts went over this in
great detail, so I'm not going to do this in tremendous
detail.

But I would like to talk for a second about the
interior light reflecting surface, I'll show you on the next
page.  Let's go to the next page, please.  Yes.  And if you
can expand, each with an interior light reflecting surface.

Now, this is the spot where Mr. Hathaway, Fallon's
expert, and Dr. Roberts disagree.  Dr. Roberts found that the
inside of the sidewalls in the Fallon signs reflect a
significant amount of light up into these milky white letters
or waveguides at the top.  And his experiments showed that if
you remove these inside sidewalls, it reduces the amount of
light quite dramatically.  And frankly, that proves, from a
scientific level, that indeed these interior sidewalls are
reflecting light.

Now, Mr. Hathaway is trying to say that, well, they

don't.  And that was just about it.  He says because they are

dark.  But indeed, those interior sidewalls are very, very

polished.  You can take the sign apart, look at it, some of

the pieces come off.  You will see how highly polished those

walls are to serve as a reflecting surface.

09:31:35    Can you pull up Exhibit 588.  Let's look at the first

page for a second.

09:31:59    Now, this Exhibit 588 are photographs of the Fallon

Xenon original Open sign.  And you will see the exhibit

includes eight photographs, and that's just a summary page on

the front.  And would you go to photograph 8.  Which I believe

is the last one in the exhibit.  Okay.  Maybe rotate it.  Now,

it's a little -- Your Honor, I wonder if we can for a moment

dim the light a little bit so this will show up.  Thank you.

That's very helpful.

09:32:52    Now, if you look on these photographs, which are

actual photographs of the Fallon what we believe is infringing

device, you will see what looks like a row of LEDs here and

reflections on the inside.  There is certainly no question

that, when these signs are illuminated, those walls are very,

very shiny and highly reflective.  It looks like there is a

bunch of rows of LEDs in here.

09:33:27    And indeed, John, if you can illuminate the Fallon

original sign.  I think if you can bring it a little closer to

the jury, you can see it with your own eyes, and you can do

09:33:58 this back in the jury room, that those sidewalls are

reflecting -- very reflective.  And you will see what looks

like multiple rows of LEDs in this.  Thank you.

So to assert that the sidewalls are not reflective,

the inside sidewalls, as the claim calls for, we think it just

doesn't make sense.  And basically, that's one of Fallon's

don't believe your own eyes defense.  We just don't think that

holds water at all.

Then another is the exterior light absorbing surfaces.

You have seen these matted outside surfaces that were talked

about quite a bit.  That is to absorb light.  So that part of

the sign doesn't stand out.  What you really I want when these

are lit up is for people to see the lighted part and not the

other part of the sign that stands up and makes it leap out at

you.  So we think that part of the claim, Claim 8, of the '238

Patent, certainly is infringed.  Or is present, I'll put it

that way, in the Fallon signs.

I think, Your Honor, if we could put the light back on

now.

THE COURT:  All right.

MR. VEZEAU:  Thank you.  So that basically I had the

claim chart up there, that takes you through Claim 8.  Claim

25 has very similar claim recitations.  And I'm not going to

take you through that, but that is in the claim chart.  You

step through it pretty much same way.  So once you get past

the first claims and to the other claims, they are easier

because you will see that there is reputation.

09:35:26  Some of the words in the claim are different, and you

really do need to focus on that.  For example, Claim 25

doesn't talk about rod or rod-like, it talks about a light

transmitting member.

09:35:39  Claim 1 for example, of the '262 Patent, which is one

of the claims Fallon has infringed, talks about an essentially

solid leaky waveguide rod.  And the claims of the '970 Patent

are each a little different, and the wording used is a little

different.

09:35:56  For example, Claim 5 talks about an essentially solid

leaky waveguide rod.  That all gets important when you are

considering the issue of Mr. Slayden's patent, which is the

hollow tube patent.  That certainly is not an essentially

solid waveguide rod.

09:36:19  Now, again, to get back to this rod or rod-like and

the distinctions fallon's counsel was trying to make.  You can

tear a sign apart, hold up just about any little piece, and

say, oh, that's not what the claim calls for, that's not what

the device is, this is not sold as a bunch of little parts.

This device was sold by Fallon to Sam's Club and to

Anheuser-Busch on the Bowtie sign as a complete assemblage.

It's an illumination device.  It's fully assembled.

09:36:51  And when assembled, each of these ten strips on the

1  top, the slender strips, have the shape of a wand.  And again,

2  the reason for that is they are replacing these thin neon

3  bulbs that were previously in here, so they must have this

4  wand-like or rod shape, and that's why they are shaped in that

5  manner.

09:37:18  6      Now, there was an issue raised by Fallon's expert

7  about preferentially scattering light.  You saw lot of

8  scientific evidence from Dr. Roberts about that.  He showed

9  you photographs where the light on this top waveguide on the

10  Fallon signs were stretched out.  That's what preferentially

11  scattering light means.  The Court will define that in greater

12  detail for you.

09:37:46  13      But that's the basic feature.  And the whole idea for

14  that was that's what gives you -- when you do that, that's

15  what gives you this smooth, even glow on these letters, which

16  is why people like neon signs.  The neon sign has -- it

17  doesn't looks like a bunch of little points, lights, it looks

18  like a big lamp, stretched out, nice, soft and smooth.  And by

19  using this preferentially scattering light that's in some of

20  the iLight claims, with the waveguide, with the waveguide

21  technology, Fallon was able to achieve that neon simulation in

22  its LED signs.

09:38:29  23      I'd like you to put up, if you will, Trial Exhibit

09:38:34  24  29 BB, as in boy.  I'm sorry.  This is another photograph,

25  Your Honor.  I thought we were through with this, but maybe if

1       we can dim the light again.

09:38:45  2            This is one of the experiments that Dr. Roberts did.

3       And it showed how, on the top here, when one bulb was lit, how

4       you really had this preferentially scattering or this

5       stretching of the light down the waveguide and ultimately

6       around the sides, too.  And that's what gives you that even

7       glow.

09:39:08  8            He did that for each of the signs to show that this

9       phenomenon, if you will, is present when these thin strips,

10      like the waveguide strips at the top of the sign that covers

11      the top of the channels in which the LEDs sit, when that's

12      formed, if you will, as in this rod or wand-like shape,

13      rounded at the top.

09:39:30  14           That, what we have up, this display, is Trial Exhibit

15      29 BB, and that's boy-boy.  And that's for the Xenon Open

16      sign.  The same thing was done for the original Budweiser

17      Bowtie.  And that's Trial Exhibit 29 HHH.  The Super Bright

18      Open sign, the later -- that's Trial Exhibit 31 I.  And

19      finally, the new Bowtie, the sign for Budweiser, that is Trial

20      Exhibit 31 R.

09:40:06  21           And as I mentioned, Fallon's expert also took issue

22      with the interior light reflecting surfaces, saying he didn't

23      believe they were light reflecting surfaces.  I think when you

24      look at it, turn it on in the jury room, your own eyes are

25      going to tell you something different.

If we could bring the light up again, please.  Thank

2  you.

Each of the features of each of the asserted claims of

4  the iLight patents is present in the Fallon signs we put in

5  front of you.  We didn't overdo it.  We didn't throw a lot of

6  claims at you.  We tried to pick and choose after Dr. Roberts'

7  analysis.  And I think we're very candid in telling you that

8  the new Budweiser sign, that's one claim that I pointed out,

9  didn't just say, oh, it's infringed by everything.  We tried

10  to be specific, and we tried to be accurate.  We believe the

11  evidence, on balance, the scales tip in iLight's favor with

12  respect to the issue of infringement.

Now, another issue dealing with infringement is the

14  concept of willfulness.  Was this infringement by Fallon

15  willful?  And of course, now that Fallon is in court, you are

16  going to hear oh, no, no, it wasn't willful, and you're going

17  to hear a bunch of excuses.  But candidly, we think Fallon's

18  own documents and own people tell a different story.  This was

19  the story before they got into trial.

Fallon's infringement was not accidental.  In fact, it

21  was deliberate, willful, and in our view, in callous disregard

22  of iLight's patent rights.

From any objective perspective, we think Fallon's

24  conduct in this case was reckless.  Fallon decided it was

25  going to do whatever it took to save its business with Sam's

Club and to get business with Bud Anheuser-Busch, even if it
meant ignoring iLight's patents.

09:42:09 Could you put up Trial Exhibit 19, please.

09:42:11 This is an e-mail from Tim Fallon.  You heard from
him.  And it's from December of 2003.  This is Trial Exhibit
19.  And he tells the buyer at Sam's Club, Ms. Van Roo, that,
in developing our alternate technology over the past three
months, we looked at a couple of iLight products.

09:42:41 No question they had iLight products in 2003, long
before they had a product.  And up to that time, they hadn't
even though about LED, they were just selling neon technology.
This was something new to them.  And it was new because they
now have got the sense that Sam's Club was going to get rid of
neon signs, was going to bring in iLight's new LED technology,
signage technology.

09:43:09 And he said -- he goes on, and you can read the e-mail
again, we have put it in front of you a couple of times.  But
he goes on to say, this new product --

09:43:17 Will you expand the bottom a little bit, starting with
this new product?  Right where you were, a little more in the
sentence.  Go back, please.  Go back to the prior slide.
Highlight the sentence, the fourth line there.  This new
product.  Starting with this new product.  The end of that
line, the next line.  All right.

09:44:08 And so here's Tim Fallon in 2003 assuring a Sam's Club

buyer that this new product, meaning the Fallon product, would look similar to iLight's Newon. That was the joint venture product with the Cookeville company here that iLight had been selling to Sam's Club.

And you also heard, oh, how easy it would be, it would be obvious for anybody to do this, and this, and no problem whatsoever. Well, frankly, this was December of 2003. It wasn't until January of 2005 that Fallon was finally able to deliver a product to Sam's Club. It took them that long. So it wasn't an easy or straightforward job. It took even on their part, even after seeing iLight's patents, seeing their product, it still took time to develop this technology to a point, to get it into production so they could sell it.

Fallon's also interest -- in the last page of this exhibit, this is from our good friend, Mr. Fallon, again, in December of 2003 to Ms. Van Roo, the buyer at Sam's Club. And just so you know, this is part of what we believe is copying the invention in our products. Mr. Fallon's tone to Ms. Van Roo, wanted to follow up. While we were testing iLight signs, we sent a couple of them to U.L.

That's Underwriters Laboratory in Chicago. They look at a lot of products and list them if they meet certain industry requirements.

We just heard back from them late yesterday afternoon coincidentally. They told us that the U.L. 48 standard for

electric signs is changing to include --

So now it's just changing to include.

-- LED signs like the one we sent in.  As long as the adapter is U.L. listed, this sign is U.L. listed, too.  So the Supreme Court -- Tim Fallon has got his hands now on some iLight signs, and they are going to use that, of course, and what they learn from that, in developing their own products. This is all on the issue of willfulness in their infringement.

Other trial exhibits also demonstrate Fallon's desperation.  Can you put up, for example, Trial Exhibit 22. This, we talked about a little bit, was 12/20/05.  And this was a letter from Mr. Huo.  Now, Mr. Huo was the head of Fallon's Shanghai plant where they pumped out these signs and then shipped them into this country.

Now, Mr. Huo is telling his boss in this e-mail -- and his boss is the big boss at Fallon, Mr. Bagin, who didn't bother to come to here for trial.  But he is telling him, we can always submit a patent application for the LED oval sign with broken borders, but I don't believe it will receive approval, and if iLight does get a whiff of our filing and files an objection, we are dead in the water.

And then he said at the bottom, iLight does have a patent filing for its LED product.  Please see the attached. And he admitted in his deposition that that was the iLight patent that you have, the '238 Patent.

09:47:27  1      So there is no question that they had their hands on

2     iLight's patent, they had their hands on iLight's product, and

3     they just went merrily ahead because business was at stake,

4     and after all, who was iLight?  They never heard of them.

5     Just a little upstart.

09:47:42  6      So, what happened next?  Well, of course, iLight finds

7     out from Sam's Club that, oh, we're maybe looking back at the

8     Fallon because they said they can give us a sign that looks

9     just like yours.

09:47:54 10      So rather than hauling off and filing a lawsuit,

11    iLight said, well, let's be reasonable, let's write to the

12    Fallon company and see if we can talk to some sense to them,

13    tell them about our patents.

09:48:11 14      So can you pull up Trial Exhibit 8.

09:48:22 15      I won't go into this in great detail, but this is a

16    letter from iLight's counsel to --

09:48:31 17      Can you pull up the heading.

09:48:36 18      -- To the president or legal department of Fallon.  It

19    wound up eventually with the president, Mr. Bagin.  And

20    basically, the letter says -- it's Trial Exhibit 8.  You can

21    read it if you want, but we've already read it to you several

22    times.  I'm not going to belabor the point.  But basically

23    it's saying, look, we've got some patents here, please pay

24    attention.

09:48:53 25      Not much happened after that.  There was a response

from Fallon's counsel.  His lawyer wrote back.

09:49:08    Can you put up Trial Exhibit 26.  Hold on.  Trial
Exhibit 40.

09:49:12    This is the response, very cryptic, short, to the
point.  You will see a little problem with it later.  But This
is one of Fallon's lawyers writing back saying, we don't
infringe, so thank you very much.

09:49:26    That's what we -- that's what could be referred to
very uncharitably as a blow-off letter.  But indeed, there was
a lot of concern at Fallon.

09:49:39    Can we put up Trial Exhibit 6.  Oh, sorry.  Stay for a
second on this exhibit, I'm sorry.

09:49:45    Now, this is kind of interesting, because you're going
to hear in this trial how, oh, these claims are so indefinite
that nobody can understand them.  Well, there's no word about
that from Fallon's lawyer way back when before they got to
trial.  He understood it.  And he said, no, we don't infringe.
To make that conclusion, you've got to understand the claims.
He could have said, we don't know what these patents are
really saying.  He didn't say that.

09:50:06    So that's just another excuse they came up with in
this trial.  We believe it doesn't hold water.  And part of
the evidence it doesn't hold water is Fallon's own attorney
certainly could understand it before they got into lawsuit.
Now, all of a sudden, they are very confused.

09:50:22  1      Now, could you pull up Trial Exhibit 6 -- 61, I'm

         2  sorry.

09:50:29  3      Now, this exhibit is from August of 2005, right when

         4  they are trying to keep the business, get the business, keep

         5  the business.  In this case, it's with Anheuser-Busch, that's

         6  what AB is.  This is Trial Exhibit 6.

09:50:45  7      We see this is from Mr. Demmond.  He was in charge of

         8  sales at Fallon.  He was the big guy in sales.  And He is

         9  telling Tim Fallon that:  The bottom line, Tim, we want AB's

        10  business -- that's Anheuser-Busch -- but it must be

        11  profitable.  China and LED seems to be the only solution.

        12      No question they were getting desperate.  They wanted

        13  to maintain that business with Anheuser-Busch, so they had to

        14  go to China, get products made cheaply, and also they had to

        15  switch to LEDs.  And why not switch, as they did, and come up

        16  with something, as they said they were going to do, that

        17  looked like iLight's products.

09:51:33 18      Well, not hearing much, not being satisfied, --

09:51:37 19      Can you put up Trial Exhibit 8, please.

09:51:42 20      In December of 2005, iLight's attorney wrote back to

        21  Fallon's attorney, and this started to get a little more

        22  serious.  Here he calls the attention of Fallon to not only

        23  the '238 Patent but some other patents, including the '262

        24  patent.

09:52:00 25      And he expressed iLight's grave concerns.

09:52:04 1      Do you see that in the first sentence of the second

2  paragraph.  The whole sentence, please.

09:52:17 3      Again, this is Trial Exhibit 8, where iLight's

4  attorney tells Fallon's attorney:

09:52:20 5      Since writing that letter --

09:52:23 6      He's referring to his earlier letter in April.

09:52:25 7      -- We have had an opportunity to review your client's

8  products in the marketplace and have grave concerns.

09:52:33 9      So he's kind of signaling there, look, yeah, maybe

10  we're a young upstart, but you'd better take us seriously.

09:52:41 11      Now, interestingly enough, let's put up the response

12  to this from Fallon's lawyers, Trial Exhibit 41.

09:52:54 13      So here's Fallon's lawyers writing back to iLight's

14  lawyer saying:

09:52:58 15      We got your letter of December 25 --

09:53:00 16      And this is interesting.

09:53:05 17      -- and are in the process of evaluating the issue

18  patents and published patent applications, the file wrappers

19  and the art of record contained therein.  We anticipate this

20  review will be complete, et cetera, et cetera.

09:53:20 21      This is another, in our view, stalling letter.  But

22  it's kind of interesting, because if you recall in the prior

23  letter, they just wrote back quickly and said, oh, we don't

24  infringe, thank you very much.  And now he seems to be saying,

25  well, maybe now we'll read your patents and start studying

them.  In other words, doing the homework.

So you have to question really how much of a study did they do back in April when they said, oh, thank you, we don't infringe.  We don't think they did much at all.

You saw portions of Mr. Bagin's deposition.  I don't know if you remember the gentleman, but he's the boss.  He's the big guy at Fallon.  And he pretty much admitted he couldn't be bothered by this matter.  He said he got a letter from his counsel that said, no infringement, didn't know much about the letter, didn't know who reviewed it, whatever, didn't ask questions.  He said he just put it in file and didn't inquire further.  He said it wasn't that important to him.  It just wasn't that important.

He didn't care to question.  He had no comments.  He didn't stop sales during this -- whatever investigation was done by his lawyers, he didn't stop sales of LED products.  Why?  Because they were frightened, frightened, frightened of losing the business, and they were going to just keep selling.

So he got this letter, put it in his hip pocket, so some day if ot got to trial, he could say, oh, well, we didn't think we infringed.  Well, we don't think he cared at all, frankly, except he cared about those bottom line profits, and that was it.

Tim Fallon, who you saw, and Mr. Bagin, head of the company simply continued to run rough shod over iLight.  This

was a small company. They probably never heard of them
before. And money was at stake. So frankly, Fallon simply
tossed caution to the wind and said, we've got to keep that
business. That's what's important to the company.

09:55:08     The evidence, we think from Fallon's own documents,
you saw the testimony, and it own actions, show that Fallon's
infringement of the '238 and the '262 Patents, there was no
question it was deliberate and, we think, willful.

09:55:24     Damages. I would like to talk a little bit about
damages with you. Mr. Bratic came on. I know he was the
first of the damages expert, he was our expert, and spent
quite a bit of time with you explaining in detail what the
base was for damages in his view, what the royalty rate should
be as a result of this hypothetical negotiation, and told you
what in his view should be awarded.

09:55:50     His entire report -- all the experts had reports in
this case -- is in evidence and is Trial Exhibit 32, in case
you want to know any of the details on damages. I'm sure
there's much more detail there than you care to really learn,
but it's there if you want to look at it.

09:56:06     I want to show you some of his slides. We'll go
through them quickly. But just to bring you head back to his
testimony and why we believe an appropriate award is called
for in this case.

09:56:20     Could we put up, please, Exhibit 32 J. Now, this is

Trial Exhibit 32 J, and it's a pretty important exhibit
because it's his summary.  This is his bottom line.

09:56:30    And he gave his opinion that the damages in this case
owed to iLight would be calculated by applying what he
determined was a reasonable royalty rate to the infringing
base, that's $34.5 million of sales, sales of the infringing
products by Fallon.  And that calculation will result in
09:56:55    $2.5 million.  And he believed that would be a total -- a
reasonable royalty in this case.

09:57:01    Now, it's kind of important, I don't think you will
find that Mr. Bratic got too greedy here or that iLight is
trying to be too greedy.  He explained to you, and we'll go
through a couple of slides, how this represented one-half of
the profit premium that Fallon was able to achieve by moving
into the LED business.  They already had a plant set up.  They
were selling neon signs.  Still are selling neon signs today.

So it's not like they had to build a new building or
hire new people or do this.  This was the profit premium, what
they were able to achieve, by selling these infringing LED
signs.  And that premium -- you will see the slides -- was
anywhere from 14 to 15 percent.

09:57:46    So looking at that, Mr. Bratic concluded that, of
course, he couldn't say that Fallon did nothing to get the
business.  They did have relationships.  They were out there
beating on doors.  They undercut iLight's price.  They did a

lot of stuff. And so he's saying, I don't think it would be
fair to give iLight all of that, but half of it he thought was
fair. And that's where he came up with the 7 percent, in
addition to talking to industry experts and looking at other
factors.

09:58:13 So could we show Trial Exhibit 32 G, please.

09:58:15 This is that so-called hypothetical negotiation. Kind
of strange, because it never took place. So this would have
taken place at the beginning of Fallon's infringement back in
January of 2005 when they first sold their first LED
infringing sign to -- Open sign to Sam's Club.

09:58:34 And in this hypothetical negotiation, there would have
been a negotiator for iLight and a negotiator for Fallon who
would look at the landscape and see if they could come up with
a reasonable royalty for a license, assuming that the claims
of the iLight patents were valid, and assuming that Fallon was
infringing, and assuming that the parties were really
interested in doing a deal to avoid litigation. So that's the
whole construct of this hypothetical negotiation that both
experts talked about.

09:59:10 Could we go to 32 Q.

09:59:14 Now, Mr. Bratic said, I didn't just pull a number out
of the air. He did look at what he called and other witness
called Georgia-Pacific factors. In fact, Mr. Bratic grouped
them into various logical what he called buckets, the

licensing characteristics and other group of factors were
under nature and use of the invention, et cetera.  And pretty
much both experts talked about these.  The Fallon expert said,
oh, they all weighed in Fallon's favor.  And Mr. Bratic said
many of these weighed in iLight's favor, which you could
imagine, but not all of them.

09:59:50   But in weighing each of these, Mr. Bratic came up with
the -- this was part of the basis for his conclusion that 7
percent would be a reasonable royalty.

10:00:01   Could we do 32 R.

10:00:03   So, for example, he started breaking these buckets
down and talked about this first series of factors, factors 1,
2, 3, 7 and 12, which he listed under licensing
characteristics.  And each of these are discussed in greater
detail in his report.  If you need to turn to that, it's Trial
Exhibit 32.

10:00:24   Could we put up Exhibit 32 U.

10:00:28   Now, as a sanity check or reality check, Mr. Bratic
said he got in touch with Mr. Kallmes, who we described as an
industry expert in the field of licensing.  He was a prior
licensing director at a company called Color Kinetics, CK, a
member of the Licensing Executive Society, and he had over ten
years of experience.

10:00:52   And he discussed with Mr. Kallmes, Mr. Kallmes's views
and experience in the field.  And Mr. Kallmes said that at

Color Kinetics, the royalty rate ranged from 5 percent to 25

percent.  And then later he narrowed the range to 5 to 9

percent when negotiating agreements.  And he said those were

the typical rates, 5 to 9 percent, in his view, for LED

lighting and lighting control technology.

10:01:18   And he said to the upper end of that range was the

range that were typically looked at when you were dealing with

competitive situations, which, indeed, was the situation here

between iLight and Fallon at the time, in January of 2005,

when this hypothetical negotiation would have taken place.

10:01:43   May we have Exhibit 32, please.  All right.  So this

basically gives Mr. Bratic support for his determination of

the 7 percent royalty rate.  ILight had a license with Color

Kinetics, so it was very familiar with that royalty range, 9

percent for competitive products in this field, 5 percent for

noncompetitive products.

10:02:13   Again, Mr. Bratic talked to Mr. Kallmes, got his

experience, the range Mr. Kallmes believed was the appropriate

was 5 to 9 percent.  Again, the higher end of that range for

competitive situations.

10:02:32   Mr. Bratic determined Fallon's profit premium was 14.3

to 15.3 percent from the sales of the infringing products.

And so he said basically in his view the negotiators would

have said, well, Fallon can't walk away with nothing.  We're

not quarreling with that.  But a fair distribution here, in

1158

1   view of the contributions of iLight, iLight's technology,

2   patented technology, would be a 7 percent royalty to iLight.

10:03:03  3       I believe that was U.  The next one I think is 32 N.

4   Pardon me?  That is N?  How about that.  32 Y, please.

10:03:37  5       This goes back -- again, this is something Mr. Bratic

6   considered, that in around 2004 Sam's had stopped purchasing

7   oval neon Open signs from Fallon.  That was Fallon's mainstay.

8   That was the heart and soul of its business with Sam's Club.

9   While they tested the signs, the LED Open signs, that used

10  iLight's technology.

10:04:01  11      Fallon develop its Xenon Open sign -- that was the

12  first one of these infringing signs we looked at -- to avoid

13  losing Sam's Club business.  No question about that.  Sam's

14  Club later began selling those signs to Sam's Club beginning

15  in 2005.  Indeed, Fallon likely would have lost Sam's Club

16  business without going to these LED Open signs.  That seems

17  pretty clear from the correspondence we've seen.

10:04:28  18      And by that time, when iLight now approached Sam's

19  Club, Fallon had already obtained the business, and Sam's Club

20  said, hey, we're getting basically the same thing from Fallon,

21  and it's a lesser price -- I think you remember he discussed

22  price differential -- and he said, so thank you very much, but

23  we're already getting these from Fallon.

10:04:51  24      Can we have the next exhibit?  I think it's 32 W.

10:04:56  25      Mr. Bratic listened to the views of the experts, and

particularly Dr. Roberts, and in talking with Mr. Cleaver, and

determined that these iLight patents in his view were, indeed,

a significant advance in this particular field.  And There

were quite a few benefits.  I don't think anybody has really

quarreled with the benefits that were present in iLight's

patented technology and in its signs.

10:05:26  Can we have the next exhibit.  I think it's 32 Y.

10:05:29  Now, why is this so important to Fallon?  Well, you

can see that now, beginning in 2005, but now the accused sales

represent 42, almost 43 percent of Fallon's total sales.  So

where it had sold none before, iLight came on the scene, now

using the LED approach to signs, that has turned out to be

about 43 percent of their total sales.

10:05:58  The next exhibit, please.  I believe it's AA.

10:06:04  The iLight products, this was another issue that was

considered in connection with what would be reasonable, indeed

well recognized in the industry, achieved Product of the Year

award in 2003.  Sales were growing dramatically.  Of course,

he started small, no question about it.  But they were growing

very well from September of 2004 through August 2006.

10:06:30  Anheuser-Busch became one of iLight's customers with

iLight's teaching partner with custom made signs.  I think you

saw those -- the Budweiser signs, the Bowtie signs.  They were

a customer before Fallon came in and grabbed that business by

its own infringing products.

Mr. Cleaver estimated that the gross profit margin

iLight was achieving on Plexineon, which is what they call

their technology, their patented technology, was 37 percent in

2005 and 39 percent in 2006.  Pretty good for a startup

company.

May we have Exhibit BB.

So iLight's sales grew pretty rapidly in the

beginning.  And you can see in 2005 they are doing very well.

And these are sales of its LED signs that have incorporated

its patented technology.  But then after that, once Fallon was

able to get back in with its own sign that look like iLight

signs, or so as they told Sam's Club, you can see those sales

dropped off dramatically.

So there is no question this was a competitive

situation.  And there is no question that Fallon's infringing

sales hurt iLight dramatically.

May we have Exhibit 32 EE.

This is their profit premium I told you about.  This

is 32EE.  I think it's a pretty important slide because Fallon

is going to say, oh, we are just barely making it.  Well, the

reason why they were, if they were, were barely making it was

because they were riding on the back of iLight's invention.

The profit premium from iLight's technology that they

incorporated in their LED signs gave them, on the gross profit

-- looking at it from gross profit side, over 15 percent, and

at the operating profit level, over 14 percent.

10:08:30           May I have Exhibit LL.

10:08:36           So this is Tim Demmond, head of sales, writing -- at Fallon, writing in December 2003, writing to -- this is Tim Demmond writing saying that:

10:08:47           Tom presented the Bud Light Prestige.

10:08:50           That's their version of the Bud Light sign, the LED sign.

10:08:55           Even though the unit was flickering, they like it.

          They being Anheuser-Busch, the people there.

10:09:01           However, they are leaning towards Version 2. Anheuser-Busch said they are going to order several thousand units of this product, and they absolutely need to have Version 2 in their hands next week.  We either deliver or they buy from iLight.  Our fate is in our hands.

10:09:21           So now say these folks weren't competitors?  I don't think that's the case.  I think their own documents before they got into litigation show that, indeed, this was a very competitive situation.

10:09:33           May I have Exhibit TT.

10:09:38           This was the slice, if you will, of the total sales that Mr. Bratic thought would be reasonable.  Exhibit TT, I think, puts it into a visual perspective.  In this case, as the Court will instruct you, iLight is only entitled to -- regardless of the ethics involved or whatever, iLight is only

entitled under the law to a reasonable royalty.  And I think

this slide tends to put it in perspective.  Seven percent is a

small piece of these infringing sales and we believe is a

reasonable royalty.

10:10:16 May I have Exhibit R-1.

10:10:19 Now, Fallon's expert got up and argued that the

redesign of Fallon's signs, the newer ones we have looked at

here were not infringing, but that's simply not the case.

They are infringing.  Where he came up with that, we don't

know.

10:10:39 But according to Dr. Roberts and his testimony and

what I went through with you, and you have the claims charts

that are in the back -- those are the ones I mentioned --

these new products do infringe the patents-in-suit.  But that

was the reason why Mr. Degen believed that the royalty rate

should be less.

10:10:57 Should we go to -- is that 1 or 2?  This is Trial

Exhibit 32 R-2.

10:11:01 Now, mr. Degen asserted that Fallon could have

retooled to make its current noninfringing design in January

of 2005.  But Fallon indeed sued -- I'm sorry, iLight indeed

sued Fallon way back in March of 2006.  And even if you

believe Mr. Degen that, wherever he got this information,

these signs, the newer signs, don't infringe, it certainly

took them over -- a couple of years to get to this point.  So

to say it was an easy thing, they could have just simply

redesigned, well, that's not the fact.  There is no evidence

that Fallon ever designed its products around the

patents-in-suit.

10:11:47     If we could have Exhibit 32 R-3.  Mr. Degen would have

you believe that a reasonable royalty would be likely to cost

a retooling to implement the current design, which would be

$30,000 to $40,000.  Indeed, where he came up with that, he

says Fallon told him that.  It took them over a year from when

they told Sam's Club that they were going to give them a new

product that looked like iLight, to really get there, that's

not a $30,000, $40,000 investment.  And even when they did

that, they said it was going to be like iLight's products, and

it was, it was infringing iLight's products, iLight's patents.

     So they did not come up with a noninfringing design,

the $30,000 number, we don't really know where that came from,

there was no evidence of that, just something that somebody at

Fallon told Mr. Degen.

10:12:35     But indeed, at that time, at the time of the

hypothetical negotiation, they weren't planning to do this,

and their whole business was at stake.  Their business with

their two major customers, Sam's Club and Anheuser-Busch.  So

to say the reasonable royalties should only be $30,000 to

$40,000 when their whole business was at stake is a little bit

of a stretch.  That's simply not reasonable.

10:13:04 1        And to think that iLight's hypothetical negotiator

2   would have agreed, oh, you want to give us $30,000 to $40,000

3   for a license, and then you are free to do what you want?

4   Think about that.  Is that reasonable?  Certainly that

5   wouldn't have been agreed to in January of 2005 when iLight's

6   sales had been growing like mad, and they were at a high

7   point.  They wouldn't have said, oh, yeah, just come on in,

8   and that's fine with us for $30,000.  Makes no sense

9   whatsoever.

10:13:42 10       May we have 32 R-15.

10:13:48 11       There was some talk about this 25 percent rule.  Mr.

12  Bratic's view was there is no economic basis for it.  He said

13  it was widely criticized and arbitrary.  And frankly, that was

14  the start of -- Mr. Degen said that was the start of his

15  analysis.  But really, there is no basis.  He said, oh, it's

16  an industry-wide thing.  Here we have just a dispute between

17  the experts.  Mr. Bratic said he did not agree with that, and

18  frankly, he could find no economic basis for it.  It's just a

19  number pulled out of the air.

10:14:16 20       So in summary, the conclusion Mr. Bratic reached that

21  a $2.5 million award to iLight as a reasonable royalty for

22  Fallon's sales, infringing sales, of over $35 million we do

23  believe is reasonable, and that's what we ask from you.

10:14:37 24       Now, I would like to spend my few remaining moments

25  talking about some of the defenses that have been raised in

1  this case by Fallon's lawyers.

10:14:50  2       Basically, Fallon is going to argue to you and has

3  argued to you that the Commissioner of Patents and the United

4  States patent examiners didn't know what they were doing when

5  they granted iLight a patent.  Well, I guess in a patent

6  infringement case, you would not expect to hear the infringer

7  argue anything else.  Of course they are going to argue that.

8       However, the evidence is clear that the Patent Office

9  looked very carefully at the iLight patent application.  Not

10  once, not twice, but three times they had to examine it, each

11  time before they granted a patent.

10:15:21  12       We know that Mr. Sember was a primary examiner.  He's

13  the guy that examined Mr. Slayden's patent also.  Mr. Slayden

14  had the hollow tube invention.  And he found that -- and he

15  brought that patent up to iLight's attention and said, well,

16  let's be sure that there is a line between these two, so let's

17  look at your claims and make sure they are patentable over

18  Slayden's how-to patent.  In other words, that they are not

19  obvious, and they are not anticipated by Mr. Slayden's patent.

20  That's the determination that the examiner at the Patent

21  Office had to make.  And he did.  He did that each time he

22  allowed a patent in this case, the three iLight patents.

10:16:00  23       He also had to determine, are these claims reasonably

24  clear in this industry to those working in this industry, and

25  definite.  He could not issue the patent unless he makes that

determination. And indeed, each time he looked at that, he
said, yes, these claims are pretty good. They are clear.
They are definite in his view, or else he could not have
issued these claims.

10:16:21    And you saw the confirmation by the Commissioner of
Patents on the first page of each of those patents. You go
back and look. The Commissioner said they met all the
requirements of patentability. Some of those requirements,
they cannot be obvious in view of the prior art at that time,
they cannot be anticipated by the prior art, and the claims
must be clear and definite.

10:16:44    You will hear that patents and the claims of the
patent are presumed to be valid. And that's a presumption
that applies to each claim. Each claim separately is presumed
to be valid. You don't group them as a bundle. You have to
look at each one.

10:17:00    And to prove that the claims are invalid in court,
it's a very high burden called a clear and convincing
evidence. It's different than infringement. Infringement,
the scales just have to tip a little bit in iLight's favor
with the evidence, and then the verdict -- then the evidence
is in iLight's favor. Infringement is established.

10:17:22    But for these invalidity defenses, Fallon must
establish by a clear and convincing evidence a greater burden
that the claims are invalid. And why is that? Sounds maybe

at first blush, well, that doesn't sound fair.  But it is

fair.  And the reason for that is, iLight has gone through the

process.  ILight has gone through the patent process.  It did

it three times.  And having gone through that process, having

put itself before the Patent Office and the independent

experts there, that is why this heavy burden is imposed on

Fallon, to prove in a court setting by a clear and convincing

evidence that the claims of the patent, each claim is invalid.

10:18:03    Fallon's witness, Mr. Hathaway, basically asserted two

grounds for invalidity.  He said first that the patents are

anticipated by Mr. Slayden's hollow tube patent.  And

secondly, he said, oh, well, maybe if the hollow tube patent

of Mr. Slayden doesn't have everything that's in the iLight

claims, well, then it would have been obvious.  ILight's

invention would have been obvious.

10:18:27    Let's talk about anticipation first.  For Fallon to

succeed on that defense, again, it's got this high burden of

clear and convincing evidence, but it has to show that all of

the elements of that claim were disclosed in a single prior

patent.

10:18:43    In this case, Fallon has focused on Mr. Slayden's

hollow tube patent.  But that patent doesn't show all of the

element of iLight's -- claims of iLight's patents.

10:18:57    May I have the Slayden patent of Trial Exhibit 77,

maybe the first page.

10:19:04 1       Now, this is his patent.  And again, you will note --

2   can we pull up on the left column at the bottom, primary

3   examiner.  At the bottom you will see Mr. Sember.  You will

4   see him on the first page of all of the iLight patents.  Mr.

5   Sember was the senior examiner there, what's called the

6   primary examiner.  So there is no question, he was responsible

7   for the Slayden patent being issued.  He had to examine that

8   application.

10:19:34 9       He knew this patent.  This wasn't something he just

10   forgot about, as Fallon will try and stress with you.  This is

11   something he knew, he examined, and then he examined the

12   iLight patents.  And indeed, he was the guy that called this

13   patent to iLight's attention and said, now, let's look at this

14   and make sure your claims, what you are claiming to be your

15   invention, is different, is not anticipated by Mr. Slayden's

16   patent and is not obvious in view of it.

10:20:05 17       Now, if we can go down and expand on the hollow tube.

18       By now, you probably know more about this thing than I

19   do, so I'm not going to overdo this.  But this is the hollow

20   tube.  This is just a base, if you will, or a housing to hold

21   the hollow tube.

10:20:23 22       Importantly, I will talk about this, but the sides of

23   these housings don't reflect -- are not relied on at all --

24   there is not a word in Mr. Slayden's patent about those sides

25   doing any reflecting of light, because the LEDs are mounted

right below this hollow tube and shine the light directly up
into the hollow tube.

10:20:44    And Mr. Slayden's consideration was to use this long
hollow tube.  And that's what his whole patent is about.  And
You can read it.  But that's what he talks about in his
patent.  He says, now, in my tube, I get this whole big round
tube to glow by having light bounce around all over in the
hollow.  In the inside of this hollow tube.  That's why he
needs a tube.

10:21:04    And he says that it reflects all around in there, it
bounces around, it refracts in there, goes inside, up through
here and out through there.  And that's how he gets what he
believes is a nice glow on his tube.

10:21:19    It's quite different than what you will see in the
claims of the iLight patent.  And it's quite different in the
examiner's mind, because what he did, since he was working on
these applications way back in the early part of this decade,
he is trained and the examiners are trained to do what you
must do.  Put your head, if you can, back in January of 2001.
That is the time of the invention.  And on the question of
obviousness, ask yourself, at that time, without knowing
iLight's solution, would it have been obvious to somebody
skilled in the art to come up with the claims as a whole,
everything in the claim, the entire combination of each claim
of iLight's patent?  That's what the examiner -- sounds tough,

1    but that's their job, and that's what they are trained to do.

2         Now, that analysis was not done in this case.  The

3    questions you probably heard from the stand were, would it be

4    obvious for somebody to do that?  Well, today, of course.  You

5    know the solution.  Once you know the solution to a problem,

6    well, the solution is obvious because you see it.  It's like

7    any puzzle that you solve.  All of a sudden, once you solve

8    it, yeah, it's pretty easy.  But going back from January 2001

9    and back in 2000 when the inventor started, it wasn't that

10   obvious.

10:22:33  11      And it wouldn't be obvious to substitute something for

12   this hollow tube.  The suggestion was made, well, I can just

13   take a hollow rod or something like that from somebody else's

14   patent and put it in Slayden's patent, and then voila, we've

15   got what iLight invented.

10:22:51  16      That's not the case.  Why?  The whole patent and the

17   whole contribution by Mr. Slayden was the effect he got out of

18   using this hollow tube and its tiny brother, or what he called

19   the slotted hollow tube, which he said didn't even work as

20   good as this.  That had problems.  It was not a good lighting

21   device.

10:23:14  22      So, to argue that to throw away Mr. Slayden's

23   contribution, this hollow tube, and just throw something else

24   in there makes no sense at all, because that's what this

25   Slayden patent, the hollow tube patent, is all about.  So it

would not have been obvious if you look back in January 2001

for somebody to do it, because this was his whole invention.

And that is exactly what the Patent Office concluded,

that it would not have been obvious, to substitute somebody

else's -- something from some other patent into Mr. Slayden's

patent to invalidate, if you will, the claims of the iLight

patents.

10:23:53    If the examiner thought that would have been obvious,

he could not issue the patents, and he came to a different

conclusion.  If the examiner thought that all of the features

in the iLight patents were present in Slayden's patent, the

hollow tube patent, he could not have issued the patent.  And

he came up with a different conclusion.

10:24:11    You know, the claims in the iLight patent, you have to

go and you have to read them, because that's what the examiner

did.  They called for not a hollow tube.  They used different

terms in each of the claims.  Some are the same; some are

different.  But they call for a substantially rod-like member.

Some of the claims call for an essentially solid leaky

waveguide.  That's not this hollow tube.

10:24:35    And the Court will define for you a rod -- already

has.  It's a slender strip or a slender bar resembling in

shape a wand.  We have seen that in the Fallon devices.  It's

kind of a stretch to say that those claim elements are this

hollow tube of Mr. Slayden.

1          Now, Another reason why the claims are not

2     anticipated, anticipated means everything has got to be -- in

3     the iLight claims has to be in Mr. Slayden's patent alone.

4     Well, the other thing in the iLight's patents, or one of the

5     other things that there was a lot of focus on were the

6     internal reflecting sidewalls.  We have showed you how Fallon

7     uses those in its signs.  That's in the iLight patents.  It's

8     in each claim.

9          And what iLight does is put its LEDs in the bottom of

10    a big channel.  And then at the top is the waveguide that

11    iLight talks about.  And iLight relies on light bouncing off

12    the sidewalls and then entering the top to increase the light

13    from the LEDs or increase the amount being received by the top

14    piece.  And that's how iLight achieved its glow, its constant

15    glow that would simulate neon lighting.

16         That is not in the Slayden patent at all.  Slayden

17    mounts his LEDs right below his hollow tube.  And not a word,

18    not a word, in his patent about using sidewalls there that

19    just hold the tube up to try to get reflections.  The only

20    reflections he talks about that occur in this device are

21    reflections from light bouncing around inside his hollow tube.

22    It's a very different approach to trying to achieve the effect

23    of simulating neon lights.

24         Now, you are going to hear oh, well, it would have

25    been inherent.  What does inherent mean?  That's a concept.

And basically, it means it must necessarily be so.  So you may

hear that, oh, it would be inherent to just get some light

from the sidewalls, and it will bounce somehow up into this

hollow tube.

10:26:48    Well, you heard from Dr. Roberts that he didn't think

that could happen because of these protuberances that actually

lock that hollow tube in place.  They actually project in, and

they are going to block reflected light, even if there were

any, from the sidewalls.

10:27:05    But frankly, the issue is, could it be?  You can

always say, maybe it could be.  But could it not be?  Yeah,

maybe it could not be it.  It can't be inherent if it ain't

necessarily so.  To be inherent, it must be necessarily be so.

If it ain't necessarily so, it's not inherent.

10:27:25    So the inherency argument doesn't go anywhere in our

view, because if Mr. Slayden thought he could get any

reflective light to help increase the glow or the brightness

of this tube on the top, don't you think he would have said

something about it in his patent?  And he didn't.  There is

not one word on that.  He doesn't rely on that at all.

10:27:49    I believe I talked about obviously, frankly, until I'm

starting to get blue in the face.  But the real issue here is

that's a tough test, and you need a pretty searching analysis

for that.  Again, you have to try to think back, not knowing

the answer today, not knowing, yeah, now I know all about the

iLight patent and what they did to come up with a solution.
You have to go back and say, without knowing that, would it
have been obvious back then, in view of the prior art Fallon
is relying on, to do what iLight did.

10:28:15   And I think you will find the question is no.  The
Patent Office certainly thought it wasn't obvious.  And there
are others, too.  There's Fallon itself.  It never did it and
never thought about it until it saw iLight signs and realized
its business was at risk.  Then it said, as it told Sam's
Club, we'd better -- we'll have something here that looks like
iLight signs for you real soon.  Took them over a year to do
it.  They didn't get around to it until 2005.  But the
inventors had already solved the problem way back in January
of 2001 and filed their patent application back then.

10:28:53   In our view, Fallon's arguments, now that they are in
trial, want to escape from the infringement issue that, oh,
these basically -- the argument is, yeah, whether or not we
took iLight's invention, the invention is no good.  That's
basically the argument.  And we think that just doesn't hold
water.  That's to be expected from an infringer.  Of course
they are going to make that argument.

10:29:13   But we think that when you really look at the
evidence, look at the job the Patent Office did, and look at
the real world.  It wasn't obvious to Fallon.  They didn't
know the solution.  It never dawned on them until they saw

iLight's solution, and they said, we'd better do that, we're

going to lose a lot of business.

10:29:34     Now, Dr. Roberts looked at all these arguments about

obviousness that were raised by Fallon's expert.  And you will

find in his expert report, that's Trial Exhibit 30, at Pages 7

to 12, if anybody wants any detail, it's Trial Exhibit 30,

Pages 7 to 12, he takes apart all these other patents that you

just got numbers on from Fallon's technical expert.  Nice man,

but he just rattled off some numbers and said, well, it would

have been obvious.

10:30:01     If you do a searching analysis, though, I think you

will find his analysis was pretty cryptic at best and not the

type of analysis the Patent Office did and is trained to do.

10:30:17     The final argument that Fallon uses on invalidity,

they want you to conclude that the claims don't mean anything,

that they are indefinite, certainly tough to understand.

Well, claims are difficult to understand.  That's the nature

of legal writing, frankly.  It's a legal definition.  What

you're doing is trying to reduce an invention to words, a

concept of words, and make those words different than what

came before, but encompass your invention.  And that's never

an easy task.  We're all human.  Nobody is perfect.

10:30:48     But a pretty good job was done here.  At least in the

Patent Office's view, those words were just fine.  They were

clear, and they were definite.  Fallon now wants to escape and

say, oh, well, we were confused, and we don't understand it,

and, therefore, you should toss these patents out.

10:31:04      We frankly think that makes no sense.  Their own

attorney back in April of 2005 understood it.  He wrote back

and said, oh, we don't infringe.  Never really said much about

it, but, we don't infringe.  So he understood it.  It's not

until they get to court and want to get off the hook that they

are now coming up with all these defenses, oh, it can't be

understood.

10:31:27      Now, in sum -- that's always a good sign for you.  The

lawyer is saying in sum, that means he's getting to the end.

But we believe it's pretty clear Fallon has not established by

clear and convincing evidence this high burden that each of

the claims of the three iLight patents that I've told you

about that are in suit is invalid.

10:31:48      I would like to just focus for a minute on who thinks

the iLight patents are invalid.  Hopefully you won't at the

end of the day, but we don't know that yet.  But really, the

only ones that do are Fallon's lawyers, of course.  And their

expert, Mr. Hathaway, who expressed his views here.

10:32:06      And now let's take for a moment and look at who

believes the claims of the iLight patents are pretty good and

are valid.

10:32:16      Well, first of all, we have the guy that I talked to

you a lot about, this primary examiner Sember, the guy who

knew all about Slayden's hollow tube invention and Slayden's

patent, because he's the guy that granted it. And he's the

guy that called it to iLight's attention and worked it out

with iLight's lawyers, changed the claim so that they wouldn't

-- the Slayden patent wouldn't be a problem for iLight's

claims. And he is the guy that decided these claims are now

in good form, they were clear and definite, were not

anticipated, were not obvious, and I can issue these patents

to iLight.

Now he's one that thinks the iLight patents are pretty

good, and he had no stake in this dispute between iLight and

Fallon.

Two others. There's James Rogan. You will see him on

the page of the grant. He is the guy that signed off at the

bottom after telling you that the patents met, the

applications had met all the requirements for patentability,

that include definiteness, that includes anticipation and

obviousness. Those were not a problem. And he can't sign

that grant -- he can't grant than patent unless that's the

determination that the officials in the Patent Office make.

There was also John Dudus. He was another

Commissioner of Patents. He signed off on the '262 and '970

patents. Certainly these very high officials in the Patent

Office had no stake in this dispute.

And there is Dr. Roberts. He studied the issues. He

looked at Mr. Hathaway's arguments, and he concluded in his

mind that, indeed, there was insufficient evidence to find

these claims were, one, indefinite, and -- I apologize -- were

anticipated or obvious.  He didn't think that was the case.

We also have Fallon's senior -- own senior engineer,

closer in time to iLight invention, who said this just

couldn't be done.  Could we show that -- I think you have a

clip that you saw before, but if we could just turn the lights

down for a minute, please.

(Video playing:)

*I recall another visit with Fallon.*

*Go ahead.*

*If you want to be, you know.  I visited Fallon at*

*their trade show in Vegas once and spoke with one of their*

*senior engineers.  At the time -- this was later, but at the*

*time I had a functioning piece of our prototype product in my*

*pocket that was neon, looked like neon with LEDs.  I remember*

*pointing to Fallon's sign, putting my finger on the neon sign,*

*and asking, can this ever been made out of LEDs.  And he*

*looked at me and said, no, it can't be done.*

(Conclusion of video playing.)

MR. VEZEAU:  That's long before we got into trial.

That's pretty powerful, I think.  That's Fallon's own senior

engineer, a man skilled in this field.  He didn't believe this

could be done.

10:35:37  1      And finally, and I'm going to leave this with you --

2      finally is a good word, too -- we have Fallon's senior

3      management who recognized it was iLight's patented technology,

4      not Slayden's hollow tube or anyone else that stood in

5      Fallon's way.

10:35:51  6      Can you play -- oh, by the way, that was Eric

7      Eriksson, if you remember, one of the three iLight inventors.

8      Now we're going to listen to the head of Fallon's Shanghai

9      facility, Mr. Huo.

10:36:06  10     (Video playing:)

10:36:09  11     You said if iLight gets a whiff of our filing -- files

12     an objection, we are dead in the water.  Why did you believe

13     that?

10:36:17  14     That's just my opinion of how the patent process

15     works.

10:36:21  16     What did you mean by that?

10:36:42  17     I -- I don't recall, but -- dead in the water.

10:36:45  18     You don't know what you meant?

10:36:50  19     I'm -- based on that -- again, this was written four

20     years ago, so based on that, my interpretation right now would

21     be that it would -- it could possibly block -- dead in the

22     water.  Again, my interpretation was that there was a prior

23     art on the patent, and that's why we wouldn't get the

24     approval.  I don't recall why I would have said the objection,

25     we would be dead in the water.

10:37:28  1      MR. VEZEAU:  I think that tells the whole story, a

        2  good part of the story.

10:37:33  3      I really thank you for your attention.

10:37:36  4      THE COURT:  On behalf of the defendant?

10:37:38  5      MR. KITTREDGE:  It's going to take us probably about

        6  five minutes to get set up.

10:37:42  7      THE COURT:  Ladies and gentlemen of the jury, we'll

        8  take about a five minute recess.  Don't discuss the case

        9  amongst yourselves until you receive all of the arguments of

       10  all counsel and the Court's instruction.  It will be about a

       11  five minute recess.

10:38:01 12      (Jury out.)

10:47:49 13      THE COURT:  We're in recess.

10:47:49 14      (Recess.)

10:47:52 15      THE COURT:  Are we ready?

10:47:54 16      MR. KITTREDGE:  Yes, Your Honor.

10:47:58 17      THE COURT:  You can bring the jury in.

10:48:00 18      (Jury in.)

10:48:12 19      THE COURT:  You can be seated.  All right, ladies and

       20  gentlemen of the jury.  We'll now hear closing arguments on

       21  behalf of the defendant.

10:48:19 22      MR. KITTREDGE:  May it please the Court, ladies and

       23  gentlemen of the jury.

10:48:25 24      When we first met a little over a week ago, I believe

       25  I told you the case was going to be sometimes dry, sometimes a

1  little slow.  I'm pretty sure it was, and for that I

2  apologize, but thank you for your patience.  We just need a

3  little bit patience.  We're just about done.  And I am going

4  to do as much as possible to keep my comments as focused and

5  as brief as possible.  I'm not going to go through all of the

6  evidence you heard.  I'm just going to hit some of the high

7  points.

10:48:55  8          A couple of points that I would like to make clear,

9  Fallon Luminous Products is in business, and it is in business

10  to make money.  We stand accused of that, and we're guilty.  I

11  happen to think that's what America is all about.  There is

12  nothing wrong with trying to make a profit, and nothing wrong

13  with trying to develop better products so that you can make

14  that profit.

10:49:21  15          ILight's inability to compete in the sign market, they

16  refuse to accept any responsibility for themselves there.

17  They are doing what has become far too common in America.  And

18  that is, when things don't work the way you want, you look

19  around and find someone to sue.  They are using the patent

20  system to do that.  We believe that they are abusing the

21  patent system, much like your personal injury plaintiff often

22  abuses the court system to get big damages that they really

23  aren't entitled to.

10:49:55  24          If we can step back to talk about what's really at

25  issue in this case.  What's really at issue in this case is

whether or not Fallon's signs infringe the patents and whether
or not iLight's patents are valid.

There was a lot of detailed scientific testimony about
the science behind these products. What are we really talking
about? You've got a basic channel, just like the channels
that Fallon had in its original neon signs, and just like
channels have been used in the sign industry for decades.
You put a row of lights in that channel, again, just like the
sign industry has been doing for decades. You put a plastic
diffuser over it so you get a nice, uniform, even glow, just
like the sign industry has been doing forever.

Just because all of a sudden you want to come into the
Patent Office and say, that diffuser that has been used
forever is really this fancy waveguide doesn't change the
fundamentals that are at issue here.

Now, you heard an awful lot of testimony -- I'm sorry,
an awful lot of argument about the timeline and all the evil
things that Fallon was doing, and all of the evidence that
supposedly shows Fallon was copying iLight's sign.

That's their whole case. That is the principal basis
of their case, is trying to convince you that Fallon went out
and deliberately developed this sign that's a copy of the
iLight sign that was in existence in this case.

You met Chuck Nelson last Friday. He testified about
his 20 years of experience in the sign industry, making

lighted signs.  He testified at length about the process by
which they go through developing signs, by how they have made
regularly signs that used these same features, rows of lights,
inside channels, plastic lenses, diffusers over that.

He testified about how Sam's Club did, indeed, come to
Fallon and asked if it could make an LED version of the old
oval neon sign.  And he explained to you how they did that.

He testified at length about how he developed the sign
that's accused of infringing, went out into the shop, looked
at the signs they had been making, used his experience with
channel making signs, and realized, using the basic shape and
the basic channels from the existing neon sign that they could
put in lights inside and cover those with a plastic diffuser.

Now, where did he get that plastic diffuser?  He chose
from a set of samples that he had in his desk, the kind of
samples he had used forever, finds one that he thinks looks
good, and then tries it, adjusts the dimensions a little bit
as they start playing with the prototype and the lens.  But it
pretty much works pretty good from the beginning.  It's not
rocket science.

Plaintiffs want you to think it's rocket science
because they use terms like LEDs and terms like waveguide and
terms like leaky waveguide.  You don't get to take over the
prior art and the prior art way of doing things by all of a
sudden using fancy words like waveguide and leaky waveguide.

It's just a plastic tube like has been used in the sign

industry forever.

ILight didn't invent LEDs.  They don't claim to have.

They didn't invent the idea of using LEDs in signs.  They

don't claim that.  They certainly didn't invent using plastic

diffusers to get you a nice uniform glow from those LEDs or

any other lens source.

Which makes another point that probably hasn't been

made clear yet in this trial.  ILight's patents aren't limited

to the use of LEDs.  The patents clearly and expressly say

other lighting sources can be used.  Any other kind of

lighting.  They would prefer LEDs, but it's not limited to

LEDs.

If you look at the claims that are being asserted in

this case, none of them call for LEDs.  Any kind of light can

be used, like the sign industry has been doing forever.

Of course, you don't have to rely on just Chuck's

testimony to decide that Fallon's LED version of its Open sign

is not a copy of iLight's.  You can look at them for

yourselves.  There is a lot of common sense involved in saying

these are very, very different.  You look at the way their

waveguide is constructed.  It might be easier if you look at

this piece here, the Plexineon.  The testimony and the

evidence is that they do have this big thick extruded solid

rod, which is what they describe as a leaky rod.  It sits on

1  top of a housing, all unitary construction, all linked

2  together.  It's got a row of LEDs inside there, all part,

3  again, of the same unitary construction.  You've got the

4  internal light sidewalls that reflect and some external

5  sidewalls that are darker, light absorptive.

10:55:47  6      Fallon sends the channels, like you saw previously, I

7  think between the LEDs and the plastic diffusers.  The LEDs

8  aren't in there, but you can picture where they are.  And the

9  issue is the plastic diffuser, again, a plastic diffuser that

10  is a standard sample that Chuck Nelson just pull out of his

11  desk.

10:56:12  12      You just cannot seriously credit the idea that this

13  sign is a copy of that sign.  And if you look at them, and ask

14  yourself which one is more desirable, you may have a

15  difference of opinion, but it's easy to imagine many people

16  might find this sign more desirable just because of the way it

17  looks, it's more professionally made, it doesn't have cheap

18  foam stuff on it, it can be repaired.

10:56:49  19      If you remember, looking at the Plexineon, this is all

20  glued together, some kind of epoxy in there, around every

21  single LED.  If one LED in this burns out, it's burnt out

22  forever.

10:57:02  23      You can actually get into this sign and replace LEDs

24  if one burns out.  So what we get to then, a lot of discussion

25  about the first letter alleging, gosh, pay attention to our

patents.  We think they are special.  That was in March of

2005.  Fallon send it to its patent lawyers.  Patent lawyers

look at the patent and said, boy, they describe a really big

thick rod-like waveguide.  We just have plastic diffusers.

10:57:31  They have these internal side reflecting sidewalls, the patent

talks about them being light colored, and that's what they

have in theirs.  We just have black.

10:57:41  The black sidewalls are shiny.  There is no doubt

about that.  Chuck Nelson explained that shininess is because

of the manufacturing process, the injection molding, tight

pieces like that, you polish the tool, and that results in a

shiny sidewall.

10:57:55  But back to the letter.  Writes back and explains, we

don't believe we infringe.  Nothing back from iLight's

counsel.  Nothing back explaining why we think -- why iLight

thinks they are mistaken.  Radio silence all the way through

December.  Well, between that time, then a couple of weeks

after that was sent, Chuck Nelson has a meeting.  He meets the

lawyer who wrote the letter for Fallon.  He sees the letter.

He says, that kind of makes sense.  But he doesn't stop there.

He goes and gets a copy of the patent.

10:58:32  Can I see the first figure?  This is the figure from

the '238 Patent.  This is the same slide I showed you in the

opening at the beginning of the Trial.  Chuck reads through

the patent.  He doesn't study it in detail.  He's not a patent

lawyer.  Gets a general understanding of what the patent is,
looks at the figures.  And then he does have a copy by then of
iLight's sign.  And he looks at the sign, says, boy, that
patent looks to me like it describes exactly the sign that
iLight has built.  He said, our sign is nothing like that.

Now, that was reasonable.  In fact, Mr. Cleaver
testified that he believed, he agreed, a reasonable person in
the sign industry could look at their patent, look at the
figures, look at the claims, and it would be reasonable to
think, this sign doesn't infringe.  He said he didn't agree
with it, but he said it was a reasonable conclusion.

Doug Bagin, the president of the company, did the same
thing.  It was a little later in time.  He had gotten another
letter by then from iLight's lawyers.  He had asked his patent
lawyers to take a look at it again.  They looked at it a
little more carefully, in a little more detail.  Told him they
didn't believe it infringed.  He is the CEO of the company,
president of the company.

That's usually enough.  You hire your lawyer to help
to make decisions like that.  He kind of put it out of his
mind.  He said he did the same thing Chuck did.  He looked at
the patent, read through it, not in detail.  Looked at the
signs, said they are different.  They are as different as
night and day.  And that's not the end of the analysis that
you guys have to do.  And I didn't want to pretend otherwise.

1          If we could see the next line.

11:00:20  2          This is a case about infringement and validity.  And

3    you have seen tons of evidence, listened to tons of evidence,

4    about infringement and validity.

11:00:32  5          Most of the evidence has focused on, again, these same

6    claim terms that I highlighted at the beginning of the trial.

7    And I'm going to be talking about those in summary form.  I'm

8    not going to go through each claim or each element in detail

9    for you.

11:00:41  10         But in summary form, before I get to that,

11   infringement and validity -- it may have seemed a little

12   confusing with the evidence that you were hearing all week,

13   because it probably looked at times like both sides were

14   trying to prove similar things, that these claim elements are

15   there, but they are not there.

11:01:01  16         The reason is, infringement and validity are two sides

17   of the same coin.  To prove infringement, plaintiff has to

18   prove that each one of these limitations is found in iLight's

19   products -- is found in Fallon's products.  To prove

20   invalidity, Fallon has to prove that each one of those

21   limitations is found in the prior art.  Either directly, or it

22   would be an obvious extension.  And that's why there was that

23   kind of evidence coming in on both sides.

11:01:32  24         If we could see the next line.

11:01:35  25         Now, this is a summary slide again of those same key

points.  I'm summarizing the evidence that has come in on
these issues focusing on infringement.  Again, if we prove --
if you find that one these elements is missing, then it
doesn't infringe.  An awful lot of testimony on the word rod,
and whether or not this is a rod, rod-like, a solid rod.  We
have made it very clear we do not believe this is a rod.  It's
a hollow arch.  You can see the hollow in here.  It's neither
a rod and certainly not solid.  It's a hollow thin diffuser.

There was competing testimony from Mr. -- sorry, Dr.
Roberts.  You may remember this.  Dr. Roberts testified last
week that indeed this was a rod, this was a solid rod.  If we
roll it up, he testified it's still a rod.  But even though
this part is solid, it's not a solid rod, it's a hollow rod.

He also testified -- and this is where it gets
confusing -- that if I put it in a horseshoe shape, it's still
a rod, but not solid.  And if I just straighten it out a
little bit, it all of a sudden becomes a solid rod.

You can't rationally explain those two different
analyses.  And you have to ask yourself why Dr. Roberts
testified that way.  Well, he testified that way because, if
he didn't, iLight losses.  If this isn't a solid rod, they
lose; if this isn't a hollow rod, they lose.

There was also a lot of testimony about waveguides and
leaky waveguides.  Again, we presented substantial evidence
from our expert witness Kevin Hathaway that it really is just

a hollow, thin diffuser just like they told Patent Office was
not covered by their patents.

11:03:58    The testimony from their expert said, well, any
plastic diffuser that you put over a row of lights becomes a
waveguide.  That's not what they told the Patent Office, but
that's what they are telling you in this trial.

11:04:16    We talked about preferentially scattering light.
Again, you remember the light through the square sample of
material that Kevin Hathaway showed you that gives you a nice
uniform pattern.  That's not preferentially scattering.

11:04:34    On the other hand, what Dr. Roberts said was -- again,
remember the hours of testimony about all the science on what
waveguides are and how you achieve waveguides and what
preferentially scattering is and how you achieve it, and
Snell's Law and all that crazy stuff.

11:04:52    But in order to decide whether or not light Fallon's
plastic diffuser preferentially scattered, he shined a light
through it and looked at it and said, yeah, it preferentially
scatters.

11:04:57    In order to decide whether the plastic diffuser is a
waveguide, he didn't go to any of that science that he spent
hours telling you about.  He shined a light through it and
said, yeah, that's a waveguide.

11:05:15    Reflectivity.  There was a lot of testimony and a lot
of confusion about reflectivity and light absorptive surfaces.

No doubt the surface is inside, very shiny and has a
mirror-like surface. The testimony was, any surface that you
can see will be reflective, both inside and outside. Any
surface you can see will be light absorptive, both inside and
outside.

But most important, both experts agreed that if you
look at the inner sidewall and the outer sidewall of the
channel that the LEDs are in, they have essentially the same
total reflectivity. It's a different kind. All this
testimony about specular and diffuse reflectivity. The same
total. One is shiny; one is not. But the same total means
the same amount of light ends up getting up to the diffuser.

That was the basis of Mr. Hathaway's testimony, that,
as the Court has defined it, it really isn't reflective. It
doesn't enhance the output any more than the one on the
outside would, and, therefore, it's not reflective.

Now, Kevin Hathaway gave far more detailed analyses
and detailed claims, mapped out all the claims and all the
reasons why these various limitations aren't met by Fallon's
products with respect to all the different claims. I'm not
going through those charts with you. They are in his expert
report. They have been submitted into evidence. His
infringement and noninfringement report is Exhibit 877, if you
care to look through it.

I'm going to next turn to the validity issues. There

is a first concept here with validity.  Again, this is the
other side of the coin.  And I'm going to talk first about
anticipation and obviousness.

11:07:03    One of the instructions that you are going to get from
the Court on obviousness is, if the claimed invention is
really just a combination of known elements that produce a
predictable result, that's one of the ways you determine it's
obvious.

11:07:21    Again, think about the combination of known elements
that Chuck Nelson put together.  Signs like he has been making
for 20 years.  A channel for letters.  A light -- string of
lights at the bottom of that channel.  And a plastic diffuser
to cover that channel just like he has been doing for 20
years.  That's a combination of known elements that got a
predictable result, a nice uniform glow right there in the
channel, happens all the time.

11:07:52    Chuck's testimony alone demonstrates it's obvious.
The truth is -- and this is where I think the patent system is
being abused here -- there might be something here, some
invention here.  But if they are going to read their patent so
broadly that it captures what Chuck did -- you know, Chuck is
not some Ph.D. in optics.  He's not some master's degree in
optics.  He's a guy who has just worked in the sign industry
for twenty years.  If their claims capture what he did, it's
got to be obvious.  Otherwise, you are saying, Chuck wasn't

smart enough to know that what he was doing was an invention
that someone else had.  If he was only smarter, it wouldn't be
an invention.

If I could see the next slide, Exhibit 77.

Obviousness in this case is not just based on Chuck's
testimony.  We are basing it very heavily on Slayden patent.
And it's absolutely right that that had the same primary
examiner examine the Slayden patent as examined the
patents-in-suit.  That was no big surprise.

The idea that that examiner knew about Slayden -- of
course he knew.  He used Slayden to reject their patent.  I
think Mr. Vezeau described that as he brought it to our
attention so we could discuss it.  He rejected their patent
based on Slayden and based on his understanding of Slayden.

We're asking you to conclude that, yes, the Patent
Office made a mistake here.  Yes, a government employee in
Washington made a mistake here.  It's not the first time.  It
obviously won't be the last time.

But you should understand how they made that mistake
and why.  They made mistake because they relied on what iLight
told them.

If we can see Exhibit 627.

Remember, they rejected it on Slayden.  That's the
'186 Patent.  Again, they didn't just bring it to their
notice.  They rejected the patent.

1         And what iLight told the Patent Office, what they told

2   Mr. Sember was, you don't understand it exactly right.

3   Slayden, the '186 patent, describes the use of a hollow thin

4   walled translucent diffuser that provides no preferentially

5   scattering.

6         The Patent Office relied on that and said, okay, if

7   you are going to exclude that from your inventions, then maybe

8   you get one.

9         Now, you may remember when I was talking to Dr.

10  Roberts yesterday, he said, in fact, Slayden wasn't just a

11  thin-walled translucent diffuser, it was a waveguide.  In

12  fact, it was a leaky waveguide.  In fact, it did provide

13  preferentially scattering of light.

14        That testimony demonstrates that he was careful to say

15  that's based on the Court's claim construction today; maybe

16  the examiner didn't have that.  That demonstrates, as far as

17  we know, sitting here today, what iLight told the Patent

18  Office was just wrong.  What the Patent Office relied on was

19  just wrong.

20        The next slide helps demonstrate this.

21        Remember, they said -- let me -- to be fair to Dr.

22  Roberts, he testified exactly as I said, and then when his

23  client, the lawyer, got up and asked him some questions, he

24  change his testimony.  Right in front of you.  Changed his

25  testimony 180 degrees.

11:11:39 1         Why did he change his testimony?  He changed his

2    testimony because, under the testimony that he gave when he

3    was talking to me, iLight loses.  I think he was trying --

4    trying to tell the truth.  I think he has just been given a

5    job that's undoable.  He is been given a job to walk this line

6    that can't be walked.  He's doing his best, but you saw him go

7    back and forth, whip saw.

11:12:13 8         If we could see the next exhibit, Exhibit 29 N.

11:12:17 9         This is Dr. Roberts' exhibit from his expert report on

10    the plastic diffuser that Fallon uses, the same thing that he

11    concluded is not only a rod, but a solid rod, and a waveguide

12    that preferentially scatters.

11:12:36 13         Let's go to the big three slide.

11:12:42 14         Now, this is a slide composite of images -- let me

15    make sure you understand what each of them are.  On the upper

16    right, this is Figure 3 from the '238 Patent, the same figure

17    in all three patents.  Covered in blue for you, the big, solid

18    rod-like waveguide that iLight disclosed in its invention.

19         Colored in blue for you over here, what the Patent

20    Office said was a waveguide, disclosed and taught by Slayden.

21    And coming to you down here, the hollow arch plastic diffuser

22    that Dr. Roberts and iLight says is really a solid rod-like

23    waveguide.

11:13:24 24         They can't have it both ways.  They certainly can't

25    have it both ways based on what they told the Patent Office

and what Dr. Roberts testified to yesterday.

What they are effectively trying to do here, what Dr. Roberts and iLight are trying to do here is to say, we disclosed big, solid rod waveguides. We get ownership of all possible shapes of plastic diffusers put across a row of LEDs, all possible shapes, the whole universe, from this shape to this shape. We own that, because we told you about this. Oh, except, except, we don't own this shape. If we owned this shape, there would be a battle.

So the only thing they carved out of their universe is the horseshoe shape of Slayden and, of course, the circle shape of Slayden. Slayden is limited strictly to only to the pictures in his patent. They are not limited to anything.

Where is the justice in that? There is certainly no justice for Fallon in that. Certainly no justice for Mr. Slayden.

Now, Kenneth Hathaway gave you a lot of testimony on these topics. Dr. Roberts gave you conflicting testimony. Thursday he said one thing. Wednesday he said -- I'm sorry, Thursday he said one thing; yesterday he said another. Then when he was talking to me, he said a third thing. Then when his client got up asked him some more questions, he said a fourth thing. We think he's not a reliable witness.

But in any event, I wanted to make sure I mentioned Kevin Hathaway. I'm not going through in great detail

everything he testified to.  And indeed, we sped things along
by putting in some of his evidence in directly through his
reports.  If you are interested in seeing all the painful
detail where he marches through each and every claim, each and
every element, showing how it was anticipated by or made
obvious by the Slayden patent.  That's his Exhibit 758.  He
also has a claim chart where he marches through it in great
detail.  And that's Exhibit 742, Kevin Hathaway's claim chart
explaining in detail why this latent patent invalidates these
claims.

11:15:55     I would also next like to turn to the issue of
indefiniteness.  It's true, the Patent Office issued this
patent.  It's true the examiner thought the claims had some
meaning that could be understood.

11:16:05     The claims are interpreted as a matter of law, as His
Honor has told you, and his Honor has given us his
interpretation, the interpretation as a matter of law.  And
it's consistent with the way iLight is applying these claims
in this case, or at least trying to.  And the way that
application is happening is why these claims are indefinite.
And let me give you a couple of examples.

11:16:28     A lot of testimony about reflectivity and
absorptivity, two of the key claim limitations that we think
are indefinite.  Both experts testified all surfaces are
reflective, and all surfaces are absorptive.  Both experts

testified that the key surfaces we're talking about here have

essentially the same total reflectivity.

So the question becomes, as a person of ordinary skill

in the art, if I want to make something like this without

infringing, how do I know when it's reflective enough to

infringe or not reflective enough so I don't infringe?  And if

it's not reflective enough so I don't infringe, does that mean

I now have a light absorptive layer on the outside?

There is just no way for somebody to figure out when

or when you don't infringe.  The same thing with waveguide and

preferentially scatters.  Again, a lot of testimony about what

waveguides are, how do you make them, the science behind

waveguides.  But at the end of the day, Dr. Roberts testified,

any plastic -- translucent plastic diffuser that you put over

a row of lights is a waveguide.  So that means everything the

sign industry has been using for 20 years is a waveguide; they

just didn't know it, because they didn't have a Ph.D. in

optics.

How do you keep doing what you have been doing for 20

years with that definition of a waveguide?  The people out

there working in this field just can't figure it out.  The

same thing with preferentially scatters.  Said that saying,

any piece of plastic diffuser put over a channel of lights is

going to preferentially scatter.  No way to figure out when I

have a diffuser or when I have a waveguide because, again, all

diffusers are waveguides.

But they told the Patent Office their patent doesn't cover thin-walled diffusers. They can't have their cake and eat it, too, here. If the patent doesn't cover thin walled diffusers, then you've got to have a clear understanding of the difference between a waveguide and a thin-walled diffuser. Dr. Roberts was crystal clear. Any diffusive piece of plastic, translucent plastic, that I've put over those lights -- oh, yeah, that's a waveguide. It's got waveguide properties. The only thing that doesn't, apparently, is the horseshoe shape from Slayden, because that was specifically discussed in the Patent Office.

Human observer. You heard repeatedly, any time Dr. Roberts got in trouble, oh, well, it's based on the appearance. And I'm a human observer, and based on my observation, I think that infringes.

Or if it's a validity issue, it's a human observer. Based on my observation, I don't think that would infringe, but I would really have to see more, so, therefore, that doesn't make it invalid.

This human observer test is fraught with problems. Who is the human? And how does that human decide? How does that inventor of a new product decide it might violate their human observer test.

Now, it has been said about profanity -- not

profanity, about obscenity:  I'm not sure I can define
obscenity, but I know it when I see it.  That's okay for the
Supreme Court deciding issues about obscenity.  But that's not
okay for the patent system.  Patent systems require that you
have claims that can be understood by people of skill in the
art so that they know where your invention fits and where it
doesn't.

11:20:03          That human observer test makes it impossible to know
when you might infringe and when you might not.  Basically,
what it says is, you infringe if I've got a smart slick lawyer
who comes in and explains to you that you violated our human
observer test.

11:20:24          THE COURT:  I hate to interrupt, but will counsel
approach the bench?

11:20:26          (Whereupon, a bench conference was held, out of the
hearing of the jury, to wit:)

11:20:39          THE COURT:  If the human observer act is part of the
law, aren't you arguing for jury nullification?

11:20:45          MR. KITTREDGE:  No.  I'm not, Your Honor.  I'm arguing
a human observer is indefinite.  That's one of the
indefiniteness arguments.

11:20:52          THE COURT:  But it's one of the legal standards to
determine.  You're saying that that's not workable, and that's
a jury nullification argument.

11:21:00          MR. KITTREDGE:  No, because if you look at the cases

1201

we cited, this is exactly what the case law says, the type of

                  language that makes invalidness indefinite.

11:21:11          Again, we are just asking for an advisory decision.

                  We can brief this to you afterwards.  I'm done talking about

                  that test, anyway.

11:21:18          MR. VEZEAU:  I do suggest, Your Honor, I was sitting

                  there twitching, and I don't like to interrupt counsel, but --

11:21:25          THE COURT:  I really hated to do it.

11:21:26          MR. VEZEAU:  I know.  But this to me is a little

                  improper here.  He is substituting -- these are the terms he

                  used in his examination of witnesses.  Dr. Roberts didn't

                  adopt that.  This is something he put in his mouth.

11:21:38          MR. KITTREDGE:  I disagree completely.

11:21:40          MR. VEZEAU:  And these signs, these are illuminating

                  devices --

11:21:44          THE COURT:  Well, I'm not going to go that far.

11:21:45          MR. KITTREDGE:  I'm done with this topic.

11:21:48          THE COURT:  If he's done with it, let's move on.  I'll

                  see if I need to address it further.

11:21:59          MR. VEZEAU:  Thank you, Your Honor.

11:21:59          (Conclusion of bench conference.)

11:22:12          MR. KITTREDGE:  Finally, I was getting ready to move

                  into some of Mr. Cleaver's testimony.  A big part of iLight's

                  claims that it suffered horrible, horrible damage because of

                  Fallon getting into the sign business.  Remember the Camel

sign they were so proud of.  Remember they showed that big

peak in sales in 2005.  The big peak in sign sales was all a

result of selling 30,000 units of these Camel signs in 2005 to

R.J.R. Reynolds.  They haven't sold any since.  It has been

four years.  They haven't sold any since.

What Mr. Cleaver then testified to was, I don't know

why they haven't bought any more.  I said, well, do you think

it's because maybe they might have some concerns about the

quality?  He said, I don't know.  I asked him, well, do you

know who is selling to them?  No, I don't know.

He doesn't know who is selling to them.  He doesn't

know why they haven't bought again in four years.  But he

wants you to make the assumption that somehow that's Fallon's

part.

This is a chairman of what's supposed to be a sign

company.  His biggest customer ever.  A sign that he's proud

of because of all the awards.  He doesn't know why they never

bought it again.  Actually, he wouldn't admit to that.  He

said more than zero was sold, but he couldn't give us anything

more than that.  So maybe one or two more were sold.  He

doesn't know why they weren't ever bought again, and doesn't

know who is supplying to R.J.R. Reynolds now.  He is a market

research specialist.

If you credit his testimony that he doesn't know any

of that, the Chairman of the sign company, market research

specialist. This is a company that isn't really in the sign

business.

Now, I'm going to be very brief about damages. You

heard from Carl Degen. He testified about the same reasonable

royalty analysis. Both he and Walter Bratic applied the

Georgia-Pacific factors. Carl Degen opined about how

reasonable businessmen sitting down before any this happened,

what they would do to come up with a reasonable royalty. And

he opined that there could be a two percent royalty. I'm not

going to go through the details and show you everything. You

saw it all. His expert report is in evidence as Exhibit 956

if you want to look at it again.

Let's contrast some of what he said to what Walter

Bratic said. Walter Bratic reached an opinion of a 7 percent

royalty. They would have agreed -- reasonable businessmen

would have agreed to a 7 percent royalty when the projected

income was only 7.7 percent. No reasonable business people

are going to agree to give away all of their profits before

they go into a new business. If you have to do that, you

don't go into the business.

Walter Bratic also complained that there was an

allocation of overhead. That's the way you do business plans.

When you are trying to go into a new business, you look at

what your overhead is, and you allocate those overhead costs.

Nobody is going to go into a business without figuring out how

1    you allocate that overhead.

11:25:20 2    You may remember it wasn't just Walter Pratt and Carl

3    Degen you heard from.  Leah white, the CFO of Fallon, came in

4    and testified Friday afternoon.  She gave some really nice

5    common sense testimony about what a business needs to be

6    profitable and about expenses.  Remember, she give that

7    paycheck analogy, how you take that paycheck home, even after

8    taxes are taken out, that really isn't your net because you've

9    got bills, you've got mortgages to pay, maybe car payments,

10   utility, groceries, clothing for your kids.  At the end,

11   that's your net.  And that's what you decide when you are

12   deciding whether you are going to take on a new expenditure in

13   life.  You look at what you have at the end after you have

14   paid everything you already have to pay.

11:26:13 15   The last thing I want to finish with is reviewing some

16   of the testimony of Dr. Roberts on the Slayden reference.  If

17   I can see that slide, please.  Now, I don't know if you can

18   see that from back there.  I would hope you can.  Expand it a

19   little bit without going off the screen.  That is probably the

20   same.

11:26:43 21   But with respect to simulating neon, again, this is

22   what I was talking -- Dr. Roberts was talking with me

23   yesterday morning about Slayden.  I asked him if it simulates

24   neon.  Again, the plastic slotted tube or hollow tube,

25   whatever you want to call it.  He said, yes, it does.

Now, what he did was he read that, yes, Slayden

       2  describes what he is doing now.

I asked him:  Is that slotted tube a leaky waveguide?

       4            He said:  Yes.

Question.  And it will also be a leaky waveguide?

       6            Answer.  Yes.

I asked him:  Do you agree it's a rod?

That was with respect to both the hollow tube and the

       9  horseshoe-shaped one.

He said:  Yes.

And specifically, the slotted tube in Figure 4 is a

      12  rod or rod-like member within the Court's definition?

Yes.

I asked him:  Does it preferentially scatter light?

      15  So, it does preferentially scatter?

Answer:  Yes.

I asked him:  Would there be light reflective surfaces

      18  in Slayden?

Answer:  Yes.  I would agree they may be light

      20  reflecting, even though is he says flat black.  Not all

      21  surfaces reflect light.

I asked him:  Are the exterior surfaces going to be

      23  light absorptive?  Slayden certainly discloses light absorbing

      24  exterior surfaces?

Answer:  Yes.

11:28:23 1          In fairness to Dr. Roberts, his client, Mr. Scruton,

2     got up and asked him a lot of questions, and he changed his

3     answers to a lot of these.  Not all of them, but a lot of

4     them.  Why did he do that?  If he didn't do that, iLight

5     loses.  He is just doing his job.

11:28:46 6          That's all I have for you today, ladies and gentlemen.

7     I may get a minute or two more later, I don't know.  If I

8     don't, I would ask you to think about what I would say --

11:28:53 9          THE COURT:  That's a matter for the province of the

10    Court, counsel.

11:28:57 11         MR. KITTREDGE:  And with that, we leave Fallon's case

12    in your hands.

11:29:12 13         THE COURT:  For the plaintiff?

11:29:15 14         MR. VEZEAU:  Thank you, Your Honor.  Your Honor, I

15    have very little.  And I'm sure you will be happy to hear

16    that.  And I really will not belabor this.

11:29:29 17         You have heard now this morning a couple of lawyers

18    arguing very hard for their client.  And that is to be

19    expected.  This is an important matter for our clients.  It

20    means money to Fallon; it means a lot to Mark Cleaver and his

21    company and a lot of people that are employed by his company.

22         But what you heard was arguments.  Now, very candidly,

23    the Judge has told you, and he will tell you again, the

24    arguments are not evidence.  The evidence are the documents

25    that have been received in evidence and you will have in the

jury room, and the evidence is the testimony of the witnesses,
not what I say as a lawyer for iLight, and certainly not what
Fallon's lawyer says as a lawyer for Fallon.  So I think
that's an important point, and hopefully the arguments have
been helpful in focusing you on the issues.  But they don't
decide cases; it's the evidence.

11:30:23   And frankly, I went through the evidence earlier and
the testimony, we went through the evidence, and much of the
damning evidence in this case and the issues of infringement
are Fallon's own internal documents.

11:30:36   And you heard the testimony from Fallon's own
witnesses.  We didn't make that stuff up.  We got those
documents from Fallon.  That's what we put in front of you.

Now, it's kind of a switch here made with these signs.
We never said that this design, if you will, was a copy of
iLight's products.  But what was copied was the technology.
The invention.  The invention is not the design or the shape
of the letters or whatever, it is what's used to make the
designs.

11:31:11   And that was pretty clear to Fallon.  Remember, Tim
Fallon told the Sam's Club buyer, we're going to give you a
sign that's like iLight's.  That's exactly what they did.
Because iLight had provided its LED design with its partner
here in Cookeville to Sam's Club, and that included the new
LED technology.  And that's what Tim Fallon assured Sam's Club

they would wind up providing to Sam's Club.

Now, another point here, and something to take home, I think, and I want to make this very clear. ILight does not have to prove the claims of its patents are valid. That's not iLight's burden at all. And the reason for that is that the Patent Office already made that determination. It is only the burden of Fallon to prove that each and every claim that we put in front of you, the entirety of the claim, is invalid. And that burden is by a clear and convincing evidence. So iLight doesn't have a burden there. That burden is on Fallon. That's a heavy burden.

You saw Dr. Roberts was taken to task a little bit. Dr. Roberts you saw struggle with the words. Words are difficult. And the reason why he struggled? He was very candid with you. He didn't blow smoke. He said he was a scientist. That's what he does. He's not a lawyer. He's not a judge. And then all of a sudden he had to come in this trial and hear from the Court what the Court's view was on what the claim terms mean, which he struggled with because he had his own scientific understanding. And he was trying to reconcile that.

And I think you heard him yesterday be very candid about that, that he struggled with that, finally understood, finally came to terms with it. And he said in his view at the end that what the Court defined as rod or rod-like was not Mr.

Slayden's hollow tube.  And he explained that, as the Court

defined it -- and you will get those definitions -- a rod is a

slender strip or a bar that is shaped, that has the

appearance, of a wand.  And that's what he viewed it as.  And

he said, that's not a hollow tube.  That's not Mr. Slayden's

device, because it's not a slender strip or a bar.

And he also got into how, when this was assembled, it

then does -- in the Fallon device, it then does take that

shape of the form of a neon tube, which is the shape of a

wand, if you will.

So I don't think -- I think if you understand that

this man is coming from a scientific arena.  This is not his

game, playing in court.  He came in here to give you his

testimony candidly.  He was very candid with you.  You saw him

struggle.  But I don't think that means he was dishonest.  I

think that means he was struggling with his issues.  And he

ultimately gave his views.  It's up to you to judge whether

those were credible or not.  But the man was obviously trying

to be with you as honest as he could be.

You also saw apparently Mark Cleaver attacked for some

reason.  You can decide whether that was appropriate or not.

I think you heard Mark Cleaver testify before you.  In my

mind, there is no reason to question his credibility

whatsoever.

Now, there were some comments by counsel for Fallon

that Dr. Roberts found the inner surfaces of the Fallon
devices to be no different than the outer surfaces as far as
reflectivity.  I think if you will check his work that I
called to your attention you will find just the opposite.  He
found a significant difference.  He found the inner surfaces
contributed greatly to the light that ultimately was emitted
by the Fallon LED signs and that the outer surfaces had
significantly less reflectivity.

11:35:18    And so I don't know the basis for that comment by
Fallon's counsel, but it's not from Dr. Roberts' testimony.
His slides are there as part of his report.  You can check
that for yourself.

11:35:39    Now, also you saw some snippets of Dr. Roberts'
testimony.  He was asked about certain words, not the entirety
of the claims.  Of course, it's the claims as a whole that you
have to base your decisions on.  And that was never put before
him.

11:35:55    And so some of these snippets, is this here, is this
here, is this here, are not the issue.  The issue is:  Are the
claims as a whole anticipated on their obviousness defense, on
their invalidity defense either anticipated or obvious.  Not
individual words.

11:36:16    Finally, -- that's a good word -- Fallon, the
infringer's burden, as I said before, is clear and convincing
evidence on this invalidity defense.  Now, what does that

mean?  That means that if you get back in that jury room and
start talking and you start scratching your head, and if it
wasn't clear, and if you are not convinced, that's not your
fault.  It's Fallon's burden to provide clear and convincing
evidence on its invalidity defenses.  And candidly, we think
that burden has not been met.  Thank you.

11:36:55  THE COURT:  Ladies and gentlemen of the jury, we're
going to take about a five minute recess and discuss whether
the Court will give its instructions now or whether you all
want to break for lunch and then come back and receive the
Court's instructions.

11:37:18  The Court's instructions will take about a hour or so
to read.  So I'll let you all decide whether you want to hear
those instructions now or whether you want to come back at
about 12:30 and receive those Court's instructions.  So we
will take a brief recess in the back to allow you all to
consider that, okay?

11:37:57  (Jury out.)

11:38:00  THE COURT:  Don't you ever back door me again.  I put
the issue of whether you would be given an opportunity to
speak as an issue I would decide.  You put it before the jury.
I consider that very improper.  In fact, I'm going to have to
explain it to the jury when they come back in.  Don't ever do
that again.

11:46:14  We're in recess.

| | | |
|---|---|---|
| 11:46:47 | 1 | (Recess.) |
| 11:47:32 | 2 | THE COURT:  The note that I received from the Marshal |
| | 3 | from the jurors is: |
| 11:47:35 | 4 | We would like to go to lunch now. |
| 11:47:39 | 5 | If you will bring the jurors in, I'm going to give |
| | 6 | them the standard instruction.  I'm also going to have to make |
| | 7 | a comment about this statement made by defense counsel. |
| 11:48:10 | 8 | (Jury in.) |
| 11:48:12 | 9 | THE COURT:  Ladies and gentlemen of the jury, the |
| | 10 | Court is going to honor your request that you go to lunch now. |
| | 11 | When you come back, you will receive the Court's instruction. |
| | 12 | But before I do that, there are two things I want to go over |
| | 13 | with you. |
| 11:48:26 | 14 | Number one, you heard a reference at the end of |
| | 15 | defense counsel's closing argument that he may or may not get |
| | 16 | an additional opportunity to address you.  The Court feels it |
| | 17 | is necessary to explain to you the process. |
| 11:48:39 | 18 | In this case and in normal cases, the plaintiff has |
| | 19 | the burden of proof.  Therefore, in closing arguments, the |
| | 20 | plaintiff gets the opportunity to address you, and then the |
| | 21 | defendant, and then the plaintiff finally gets the opportunity |
| | 22 | to address you, because the plaintiff has the burden of proof |
| | 23 | in the case. |
| 11:48:56 | 24 | In this case, there are certain defenses asserted by |
| | 25 | the defendant for which the defendant has the burden of proof. |

11:49:02 1    So to ensure that the normal procedure works within the
2    framework of this case, I required the plaintiffs to state in
3    their opening statements what they would have said in response
4    to the defendant's defense.  So that when the defendant made
5    his closing statement, he not only knew what the other side
6    was going to say about his defenses, but he had the
7    opportunity to both make a full explanation and a full
8    response to any response to his defenses.

11:49:32 9        So the Court felt under that arrangement each side
10   fairly had the opportunity to comment on what the other side
11   had to say about their claims and defenses, so that they had a
12   fair opportunity to comment.  So the Court is convinced that
13   everyone had the fair opportunity to comment on all of the
14   claims and defenses in this case, so that you have heard all
15   of the parties' views and are now in a position to deliberate.

11:49:58 16       The second thing is what I tell you every time you
17   leave the jury room.  Please do not discuss the evidence
18   amongst yourselves until you receive the Court's instructions
19   on this.  Don't do anything concerning consideration of the
20   evidence until you receive the Court's instructions, you are
21   in the jury room, and you have selected a foreperson.  At that
22   point you may begin your jury deliberations.

11:50:19 23       But with that instruction, I'm going to let you go to
24   lunch.  If you will come back at -- let's just say 1:00.
25   Okay?  Thank you.  You are free to go.  You can give your note

1  pads to the Marshal.  He will take custody of them until you

2  return.

11:50:56  3  (Jury out.)

12:59:45  4  THE COURT:  We're adjourned.

12:59:45  5  (Recess.)

12:59:51  6  THE COURT:  One matter I need to take up.  If you will

7  turn to Page 19 of your jury instructions, the second

8  paragraph, as to the legal issues the Court has construed or

9  interpreted of the plaintiff's claims.  I took out of that

10  earlier version you had to include the following, because the

11  following doesn't really appear until about four or five pages

12  later.  So it just didn't make sense to continue to have it

13  there.

13:00:27  14  If there are no other matters, you may bring the jury

15  in, Mr. Marshal.

13:00:30  16  (Jury in.)

13:01:11  17  THE COURT:  Members of the jury, you have now heard

18  all of the evidence in the case as well as the final arguments

19  of the lawyers for the parties.  It becomes my duty,

20  therefore, to instruct you on the rules of law that you must

21  follow in arriving at your own decision in the case.

13:01:17  22  In any jury trial there are, in effect, two judges.

23  I'm one of the judges; the other is the jury.  It is my duty

24  to preside over the trial and to determine what testimony and

25  evidence is relevant under the law for your consideration.

13:01:29  1    It is also my duty at end of the trial to instruct you on the
        2    law applicable to the case.  You, as jurors, are judges of the
        3    facts.  But in determining what actually happened in this
        4    case, that is, in reaching your decision as to the facts, it
        5    is your sworn duty to follow the law I am now in the process
        6    of defining for you.

13:01:43  7         Now, you must follow all of my instructions as a
        8    whole.  You have no right to disregard or give special
        9    attention to any one instruction or to question the wisdom or
       10    correctness of any rule I may state to you.  That is, you must
       11    not substitute or follow your own notion or opinion as to what
       12    law is or ought to be.  It is your duty to apply law as I give
       13    it to you, regardless of the consequences.

13:02:09 14         By the same token, it is also your duty to base your
       15    verdict solely on the testimony and evidence in the case,
       16    without prejudice or sympathy.  That was the promise you made
       17    and the oath you took before being accepted by the parties as
       18    jurors in this case, and they have the right to expect nothing
       19    less.

13:02:19 20         The attorneys for the parties in this lawsuit have
       21    quite properly referred to some of the governing rules of law
       22    in their arguments.  If, however, any difference appears to
       23    you between the law as stated by counsel and that stated by
       24    the Court in these instructions, you are, of course, to be
       25    governed by the Court's instructions.  You must apply the law

1216

1    that I give to you to the facts of this case.

13:02:34    2        Remember that any statements, objections, or arguments
3    made by the lawyers are not evidence in the case.  The
4    function of the lawyers is to point out those things that are
5    most significant or most helpful to their side of the case,
6    and in so doing, to call to your attention certain facts or
7    inferences that might otherwise escape your notice.  In the
8    final analysis, however, it is your own recollection and
9    interpretation of the evidence that controls in the case.
10   What lawyers say is not binding upon you.

13:02:58   11        Also, during the course of the trial I occasionally
12   make comments to the lawyers or ask questions of a witness or
13   admonish a witness concerning the manner in which he or she
14   should respond to the questions of counsel.  Do not assume
15   from anything I may have said or any questions I may have had
16   that I have any opinion concerning any of the issues in this
17   case.  Except for my instructions to you on the law, you
18   should disregard anything I may have said during the trial in
19   arriving at your own findings as to the facts.

13:03:21   20        Evidence may be either direct or circumstantial or
21   both.  Direct evidence is that contained in the testimony of a
22   witness to a fact, the knowledge of which the witness acquired
23   through the witness's own senses.  It is evidence that proves
24   a fact or group of facts without an inference.

13:03:35   25        Circumstantial evidence or indirect evidence is

knowledge that which is inferred from known facts.  In other

words, it is a proof of a chain of circumstances that

indicates the existence or nonexistence of certain other

facts.  It is not permissible to draw an inference from

another inference.  However, it is permissible to draw

reasonable inferences from proven facts.

13:03:57  An inference is a deduction of fact that may logically

and reasonably be drawn from another fact or group of facts

established by the evidence.  The fact or facts upon which

you, the jury, base an inference must be proved and not left

to rest in conjecture, and when proved, it must appear that

the inference drawn is more probable than any other

explanation.

13:04:15  So, while you should consider only the evidence in the

case, you are permitted to draw such reasonable inferences

from the testimony and exhibits as you feel are justified in

light of common experience.  In other words, you may make

deductions and reach conclusions which reason and common sense

lead you to draw from the facts which have been established by

the testimony and evidence in the case.

13:04:35  The law makes no distinction between direct and

circumstantial evidence as to the degree of proof required.

Each is accepted as a reasonable method of proof, and each is

respected for such convincing force as it may carry.

13:04:46  Now that I have said you must consider all of the

evidence, this does not mean, however, that you must accept all the evidence as true or accurate. You are the sole judges of the credibility or believability of each witness and the weight to be given to the witness's testimony.

In weighing the testimony of a witness, you should consider the witness's relationship to the parties; the witness's interest, if any, in the outcome of the case; the witness's manner of testifying; the witness's opportunity to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience.

A witness may be discredited by contradictory evidence, by a showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something or failed to see or do something which is inconsistent with the witness's

present testimony.  If you believe any witness has been so impeached, then it is within your exclusive province to give the testimony of that witness such credibility or weight, if any, that you may think it deserves.

13:06:06    In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail and whether the discrepancy results from innocent error or intentional falsehood.

13:06:20    You are not required to accept testimony, even though the testimony is uncontradicted and the witness is not impeached.  You may decide, because of the witness's appearance, bearing and demeanor, or because of the inherent improbability of the witness's testimony, or for other reasons sufficient to you, that such testimony is not worthy of belief.

13:06:33    The weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

13:06:52    The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, and who may appear to have some knowledge of the matters in issue at this trial.  Nor does the

law require any party to produce as exhibits all papers and
things mentioned in the evidence in the case.

A person who begins a lawsuit is called a plaintiff.
A plaintiff always seeks some kind of relief against the other
party, called the defendant.

In order to be entitled to the relief it seeks, the
plaintiff in this case is required to prove its case by a
preponderance of the evidence; that is, by the greater weight
of the evidence.  It is said, therefore, that the burden of
proof is upon the plaintiff.  This broad, general burden
continues upon the plaintiff, and he must maintain it in order
to be entitled to a verdict.

When a lawsuit is brought by a plaintiff against a
defendant, the defendant may simply deny that he was at fault.
The burden of proof is not upon the defendant to prove that it
was not at fault, but rather, it is up to the plaintiff to
prove that the defendant was at fault, and because of the
defendant's wrongful conduct, the plaintiff sustained damages.

    In other words, after the plaintiff has presented
evidence tending to establish the elements of his claim, the
defendant may simply deny he was at fault and confine the
evidence presented to evidence which tends to rebut or
disprove the elements of the plaintiff's claims.

Yet, whereas here the defendant relies upon the
defenses of invalidity and obviousness, the defendant bears

the burden of proof to prove by a clear and convincing
evidence that the claims of the plaintiff's patents are
obvious or otherwise invalid.

Where the burden of proof rests upon a particular
party, that party is required to prove his claim by a
preponderance of the evidence.  Preponderance means the
greater weight of the evidence.  The plaintiff, who is
required to make out his case substantially as alleged, must
meet its obligation with the greater weight of the evidence.
The balance of the scales must be tipped in his favor.  If the
evidence swings to the balance to the defendant's side, the
plaintiff must fail.  Also, if the scales are in an even state
of balance, the plaintiff must fail, because in that event the
parties are in same situation before they started.

However, the defendant, to prove its defenses, has the
burden of beyond -- of clear and convincing evidence.  The
legal effect of the defendants' denial and theory is to deny
each and every material allegation of the plaintiff and to
cast the burden of proof upon the plaintiff, who must prove
its case by a preponderance of the evidence before any
recovery can be had in favor of the plaintiff, though a bare
preponderance of the evidence, however slight, will be
sufficient to entitle the plaintiff to recover.

In common, everyday language, what I have just stated
to you simply means that where the plaintiff iLight has the

burden of proof, iLight must prove its affirmative theory of

infringement of its patents to your satisfaction by a

preponderance of the evidence; that is, that something is more

likely to have occurred than not.

The defendant Fallon has the burden of proof of its

defenses of invalidity and obviousness by a clear and

convincing evidence standard. That is, based upon the

evidence presented in this case, you must be left with a clear

conviction that the claim is not new.

You have heard testimony in the form of opinions. The

rules of evidence ordinarily do not permit witnesses to

testify as to opinions or conclusions. Lay persons may give

opinions where the Court determines such opinions may be of

aid to the jury.

Given the subject matter of this dispute, the Court

deemed it helpful to aid in your evaluating the evidence to

hear some of the opinions of lay persons who are knowledgeable

about the subject of this lawsuit.

You should consider each witness's opinion received in

evidence in the case, and give it such weight as you may think

it deserves. If you should decide the opinion of any witness

is not based upon sufficient experience, or if you should

conclude that the reasons given in support of the opinion are

not sound, or that opinion is outweighed by other evidence,

you may disregard the opinion entirely.

An expert witness is one who possesses special or technical knowledge or skill upon the subject about which the expert testifies. That is, upon a subject with which ordinary people are not familiar. An expert differs from the ordinary witness in that the expert is permitted to express opinions as to the results of proven facts, although the expert may also testify as to facts themselves, as any other witness.

Expert opinions are not to be accepted as facts. Those opinions should be carefully weighed by the jury with regard to the expert's education, training, experience and sources of knowledge, as well as with regard to that expert's prejudices, if any appear.

Expert witnesses are frequently paid special compensation by the party on whose behalf they testify. Such compensation is entirely proper. Yet, because of it, the jury should receive the expert's testimony with caution and weigh it carefully.

Certain testimony has been read into evidence from a deposition. A deposition is testimony taken under oath before trial and preserved in writing. You are to consider that testimony as if it had been given in court.

As I did at the start of the case, I will first give you a summary of each side's contentions in this case. I will then provide you with detailed instructions on what each side must prove to win on each of its contentions. As I previously

told you, iLight seeks money damages from Fallon for allegedly
infringing the patents in this lawsuit by making, importing,
using, selling, and offering for sale products that iLight
argues are covered by Claims 8 and 25 of the '238 Patent,
Claims 1 and 8 of the '262 Patent, and Claims 1, 5 and 8 of
the '970 Patent.  These are the asserted claims of the patents
in this lawsuit.  The products that are alleged to infringe
are Fallon's LED signs.

13:12:07    Fallon denies that it has infringed the asserted
claims of the patents and argues that, in addition, Claims 8
and 25 of the '238 Patent, Claims 1 and 8 of the '262 Patent,
and Claims 1, 5 and 8 of the '970 Patent are invalid.

13:12:25    Your job is to decide whether Fallon has infringed the
asserted claims of the patents-in-suit and whether any of
these asserted claims in the patents-in-suit are invalid.  If
you decide any claim of the patent has been infringed and is
not invalid, you will then need to decide any money damages to
be awarded to iLight to compensate it for the infringement.
You will also need to make a finding as to whether the
infringement was willful.  If you decide any infringement was
willful, that decision should not affect any damage awards you
make.  I will take willfulness into account later.

13:12:53    This case involves a dispute relating to three United
States patents owned by the plaintiff iLight.  A summary of
the earlier descriptions of patents and the patent process may

be helpful.  Patents are granted by the Patent Office.  A
valid United States patent gives iLight the right for up to 20
years from the date the patent application was filed to
prevent others from making, using, offering to sell, or
selling the patented invention within the United States, or
from importing it into the United States without iLight's
permission.  A violation is of iLight's rights is called
patent infringement.  ILight may enforce its patents against
persons believed to be infringers by filing a lawsuit in
federal court.

13:13:32     The process of obtaining a patent is called patent
prosecution.  To obtain a patent requires an application filed
with the Patent Office.  The Patent Office is an agency of the
federal government and employs trained examiners who review
applications for patents.  The application includes what is
called a specification that must contain a written description
of the claimed invention describing the invention, how it
works, how to make it, how to use it, so others skilled in the
field will know how to make it or use it.  The specification
concludes with one or more numbered sentences.  These are the
patent claims.  When the patent is eventually granted by the
Patent Office, the claims define the boundaries of the
patent's protection and give notice to the public of those
boundaries.

13:14:16     After the applicant files the application, the Patent

Office patent examiner reviews the application to determine whether the claims are patentable, that is, appropriate for patent protection, and whether the specification adequately describes the invention claimed.

In examining a patent application, the patent examiner reviews records available tot he Patent Office or submitted by the applicant for what is referred to as prior art. The examiner reviews this prior art to determine whether the invention is truly an advance over the state of the art at the time. That is, whether each claim defines an invention that is new and not obvious in view of the prior art.

Prior art is defined by law that will be described later in detail, but in general, prior art includes any subject matter that existed before the claimed invention. A patent lists the prior art that the examiner considered, and that list is called the cited references.

After the prior art search and examination of the application, the patent examiner informs the applicant in writing of what the examiner has filed and whether the examiner considers any claim to be patentable, and, thus, would be, quote, allowed. This writing from the patent officer is called an office action. If the examiner rejects the claims, the applicant has an opportunity to respond to the examiner and to change the claims or to submit new claims. This process may go back and forth for some time until the

examiner is satisfied whether the application meets the
requirements for a patent.  The papers generated during these
communications between the patent examiner and the applicant
are called the prosecution history.

13:15:49  The fact that the Patent Office grants a patent does
not necessarily mean that any invention claimed in the patent,
in fact, deserves the protection of a patent.  For example,
the Patent Office may not have had available to it all the
other prior art that will be presented to you.  A person
accused of infringement has the right to argue in federal
court that a claimed invention in the patent is invalid
because it does not meet the requirements for a patent.  The
jury must consider the evidence presented by the parties and
determine independently whether Fallon has proved that
iLight's patents are invalid.

13:16:24  The cover page of each of iLight's patents identifies
the date the patent was granted and the patent number along
the top, as well as the inventor's name, the filing date, and
a list of references considered in the Patent Office.  The
plaintiff's patents at issue in this case are U.S. Patent
Number 6,592,238, the '238 Patent, issued July 15, 2003; the
U.S. Patent Number 6,952,262, or the '262 Patent, issued
October 11, 2005; and U.S. Patent 7,188,970, the '970 Patent,
issued march 13, 2007.  The usual practice at trial is to
refer to the patents by the last three numbers of the patent.

Now, the specification of the patent begins with an abstract, also found on the cover page. The abstract is a brief statement about the subject matter of the patent. Next come the drawings that illustrate various aspects or features of the invention. The written description of the invention appears next and is organized into two numbered columns on each page. The written description includes a background of the invention, the summary of the present invention, the description of the drawings, and a detailed description of the invention. The specification ends with numbered paragraphs. These are the patent claims.

I have already determined the meaning of iLight's claims in its three patents that are at issue in this lawsuit. For those words in the claim for which I have not provided you with a definition, you should apply their plain English meaning. You are to apply my definitions of these terms throughout the case. However, my interpretation of the language of the claims should not be taken as any indication that I have one view on the issues of infringement and invalidity. You, the jury, must decide the issues of infringement and invalidity as defined in these instructions.

Ladies and gentlemen of the jury, as stated to you earlier, the questions or issues in this case are two-fold. The first issue is a legal issue for the Court to determine, namely, the meaning of the claims of the plaintiff's patents

that are entitled to legal protection under the patent laws.
The second set of questions is for the jury's determination of
whether the defendant's product infringes upon the asserted
claims of the plaintiff's patent.

As to the legal issues, the Court has construed and
interpreted the plaintiff's patent's claims.

The patent claims are the numbered sentences at the
end of each patent.  These claims are important, because the
claims define what a patent covers.  The figures and text in
the rest of the patent provide a description and/or examples
of the invention, and provide a context for the claims.  But
the claims define how broad or narrow the patent's coverage
is.

Each claim is effectively treated as if it were a
separate patent, and each claim may cover more or less than
another claim.  Therefore, what a patent covers depends, in
turn, on what each of its claims covers.

As a matter of law, each and every claim of a patent
is presumed valid, and this presumption of validity exists at
every stage of the litigation until such time, if ever, you
find the defendant has shown, by clear and convincing
evidence, that the patent is invalid.

A claim sets forth, in words, a set of requirements.
Each claim sets forth its requirements in a single sentence.
If a device or method satisfies each of the requirements, then

it is covered by the claim.  There can be several claims in a
patent.  Each claim may be narrower or broader than another
claim by setting forth more or less requirements.  The
coverage of a patent is assessed claim by claim.  To decide
whether any infringement of the claim or to decide whether the
claim is invalid, you must apply the definitions in these
instructions.  You must accept my definitions of these words
in the claims as correct.  You must take these definitions and
apply them to decide the issues of infringe and invalidity.

In patent law, the requirements of a claim are often
referred to as, quote, claim elements, or, quote, claim
limitations.  When a product meets all the requirements of the
claim, the claim is said to cover that product, and that
product is construed to fall within the scope of that claim.
In other words, a claim covers a product where each of the
claim's elements or limitations is present in that product.

For example, a claim that reads:  "A product
comprising of a seat and legs" covers all products that have
both a seat and legs.  The word "comprising" in this claim is
a special word in patent law, meaning that the claim covers
all products that have a seat and legs, regardless of whether
or not they also have additional features.

For example, this claim would cover several different
kind of chairs, stools and sofas, because there are several
kinds of different chairs, stools and sofas that have at least

a seat and legs.  By understanding the meaning of the words in

the claims, and by understanding that the words in a claim set

forth the requirements that must be met to be covered by that

claim, you will be able to determine the scope of each claim.

Once you determine the scope of each claim, then you decide if

the defendant's product infringe plaintiff's patents and

whether plaintiff's patents are invalid.

This case involves two types of patent claims:

Independent claims and dependent claims.  And independent

claim sets forth all the requirements that must be met to be

covered by that claim.  For an independent claim, you not need

to look at any other claim to determine what an independent

claim covers.

In this case, the Court instruct you that Claims 8 and

25 of iLight's '238 Patent, Claim 1 of iLight's '262 Patent,

and Claims 1, 5 and 8 of iLight's '970 Patent, of the patents

in this lawsuit are each independent claims.

The Court instructs you that Claim 8 of iLight's '260

patent is a dependent claim.  A dependent claim does not

recite all of the requirements of the claim, but refers to

another claim for some of its requirement.  In this way, the

claim depends upon on another claim.  The law considers a

dependent claim to incorporate all the requirements of the

claim to which it refers.  The dependent claim then adds its

own additional requirements.

To determine what a dependent claim covers, you must examine both the dependent claim and any other claim to which it refers.  A product that meets all the requirements of both the dependent claim and the claim to which refers is covered by that dependent claim.

The Court has construed or interpreted the plaintiff's patents to include the following claims that are protected by patent.  The relevant claims for your consideration in this case are as follows:

The '238 Patent.

Claim 8.  An illumination device for simulating neon light comprising:

A substantially rod-like member having a predetermined length with a lateral light receiving surface and lateral curved light emitting surface having a predetermined circumferential width, said member being comprised of a material that has both optical waveguide and light scattering properties that preferentially scatters light entering said light receiving surface into an elongated light intensity pattern on said light emitting surface with a major axis extending along said predetermined length;

An elongated light source extending along and positioned adjacent said light receiving surface and spaced from said light emitting surface a sufficient distance to allow said light intensity pattern on said emitting surface to

have a minor axis extending substantially the entire

circumstantial width of said light emitting surface;

13:24:03  A housing in which said light source is positioned;

said housing extending along said light receiving surface, and

having a pair of sidewalls, each with an interior light

reflecting surface and an exterior light absorbing surface;

and

13:24:14  Electric connecting member positioned within said

housing and adapted to connect said light source to a remote

power source.

13:24:25  Claim 25.  An illumination device for simulating neon

lighting, comprising:

13:24:33  A light transmitting member of a predetermined length

having a substantially curved front surface and a light

receiving lateral surface, said member being comprised of a

material that has both optical waveguide and light scattering

properties that preferentially scatters light entering said

light receiving surface into an elongated light intensity

pattern on said light emitting surface with a major axis

extending along said predetermined length;

13:24:55  A housing having spaced sidewalls abutting said light

receiving later surface and defining a volume extending along

predetermined length of said light transmitting member, said

sidewalls having light reflecting interior surfaces and light

absorbing exterior surfaces; and

13:25:11 1    A multiplicity of spaced point light sources housed

2    within said volume and extending along said predetermined

3    length, said spaced point light sources positioned a distance

4    from said curved front surface sufficient to allow a light

5    intensity pattern from each of said point light sources to

6    overlap neighboring light intensity patterns so that the light

7    intensity pattern collectively emitted from said front surface

8    appears uniform.

13:25:42 9    The '262 Patent.

13:25:46 10    Claim 1.  An illumination device for simulating neon

11    lighting, comprising:

13:25:53 12    An essentially solid leaky waveguide rod having a

13    predetermined length with a lateral light receiving surface

14    and a lateral light emitting surface;

13:26:04 15    An elongated light source extending substantially

16    along said predetermined length of and positioned adjacent to

17    said light receiving surface for emitting a portion of light

18    emitted by said light source directly into said light source

19    receiving surface; and

13:26:24 20    A housing positioned externally and adjacent to said

21    waveguide rod and defining a volume that encompasses said

22    elongated light source, whereby said housing includes

23    sidewalls, having internally light reflecting surfaces and

24    serves to collect and direct light emitted by such light

25    source into said lateral light receiving surface such that

light is preferentially directed along the predetermined

13:26:43  length of the leaky waveguide rod, exiting said light emitting

surface in an elongated light intensity pattern that has a

major axis extending along the length of said waveguide rod.

13:26:57  Claim 8.  The illumination device of Claim 1 in which

said sidewalls have externally light absorbing surfaces.

13:27:03  The '970 Patent.

13:27:05  Claim 1.  An illumination device comprising:

13:27:12  A rod-like member having a predetermined length and a

curved light emitting surface;

13:27:15  An elongated light source extending substantially

along the predetermined length of said rod-like member at a

fixed distance from said light emitting surface; and

13:27:26  A housing for said elongated light source, said

housing including opposing and substantially parallel

sidewalls with internally light reflecting surfaces such that

said housing serves to collect and direct light emitted by

said light source into said rod-like member, with such light

then passing through and being scattered by said rod-like

member so as to exit the curved light emitting surface in a

substantially uniform light intensity pattern.

13:27:56  Claim 5.  An illumination device comprising:

13:28:00  An essentially solid leaky waveguide rod having a

predetermined length and a curved light emitting surface;

13:28:08  An elongated light source extending substantially

1 along the predetermined length of said waveguide rod at a

2 fixed distance from said light emitting surface; and

3 Opposing and substantially parallel sidewalls

4 positioned on either side of the light source, each having

5 internally light reflecting surfaces that serve to collect and

6 direct light emitted by said light source into said waveguide

7 rod, with such light then passing through and being scattered

8 by said waveguide rod so as to exit the curved light emitting

9 surface in a substantially uniform light intensity pattern.

10 Claim 8. An illumination device for simulating neon

11 lighting, comprising:

12 A rod-like member having a predetermined length and a

13 curved light emitting surface. An elongated light source

14 extending substantially along the predetermined length of said

15 rod-like member at a fixed distance from said light emitting

16 surface; and

17 A housing for said elongated light source, said

18 housing including opposing and substantially parallel

19 sidewalls with internally light reflective surfaces such that

20 said housing serves to collect and direct light emitted by

21 said light source into said rod-like member, with such light

22 then passing through and being scattered by said rod-like

23 member into a light intensity pattern that is perceived as

24 being substantially uniform over the curved light emitting

25 surface, irrespective of viewing angle, so as to simulate neon

lighting.

Now, you must accept my definition of these words in these claims as correct. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide those issues that you are being asked to decide such as infringement and invalidity. Those issues are for you to decide.

Now, the plaintiff's claimed invention is a, quote, illuminating device for simulating neon lighting that is a lighting device with low voltage lighting sources that uses electricity to produce lighting with high intensity nearly evenly or uniformly distributed and in appearance is close to a neon gas light. This device can be made into different shapes without breaking and is used mostly for commercial signage and advertising. This device does not use neon gas, but includes a rod and rod-like substance through which light passes, producing an even glow throughout its entire length and the radial circumference, regardless of the viewing angle. This device uses a material with waveguide characteristics. A waveguide is material that transmits and channels light waves through the device.

The term "rod" means a slender strip or slender bar resembling in shape a wand.

The term "rod-like" means a slender bar like a rod.

The term "preferentially scatters light" means light

produced that has a higher desirability or offers an advantage

of light spread over a wide area throughout the interior and

exterior areas of the rod or rod-like device.

13:30:59     The term "interior light reflecting surfaces" means

the material of the interior walls of the housing of the

device that transmits the light waves in a favorable manner so

as to send the light waves to the exterior.

13:31:15     The term "exterior light absorbing surfaces" means the

material on the outside of the housing of the device that

absorbs the light in favorable manner so as to maximize the

appearance of light on the exterior.

13:31:29     The term "substantially parallel" means that the

interior walls of the housing of the device extend in the same

direction and close approximation everywhere so as to be

equidistant, thereby forming lines in the same direction but

not meeting.  The materials come close to or resemble parallel

lines, with each sharing essential qualities or

characteristics.

13:31:47     I will now instruct you on how to decide whether

Fallon has infringed iLight's patents.  Infringement is

assessed on a claim-by-claim basis.  Therefore, there may be

an infringement as to one claim but not infringement as to

another.

13:32:01     Here, iLight alleges that Fallon directly infringes

the patents.  ILight also alleges that Fallon is liable for

infringement through importation and sale of an infringing

product.

Plaintiff asserts claims for direct or literal

infringement.

A company directly or literally infringes a claim if,

during the time the patent is in force, the company makes,

uses, sells or offers to sell within, or imports into the

United States a product that meets all of the requirements of

the claim and does so without the permission of iLight.

To determine whether a particular product meets all of

the requirements of a claim, you must apply the meaning of the

words in the disputed claims as I explained them to you.

Other words in the claims should be given their plain English

meaning.

You must compare the product with each and every one

of the requirements of the claim to determine whether all the

requirements of the claim are met.

When the product meets all of the requirements of the

claim, the product is said to literally infringe that claim.

If a product that literally infringes a claim is made, used,

sold, offered for sale within, or imported into the United

States during the time the patent is in force, without

iLight's authorization, then Fallon directly infringed that

claim.

To prove direct infringement by literal infringement,

iLight must prove that the above requirements are met by a preponderance of the evidence. That is, that it is more likely than not that Fallon made, used, sold, offered for sale within, or imported into the United States, without iLight's permission, during the time the patent is in force, a product that meets all of the requirements of a claim. The whole product need not infringe. Thus, if only a part of a product meets all of the requirements of a claim, the product is an infringing product.

You must determine, separately, for each of the asserted claims, whether Fallon's product infringed iLight's patent rights. However, as I have explained to you, a dependent claim includes all of the requirements of any of the claims to which it refers, plus additional requirements of its own. Therefore, if you should find that an independent claim is not infringed directly or literally, then you must also find that any claim that depends upon the independent claim also does not infringe.

On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the additional requirements of any claims that depend upon the independent claim have also been infringed.

In this case, iLight argues both that Fallon infringed and, further, that Fallon infringed willfully. Even if you decide that Fallon has infringed, you must then address the

additional issue of whether Fallon's infringement was willful.

willfulness requires proof by clear and convincing evidence:

1.  That Fallon was aware of the patent in question;

2.  That Fallon acted despite an objectively high likelihood that Fallon knew its acts infringed on iLight's valid patent; and

3.  This objectively high risk was either known or so obvious that it should have been known.

To prove willful infringement, iLight must establish that Fallon willfully infringed any of its patents, and iLight's proof of willfulness must leave you with a clear conviction that the infringement was willful.

In deciding whether Fallon committed willful infringement, you must consider all of the facts, which include but are not limited to:

1.  Whether Fallon intentionally copied a product of iLight that is covered by the patent in question;

2.  Whether Fallon possessed a reasonable basis to believe that it had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

3.  Whether Fallon made a good faith effort to avoid infringing the patent; for example, Fallon took remedial action upon learning of the patent by ceasing infringing activity or attempting to design and around the patent; and

13:35:57

4.      Whether Fallon tried cover up its alleged infringement.

You must decide whether Fallon has proven that the claims of the particular iLight patent in question are invalid.  To prove that any claim of a patent is invalid, Fallon must persuade you by clear and convincing evidence.  That is, in order to find a claim invalid, you must be left with a clear conviction that the claim is invalid.  As a matter of law, each and every claim of a patent is presumed valid, and this presumption of validity exists at every stage of the litigation, until such time, if ever, you find that the defendant has shown by clear and convincing evidence that the patent is invalid.

Fallon's invalidity defense is based upon the doctrines of anticipation, obviousness and indefiniteness.

Fallon may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention is not new.  For the claim to be invalid because it is not new, Fallon must show that all of the requirements of that claim are present in a single previous device or method, or described in a single previous printed publication or patent.  We call these things "prior art".  The description in a reference does not have to be in the same words as the claim, but all of the requirements of the claim must be there, either stated expressly or necessarily implied or inherent in

the level or ordinary skill in the art in the technology of
the invention at the time of the invention so that someone of
ordinary skill in the field of technology of the patent
looking at that one reference would be able to make and use
the claimed invention.

Here is a list of ways that Fallon can show the patent
was not new:

If the claimed invention was known or used by others
in the United States before the invention was made by the
inventor, in this case January 31, 2001;

If the claimed invention was patented or described in
a printed publication anywhere in the world before the
invention was made by the inventor, in this case January 31,
2001;

If the claimed invention was patented and described in
a printed publication anywhere the world more than a year
before January 31, 2001;

If the claimed invention was in public use or on sale
in the United States before January 31, 2001;

If the claimed invention was patented or a patent
application was filed in a foreign country more than one year
before January 31, 2001;

If the claimed invention was described in a published
patent application filed by another in the United States or
was filed with the World Intellectual Property Organization

after November 29, 2000, designated by the United States, and was published in English before the invention was made by the inventor, in this case January 31, 2001;

If the claimed invention was described in a patent granted on an application for a patent by another filed in the United States, or was filed with the World Intellectual Property Organization after November 29, 2000, designated in the United States, and was published in English before the invention was made by the inventor, in this case January 31, 2001;

If the claimed invention was made by someone else in the United States before the invention was made by the inventor, in this case January 31, 2001, and the other person had not abandoned the invention, kept it secret, or took steps to prevent information about the invention from being revealed to others.

To establish that the claimed invention is invalid for any of the above reasons, Fallon must establish by clear and convincing evidence that the invention is not new. That is, based upon the evidence presented in this case, you must be left with a clear conviction that the claim is not new.

In determining whether a single item of prior art anticipates a patent claim, you should take into consideration not only what is expressly disclosed in a particular item of prior art, but also what inherently resulted from its

practice.  This is called inherency.  A party claiming

inherency must prove it by clear and convincing evidence.

Inherency requires a determination of the meaning of

the prior art.  To establish inherency, the evidence must make

clear that the missing descriptive matter is necessarily

present in the thing described in the prior art reference.

By necessarily present I mean the presence of the missing

descriptive matter is logically required based on

circumstances that would be understood by one of ordinary

skill in the art.  It is not required, however, that the

person of ordinary skill would have recognized the inherent

disclosure in the prior art either at the time the prior art

was created or before the date on which the invention was

available for sale, described in a publication, or in public

or commercial use.

The fact that a characteristic is a necessary feature

or a result of a prior invention is enough to establish

inherency, even if that fact were unknown at the time of the

prior invention.

Obviousness.  Even though an invention may not have

been identically disclosed or described before it was made by

an inventor, to be patentable, the invention must not have

been obvious to a person of ordinary skill in the field of

technology of the patent at the time the invention was made.

Fallon may establish that a patent claim is invalid by

showing by clear and convincing evidence that the claimed

invention would have been obvious to persons of ordinary skill

in the art at the time the invention was made.  For the claim

to be invalid because it would have been obvious, you must

first evaluate the following factors:

13:41:17 1.      What is the scope and content of the prior art;

13:41:19 2.      What are the differences, if any, between the

inventions and the prior art;

13:41:24 3.      What was the level of ordinary skill in the art

at the time the inventions were made; and

13:41:29 4.      What evidence is there, if any, of certain

additional considerations relating to obviousness or

nonobviousness of the inventions?

13:41:37 You must decide, in view of the evidence presented to

you on these factors, whether iLight's inventions, considered

as whole, would have been obvious to one having ordinary skill

in the art at the time the inventions were made.  You must

make this determination separately for each of the inventions

described in each of the claims.

13:41:52 Before doing so, however, you must keep in mind that

it is not permissible to use hindsight in assessing whether

the inventions are invalid for obviousness.  You cannot look

at the invention knowing what persons of ordinary skill in the

art know today.  Rather, you must place yourself in the shoes

of a person having ordinary skill in the field of technology

1    of the patent at the time the inventions were made.

13:42:17  2          In this case, Fallon contends that the inventions are

3    obvious in view of a combination of more than one prior art

4    reference.  In placing yourself in the shoes of a person

5    having ordinary skill in the field of technology relevant to

6    this case at the time the inventions were made, you may also

7    consider whether such a person would have been motivated to

8    combine these prior art references in order to arrive at the

9    claimed inventions.

13:42:43 10          The first question you must answer in determining

11   whether the invention was obvious is the scope and content of

12   the prior art at the time the invention was made.  You must

13   decide whether specific references relied upon in this case

14   are prior art to the inventions described in Claims 8 and 25

15   of the '238 Patent, Claims 1 and 8 of the '262 Patent, and

16   Claims 1, 5 and 8 of the '970 Patent.

13:43:06 17          Prior art include previous devices, articles and

18   methods that were offered for sale, printed publications or

19   patents that disclose the inventions or elements of the

20   inventions.  Once you decide whether specific references are

21   prior art, you must also decide what those references would

22   have disclosed or taught to one having ordinary skill in the

23   field of technology of the patent at the time the inventions

24   were made.

13:43:29 25          For a reference to be considered prior art, you must

find the reference was known, used, published or patented as appropriate to the particular reference, before the invention was made by the inventor, in this case before January 31, 2001. Alternately, even if a reference was not known before the date of the invention, the reference is nonetheless prior art if the reference was known, used, published or patented more than one year before the filing of the application for the patents-in-suit.

For a reference to be relevant for you to consider in deciding whether iLight's claimed inventions would have been obvious, the reference must be within the field of the inventor's endeavor, or if it is from another field of endeavor, the reference must reasonably relate to particular problems or issues that the inventors faced or addressed when making the inventions described in Claims 8 and 25 of the '238 Patent, Claims 1 and 8 of the '260 Patent, and Claims 1, 5 and 8 of the '970 Patent.

A reference from a field of endeavor other than the inventor's is reasonably related to the problems or issues the inventors faced if the reference is one which, because of the matter with which the reference deals, logically would have committed itself to the attention of the inventors when considering the problems or issues they faced in this case.

You must decide what the problems or issues were that the inventors faced at the time the inventions in Claims 8 and

1   25 of the '238 Patent, Claims 1 and 8 of the '262 Patent, and

2   Claims 1, 5 and 8 of the '970 Patent were made.

13:45:01  3       The second question you must answer in determining

4   whether the inventions were obvious at the time they were made

5   is what differences there are, if any, between the prior art

6   and patented inventions.  In analyzing this issue, do not

7   focus solely on the differences between the prior art and

8   inventions because the test is not whether there are

9   differences.  Rather, the test is whether each invention as a

10  whole would have been obvious to one having ordinary skill in

11  view of all the prior art at the time each invention was made.

12       The third question you must answer in determining

13  whether the inventions were obvious at the time they were made

14  is what was the level of ordinary skill in the field at the

15  time.  ILight contends that the level of ordinary skill in the

16  field was an individual with a least a bachelor of science

17  degree in physics or electrical or mechanical engineering who

18  also has a background in physics as generally taught to

19  undergraduate engineering students, and at least four years of

20  experience in illumination design or engineering; or an

21  individual with at least a master's degree in optical

22  engineering, physics or lighting, and two years of experience

23  in illumination design and/or engineering field at the time

24  the inventions were made.

13:46:13  25      Fallon contends that the level of ordinary skill in

1   the field was individuals with a bachelor of science or

 2   master's degree in general science or engineering with a

 3   strong background in physics and at least five years of

 4   experience in illumination design and/or engineering field; or

 5   an individual with a master's or doctorate degree in optical

 6   engineering, and two years of experience in illumination

 7   design and/or engineering field at the time the inventions

 8   were made.

13:46:36  9        It is for you to decide what the level of ordinary

 10   skill was at the time the inventions were made based upon the

 11   evidence presented to you in the case.  In so doing, you may

 12   consider any evidence relating to this issue that is

 13   introduced at trial, including in particular any evidence

 14   introduced of:

13:46:52 15        1.     The educational levels and experience of the

 16   investors at the time the inventions were made;

13:46:59 17        2.     The education levels and experience of other

 18   persons working in the field of the inventions at the time the

 19   inventions were made, and particularly of any persons you may

13:47:11 20   Find to have independently made the inventions about the same

 21   time as the inventors;

13:47:15 22        3.     The types of problems encountered in the field

 23   at the time the inventions were made;

13:47:15 24        4.     The sophistication of the technology in the

 25   field at the time the inventions were made;

5.     The teachings and disclosures of prior art references such as patents and publications; and

6.     The teachings and disclosures of any of references that, while not prior art to the inventions, nonetheless contain teachings or disclosures of what the level of ordinary skill in the field may have been at the time the inventions were made.

The fourth question you must answer in determining whether the inventions were obvious at the time they were made is what evidence there is, if any, of additional considerations relating to obviousness or nonobviousness of the inventions.  You may consider any evidence that was presented to you in this case regarding the presence or absence of the following factors in deciding whether each of iLight's inventions would have been obvious at the time they were made:

1.     Whether the inventions proceeded in a direction contrary to accepted wisdom in the field;

2.     Whether there was long felt but unresolved need in the art that was satisfied by the invention;

3.     Whether others had tried but failed to make the inventions;

4.     Whether others copied the inventions;

5.     Whether the inventions achieved any unexpected results;

6.      Whether the inventions were praised by others;

7.      Whether others have taken licenses to use the inventions;

8.      Whether experts or those skilled in art at the making of the inventions expressed surprise or disbelief regarding the inventions;

9.      Whether the products incorporating the inventions have achieved commercial success; and

10.     Whether others having ordinary skill in the field of invention independently made the claimed invention at or about the time the inventors made the inventions.

Evidence that you find establishes the existence of items 1 through 8 tends to show that the inventions were not obvious at the time they were made.  You may also consider the lack of evidence on these items to support a conclusion that the inventions would have been obvious to persons of ordinary skill in the art at the time it was made.

Evidence of item 9, commercial success, also tends to show the inventions were not obvious at the time they were made, provided the success is directly attributable to the unique characteristics of the inventions or to the inclusion of the inventions in commercially successful products.

If you do find that the Commercial success of the products is attributable to other factors such as advertising or commercial incentives, for example, commercial success

would not be attributable to the unique characteristics of the inventions, and any commercial success of the products incorporating the inventions has no bearing on whether the inventions were obvious.

Evidence establishing item 10, independent making of the inventions by others at about the same time as the inventors, may tend to show that the patented inventions were obvious at the time, provided the independent invention by others was done without knowledge of the patented inventions, or the efforts that went into the making of the patented inventions. The weight and relevancy of any independent making of the inventions at about the same time as the inventors that you may find depends on all of the circumstances at the time, including:

1. The similarities between the inventor's conception of the patent solution and the independent inventor's conception of the independently developed solution;

2. The time between the identification of the need for a solution to a problem by the inventors of the patented invention and the conception of the patented solution;

3. The time between the identification of a need for a solution to a problem by the independent inventors and the conception of the independently developed solution; and

4. The sequence of or time between the inventor's conception of the patented solution and the independent

inventor's conception of the independently developed solution.

In this case, Fallon contends that the inventions would have been obvious over a combination of prior art references. In determining whether or not the inventions would have been obvious to one of ordinary skill in the art at the time the inventions were made, you must consider whether or not the combination is more than the predictable use of prior art elements according to their established functions.

If a technique has been used to improve one device and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique would have been obvious unless the actual application is beyond that person's skill.

In answering this question, it will often be necessary to consider any apparent reason to combine the known elements in the manner the patent claims; teaching of multiple references; the effects of demands that were known to the community or that were present in the marketplace; and the background knowledge possessed by persons of ordinary skill in the art.

To find by clear and convincing evidence that the inventions would have been obvious, it is important for you to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the inventions do. Advances that would have occurred anyway in

the ordinary course of development of the art may have been

obvious, but you need not limit your consideration to the same

problem or same prior art elements or the same solution

adopted by the inventors.

13:52:23   You should consider the level of common sense and

creativity of the persons of ordinary skill in the art that

familiar items may have been obvious uses beyond their primary

purposes, and that a person of ordinary skill in art may be

able to fit the teachings of multiple patents and/or

references together like pieces of a puzzle.

13:52:43   In certain circumstances, the fact that a combination

was obvious to try might show that it was obvious under

Section 103.  For example, when there is a design need or

market pressure to solve a problem and there are a finite

number of identified predictable solutions, a person of

ordinary skill has good reason to pursue the known options

within his or her technical grasp.  If this leads to an

anticipated success, it is likely but not necessarily that the

product is not of innovation but of ordinary skill and common

sense.

13:53:23   The reason to select and combine features, the

predictability of the results of doing so, and a reasonable

expectation of success may be found in the teachings of prior

art references themselves, in the nature of any need or

problem in the field that was addressed by the patent, in the

knowledge of persons having ordinary skill in the field at the
time, as well as in common sense or the level of creativity
exhibited by persons of ordinary skill in the art. There need
not be an explicit suggestion to combine references.

13:53:53 As a matter of law, each and every claim in a patent
is presumed valid, and this presumption of validity exists at
every stage of the litigation until such time, if ever, you
find that the defendant has shown by a clear and convincing
evidence that the patent is invalid. Yet the claims of a
patent must be sufficiently definite that one skilled in the
art could determine the precise limits of the claimed
invention.

13:54:18 If a claim is found to be indefinite, the claim is
invalid. The amount of detail required to be included in the
claims depends upon the particular invention and the prior
art. It is not to be evaluated in the abstract but in
conjunction with the patent's disclosure.

13:54:34 Fallon contends that the claims of the patents-in-suit
are invalid for indefiniteness. You must decide if the claims
of these patents, read in light of the disclosure, reasonably
apprised those skilled in art of the proper scope of the
invention, and if the language is as precise as the subject
matter permits. If they did not, the claim are indefinite.

13:54:54 Simply because some claims language may not be precise
does not automatically render a claim invalid. When a word or

phrase of degree such as light reflective or light absorbtive

is used, you must determine whether the patent disclosure

provides some standard for measuring that degree. You must

then consider whether one of ordinary skill in the art would

understand what is covered when the claim is read in light of

the disclosure. The primary purpose of this requirement is to

ensure that the claims are written in a way that the public is

given notice of the extent of the legal protection afforded by

the patent so that interested parties can determine whether or

not they infringe.

When I construed the claims at issue, I did not make

any decision as to whether the claims were definite. Although

the question of whether the patents are indefinite is one that

I will decide, I will ask for your findings so that I can

consider them in making my decision. You should make

determinations on this issue as you would for any other issue

in this case, because I will consider them seriously in making

my determination.

I will now instruct you about the measure of damages.

By instructing you on damages, I am not suggesting that iLight

should win this case, on any issue. If you find that Fallon

infringed any valid claim of the patents-in-suit, you must

then determine the amount of money damages to be awarded to

iLight to compensate it for the infringement. The amount of

those damages must be adequate to compensate iLight for the

infringement.  The damages you award are meant to compensate
iLight and not to punish an infringer.  Your damages award, if
any, should put iLight in approximately the same financial
position that it would have been in had infringement not
occurred, but in no event may the damages award be less than a
reasonable royalty.  I will give you more detailed
instructions on the calculation of a reasonable royalty
shortly.

ILight has the burden to establish the amount of its
damages.  You should award only those damages that iLight
establishes that it more likely than not suffered damages.
ILight is not entitled to damages that are remote or
speculative.  While iLight is not required to prove its
damages with mathematical precision, iLight must prove them
with reasonable certainty.

To the extent Fallon contends that the amount of
damages should be reduced or offset, Fallon must prove the
amount of such reduction or offset.  When the amount of
damages cannot be ascertained with precision, any doubts
regarding the amount must be resolved against Fallon as the
infringer.

In determining the amount of damages, you must
determine when the damages began.  Damages commence on the
date that Fallon has both infringed and been notified of the
patent.  ILight and Fallon agreed that that date was January

1    2005.

13:57:30    2         If you find that iLight has established infringement,

3    iLight is entitled to at least a reasonable royalty to

4    compensate it for that infringement.  A royalty is a payment

5    made to iLight in exchange for the right to make, use or sell

6    the claimed invention.  A reasonable royalty is the amount of

7    royalty payment that iLight and the infringer would have

8    agreed to in a hypothetical negotiation taking place at the

9    time when the infringing sales first began.

13:57:58    10        In considering this hypothetical negotiation, you

11    should focus on what the expectations of iLight and the

12    infringer would have been had they entered into an agreement

13    at that time, and had they acted reasonably in their

14    negotiations.  You must also assume that both parties believed

15    the patent was valid and infringed.

13:58:18    16        In addition, you must assume that iLight and the

17    infringer were willing to enter into an agreement.  Your role

18    is to determine what that agreement would have been.  The

19    measure of damages is what royalty would have resulted from

20    the hypothetical negotiation, and not simply what royalty

21    either party would have preferred.

13:58:31    22        In this trial, you have heard evidence of things that

23    happened after the infringing sales first began.  That

24    evidence can be considered by you only to the extent that that

25    evidence aids in your assessing what royalty would have

resulted from a hypothetical negotiation.  Although evidence
of the actual profits Fallon made may aid you in determining
the anticipated profits at the time of the hypothetical
negotiations, you may not limit or increase the royalty based
on the actual profits Fallon made.

In determining the reasonable royalty, you should
consider all of the facts known and available to the parties
at the time the infringement began.  Some of the kinds of
factors that you may consider in making your determinations
are:

1.  Whether iLight had an established royalty for the
invention; whether, in the absence of an established royalty,
there is evidence that tends to prove an established royalty;
whether in the absence of such licensing history there are any
royalty arrangements that were generally used or recognized in
the particular industry at the time;

2.  The nature of the commercial relationship between
iLight and the licensee, such as whether they were competitors
or whether their relationship was that of an inventor and a
promoter;

3.  The established profitability of the patented
product, its commercial success, and its popularity at the
time;

4.  Whether iLight had an established policy of
granting licenses or retaining the patented invention as its

exclusive right, or whether iLight had a policy of granting

licenses under special conditions designed to preserve its

monopoly;

5.  The size of the anticipated market for the

invention at the time the infringement began;

6.  The duration of the patent and of the license, as

well as the terms and scope of the license, such as whether it

is exclusive or nonexclusive or subject to territorial

restrictions;

7.  The rates paid by the licensee for the use of

other patents comparable to the plaintiff's patent;

8.  Whether the licensee's sale of the patented

invention promotes sales of its other products or whether the

invention generates sales to the inventor of his nonpatented

items;

9.  The utility and advantages of the patented

property over the old modes or devices, if any, that had been

used for working out similar results;

10.  The extent to which the infringer used the

invention and any evidence probative of the value of such

use;

11.  The portion of the profits in the particular

business that is customarily attributable to the use of the

invention and analogous inventions;

12.  The portion of the profits that should be credited

to the invention as distinguished from such nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

13. The opinion or testimony of qualified experts of iLight and Fallon; and

14. Any other factors which in your mind would have increased or decreased the royalty the infringer would have been willing to pay and iLight would have been willing to accept, acting as normally prudent business people.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors. The final factor establishes the framework which you should use in determining a reasonable royalty. That is, the payment that would have resulted from a negotiation between iLight and Fallon taking place at the time the infringing sales first began.

In determining the amount of damages, you must determine when the damages began. Damages commenced on the date that Fallon has both infringed and been notified of the patent. ILight and Fallon agree that the date was January 2005.

The only issues in this action that you must decide are as follows:

1. Whether iLight has established by a preponderance of the evidence that Fallon infringed any valid claim of

iLight's '238, '262 or '970 patents;

14:02:20     2.  Whether Fallon has established by clear and convincing evidence that the asserted claims of the '238, '262 and '970 patents are invalid as anticipated;

14:02:32     3.  Whether Fallon has established by clear and convincing evidence that the asserted claims of the '238, '262 and '970 patents are invalid as obvious;

14:02:43     4.  Whether Fallon has established by clear and convincing evidence that the asserted claims of the '238, '262 and '970 patents are invalid as indefinite;

14:02:54     5.  If you determine that Fallon infringed any valid claim of iLight's '238, '262 or '970 patents, the amount of damages; and

14:03:02     6.  If you determine that Fallon infringed any valid claim of iLight's '238, '262 or '970 patents, whether iLight has established by clear and convincing evidence that the infringement was willful.

14:03:22     Any verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  In other words, your verdict must be unanimous.

14:03:28     It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to your individual judgment.  Each of you must decide the case for yourself, but only after

impartial consideration of the evidence in the case with your

fellow jurors.

14:03:40          In the course of your deliberations, do not hesitate

to reexamine your own views and change your opinion if

convinced it is erroneous.  But do not surrender your honest

conviction as to the weight or effect of the evidence solely

because of the opinion of your fellow jurors or for the mere

purpose of returning a verdict.

14:03:56          Remember at all times, you are not partisans.  You are

judges -- judges of the facts.  Your sole interest is to seek

the truth from the evidence in the case.

14:04:06          Upon retiring to the jury room, you should first

select one of your number to act as your foreperson who will

preside over your deliberations and will speak for you here in

court.  A verdict form has been prepared for your convenience.

A copy of these instructions and all exhibits in the case will

also be provided to you.

14:04:20          When you have reached unanimous agreement as to your

verdict, you will have your foreperson fill it in, date and

sign it, and then return to the courtroom.

14:04:27          If, during your deliberations, you should desire to

communicate with the Court, please reduce your message or

question to writing, signed by the foreperson, and pass the

note to the Marshal, who will bring it to my attention.  I

will then respond as promptly as possible, either in writing

1    or having you return to the courtroom so I can address you

2    orally.  I caution you, however, with regard to any message or

3    question you might send, that you should never state or

4    specify the vote of the jury at the time.

14:04:57  5    You may now retire to the jury room.  Shortly you will

6    receive a copy of the instructions, which is this; a copy of

7    the verdict form, which is this; and all of the exhibits

8    admitted into the record.

14:05:10  9    The Marshal will escort you to the jury room, and you

10   can take all of that with you.

14:05:39  11   (Jury out at 2:05 p.m.)

14:05:41  12   THE COURT:  Any objections to the instructions as

13   read?

14:05:44  14   MR. VEZEAU:  Not from the plaintiff, Your Honor.

14:05:45  15   THE COURT:  From the defense?

14:05:47  16   MR. KITTREDGE:  No, Your Honor.

14:05:52  17   THE COURT:  All I ask is that, if you all are going to

18   leave the immediate area, leave your cell phone number where

19   we can reach somebody.  We're in recess.

17:27:21  20   (Recess.  Reconvened at 5:30 p.m.)

17:40:38  21   THE COURT:  Counsel, I have received two notes from

22   the jurors.  One note is:

17:40:46  23   Starving and want cigarette.

17:40:52  24   The other one is:  If we are not unanimous about any

25   claim, does that mean no?

1      I'm going to bring the jurors in, I'm going to tell

2   them what their options are.  The options are we can honor the

3   request of one of the jurors to come back tomorrow at 9:00.

4   If they want to stay, we can order them dinner and they can

5   continue to deliberate.  If they are not unanimous as to any

6   one claim, the case has been tried with seven days of proof

7   and extended closing arguments, there are a lot of exhibits,

8   complex instructions, and the Court doesn't feel they have

9   deliberate long enough to come to any final vote on this, and

10  would suggest to them if they are tired that they come back in

11  the morning.

12      Any objection, either side?

13      MR. VEZEAU:  Not from the plaintiff, Your Honor.

14      MR. KITTREDGE:  No objections from the defense.

15      THE COURT:  You can bring the jury in.  While they are

16  waiting, there are some matters that were given to me during

17  the course of the trial, and I will leave it to counsel if

18  they want to mark any of these for identification.

19      One is an objection to Carl Degen's revised narrative.

20  The other is a letter from Hathaway to Leah white that was

21  excluded.  The other ones are minutes from an iLight board

22  meeting that was submitted on a privilege issue.  There is a

23  transcript of a videotaped deposition of Carl -- Douglas Bagin

24  that was given to the Court I guess in connection with the

25  objections that were Exhibits 71, looks like Defendant's

Exhibit 71 that was submitted to the Court I think it was in
connection with one of the -- I'm not sure.

17:44:14    But then there is the deposition testimony of
Elizabeth Randgaard, and I think it was concerned the e-mails
is what Exhibit 71 was. So I will leave these up here. You
all can inspect them. I think the minutes were from the
plaintiff, as I recall. You all can look at those. If there
is any of this you want filed for the record or marked for
identification, we can do that. The record is closed, but --

17:45:11    (Jury in.)

17:45:14    THE COURT: You can be seated. Ladies and gentlemen
of the jury, I have shared your note with the attorneys and
the parties. And the Court's response is, in essence, as I
said earlier, you are kind of your own bosses. If you need a
cigarette, for the juror who wants a cigarette and needs to
eat, if you all want to stay later, we can order you dinner
and have it brought in. If you want to have a cigarette
break, the Marshal can escort you outside and let you get a
cigarette. While you are outside, you can't -- the rest of
the jurors can't deliberate until the juror comes back after a
smoke.

17:45:55    As to the other note about not unanimous, this case
has had seven days of proof, extended argument, extended jury
charge and a lot of exhibits. So the Court feels there is
really need for further deliberations. It's too early to take

a view of the matter that you have the right now.

I think you need to continue to deliberate with one another,
and as the Court's instructions say, reexamine your own views
and consider the views of the others.  But don't surrender
your honest conviction if you feel that way.

        I'm going to let you all go to the little small room,
and you all decide what you want to do, whether A, come back
in the morning at nine o'clock and start all over again; or
two, take a recess and let the juror who wants to smoke,
smoke; three, if the jury wants to stay late, we'll order
pizza and order anything else you all want and continue to
deliberate.  If you all will step into the ante room and have
your foreperson come back in and let us know what you want to
do.  Okay?

        (Jury out.)

        THE COURT:  You all can have a seat.  We'll be in
recess until the jury is back.

        (Recess.)

        THE COURT:  The juror's note says:

        We would like to leave for the evening and return at
9:00 a.m. Thursday.

        If you will bring the jurors in, that's what I will
do.  Do you all want them to reconvene?  Do you all want to
see them reconvene at 9:00 or just leave it to the jury?

        MR. VEZEAU:  No.

17:52:01  1           MR. KITTREDGE:  Just leave it to the jury, that's

        2      fine.

17:52:05  3           THE COURT:  Okay.

17:52:12  4           (Jury in.)

17:52:15  5           THE COURT:  All right, ladies and gentlemen of the

        6      jury.  I have shared your note with the Marshal.  You are free

        7      to go this evening.  The Court will give you the same

        8      instruction.  Please do not discuss this case with anyone

        9      else, your family or friends, until you have all returned to

        10     the jury room.  And I will ask the foreperson of the jury to

        11     make sure that you do not begin deliberations until all jurors

        12     are present.  Then once all jurors are present, you can start

        13     your deliberations to make sure you are hearing all your --

        14     each other's views about the matter.  You are free to go.  You

        15     can pass your pads to the Marshal.  He will take custody until

        16     you return in the morning.  You are free to go.

17:53:08 17           (Jury out.)

17:53:17 18           THE COURT:  I would suggest to the parties that -- you

        19     all are available by cell phone, but the closer it gets about

        20     11:30 about 11:45, I think it would be appropriate if you all

        21     start returning to the courtroom so if there is any report

        22     from the jury about that time, we won't have to wait 15 or 20

        23     minutes.

17:53:39 24           MR. VEZEAU:  Very good.

17:53:42 25           THE COURT:  We're in recess.

17:53:42  1                    REPORTER'S CERTIFICATE

17:53:42  2

17:53:42  3        I, Peggy G. Turner, Official Court Reporter for

17:53:42  4 the United States District Court for the Middle

17:53:42  5 District of Tennessee, with offices at Nashville, do

17:53:42  6 hereby certify:

17:53:42  7        That I reported on the Stenograph machine the

17:53:42  8 proceedings held in open court on April 29, 2009, in the

         9  matter of ILIGHT V. FALLON, Case No. 2:06-0025; that said

        10  proceedings in connection with the hearing were reduced to

        11  typewritten form by me; and that the foregoing transcript,

        12  Pages 1118 through 1270, is a true and accurate record of said

        13  proceedings.

17:53:42  14        This the 21st day of May, 2009.

17:53:42  15

17:53:42  16

17:53:42  17

17:53:42  18                   _____
                                   S/Peggy G. Turner, RPR
17:53:42  19                   Official Court Reporter

        20

17:53:42  21

17:53:42  22

17:53:42  23

17:53:42  24

17:53:42  25